**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:   THE HONORABLE CLAIRE R. KELLY, JUDGE**
**THE HONORABLE GARY S. KATZMANN, JUDGE**
**THE HONORABLE JANE A. RESTANI, SR. JUDGE**

| | |
|---|---|
| TRANSPACIFIC STEEL LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>THE UNITED STATES; DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; UNITED STATES CUSTOMS AND BORDER PROTECTION; KEVIN K. MCALEENAN, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION; UNITED STATES DEPARTMENT OF COMMERCE; AND WILBUR L. ROSS, JR., IN HIS OFFICIAL CAPACITY AS SECRETARY OF COMMERCE,<br><br>*Defendants*. | Court No. 19- 00009 |

## PLAINTIFF TRANSPACIFIC STEEL LLC {CONSENT} MOTION TO AMEND THE COMPLAINT

Pursuant to Rule 15(a)(2) of the Rules of the United States Court of International Trade,

Plaintiff Transpacific Steel LLC ( "Transpacific Steel" or "Plaintiff"), respectfully moves to

amend its complaint, originally filed on January 17, 2019, ECF No. 6 to recognize the

withdrawal of MedTrade Inc. ("MedTrade") and A.G. Royce Metal Marketing LLC (doing

business as Concrete Reinforcing Products) ("A.G. Royce") from this proceeding. A copy of the

proposed Amended Complaint is attached as **Exhibit 1**.

On March 29, 2019, counsel for Plaintiffs MedTrade Inc., Transpacific Steel LLC and

A.G. Royce Metal Marketing LLC (doing business as Concrete Reinforcing Products), filed a

Notice of Dismissal with respect to Plaintiffs MedTrade and A.G. Royce, ECF No. 15.  Plaintiff Transpacific Steel LLC intends to continue with its appeal.

According to Rule 15(a)(2) of the Rules of this Court, a party may amend its pleading with the consent of the opposing party or with leave of the Court. The opposing party to this action consents to Plaintiff's motion to amend the complaint. Specifically, on March 29, 2019, Tara K. Hogan, counsel for Defendant, consented to this amendment to Transpacific Steel's complaint.

For the reasons set forth above, Transpacific Steel respectfully requests that this Court grant Plaintiff's Consent Motion to Amend the Complaint and order that Transpacific Steel's Amended Complaint shall be deemed filed as of this date.

**/s/ Matthew Nolan**
Matthew Nolan
Nancy A. Noonan
Diana Dimitriuc Quaia
Aman Kakar
Andrew Jaxa-Debicki

ARENT FOX LLP
1717 K Street, NW
Washington, DC 20006-5344
202-857-6013
*Counsel to Transpacific Steel LLC*

Dated: April 1, 2019

AFDOCS/17573913.2

## UNITED STATES COURT OF INTERNATIONAL TRADE
**BEFORE:    THE HONORABLE CLAIRE R. KELLY, JUDGE
THE HONORABLE GARY S. KATZMANN, JUDGE
THE HONORABLE JANE A. RESTANI, SR. JUDGE**

| | |
|---|---|
| TRANSPACIFIC STEEL LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>THE UNITED STATES; DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; UNITED STATES CUSTOMS AND BORDER PROTECTION; KEVIN K. MCALEENAN, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION; UNITED STATES DEPARTMENT OF COMMERCE; AND WILBUR L. ROSS, JR., IN HIS OFFICIAL CAPACITY AS SECRETARY OF COMMERCE,<br><br>*Defendants.* | Court No. 19- 00009 |

## <u>ORDER</u>

Upon consideration of Plaintiff Transpacific Steel Ltd.'s Consent Motion to Amend its

Complaint, and all other pertinent papers, it is hereby:

**ORDERED** that Transpacific's Steel Ltd.'s Motion is granted; and it is further

**ORDERED** that Transpacific's Steel Ltd.'s Amended Complaint is deemed filed as of

this date.

**SO ORDERED.**

Dated: _____, 2019                    _____
        New York, New York                                          Judge

# EXHIBIT 1

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:   THE HONORABLE CLAIRE R. KELLY, JUDGE**
**THE HONORABLE GARY S. KATZMANN, JUDGE**
**THE HONORABLE JANE A. RESTANI, SR. JUDGE**

| | |
|---|---|
| TRANSPACIFIC STEEL LLC, | ) |
| *Plaintiff*, | ) |
| v. | ) |
| THE UNITED STATES; DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; UNITED STATES CUSTOMS AND BORDER PROTECTION; KEVIN K. MCALEENAN, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION; UNITED STATES DEPARTMENT OF COMMERCE; AND WILBUR L. ROSS, JR., IN HIS OFFICIAL CAPACITY AS SECRETARY OF COMMERCE, | ) ) ) ) ) ) ) ) ) ) )   Court No. 19- 00009 |
| *Defendants*. | ) ) ) |

## AMENDED COMPLAINT

Pursuant to Rule 3(a)(3) of the Rules of the United States Court of International Trade,

Plaintiff Transpacific Steel LLC ( "Plaintiff"), by and through its undersigned attorneys, brings

this action and alleges and states as follows:

## SUMMARY

1.      On March 8, 2018, President Donald J. Trump issued a proclamation titled

"Adjusting Imports of Steel Into the United States," Proclamation No. 9705, imposing 25% *ad*

*valorem* tariffs on U.S. imports of certain steel products pursuant to Section 232 of the Trade

Expansion Act of 1962, as amended (19 U.S.C. § 1862). *See* 83 Fed. Reg. 11625, 11625 (Mar.

15, 2018) ("*First Steel Proclamation*") (attached as **Exhibit 1**). Section 232 of the Trade

Expansion Act of 1962 ("Section 232") authorizes the President to impose restrictions on certain

imports following an investigation that concludes that the targeted products are being imported

into the United States "in such quantities or under such circumstances as to threaten to impair the

national security." 19 U.S.C. § 1862 (c)(1)(A).

2.      On August 10, 2018, the President issued a new Proclamation titled "Adjusting

Imports of Steel Into the United States," Proclamation 9772, imposing a 50% *ad valorem* duty on

steel articles imported from Turkey, effective as of August 13, 2018. *See Adjusting Imports of*

*Steel Into the United States,* Proclamation 9772 of August 10, 2018, 83 Fed. Reg. 40429 (Aug.

15, 2018) ("*Steel Proclamation on Turkey*" or "*Fifth Steel Proclamation*") (attached as **Exhibit**

**2**).  Unlike the March 8, 2018 proclamation, which addressed steel imports globally, the *Steel*

*Proclamation on Turkey* had the effect of doubling the tariffs on steel articles from Turkey alone,

while tariffs on all other steel imports from worldwide sources remained unchanged. Acting

pursuant to the *Steel Proclamation on Turkey*, U.S. Customs and Border Protection is requiring

Plaintiff to pay a 50% *ad valorem* duty on steel articles imported from Turkey.

3.      This appeal challenges the *Steel Proclamation on Turkey* and Defendants' actions

in adopting and enforcing the proclamation as unconstitutional and contrary to the statute, 19

U.S.C. § 1862.  The doubling of the tariffs on imports of steel articles from Turkey is inflicting

economic and competitive harm on Plaintiff who is an importer of steel products from Turkey

and is responsible for the payment of the Section 232 tariffs on its imports. First, the President's

action doubling the tariffs on steel imports from Turkey violates Section 232, which requires a

nexus to a national security purpose, and is therefore an action outside the statutory authority

delegated to the President by the United States Congress. Second, the statute, 19 U.S.C.

§ 1862(b) and (c), prescribes a process and certain timelines that must be followed before any actions to adjust imports may be taken. By doubling the tariffs on steel imports from Turkey overnight without following the procedures laid out in the statute, the *Steel Proclamation on Turkey* contravenes the statutory mandate while divesting Plaintiff of the benefits of the administrative process to which the statute entitles them. Third, the *Steel Proclamation on Turkey* is unconstitutional because it violates equal protection of the laws as guaranteed by the Fifth Amendment's due process clause. The proclamation creates an arbitrary distinction between importers of steel products from Turkey and importers of steel products from all other sources. Establishing a false distinction between importers of steel from Turkey and importers of steel from all other sources and selectively imposing additional tariffs on the basis of that distinction does not meet the standard of pursuing a legitimate government purpose employing rational means. Fourth, the *Steel Proclamation on Turkey* is unconstitutional because it violates the Fifth Amendment's due process clause.

4.       Because the *Steel Proclamation on Turkey* is unconstitutional and contrary to the laws of the United States, Plaintiff seeks a Judgment that the Proclamation doubling tariffs on steel imports from Turkey is unlawful, that Defendants be permanently enjoined from implementing or otherwise giving effect to such proclamation and that U.S. Customs and Border Protection be ordered to issue refunds to Plaintiff for any tariffs paid on its imports as a result of such proclamation.

## JURISDICTION

5.       This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1581(i)(2) and (4) and 28 U.S.C. § 2631.

6.       Section 1581 provides that

3

> the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs, duties, fees, or other taxes on the importation of merchandize for reasons other than the raising of revenue,

28 U.S.C. § 1581(i)(2), and "administration and enforcement with respect to the matters referred to in paragraphs (1)-(3) of this subsection and subsections (a)-(h) of this section." *Id.* § 1581(i)(4).

7.      The President's action of doubling the tariffs on steel imports from Turkey is subject to judicial review due to the statutory limitations imposed by Section 232, 19 U.S.C. § 1862, to determine whether there has been "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority."  *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1346 (Fed. Cir. 2018); *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985).

8.      Section 232 of the Trade Expansion Act of 1962 is a law, "providing for . . . tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue," as well as for "administration and enforcement with respect to" such tariffs, duties and fees. *Id.* §§ 1581(i)(2) and (4). Therefore, this matter involves administration and enforcement of matters referred to in, *inter alia*, 28 U.S.C. §§ 1581(i)(2) and (4). The *Steel Proclamation on Turkey* does not constitute a determination reviewable under this Court's jurisdiction established at 28 U.S.C. § 1581(a)-(h). Accordingly, the Court has subject matter jurisdiction of this action under 28 U.S.C. § 1581(i) and may order the relief requested pursuant to 28 U.S.C. § 2643.

9.      Plaintiff also challenges the constitutionality of the *Steel Proclamation on Turkey* doubling of the Section 232 tariffs on imports of steel products from Turkey alone. Plaintiff

4

further challenges the actions taken by Defendants in the administration and enforcement of the *Steel Proclamation on Turkey*. The actions taken by U.S. Customs and Border Protection in the administration and enforcement of the doubled Section 232 tariffs on steel imports from Turkey represent final agency action as such imports continue to be subject to the 50% *ad valorem* duty since August 13, 2018.

## PARTIES

10.     Plaintiff Transpacific Steel LLC ("Transpacific") is a Limited Liability Company organized under the laws of Delaware with its principal place of business in Austin, Texas. Transpacific is a U.S. importer of steel products from several countries, including Turkey. Transpacific purchased approximately 10,653 MT of steel products from Turkey in 2017 and approximately 17,000 MT of steel products in 2018 for delivery into Puerto Rico, prior to imposition of the Section 232 tariffs. Since the imposition of the 50% tariffs on steel imports from Turkey, Transpacific has not contracted to purchase steel from Turkey for entry through Puerto Rico or any other U.S. destination port because the doubled rate has placed steel imports from Turkey at a competitive disadvantage as compared to all other sources. The 11,430 MT of steel products from Turkey previously contracted for and purchased before March 23, 2018 that have been shipped to Puerto Rico will be entered subject to the 50% tariff rate. This steel was purchased for delivery to Puerto Rico in response to increased demand for steel products for rebuilding in the aftermath of Hurricanes Irma and Maria. A Declaration setting forth these facts in more detail is provided at **Exhibit 3**.

5

11.    The defendant United States of America is the federal government to which the Section 232 tariff increases are being paid and is the statutory defendant under sections 1581(i)(2) and (4).

12.    Defendant Donald J. Trump is the President of the United States. He issued the *Steel Proclamation on Turkey* that is the subject of this Complaint.

13.    Defendant United States Customs and Border Protection ("CBP") is the agency that administers and enforces the tariffs imposed under Section 232, including the 50% tariffs ordered pursuant to the *Steel Proclamation on Turkey*.

14.    Defendant Kevin K. McAleenan is the Commissioner of United States Customs and Border Protection. He is sued in his official capacity only.

15.    Defendant United States Department of Commerce ("Commerce") is the agency responsible for initiating and conducting an investigation under Section 232 and for providing findings and recommendations to the President of the United States.

16.    Defendant Wilbur L. Ross, Jr. is the Secretary of the United States Department of Commerce. He is sued in his official capacity only.

**STANDING**

17.    Plaintiff has standing to bring this action pursuant to 28 U.S.C. § 2631(i), which states that "[a]ny civil action of which the Court of International Trade has jurisdiction, other than an action specified in subsections (a)-(h), may be commenced in the court by any person adversely affected or aggrieved by agency action within the meaning of section 702 of title 5."

18.    Plaintiff's action arises under Section 232, 19 U.S.C. § 1862, as the President has acted beyond his statutory authority, the Constitution of the United States and Section 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.  Section 702 states that "[a] person

6

suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." In an action under Section 702 of the APA, "the reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [and] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . ." 5 U.S.C. §§ 706(2)(A), (C).

19.     Plaintiff has standing to challenge the Defendants' unlawful acts in adopting and implementing the *Steel Proclamation on Turkey* imposing a 50% tariff on steel products imported from Turkey but not from any other country. Plaintiff is an importer of steel products from Turkey whose imports are covered by the *Steel Proclamation on Turkey* and who is responsible for the payment of the 50% tariffs on its imports of steel products from Turkey. Therefore, Plaintiff is a "person" adversely affected or aggrieved by agency action – in this instance the imposition of additional tariffs on steel imports from Turkey alone – within the meaning of 5 U.S.C. § 702. Plaintiff is in the zone of interests to be protected or regulated by the statute or constitutional guarantees in question, and it is suffering injury caused by the unlawful imposition of tariffs through the *Steel Proclamation on Turkey*.

## TIMELINESS OF THIS ACTION

20.     An action under 28 U.S.C. §1581(i) must be commenced within two years after the cause of action first accrues. 28 U.S.C. § 2636(i).

21.     Plaintiff is commencing this action under 28 U.S.C. § 1581(i) by concurrently filing a summons and complaint within two years after the cause of action first accrued. The claims asserted by Plaintiff accrued at the earliest on August 13, 2018, the effective date of the

President's *Steel Proclamation on Turkey*. *See* 83 Fed. Reg. at 40431 (para 7), **Exhibit 2**. This action is therefore timely filed.

## STATEMENT OF FACTS

### I.    SECTION 232 OF THE TRADE EXPANSION ACT OF 1962

22.    President Trump cited his authority under Section 232 of the Trade Expansion Act of 1962, codified at 19 U.S.C. § 1862, in imposing the steel tariffs.

23.    Section 232, titled "Safeguarding National Security," authorizes the President, upon a "finding" that "an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," to take action "to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A)(ii).

24.    The process for initiating a Section 232 action begins with a request for such an investigation. The Secretary of the United States Department of Commerce ("Secretary of Commerce") "shall immediately initiate an appropriate investigation to determine the effects on the national security of imports of [an] article" after a request from "the head of any department or agency, upon application of an interested party" or on the Secretary's "own motion." *Id*. § 1862(b)(1)(A). Commerce's Bureau of Industry and Security ("BIS") conducts Section 232 investigations in accordance with the federal regulations codified at 15 C.F.R. part 705.

25.    Section 232 requires that the Secretary of Commerce conduct the investigation in consultation with the Secretary of the Department of Defense ("Secretary of Defense") and other U.S. officials, as appropriate, to determine the effects of the specified imports on the national security. Specifically, the Secretary of Commerce shall "immediately provide notice to the Secretary of Defense of any investigation," shall "consult with the Secretary of Defense

8

regarding the methodological and policy questions raised in any investigation," and if appropriate, shall "hold public hearings or otherwise afford interested parties an opportunity to present information and advice . . . ." 19 U.S.C. §§ 1862(b)(1)(B), (b)(2)(A).

26.     The "Secretary of Defense shall provide the Secretary [of Commerce] an assessment of the defense requirements of any article" under investigation. *Id*. § 1862(b)(2)(B).

27.     Within 270 days after initiating an investigation, the Secretary of Commerce "shall submit to the President" and publish in the *Federal Register* "a report on the findings of such investigation with respect to the effect of the importation of such article in such quantities or under such circumstances upon the national security and, based on such findings, the recommendations of the Secretary for action or inaction under th[e] section." *Id*. § 1862(b)(3)(A).

28.     The Secretary of Commerce's report triggers a duty of the President to act. Within ninety days, the President must "determine whether the President concurs with the finding of the Secretary . . . ." *Id*. § 1862(c)(1)(A). The President may implement the recommendations contained in the Secretary of Commerce's report, take other actions or refrain from taking action.

29.     If the President concurs with the Secretary of Commerce that action is necessary, the President must "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." *Id*. § 1862(c)(1)(A)(ii).

30.     After making a decision, the President has 15 days to implement the action. *Id*. § 1862(c)(1)(B). An "action" under Section 232 may involve either "quantitative methods i.e., quotas" or "monetary methods i.e., license fees" or tariffs. *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 561 (1976).

9

31.     Alternatively, the President may choose, as "the action taken by the President under [Section 232(c)(1)]," to "negotiat[e] . . . an agreement which limits or restricts the importation into, or the exportation to, the United States of the article that threatens to impair national security . . . ." 19 U.S.C. § 1862(c)(3)(A)(i). If the President chooses to pursue the negotiation of that kind of article-specific agreement, and either "no such agreement is entered into" within 180 days or an agreement is entered into but "is not being carried out or is ineffective," then the President "shall take such other actions as the President deems necessary to adjust the imports of such article so that such imports will not threaten to impair the national security." *Id*. § 1862(c)(3)(A).

32.     The President "shall submit to the Congress a written statement of the reasons" explaining his decision "[b]y no later than the date that is 30 days after the date on which the President makes any determinations." *Id*. § 1862(c)(2).

33.     Although Section 232 does not include a definition of "national security," it includes a non-exclusive list of factors that the Secretary of Commerce and the President "shall . . . give consideration to," including:

> domestic production needed for projected national defense requirements, the capacity of domestic industries to meet such requirements, existing and anticipated availabilities of the human resources, products, raw materials, and other supplies and services essential to the national defense, the requirements of growth of such industries and such supplies and services including the investment, exploration, and development necessary to assure such growth, and the importation of goods in terms of their quantities, availabilities, character, and use. . . .

*Id*. § 1862(d). Additionally, the Secretary of Commerce and the President

> shall further recognize the close relation of the economic welfare of the Nation to our national security, and shall take into consideration the impact of foreign competition on the economic welfare of individual domestic industries[,] . . . without excluding other factors, in determining whether such weakening of our internal economy may impair the national security.

10

*Id.*

## II.   **COMMERCE'S INVESTIGATION UNDER SECTION 232**

34.     On April 19, 2017, Secretary of Commerce Wilbur Ross initiated an investigation

into the effects of steel imports on the United States' national security. On April 20, 2018, the

President instructed Commerce to give priority to the investigation into the national security

threats posed by imports of steel and to complete the investigation by June 2017.[1] As part of the

investigation, Commerce collected written public comments, held a public hearing, and

consulted with the Secretary of Defense.[2]

35.     On January 11, 2018, Commerce submitted a report to the President containing its

findings and recommendations on steel imports.[3]

36.     Commerce explained that it analyzed the impact of steel imports using a broad

definition of "national security," to include not only the term "national defense" but also to

"include[] the 'general security and welfare of certain industries, beyond those necessary to

satisfy national defense requirements, which are critical to minimum operations of the economy

and government.'" *Steel Report* at 1, 13-15, **Exhibit 4** (quoting Dep't of Commerce, Bureau of

---

[1] *Memorandum on Steel Imports and Threats to National Security* (U.S. President, April 20, 2017) *available at* https://www.gpo.gov/fdsys/pkg/DCPD-201700259/pdf/DCPD-201700259.pdf.

[2] *Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel*, 82 Fed. Reg. 19205 (BIS April 26, 2017); *see also Notice of Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Aluminum*, 82 Fed. Reg. 21509 (BIS May 9, 2017).

[3] Dep't of Commerce, Bureau of Indus. & Sec. (BIS), *The Effect of Imports of Steel on the National Security* (Jan. 11, 2018) ("*Steel Report*"), available at https://www.commerce.gov/sites/commerce.gov/files/the_effect_of_imports_of_steel_on_the_national_security_-_with_redactions_-_20180111.pdf (attached as **Exhibit 4**).

AFDOCS/17573913.2

Export Admin., *The Effect of Imports of Iron Ore and Semi-Finished Steel on the National Security* at 5 (Oct. 2001) ("*2001 Report*"), attached as **Exhibit 5**.[4]

37.   Commerce stated that its definition of the term "national security" is consistent with the *2001 Report*, which explains that the term 'national security' can be interpreted more broadly to include the general security and welfare of certain industries, beyond those necessary to satisfy national defense requirements that are critical to the minimum operations of the economy and government. " *Steel Report* at 13, **Exhibit 4** (quoting *2001 Report* at 5, **Exhibit 5)**.

38.   The *Steel Report* observed that the United States' domestic steel industry was in decline; that shrinking "capacity utilization rates" were deterring capital investment; and that foreign imports had contributed to the falloffs in domestic production. *Steel Report* at 3-5, **Exhibit 4**. The *Steel Report* concluded, "the present quantities and circumstance of steel imports are 'weakening our internal economy' and threaten to impair the national security as defined in Section 232." *Id.* at 5.

39.   Commerce identified global excess steel capacity as a circumstance that contributes to the "weakening of our internal economy" that "threaten[s] to impair" the national security as defined in Section 232. *Id.* at 5, 16. It explained that "U.S. steel production capacity has remained flat since 2001, while other steel producing nations have increased their production capacity, with China alone able to produce as much steel as the rest of the world combined." *Id.* at 52. The *Steel Report* did not identify any excess capacity with respect to Turkey.

40.    Commerce recommended that the President take immediate action to adjust the level of these imports through quotas or tariffs." *Id.* at 58-61. Commerce recommended three

---

[4] Available at https://www.bis.doc.gov/index.php/documents/section-232-investigations/81-iron-ore-and-semi-finished-steel-2001/file.

alternative actions, each of which had the stated objective of enabling the U.S. steel industry to operate at an 80% or better average capacity utilization rate. *Id.* at 6-9. Option one was the imposition of a global quota equal to 63% of the 2017 import level of all imported steel products. *Id.* at 7-8. Option two was a global 24% tariff on imports of all imported steel products. *Id.* at 8. Option three was a 53% tariff on all imported steel products from twelve countries (Brazil, South Korea, Russia, Turkey, India, Vietnam, China, Thailand, South Africa, Egypt, Malaysia, and Costa Rica), with all other countries being limited to 100% of their 2017 import volumes. *Id.* at 8-9.

41.     On February 18, 2018, the Secretary of Defense sent a letter to Commerce providing its position on the recommendations contained in the *Steel Report*.[5] The Secretary of Defense conveyed that in his view, "U.S. military requirements for steel and aluminum each only represent about three percent of U.S. production" and "[t]herefore, DoD does not believe that the findings in the reports [by Commerce] impact the ability of DoD programs to acquire the steel or aluminum necessary to meet national defense requirements." *Steel/Aluminum Policy Recommendations Resp.* at 1, **Exhibit 6**.

42.     The Secretary of Defense also shared that it "continues to be concerned about the negative impact on our key allies" of "the recommended options within the reports." *Id.*

---

[5] Memorandum from Sec'y of Def. to Sec'y of Commerce, re: *Response to Steel and Aluminum Policy Recommendations* (Feb. 18, 2018) ("*Steel/Aluminum Policy Recommendations Resp.*") (attached as **Exhibit 6**).

AFDOCS/17573913.2

III.   **THE SECTION 232 STEEL PROCLAMATIONS**

43.    On March 8, 2018, President Trump issued Proclamation No. 9705, *First Steel Proclamation* which imposed a 25% *ad valorem* tariff on steel articles imported from all countries, except Canada and Mexico. *See* 83 Fed. Reg. at 11626 (para. 8) (**Exhibit 1**).

44.    Proclamation 9705 stated "that Canada and Mexico present a special case" given their "shared commitment [with the United States] to support[ ] each other in addressing national security concerns." *Id.* at 11626 (para. 10). Accordingly, the President "determined that the necessary and appropriate means to address the threat to national security posed by imports of steel articles from Canada and Mexico is to continue ongoing discussions with these countries" and exempt them "from the tariff, at least at this time." *Id.*

45.    The new 25% steel tariffs were scheduled to take effect as to all countries other than Canada and Mexico on March 23, 2018.

46.    On March 22, 2018, President Trump issued Proclamation No. 9711 which expanded the list of countries exempted from the tariffs beyond Canada and Mexico to include "the Commonwealth of Australia ('Australia'), the Argentine Republic ('Argentina'), the Republic of Korea ('South Korea'), the Federative Republic of Brazil ('Brazil'), and the European Union ('EU')." *See Adjusting Imports of Steel Into the United States*, Proclamation No. 9711 of Mar. 22, 2018, 83 Fed. Reg. 13361, 13361 (para. 4) (Mar. 28, 2018) ("*Second Steel Proclamation*") (attached as **Exhibit 7**).

47.    The March 22, 2018 proclamation made the country exemptions temporary, including for Canada and Mexico. It stated that on May 1, 2018, all of "the countries listed as excepted" would be subject to the 25% steel, unless the President were to "determine by further proclamation that the United States has reached a satisfactory alternative means to remove the

14

threatened impairment to the national security by imports" of that country. *Id.* at 13362 (para. 11). In the interim, President Trump instructed that "ongoing discussions" with the temporarily-exempted countries "continue," so that other "measures to reduce excess . . . production" abroad and "increase domestic capacity utilization" in the United States could be agreed upon. *Id.* at 13362 (para. 10).

48.     On April 30, 2018, President Trump issued Proclamation No. 9740, extending the period of reprieve for Canada, Mexico, and the EU for an additional 30 days. *Adjusting Imports of Steel Into the United States*, Proclamation No. 9740 of April 30, 2018, 83 Fed. Reg. 20683 (May 7, 2018) ("*Third Steel Proclamation*") (attached as **Exhibit 8**). The Section 232 tariffs were scheduled to take effect as to Canada, Mexico, and the EU on June 1, 2018, unless the President were to "determine by further proclamation that the United States has reached a satisfactory alternative means to remove the threatened impairment to the national security by imports" from those countries. *Id.* at 20684 (para. 7).

49.     Argentina, Australia, Brazil, and South Korea received different treatment in the *Third Steel Proclamation*. For Argentina, Australia, and Brazil, the proclamation noted that the United States had "agreed in principle" on "satisfactory alternative means" to address steel that would allay the United States' concerns, and that the President was therefore "extend[ing] the temporary exemption" for these countries, with no set expiration date, "in order to finalize the details of these satisfactory alternative means." *Id.* (para. 5). South Korea was removed entirely and indefinitely from the 25% steel tariff. *Id.* at 20683-84 (para. 4). The *Third Steel Proclamation* announced that the United States and South Korea had "successfully" "agreed on a range of measures" to address the level of steel imports that would sufficiently "address South

15

Korea's contribution to the threatened impairment to [the United States'] national security." *Id.* at 20683 (para. 4).

50.     On May 31, 2018, President Trump amended the steel proclamations a fourth time. *Adjusting Imports of Steel Into the United States*, Proclamation No. 9759 of May 31, 2018, 83 Fed. Reg. 25857 (June 5, 2018) ("*Fourth Steel Proclamation*") (attached as **Exhibit 9**). The May 31 proclamation directed that the new tariffs would apply to imported steel articles from Canada, Mexico, and the EU, beginning on June 1, 2018. *Id.*

51.     The *Fourth Steel Proclamation* exempted Argentina, Australia, and Brazil from the steel tariff because these countries had "agreed on a range of measures" addressing steel imports into the United States that the President determined would "provide effective, long-term alternative means to address these countries' contribution to the threatened impairment to our national security." *Id.* at 25857-58 (paras. 4 & 5).

52.     On August 10, 2018 at 5:47 AM, the President released the following statement on Twitter: "I have just authorized a doubling of Tariffs on Steel and Aluminum with respect to Turkey as their currency, the Turkish Lira, slides rapidly downward against our very strong Dollar! Aluminum will now be 20% and Steel 50%. Our relations with Turkey are not good at this time!" *See* **Exhibit 10**.

53.     On the same day, the President issued the *Steel Proclamation on Turkey* imposing a 50% *ad valorem* tariff on steel articles imported from Turkey. *See* **Exhibit 2**. The *Steel Proclamation on Turkey* raised the tariffs on steel articles from Turkey only and did not raise the tariffs on imports from other countries. The increased tariffs on imports of steel articles from Turkey went into effect on August 13, 2018. *Steel Proclamation on Turkey*, 83 Fed. Reg. at

16

40429 (para. 6), **Exhibit 2**. To date, the President has not issued a proclamation imposing 20% tariffs on aluminum from Turkey.

54.     In justifying the increase in tariffs to 50% on Turkey alone, the President explained that "while capacity utilization in the domestic steel industry has improved, it is still below the target capacity utilization level the Secretary recommended in his report." *Id.* at 40429 (para. 4). The President further noted that "it is necessary and appropriate in light of our national security interests to adjust the tariff imposed by previous proclamations" because the imports have not declined as much as anticipated and because the capacity utilization has not increased to the target level. *Id.* (para. 5).

55.     The President explained that in the *Steel Report*, "[T]he Secretary recommended that I consider applying a higher tariff to a list of specific countries should I determine that all countries should not be subject to the same tariff. One of the countries on that list was the Republic of Turkey (Turkey)." *Id.* (para. 6). In order to further reduce imports of steel articles and increase domestic capacity utilization, the President "determined that it is necessary and appropriate to impose a 50% *ad valorem* tariff on steel articles imported from Turkey." *Id.* The President further explained that the Secretary of Commerce "has advised me that this adjustment will be a significant step toward ensuring the viability of the domestic steel industry." *Id.*

56.     On August 29, 2018, the President issued Proclamation No. 9777 to provide potential relief to certain steel importers. *Adjusting Imports of Steel Into the United States*, Proclamation No. 9777 of August 29, 2018, 83 Fed. Reg. 45025 (Sept. 4, 2018) (the "*Sixth Steel Proclamation*") (attached as **Exhibit 11**). In the *Sixth Steel Proclamation*, the President provided some relief from quantitative limitations set forth in the *Third Steel Proclamation* and *Fourth Steel Proclamation*.

17

## IV.   U.S. IMPORTS OF TURKISH STEEL ARTICLES

57.   Based on public tariff and trade data compiled and aggregated from Commerce and the U.S. International Trade Commission websites, total import volumes from Turkey of affected steel products under Section 232 totaled 1,568,645 MT from January –July 2017. This compares with imports from Turkey of 654,339 MT for January –July 2018. The import volumes from Turkey were reduced over 58.29% between interim 2017 and 2018 as demonstrated in the import charts provided at **Exhibit 12.**

58.   Based on tariff and trade data compiled and aggregated from Commerce and the U.S. International Trade Commission websites, total import volumes from Turkey of affected steel products under Section 232 totaled 879,287 MT from March through June 2017. This compares with 409,810 MT during the period March – June 2018, the period during which 25% Section 232 tariffs were in effect, but prior to imposition of the 50% tariffs. The Turkish import volumes were reduced over 53% during the interim period when Section 232 tariffs were in effect, relative to 2017. *See* **Exhibit 12**.

59.   Commerce's own publications show a significant decrease in steel imports from Turkey in 2018. The Department of Commerce, International Trade Administration, published its *Global Steel Trade Monitor* report in June 2018 which discusses "Trends in Imports from Top Sources." *Global Steel Trade Monitor, Steel Imports Report: United States* at 3 (June 2018) ("*Global Steel Trade Monitor*") (attached at **Exhibit 13**). In relevant part, the report states,

> [b]etween YTD 2017 [Jan- March] and YTD 2018, imports increased from five of the United State' top 10 import source countries. Imports from Germany showed the largest volume increase in YTD 2018, up 29 percent, followed by Mexico (14%), Canada (7%), South Korea (6%), and China (5%). Some of the countries which the United States had decreases in imports from were Turkey (-59%), Russia (-10%), and Taiwan (-10%).

*Id.*

18

60.     The June 2018 *Global Steel Trade Monitor* report also lists the top 10 sources of steel imports, "Imports by Top Source," in order: Canada (20%), Brazil (13%), South Korea (11%), Mexico (11%), Russia (7%), Japan (5%), Turkey (4%), Germany (3%), Taiwan (3%), and China (2%). *Id.*

61.     The *Steel Report* published by Commerce in the Section 232 investigation, estimated that U.S. steel production capacity in 2017 was approximately 113.3 million MT, with production at 81.9 million MT, for a capacity utilization rate of 72.3%. *Steel Report* at 7, **Exhibit 4**. According to the report, "[u]tilization rates of 80 percent or greater are necessary to sustain adequate profitability and continued capital investment, research and development, and workforce enhancement in the steel sector." *Id.* at 4.

62.     Therefore, in order to reach the stated capacity utilization rate of 80% or higher, U.S. steel production would have to increase from 81.9 million MT to a minimum of 90.6 MT, or 8.7 + million MT. *Id.* at 7. As noted above, based on publicly available data, 2017 import volumes from Turkey of steel products covered by the Section 232 measure totaled 1,990,337 MT. Turkish Import Volumes, attached as **Exhibit 12**. The total volume of Turkish steel imports in 2017 is less than 23% of the total increase in U.S. production necessary to meet the minimum 80% capacity utilization target stated in the *Steel Report*.

63.     Nor is Turkey expanding its steelmaking capacity and posing an increased threat to U.S. interests as a results of excess steel capacity. The OECD's steelmaking capacity database, relied upon by Commerce in the *Steel Report*,[6] indicates that steelmaking capacity in Turkey has

---

[6] *Steel Report* at 51-53, **Exhibit 4**. OECD data on global steelmaking capacity and by country, are attached at **Exhibit 14,** OECD, Dir. for Science, Tech. & Innovation Steel Comm., *Capacity Developments in the World Steel Industry*, DSTI/SC(2017)2/Final (Aug. 7, 2017) data on global steelmaking capacity and OECD, *Recent developments in steelmaking capacity*,

been generally flat since 2012, with a slight decrease in 2017. *Steel Report* at 41 & 47, **Exhibit 4**; *see also* Turkish Import Volumes, **Exhibit 12**.

64.     In sum, Commerce's own data show that under no scenario could the doubling of the Section 232 tariffs on imports of steel products from Turkey contribute significantly to the stated goal of the measure to increase domestic capacity utilization to 80%. Prior to imposition of the 50% tariffs, Turkish imports had already declined over 50% in 2018 when compared to 2017, more than any other country subject to the 232 tariffs. The 25% tariff had more than addressed any national security concerns or goals with respect to a single country. The added 25% tariffs on a very low import volume from Turkey that was already subject to 25% tariffs could have no more but a negligible impact, if any, on domestic capacity utilization. Therefore, the doubling of the tariffs on Turkish imports was neither necessary, nor could it advance any legitimate national security needs.

## STATEMENT OF CLAIMS

### COUNT I

65.     Plaintiff incorporates by reference paragraphs 1-64 of this Complaint.

66.     The Constitution, Article I, Section 8 enumerates many of the legislative powers conferred on Congress. Clause 1 of Section 8 grants Congress the power "To lay and collect Taxes, Duties, Imposts and Excises" and Clause 3 of Section 8 empowers Congress to "regulate Commerce with foreign Nations." Thus, in the scheme of allocated powers established by the Constitution, Section 232 represents a delegation to the Executive by Congress of authority to exercise certain powers that otherwise are exclusively within the province of Congress.

---

DSTI/SC(2018)2/Final (2018).

67.     Because Section 232 authority has been delegated to the President by Congress, it is inherently limited. It must be exercised as Congress directs and only for the purpose mandated by Congress. Any discretion afforded the President under Section 232 is not and cannot be without limits. *See, e.g., Mistretta v. United States*, 488 U.S. 361, 371-373 (1989).

68.     Section 232 authorizes the President to take action to "adjust" the imports of an article and its derivatives based on a finding that the article "is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A). The statute requires that any action to adjust imports taken by the President pursuant to Section 232 must be consistent with the purpose of protecting or furthering the national security.

69.     The *Steel Report* states that the terms "national security" and "national defense" in Section 232 are understood to include the general security and welfare of certain industries that are deemed critical to the nation's economic well-being, as well as to meeting its defense needs. The *Steel Report* concluded that the national security requires a viable domestic steel industry, which it defined as one operating at an 80% or better average capacity utilization rate, and found that foreign imports were a significant contributor to the industry's declining production. *Steel Report* at 6. As set forth in the *Steel Report* and in the six steel proclamations to date, the alleged national security objective sought under Section 232 is the preservation of a viable domestic steel industry, with its viability defined in terms of its capacity utilization rate. The Section 232 adjustments or means chosen to achieve that purpose include tariff and other restrictions on foreign steel imports.

70.     The *Steel Proclamation on Turkey* stated that in order to further reduce imports of steel and thereby increase domestic capacity utilization it was necessary and appropriate to

21

double the existing Section 232 tariff on imports of steel from Turkey to a rate of 50% *ad valorem*. *Steel Proclamation on Turkey* at 40429 (para. 6), **Exhibit 2**. However, the facts do not support the contention that doubling the Section 232 tariffs on Turkey serves the proclaimed national security purpose of increasing the domestic steel industry's capacity utilization rate. There is, in fact, no nexus between the President's action and achievement of the national security purpose, as defined by the President, that the action is asserted to promote.

71.     19 U.S.C. § 1862(d) sets forth factors that the President and the Secretary must consider in determining whether and how to adjust imports. Section 1862(d) states that "in the light of the requirements of national security and without excluding other relevant factors" the President must consider the capacity of domestic industries to meet projected national defense requirements and "the importation of goods in terms of their quantities, availabilities, character, and use" as they affect the capacity of the United States to meet national security requirements.

72.     The President's Twitter statement that the relationship between the United States and Turkey are "not good" and the relevant trade figures available at the time demonstrate that the President's action to double the tariff on imports of steel from Turkey is based upon considerations unrelated to the factors required by Section 1862(d). The President's action is, therefore, not in accordance with the statute.

73.     Neither the *Steel Report* nor the trade data support the declaration in the *Steel Proclamation on Turkey* that imposing a 50% tariff on Turkey alone would lead to the desired increase in the domestic industry's capacity utilization. None of the alternative adjustments to imports proposed in the *Steel Report* support the proposition that action only against Turkey would be sufficient to achieve the reduction in imports to a level that would serve to promote higher domestic capacity utilization. The trade data clearly shows that elimination of all imports

22

from Turkey and their replacement by domestic production would not by itself be enough to bring the domestic industry's capacity utilization rate to the target level.

74.     Prior to imposition of the 50% tariffs, Turkish imports had already declined over 50% in 2018 as compared with 2017, more than for any other country subject to the Section 232 tariffs. The additional 25% tariff on rapidly declining volumes of imports from Turkey already subject to 25% tariffs could have no more than a negligible effect, if any, on achieving the goal of reducing imports in order to promote domestic capacity utilization. Thus, the doubling of the tariffs on Turkish imports was neither necessary nor appropriate to advancing the national security purpose proclaimed to underlie the President's actions pursuant to Section 232 to adjust steel imports.

75.     The absence of a nexus between the President's action and carrying out the national security purpose of the statute mandated by Congress means that the President has acted outside the bounds of the authority delegated to him by Congress under Section 232. Accordingly, that action must be nullified as not in accordance with the authority delegated to the President by Congress under Section 232.

## COUNT II

76.     Plaintiff incorporates by reference paragraphs 1-64 of this Complaint.

77.     A presidential action may be set aside if the President's action involves "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1346 (Fed. Cir. 2018); *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985); *Motion Systems Corp. v. Bush*, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (en banc) (stating that courts may consider whether the President has violated an explicit statutory mandate).

23

78.    Subsections (b) and (c) of Section 232, 19 U.S.C. § 1862(b)-(c), establish a process that must be followed before any actions to adjust imports may be taken. As discussed in the factual section of this complaint, among other procedural protections, the process devised by Congress in Section 232 includes an investigation by the Secretary of Commerce, consultation with the Secretary of Defense, a report on the findings of the investigation with respect to the effects of the targeted imports on national security and, if appropriate, a public comment and hearing process. Section 232 also requires that any actions to adjust imports must be consistent with the purpose of protecting or furthering the national security.

79.    This statutory process was not followed with respect to the *Steel Proclamation on Turkey*. There was no investigation, report or consultation to determine the effect on the national security of imports from Turkey prior to the issuance of the challenged proclamation to support the doubling of the tariffs on steel imports from that country alone. Unlike the *First Steel Proclamation* on global steel imports, there was no opportunity for interested parties to present information with respect to the national security impact of imports from Turkey. While Defendants may have sought to follow the statutory process laid out by Section 232 with respect to the initial Section 232 Proclamations affecting global steel imports, that process was not followed prior to the proclamation doubling the steel tariffs on Turkey.

80.    In violation of the statutory requirements, the *Steel Proclamation on Turkey* imposed additional tariffs on imports from Turkey without following the procedures prescribed by Congress in the Trade Expansion Act of 1962, as amended. Failure to comply with the procedural requirements of Section 232 prior to issuing the *Steel Proclamation on Turkey* represents a serious procedural violation and has denied Plaintiff and similarly situated importers

24

the benefit of the protection of their interests that inclusion of those requirements in the statute was intended to provide.

## COUNT III

81.     Plaintiff incorporates by reference paragraphs 1-64 of this Complaint.

82.     The *Steel Proclamation on Turkey*, on its face, violates the Equal Protection Doctrine of the U.S. Constitution by impermissibly discriminating between similarly situated domestic importers and selectively imposing an additional burden only on certain of those importers who import steel products from Turkey.

83.     The equal protection of the laws of the United States is guaranteed by the Fifth Amendment's Due Process requirement, which prohibits the government from unjustifiably treating similarly situated persons differently. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) ("[A]s this Court has recognized, discrimination may be so unjustifiable as to be violative of due process."). A classification that "neither burdens a fundamental right nor targets a suspect class" will be upheld "so long as it bears a rational relation to the some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996); *Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012) ([A] classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." (citation omitted))

84.     Plaintiff is in all relevant aspects similarly situated to U.S. importers who import steel from countries other than Turkey and whose imports are subject to the 25% tariff set forth in the First through Fourth Presidential Proclamations. The *Steel Proclamation on Turkey* imposes a different, more burdensome treatment on U.S. importers of steel products from Turkey. There is no legitimate governmental purpose achieved by differentiating between U.S.

25

importers based solely on the country of origin of their steel imports and doubling the duty on imports from Turkey entered by Plaintiff and similarly situated U.S. importers. There being no legitimate governmental purpose for this discriminatory treatment, the *Steel Proclamation on Turkey* violates the Equal Protection Doctrine and is unconstitutional.

## COUNT IV

85.     Plaintiff incorporates by reference paragraphs 1-64 of this Complaint.

86.     The Constitution's Due Process Clause provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

87.     The Federal Circuit has stated that "an importer may be entitled to procedural due process regarding the resolution of disputed facts involved in a case of foreign commerce when the importer faces a deprivation of 'life, liberty, or property' by the Federal Government." *NEC Corp. v. United States*, 151 F.3d 1361, 1370 (Fed. Cir. 1998).

88.     Plaintiff faces economic and competitive harm from the additional tariffs imposed by the *Steel Proclamation on Turkey* that were imposed without benefit of due process prior to the issuance of the *Steel Proclamation on Turkey* on August 10, 2018. They have in violation of the Constitution been deprived of their property without due process of law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(a)     Enter judgment in favor of Plaintiff and declare the *Steel Proclamation on Turkey* unconstitutional, null and void;

(b)     Enjoin Defendants from implementing or enforcing the *Steel Proclamation on Turkey* against Plaintiff;

26

(c)      Order CBP to refund Plaintiff the difference between any tariffs collected by CBP

on its imports of steel products pursuant to the *Steel Proclamation on Turkey* and

the 25% *ad valorem* tariff that would otherwise apply on these imports; and

(d)      Grant such additional relief as the Court may deem just and proper.

/s/ **Matthew Nolan**
Matthew Nolan
Nancy A. Noonan
Diana Dimitriuc Quaia
Aman Kakar
Andrew Jaxa-Debicki

ARENT FOX LLP
1717 K Street, NW
Washington, DC 20006-5344
202-857-6013
*Counsel to Transpacific Steel LLC*

Dated:  April 1, 2019

AFDOCS/17573913.2

**EXHIBIT LIST TO AMENDED COMPLAINT**

| Exhibit | Description |
|---|---|
| 1 | *Adjusting Imports of Steel Into the United States, Proclamation No. 9705*, 83 Fed. Reg. 11625 (Mar. 15, 2018) ("*First Steel Proclamation*") |
| 2 | *Adjusting Imports of Steel Into the United States, Proclamation 9772 of August 10, 2018*, 83 Fed. Reg. 40429 (Aug. 15, 2018) ("*Steel Proclamation on Turkey*" or "*Fifth Steel Proclamation*") |
| 3 | Transpacific Steel LLC ("Transpacific") Declaration |
| 4 | Dep't of Commerce, Bureau of Indus. & Sec. (BIS), *The Effect of Imports of Steel on the National Security* (Jan. 11, 2018) ("*Steel Report*") |
| 5 | Dep't of Commerce, Bureau of Export Admin., *The Effect of Imports of Iron Ore and Semi-Finished Steel on the National Security* (Oct. 2001) |
| 6 | Memorandum from Sec'y of Def. to Sec'y of Commerce, re: Response to Steel and Aluminum Policy Recommendations (Feb. 18, 2018) |
| 7 | *Adjusting Imports of Steel Into the United States, Proclamation No. 9711 of Mar. 22, 2018*, 83 Fed. Reg. 13361 (para. 4) (Mar. 28, 2018) ("*Second Steel Proclamation*"). |
| 8 | *Adjusting Imports of Steel Into the United States, Proclamation No. 9740 of April 30, 2018*, 83 Fed. Reg. 20683 (May 7, 2018) ("*Third Steel Proclamation*") |
| 9 | *Adjusting Imports of Steel Into the United States, Proclamation No. 9759 of May 31, 2018*, 83 Fed. Reg. 25857 (June 5, 2018) ("*Fourth Steel Proclamation*") |
| 10 | Donald J. Trump Tweets of August 10, 2018 |
| 11 | *Adjusting Imports of Steel Into the United States, Proclamation No. 9777 of August 29, 2018*, 83 Fed. Reg. 45025 (Sept. 4, 2018) (the "*Sixth Steel Proclamation*") |
| 12 | Turkish Import Volumes |
| 13 | *Global Steel Trade Monitor, Steel Imports Report: United States* (June 2018) |
| 14 | OECD, *Recent developments in steelmaking capacity*, DSTI/SC(2018)2/Final (2018) |

# EXHIBIT 1

# Presidential Documents

Proclamation 9705 of March 8, 2018

## Adjusting Imports of Steel Into the United States

### By the President of the United States of America

### A Proclamation

1. On January 11, 2018, the Secretary of Commerce (Secretary) transmitted to me a report on his investigation into the effect of imports of steel mill articles (steel articles) on the national security of the United States under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862).

2. The Secretary found and advised me of his opinion that steel articles are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States. The Secretary found that the present quantities of steel articles imports and the circumstances of global excess capacity for producing steel are "weakening our internal economy," resulting in the persistent threat of further closures of domestic steel production facilities and the "shrinking [of our] ability to meet national security production requirements in a national emergency." Because of these risks and the risk that the United States may be unable to "meet [steel] demands for national defense and critical industries in a national emergency," and taking into account the close relation of the economic welfare of the Nation to our national security, *see* 19 U.S.C. 1862(d), the Secretary concluded that the present quantities and circumstances of steel articles imports threaten to impair the national security as defined in section 232 of the Trade Expansion Act of 1962, as amended.

3. In reaching this conclusion, the Secretary considered the previous U.S. Government measures and actions on steel articles imports and excess capacity, including actions taken under Presidents Reagan, George H.W. Bush, Clinton, and George W. Bush. The Secretary also considered the Department of Commerce's narrower investigation of iron ore and semi-finished steel imports in 2001, and found the recommendations in that report to be outdated given the dramatic changes in the steel industry since 2001, including the increased level of global excess capacity, the increased level of imports, the reduction in basic oxygen furnace facilities, the number of idled facilities despite increased demand for steel in critical industries, and the potential impact of further plant closures on capacity needed in a national emergency.

4. In light of this conclusion, the Secretary recommended actions to adjust the imports of steel articles so that such imports will not threaten to impair the national security. Among those recommendations was a global tariff of 24 percent on imports of steel articles in order to reduce imports to a level that the Secretary assessed would enable domestic steel producers to use approximately 80 percent of existing domestic production capacity and thereby achieve long-term economic viability through increased production. The Secretary has also recommended that I authorize him, in response to specific requests from affected domestic parties, to exclude from any adopted import restrictions those steel articles for which the Secretary determines there is a lack of sufficient U.S. production capacity of comparable products, or to exclude steel articles from such restrictions for specific national security-based considerations.

5. I concur in the Secretary's finding that steel articles are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States, and I have considered his recommendations.

6. Section 232 of the Trade Expansion Act of 1962, as amended, authorizes the President to adjust the imports of an article and its derivatives that are being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security.

7. Section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), authorizes the President to embody in the Harmonized Tariff Schedule of the United States (HTSUS) the substance of acts affecting import treatment, and actions thereunder, including the removal, modification, continuance, or imposition of any rate of duty or other import restriction.

8. In the exercise of these authorities, I have decided to adjust the imports of steel articles by imposing a 25 percent ad valorem tariff on steel articles, as defined below, imported from all countries except Canada and Mexico. In my judgment, this tariff is necessary and appropriate in light of the many factors I have considered, including the Secretary's report, updated import and production numbers for 2017, the failure of countries to agree on measures to reduce global excess capacity, the continued high level of imports since the beginning of the year, and special circumstances that exist with respect to Canada and Mexico. This relief will help our domestic steel industry to revive idled facilities, open closed mills, preserve necessary skills by hiring new steel workers, and maintain or increase production, which will reduce our Nation's need to rely on foreign producers for steel and ensure that domestic producers can continue to supply all the steel necessary for critical industries and national defense. Under current circumstances, this tariff is necessary and appropriate to address the threat that imports of steel articles pose to the national security.

9. In adopting this tariff, I recognize that our Nation has important security relationships with some countries whose exports of steel articles to the United States weaken our internal economy and thereby threaten to impair the national security. I also recognize our shared concern about global excess capacity, a circumstance that is contributing to the threatened impairment of the national security. Any country with which we have a security relationship is welcome to discuss with the United States alternative ways to address the threatened impairment of the national security caused by imports from that country. Should the United States and any such country arrive at a satisfactory alternative means to address the threat to the national security such that I determine that imports from that country no longer threaten to impair the national security, I may remove or modify the restriction on steel articles imports from that country and, if necessary, make any corresponding adjustments to the tariff as it applies to other countries as our national security interests require.

10. I conclude that Canada and Mexico present a special case. Given our shared commitment to supporting each other in addressing our national security concerns, our shared commitment to addressing global excess capacity for producing steel, the physical proximity of our respective industrial bases, the robust economic integration between our countries, the export of steel articles produced in the United States to Canada and Mexico, and the close relation of the economic welfare of the United States to our national security, *see* 19 U.S.C. 1862(d), I have determined that the necessary and appropriate means to address the threat to the national security posed by imports of steel articles from Canada and Mexico is to continue ongoing discussions with these countries and to exempt steel articles imports from these countries from the tariff, at least at this time. I expect that Canada and Mexico will take action to prevent transshipment of steel articles through Canada and Mexico to the United States.

11. In the meantime, the tariff imposed by this proclamation is an important first step in ensuring the economic viability of our domestic steel industry.

Without this tariff and satisfactory outcomes in ongoing negotiations with Canada and Mexico, the industry will continue to decline, leaving the United States at risk of becoming reliant on foreign producers of steel to meet our national security needs—a situation that is fundamentally inconsistent with the safety and security of the American people. It is my judgment that the tariff imposed by this proclamation is necessary and appropriate to adjust imports of steel articles so that such imports will not threaten to impair the national security as defined in section 232 of the Trade Expansion Act of 1962, as amended.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including section 301 of title 3, United States Code, section 604 of the Trade Act of 1974, as amended, and section 232 of the Trade Expansion Act of 1962, as amended, do hereby proclaim as follows:

(1) For the purposes of this proclamation, ''steel articles'' are defined at the Harmonized Tariff Schedule (HTS) 6-digit level as: 7206.10 through 7216.50, 7216.99 through 7301.10, 7302.10, 7302.40 through 7302.90, and 7304.10 through 7306.90, including any subsequent revisions to these HTS classifications.

(2) In order to establish increases in the duty rate on imports of steel articles, subchapter III of chapter 99 of the HTSUS is modified as provided in the Annex to this proclamation. Except as otherwise provided in this proclamation, or in notices published pursuant to clause 3 of this proclamation, all steel articles imports specified in the Annex shall be subject to an additional 25 percent ad valorem rate of duty with respect to goods entered, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on March 23, 2018. This rate of duty, which is in addition to any other duties, fees, exactions, and charges applicable to such imported steel articles, shall apply to imports of steel articles from all countries except Canada and Mexico.

(3) The Secretary, in consultation with the Secretary of State, the Secretary of the Treasury, the Secretary of Defense, the United States Trade Representative (USTR), the Assistant to the President for National Security Affairs, the Assistant to the President for Economic Policy, and such other senior Executive Branch officials as the Secretary deems appropriate, is hereby authorized to provide relief from the additional duties set forth in clause 2 of this proclamation for any steel article determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality and is also authorized to provide such relief based upon specific national security considerations. Such relief shall be provided for a steel article only after a request for exclusion is made by a directly affected party located in the United States. If the Secretary determines that a particular steel article should be excluded, the Secretary shall, upon publishing a notice of such determination in the *Federal Register*, notify Customs and Border Protection (CBP) of the Department of Homeland Security concerning such article so that it will be excluded from the duties described in clause 2 of this proclamation. The Secretary shall consult with CBP to determine whether the HTSUS provisions created by the Annex to this proclamation should be modified in order to ensure the proper administration of such exclusion, and, if so, shall make such modification to the HTSUS through a notice in the *Federal Register*.

(4) Within 10 days after the date of this proclamation, the Secretary shall issue procedures for the requests for exclusion described in clause 3 of this proclamation. The issuance of such procedures is exempt from Executive Order 13771 of January 30, 2017 (Reducing Regulation and Controlling Regulatory Costs).

(5) (a) The modifications to the HTSUS made by the Annex to this proclamation shall be effective with respect to goods entered, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time

on March 23, 2018, and shall continue in effect, unless such actions are expressly reduced, modified, or terminated.

(b) The Secretary shall continue to monitor imports of steel articles and shall, from time to time, in consultation with the Secretary of State, the Secretary of the Treasury, the Secretary of Defense, the USTR, the Assistant to the President for National Security Affairs, the Assistant to the President for Economic Policy, the Director of the Office of Management and Budget, and such other senior Executive Branch officials as the Secretary deems appropriate, review the status of such imports with respect to the national security. The Secretary shall inform the President of any circumstances that in the Secretary's opinion might indicate the need for further action by the President under section 232 of the Trade Expansion Act of 1962, as amended. The Secretary shall also inform the President of any circumstance that in the Secretary's opinion might indicate that the increase in duty rate provided for in this proclamation is no longer necessary.

(6) Any provision of previous proclamations and Executive Orders that is inconsistent with the actions taken in this proclamation is superseded to the extent of such inconsistency.

IN WITNESS WHEREOF, I have hereunto set my hand this eighth day of March, in the year of our Lord two thousand eighteen, and of the Independence of the United States of America the two hundred and forty-second.

# ANNEX

## TO MODIFY CHAPTER 99 OF THE HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES

Effective with respect to goods entered, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on March 23, 2018, subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States is modified by inserting in numerical sequence the following new note and tariff provision, with the material in these provisions inserted in the columns labeled "Heading/Subheading", "Article Description", "Rates of Duty 1-General", and "Rates of Duty 2", respectively:

"16. (a)  Heading 9903.80.01 sets forth the ordinary customs duty treatment applicable to all entries of iron or steel products from all countries, except products of Canada and of Mexico, classifiable in the headings or subheadings enumerated in this note. Such goods shall be subject to duty as provided herein. No special rates of duty shall be accorded to goods covered by heading 9903.80.01 under any tariff program enumerated in general note 3(c)(i) to the tariff schedule. All anti-dumping, countervailing, or other duties and charges applicable to such goods shall continue to be imposed.

(b)  The rates of duty set forth in heading 9903.80.01 apply to all imported products of iron or steel classifiable in the provisions enumerated in this subdivision:

(i)  flat-rolled products provided for in headings 7208, 7209, 7210, 7211, 7212, 7225 or 7226;

(ii)  bars and rods provided for in headings 7213, 7214, 7215, 7227, or 7228, angles, shapes and sections of 7216 (except subheadings 7216.61.00, 7216.69.00 or 7216.91.00); wire provided for in headings 7217 or 7229; sheet piling provided for in subheading 7301.10.00; rails provided for in subheading 7302.10; fish-plates and sole plates provided for in subheading 7302.40.00; and other products of iron or steel provided for in subheading 7302.90.00;

(iii)  tubes, pipes and hollow profiles provided for in heading 7304, or 7306; tubes and pipes provided for in heading 7305.

(iv)  ingots, other primary forms and semi-finished products provided for in heading 7206, 7207 or 7224; and

(v)  products of stainless steel provided for in heading 7218, 7219, 7220, 7221, 7222 or 7223.

(c)  The Secretary of Commerce may determine and announce any exclusions from heading 9903.80.01 that may be appropriate for individual iron or steel products

**11630**   **Federal Register** / Vol. 83, No. 51 / Thursday, March 15, 2018 / Presidential Documents

otherwise covered by subdivision (b) of this note or for individual shipments thereof, whether or not limited to particular quantities of any such goods or shipments, and shall immediately convey all such determinations to U.S. Customs and Border Protection ("CBP") for implementation by CBP at the earliest possible opportunity, but not later than five business days after the date on which CBP receives any such determination from Commerce.

(d)   Any importer entering the iron or steel products covered by this note under heading 9903.80.01 shall provide any information that may be required, and in such form, as is deemed necessary by CBP in order to permit the administration of this subheading. Importers are likewise directed to report information concerning any applicable exclusion granted by Commerce in such form as CBP may require.

| Heading/ Subheading | Article description | Rates of Duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| 9903.80.01 | "Products of iron or steel provided for in the tariff headings or subheadings enumerated in note 16 to this subchapter, except products of Canada or of Mexico or any exclusions that may be determined and announced by the Department of Commerce.......................................................... | 25% | | The duty provided in the applic- able sub- heading + 25%" |

[FR Doc. 2018–05478

Filed 3–14–18; 11:15 am]

Billing code 7020–02–C

# EXHIBIT 2

Federal Register

Vol. 158, No. 83

Wednesday, August 15, 2018

# Presidential Documents

Title 3—

The President

Proclamation 9772 of August 10, 2018

## Adjusting Imports of Steel Into the United States

**By the President of the United States of America**

**A Proclamation**

1. On January 11, 2018, the Secretary of Commerce (Secretary) transmitted to me a report on his investigation into the effect of imports of steel articles on the national security of the United States under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862). The Secretary found and advised me of his opinion that steel articles are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States.

2. In Proclamation 9705 of March 8, 2018 (Adjusting Imports of Steel Into the United States), I concurred in the Secretary's finding that steel articles, as defined in clause 1 of Proclamation 9705, as amended by clause 8 of Proclamation 9711 of March 22, 2018 (Adjusting Imports of Steel Into the United States), are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States, and decided to adjust the imports of these steel articles by imposing a 25 percent ad valorem tariff on such articles imported from most countries.

3. In Proclamation 9705, I also directed the Secretary to monitor imports of steel articles and inform me of any circumstances that in the Secretary's opinion might indicate the need for further action under section 232 with respect to such imports.

4. The Secretary has informed me that while capacity utilization in the domestic steel industry has improved, it is still below the target capacity utilization level the Secretary recommended in his report. Although imports of steel articles have declined since the imposition of the tariff, I am advised that they are still several percentage points greater than the level of imports that would allow domestic capacity utilization to reach the target level.

5. In light of the fact that imports have not declined as much as anticipated and capacity utilization has not increased to that target level, I have concluded that it is necessary and appropriate in light of our national security interests to adjust the tariff imposed by previous proclamations.

6. In the Secretary's January 2018 report, the Secretary recommended that I consider applying a higher tariff to a list of specific countries should I determine that all countries should not be subject to the same tariff. One of the countries on that list was the Republic of Turkey (Turkey). As the Secretary explained in that report, Turkey is among the major exporters of steel to the United States for domestic consumption. To further reduce imports of steel articles and increase domestic capacity utilization, I have determined that it is necessary and appropriate to impose a 50 percent ad valorem tariff on steel articles imported from Turkey, beginning on August 13, 2018. The Secretary has advised me that this adjustment will be a significant step toward ensuring the viability of the domestic steel industry.

7. Section 232 of the Trade Expansion Act of 1962, as amended, authorizes the President to adjust the imports of an article and its derivatives that are being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security.

8. Section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), authorizes the President to embody in the Harmonized Tariff Schedule of the United States (HTSUS) the substance of statutes affecting import treatment, and actions thereunder, including the removal, modification, continuance, or imposition of any rate of duty or other import restriction.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including section 232 of the Trade Expansion Act of 1962, as amended, section 301 of title 3, United States Code, and section 604 of the Trade Act of 1974, as amended, do hereby proclaim as follows:

(1) In order to establish increases in the duty rate on imports of steel articles from Turkey, subchapter III of chapter 99 of the HTSUS is modified as provided in the Annex to this proclamation. Clause 2 of Proclamation 9705, as amended by clause 1 of Proclamation 9740 of April 30, 2018 (Adjusting Imports of Steel Into the United States), is further amended by striking the last two sentences and inserting in lieu thereof the following three sentences: ''Except as otherwise provided in this proclamation, or in notices published pursuant to clause 3 of this proclamation, all steel articles imports specified in the Annex shall be subject to an additional 25 percent ad valorem rate of duty with respect to goods entered for consumption, or withdrawn from warehouse for consumption, as follows: (a) on or after 12:01 a.m. eastern daylight time on March 23, 2018, from all countries except Argentina, Australia, Brazil, Canada, Mexico, South Korea, and the member countries of the European Union; (b) on or after 12:01 a.m. eastern daylight time on June 1, 2018, from all countries except Argentina, Australia, Brazil, and South Korea; and (c) on or after 12:01 a.m. eastern daylight time on August 13, 2018, from all countries except Argentina, Australia, Brazil, South Korea, and Turkey. Further, except as otherwise provided in notices published pursuant to clause 3 of this proclamation, all steel articles imports from Turkey specified in the Annex shall be subject to a 50 percent ad valorem rate of duty with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on August 13, 2018. These rates of duty, which are in addition to any other duties, fees, exactions, and charges applicable to such imported steel articles, shall apply to imports of steel articles from each country as specified in the preceding two sentences.''.

(2) The text of U.S. note 16(a)(i) to subchapter III of chapter 99 of the HTSUS is amended by deleting ''Heading 9903.80.01 provides'' and inserting the following in lieu thereof: ''Except as provided in U.S. note 16(a)(ii), which applies to products of Turkey that are provided for in heading 9903.80.02, heading 9903.80.01 provides''.

(3) U.S. note 16(a)(ii) to subchapter III of chapter 99 of the HTSUS is re-designated as U.S. note 16(a)(iii) to subchapter III of chapter 99 of the HTSUS.

(4) The following new U.S. note 16(a)(ii) to subchapter III of chapter 99 of the HTSUS is inserted in numerical order: ''(ii) Heading 9903.80.02 provides the ordinary customs duty treatment of iron or steel products of Turkey, pursuant to the article description of such heading. For any such products that are eligible for special tariff treatment under any of the free trade agreements or preference programs listed in general note 3(c)(i) to the tariff schedule, the duty provided in this heading shall be collected in addition to any special rate of duty otherwise applicable under the appropriate tariff subheading, except where prohibited by law. Goods for which entry is claimed under a provision of chapter 98 and which are subject to the additional duties prescribed herein shall be eligible for and subject to the terms of such provision and applicable U.S. Customs and Border Protection (''CBP'') regulations, except that duties under subheading 9802.00.60 shall be assessed based upon the full value of the imported article. No claim for entry or for any duty exemption or reduction

shall be allowed for the iron or steel products enumerated in subdivision (b) of this note under a provision of chapter 99 that may set forth a lower rate of duty or provide duty-free treatment, taking into account information supplied by CBP, but any additional duty prescribed in any provision of this subchapter or subchapter IV of chapter 99 shall be imposed in addition to the duty in heading 9903.80.02.''.

(5) Paragraphs (b), (c), and (d) of U.S. note 16 to subchapter III of chapter 99 of the HTSUS are each amended by replacing ''heading 9903.80.01'' with ''headings 9903.80.01 and 9903.80.02''.

(6) The ''Article description'' for heading 9903.80.01 of the HTSUS is amended by replacing ''of Brazil'' with ''of Brazil, of Turkey''.

(7) The modifications to the HTSUS made by clauses 2 through 6 of this proclamation and the Annex to this proclamation shall be effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on August 13, 2018, and shall continue in effect, unless such actions are expressly reduced, modified, or terminated.

(8) The Secretary, in consultation with U.S. Customs and Border Protection of the Department of Homeland Security and other relevant executive departments and agencies, shall revise the HTSUS so that it conforms to the amendments directed by this proclamation. The Secretary shall publish any such modification to the HTSUS in the *Federal Register.*

(9) Any provision of previous proclamations and Executive Orders that is inconsistent with the actions taken in this proclamation is superseded to the extent of such inconsistency.

IN WITNESS WHEREOF, I have hereunto set my hand this tenth day of August, in the year of our Lord two thousand eighteen, and of the Independence of the United States of America the two hundred and forty-third.

## ANNEX

## TO MODIFY CERTAIN PROVISIONS OF CHAPTER 99 OF
## THE HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES

Effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on August 13, 2018, subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States is modified by inserting in numerical sequence the following new tariff provision, with the material in the new tariff provisions inserted in the columns labeled "Heading/Subheading", "Article Description", "Rates of Duty 1-General", "Rates of Duty 1-Special," and "Rates of Duty 2", respectively:

| Heading/ Subheading | Article description | Rates of Duty | | |
| --- | --- | --- | --- | --- |
| | | 1 | | 2 |
| | | General | Special | |
| 9903.80.02 | Products of iron or steel that are the product of Turkey and provided for in the tariff headings or subheadings enumerated in note 16(b) to this subchapter, except any exclusions that may be determined and announced by the Department of Commerce.................................................... | 50% | | |

[FR Doc. 2018–17703

Filed 8–14–18; 8:45 a.m.]

Billing code 7020–02–C

# EXHIBIT 3

**Declaration of Transpacific Steel LLC regarding Imports of Steel Products from Turkey**

I, Jules Levin, under penalty of perjury, do hereby declare and make the following statements relating to imports of steel products by Transpacific Steel LLC ("Transpacific") from Turkey. I have firsthand knowledge of Transpacific's imports because I am the Chief Executive Officer of Transpacific.

1. Transpacific has imported steel products from Turkey as the importer of record since 2009.

2. Transpacific imported 7,931 MT of steel products from Turkey from January to July 2017 and 7,918 MT from January to July 2018.

3. Transpacific imports steel products into Puerto Rico and serves the Puerto Rican market exclusively. Transpacific experienced higher demand in Puerto Rico as a result of Hurricanes Maria and Irma which caused extensive damage to Puerto Rico and resulted in higher demand for construction steel products.

4. Transpacific imported 8,751.822 MT of steel products from Turkey from March 23, 2018 to August 12, 2018.

5. Transpacific has paid $2,071,123 as a result of the 25% tariff that was applicable on imports of steel products from Turkey from March 23, 2018 to August 12, 2018.

6. Transpacific expects to import 11,430 MT of steel products from Turkey after August 13, 2018 which it contracted to purchase prior to the 50% tariff.

7. Transpacific estimates that it will pay $4,668,758 as a result of the 50% tariff that is applicable on imports of steel products from Turkey on and after August 13, 2018 and to date has paid $ $2,874,828.65 as a result of the 50% tariff.

8. Transpacific has not placed any orders for steel products from Turkey after the 50% tariff went into effect because Transpacific lacks the financial resources to pay the increased tariff.

9. Transpacific has undertaken interim solutions to delay the payment of the 50% tariff until it arranges for the financial resources to meet its duty obligations. However, the storage of steel imports from Turkey in bonded warehouses has a devastating effect on Transpacific's financial health. Transpacific has incurred costs to date of $761,876.72 in order to transfer the steel to a bonded warehouse in the first month and thereafter will incur $43,266.66 per month in additional costs. Transpacific is also incurring financing costs for goods that it is now unable to deliver to its customers.

10. Transpacific Steel is one of the largest importers of steel into Puerto Rico and its products are at the forefront of the rebuilding effort in Puerto Rico. Steel Products from Turkey were perfectly positioned to meet this demand, meeting every requirement including: price, quality, lead time, prompt voyage time, and thereby assisted in speedily rebuilding Puerto Rico. The prohibitive costs of importing steel products from Turkey due to the

50% tariff will have a negative impact on American citizens in Puerto Rico and their efforts to rebuild the island.

_____

Jules Levin
Chief Executive Officer
Transpacific Steel LLC
January 11, 2019

# EXHIBIT 4

# THE EFFECT OF IMPORTS OF STEEL ON THE NATIONAL SECURITY

## AN INVESTIGATION CONDUCTED UNDER SECTION 232 OF THE TRADE EXPANSION ACT OF 1962, AS AMENDED



**U.S. Department of Commerce
Bureau of Industry and Security
Office of Technology Evaluation**

# January 11, 2018

# THE EFFECT OF IMPORTS OF STEEL ON THE NATIONAL SECURITY

## TABLE OF CONTENTS

I.    EXECUTIVE SUMMARY ......................................................................................... 1

II.   LEGAL FRAMEWORK ........................................................................................ 11

III.  INVESTIGATION PROCESS ............................................................................... 18

   A.   *Initiation of Investigation* ............................................................................. 18

   B.   *Public Hearing* ............................................................................................. 18

   C.   *Public Comments* .......................................................................................... 18

   D.   *Interagency Consultation* ............................................................................. 19

IV.  PRODUCT SCOPE OF THE INVESTIGATION. ................................................ 21

V.   FINDINGS ............................................................................................................. 23

   A.   *Steel is Important to U.S. National Security* ................................................ 23

     1.   Steel is Needed for National Defense Requirements ................................. 23

     2.   Steel is Required for U.S. Critical Infrastructure .................................... 23

     3.   Domestic Steel Production is Essential for National Security Applications ................. 24

     4.   Domestic Steel Production Depends on a Healthy and Competitive U.S. Industry ....... 25

     5.   Steel Consumed in Critical Industries ..................................................... 25

   B.   *Imports in Such Quantities as are Presently Found Adversely Impact the Economic Welfare of the U.S. Steel Industry* ............................................................... 27

     1.   Imports of Steel Products Continue to Increase ....................................... 27

     2.   High Import Penetration ........................................................................... 29

     3.   High Import to Export Ratio ..................................................................... 30

     4.   Steel Prices .............................................................................................. 31

     5.   Steel Mill Closures ................................................................................... 33

     6.   Declining Employment Trend Since 1998 ................................................ 35

     7.   Trade Actions – Antidumping and Countervailing Duties ....................... 36

     8.   Loss of Domestic Opportunities to Bidders Using Imported Steel ........... 36

     9.   Financial Distress .................................................................................... 37

     10.  Capital Expenditures ............................................................................... 40

   C.   *Displacement of Domestic Steel by Excessive Quantities of Imports has the Serious Effect of Weakening Our Internal Economy* ............................................................ 41

     1.   Domestic Steel Production Capacity is Stagnant and Concentrated ........ 41

     2.   Production is Well Below Demand ........................................................... 46

3.   Utilization Rates are Well Below Economically Viable Levels ..................................... 47

4.   Declining Steel Production Facilities Limits Capacity Available for a National Emergency .......................................................................................................................... 49

*D.   Global Excess Steel Capacity is a Circumstance that Contributes to the Weakening of the Domestic Economy* ................................................................................................................. 51

1.   Free markets globally are adversely affected by substantial chronic global excess steel production led by China ............................................................................................................ 51

2.   Increasing global excess steel capacity will further weaken the internal economy as U.S. steel producers will face increasing import competition .......................................................... 53

VI.  CONCLUSION ...................................................................................................................... 55

VII. RECOMMENDATION .......................................................................................................... 58

**Prepared by Bureau of Industry and Security**
**http://www.bis.doc.gov**

## **APPENDICES**

APPENDIX A:  Section 232 Investigation Notification Letter to Secretary of Defense James Mattis (April 19, 2017); Department of Defense Response to Notification (May 8, 2017)

APPENDIX B:  Presidential Memorandum for the Secretary of Commerce - Steel Imports and Threats to National Security (April 20, 2017)

APPENDIX C:  Federal Register - Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel (April 21, 2017)

APPENDIX D:  Federal Register - Notice on Procedures for Attending or Viewing Remotely the Public Hearing on Section 232 National Security Investigation of Imports of Steel (May 17, 2017)

APPENDIX E:  Public Hearing Witnesses

APPENDIX F:  Public Hearing Testimonies

APPENDIX G:  Public Comments

APPENDIX H:  Uses of Steel for National Defense

APPENDIX I:  Uses of Steel for Critical Infrastructure

APPENDIX J:  U.S. Government Steel Measures and Actions

APPENDIX K:  Steel Orders in Effect as of January 11, 2018

APPENDIX L:  Global Excess Capacity in Steel Production

# I.   EXECUTIVE SUMMARY

## Overview

This report summarizes the findings of an investigation conducted by the U.S. Department of Commerce (the "Department") pursuant to Section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. §1862 ("Section 232")), into the effect of imports of steel mill products ("steel") on the national security of the United States.

In conducting this investigation, the Secretary of Commerce (the "Secretary") noted the Department's prior investigations under Section 232. This report incorporates the statutory analysis from the Department's 2001 Report[1] with respect to applying the terms "national defense" and "national security" in a manner that is consistent with the statute and legislative intent.[2] As in the 2001 Report, the Secretary in this investigation determined that "national security" for purposes of Section 232 includes the "general security and welfare of certain industries, beyond those necessary to satisfy national defense requirements, which are critical to minimum operations of the economy and government."[3]

As required under Section 232, the Secretary examined the effect of imports on national security requirements, including: domestic production needed for projected national defense requirements; the capacity of domestic industries to meet such requirements; existing and anticipated availabilities of the human resources, products, raw materials, and other supplies and services essential to the national defense; the requirements of growth of such industries and such supplies and services including the investment, exploration, and development necessary to assure such growth; and the importation of goods in terms of their quantities, availabilities, character, and use as those affect such industries; and the capacity of the United States to meet national security requirements.

---

[1]   Department of Commerce, Bureau of Export Administration; *The Effect of Imports of Iron Ore and Semi-Finished Steel on the National Security*; Oct. 2001 ("2001 Report").

[2]   *Id.* at 5.

[3]   *Id.*

The Secretary also recognized the close relation of the economic welfare of the United States to its national security; the impact of foreign competition on the economic welfare of individual domestic industries; and any substantial unemployment, decrease in revenues of government, loss of skills, or any other serious effects resulting from the displacement of any domestic products by excessive imports, without excluding other factors, in determining whether a weakening of the U.S. economy by such imports may impair national security.  In particular, this report assesses whether steel is being imported "in such quantities" and "under such circumstances" as to "threaten to impair the national security."[4]

## **Findings**

In conducting the investigation, the Secretary found:

A. *Steel is Important to U.S. National Security*

1. National security includes projected national defense requirements for the U.S. Department of Defense.

2. National security also encompasses U.S. critical infrastructure sectors including transportation systems, the electric power grid, water systems, and energy generation systems.

3. Domestic steel production is essential for national security applications. Statutory provisions illustrate that Congress believes domestic production capability is essential for defense requirements and critical infrastructure needs, and ultimately to the national security of the United States.[5]  U.S. Government actions on steel across earlier Administrations

---

[4]   19 U.S.C. § 1862(b)(3)(A).

[5]   *See,* e.g., 15 U.S.C. § 271(a)(1)("The future well-being of the United States economy depends on a strong manufacturing base…"); 50 U.S.C. § 4502(a)("Congress finds that – (1) the security of the United States is dependent on the ability of the domestic industrial base to supply materials and services…  (2)(C) to provide for the protection and restoration of domestic critical infrastructure operations under emergency conditions…"; and American Recovery and Reinvestment Act, P.L. 111-5, §1605, 123 Stat. 303 (Feb. 17, 2009) (providing that none of the funds appropriated or made available by the act may be used for the construction, alteration, maintenance, or repair of a public building or public work unless the iron, steel, and manufactured goods are produced in the United States).

further demonstrate domestic steel production is vital to national security.[6]

4. Domestic steel production depends on a healthy and competitive U.S. industry. The principal types of mills that produce steel are integrated mills with basic oxygen furnaces (BOFs); mini-mills using electric arc furnaces (EAFs); re-roller/converter; and metal coater facilities. Basic oxygen furnaces convert raw materials into steel, and remain critical for continued innovation in steel technology. Covered in this report are five categories of steel products that are used for national security applications: flat, long, semi-finished, pipe and tube, and stainless.

5. The Department found that demand for steel in critical industries has increased since the Department's last investigation in 2001. The 2001 Report determined that there was 33.68 million tons of finished steel consumed in critical industries per year in the United States based on 1997 data.[7] The Department updated that analysis for this report using 2007 data (the latest available) and determined that domestic consumption in critical industries has increased significantly, with 54 million metric tons of steel now being consumed annually in critical industries.

B. *Imports in Such Quantities as are Presently Found Adversely Impact the Economic Welfare of the U.S. Steel Industry*

1. The United States is the world's largest steel importer. In the first ten months of 2017 steel imports have increased at a double-digit rate over 2016, accounting for more than 30 percent of U.S. consumption. Notwithstanding numerous anti-dumping and countervailing duty orders, which are limited in scope, imports of most types of steel continue to increase.

---

[6]  *See infra,* section V(A)(3) and Appendix J.

[7]  2001 Report at 14. The 2001 Report is not clear whether it used short tons or metric tons. If short tons were used then the metric ton equivalent is 30.56 million metric tons.

2. Import penetration levels for flat, semi-finished, stainless, long, and pipe and tube products continue on an upward trend above 30 percent of domestic consumption.

3. Imports are nearly four times U.S. exports.

4. Imports are priced substantially lower than U.S. produced steel.

5. Excessive steel imports have adversely impacted the steel industry. Numerous U.S. steel mill closures, a substantial decline in employment, lost domestic sales and market share, and marginal annual net income for U.S.-based steel companies illustrate the decline of the U.S. steel industry.

C. *Displacement of Domestic Steel by Excessive Quantities of Imports has the Serious Effect of Weakening our Internal Economy*

1. As steel imports have increased, U.S. steel production capacity has been stagnant and production has decreased.

2. Since 2000, foreign competition and the displacement of domestic steel by excessive imports have resulted in the closure of six basic oxygen furnace facilities and the idling of four more (which is more than a 50 percent reduction in the number of such facilities), a 35 percent decrease in employment in the steel industry, and caused the domestic steel industry as a whole to operate on average with negative net income since 2009.

3. The declining steel capacity utilization rate is not economically sustainable. Utilization rates of 80 percent or greater are necessary to sustain adequate profitability and continued capital investment, research and development, and workforce enhancement in the steel sector.

D. *Global Excess Steel Capacity is a Circumstance that Contributes to the Weakening of the Domestic Economy*

1. In the steel sector, free markets globally are adversely affected by substantial chronic global excess steel production led by China. The world's nominal crude steelmaking capacity reached about 2.4 billion metric tons in 2016, an increase of 127 percent compared to the capacity

level in 2000, while steel demand grew at a much smaller rate.  In 2016 there was a 737 million metric ton global gap between steelmaking capacity and steel crude demand, which means there is unlikely to be any market-driven reduction in steel exports to the United States in the near future.[8]

2. While U.S. steel production capacity has remained flat since 2001, other steel producing nations have increased their production capacity, with China alone able to produce as much steel as the rest of the world combined.  This overhang of excess capacity means that U.S. steel producers, for the foreseeable future, will face increasing competition from imported steel as other countries export more steel to the United States to bolster their own economic objectives and offset loss of markets to Chinese steel exports.

## Conclusion

Based on these findings, the Secretary of Commerce concludes that the present quantities and circumstance of steel imports are "weakening our internal economy" and threaten to impair the national security as defined in Section 232.  The Secretary considered the Department's narrower investigation of iron ore and semi-finished steel imports in 2001, which recommended no action be taken, and finds that several important factors – the broader scope of the investigation, the level of global excess capacity, the level of imports, the reduction in basic oxygen furnace facilities since 2001, and the potential impact of further plant closures on capacity needed in a national emergency, support recommending action under Section 232. In light of this conclusion, the Secretary has determined that the only effective means of removing the threat of impairment is to reduce imports to a level that should, in combination with good management, enable U.S. steel mills to operate at 80 percent or more of their rated production capacity.

---

[8]   Source: Global Forum report; http://www.bmwi.de/Redaktion/EN/Downloads/global-forum-on-steel-excess-capacity-report.pdf

## **Recommendation**

Prior significant actions to address steel imports using quotas and/or tariffs were taken under various statutory authorities by President George W. Bush, President William J. Clinton (three times), President George H. W. Bush, President Ronald W. Reagan (three times), President James E. Carter (twice), and President Richard M. Nixon, all at lower levels of import penetration than the present level, which is greater than 30 percent.

Due to the threat, as defined in Section 232, to national security from steel imports, the Secretary recommends that the President take immediate action by adjusting the level of these imports through quotas or tariffs.  The quotas or tariffs imposed should be sufficient, even after any exceptions (if granted), to enable U.S. steel producers to operate at an 80 percent or better average capacity utilization rate based on available capacity in 2017 (*see* Figure 1).

| Figure 1.  Import Levels and U.S. Steel Mill Capacity Utilization Rates* | | |
|---|---|---|
| **Steel Market Snapshot (millions of metric tons)** | **2011-2016 Average** | **2017 Annualized** |
| Total Demand for Steel in U.S. (production + imports-exports) | **105.5** | **107.3** |
| U.S. Annual Capacity | **114.4** | **113.3** |
| U.S. Annual Production (liquid) | **84.6** | **81.9** |
| Capacity Utilization Rate (percentage) | **74.0** | **72.3** |
| **Imports and Exports (millions of metric tons)** | | |
| Imports of Steel to U.S. (including semi-finished) | **31.8** | **36.0** |
| Exports of Steel from the U.S. | **10.8** | **10.1** |
| Percent Import Penetration | **30.1** | **33.8** |
| **Production at Various Utilization Rates (millions of metric tons)** | | |
| Maximum Capacity | **114.4** | **113.3** |
| Production at 75% Capacity Utilization | **85.8** | **85.0** |
| Production at 80% Capacity Utilization | **91.5** | **90.6** |
| Production at 85% Capacity Utilization | **97.2** | **96.3** |
| **Import Levels and Domestic Production Targets Based on 80% Capacity Utilization** | | |
| **General Equilibrium (GTAP Model – Includes Reduction in Exports and Demand)** | | |
| Maximum Import Level (mmt) | **22.7** | |
| Estimated Import Penetration | **22%** | |
| Estimated Production (mmt) | **90.6** | |
| **Alternative 1A: Quota Applied to 2017 Import Levels** | **63%** | |
| **Alternative 1B: Tariff Rate Applied to All Imports** | **24%** | |
| *Numbers may differ slightly due to rounding. **Sources: United States Department of Commerce, Bureau of the Census; American Iron and Steel Institute.  Calculations based on industry and trade data.** | | |

The Secretary recommends that the President impose a quota or tariff on all steel products covered in this investigation imported into the United States to remove the threatened impairment to national security.

## Alternative 1 – Global Quota or Tariff

### 1A.   Global Quota

Impose quotas on all imported steel products at a specified percent of the 2017 import level, applied on a country and steel product basis.

According to the Global Trade Analysis Project (GTAP) Model[9], produced by Purdue University, a 63 percent quota would be expected to reduce steel imports by about 37 percent (13.3 million metric tons) from 2017 levels.  Based on imports from January to October, import levels for 2017 are projected to reach 36.0 million metric tons.  This action would result in imports equaling about 22.7 million metric tons, which will enable an 80 percent capacity utilization rate at 2017 demand levels (including exports).

### 1B.    Global Tariff

Apply a tariff rate on all imported steel products, in addition to any antidumping or countervailing duty collections applicable to any imported steel product.

According to the Global Trade Analysis Project (GTAP) Model, produced by Purdue University, a 24 percent tariff on all steel imports would be expected to reduce imports by 37 percent (i.e., a reduction of 13.3 million metric tons from 2017 levels of 36.0 million metric tons).  This tariff rate would thus result in imports equaling about 22.7 million metric tons, which will enable an 80 percent capacity utilization rate at 2017 demand levels (including exports).

## Alternative 2 – Tariffs on a Subset of Countries

Apply a tariff rate on all imported steel products from Brazil, South Korea, Russia, Turkey, India, Vietnam, China, Thailand, South Africa, Egypt, Malaysia and Costa Rica, in addition to any antidumping or countervailing duty collections applicable to any steel products from those countries.  All other countries would be limited to 100 percent of their 2017 import level.

According to the Global Trade Analysis Project (GTAP) Model, produced by Purdue University, a 53 percent tariff on all steel imports from this subset of countries would be expected to reduce imports by 13.3 million metric tons from 2017

---

[9]    The standard GTAP Model is a static multiregional, multisector, computable general equilibrium model, with perfect competition and constant returns to scale.  The model is based on optimizing behavior by economic agents.  The standard GTAP closure allows all prices and wages in the economy to adjust so as to ensure supply equals demand in all markets including the labor market.  The estimates in this report were made using the GTAP 10 model which has a 2014 base.

import levels from the targeted countries. This action would enable an increase in domestic production to achieve an 80 percent capacity utilization rate at 2017 demand levels (including exports). The countries identified are projected to account for less than 4 percent of U.S. steel exports in 2017.

## Exemptions

In selecting an alternative, the President could determine that specific countries should be exempted from the proposed 63 percent quota or 24 percent tariff by granting those specific countries 100 percent of their prior imports in 2017, based on an overriding economic or security interest of the United States. The Secretary recommends that any such determination should be made at the outset and a corresponding adjustment be made to the final quota or tariff imposed on the remaining countries. This would ensure that overall imports of steel to the United States remain at or below the level needed to enable the domestic steel industry to operate as a whole at an 80 percent or greater capacity utilization rate. The limitation to 100 percent of each exempted country's 2017 imports is necessary to prevent exempted countries from producing additional steel for export to the United States or encouraging other countries to seek to trans-ship steel to the United States through the exempted countries.

It is possible to provide exemptions from either the quota or tariff and still meet the necessary objective of increasing U.S. steel capacity utilization to a financially viable target of 80 percent. However, to do so would require a reduction in the quota or increase in the tariff applied to the remaining countries to offset the effect of the exempted import tonnage.

## Exclusions

The Secretary recommends an appeal process by which affected U.S. parties could seek an exclusion from the tariff or quota imposed. The Secretary would grant exclusions based on a demonstrated: (1) lack of sufficient U.S. production capacity of comparable products; or (2) specific national security based considerations. This appeal process would include a public comment period on each exclusion request,

and in general, would be completed within 90 days of a completed application being filed with the Secretary.

An exclusion may be granted for a period to be determined by the Secretary and may be terminated if the conditions that gave rise to the exclusion change.  The U.S. Department of Commerce will lead the appeal process in coordination with the Department of Defense and other agencies as appropriate.  Should exclusions be granted the Secretary would consider at the time whether the quota or tariff for the remaining products needs to be adjusted to increase U.S. steel capacity utilization to a financially viable target of 80 percent.

## II.    LEGAL FRAMEWORK

### I. Section 232 Requirements

Section 232 provides the Secretary with the authority to conduct investigations to determine the effect on the national security of the United States of imports of any article.  It authorizes the Secretary to conduct an investigation if requested by the head of any department or agency, upon application of an interested party, or upon his own motion.  *See* 19 U.S.C. § 1862(b)(1)(A).

Section 232 directs the Secretary to submit to the President a report with recommendations for "action or inaction under this section" and requires the Secretary to advise the President if any article "is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security."  *See* 19 U.S.C. § 1862(b)(3)(A).

Section 232(d) directs the Secretary and the President to, in light of the requirements of national security and without excluding other relevant factors, give consideration to the domestic production needed for projected national defense requirements and the capacity of the United States to meet national security requirements.  *See* 19 U.S.C. § 1862(d).

Section 232(d) also directs the Secretary and the President to "recognize the close relation of the economic welfare of the Nation to our national security, and …take into consideration the impact of foreign competition on the economic welfare of individual domestic industries" by examining whether any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports, or other factors, result in a "weakening of our internal economy" that may impair the national security.  *See* 19 U.S.C. § 1862(d).

Once an investigation has been initiated, Section 232 mandates that the Secretary provide notice to the Secretary of Defense that such an investigation has been initiated.  Section 232 also requires the Secretary to do the following:

(1)    "Consult with the Secretary of Defense regarding the methodological and policy questions raised in [the] investigation;"

(2)     "Seek information and advice from, and consult with, appropriate officers of the United States;" and

(3)     "If it is appropriate and after reasonable notice, hold public hearings or otherwise afford interested parties an opportunity to present information and advice relevant to such investigation."[10] *See* 19 U.S.C. § 1862(b)(2)(A)(i)-(iii).

As detailed in Parts III and V of this report, each of the legal requirements set forth above has been satisfied.

In conducting the investigation, Section 232 permits the Secretary to request that the Secretary of Defense provide an assessment of the defense requirements of the article that is the subject of the investigation. *See* 19 U.S.C. § 1862(b)(2)(B).

Upon completion of a Section 232 investigation, the Secretary is required to submit a report to the President no later than 270 days after the date on which the investigation was initiated. *See* 19 U.S.C. § 1862(b)(3)(A). The required report must:

(1)     Set forth "the findings of such investigation with respect to the effect of the importation of such article in such quantities or under such circumstances upon the national security;"

(2)     Set forth, "based on such findings, the recommendations of the Secretary for action or inaction under this section;" and

(3)     "If the Secretary finds that such article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security . . . so advise the President." *See* 19 U.S.C. § 1862(b)(3)(A).

---

[10]   Department regulations (i) set forth additional authority and specific procedures for such input from interested parties, *see* 15 C.F.R. §§ 705.7 and 705.8, and (ii) provide that the Secretary may vary or dispense with those procedures "in emergency situations, or when in the judgment of the Department, national security interests require it." Id., § 705.9.

All unclassified and non-proprietary portions of the report submitted by the Secretary to the President must be published.

Within 90 days after receiving a report in which the Secretary finds that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the President shall:

(1)  "Determine whether the President concurs with the finding of the Secretary;" and

(2)  "If the President concurs, determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security."  *See* 19 U.S.C. § 1862(c)(1)(A).

## II.  Discussion

While Section 232 does not contain a definition of "national security", both Section 232, and its implementing regulations at 15 C.F.R. Part 705, contain non-exclusive lists of factors that Commerce must consider in evaluating the effect of imports on the national security.  Congress in Section 232 explicitly determined that "national security" includes, but is not limited to, "national defense" requirements. *See* 19 U.S.C. § 1862(d).  The Department in 2001 determined that "national defense" includes both defense of the United States directly and the "ability to project military capabilities globally."[11]

The Department also concluded in 2001 that "in addition to the satisfaction of national defense requirements, the term "national security" can be interpreted more broadly to include the general security and welfare of certain industries, beyond those necessary to satisfy national defense requirements that are critical to the minimum operations of the economy and government."  The Department called these "critical industries."[12]   This report once again uses these reasonable

---

[11]  Department of Commerce, Bureau of Export Administration; *The Effect of Imports of Iron Ore and Semi-Finished Steel on the National Security*; Oct. 2001 ("2001 Report").

[12]  *Id.*

13

interpretations of "national defense" and "national security." However, this report uses the more recent 16 critical infrastructure sectors identified in Presidential Policy Directive 21[13] instead of the 28 critical industry sectors used by the Bureau of Export Administration in the 2001 Report.[14]

Section 232 directs the Secretary to determine whether imports of any article are being made "in such quantities or under such circumstances" that those imports "threaten to impair the national security." *See* 19 U.S.C. § 1862(b)(3)(A). The statutory construction makes clear that either the quantities or the circumstances, standing alone, may be sufficient to support an affirmative finding. They may also be considered together, particularly where the circumstances act to prolong or magnify the impact of the quantities being imported.

The statute does not define a threshold for when "such quantities" of imports are sufficient to threaten to impair the national security, nor does it define the "circumstances" that might qualify.

Likewise, the statute does not require a finding that the quantities or circumstances are impairing the national security. Instead, the threshold question under Section 232 is whether those quantities or circumstances "threaten to impair the national security." *See* 19 U.S.C. § 1862(b)(3)(A). This formulation strongly suggests that Congress expected an affirmative finding under Section 232 would occur before there is actual impairment of the national security.[15]

Section 232(d) contains a considerable list of factors for the Secretary to consider in determining if imports "threaten to impair the national security"[16] of the United States, and this list is mirrored in the implementing regulations. *See* 19

---

[13]  Presidential Policy Directive 21; Critical Infrastructure Security and Resilience; February 12, 2013 ("PPD-21").

[14]  See Op. Cit. at 16.

[15]  The 2001 Report used the phrase "fundamentally threaten to impair" when discussing how imports may threaten to impair national security. *See* 2001 Report at 7 and 37. Because the term "fundamentally" is not included in the statutory text and could be perceived as establishing a higher threshold, the Secretary expressly does not use the qualifier in this report. The statutory threshold in Section 232(b)(3)(A) is unambiguously "threaten to impair" and the Secretary adopts that threshold without qualification. 19 U.S.C. § 1862(b)(3)(A). The statute also uses the formulation "may impair" in Section 232(d). *Id.* at 1862(d).

[16]  19 U.S.C. § 1862(b)(3)(A).

U.S.C. § 1862(d) and 15 C.F.R. § 705.4.   Congress was careful to note twice in Section 232(d) that the list they provided, while mandatory, is not exclusive.[17] Congress' illustrative list is focused on the ability of the United States to maintain the domestic capacity to provide the articles in question as needed to maintain the national security of the United States.[18]   Congress broke the list of factors into two equal parts using two separate sentences.   The first sentence focuses directly on "national defense" requirements, thus making clear that "national defense" is a subset of the broader term "national security."   The second sentence focuses on the broader economy, and expressly directs that the Secretary and the President "shall recognize the close relation of the economic welfare of the Nation to our national security."[19]   *See* 19 U.S.C. § 1862(d).

Two of the factors listed in the second sentence of Section 232(d) are most relevant in this investigation.   Both are directed at how "such quantities" of imports threaten to impair national security.   *See* 19 U.S.C. § 1862(b)(3)(A).   In administering Section 232, the Secretary and the President are required to "take into consideration the impact of foreign competition on the economic welfare of individual domestic industries" and any "serious effects resulting from the displacement of any domestic products by excessive imports" in "determining whether such weakening of our internal economy may impair the national security."

---

[17]   *See* 19 U.S.C. § 1862(d) ("the Secretary and the President shall, in light of the requirements of national security and without excluding other relevant factors…" and "serious effects resulting from the displacement of any domestic products by excessive imports shall be considered, without excluding other factors…   ").

[18]   This reading is supported by Congressional findings in other statutes.   *See, e.g.,* 15 U.S.C. § 271(a)(1)("The future well-being of the United States economy depends on a strong manufacturing base…") and 50 U.S.C. § 4502(a)("Congress finds that – (1) the security of the United States is dependent on the ability of the domestic industrial base to supply materials and services…   (2)(C) to provide for the protection and restoration of domestic critical infrastructure operations under emergency conditions…   (3)… the national defense preparedness effort of the United States Government requires – (C) the development of domestic productive capacity to meet – (ii) unique technological requirements…   (7) much of the industrial capacity that is relied upon by the United States Government for military production and other national defense purposes is deeply and directly influenced by – (A) the overall competitiveness of the industrial economy of the United States; and (B) the ability of industries in the United States, in general, to produce internationally competitive products and operate profitably while maintaining adequate research and development to preserve competitiveness with respect to military and civilian production; and (8) the inability of industries in the United States, especially smaller subcontractors and suppliers, to provide vital parts and components and other materials would impair the ability to sustain the Armed Forces of the United States in combat for longer than a short period.").

[19]   *Accord* 50 U.S.C. § 4502(a).

*See* 19 U.S.C. § 1862(d). Since the 2001 investigation, foreign competition and the displacement of domestic steel by excessive imports have resulted in the closure of six basic oxygen furnace facilities and the idling of four more (which is more than a 50 percent reduction in the number of such facilities), a 35 percent decrease in employment in the steel industry, and caused the domestic steel industry as a whole to operate on average with negative net income since 2009.

Another factor, not on the list, that the Secretary finds to be a relevant is the presence of massive excess capacity for producing steel. This excess capacity results in steel imports occurring "under such circumstances" that they threaten to impair the national security. *See* 19 U.S.C. § 1862(b)(3)(A). The circumstance of excess global steel production capacity is a factor because, while U.S. production capacity has remained flat since 2001, other steel producing nations have increased their production capacity, with China alone able to produce as much as the rest of the world combined. This overhang of global excess capacity means that U.S. steel producers, for the foreseeable future, will continue to lose market share to imported steel as other countries export more steel to the United States to bolster their own economic objectives and offset loss of markets to Chinese steel exports.

It is these three factors – displacement of domestic steel by excessive imports and the consequent adverse impact on the economic welfare of the domestic steel industry, along with global excess capacity in steel – that the Secretary has concluded create a persistent threat of further plant closures that could leave the United States unable in a national emergency to produce sufficient steel to meet national defense and critical industry needs. The Secretary finds this "weakening of our internal economy may impair the national security" as defined in Section 232. *See* 19 U.S.C. 1862(d).

The Secretary also considered whether the source of the imports affects the analysis under Section 232. In the 2001 Report, "the Department found that iron ore and semi-finished steel are imported from reliable foreign sources" and concluded that "even if the United States were dependent on imports of iron ore and semi-finished steel, imports would not threaten to impair national security." 2001 Report at 27. However, because Congress in Section 232 chose to explicitly direct the Secretary to consider whether the "impact of foreign competition" and "the

displacement of any domestic products by excessive imports" are "weakening our internal economy" but made no reference to an assessment of the sources of imports, it appears likely that Congress recognized adverse impacts might be caused by imports from allies or other reliable sources.[20]  As a result, the fact that some or all of the imports causing the harm are from reliable sources does not compel a finding that those imports do not threaten to impair national security.[21]

After careful examination of the facts in this investigation, the Secretary has concluded that excessive imports of steel in the present circumstances do threaten to impair national security under Section 232.  Several important factors – the broader scope of the investigation,[22] the level of global excess capacity, the level of imports, the reduction in basic oxygen furnace facilities since 2001, and the potential impact of further plant closures on capacity needed in a national emergency – support a recommendation different from the one adopted in the 2001 Report.

---

[20]  When Congress adopted Section 232(d) in 1962 the immediately preceding section was Section 231, 19 U.S.C. § 1861, which required the President, as soon as practicable, to suspend most-favored-nation tariff treatment for imports from communist countries.  Given the bipolar nature of the world at the time, the absence of a distinction between communist and non-communist countries in Section 232 suggests that Congress expected Section 232 would be applied to imports from all countries—including allies and other "reliable" sources.

[21]  To the extent that the 2001 Report or other prior Department reports under Section 232 can be read to conclude that imports from reliable sources cannot impair the national security when the Secretary finds those imports are causing "substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports", the Secretary expressly rejects such a reading.

[22]  This investigation examines the import of a broad range of steel products – flat, long, pipe and tube, semi-finished, and stainless – whereas the 2001 Report addressed only semi-finished steel products and iron ore, which is not part of this investigation.  As the 2001 Report noted, at the time semi-finished imports accounted for "a small percentage (approximately 7 percent) of total U.S. semi-finished steel consumption."  2001 Report at 31.  The 2001 Report also stated that "whether imports have harmed or threaten to harm U.S. producers writ large is beyond the scope of the Department's inquiry, and need not be resolved here."  *Id.* at 37.  This investigation is focused on the larger inquiry that the 2001 Report expressly did not reach.

## III.  INVESTIGATION PROCESS

### A.  *Initiation of Investigation*

On April 19, 2017, U.S. Secretary of Commerce Wilbur Ross initiated an investigation to determine the effect of imported steel on national security under Section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. § 1862).

Pursuant to Section 232(b)(1)(B), the Department notified the U.S. Department of Defense with an April 19, 2017 letter from Secretary Ross to Secretary James Mattis.[23]

On April 20, 2017, President Donald Trump signed a Presidential Memorandum directing Secretary Ross to proceed expeditiously in conducting his investigation and submit a report on his findings to the President.[24]

On April 21, 2017, the Department published in the Federal Register a notice about the initiation of this investigation to determine the effect of imports of steel on the national security.  The notice also announced the opening of the public comment period as well as a public hearing to be held on May 24, 2017.[25]

### B.  *Public Hearing*

The Department held a public hearing to elicit further information concerning this investigation in Washington, DC, on May 24, 2017.  The Department heard testimony from 37 witnesses at the hearing.  A full list of witnesses and copies of their testimony are included in Appendices E and F.

### C.  *Public Comments*

On April 21, 2017, the Department invited interested parties to submit written comments, opinions, data, information, or advice relevant to the criteria listed in

---

[23]  19 U.S.C. § 1862(b)(1)(B).  *See* Appendix A: Section 232 Investigation Notification Letter to Secretary of Defense James Mattis (April 19, 2017) ; Department of Defense Response to Notification (May 8, 2017)

[24]  *See* Appendix B: Presidential Memorandum for the Secretary of Commerce - Steel Imports and Threats to National Security (April 20, 2017)

[25]  *See* Appendices C and D for Federal Register Notice Federal Register, Vol. 82, No. 79, 19205-19207 and *See* Federal Register, Vol. 82, No. 98, 23529-23530.

Section 705.4 of the National Security Industrial Base Regulations (15 C.F.R. § 705.4) as they affect the requirements of national security, including the following: (a) Quantity of the articles subject to the investigation and other circumstances related to the importation of such articles; (b) Domestic production capacity needed for these articles to meet projected national defense requirements; (c) The capacity of domestic industries to meet projected national defense requirements; (d) Existing and anticipated availability of human resources, products, raw materials, production equipment, facilities, and other supplies and services essential to the national defense; (e) Growth requirements of domestic industries needed to meet national defense requirements and the supplies and services including the investment, exploration and development necessary to assure such growth; (f) The impact of foreign competition on the economic welfare of any domestic industry essential to our national security; (g) The displacement of any domestic products causing substantial unemployment, decrease in the revenues of government, loss of investment or specialized skills and productive capacity, or other serious effects; (h) Relevant factors that are causing or will cause a weakening of our national economy; and (i) Any other relevant factors.  *See* Federal Register, Vol. 82, No. 79, 19205-19207.

The public comment period ended on May 31, 2017.  The Department received 201 written public comment submissions concerning this investigation.  All public comments were carefully reviewed and factored into the investigation process.  For a listing of all public comments, *see* Appendix G.

### D.   *Interagency Consultation*

In addition to the required notification provided by the April 19, 2017 letter from Secretary Ross to Secretary Mattis, Department staff carried out the consultations required under Section 232(b)(2).[26]   Staff consulted with their counterparts in the Department of Defense regarding any methodological and policy questions that arose during the investigation.  Discussions were held with the U.S. Army Materiel Command, the Defense Logistics Agency, the U.S. Navy/Naval Air

---

[26]   19 U.S.C. § 1862(b)(2)

Systems Command, and the Under Secretary of Defense for Acquisitions & Logistics, Manufacturing and Industrial Base Policy.

Discussions were also held with "appropriate officers of the United States," including the Department of State, Department of the Treasury, Department of the Interior/U.S. Geological Survey, the Department of Homeland Security/U.S. Customs and Border Protection, the International Trade Commission, and the Office of the United States Trade Representative.[27]

---

[27] *Id.*

# IV. PRODUCT SCOPE OF THE INVESTIGATION[28, 29]

For this report, the product scope covers steel mill products ("steel") which are defined at the Harmonized System ("HS") 6-digit level as: 720610 through 721650, 721699 through 730110, 730210, 730240 through 730290, and 730410 through 730690, including any subsequent revisions to these HS codes. The following discontinued HS codes have been included for purposes of reporting historical data (prior to 2007): 722520, 722693, 722694, 722910, 730410, 730421, 730610, 730620, and 730660.

These steel products are all produced by U.S. steel companies and support various applications across the defense, critical infrastructure, and commercial sectors. Generally, these products fall into one of the following five product categories (including but not limited to):

(1) Carbon and Alloy Flat Product (Flat Products): Produced by rolling semi-finished steel through varying sets of rolls. Includes sheets, strips, and plates.

Flat products are covered under the following 6-digit HS codes: 720810, 720825, 720826, 720827, 720836, 720837, 720838, 720839, 720840, 720851, 720852, 720853, 720854, 720890, 720915, 720916, 720917, 720918, 720925, 720926, 720927, 720928, 720990, 721011, 721012, 721020, 721030, 721041, 721049, 721050, 721061, 721069, 721070, 721090, 721113, 721114, 721119, 721123, 721129, 721190, 721210, 721220, 721230, 721240, 721250, 721260, 722511, 722519, 722530, 722540, 722550, 722591, 722592, 722599, 722611, 722619, 722691, 722692, 722693, 722694, 722699

(2) Carbon and Alloy Long Products (Long Products): Steel products that fall outside the flat products category. Includes bars, rails, rods, and beams.

Long products are covered under the following 6-digit HS codes: 721310, 721320, 721391, 721399, 721410, 721420, 721430, 721491, 721499,

---

[28]   The scope includes steel products.

[29]   Note that import data for steel products includes what are believed to be very small amounts of iron as well as steel, both of which are included in the HS codes covered in the scope.

721510, 721550,721590, 721610, 721621, 721622, 721631, 721632, 721633, 721640, 721650, 721699, 721710, 721720, 721730, 721790, 722520, 722620,722710, 722720, 722790, 722810, 722820, 722830, 722840, 722850, 722860, 722870, 722880, 722910,722920, 722990, 730110, 730210, 730240, 730290

(3) Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products): Either seamless or welded pipe and tube products.  Some of these products may include stainless as well as alloy other than stainless.

Pipe and Tube products are covered under the following 6-digit HS codes: 730410, 730419, 730421, 730423, 730429, 730431, 730439, 730451, 730459, 730490, 730511, 730512, 730519, 730520, 730531, 730539, 730590, 730610, 730619, 730620, 730629, 730630, 730650, 730660, 730661, 730669, 730690

(4) Carbon and Alloy Semi-finished Products (Semi-finished Products): The initial, intermediate solid forms of molten steel, to be re-heated and further forged, rolled, shaped, or otherwise worked into finished steel products. Includes blooms, billets, slabs, ingots, and steel for castings.

Semi-finished products are covered under the following 6-digit HS codes: 720610, 720690, 720711, 720712, 720719, 720720, 722410, 722490

(5) Stainless Products: Steel products, in flat-rolled, long, pipe and tube, and semi-finished forms, containing at minimum 10.5 percent chromium and, by weight, 1.2 percent or less of carbon, offering better corrosion resistance than other steel.

Stainless steel products are covered under the following 6-digit HS codes: 721810, 721891, 721899, 721911, 721912, 721913, 721914, 721921, 721922, 721923, 721924, 721931, 721932, 721933, 721934, 721935, 721990, 722011, 722012, 722020, 722090, 722100, 722211, 722219, 722220, 722230, 722240, 722300, 730411, 730422, 730424, 730441, 730449, 730611, 730621, 730640

# V. FINDINGS

## A. *Steel is Important to U.S. National Security*

As discussed in Part II, "national security" under Section 232 includes both (1) national defense, and (2) critical infrastructure needs.

### 1.   Steel is Needed for National Defense Requirements

Steel articles are critical to the nation's overall defense objectives.[30] The U.S. Department of Defense (DoD) has a large and ongoing need for a range of steel products that are used in fabricating weapons and related systems for the nation's defense.[31] DoD requirements – which currently require about three percent of U.S. steel production – are met by steel companies that also support the requirements for critical infrastructure and commercial industries.

The free market system in the United States requires commercially viable steel producers to meet defense needs. No company could afford to construct and operate a modern steel mill solely to supply defense needs because those needs are too diverse. In order to supply those diverse national defense needs, U.S. steel mills must attract sufficient commercial (i.e., non-defense) business. The commercial revenue supports construction, operation, and maintenance of production capacity as well as the upgrades, research and development required to continue to supply defense needs in the future. *See* Appendix H for examples.

### 2.   Steel is Required for U.S. Critical Infrastructure

Steel also is needed to satisfy requirements for "those industries that the U.S. Government has determined are critical to minimum operations of the economy and government."[32] In the 2001 Report the Department identified 28 "critical industries."[33] The Critical Infrastructure Assurance Office that identified the

---

[30]  *Accord*, 2001 Report at 1, 12.

[31]  AISI 2017 public policy agenda, available from http://www.steel.org/~/media/Files/AISI/Reports/AISI-2017-Public-Policy-Agenda.pdf?la=en

[32]  2001 Report at 14. *See also,* 2001 Report at 16, Table 2, for a listing of the 28 critical industries.

[33]  *Id.*

"critical industries" is no longer in existence, so for this investigation the Department instead relied on the industries identified by the U.S. Government in the 2013 Presidential Policy Directive 21 (PPD-21).[34]  The Secretary believes that the range of industries identified in PPD-21 is comparable to the range of critical industries analyzed in the 2001 Report.

Pursuant to PPD-21, there are 16 designated critical infrastructure sectors in the United States, many of which use high volumes of steel (*see* Appendix I).[35]  The 16 sectors include chemical production, communications, dams, energy, food production, nuclear reactors, transportation systems, water, and waste water systems.

Increased quantities of steel will be needed for various critical infrastructure applications in the coming years.  The American Society of Civil Engineers estimates that the United States needs to invest $4.5 trillion in infrastructure by 2025, and a substantial portion of these projects require steel content.[36]

### 3.    Domestic Steel Production is Essential for National Security Applications

Domestic steel production is essential for national security.  Congress, in Section 232(d), directed the Secretary of Commerce and the President to consider domestic production and the economic welfare of the United States in determining whether imports threaten to impair national security.

In the case of steel, the history of U.S. Government actions to ensure the continued viability of the U.S. steel industry demonstrates that, across decades and Administrations, there has been consensus that domestic steel production is vital to national security.

---

[34]  PPD-21 can be viewed at https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/presidential-policy-directive-critical-infrastructure-security-and-resil

[35]  Department of Homeland Security, "Critical Infrastructure Sectors," https://www.dhs.gov/critical-infrastructure-sectors#

[36]  2017 Infrastructure Report Card, American Society of Civil Engineers, https://www.infrastructurereportcard.org/wp-content/uploads/2016/10/2017-Infrastructure-Report-Card.pdf

Prior significant actions under various statutory authorities to address steel imports using quotas or tariffs were taken by President George W. Bush, President William J. Clinton (three times), President George H. W. Bush, President Ronald W. Reagan (three times), President James E. Carter (twice), and President Richard M. Nixon, all at lower levels of import penetration than at present. In the 1970s, action was taken to limit import penetration to approximately 19 percent. In the 1980s, import penetration had reached 21 percent and the U.S. Government enacted correcting measures. In the 1990s and 2000s import penetration again reached up to 23 percent, which prompted the U.S. Government to take additional actions.[37] In 2016, import penetration averaged 30 percent and for the first nine months of 2017 imports have consistently averaged over 30 percent of U.S. domestic demand.

### 4. Domestic Steel Production Depends on a Healthy and Competitive U.S. Industry

U.S. steel producers would be unable to survive purely on defense or critical infrastructure steel needs. In the steel industry, it is commercial and industrial customer sales that generate the relatively steady production needed for manufacturing efficiency, and the revenue volume needed to sustain the business. Sales for critical infrastructure and defense applications are often less predictable, cyclical, and limited in volume.

Steel manufacturers operating in the United States, however, have seen their commercial and industrial business steadily eroded by a growing influx of lower-priced imported product from countries where steel manufacturing often is subsidized, directly or indirectly. The Department of Commerce currently has 164 antidumping and countervailing duty determinations in effect, and has 20 additional cases under investigation, to address specific cases. *See* Appendix K.

### 5. Steel Consumed in Critical Industries

In this investigation, the issue before the Department is whether steel imports "threaten to impair" national security. *See* 19 U.S.C. § 1862. As discussed in Part II, the Secretary has determined that in the present case the relevant factors are the

---

[37] *See* Appendix J for additional detail on U.S. Government actions on steel in the past.

"serious effects resulting from the displacement of … domestic [steel] products by excessive imports" and the "impact of foreign competition on the economic welfare of individual domestic [steel] industries" that, when combined with the circumstance of massive global excess capacity, causes a "weakening of our internal economy" that "may impair the national security."[38]

In a free market system, the ability of the domestic steel industry to continue meeting national security needs depends on the continued capability of the U.S. steel industry to compete fairly in the commercial marketplace and maintain a financially viable domestic manufacturing capability.   This includes the need to have an adequately skilled workforce for manufacturing as well as to conduct research and development for future products.[39]   A continued loss of viable commercial production capabilities and related skilled workforce will jeopardize the U.S. steel industry's ability to meet the full spectrum of national security requirements.

The Department in 2001 determined that the "critical industries" sector, which is analogous to the more robust critical infrastructure sectors identified pursuant to PPD-21, would require "no more than 33.68 million tons of finished steel per year,"[40] based on 30.88 percent of domestic consumption being used in industries related to critical infrastructure.   The Department has now updated the "critical industries" calculation from the 2001 Report[41] using Census Bureau steel usage figures from 2007, which are the latest available.   *See* Appendix I for more detailed information on steel needs for critical infrastructure.

---

[38] 19 U.S.C. § 1862(d).

[39] *See* 50 U.S.C. § 4502(a)("Congress finds that – … (7) much of the industrial capacity that is relied upon by the United States Government for military production and other national defense purposes is deeply and directly influenced by – (A) the overall competitiveness of the industrial economy of the United States; and the ability of industries in the United States, in general, to produce internationally competitive products and operate profitably while maintaining adequate research and development to preserve competitiveness with respect to military and civilian production…").

[40] 2001 Report at 14.  The report is not clear whether it is referring to short tons or metric tons.  While not crucial to the analysis, if the figure is in short tons then the equivalent amount in metric tons would be 30.56 million metric tons.

[41] 2001 Report at 16 (Table 2).

The updated analysis in Appendix I shows that 49.1 percent of domestic steel consumption in 2007 was used in critical industries.  Domestic production in 2007 was 110 million metric tons.  The 49.1 percent of domestic consumption used in critical industries equals 54 million metric tons, compared to 30.56 million metric tons (or 33.68 million short tons) used in critical industries in 1997.  Thus in 10 years the demand for steel in critical industries increased by 63 percent.

## B. Imports in Such Quantities as are Presently Found Adversely Impact the Economic Welfare of the U.S. Steel Industry

In the steel sector, foreign competition is characterized by substantial and sustained global overcapacity and production in excess of foreign domestic demand.

### 1.   Imports of Steel Products Continue to Increase

The United States is the world's largest steel importer.  The top 20 sources of U.S. imports of steel products accounted for approximately 91 percent of the roughly 36 million metric tons of steel the United States is expected to import in 2017 (*see* Figure 2).

Total U.S. imports rose from 25.9 million metric tons in 2011, peaking at 40.2 million metric tons in 2014 at the height of the shale hydrocarbon drilling boom.  For 2017 (first ten months) imports are increasing at a double-digit rate over 2016, pushing finished steel imports consistently over 30 percent of U.S. consumption.

| | Figure 2. Top U.S. Imports of All Steel Products | | | |
|---|---|---|---|---|
| | Imports for Domestic Consumption, Quantity In Metric Tons, Ranked By 2017 | | | |
| 2017 Rank | Country | 2011 | 2017 (Annualized) | % Change 2011 2017 (Annualized) |
| | **World** | 25,994,621 | 35,927,141 | 38% |
| 1 | Canada | 5,539,448 | 5,800,008 | 5% |
| 2 | Brazil | 2,820,927 | 4,678,530 | 66% |
| 3 | South Korea | 2,572,981 | 3,653,934 | 42% |
| 4 | Mexico | 2,625,104 | 3,249,292 | 24% |
| 5 | Russia | 1,269,717 | 3,123,691 | 146% |
| 6 | Turkey | 665,303 | 2,249,456 | 238% |
| 7 | Japan | 1,824,393 | 1,781,147 | -2% |
| 8 | Germany | 978,230 | 1,370,669 | 40% |
| 9 | Taiwan | 588,036 | 1,251,767 | 113% |
| 10 | India | 735,802 | 854,026 | 16% |
| 11 | China | 1,132,292 | 784,393 | -31% |
| 12 | Vietnam | 120,134 | 727,643 | 506% |
| 13 | Netherlands | 517,773 | 589,930 | 14% |
| 14 | Italy | 276,809 | 515,459 | 86% |
| 15 | Thailand | 72,183 | 417,389 | 478% |
| 16 | Spain | 195,907 | 403,091 | 106% |
| 17 | United Kingdom | 400,244 | 354,389 | -11% |
| 18 | South Africa | 123,001 | 350,425 | 185% |
| 19 | Sweden | 267,685 | 299,170 | 12% |
| 20 | United Arab Emirates | 63,316 | 290,221 | 358% |
| | **Top 20 Total** | **22,789,285** | **32,744,630** | **44%** |

Source: United States Department of Commerce, Bureau of the Census, Foreign Trade Division, IHS Global Trade Atlas Database: Revised Statistics for 2011 - 2017.  2017 data is annualized based on YTD 2017 through October.

As shown in Appendix K, antidumping and countervailing duty actions can address specific instances of unfairly traded steel products.  However, given the large number of countries from which the United States imports steel and the myriad of different products involved, it could take years to identify and investigate every instance of unfairly traded steel, or attempts to transship or evade remedial duties.

Moreover, U.S. industry has already spent hundreds of millions of dollars in recent years on AD/CVD cases, with seemingly no end in sight to their outlays. Smaller steel manufacturers are financially unable to afford these type of cases, or are hesitant to file cases in light of possible market entry retaliation in foreign markets for finished steel products.[42]

## 2.   High Import Penetration

In contrast to the situation in the 2001 Report, where imports of semi-finished steel represented approximately 7 percent of domestic consumption,[43] imports of finished steel products (i.e. not including semi-finished steel) currently represent over 25 percent of U.S. consumption (*see* Figure 3).[44]  If imports of semi-finished products are included, the import penetration level has been above 30 percent for the first ten months of 2017.  Import penetration of steel pipe and tube was 74 percent in 2016 and further increased in 2017.



Figure 3. U.S. Import Penetration of Finished Steel Products (Excludes Semi-Finished)

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | YTD 2016 | YTD 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Imp. Pen. | 26.4 | 21.6 | 22.3 | 20.4 | 20.4 | 15.9 | 21.6 | 20.9 | 26.7 | 21.9 | 23.9 | 21.7 | 20.9 | 21.8 | 23.9 | 23.1 | 28.1 | 28.9 | 25.5 | 25.4 | 27.5 |

Source: American Iron and Steel Institute. YTD data source is through October 2016 and October 2017. Excludes semi-finished imports.

---

[42]  Congress has specifically expressed concern about the need to maintain small suppliers and the potential adverse impact on military readiness caused by the loss of small suppliers.  *See* 50 U.S.C. § 4502(a)(8).

[43]  2001 Report at 31.

[44]  AISI's statistical yearbook reports that about 8 percent of U.S. shipments are made of imported substrate.

### 3.     High Import to Export Ratio

U.S. imports of steel products, which displace demand for domestic steel and lower production at U.S. plants, reached nearly four times the level of exports of U.S. steel products in 2016 (*see* Figure 4).   The expansion of steel production capacity outside of the United States in the last decade (Asia, the Middle East, and South America), much of it subsidized by national governments, continues to depress world steel prices while making it increasingly difficult for U.S. companies to export their steel products.   While U.S. steel producers saw a mild increase in steel exports from 2005 to 2013, more recently sales to foreign customers have been declining.   Exports fell to nine million metric tons in 2016 from a 20-year high of 12 million metric tons annually from 2011 to 2013.   Most U.S. steel exports are auto industry related and are sent to Canada (50 percent by weight in 2016) and Mexico (39 percent by weight in 2016).   Flat products represent the majority of these exports – 57 percent of U.S. steel exports for Canada and 64 percent of steel exports for Mexico.



Figure 4. U.S. Imports and Exports of Steel Mill Products

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | YTD 2016 | YTD 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Imports | 38.1 | 32.7 | 34.8 | 27.7 | 29.9 | 21.1 | 32.6 | 29.3 | 41.3 | 30.3 | 29.2 | 14.7 | 21.8 | 26 | 30.5 | 29.3 | 40.3 | 35.4 | 30 | 25 | 29.9 |
| Exports | 5.4 | 5.1 | 6.3 | 5.8 | 5.8 | 7.8 | 7.5 | 9.1 | 9.2 | 10.5 | 12.9 | 9 | 11.5 | 12.8 | 13.1 | 12.1 | 11.5 | 9.6 | 8.9 | 7.2 | 8.1 |

Sources: IHS Markit Global Trade Atlas
YTD through October 2016 & 2017.

The same is true in the line pipe sector.   The United States exports a minimal amount of line pipe.   Exports of line pipe reached a recent peak of 525 thousand metric tons in 2013 before declining significantly.   Exports totaled just 60 thousand metric tons in 2016, a decrease of 89 percent from 2013, and were less than one-

twentieth of the size of line pipe imports.  Canada represents the largest destination for U.S. line pipe exports, with 39 percent of 2016 exports going to Canada, followed by Mexico with 13 percent.

### 4.    Steel Prices

Hot-rolled coil prices are a benchmark price indicator for a common type of steel (*see* Figure 5).  Hot rolled coil is considered a "benchmark" because it is a commodity product with a fairly common definition globally.



**Figure 5. Hot Rolled- USA Domestic Hot Rolled Coil (FOB Midwest Mill) $/mt**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| US HRC | 674.27 | 597.22 | 962.51 | 538.89 | 680.56 | 822.62 | 701.84 | 696.20 | 727.78 | 505.65 | 575.68 | 684.11 |

Source: Platts (accessed from Bloomberg Financial) 2017 reflects the price through December (as of December 21, 2017.

U.S. prices for hot-rolled steel coil have been higher than in other countries since 2010.  U.S. domestic benchmark prices for this product class dipped especially low in 2015 at $505.65/metric ton before recovering in 2016 to $575.68/metric ton.  In 2016, the price of freight-on-board stowed China port steel hot-rolled coil was 14 percent lower than U.S. domestic hot-rolled coil.  In the case of ASEAN nations, import prices for hot-rolled coil were 33 percent lower and North Europe domestic hot-rolled coil was 21 percent lower.  Each region saw a price decline in 2015 (*see* Figure 6).  U.S. prices remained higher than other regions' prices for this commodity level product throughout the period.  Such higher prices are attributable to higher taxes, healthcare, environmental standards,

and other regulatory expenses. Moreover, lower prices in steel producing regions backed by state-subsidized enterprises adds pressure on U.S. competitors to export their steel products to the U.S. Again in 2016, all categories of steel in all countries continued to experience pressure to lower prices compared to what could be charged in 2012.



**Figure 6. Regional Comparison of Hot Rolled Coil Bench Mark Prices (USD/MT)**

|  | 2012 | 2013 | 2014 | 2015 | 2016 | 2017* |
|---|---|---|---|---|---|---|
| ■ USA Domestic Hot Rolled Coil | 701.84 | 696.20 | 727.78 | 505.65 | 575.68 | 684.11 |
| ■ Steel Hot Rolled Coil (FOB Stowed China Port) | 562.50 | 525.00 | 457.50 | 269.50 | 497.50 | 572.00 |
| ■ Asean Import Hot Rolled Coil | 605.66 | 570.43 | 519.89 | 336.55 | 386.81 | 534.75 |
| ■ North Europe Domestic Hot Rolled Coil | 659.54 | 614.41 | 568.41 | 420.19 | 455.29 | 604.90 |
| ■ South Europe Domestic Steel Rebar | 636.59 | 598.34 | 551.66 | 394.11 | 427.68 | 568.53 |

Source: Bloomberg, Platts, Antaike. 2017 prices are through December 20, 2017.

In 2015, steel prices fell globally. As the OECD noted, the combined effect of weakening global steel demand, including in the United States, growing exports in many economies, and decreases in steelmaking costs led to a very sharp decline

in steel prices in 2015.  Notwithstanding these effects, prices for steel in the U.S. remained substantially higher than in any other area.  However, relative to prices between 2010 and 2013, prices are still relatively depressed.

Global excess steel production weakens the pricing power of U.S. steel producers.  U.S. steel producers' costs are higher than the costs for producers in other regions due to higher taxes, healthcare, environmental, and other regulatory expenses.  Higher U.S. steel prices incentivize importing lower-cost foreign steel. Moreover, excess production and lower prices in regions proximate to state subsidized enterprises displace purchases from market based steel exporters and add pressure on those market based suppliers to export to the U.S.  The effect of global excess steel production on U.S. steel prices and import levels is discussed in greater detail in Appendix L.

## 5.    Steel Mill Closures

U.S. steel mill closures continue eroding overall U.S. steel mill capacity and employment.  Many U.S. steel mills have been driven out of business due to declining steel prices, global overcapacity, and unfairly traded steel.  Since 2000, the United States has lost over 25 percent of its basic oxygen furnace facilities with the closure of six facilities: RG Steel in Sparrows Point, Maryland; RG Steel in Steubenville, Ohio; RG Steel in Warren, Ohio; ArcelorMittal in East Chicago, Indiana; ArcelorMittal in Weirton, West Virginia; and U.S. Steel in Fairfield, Alabama.

In addition, four electric arc furnace steel facilities have closed: Evraz in Claymont, Delaware; ArcelorMittal in Georgetown, South Carolina; Gerdau in Sand Springs, Oklahoma; and Republic Steel in Lorain, Ohio. Most recently, ArcelorMittal has announced the closure of its plate rolling mill in Conshohocken, Pennsylvania, because of sagging commercial sales attributed to surging imports of low-cost steel product and flat defense demand.[45]

The closures of these facilities have had a significant impact on the U.S. industrial workforce and local economies.  RG Steel suffered three closures:

---

[45]   Cowden, M. "Arcelor Mittal to Shut PA Plate Mill," American Metal market, September 18, 2017.

Sparrows Point, Maryland; Steubenville, Ohio; and Warren, Ohio.  After filing for bankruptcy in 2012, more than 2,000 employees were displaced in Maryland alone and another 2,000 in the Midwest.  The company cited weak demand in the steel industry as well as lack of financing as key contributors to the closure.[46]

Closures of smaller steel mills have had equally devastating impacts on employment.  Gerdau Sand Springs in Oklahoma lost 300 employees after closing in 2009 because of a long-term drop in demand for steel.[47]  Sand Springs was the last remaining steel plant in Oklahoma and had been in production since the 1920s.

In 2013, at least 345 employees were laid off in response to the closure of the Claymont steel mill in Delaware.  The Governor of Delaware, Jack Markell, attributed the financial difficulties of the facility to "subdued market demand and the high volume of imports."[48]

Similar difficulties were cited by the ArcelorMittal's Georgetown, South Carolina facility and U.S. Steel's location in Fairfield, Alabama, both of which closed in 2015.  Layoffs for these two corporations totaled 226 and more than 1,100 employees, respectively.  Both companies attributed the layoffs to financial losses and ultimately, to facility closures due to the rise in competition from inexpensive imports.[49]

Even temporary idling of steel plants threatens the U.S. steel industry as there are significant financial costs with re-opening a steel mill.  Multiple U.S. facilities remain idled: there are four idled basic oxygen furnace facilities, two each in Kentucky and Illinois, representing almost one third of the remaining basic oxygen

[46] Business Journal, "'Unforeseen Conditions' Closes Warren Steel Holdings," January 12, 2016, http://businessjournaldaily.com/utilities-cut-to-warren-steel-holdings/; Baltimore Brew, "Six reasons why the Sparrows Point steel mill collapsed," May 25, 2012, https://baltimorebrew.com/2012/05/25/six-reasons-why-the-sparrows-point-steel-mill-collapsed/.

[47] News on 6, "Sand Springs Steel Plant May Close," June 9, 2009, http://www.newson6.com/story/10500785/sand-springs-steel-plant-may-close.

[48] Business Insider, "Shutdown of Russian Steel Mill in Delaware Could Send a Message About US Trade," October 17, 2013, http://www.businessinsider.com/evraz-closes-claymont-steel-2013-10.

[49] AL.com, "U.S. Steel lays off 200 more workers in Fairfield," March 18, 2016, http://www.al.com/business/index.ssf/2016/03/us_steel_lays_off_200_more_wor.html.

furnace facilities in United States.[50]   In addition, there are idled pipe and tube mills in Texas, Ohio, and Alabama.  Once production is halted at these facilities it is not always possible to bring back the highly skilled workforce needed to operate them. When steel mill restarts do occur, additional costs are often incurred for specialized worker training and production ramp-up.

In addition, when a steel mill closes at a given location, the workers find other occupations, move to other steel mills, or remain indefinitely unemployed.  After a significant period of unemployment, much of the specialized skill required by steel mill workers is forgotten.  Furthermore, it is typically not easy to find and recruit displaced workers who may live hundreds or thousands of miles away.

### 6.    Declining Employment Trend Since 1998

U.S. steel industry employment has declined 35 percent (216,400 in 1998 to 139,800 in January 2016 - December 2016), including 14,100 lost jobs between 2015 and 2016.  While employment numbers increased slightly in certain years, the trend is dramatically downward (*see* Figure 7).  Layoffs defer formal plant closings but are an indication of financial distress.  Layoffs in the last two years have been particularly acute in steel producers with pipe and tubular facilities.  In addition to layoffs, there are permanent closures and bankruptcies in the industry.[51]

The loss of skilled workers is especially detrimental to the long-term health and competitiveness of the industry.  The unstable and declining employment outlook for the industry also dissuades younger workers from wanting to participate in the future U.S. steel industry.  The inability to rapidly add skilled workers to the industry negatively affects current manufacturing capabilities.  This is especially problematic in the event of a major production surge or mobilization.

---

[50]   *See* Figure 13.

[51]   *See infra,* section V(C)(1).



Figure 7. Combined Steel Industry Employment (Yearly Average)

| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 218.2 | 216.4 | 211.0 | 208.2 | 189.4 | 170.4 | 163.0 | 156.5 | 156.9 | 157.0 | 161.3 | 160.2 | 135.2 | 138.6 | 148.7 | 152.4 | 149.4 | 151.2 | 147.9 | 139.8 | 142.2 |

Source: Bureau of Labor Statistics, using the annual average of seasonally adjusted employees, NAICS Codes: 3311 and 3312, updated 11.22.2017

## 7.    Trade Actions – Antidumping and Countervailing Duties

The number of U.S. antidumping and countervailing duty measures in effect illustrates the scope of the problem confronting the U.S. steel industry.  In 1998, at the height of that periods steel crisis, there were just over 100 antidumping and countervailing duty cases against finished steel products.[52]  Today there are 164 antidumping and countervailing duty orders in effect for steel, with another 20 steel investigations currently ongoing and another waiting to take effect through publication in the Federal Register (*see* Appendix K for a full listing of Steel Antidumping and Countervailing Duty Orders in Effect).  This represents a 60 percent increase in cases since the last time the Department investigated steel in 2001.

## 8.  Loss of Domestic Opportunities to Bidders Using Imported Steel

Despite efforts to level the playing field through AD/CVD orders, there are numerous examples of U.S. steel producers being unable to fairly compete with foreign suppliers, including the lack of ability to bid on some critical U.S. infrastructure projects.  Due to unfair competition, particularly from foreign state-

---

[52]  Global Steel Trade: Structural Problems and Future Solutions; Department of Commerce; July, 2000.

owned enterprises, U.S. steel producers have lost out on U.S. business opportunities. Some examples include Chinese companies providing steel for the eastern span of the San Francisco-Oakland Bay Bridge as well as the Alexander Hamilton Bridge over the Harlem River in New York.[53]

The Alliance for American Manufacturing's statement before the Congressional Steel Caucus (March 2017) identified three other recent infrastructure projects in New York that have used or will use heavily subsidized or possibly dumped foreign steel:  the Verrazano-Narrows Bridge, LaGuardia Airport, and the Holland Tunnel.  Two major U.S. cities – Boston and Chicago – have contracted with Chinese companies to build new subway cars, primarily constructed with imported steel, for their respective transportation systems.[54]

### 9.   Financial Distress

Rising levels of imports of steel continue to weaken the U.S. steel industry's financial health.  Years of running on low-profit margins or at a loss have weakened an industry that continues to face an ever-increasing wave of steel imports.  The U.S. industry, as a whole, has operated on average with negative net income from 2009-2016.  Net income for U.S.-owned steel companies has averaged only $162 million annually since 2010, challenging the financial viability of this vital industry (*see* Figure 8).

---

[53]   New York Times, "Bridge Comes to San Francisco With a Made-in-China Label," June 25, 2011, http://www.nytimes.com/2011/06/26/business/global/26bridge.html

[54]   Reuters, "China's CRRC lands $1.3 billion China rail car project," March 10, 2016, http://www.reuters.com/article/us-crrc-usa-idUSKCN0WC17I



Figure 8. U.S. Steel Industry Net Annual Income

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Income | 555 | -178 | 380 | -261 | 3060 | 3057 | 4368 | 3857 | 4856 | -1803 | -458 | 927 | -188 | 549 | 1230 | -1636 | 713 |

Source: Company websites.
*Includes financials of AK Steel, Carpenter Technology, Commercial Metals Company, Nucor, Steel Dynamics, and U.S. Steel.

The Stern School of Business at New York University calculates that U.S. steel industry participants in the last five years experienced negative net income of 17.8 percent. Compounded growth in revenue for the past five years in the steel industry has been a negative 7 percent.[55] The loss of revenue has caused U.S. steel manufacturers, both large and small, to defer or eliminate production facility capital investments and funding for research and development. Even though there was a slight uptick in net income for the first quarter in 2017 over the fourth quarter of 2016 margins remain poor compared to historic levels.

Not only have earnings before interest, taxes, depreciation, and amortization (EBITDA) been shallow for steel producers in the United States, many of them are burdened with high levels of debt, as much as 11.9 times of earnings for one major producer (*see* Figure 9).[56] While some companies are starting to pay down debt,

---

[55] "Historical (Compounded Annual) Growth Rates by Sector," Aswath Damodaran, New York University Stern School of Business, January 2017. (*see* http://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile /histgr.html)

[56] Nucor operates mini-mills that use electric arc furnaces to produce high demand steel products primarily with recycled steel scrap. From a financial perspective, this business model allows Nucor to be highly price competitive, but the company produces a narrower range of flat steel products than integrated steel mills. The mini-mills can weather bad economic times because they have lower energy costs and can regulate production

others have not been able to do so primarily because of slack demand for domestically produced steel in the face of competition from imported products. Absent increases in steel production volume and pricing, one leading law firm specializing in insolvency, White & Case, observes that some steelmakers in the United States may soon have to renegotiate loan agreements to extend maturities; those that are not able to may have to consider Chapter 11 bankruptcy.[57]

### Figure 9. U.S. Steel Industry Leverage Analysis (FY 2015)



Source: Debtwire, Bloomberg, NYSE, White & Case LLP
*EBITDA unavailable; debt is estimated

Note: Nucor has only electric arc furnaces (EAF).  EAFs can be quickly stopped (or used for fewer shifts) and then restarted more easily than blast furnaces, where the furnace must be kept hot.  This attribute makes Nucor slightly more flexible to adapt their production to demand and likely more profitable than large BOF producers. Nucor's key end-markets include nonresidential construction and energy.

JMC Steel is now part of Zekelman Industries

No capital intensive industry can survive with such poor margins over the longer term.  The extensive leverage in the industry shown in Figure 9 adds to the

---

more easily.  Basic oxygen furnace plants have higher fixed operating costs because they directly convert iron ore and other raw materials along with scrap into steel using more energy-intensive processes.

[57]   "Losing Strength: U.S. Steel Industry Analysis," Scott Griesman, White & Case, April 16, 2016 (*see* https://www.whitecase.com/publications/article/losing-strength-us-steel-industry-analysis).

likelihood of further closures if the present high level of imports continues to force U.S. steel mills to operate well below profitable capacity utilization rates.

### 10.    Capital Expenditures

The ability of U.S. manufacturers of iron and steel products to fund capital expenditures for new production plants as well as facility modernization and advanced manufacturing equipment has been limited by falling revenue and reduced profits.  As shown in Figure 10, annual capital expenditures for companies making iron and steel ingot, bars, rods, plate and other semi-finished products wavered from $5.7 billion to $5.1 billion for 2010-2012, before ramping to $7.1 billion in 2013.

| Figure 10. Annual Capital Expenditures | | | | | | | |
|---|---|---|---|---|---|---|---|
| Iron, Steel, and Ferroalloys Steel NAICS Codes 3311 and 3312 Combined | Millions of Current Dollars | | | | | | |
| | Annual Capital Expenditures Survey | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| A. | Structures [New & Used Structures Combined] | 1,026 | 1,322 | 1,564 | 1,157 | 724 | 580 |
| B. | Equipment [New & Used Equipment Combined] | 4,634 | 4,572 | 3,592 | 5,954 | 3,139 | 2,531 |
| C. | Total Capital Expenditures | 5,661 | 5,894 | 5,157 | 7,111 | 3,863 | 3,110 |
| D. | (Unweighted) Payroll of Reporters / Total Payroll of Firms Classified in Industry group | 86% | 84% | 80% | 61% | 86% | 84% |
| Source:  U.S. Census Bureau, Annual Capital Expenditures Survey, www.census.gov/programs-surveys/aces.html | | | | | | | |

Confronted with receding orders for products and declines in income in 2013, iron and steel companies operating production facilities in the United States started curtailing capital investments.  Total capital spending dropped to $3.87 billion in 2014 and slid further to $3.11 billion in 2015 – 32 percent below 2010 levels of $5.66 billion.

The decline in capital expenditures reflected similar drops in net sales, which plummeted from $129.6 billion in 2014 to $102 billion in 2015.  Income after taxes

for U.S. iron and steel manufacturers fell from $2.48 billion in the same two-year period to a massive loss of $3.5 billion in 2015.

**C.** *Displacement of Domestic Steel by Excessive Quantities of Imports has the Serious Effect of Weakening Our Internal Economy*

### 1. Domestic Steel Production Capacity is Stagnant and Concentrated

According to the OECD, U.S. steel production capacity has remained stagnant at an average of approximately 114.3 million metric tons for more than a decade from 2006-2016 (*see* Figure 11).  For 2016, the rated maximum capacity was 113 million metric tons for existing basic oxygen furnace and electric arc furnace facilities.



**Figure 11. U.S. Annual Steel Production Capacity**

| | 1995 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Capacity | 102 | 116 | 112 | 102 | 109 | 110 | 113 | 115 | 113 | 115 | 115 | 115 | 117 | 118 | 114 | 114 | 111 | 113 | 112.8 |

Source: Organization for Economic Cooperation and Development (OECD), 2017 capacity is a forecast







The present situation with respect to basic oxygen furnace production is significantly worse than the situation assessed by the Department in the 2001 Report. As shown in Figure 13 below, the number of basic oxygen furnace facilities and units has declined precipitously since 1995. In 2000, there were 105 companies that produced raw steel at 144 locations,[59] while today there are only 38 companies producing steel at 93 locations, a 64 percent and 36 percent reduction, respectively.

Most importantly, in 2000 thirteen companies "operated integrated steel mills, with an average of 35 blast furnaces in continuous operation during the year"[60] while today there are only three companies operating 13 basic oxygen furnaces. These are 77 percent and 60 percent reductions, respectively. As a result, today only 26 percent of domestic steel is produced from raw materials in the United States, as compared to 53 percent in 2000.

As noted earlier, since 2000 there has been over a 25 percent reduction in the number of basic oxygen furnaces operating in the United States, and 33 percent of the remaining basic oxygen furnaces are currently idled. In the Secretary's view, a further reduction in basic oxygen furnace capacity, which is especially important to the ability of domestic industry to meet national security needs, is inevitable if the present imports continue or increase.



This would be a serious "weakening of our internal economy" and place the United States in a position where it is unable to be certain

---

[59]   2001 Report at 21.

[60]   *Id.*

it could meet demands for national defense and critical industries in a national emergency.[61]

| Figure 13.  Basic Oxygen and Electric Arc Facilities and Units Located in the United States, 1975 - 2016 | | | | |
|---|---|---|---|---|
| Year | Basic Oxygen Furnace Facilities | Basic Oxygen Furnace Units | Electric Arc Furnace Facilities | Electric Arc Furnace Units |
| 1975 | 38 | 90 | -- | -- |
| 1980 | 33 | 78 | -- | -- |
| 1985 | 27 | 66 | -- | -- |
| 1990 | 24 | 61 | 127 | 246 |
| 1995 | 22* | 56* | 116 | 218 |
| 2000 | 19* | 50* | 122 | 174 |
| 2005 | 17 | 46 | 115* | 169* |
| 2010 | 16 | 44 | 108 | 164 |
| 2015 | 13 | 31 | 98 | 154 |
| 2016 | 13 | 31 | 98 | 154 |

Source: U.S. Department of Commerce/BIS, American Iron and Steel Institute, Association for Iron & Steel Technology, Steel Manufacturers Association, August 2017.  *Estimated.

Basic Oxygen Furnace: Basic Oxygen Furnaces (BOF) are the dominant steelmaking technology globally, accounting for 74% of the world's total output of crude steel in 2016.  BOF share of production in the U.S. was 33% in 2016 and has been slowly declining, due primarily to the advent of the "Greenfield" electric arc furnace (EAF) flat-rolled mills.  The primary raw materials for the BOF are liquid hot metal (iron) from the blast furnace and steel scrap.  [1] These are charged into the BOF vessel.  Oxygen (>99.5% pure) is "blown" into the BOF at supersonic velocities.  It oxidizes the carbon and silicon contained in the hot metal, liberating great quantities of heat, which melts the scrap.  Source: Steel.org.

Electric Arc Furnace: The Electric Arc Furnace (EAF) operates as a batch melting process, producing batches of molten steel known "heats".  The EAF process uses steel scrap and iron units, melting them using electricity to make new steel.  EAF output accounted for 66% of U.S. steel production in 2016.  Source: Steel.org.

[1] The Blast Furnace chemically reduces and physically converts iron oxides into liquid iron called "hot metal".  The blast furnace is a huge steel stack lined with refractory brick, where iron ore, coke, and limestone are dumped into the top, and preheated air is blown into the bottom.  The raw materials require six to eight hours to descend to the bottom of the furnace, where they become the final product of liquid slag and liquid iron.  Source: Steel.org.

In contrast to the situation in the United States, the leading global producers of steel (Brazil, South Korea, Japan, Russia, Germany, and especially China) primarily rely on basic oxygen furnace capacity rather than electric arc furnace capacity (*see* Figure 14).  Each of these economic competitors to the United States possess critical research, development and production capabilities that the United

---

[61]  *See infra*, sections C4 and C5, for a further discussion of the inability to meet surge requirements in an emergency.

States is in danger of losing if imports continue to force U.S. steel producers to operate at uneconomic capacity utilization levels.

A further reduction in domestic basic oxygen furnace capacity would put the United States at serious risk of becoming dependent on foreign steel to support its critical industries and defense needs. Allowing this decline to continue represents a "weakening of our internal economy that may impair national security" which the Congress has directed the Secretary to advise the President of under the Section 232. *See* 19 U.S.C. § 1862(d).

| Rank | Top Import Sources in 2016 in Tonnage Terms | 2015 BOF Share | 2015 EAF Share | 2015 Other Share | Approx. Country s Average Capacity Utilization in 2016 (OECD) |
|------|---------------------------------------------|----------------|----------------|------------------|--------------------------------------------------------------|
| | World | 74.20% | 25.20% | 0.50% | 67% |
| 1 | Canada | 53.80% | 46.20% | | 62% |
| 2 | Brazil | 78.20% | 20.20% | | 57% |
| 3 | South Korea | 69.60% | 30.40% | | 80% |
| 4 | Mexico | 29.70% | 70.30% | | 75% |
| 5 | Turkey | 35.00% | 65.00% | | 65% |
| 6 | Japan | 77.10% | 22.90% | | 80% |
| 7 | Russia | 66.30% | 30.50% | 3.10% | 76% |
| 8 | Germany | 70.40% | 29.60% | | 72% (EU 28) |
| 9 | Taiwan | 62.30% | 37.70% | | 75% |
| 10 | Vietnam | 25.00% | 59.90% | 15.20% | 32% |
| 11 | China | 93.90% | 6.10% | | 69% |
| 12 | Netherlands | 98.60% | 1.50% | | 72% (EU 28) |
| 13 | Italy | 21.30% | 78.20% | | 72% (EU 28) |
| 14 | United Kingdom | 83.00% | 17.00% | | 72% (EU 28) |
| 15 | France | 65.60% | 34.40% | | 72% (EU 28) |
| 16 | India | 42.90% | 57.10% | | 75% |
| 17 | Australia | 77.60% | 22.40% | | 63% |
| 18 | Spain | 31.70% | 68.30% | | 72% (EU 28) |
| 19 | Sweden | 66.10% | 33.90% | | 72% (EU 28) |
| 20 | South Africa | 56.50% | 43.50% | | 58.5% |

**Figure 14. The Top 20 Countries Exporting to the U.S. – BOF vs. EAF Capacity**

Source: World Steel- Production Share Figures for 2015, US Census Bureau (Accessed Via HIS) – Import Growth Rates, OECD 2017 Q2 Market Assessment – Approximate Capacity Utilization

This is not a hypothetical situation. The Department of Defense already finds itself without domestic suppliers for some particular types of steel used in defense

products, including tire rod steel used in military vehicles and trucks.[62]  While the United States has many allies that produce steel, relying on foreign owned facilities located outside the United States introduces significant risk and potential delay for the development of new steel technologies and production of needed steel products, particularly in times of emergency.  The Secretary notes that the authority for the Department of Defense to place its order ahead of commercial orders on a mandatory basis does not extend to foreign-owned facilities outside the United States.[63]

In the case of critical infrastructure, the United States is down to only one remaining producer of electrical steel in the United States (AK Steel – which is highly leveraged).  Electrical steel is necessary for power distribution transformers for all types of energy – including solar, nuclear, wind, coal, and natural gas – across the country.  If domestic electrical steel production, as well as transformer and generator production, is not maintained in the U.S., the U.S. will become entirely dependent on foreign producers to supply these critical materials and products.[64]  Without an assured domestic supply of these products, the United States cannot be certain that it can effectively respond to large power disruptions affecting civilian populations, critical infrastructure, and U.S. defense industrial production capabilities in a timely manner.

## 2.  Production is Well Below Demand

Demand for steel products in the United States (*see* Figure 15), increased from 100.1 million metric tons in 2011 to 117.5 million metric tons in 2014, then declined to 99.8 million metric tons in 2016.  Demand in 2017 is projected to rebound to 107.7 million metric tons.  During the 2011 to 2016 period, U.S. production of steel products dropped from 86.4 million metric tons in 2011 to 78.6 million metric tons in 2016, with a four percent increase expected in 2017.

---

[62]  Letter from Defense Logistics Agency, Columbus, OH to BIS/OTE, August 1, 2017.

[63]  *See* Defense Priorities and Allocations System Program (DPAS), www.dcma.mil/DPAS

[64]  United States Congress, Congressional Steel Caucus.  Statement of Roger Newport, CEO, AK Steel Corporation (on behalf of the American Iron and Steel Institute).  March 29, 2017.

For the six-year period, U.S. domestic steel production supplied only 70 percent of the average demand, even though available U.S. domestic steel production capacity during that period could have, on average, supplied up to 100 percent of demand (U.S. steel producers would be running at 92 percent capacity utilization for this period) with approximately 13 million metric tons of additional capacity remaining.

| Figure 15. U.S. Steel Market Snapshot (millions of metric tons) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 YTD | 2017 Annualized |
| Total Demand for Steel in U.S. (Production + Imports - Exports) | 100.1 | 106.6 | 104.6 | 117.5 | 104.9 | 99.8 | 80.7 | 107.3 |
| U.S. Annual Capacity | 116.5 | 118.0 | 113.5 | 113.5 | 111.3 | 113.3 | --- | --- |
| U.S. Annual Production (Liquid) | 86.4 | 88.7 | 86.9 | 88.2 | 78.8 | 78.6 | 61.5 | 81.9 |

Sources: United States Department of Commerce, Bureau of the Census.  American Iron and Steel Institute.  Calculations based on industry and trade data.

### 3.  Utilization Rates are Well Below Economically Viable Levels

Overall, steel mill production capacity utilization has declined from 87 percent in 1998, to 81.4 percent in 2008, to 69.4 percent in 2016 (*see* Figure 16).  For the most recent six-year period (2011- 2016), the average utilization rate was 74 percent.

Industry analysts note that utilization of 80 percent or more is typically necessary for sustained profitability, among other factors.[65]  For most capital and energy-intensive U.S. steel producers, capacity levels of 80 percent or higher are required to maintain facilities, carry out periodic modernization, service company debt, and fund research and development.

---

[65]   Market Realist, "Why steel investors are mindful of capacity utilization rates," October 2, 2014, http://marketrealist.com/2014/10/investors-mindful-capacity-utilization-rate/.  *See also* http://marketrealist.com/2015/09/upstream-exposure-impact-steel-companies/



Figure 16. U.S. Crude Steel Production by Furnace Type and Capacity Utilization

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basic Oxygen | 54.2 | 52.3 | 54.0 | 47.4 | 45.4 | 45.9 | 47.7 | 42.7 | 42.1 | 41.1 | 39.1 | 22.7 | 31.1 | 34.3 | 36.3 | 34.3 | 33.0 | 29.4 | 25.9 |
| Electric Arc Furnace | 44.5 | 45.1 | 47.9 | 42.7 | 46.1 | 47.8 | 52.0 | 52.2 | 56.1 | 57.0 | 52.8 | 36.7 | 49.4 | 52.1 | 52.4 | 52.6 | 55.2 | 49.4 | 52.6 |
| Capacity Utilization (%) | 86.8 | 83.8 | 86.1 | 79.2 | 88.8 | 84.9 | 94.6 | 87.5 | 87.5 | 87 | 81.4 | 51.2 | 70.4 | 74.4 | 75.2 | 76.7 | 77.5 | 70.1 | 69.4 |

Source: American Iron and Steel Institute

When steel factory utilization falls, costs per unit of steel product rises, reducing profit margins and product pricing flexibility.  Higher capacity utilization usually results in lower per-unit product costs and higher overall profit.[66]  Over 80 percent is a healthy capacity utilization rate and a rate at which most companies would be profitable.

The U.S. steel industry uses 80 percent as a benchmark for minimum operational efficiency.  Moreover, the steel industry is capable of reaching and sustaining 80 percent capacity utilization or higher.  During the 2002-2008 period, U.S. steel companies operated at an average 87.4 percent level.[67]

These industry assessments are consistent with a 1983 report on "Critical Materials Requirements in the U.S. Steel Industry" in which the Department

---

[66]   Houston Chronical, "Capacity Utilization and Effects on Product and Profit," http://smallbusiness.chron.com/capacity-utilization-effects-product-profit-67046.html; steel industry sources.

[67]   http://marketrealist.com/2015/09/upstream-exposure-impact-steel-companies.html ("It's important to note how changes in capacity utilization rates impact a company's earnings.  For example, we see a big jump in earnings when utilization rates improve from 80 percent to 85 percent.  However, incremental benefits are lower when utilization rates increase from 90 percent to 95 percent.").

explained that "[c]apability utilization or capacity use, which in effect describes the efficiency of an industry's use of capital, is a prime determinant of profitability. Domestic steel producers were operating at about 55 percent capability for the first half of 1982. The comparable rate for the first half of 1981 was 85 percent. This current rate is probably well below a breakeven point for most producers, whereas 1981 was profitable for nearly all producers."[68]

## 4. Declining Steel Production Facilities Limits Capacity Available for a National Emergency

The number of steel production facilities located in the U.S. continues to decline. As shown earlier in Figure 13, from 1975 to 2016 the number of basic oxygen furnace facilities decreased from 38 to 13. Similarly, from 1990 to 2016, the number of electric arc furnace facilities decreased from 127 to 98.

Due to this decline in facilities, domestic steel producers have a shrinking ability to meet national security production requirements in a national emergency. The U.S. Department of Commerce, Census Bureau regularly surveys plant capacity, and has found that steel producers are quickly shedding production capacity that could be used in a national emergency. The Census Bureau defines national emergency production as the "greatest level of production an establishment can expect to sustain for one year or more under national emergency conditions."[69] From 2011 to 2017, steel producers increased the utilization of the surge capacity they would have during a national emergency from 54.2 percent to 68.2 percent (*see* Figure 17). As steel producers use more of this emergency capacity, there is an increasingly limited ability to ramp up steel production to meet national security needs during a national emergency.

---

[68]   Department of Commerce, "Critical Materials Requirements in the U.S. Steel Industry", March 1983, at 16-17.

[69]   U.S. Dept. of Commerce, Census Bureau, Survey of Plant Capacity. 2011-2017.



Figure 17. Steel Industry Utilization of Emergency Capacity (2011-2017, Quarter 1)

Source: U.S. Department of Commerce, Census Bureau, Survey of Plant Capacity

The ability to increase steel production during a national emergency continues to diminish as the number of steel production facilities continues to decline.  If the U.S. requires a similar increase in steel production as it did during previous national emergencies, domestic steel production capacity may be insufficient to satisfy national security needs.  If a national emergency were to occur at present utilization levels, domestic steel producers would be able to increase production by 146 percent.

For comparison, from 1938 through 1946 the U.S. increased the production of pig iron and ferro-alloys by 217 percent and increased the production of steel ingots and castings by 210 percent to meet the demands of fighting a global war.[70] From 1960 through 1973, during the Vietnam era, the U.S. increased steel production by 152 percent.[71]  Should the U.S. once again experience a conflict on the scale of the Vietnam War, steel production capacity may be slightly insufficient

---

[70] U.S. Dept. of Commerce, Census Bureau.  Statistical Abstract of the United States, 1948.  Page 876.

[71] U.S. Dept. of Commerce, Census Bureau.  Statistical Abstract of the United States, 1978.  Page 830.

to meet national security needs.  But if the U.S. were to experience a conflict requiring the production increase seen during the Second World War, the existing domestic steel production capacity would be unable to meet national security requirements.

Increasing steel production capacity once a large-scale national emergency has arisen would take a significant amount of time.  According to the American Iron and Steel Institute, the replacement of a basic oxygen furnace facility takes more than a year to complete.  Therefore, the lack of spare domestic steel production capacity and the possible inability to sufficiently increase production during a national emergency may impair the national security of the United States.

### D. Global Excess Steel Capacity is a Circumstance that Contributes to the Weakening of the Domestic Economy

#### 1. Free markets globally are adversely affected by substantial chronic global excess steel production led by China

Numerous studies, reports, and investigations have documented the global excess steel capacity, with China having the largest installed capability (*see* Figure 18).[72,73,74] OECD analyses show that the world's nominal crude steelmaking capacity reached about 2.4 billion metric tons in 2016, an increase of 127 percent compared to the 2000 level.  Most of the capacity expansion was planned for construction and manufacturing activities, and to help build the infrastructure necessary for economic development – most in non-OECD countries.  Furthermore, the OECD reports that while steel capacity increased at a steady rate, world steel demand contracted sharply in the aftermath of the global economic and financial crisis of 2008.  Global demand for steel recovered slowly in the years following 2008.  However, since 2013, global steel demand has flattened thereby widening the capacity/demand gap.  By 2015, the gap reached over 700 million metric tons.

---

[72] Brun, L. (2016).  *Overcapacity in Steel, China's Role in a Global Problem.*  Washington, DC: Alliance for American Manufacturing.  http://aamweb.s3.amazonaws.com/uploads/resources/OvercapacityReport2016_R3.pdf

[73] Price, A., Weld, C., El-Sabaawi, L., & Teslik, A. (2016).  Capacity Runs Riot.  Washington, DC: Wiley Rein LLP.

[74] OECD Reports.  (2016). http://www.oecd.org/industry/ind/82nd-session-of-the-steel-committee.htm



The vast size of the capacity/demand gap means that steel demand alone cannot increase enough to balance the global overcapacity problem, which is particularly prevalent in China. Chinese excess capacity, estimated at more than 300 million metric tons, dwarfs total U.S. production capacity (*see* Figure 19).[75]

The effect of global overcapacity and excess steel production on U.S. steel prices and import levels is discussed in greater detail in Appendix L. While U.S. steel production capacity has remained flat since 2001, other steel producing nations have increased their production capacity, with China alone able to produce as much steel as the rest of the world combined.

---

[75]  OECD, "High Level Meeting: Excess Capacity and Structural Adjustment in the Steel Sector," April 2016, http://www.oecd.org/sti/ind/Background%20document%20No%202_FINAL_Meeting.pdf



Several countries (India, Iran, and Indonesia) in addition to China continue to add production capacity despite slack global demand. According to the OECD Steel Committee Chair's statement from March 2017, "New data suggest that nearly 40 million metric tons of gross capacity additions are currently underway and could come on stream during the three-year period of 2017-19, while an additional 53.6 million metric tons of capacity additions are in the planning stages for possible start-up during the same time period."[76] This additional global steel capacity coming online represents over 80 percent of existing U.S. steelmaking production capacity, demonstrating that the import challenge to U.S. industry is continuing to grow.

## 2. Increasing global excess steel capacity will further weaken the internal economy as U.S. steel producers will face increasing import competition

These additions to worldwide steelmaking capacity will only exacerbate the situation because they will further lower global operating utilization rates, including in the United States. Growth in foreign government-subsidized steel production is progressively weakening the financial health of the U.S. steel industry as other steel

---

[76] OECD, "82nd Session of the OECD Steel Committee – Chair's Statement," March 2017, http://www.oecd.org/sti/ind/82-oecd-steel-chair-statement.htm

producing countries export more steel to the U.S. to in part to offset the loss of regional markets to Chinese steel (*see* Appendix L).

The U.S. share of global production continues to steadily decline.  In the year 2000, when President Clinton signed into a law a statute granting China permanent normal trade relations status,[77] the U.S. share of global steel production stood at 12 percent.[78] Since that point in time, the U.S. share of global steel production continued an inexorable decline as other countries, and especially China, began to increase production.  The U.S. share of global steel production fell to 8 percent in 2005,[79] 5 percent in 2009,[80] and 4.8 percent in 2015.[81]  In contrast, China commanded a 49.7 percent share of global steel production in 2015.[82]

If even half of the planned additional global capacity identified by the OECD Steel Committee is built, and the related new production finds its way into the U.S., it will drive the operating rate of U.S. steel mills to less than 50 percent of capacity.  This will cause a substantial and unsustainable negative cash situation that will ultimately result in multiple corporate bankruptcies due to heavy debt loads and related declines in steel production capacity and employment levels.

---

[77]   Public Law 106-286.  An act to authorize extension of nondiscriminatory treatment (normal trade relations treatment) to the People's Republic of China, and to establish a framework for relations between the United States and the People's Republic of China.  October 10, 2000.  https://www.gpo.gov/fdsys/pkg/PLAW-106publ286

[78]   U.S. Dept. of Commerce, Census Bureau.  Statistical Abstract of the United States, 2012.  Page 574.

[79]   *Id.*

[80]   *Id.*

[81]   Steel Statistical Yearbook, 2016.  World Steel Association.  https://www.worldsteel.org/en/dam/jcr:37ad1117-fefc-4df3-b84f-6295478ae460/Steel+Statistical+Yearbook+2016.pdf

[82]   Steel Statistical Yearbook, 2017.  World Steel Association.  https://www.worldsteel.org/en/dam/jcr:3e275c73-6f11-4e7f-a5d8-23d9bc5c508f/Steel+Statistical+Yearbook+2017.pdf

## VI.   CONCLUSION

The Secretary has determined that the displacement of domestic steel by excessive imports and the consequent adverse impact of those quantities of steel imports on the economic welfare of the domestic steel industry, along with the circumstance of global excess capacity in steel, are "weakening our internal economy" and therefore "threaten to impair" the national security as defined in Section 232.

The continued rising levels of imports of foreign steel threaten to impair the national security by placing the U.S. steel industry at substantial risk of displacing the basic oxygen furnace and other steelmaking capacity, and the related supply chain needed to produce steel for critical infrastructure and national defense.

In considering "the impact of foreign competition on the economic welfare of individual domestic [steel] industries" and other factors Congress expressly outlined in Section 232, the Secretary has determined that the continued decline and concentration in steel production capacity is "weakening of our internal economy and may impair national security." *See* 19 U.S.C. § 1862(d).

Global excess steel capacity is a circumstance that contributes to the "weakening of our internal economy" that "threaten[s] to impair" the national security as defined in Section 232.  Free markets globally are adversely affected by substantial chronic global excess steel production led by China.  While U.S. steel production capacity has remained flat since 2001, other steel producing nations have increased their production capacity, with China alone able to produce as much steel as the rest of the world combined.  This overhang of excess capacity means that U.S. steel producers, for the foreseeable future, will face increasing competition from imported steel as other countries export more steel to the United States to bolster their own economic objectives.

Since defense and critical infrastructure requirements alone are not sufficient to support a robust steel industry, U.S. steel producers must be financially viable and competitive in the commercial market to be available to produce the needed steel output in a timely and cost efficient manner.  In fact, it is the ability to quickly shift

production capacity used for commercial products to defense and critical infrastructure production that provides the United States a surge capability that is vital to national security, especially in an unexpected or extended conflict or national emergency.  It is that capability which is now at serious risk; as imports continue to take business away from domestic producers, these producers are in danger of falling below minimum viable scale and are at risk of having to exit the market and substantially close down production capacity, often permanently.

Steel producers in the United States are facing widespread harm from mounting imports.  Growing global steel capacity, flat or declining world demand, the openness of the U.S. steel market, and the price differential between U.S. market prices and global market prices (often caused by foreign government steel intervention) ensures that the U.S. will remain an attractive market for foreign steel absent quotas or tariffs.  Excessive imports of steel, now consistently above 30 percent of domestic demand, have displaced domestic steel production, the related skilled workforce, and threaten the ability of this critical industry to maintain economic viability.

A U.S. steel industry that is not financially viable to invest in the latest technologies, facilities, and long-term research and development, nor retain skilled workers while attracting a next-generation workforce, will be unable to meet the current and projected needs of the U.S. military and critical infrastructure sectors. Moreover, the market environment for U.S. steel producers has deteriorated dramatically since the 2001 Report, when the Department concluded that imports of iron ore and semi-finished steel do not "fundamentally threaten" the ability of U.S. industry to meet national security needs.[83]

The Department's investigation indicates that the domestic steel industry has declined to a point where further closures and consolidation of basic oxygen furnace facilities represents a "weakening of our internal economy" as defined in Section 232.  The more than 50 percent reduction in the number of basic oxygen furnace

---

[83]   2001 Report at 28 – 37.  As noted, *supra* note 16, the 2001 Report added the qualifier "fundamentally" which is not found in the statutory text.  The Secretary in this report uses the statutory standard of "threatens to impair" without such qualification.

facilities – either through closures or idling of facilities due to import competition – increases the chance of further closures that place the United States at serious risk of being unable to increase production to the levels needed in past national emergencies.  The displacement of domestic product by excessive imports is having the serious effect of causing the domestic industry to operate at unsustainable levels, reducing employment, diminishing research and development, inhibiting capital expenditures, and causing a loss of vital skills and know-how.  The present capacity operating rates for those remaining plants continue to be below those needed for financial sustainability.  These conditions have been further exacerbated by the 22 percent surge in imports thus far in 2017 compared with 2016.  Imports are now consistently above 30 percent of U.S. domestic demand.

It is evident that the U.S. steel industry is being substantially impacted by the current levels of imported steel.  The displacement of domestic steel by imports has the serious effect of placing the United States at risk of being unable meet national security requirements.  The Secretary has determined that the "displacement of domestic [steel] products by excessive imports" of steel is having the "serious effect" of causing the "weakening of our internal economy."  *See* 19 U.S.C. § 1862(d). Therefore, the Secretary recommends that the President take corrective action pursuant to the authority granted by Section 232.  *See* 19 U.S.C. § 1862(c).

# VII.  RECOMMENDATION

Prior significant actions to address steel imports (quotas and/or tariffs) were taken under various statutory authorities by President George W. Bush, President William J. Clinton (three times), President George H. W. Bush, President Ronald W. Reagan (three times), President James E. Carter (twice), and President Richard M. Nixon, all at lower levels of import penetration than the present level, which is above 30 percent.

Due to the threat of steel imports to the national security, as defined in Section 232, the Secretary recommends that the President take immediate action by adjusting the level of imports through quotas or tariffs on steel imported into the United States, as well as direct additional actions to keep the U.S. steel industry financially viable and able to meet U.S. national security needs.  The quota or tariff imposed should be sufficient, after accounting for any exclusions, to enable the U.S. steel producers to be able to operate at about an 80 percent or better of the industry's capacity utilization rate based on available capacity in 2017.

In 2016, U.S. steel production was 78.6 million metric tons and U.S. capacity was 113.3 million metric tons, which represents a 69.4 percent capacity utilization rate.  If current import trends for 2017 continue, continued imports without any action are projected to be 36.0 million metric tons, an increase over 2016 of 6.0 million metric tons.  Even with U.S. demand projected to increase to 107.3 from 99.8 million metric tons, increased imports mean U.S. capacity utilization is forecast to rise only to 72.3 percent, a non-financially viable and unsustainable level of operation.

By reducing import penetration rates to approximately 21 percent, U.S. industry would be able to operate at 80 percent of their capacity utilization. Achieving this level of capacity utilization based on the projected 2017 import levels will require reducing imports from 36 million metric tons to about 23 million metric tons.  If a reduction in imports can be combined with an increase in domestic steel demand, as can be reasonably expected rising economic growth rates combined with the increased military spending and infrastructure proposals that the Trump Administration has planned, then U.S. steel mills can be expected to reach a capacity

utilization level of 80 percent or greater.  This increase in U.S. capacity utilization will enable U.S. steel mills to increase operations significantly in the short-term and improve the financial viability of the industry over the long-term.

## Recommendation to Ensure Sustainable Capacity Utilization and Financial Health

**Impose a Quota or Tariff on all steel products covered in this investigation imported into the United States to remove the threatened impairment to national security.**  The Secretary recommends adjusting the level of imports through a quota or tariff on steel imported into the United States.

### Alternative 1 – Global Quota or Tariff

#### 1A.   Global Quota

Impose quotas on all imported steel products at a specified percent of the 2017 import level, applied on a country and steel product basis.

According to the Global Trade Analysis Project (GTAP) Model, produced by Purdue University, a 63 percent quota would be expected to reduce steel imports by 37 percent (13.3 million metric tons) from 2017 levels.  Based on imports from January to October, import levels for 2017 are projected to reach 36.0 million metric tons.  The quotas, adjusted as necessary, would result in imports equaling about 22.7 million metric tons, which will enable an 80 percent capacity utilization rate at 2017 demand levels (including exports).  Application of an annual quota will reduce the impact of the surge in steel imports that has occurred since the beginning of 2017.

#### 1B.   Global Tariff

Apply a tariff rate on all imported steel products, in addition to any antidumping or countervailing duty collections applicable to any imported steel product.

Similar to what is anticipated under a quota, according to the Global Trade Analysis Project (GTAP) Model, produced by Purdue University, a 24 percent tariff on all steel imports would be expected to reduce imports by 37 percent (i.e., a

reduction of 13.3 million metric tons from 2017 levels of 36.0 million metric tons).[84] This tariff rate would thus result in imports equaling about 22.7 million metric tons, which will enable an 80 percent capacity utilization rate at 2017 demand levels (including exports).[85]

**Alternative 2 –Tariffs on a Subset of Countries**

Apply a tariff rate on all imported steel products from Brazil, South Korea, Russia, Turkey, India, Vietnam, China, Thailand, South Africa, Egypt, Malaysia and Costa Rica, in addition to any antidumping or countervailing duty collections applicable to any steel products from those countries. All other countries would be limited to 100 percent of their 2017 import level.

According to the Global Trade Analysis Project (GTAP) Model, produced by Purdue University, a 53 percent tariff on all steel imports from this subset of countries would be expected to reduce imports by 13.3 million metric tons from 2017 import levels from the targeted countries. This action would enable an increase in domestic production to achieve an 80 percent capacity utilization rate at 2017 demand levels (including exports). The countries identified are projected to account for less than 4 percent of U.S. steel exports in 2017.

**Exemptions**

In selecting an alternative, the President could determine that specific countries should be exempted from the proposed 63 percent quota or 24 percent tariff by granting those specific countries 100 percent of their prior imports in 2017, based on an overriding economic or security interest of the United States. The Secretary recommends that any such determination should be made at the outset and a corresponding adjustment be made to the final quota or tariff imposed on the

---

[84] Due to general equilibrium effects, the overall import level would need to decrease by more than the corresponding increase in domestic production to offset the negative effects of price or exchange rate changes on export demand.

[85] The elasticity factor is an estimate, not a certainty. A variation of 0.1 in the elasticity factor would change the tonnage reduction by about 375,000 tons. For example, imports would fall by an additional 375,000 tons under a demand elasticity of -1.7 instead of -1.6 and a 25 percent tariff.

remaining countries.  This would ensure that overall imports of steel to the United States remain at or below the level needed to enable the domestic steel industry to operate as a whole at an 80 percent or greater capacity utilization rate.  The limitation to 100 percent of each exempted country's 2017 imports is necessary to prevent exempted countries from producing additional steel for export to the United States or encouraging other countries to seek to trans-ship steel to the United States through the exempted countries.

It is possible to provide exemptions from either the quota or tariff and still meet the necessary objective of increasing U.S. steel capacity utilization to a financially viable target of 80 percent.  However, to do so would require a reduction in the quota or increase in the tariff applied to the remaining countries to offset the effect of the exempted import tonnage.

**Exclusions**

The Secretary recommends an appeal process by which affected U.S. parties could seek an exclusion from the tariff or quota imposed.  The Secretary would grant exclusions based on a demonstrated: (1) lack of sufficient U.S. production capacity of comparable products; or (2) specific national security based considerations.  This appeal process would include a public comment period on each exclusion request, and in general, would be completed within 90 days of a completed application being filed with the Secretary.

An exclusion may be granted for a period to be determined by the Secretary and may be terminated if the conditions that gave rise to the exclusion change.  The U.S. Department of Commerce will lead the appeal process in coordination with the Department of Defense and other agencies as appropriate.  Should exclusions be granted the Secretary would consider at the time whether the quota or tariff for the remaining products needs to be adjusted to increase U.S. steel capacity utilization to a financially viable target of 80 percent.

# THE EFFECT OF IMPORTS OF STEEL ON THE NATIONAL SECURITY



**U.S. Department of Commerce**
**Bureau of Industry and Security**
**Office of Technology Evaluation**

# APPENDICES

**January 11, 2018**



**UNITED STATES DEPARTMENT OF COMMERCE**
**The Secretary of Commerce**
Washington, D.C. 20230

April 19, 2017

The Honorable James N. Mattis
Secretary of Defense
Washington, DC  20301-3010

Dear Mr. Secretary:

I am writing to notify you that I am initiating an investigation to determine the effects of imported steel on national security.  I am taking this action pursuant to Section 232 of the Trade Expansion Act of 1962, as amended.  Section 232 authorizes the Secretary of Commerce to initiate such an investigation and requires notice to be provided to the Secretary of Defense upon initiation of an investigation.

During the course of the investigation, Department of Commerce staff will consult with their counterparts in the Department of Defense regarding any methodological and policy questions that arise during the investigation.  The investigation report will include information the Department of Defense can provide regarding the national defense requirements for steel. I look forward to our collaboration on this important issue.

Our point of contact is Brad Botwin, Director, Industrial Studies, Office of Technology Evaluation, Bureau of Industry and Security.  Mr. Botwin can be reached at Brad.Botwin@bis.doc.gov and (202) 482-4060.

Sincerely,

Wilbur Ross

## OFFICE OF THE UNDER SECRETARY OF DEFENSE

### 3000 DEFENSE PENTAGON
### WASHINGTON, DC 20301-3000

ACQUISITION,
TECHNOLOGY,
AND LOGISTICS

MAY 0 8 2017

The Honorable Wilbur Ross
Secretary of Commerce
Washington, DC 20230

Dear Mr. Secretary:

I am writing to acknowledge receipt of your notification to initiate an investigation to

determine the effects of imports of steel on national security pursuant to section 232 of the Trade

Expansion Act of 1962, as amended.

The Office of the Under Secretary of Defense for Acquisition, Technology, and Logistics

will assist your department in this endeavor.  My point of contact is Robert Read, Director,

Industrial Assessments, Office of Manufacturing and Industrial Base Policy, at 571-571-6263 or

robert.m.read6.civ@mail.mil.

Sincerely,

John G. McGinn, Ph.D.
Acting Deputy Assistant Secretary of Defense
Manufacturing and Industrial Base Policy

cc:
Mr. Brad Botwin

2017 MAY 15  PM 3: 09
S EXECUTIVE SECRETARIAT

FOR IMMEDIATE RELEASE
Thursday, April 20, 2017

Office of Public Affairs

202-482-4883
publicaffairs@doc.gov

Today President Donald J. Trump signed a presidential memorandum calling on Secretary Wilbur Ross to prioritize a Department of Commerce investigation initiated last night into the effects of steel imports on US national security. The study will consider overcapacity, dumping, illegal subsidies, and other factors, to determine whether steel imports threaten American economic security and military preparedness.

"We are going to fight for American workers and American-made steel by conducting a thorough investigation into steel imports," said President Trump. "Thanks especially to Secretary Wilbur Ross for helping lead this critical effort."

After a thorough investigation, if any national security threats from steel imports are identified, Secretary Ross will provide a report that includes recommendations for next steps. Under Section 232 of the Trade Expansion Act, the President has broad power to adjust imports—including through the use of tariffs—if excessive foreign imports are found to be a threat to US national security.

"We will conduct this investigation thoroughly and expeditiously so that, if necessary, we can take actions to defend American national security, workers, and businesses against foreign threats," said Secretary Ross. "This investigation will help determine whether steel import issues are making us less safe in a world that is increasingly fraught with geopolitical tensions."

The United States is relatively unusual in that it has no tariffs on steel but has had to impose antidumping or countervailing duties in over 150 cases, with 13 more currently pending.

Our military often needs specialty steel alloys that require unusual production skills and are used for armor, vehicles, ships, aircraft, and infrastructure.  As a result, a robust and healthy domestic steel production industry may be deemed necessary to guarantee military supply chains in the event of conflict.

While these defense concerns continue to loom, the US steel industry has struggled in recent years.  Industry employment has been declining, companies are highly leveraged, and businesses remain both capital intensive and lacking strong cash flow.  Imports now represent 26% of the market and the US steel mills and foundries are operating at just 71% of capacity.

The investigation will include a formal request for public comment to be published in the Federal Register, followed by a public hearing.

Please visit www.commerce.gov/steel for more information on this investigation.

## Agenda

I. Introductions
II. Committee Orientation
III. Discussion on FY17 Civil Rights Project Ideas
IV. Public Comment
V. Next Steps
VI. Adjournment

Dated: April 21, 2017.

**David Mussatt,**

*Supervisory Chief, Regional Programs Unit.*

[FR Doc. 2017–08447 Filed 4–25–17; 8:45 am]

**BILLING CODE P**

## DEPARTMENT OF COMMERCE

### Bureau of Industry and Security

### Materials Technical Advisory Committee; Notice of Partially Closed Meeting

The Materials Technical Advisory Committee will meet on May 11, 2017, 10:00 a.m., Herbert C. Hoover Building, Room 3884, 14th Street between Constitution & Pennsylvania Avenues NW., Washington, DC. The Committee advises the Office of the Assistant Secretary for Export Administration with respect to technical questions that affect the level of export controls applicable to materials and related technology.

### Agenda

*Open Session*

1. *Presentation:* Twist Bioscience on Twist's experience with export controls.
2. *Presentation:* Export Enforcement Coordination Center (E2C2) and discussion on the FBI film "Made in America: Defending Our Technology."
3. A draft proposal to move a green technology report forward, engaging the Office of Technology and Evaluation and the Renewable Energy and Energy Efficiency Advisory Committee on the possibility of collaboration.
4. Open session report by regime representatives.
5. Report by working groups (composite, pumps and valves, bio, public domain, chemicals).
6. Public Comments/New Business/ Closed session.

*Closed Session*

7. Discussion of matters determined to be exempt from the provisions relating to public meetings found in 5 U.S.C. app. 2 sections 10(a)(1) and 10(a)(3).

The open session will be accessible via teleconference to 20 participants on a first come, first serve basis. To join the conference, submit inquiries to Ms. Yvette Springer at *Yvette.Springer@ bis.doc.gov,* no later than May 4, 2017.

A limited number of seats will be available during the public session of the meeting. Reservations are not accepted. To the extent time permits, members of the public may present oral statements to the Committee. Written statements may be submitted at any time before or after the meeting. However, to facilitate distribution of public presentation materials to Committee members, the materials should be forwarded prior to the meeting to Ms. Springer via email.

The Assistant Secretary for Administration, with the concurrence of the delegate of the General Counsel, formally determined on February 15, 2017, pursuant to section 10(d) of the Federal Advisory Committee Act, as amended (5 U.S.C. app. 2 sec. 10(d)), that the portion of the meeting dealing with pre-decisional changes to the Commerce Control List and the U.S. export control policies shall be exempt from the provisions relating to public meetings found in 5 U.S.C. app. 2 sections 10(a)(1) and 10(a)(3). The remaining portions of the meeting will be open to the public.

For more information, call Yvette Springer at (202) 482–2813.

**Yvette Springer,**

*Committee Liaison Officer.*

[FR Doc. 2017–08387 Filed 4–25–17; 8:45 am]

**BILLING CODE 3510–JT–P**

## DEPARTMENT OF COMMERCE

### Bureau of Industry and Security

### Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel

**AGENCY:** Bureau of Industry and Security, Office of Technology Evaluation, U.S. Department of Commerce.

**ACTION:** Notice of request for public comments and public hearing.

**SUMMARY:** The Secretary of Commerce initiated an investigation to determine the effects on the national security of imports of steel. This investigation has been initiated under section 232 of the Trade Expansion Act of 1962, as amended. Interested parties are invited to submit written comments, data, analyses, or other information pertinent to the investigation to the Department of Commerce's Bureau of Industry and Security. The Department of Commerce will also hold a public hearing on the investigation on May 24, 2017 in Washington, DC. This notice identifies the issues on which the Department is

interested in obtaining the public's views. It also sets forth the procedures for public participation in the hearing.

**DATES:** Comments may be submitted at any time but must be received by May 31, 2017.

The hearing will be held on May 24, 2017 at the U.S. Department of Commerce auditorium, 1401 Constitution Avenue NW., Washington, DC 20230. The hearing will begin at 10:00 a.m. local time and conclude at 1:00 p.m. local time.

**ADDRESSES:**

*Written comments:* Send written comments to Brad Botwin, Director, Industrial Studies, Office of Technology Evaluation, Bureau of Industry and Security, U.S. Department of Commerce, 1401 Constitution Avenue NW., Room 1093, Washington, DC 20230 or by email to *Steel232@bis.doc.gov.*

*Public hearing:* Send requests to speak and written summaries of the oral presentations to Brad Botwin, Director, Industrial Studies, Office of Technology Evaluation, Bureau of Industry and Security, U.S. Department of Commerce, Room 1093, 1401 Constitution Avenue NW., Washington, DC 20230 or by email to *Steel232@bis.doc.gov,* by May 17, 2017. Any person, whether presenting or not, may submit a written statement through May 31, 2017—7 days after the hearing date.

**FOR FURTHER INFORMATION CONTACT:** Brad Botwin, Director, Industrial Studies, Office of Technology Evaluation, Bureau of Industry and Security, U.S. Department of Commerce (202) 482– 4060, *brad.botwin@bis.doc.gov.* For more information about the section 232 program, including the regulations and the text of previous investigations, see *www.bis.doc.gov/232.*

**SUPPLEMENTARY INFORMATION:**

### Background

On April 19, 2017, the Secretary of Commerce ("Secretary") initiated an investigation under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862), to determine the effects on the national security of imports of steel. On April 20, 2017, the President signed a memorandum directing the Secretary to proceed expeditiously in conducting his investigation and submit a report on his findings to the President. The President further directed that if the Secretary finds that steel is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the Secretary shall recommend actions and steps that should be taken to adjust steel

imports so that they will not threaten to impair the national security.

## Written Comments

This investigation is being undertaken in accordance with part 705 of the National Security Industrial Base Regulations (15 CFR parts 700 to 709) ("NSIBR"). Interested parties are invited to submit written comments, data, analyses, or information pertinent to this investigation to the Office of Technology Evaluation, U.S. Department of Commerce ("the Department"), no later than May 31, 2017.

The Department is particularly interested in comments and information directed to the criteria listed in § 705.4 of the NSIBR as they affect national security, including the following: (a) Quantity of steel or other circumstances related to the importation of steel; (b) Domestic production and productive capacity needed for steel to meet projected national defense requirements; (c) Existing and anticipated availability of human resources, products, raw materials, production equipment, and facilities to produce steel; (d) Growth requirements of the steel industry to meet national defense requirements and/or requirements to assure such growth; (e) The impact of foreign competition on the economic welfare of the steel industry; (f) The displacement of any domestic steel causing substantial unemployment, decrease in the revenues of government, loss of investment or specialized skills and productive capacity, or other serious effects; (g) The displacement of any domestic steel causing substantial unemployment, decrease in the revenues of government, loss of investment or specialized skills and productive capacity, or other serious effects; (h) Relevant factors that are causing or will cause a weakening of our national economy; and (i) Any other relevant factors.

Material that is business confidential information will be exempted from public disclosure as provided for by § 705.6 of the regulations. Anyone submitting business confidential information should clearly identify the business confidential portion of the submission, then file a statement justifying nondisclosure and referring to the specific legal authority claimed, and provide a non-confidential submission which can be placed in the public file. Communications from agencies of the United States Government will not be made available for public inspection. Please note that the submission of comments for presentation at the public

hearing is separate from the request for written comments.

The Bureau of Industry and Security does not maintain a separate public inspection facility. Requesters should first view the Bureau's Web page, which can be found at *https://efoia.bis.doc.gov/* (see "Electronic FOIA" heading). If requesters cannot access the Web site, they may call 202–482–0795 for assistance. The records related to this assessment are made accessible in accordance with the regulations published in part 4 of title 15 of the Code of Federal Regulations (15 CFR 4.1 *et seq.*).

## Public Hearing

Consistent with the interest of the U.S. Department of Commerce in soliciting public comments on issues affecting U.S. industry and national security, the Department is holding a public hearing as part of the investigation. The hearing will assist the Department in determining whether imports of steel threaten to impair the national security and in recommending remedies if such a threat is found to exist. Public comments at the hearing should address the criteria listed in § 705.4 of the NSIBR as they affect national security described above.

The hearing will be held on May 24, 2017 at the U.S. Department of Commerce auditorium, 1401 Constitution Avenue NW., Washington, DC 20230. The hearing will begin at 10:00 a.m. local time and conclude at 1:00 p.m. local time.

## Procedure for Requesting Participation

The Department encourages interested public participants to present their views orally at the hearing. Any person wishing to make an oral presentation at the hearing must submit a written request to the Department of Commerce at the address indicated in the **ADDRESSES** section of this notice. The request to participate in the hearing must be accompanied by a copy of a summary of the oral presentation. The written request and summary must be received by the Department no later than Wednesday, May 17, 2017. In addition, the request to speak should contain (1) the name and address of the person requesting to make a presentation; (2) a daytime phone number where the person who would be making the oral presentation may be contacted before the hearing; (3) the organization or company they represent; and (4) an email address.

Please note that the submission of comments for presentation at the public hearing is separate from the request for written comments. Since it may be

necessary to limit the number of persons making presentations, the written request to participate in the public hearing should describe the individual's interest in the hearing and, where appropriate, explain why the individual is a proper representative of a group or class of persons that has such an interest. If all interested parties cannot be accommodated at the hearing, the summaries of the oral presentations will be used to allocate speaking time and to ensure that a full range of comments is heard.

Each person selected to make a presentation will be notified by the Department of Commerce no later than 8:00 p.m. Eastern Daylight Time on Friday, May 19, 2017. The Department will arrange the presentation times for the speakers. Persons selected to be heard are requested to bring 20 copies of their oral presentation and of all exhibits to the hearing site on the day of the hearing. All such material must be of a size consistent with ease of handling, transportation and filing. While large exhibits may be used during a hearing, copies of such exhibits in reduced size must be provided to the panel. Written submissions by persons not selected to make presentations will be made part of the public record of the proceeding. Any person, whether presenting or not, may submit a written statement through May 31, 2017—7 days after the hearing date. Confidential business information may not be submitted at a public hearing. In the event confidential business information is submitted it will be handled according to the same procedures applicable to such information provided in the course of an investigation. See 15 CFR 705.6. The hearing will be recorded.

Copies of the requests to participate in the public hearing, and the transcript of the hearing will be maintained on the Bureau of Industry and Security's Web page, which can be found at *http://www.bis.doc.gov* (see Freedom of Information Act (FOIA) heading). If the requesters cannot access the Web site, they may call (202) 482–0795 for assistance. The records related to this assessment are made accessible in accordance with the regulations published in part 4 of title 15 of the Code of Federal Regulations (15 CFR 4.1 *et seq.*).

## Conduct of the Hearing

The Department reserves the right to select the persons to be heard at the hearing, to schedule their respective presentations, and to establish the procedures governing the conduct of the hearing. Each speaker will be limited to

10 minutes, and comments must be directly related to the criteria listed in 15 CFR 705.4 of the regulations. Attendees will be seated on a first-come, first-served basis.

A Department official will be designated to preside at the hearing. The presiding officer shall determine all procedural matters during the hearing. Representatives from the Department, and other U.S. Government agencies as appropriate, will make up the hearing panel. This will be a fact-finding proceeding; it will not be a judicial or evidentiary-type hearing. Only members of the hearing panel may ask questions, and there will be no cross-examination of persons presenting statements. However, questions submitted to the presiding officer in writing may, at the discretion of the presiding officer, be posed to the presenter. No formal rules of evidence will apply to the hearing.

Any further procedural rules for the proper conduct of the hearing will be announced by the presiding officer.

**Special Accommodations**

This meeting is physically accessible to people with disabilities. Requests for sign language interpretation or other auxiliary aids should be received by the Department of Commerce no later than Thursday, May 11, 2017 at the address indicated in the **ADDRESSES** section of this notice.

Dated: April 21, 2017.

**Wilbur L. Ross,**
*Secretary of Commerce.*
[FR Doc. 2017–08499 Filed 4–24–17; 11:15 am]
**BILLING CODE 3510–33–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–822–806, A–475–836, A–580–891, A–821–824, A–791–823, A–469–816, A–489–831, A–823–816, A–520–808, A–412–826]**

**Carbon and Alloy Steel Wire Rod From Belarus, Italy, the Republic of Korea, the Russian Federation, South Africa, Spain, the Republic of Turkey, Ukraine, United Arab Emirates, and United Kingdom: Initiation of Less-Than-Fair-Value Investigations**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Effective April 17, 2017.

**FOR FURTHER INFORMATION CONTACT:** Rebecca Janz at (202) 482–2972 (Belarus), Tom Bellhouse at (202) 482–0257 (Italy), David Crespo at (202) 482–3693 (Republic of Korea (Korea)), Terre Keaton at (202) 482–1280 (the Russian

Federation (Russia)), Moses Song at (202) 482–5041 (South Africa), Chelsey Simonovich at (202) 482–1979 (Spain), Ryan Mullen at (202) 482–5260 (the Republic of Turkey (Turkey)), Julia Hancock at (202) 482–1394 (Ukraine), Carrie Bethea at (202) 482–1491 (the United Arab Emirates (UAE)), and Alice Maldonado at (202) 482–4682 (the United Kingdom), AD/CVD Operations, Enforcement and Compliance, U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

**The Petitions**

On March 28, 2017, the U.S. Department of Commerce (the Department) received antidumping duty (AD) petitions concerning imports of carbon and alloy steel wire rod (wire rod) from Belarus, Italy, Korea, Russia, South Africa, Spain, Turkey, Ukraine, the UAE, and the United Kingdom, filed in proper form on behalf of Charter Steel, Gerdau Ameristeel US Inc., Keystone Consolidated Industries, Inc., and Nucor Corporation (collectively, the petitioners).[1] The AD petitions were accompanied by countervailing duty (CVD) petitions on imports from Italy and Turkey. The petitioners are domestic producers of wire rod.[2]

On March 31, 2017, and April 6, 2017, the Department requested additional information and clarification of certain areas of the Petitions.[3] The petitioners filed responses to these requests on April 4, 2017, and on April 7, 2017, respectively.[4] On April 5, the petitioners filed a submission demonstrating that, for certain countries, the prices they obtained for normal value were below the production costs. As a result, they compared export price (EP) or constructed export price (CEP) to

normal value (NV) using constructed value (CV).[5]

In accordance with section 732(b) of the Tariff Act of 1930, as amended (the Act), the petitioners allege that imports of wire rod from Belarus, Italy, Korea, Russia, South Africa, Spain, Turkey, Ukraine, the UAE, and the United Kingdom are being, or are likely to be, sold in the United States at less than fair value within the meaning of section 731 of the Act, and that such imports are materially injuring, or threatening material injury to, an industry in the United States. Also, consistent with section 732(b)(1) of the Act, the Petitions are accompanied by information reasonably available to the petitioners supporting their allegations.

The Department finds that the petitioners filed these Petitions on behalf of the domestic industry because the petitioners are interested parties as defined in section 771(9)(C) of the Act. The Department also finds that the petitioners demonstrated sufficient industry support with respect to the initiation of the AD investigations that the petitioners are requesting.[6]

**Periods of Investigation**

Because the Petitions were filed on March 28, 2017, the period of investigation (POI) for all investigations except Belarus is January 1, 2016, through December 31, 2016. Because Belarus is a non-market economy country, the POI for that investigation is July 1, 2016, through December 31, 2016.

**Scope of the Investigations**

The product covered by these investigations is wire rod from Belarus, Italy, Korea, Russia, South Africa, Spain, Turkey, Ukraine, the UAE, and the United Kingdom. For a full description of the scope of these investigations, *see* the ''Scope of the Investigations,'' in Appendix I of this notice.

**Comments on Scope of the Investigations**

During our review of the Petitions, the Department issued questions to, and received responses from, the petitioners pertaining to the proposed scope to ensure that the scope language in the Petitions would be an accurate

---

[1] *See* Letter to the Secretary of Commerce from Petitioners ''Carbon and Alloy Steel Wire Rod from Belarus, Italy, the Republic of Korea, the Russian Federation, South Africa, Spain, the Republic of Turkey, Ukraine, the United Arab Emirates, and United Kingdom—Petitions for the Imposition of Antidumping and Countervailing Duties'' (March 28, 2017) (the Petitions).

[2] *See* Volume I of the Petitions, at 2.

[3] *See* Country-specific letters to Petitioners from the Department concerning supplemental questions on each of the country-specific records (March 31, 2017); and Memorandum to the File ''Phone Call with Counsel to Petitioners'' (April 10, 2017).

[4] *See* Country-specific amendments to the Petitions (first and second amendments for each country); *see also* Letter to the Secretary of Commerce from Petitioners ''Carbon and Alloy Steel Wire Rod from Belarus, Italy, the Republic of Korea, the Russian Federation, South Africa, Spain, the Republic of Turkey, Ukraine, the United Arab Emirates, and United Kingdom—Petitioners' Amendment to Volume I Relating to General Issues'' April 4, 2017 (General Issues Supplement).

[5] *See* Country-specific amendments to the Petitions from the petitioners, ''Re: Carbon and Certain Alloy Steel Wire Rod from the Republic of Korea, the Russian Federation, South Africa, and Ukraine—Existance of Below-Cost Sales'' (April 5, 2017).

[6] *See* the ''Determination of Industry Support for the Petitions'' section below.

—

Members of the public are also entitled to submit written comments; the comments must be received in the regional office within 30 days following the meeting. Written comments may be mailed to the Midwestern Regional Office, U.S. Commission on Civil Rights, 55 W. Monroe St., Suite 410, Chicago, IL 60615. They may also be faxed to the Commission at (312) 353–8324, or emailed to Carolyn Allen at *callen@ usccr.gov*. Persons who desire additional information may contact the Midwestern Regional Office at (312) 353–8311.

Records generated from this meeting may be inspected and reproduced at the Midwestern Regional Office, as they become available, both before and after the meeting. Records of the meeting will be available via *www.facadatabase.gov* under the Commission on Civil Rights, Louisiana Advisory Committee link (*https://database.faca.gov/committee/ committee.aspx?cid=251&aid=17*). Persons interested in the work of this Committee are directed to the Commission's Web site, *http:// www.usccr.gov,* or may contact the Midwestern Regional Office at the above email or street address.

**Agenda**

Welcome and Roll Call
Orientation
Civil Rights Topics in Louisiana
Next Steps
Public Comment
Adjournment

Dated: May 18, 2017.

**David Mussatt,**

*Supervisory Chief, Regional Programs Unit.*

[FR Doc. 2017–10530 Filed 5–22–17; 8:45 am]

**BILLING CODE P**

---

**DEPARTMENT OF COMMERCE**

**Bureau of Industry and Security**

**Notice on Procedures for Attending or Viewing Remotely the Public Hearing on Section 232 National Security Investigation of Imports of Steel**

**AGENCY:** Bureau of Industry and Security, Office of Technology Evaluation, U.S. Department of Commerce.

**ACTION:** Notice on procedures for attending or viewing remotely the public hearing.

---

**SUMMARY:** On April 26, 2017, the Bureau of Industry and Security (BIS), published the *Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel.* The

April 26 notice specified that the Secretary of Commerce initiated an investigation to determine the effects on the national security of imports of steel. This investigation has been initiated under section 232 of the Trade Expansion Act of 1962, as amended. (*See* the April 26 notice for additional details on the investigation and the request for public comments.)

The April 26 notice also announced that the Department of Commerce will hold a public hearing on the investigation on May 24, 2017 in Washington, DC. Today's notice provides additional details on the procedures for attending the hearing and for viewing the hearing, via webcast.

**DATES:** The hearing will be held on May 24, 2017 at the U.S. Department of Commerce auditorium, 1401 Constitution Avenue NW., Washington, DC 20230. The hearing will begin at 10:00 a.m. local time and conclude at 1:00 p.m. local time.

**FOR FURTHER INFORMATION CONTACT:** Brad Botwin, Director, Industrial Studies, Office of Technology Evaluation, Bureau of Industry and Security, U.S. Department of Commerce (202) 482– 4060, *brad.botwin@bis.doc.gov.* For more information about the section 232 program, including the regulations and the text of previous investigations, see *www.bis.doc.gov/232.*

**SUPPLEMENTARY INFORMATION:**

**Background**

On April 26, 2017 (82 FR 19205), the Bureau of Industry and Security (BIS) published the *Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel.* The April 26 notice specified that on April 19, 2017, the Secretary of Commerce (''Secretary'') initiated an investigation under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862), to determine the effects on the national security of imports of steel. (*See* the April 26 notice for additional details on the investigation and the request for public comments.)

The April 26 notice also announced that the Department of Commerce will hold a public hearing on the investigation. The hearing will be held on May 24, 2017 at the U.S. Department of Commerce auditorium, 1401 Constitution Avenue NW., Washington, DC 20230. The hearing will begin at 10:00 a.m. local time and conclude at 1:00 p.m. local time. The hearing will assist the Department in determining whether imports of steel threaten to impair the national security and in

recommending remedies, if such a threat is found to exist.

The April 26 notice included the following information: (a) Procedures for requesting participation in the hearing, including procedures for submitting comments; (b) conduct of the hearing; and (c) special accommodations for the hearing. (*See* the April 26 notice for additional details on these aspects of the public hearing.)

Today's notice provides additional details on the procedures for attending the hearing and for viewing the hearing, via webcast.

**Procedure for Attending the Hearing, or Viewing the Hearing Via Webcast**

*Registration:* Individuals and entities who wish to attend the public hearing are required to pre-register for the meeting on-line at *www.bis.doc.gov/ 232SteelHearing* (preferred) or by emailing *Steel232@bis.doc.gov.* Anyone wishing to attend this public hearing must register by 5:00 p.m. (EST), Tuesday, May 23, 2017.

*Webcast:* The public hearing will be available live via webcast. Please visit: *www.bis.doc.gov/232SteelHearing.*

*Visitor Access Requirement:* For participants attending in person, please note that federal agencies can only accept a state-issued driver's license or identification card for access to federal facilities if such license or identification card is issued by a state that is compliant with the REAL ID Act of 2005 (Pub. L. 109–13), or by a state that has an extension for REAL ID compliance. The main entrance of the Department of Commerce is on 14th Street NW. between Pennsylvania Avenue and Constitution Avenue, across from the Ronald Reagan Building. Upon entering the building, please go through security and check in at the guard's desk. BIS staff will meet and escort visitors to the auditorium.

*Non U.S. Citizens Please Note:* All foreign national visitors who do not have permanent resident status and who wish to register for the above meeting must fax a copy of their passport to (202) 482–5361. Please also bring a copy of your passport on the day of the hearing to serve as identification. Failure to provide this information prior to arrival will result, at a minimum, in significant delays in entering the facility. Authority to gather this information is derived from United States Department of Commerce Department Administrative Order (DAO) number 207–12. Please visit *www.bis.doc.gov/232SteelHearing* to register and for more details regarding this requirement.

Dated: May 17, 2017.

**Matthew S. Borman,**

*Deputy Assistant Secretary for Export Administration.*

[FR Doc. 2017–10444 Filed 5–22–17; 8:45 am]

**BILLING CODE 3510–33–P**

# DEPARTMENT OF COMMERCE

## International Trade Administration

**[A–557–813]**

**Polyethylene Retail Carrier Bags From Malaysia: Final Results of Antidumping Duty Administrative Review; 2015– 2016**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** On April 6, 2017, the Department of Commerce (Department) published in the **Federal Register** the preliminary results of the administrative review of the antidumping duty order on polyethylene retail carrier bags from Malaysia covering the period August 1, 2015 through July 31, 2016. The review covers one producer/exporter of subject merchandise, Euro SME Sdn Bhd (Euro SME). The Department preliminarily found that Euro SME did not have reviewable entries during the period of review (POR). The Department gave interested parties an opportunity to comment on the *Preliminary Results,* but we received no comments. Hence, the final results are unchanged from the *Preliminary Results,* and we continue to find that Euro SME did not have reviewable entries during the POR.

**DATES:** Effective May 23, 2017.

**FOR FURTHER INFORMATION CONTACT:** Alex Rosen or Brendan Quinn, AD/CVD Operations, Office III, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–7814 or (202) 482–5848, respectively.

**SUPPLEMENTARY INFORMATION:**

## Background

On April 6, 2017, the Department published the *Preliminary Results.*[1] We invited interested parties to comment on the *Preliminary Results,*[2] but received no comments. The Department conducted this review in accordance

with section 751(a)(1)(B) of the Tariff Act of 1930, as amended (the Act).

## Scope of the Order

The merchandise subject to this antidumping duty order is polyethylene retail carrier bags (PRCBs), which also may be referred to as t-shirt sacks, merchandise bags, grocery bags, or checkout bags. The subject merchandise is defined as non-sealable sacks and bags with handles (including drawstrings), without zippers or integral extruded closures, with or without gussets, with or without printing, of polyethylene film having a thickness no greater than 0.035 inch (0.889 mm) and no less than 0.00035 inch (0.00889 mm), and with no length or width shorter than 6 inches (15.24 cm) or longer than 40 inches (101.6 cm). The depth of the bag may be shorter than 6 inches (15.24 cm) but not longer than 40 inches (101.6 cm).

PRCBs are typically provided without any consumer packaging and free of charge by retail establishments, *e.g.,* grocery, drug, convenience, department, specialty retail, discount stores, and restaurants to their customers to package and carry their purchased products. The scope of this antidumping duty order excludes (1) PRCBs that are not printed with logos or store names and that are closeable with drawstrings made of polyethylene film and (2) PRCBs that are packed in consumer packaging with printing that refers to specific end-uses other than packaging and carrying merchandise from retail establishments, *e.g.,* garbage bags, lawn bags, trash-can liners.

Imports of merchandise included within the scope of this antidumping duty order are currently classifiable under statistical category 3923.21.0085 of the Harmonized Tariff Schedule of the United States (HTSUS). This subheading may also cover products that are outside the scope of this antidumping duty order. Although the HTSUS subheading is provided for convenience and customs purposes, the written description of the scope of this antidumping duty order is dispositive.

## Final Determination of No Shipments

As noted above, the Department received no comments from interested parties concerning the *Preliminary Results* on the record of this segment of the proceeding. As there are no changes from, or comments on, the *Preliminary Results,* the Department finds that there is no reason to modify its analysis. Thus, we continue to find that Euro SME had no reviewable transactions

during the POR.[3] Accordingly, no decision memorandum accompanies this **Federal Register** notice. For further details of the issues addressed in this proceeding, *see* the *Preliminary Results.*[4]

## Assessment Rates

The Department determined, and U.S. Customs and Border Protection (CBP) shall assess, antidumping duties on all appropriate entries of subject merchandise, where applicable, in accordance with section 751(a)(2)(C) of the Act and 19 CFR 351.212(b). For entries of subject merchandise during the POR for which Euro SME did not know its merchandise was destined for the United States, we will instruct CBP to liquidate un-reviewed entries at the all-others rate if there is no rate for the intermediate company involved in the transaction.[5] The Department intends to issue assessment instructions to CBP 15 days after the date of publication of the final results of this review.

## Cash Deposit Requirements

The following cash deposit requirements will be effective for all shipments of subject merchandise entered, or withdrawn from warehouse, for consumption on or after the publication date of this notice of final results of the administrative review, as provided by section 751(a)(2)(C) of the Act: (1) For Euro SME, which claimed no shipments, the cash deposit rate will remain unchanged from the rate assigned to Euro SME in the most recently completed review of the company; (2) for previously investigated or reviewed companies not listed above, the cash deposit rate will continue to be the company-specific rate published for the most recent period; (3) if the exporter is a firm not covered in this review, a prior review, or the less-than-fair-value investigation, but the manufacturer is, the cash deposit rate will be the rate established for the most recent period for the manufacturer of the merchandise; and (4) the cash deposit rate for all other manufacturers or exporters is 2.40 percent. These cash deposit requirements, when imposed, shall remain in effect until further notice.

## Notification to Importers

This notice serves as a final reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement

---

[1] *See Polyethylene Retail Carrier Bags From Malaysia: Preliminary Results of Antidumping Duty Administrative Review; 2015–2016,* 82 FR 16792 (April 6, 2017) (*Preliminary Results*).

[2] *Id.,* 82 FR at 16793.

[3] *See Preliminary Results,* 82 FR at 16792–93.

[4] *Id.*

[5] *See Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties,* 68 FR 23954 (May 6, 2003).

**Public Hearing Witnesses**

1. U.S. Congresswoman Marcy Kaptur (Ohio)
2. David Rintoul, President U.S. Steel Tubular Products, United States Steel Corporation
3. John Ferriola, CEO/President, Nucor Corporation
4. Roger Newport, CEO, AK Steel Corporation
5. John Brett, CEO/President, ArcelorMittal USA
6. Barbara Smith, COO/President, Commercial Metals Company
7. Thomas Gibson, CEO/President, American Iron and Steel Institute
8. Ward Timken, CEO/President, Timken Steel Corporation
9. Barry Zekelman, CEO/Chairman, Zekelman Industries
10. Dennis M. Oates, Chairman, Specialty Steel Industry of North America
11. Terrence Hartford, Vice President, ATI Defense
12. Lourenco Goncalves, CEO/President, Cliffs Natural Resources Inc.
13. John Adams, President, Guardian Six LLC
14. John Phelps Stupp, CEO/President, Stupp Bros., Inc.
15. Ryan Chadwick, Vice President/General Counsel, Ipsco Tubulars, Inc. (TMK IPSCO)
16. Gu Yu, First Secretary, People's Republic of China, Ministry of Commerce
17. Alexander Zhmykhov, Deputy Head of Economic Section, Trade Representation of the Russian Federation in the USA
18. Karl Tachelet, Director of International Affairs, Eurofer
19. Vitalii Tarasiuk, Minister-Counsellor, Embassy of Ukraine
20. Tim Johns, Vice President of Manufacturing, Nippon Steel AND Sumikin Cold Heading Wire Indiana
21. Byeong Bae Lee, President, Hyundai Steel America
22. Gary Horlick, International Trade Counsel, American Institute for International Steel
23. Robert Budway, President, Can Manufacturers Institute
24. Tracey Norberg, Senior VP and General Counsel, Rubber Manufacturers Association
25. Suzi Agar, President, Air Distribution Institute (ADI)
26. John Cross, Steelscape LLC
27. Jim Tennant, CEO, Ohio Coatings Company
28. Leo Gerard, International President, United Steelworkers
29. David Zalesne, Vice Chairman, American Institute of Steel Construction (AISC) AND President, Owen Steel Company
30. Philip Bell, President, Steel Manufacturers Association
31. Bill Geary, Chairman, Cold Finished Steel Bar Institute
32. Ed Vore, Chairman/President, The Committee on Pipe and Tube Imports
33. Raymond Monroe, Executive Vice President, Steel Founders' Society of America
34. Mark Millett, President/CEO, Steel Dynamics
35. Alexander Maass, President, Maass Flange Corporation
36. Robert Landry, Vice President, Port of New Orleans
37. Joel Johnson, CEO, Borusan Mannesmann Pipe U.S. (BMP)

## Commerce Dept. Hearing on National Security Investigation on Steel imports

## Testimony as prepared for Congresswoman Marcy Kaptur, May 24, 2017

Today, rising and unprecedented global overcapacity and unfair trade practices threaten the viability of our United States steel industry. Coupled with declining domestic prices, which are exacerbated by currency manipulation – we sit here today faced with a national steel crisis like few times ever before.

And who bears this burden? It is the working families in my region of the country—Ohio, Indiana, Michigan, Wisconsin, and Pennsylvania.

For years, many of us who have fought unfair trade deals have seen our neighbors brought to their knees. For years, we were promised protections to stabilize local economies and open global markets.

For years, we have stood alongside the hard working men and women who built this country with their hands, only for their jobs to move elsewhere with little regard or afterthought.

We have seen swift declines in the industrial Midwest decimate communities – leaving vacant factories and homes and hearts in the wake.

For far too long, our working families have waited simply for the opportunity to compete and for fair treatment, only to be met with empty promises and pink slips.

Last month, I wrote the Administration with Senators Rob Portman and Sherrod Brown, on behalf of the more than 700 idled U.S. Steel workers and their families in Lorain, Ohio. They were just notified that in less than two weeks, they will permanently lose their jobs.

Lorain is a town that once employed 12,000 hard working men and women in the steel industry. Yet it has witnessed hundreds more of the remaining steel jobs disappear in the last two years.  For many decades, Lorain was one of America's premier steel towns. Its dear people and have been battered by the continuing job washout in steel due to unfair trade practices and closed markets abroad, particularly China, Russia, Vietnam, Korea.

Take for example Thomas Kelling who is one of the many thousands of steelworkers to lose their jobs due to unfair trade practices and overproduction on the other side of the globe.

Tom, like many of our steelworkers, began working in the mill at a young age. Where he had the opportunity to provide for his wife and three kids - his oldest, who is now looking at colleges, took a job to help support their family.

After 22 years, and facing yet another lay off and unemployment, Tom was forced to reinvent himself and fight for his job and family.

While Mr. Kelling pursues every opportunity available, he and his colleagues are offered little retraining to find replacement work. This forces many to move their families out of Ohio. Sadly, Mr. Kelling's story is not unique. There are millions of Americans across this great land who can tell of the exact same tale.

Not only has this harmed workers and their families, but entire communities suffer as small businesses lose customers and local governments lose revenue.

It is my understanding that according to Section 232 the Department of Commerce has 270 days to complete an investigation. I urge this Administration to work as quickly as possible. Many workers and businesses do not have that long.

The time for action is now. And enforcing current rules is only the first step in correcting more than two decades of injustice.



**Testimony of David J. Rintoul**

**President – U. S. Steel Tubular**
**and**
**Senior Vice President – Tubular – United States Steel Corporation**

**For the Hearing on Section 232 National Security Investigation on Steel**

**May 24, 2017**

Good morning, and thank you for the opportunity to elaborate on the national security

consequences that significantly exacerbate the harm we suffer when the U.S. fails to act against

steel products imported in violation of U.S. law.

My name is David Rintoul. I am a proud 10-year veteran of U. S. Steel and a nearly 40-year

veteran of the steel industry. It is no small matter that I speak about today – I hope you will agree

that, in fact, it's quite a big deal, not only for one of the nation's foundational companies, but

also for the United States as a whole.

For more than a century, the iconic United States Steel Corporation, born during America's

industrial ascendancy, represented the unique ingenuity, competitiveness, and boundless

aspirations of our country. As one of the leading pioneers of the American Century, U. S. Steel

literally helped to lay the foundation of our great cities, build the tools and transportation

infrastructure that unified the continent, and heeded the call to arms when, as a nation at war, we stood against the forces of those who would forever change our way of life.

Through it all, we helped to lead the defense of America – at home and abroad. We understood our company and industry to be more than just businesses – we treasured our role as Americans.

For most of this time, the threats to our security were readily identifiable and the requirements of our response were equally clear. Not so today. In 2017, the threats to America's national defense have multiplied and now present themselves in fundamentally different forms. We still need tanks on the battlefield and airpower to control the skies, but now we also need to guard against asymmetrical risks such as those we see, for example, in cyberspace.

And, make no mistake, we – U. S. Steel and other U.S. corporations – see these threats ourselves: we have been the direct victim of trade secret thefts accomplished through sophisticated hacking into our internal computer systems. The indirect victims, of course, are the American people and the military that protects them and counts on us to provide better, stronger, more effective steel products than those possessed by others.

Just as the global supply chain has created an infrastructure that is regularly beneficial for consumer products from cars to smart phones to t-shirts, it is at the same time pernicious when it prevents us as a nation from being able to domestically source and produce the materials needed to ensure our energy independence and defense – whether on the battlefield, or in the superiority of our energy supply, or the safeguarding of our vital corporate and government secrets.

One aspect of our defense infrastructure that is dangerously threadbare involves our country's reliance on imported steel products known as oil country tubular goods (OCTG). A family of products that makes it possible for energy companies to explore for, retrieve, and bring to market the oil and gas America needs to guard its security through a reliable and dependable supply of domestically-produced energy.

Today, imports make-up approximately 50 percent of the OCTG market. Driven by Chinese manufacturers over the last several years and now overtaken by state of the art plants in South Korea, foreign suppliers have made it their mission to steal this market from U.S. companies, well aware of the danger such a loss of domestic capacity would pose to America's national security.

So, you might ask, how did we get here and how bad is it? Sadly, the answer is three-fold.

First, the governments in South Korea, China, and elsewhere have deemed dominance in this market a matter of *their* national security. To accomplish this goal, they've plainly subsidized their domestic industries, provided as much regulatory and other support as needed, and worked steadily to undermine U.S. efforts.

And, for the record, the domestic market for OCTG goods in South Korea is non-existent and in China is minimal, at best.

Second, the result of this behavior by these countries in large swaths across America has been predicable and painful in human terms and has left us with a long-term deficit when it comes to this key manufacturing capability. In the tubular business at U. S. Steel alone, this unfair competition has resulted in the closure of 50 percent of our mills since 2014 – and forced us to lay off far too many of our friends and colleagues as a result.

In just the last few years, we have been forced to abandon more than 40 percent of the OCTG products we previously made, as the tsunami of imports have driven down prices to levels where it is impossible for us, and others who operate within the traditional rules and boundaries, to successfully maintain our market presence.

And the harm is agonizingly real. In 2014, we had more than 3,000 people working as part of our team focused on tubular products and production. At its low point six months ago, that number had shrunk to 950 – a cut of more than two thirds. Even today as the energy market has begun a modest turnaround, we've only been able to engage a total of 1,300 people on this business.

In the last two years alone, U. S. Steel's tubular business has suffered severe financial losses. Adding to this pain is the fact that these losses occurred while imports from South Korea, Mexico, and Russia continued to cross our borders – including those from some competitors who claim to be American but closed their American plants to bring pipe in from their foreign operations.

Moreover, the unfair trade attacks from government-subsidized foreign competitors undermines our ability to have the resources necessary to sufficiently invest in the research and development that is the life's blood of a business that relies on continual innovation. We need our government to stand by us and the rule of law – if it will not, we will all face the prospect of surrender in a fight that was anything but fair.

Which brings me to point three. As a nation, we need to understand that the traditional remedies used in trade-related matters, from increased import duties to more rigorous enforcement, simply wither in the face of the audacity of these foreign companies and their government sponsors. While these foreign companies and governments operate under the guise of competition and fairness, their actions are driven by a no-holds barred, ruthless focus on winning control over the markets that Americans need to defend the nation against near- and long-term threats.

And, to be candid, our traditional remedies are no longer the deterrent – much less the punishment – that they once were. Despite the implementation of trade margins on certain OCTG products, certain countries simply thumb their nose at these remedies, and see our country as the answer to ensure their stability by continuing to export their unemployment to this country. As a consequence, we need new, more effective tools to level the playing field, especially when it comes to such direct threats to American national security.

Putting a stop to this foreign government-enabled encroachment into America's critical energy independence infrastructure is no less a matter of the nation's security than is building new generations of ships and aircraft and strengthening our cyber defenses. They are all crucial.

Simply put, if we as a nation are hostage to other parts of the world for the development of key pieces of our energy sector, then we can never lay claim to true energy independence – which puts us at a tremendous, macro-level risk.

As 21st century security threats have multiplied, changed their shape, and their attack vectors – so too must our vision of the most effective response. Today, protecting our homeland's borders is just as important as ensuring that we have the materials, tools, and political will to match these expanded challenges with an equally broad definition of a threat to our collective national security.  At U. S. Steel, the only large, integrated American company that manufactures OCTG goods, we proudly embrace our role as one of the nation's core industries while at the same time bringing a clear-eyed view of the market in the U.S. and globally as fundamentally distorted as the result of large volumes of competing products driven by foreign government subsidies and other unfair practices.

In conclusion, let me add that the challenges we face extend far beyond a single industry or issue. As I mentioned earlier, the tubular products we produce are but a small subset of all that U. S. Steel does. The trends that I have outlined with respect to OCTG have been replicated many times over across all of our businesses. From the automotive sector to a broad range of industrial production to the mining and consumer products arenas to tin products, the global assault on U.S. steelmakers has been acute and left our entire industry wounded.

The plants we build and the blast furnaces that operate across the country don't work like a light switch. You can't turn them off one day and then simply hit "on" and they are back in business.

6

American companies have always thrived when the playing field is level and the rules are clear. Honest competition is at the heart of our democracy and we look forward to a time in the near future when that norm, once again, governs the marketplace.

Thank you again for the opportunity to share our views on the need to clarify what we on the front lines of manufacturing know is the most effective approach to protecting America's national security.

**Section 232 National Security Investigation of Steel Imports
Testimony of John Ferriola
Chairman, CEO & President of Nucor Corporation
May 24, 2017**

Good morning.  I am John Ferriola, Chairman, CEO, and President of Nucor Corporation.  On behalf of Nucor and our nearly 24,000 teammates, I would like to thank you for the opportunity to appear before you today.  We welcome this investigation as a means of addressing the unprecedented crisis facing the U.S. steel industry, caused primarily by massive global overcapacity and historic import levels. This crisis must be resolved if we are to continue supplying steel for U.S. national defense and critical infrastructure applications.

As the largest steel producer and recycler in the United States, Nucor is proud to supply our armed forces with a wide variety of mission-critical steel products to keep our soldiers and our nation safe.  For example, Nucor bar products are used in Humvee suspensions and track forgings for the Abrams tank and Bradley Fighting Vehicle.  Our structural steel goes into the Patriot missile system, and our armor plate protects soldiers and sailors in armored vehicles, aircraft carriers, and destroyers.  In addition, Nucor steel supports critical transportation and energy infrastructure that is vital to our entire economy.

We agree with President Trump that "core industries such as steel . . . are critical elements of our manufacturing and defense industrial bases."  That is why Nucor has invested significantly to become a reliable supplier of these products.

Playing a role in our nation's defense requires a long-term financial commitment. For example, Nucor is one of only two steel companies in the U.S. certified to produce Navy-grade armor plate for aircraft carriers, destroyers, and submarines. Entering this market required purchasing specialized equipment, hiring knowledgeable personnel, developing advanced chemistries and processes, and undertaking rigorous testing and certification procedures to meet Navy requirements. This is the type of continual investment that is needed to satisfy the rapidly evolving needs of our armed forces.

Unfortunately, global overcapacity and unfairly traded imports threaten our ability to invest. Production overcapacity in the steel industry has reached crisis levels. There is more than 700 million metric tons of global steel overcapacity, more than half of which is located in China. In fact, China's state-supported steel industry now exports more steel than is produced by all three NAFTA countries combined. China is at the heart of the crisis, but governments in countries like Korea, Brazil, Russia and Turkey also do their part to drive excess steel capacity. These governments continue to flood the world with artificially cheap steel, and much of it finds its way to the United States, where markets are open and the government doesn't keep mills in business for political reasons.

A sustained surge of low-priced imports has eroded the U.S. steel industry. Over the last decade, shipments have fallen by approximately 20%, and nearly 20,000 workers have lost their jobs. In 2015, the industry operated at a $1.7 billion net loss, and despite improving demand in 2016, American mills only operated around 70% of their total capacity. U.S. steelmakers can barely maintain what they have, let alone continue to invest in developing new products. This threatens the industry's ability to supply the advanced steel products that our military relies on.

Steel used in national defense applications may be a relatively small share of our overall sales, but those products are made at the same facilities and by the same workers who make other products. A commercially healthy industry is vital to ensure a stable supply of products for national security and critical infrastructure applications. This includes the entire production chain beginning at the melting stage and continuing through finishing and fabrication. In a time of national crisis, the U.S. cannot afford to rely on imported steel slabs from foreign suppliers like China or Russia. National security begins with primary steelmaking.

Broad-based action is the only way to target all imports and also address the root cause of the current crisis – chronic overcapacity in countries that do not operate on a market basis.

In closing, we urge you to find that steel imports threaten our national security, and to take broad action that will ensure the long-term viability of our nation's steel industry.

Thank you.

### Testimony of Roger K. Newport
### Chief Executive Officer
### AK Steel Corporation

Thank you Secretary Ross.  My name is Roger Newport, and I am the CEO of AK Steel Corporation.  I want to thank you for the opportunity to testify on behalf of AK Steel and our 8,500 U.S.-based employees.

AK Steel welcomes the Department of Commerce's Section 232 investigation of the serious threat posed by imported steel to our national security.  For decades, the steel industry has battled global overcapacity and the oversupply of U.S. imports, many of them dumped and subsidized.  Just since the beginning of 2015, over 14,000 steel workers have been laid off and numerous production facilities have been idled, including AK Steel's blast furnace and steelmaking operations in Ashland, Kentucky.  Unfortunately, unfairly traded imports remain a severe threat to the long-term viability of the domestic steel industry.

AK Steel is the only company in the United States that produces a combination of flat-rolled carbon steel, stainless steel, and electrical steel products.  While I can certainly speak to the adverse impact of imports on each of these types of steel, I would like to focus my remarks today on electrical steel.  AK Steel is the sole domestic producer of grain-oriented electrical steel, or GOES, which is used in cores and core assemblies for the production of electrical transformers.  Transformers are a key component of our nation's electricity grid, from the large step-up transformers that transmit power across the entire grid, to the smaller pole- and pad-mounted transformers that deliver power to individual homes and businesses.  AK Steel is also the sole domestic producer of high-end non-oriented electrical steel, or NOES, products.  NOES

is also critical for the electrical grid, as it forms the heart of massive generators that actually create electrical energy.

About 2,000 highly-skilled workers melt and finish electrical steel products at our Butler Works facility in Pennsylvania and finish electrical steel at our Zanesville Works facility in Ohio. AK Steel also conducts extensive electrical steel research and development at our state-of-the-art Research and Innovation Center in Middletown, Ohio.

While we strongly believe that electrical steel plays a crucial role in our national security, so do many others. Pursuant to policy directives issued by both President Obama and President George W. Bush, the Department of Energy has identified electricity transmission systems as infrastructure that is critical to our national security and that requires urgent attention. The government has identified equipment failure and aging infrastructure in the U.S. as threats to our national security. Because virtually all households and businesses rely on electricity, the security and long-term viability of U.S. electrical infrastructure is a critical, national imperative.

A secure, reliable supply of electrical steel is necessary to maintain the electrical grid. Major blackouts, such as the one in San Francisco last month that shut down the financial center of the city, demonstrate that the lack of reliable electrical grid infrastructure is a major threat to our national economy. Major blackouts may occur as a result of grid obsolescence, severe weather events like Hurricane Katrina or Superstorm Sandy, or cyber, terrorist or other attacks on our electrical infrastructure. A secure, domestic source of electrical steel is more important than ever before. Fortunately, AK Steel has sufficient production capacity to meet current and future estimated demand within the United States.

Due to competition from dumped and subsidized imports, the only other U.S. producer of GOES, Allegheny Technologies, shuttered a plant and discontinued GOES production in 2016.

2

High-end electrical steel is an incredibly difficult product to manufacture, as it requires a significant amount of dedicated, capital equipment and a sophisticated, well-trained workforce. Therefore, if AK Steel were to exit the market, there would be no operational electrical steel manufacturing equipment in the United States, the specialized labor and related expertise in operations would be lost, and many of AK Steel's talented operators and researchers would either re-locate to other businesses, industries and/or foreign countries, or become unemployed.

AK Steel strongly supports Presidential action to stem the surge of imported electrical steel. We are, however, very concerned that importers will simply side-step the relief that covers steel by using foreign electrical steel to build cores and transformers abroad, then import those cores and transformers into the United States. Therefore, to effectively address the vital national security interests of the United States and to protect the domestic electrical grid for the long-run, the Department of Commerce must include imported cores and transformers in any relief that covers imports of electrical steel. Without addressing this supply chain issue, any remedy on electrical steel will be easily circumvented. Keeping imports of electrical steel, cores, and transformers at a reasonable level would balance the interests of protecting our national security with allowing a reasonable level of imports to meet the ongoing needs of buyers of these materials. Complete reliance on imports for these critical products, however, would ultimately lead to dependency on foreign sources for the materials needed to maintain and modernize the electrical grid.

Thank you again for the opportunity to testify. I would be pleased to answer your questions.

[END]

3

# TESTIMONY OF JOHN BRETT

## Hearing on Section 232 National Security Investigation
## May 24, 2017

Good morning.  I am John Brett, President and CEO of ArcelorMittal USA.  Thank you for holding this hearing today on the impact of steel imports on national security.  Our country's defense and industrial base depends on a strong and sustainable domestic steel industry to supply our military and critical infrastructure needs.

Mr. Secretary, our company has a long and rich history of supporting our nation's defense capabilities.  We are also a major supplier to the U.S. energy industry which plays a key role in moving the United States toward energy independence.  Today I would like to speak to the relationship between supplying our military customers and our broader commercial business, our efforts to meet the demands of our energy customers, and our view of the fundamental challenge facing U.S. and global steel producers.

Serving the needs of our nation's military has been a long-time, multi-generational priority of ArcelorMittal USA and our predecessor companies; in particular, Lukens Steel Company and Bethlehem Steel Corporation.  Today this tradition continues as ArcelorMittal USA supports our nation's men and women in uniform by supplying steel for a variety of military applications on land and at sea.  Providing steel to the U.S. military, whether the Navy, Army, Marine Corps, Coast Guard or Air Force, is a tremendous source of pride for our company and our employees.

We are currently the largest supplier of armor steel plate for the United States Armed Forces.  Our armor products find application in many fighting vehicles used by the Army and Marine Corps, including the Abrams M1 main battle tank, the Bradley fighting

vehicle, M88 recovery vehicles, the Stryker family of fighting vehicles, various MRAP (Mine Resistant Ambush Protected) vehicles and the up-armored Humvee.

The shipbuilding industry has also been one of the long-term staples of ArcelorMittal's business. We supply steel for a variety of United States Navy vessels, including aircraft carriers, submarines, destroyers and other ships.  The Navy's most recent force structure assessment concludes that addressing current and future threats to U.S. national security will require a larger fleet of 350-360 ships, which would entail an increase in naval shipbuilding over the coming years. The Navy, the shipbuilders and their suppliers, including ArcelorMittal, are working together to ensure that the industrial supply base can accommodate an accelerated shipbuilding schedule.

Preserving the domestic steelmaking and finishing capacity to provide the highly specialized steel for U.S. defense purposes is without a doubt a national security issue. However, the steel tonnage directly used for defense applications is quite small compared to that of the broader commercial market for steel products.  As large a supplier as ArcelorMittal USA is to the U.S. military, our sales into defense applications represent only 1 percent of our total production, and less than 5 percent of our steel plate production.

In other words, defense-related sales of steel alone are not the determining factor in whether a steel mill is successful and sustainable.  Instead, the commercial viability of a steel operation is imperative for retention of that operation's ability to serve the defense needs of the nation both in times of peace and war.

As the Department knows, ArcelorMittal USA has joined with other U.S. producers to bring a number of trade remedy cases in response to a flood of unfairly traded imports from China and other countries in recent years.  Our operations which produce steel for

military applications were not immune from the negative impact of these imports.   Along with other U.S. plate producers, we petitioned this Department and the International Trade Commission for relief from unfairly traded imports of cut-to-length plate from 12 countries, including China, after these imports increased by over 100 percent between 2013 and 2015.   The ITC found that, as a result, the U.S. plate industry's operating income had dropped 75% over those three years.

Here's what the import surge meant for ArcelorMittal USA – we saw our steel plate sales drop by a third in one year.   By 2015, our plate operations were running at only 55% of their capacity.   Our plate prices fell to the lowest levels we had seen in more than ten years.   When we are forced to price at levels that do not cover our costs, then we also are not generating the capital required to reinvest in our operations.   And if we cannot reinvest, we cannot remain on the cutting edge of new technology for the future, for our commercial business or for our military business.   In other words, the impact of the imports is felt throughout our business, commercial and military.

Staying on the cutting edge of new technology is equally important for our energy customers.   ArcelorMittal USA produces a full range of steel grades for the energy transmission and distribution markets, including for the production of large diameter line pipe.   We've been a leader in developing wide API X-70 steel for U.S. pipeline projects. We are committed to serving U.S. customers who need this advanced product and have invested significantly in the production of both plate and hot-rolled steel for our line pipe customers.   Those investments include accelerated cooling, surface quality control, slab processing and software for process control and statistical analysis to support our X-70 and other CTL plate production capabilities.   But our ability to serve these markets is

threatened when competition from low-priced, unfair imports precludes us from building a sustainable business.

The plate case is just one example of the impact that imports have had on our business. It has been a similar story on hot-rolled, cold-rolled, and corrosion-resistant steel. U.S. imports of flat rolled steel products increased 69 percent between 2013 and 2014. The impact on our business was devastating.

Mr. Secretary, we very much appreciate the attention this Administration has devoted to the state of the U.S. steel industry since it took office in January. It was my honor to stand in the Oval Office when the President announced the initiation of this Section 232 investigation. Nonetheless, the United States must address the problem of global excess steelmaking capacity or every other action you, or we, take won't matter.

This Department knows the numbers well – Chinese government industrial and trade policies have driven Chinese steel production from 128 million metric tons in 2000 to over 808 million metric tons last year. In 2016, China exported 108 million metric tons. Those exports have had direct negative effects on U.S. steel producers. They also have an indirect impact when they displace steel in other countries whose producers then ship to the U.S. market. And we have seen an increase in imports of downstream products made from cheap Chinese steel.

It is easy, and correct, to point to China as the main culprit. But it is not just China. We face challenges from countries as diverse as Korea, Russia, Turkey, and others.

The result – we sell less steel, receive less money for the steel we do sell, and employ fewer workers. Over the long term, this situation is not sustainable for U.S.

producers who operate without the kind of government support provided to the Chinese steel industry.

Mr. Secretary, we welcome this investigation because we need solutions to the unfair import problem at the U.S. border.  The antidumping and countervailing duty orders have certainly been helpful but are being circumvented.

But as you consider additional actions, please remember that we also need to find a solution to the excess steel capacity that is impacting global markets.  We need governments throughout the steelmaking world to come together to make clear to China that they need to reduce their excess capacity in steel making – the way a market-based economy would – rather than exporting it.  An objective of any actions should be to increase global pressure on China to change the policies that led to the creation of non-economic steel capacity and to discourage other governments from adopting similar policies.  Those policies have distorted global trade flows and harmed our national security.

Thank you.

**TESTIMONY OF BARBARA SMITH**

**INVESTIGATION OF THE IMPACT OF STEEL IMPORTS ON THE NATIONAL SECURITY OF THE UNITED STATES**

**MAY 24, 2017**

Good morning. My name is Barbara Smith. I am the President and Chief Operating Officer of Commercial Metals Company, a steel producer headquartered in Irving, Texas. I appreciate the opportunity to appear before you to discuss why high levels of imported steel threaten the national security of the United States.

Commercial Metals Company is vertically integrated. We are active in all aspects of the steel industry, from buying and selling scrap through steel production to distribution. The scope of CMC's global operations gives us a unique perspective on the U.S. steel industry, and the forces affecting it.

CMC is also one of the world's most technologically advanced and efficient steel producers. We have pioneered micromill technology, which enables us to produce rebar in the most efficient and lowest cost manner possible. I would like to stress the fact that the American steel industry is as modern and competitive as any in the world. Our industry can provide the United States with nearly all the steel products a modern industrial economy needs. However, steel imports are seriously damaging our ability to produce the steel products the United States requires for

1

national defense, critical infrastructure, and our general economic strength. If this trend is not reversed, the consequences will be serious.

As you have already heard, steel is essential to the national security of the United States. The product CMC makes that is most obviously vital to our national security is advanced armor plate, which is produced by one of our subsidiaries, CMC Impact Metals. CMC Impact Metals makes three different grades of military armor plate. These are used in a variety of applications, including tanks, mine resistant ambush protected vehicles – MRAPS – and other military vehicles. In fact, during the MRAP build-up in the early 2000s, we were the first new armor plate supplier approved by the Defense Department in over two decades. The lives of our soldiers literally depend upon this product.  Among other projects for the Defense Department, CMC was proud to supply the rebar used to repair the Pentagon after the 9/11 terrorist attacks.

In addition to armor plate for the military, CMC produces a variety of specialized bar, rounds, angles, and shapes where high strength and abrasion resistance are critical. These products are used by the transportation, energy, construction, and mining sectors. Of course, these critical infrastructure sectors are vital to our national security as well.

Production of armor plate and these other specialized products requires sophisticated equipment and, just as significantly, skill in steelmaking. To be able

2

to make these products, CMC has invested millions of dollars in equipment, technology and training.

However, CMC's most critical role in national security is our role as a major producer of rebar, a product of major importance to this nation's infrastructure. National Security depends upon Economic Security.  Economic Security depends upon a broad-based vibrant and self-sufficient economy.  Our economy depends upon a world class system of infrastructure, connecting and supporting all economic activity here at home and abroad.

CMC's main product, rebar, is an essential product for national security as this product is used to support every aspect of our critical infrastructure.  This includes the roads, bridges, airports, power transmission lines, and all the other facilities that we use every day, mostly without ever thinking about them. There is a reason the official name of the interstate highway system is the National System of Interstate and Defense Highways.  To build and maintain this infrastructure, you need rebar.  God forbid that we are attacked again on our own soil, without the capability to produce the necessary products like rebar to restore our country.

Unfortunately, many of the world's major producers, including Turkey, China, Taiwan, Japan, and Mexico, make far more rebar than they need for the sole purpose of export to other countries.  These exporters have taken full advantage of the open U.S. market, as rebar imports increased by nearly 50 percent from 2014 to

2016. The U.S. International Trade Commission calculates that, before the recent trade cases, rebar imports held a market share of more than 20 percent.

One of the factors the Commerce Department considers in investigations like this is the reliability of import supply. Rebar imports are generally sold by opportunistic traders who have no loyalty to the U.S. market. It seems very dangerous to me to depend on imports from questionable sources of a product so essential to our national security and economic prosperity as rebar.

These growing imports have had a significant effect on CMC's profitability, employment, and our ability to innovate and invest. To fund innovation and investment, we have to generate a return on investments that satisfies our shareholders. Imports have made it increasingly difficult to do that. In response to the flood of imports over the past several years, CMC has been forced to close 30 U.S. locations since 2008, leading to a reduction in our workforce of 4,000 jobs. Each job in the steel industry supports another seven jobs in upstream and downstream industries, and we are painfully aware of the effect these reductions have had on local communities across the United States.

Imports have also adversely affected our ability to make the new investments we need to remain competitive. CMC invested millions in our technologically advanced micromill in Mesa, Arizona and in building the most modern rebar mill in the world in Durant, Oklahoma. The technology in these mills

4

reduces energy and material usage in steel production to even lower levels, and we thought that these investments would increase our competitiveness significantly. In fact, we were planning to commission a whole series of micromills, which would have created thousands of high-paying jobs across the United States. Unfortunately, competition from imports has been so fierce that we have been forced to put our expansion plans on hold. The situation has gotten so bad that the returns on a number of our investments aren't even covering our cost of capital. Our story is repeated throughout the domestic steel industry.

Allowing our steel industry to shrink further will endanger our national security.  If CMC cannot continue to invest, it won't be able to produce either the armor plate we need for Army vehicles and other military applications, the specialized plate and bar products required by the transportation, energy, construction, and mining sectors, or the rebar needed for every kind of infrastructure application.  The United States is nearing the point where we will be depending on other countries for the steel products that are essential to our national security.  I believe we all can agree that this is a very dangerous proposition. I urge you to conclude that steel imports threaten the national security of the United States, and to recommend to the President that he take prompt and comprehensive action to address this crisis.

Thank you.

14107676.2

Testimony of Thomas J. Gibson
President and CEO
American Iron and Steel Institute

For the Hearing on Section 232 National Security Investigation on Steel

May 24, 2017

Good morning, I am Tom Gibson, President and CEO of the American Iron and

Steel Institute.  AISI represents both integrated and electric furnace steelmakers

accounting for approximately 70 percent of U.S. steelmaking capacity, with facilities in

41 states.  I appreciate the opportunity to testify at this hearing today.

A strong and viable domestic steel industry is critical to America's national

defense, national economic security and homeland security. Virtually every military

platform is dependent on U.S- produced steels and specialty metals, in applications

ranging from aircraft carriers and nuclear submarines to Patriot and Stinger missiles,

armor plate for tanks and field artillery pieces, as well as every major military aircraft in

production today. These critical applications require consistent, high quality domestic

supply sources.

 Steel's importance to national security must also be looked at in a broader

context to include both direct and indirect steel shipments to the military infrastructure

that are needed to support our defense efforts, both at home and overseas -- e.g., all of

the steel that goes into the rails, rail cars, ground vehicles, support ships, military

barracks, fences and bases, which are not classified as shipments to ordinance, aircraft, shipbuilding or other military uses.

On a broader scale, steel is also essential to our nation's critical infrastructure, in terms of transportation, public health and safety, and energy, to name a few key areas. Our military and our broader economy depend on transportation infrastructure like roads, bridges, railroads, transit systems and airports, all of which are built with steel products such as rebar, plate, sheet and fabricated structural members.  Public health and safety require reliable and efficient  water and sewage systems that are built with steel components, including tubular goods, tanks and culverts.

In addition, steel is critical to our energy security and infrastructure.  Our nation's security depends on a reliable domestic energy supply and the domestic steel and products made from steel that are necessary to develop and transport the energy. Oil country tubular goods are essential to oil and gas production, and steel linepipe is needed to move these energy supplies to market.   A typical refinery contains miles of specialty pipe, large sophisticated boilers and process pressure vessels, thousands of custom made valves and fittings -- all made from steel designed expressly for critical applications.

Electric power generation is another critical national security need served by steel.  Grain-oriented electrical steels (GOES) are a principal raw material for power and

distribution transformers, which are critical to the nation's electrical grid and our national security. Non-oriented electrical steels (NOES) are an important raw material for use in critical infrastructure, including for large cores in electrical power generators and industrial applications, such as for oil drilling and oil and gas pipelines. Steel is also present in the structures and in the boilers, pressure vessels and pipe that is needed to produce and deliver the steam or water to the generators. Transmission towers, made entirely of steel, carry high voltage electric wires and provide support for our nation's microwave, cellular and other communications equipment.

The U.S. steel industry's ability to supply our defense establishment and our nation's critical infrastructure needs depends on the steel industry's continued ability to compete in its commercial markets and maintain a domestic manufacturing presence. Repeated surges in imports of dumped and subsidized steel products from numerous countries in recent years have injured the U.S. industry and threaten further injury, putting our national security very much at risk.

Finished steel imports took a record 29 percent of the U.S. market in 2015, while domestic steel shipments declined by 12 percent, and capacity utilization averaged just 70 percent for the year. While total steel imports declined by 15 percent in 2016 as a result of a number of trade cases brought by the domestic industry against dumped and subsidized imports, foreign import market share still remained historically high at 25.4 percent for the year. And imports in 2017 are once again on the rise – with total imports

up 19 percent in the first three months of the year compared to the same period in 2016,

and finished steel imports are now taking 26 percent of the market.

These high levels of imports in recent years have been a critical factor forcing

several steel companies to temporarily close major steel-making facilities.  Employment

in the steel industry declined by 14,000 jobs from January 2015 to December 2016, before

seeing a slight recovery in the first part of this year.

Foreign government interventionist policies in the steel sector have fueled

massive, and growing, global overcapacity in steel, which the OECD has estimated to

be more than 700 million metric tons.  We estimate that more than half of that

overcapacity – 425 million metric tons – is located in China, where government market-

distorting policies have produced a dramatic increase in the size of the Chinese steel

industry, to the point that today it represents about half of all global steel production.

As a direct result of Chinese government policy direction and subsidies, Chinese

crude steel production soared from 128 million metric tons in 2000 to 823 million metric

tons in 2014, before declining slightly to 808 million MT in 2016.  In the first three

months of 2017, however, Chinese crude steel production is once again up 4.6 percent

compared to the first quarter of 2016.

After many years of growth, Chinese steel demand appears to have peaked in 2013. The World Steel Association has reported that Chinese steel consumption declined by 3.3 percent in 2014 and by 5.4 percent in 2015, before increasing slightly by 1.3 percent in 2016. Furthermore, the demand situation in China is expected to worsen over the coming decade. The POSCO Research Institute forecasts that steel demand in China will decrease steadily until 2025, due to the slowdown in the Chinese construction and manufacturing industries.

With China's domestic steel demand declining, the Chinese steel industry has increasingly relied on exports to consume its surplus steel production. China exported a record 94 million metric tons of steel products in 2014, an increase of 52 percent from 2013. That trend accelerated in 2015 with Chinese steel exports rising to 112 million metric tons, an amount big enough to meet all steel demand in Germany and Japan for a year and leave almost 9 million metric tons to spare. In 2016, Chinese steel exports, while down slightly from 2015, continued at historically high levels in excess of 108 million metric tons.

This massive increase in Chinese exports to the world has resulted both in increased imports of Chinese steel into the United States and in increased imports from third countries that have themselves received increased Chinese steel imports. In the case of direct steel exports to the United States, due to the imposition of trade relief by

the Commerce Department in several antidumping and countervailing duty cases over the past few years, Chinese direct shipments have declined since 2014.

But while direct steel imports from China may be down, the high level of Chinese exports to the world continue to put pressure on the global steel market, and lead to increased imports from many third countries. Chinese exports to third countries are being further processed into downstream steel products that are then exported to the United States. For example, Chinese billets are being further processed in Turkey into long products which are then exported to the United States, while Chinese flat-rolled steel is being converted into pipe products in Korea which are then, according to Commerce Department determinations, being dumped into the U.S. market. In addition, Chinese cold-rolled and corrosion-resistant steel is being shipped to Vietnam for minor further processing before being exported to the United States is a blatant effort to circumvent AD and CVD orders on these products. As a result, the U.S. industry continues to suffer from the injurious impact of Chinese overproduction of steel that is exported to world markets.

In addition, the Chinese model of government intervention in the steel industry is being emulated in other countries as well, perpetuating the growing overcapacity problem. Vietnam and India, for example, both have explicit government plans to support the expansion of their steel industries and to increase their exports while

restricting imports.  As these plans are implemented, further injury will be suffered in the United States from dumped steel products.

As one of the most open markets in the world, the United States is often the target of dumping by steel producers from countries around the world.  In many cases, these foreign producers are also subsidized by their governments.

To date, the U.S. steel industry has relied on our trade laws to seek to address the impact of unfairly traded steel imports in our market.  While the antidumping and countervailing duty laws have provided some relief, because the resulting orders are necessarily country and product specific, they leave openings for steel products not subject to orders to continue to surge into our market.

Accordingly, AISI recommends that the Administration use the current section 232 investigation to fashion a more comprehensive and broad-based program of action to safeguard America's national security.

Among the goals of this program should be to increase pressure on China and other countries around the globe to reduce steelmaking capacity.

Thank you for the opportunity to testify today.  I would be happy to answer any questions.

**Ward Timken, Timken Steel Corporation**

**Department of Commerce**

**Section 232 National Security Investigation of Imports of Steel**

I'd like to thank Secretary Ross and the public officials here today for the opportunity to testify at this hearing.

My great-grandfather H.H. Timken established steel production in Canton, Ohio in 1917. Generations of people built this company from a one-customer enterprise that made bearing steels ... to a global company that creates high-performance steel for demanding applications in almost every market.  As we celebrate our centennial this year, our 2,600 employees, like the generations before them, take pride in making the cleanest steel in the world.

Our niche in the steel industry is special bar quality -- or SBQ -- steel to serve customers across a wide variety of industries. Our customers share two things in common...

First, their products endure a high degree of stress and operate in harsh conditions. They need consistently high-performing steel to be successful.

And second: our customers are vital to the national security of the United States.

- You find our steel in every kind of military equipment and military ordnance.  An example is the work we've done recently with the U.S. Air Force to improve the strength and toughness of its "bunker busting" bombs. We delivered higher-performing steel at a lower price, improving the effectiveness of weapons in **eliminating** their targets and **limiting** collateral damage, while also **reducing** the total cost to the American taxpayer. (pause)

  There's a famous military quote that says "If you find yourself in a fair fight, you didn't plan your mission properly." Well, one essential part of that planning is to ensure that the military has the best, most modern tools possible … and American companies like TimkenSteel are delivering the type of innovation that gives the men and women of the military an advantage in completing their missions and returning home safely.

- We also serve companies across a wide range of industries, many of which also have a vital role in preserving and enhancing national security. You'll find our products:

  - a mile under the Gulf of Mexico in an oil string;

  - in millions of vehicle transmissions that move people and goods across the roadways of this country; and

  - in the landing gear of tens of thousands of aircraft that touch down every day.

- Our products are throughout energy, transportation and manufacturing and they enable customers to push the bounds of what's possible in **their** products. Put simply, we like the tough stuff … the harder the better.

Our ability to serve customers who preserve and enhance national security is dependent upon the domestic steel industry's continued economic viability. The world has an overcapacity of steel and many foreign competitors export steel to our shores, depressing pricing and displacing our sales.

We're not afraid of fair competition. We have some of the best people and assets in the world. Our employees not only can compete, but they can out-innovate and out-work any in the world … and the work of our engineers sets the global standard for special bar quality steel.

However, three numbers keep me up at night:

700 million

425 million

94 million

- The world has 700 million metric tons of steel overcapacity.
- 425 million of that is in China alone.
- Demand in the U.S. is only 94 million.

Imports are a real issue for the U.S. steel industry, particularly when foreign competitors don't play by the rules.

As a company, we're using every competitive tool we have to combat imports. We ask that the Commerce Department evaluate the levers it can pull as well. There is no "one size fits all" remedy to this issue. With hundreds of steel products across multiple countries, the remedy must be flexible enough to address the complex nature of the global steel trade. We recommend accessing all of the tools in the remedy toolbox, including tariffs, quotas, VRAs and more ... and in some instances, a combination of remedies may be necessary.

We appreciate your leadership on this issue. All of us at TimkenSteel take great pride in our contribution to the security of this nation and share your belief that a strong steel industry is critical to our national interests. Thank you.

Testimony of Barry Zekelman
Executive Chairman and Chief Executive Officer
Zekelman Industries

Section 232 Investigation on Steel

May 24, 2017

Thank you very much Secretary Ross.  My name is Barry Zekelman and I am the CEO

and Executive Chairman of Zekelman Industries.  I appreciate the opportunity to appear here

today on behalf of my company and our employees.  Zekelman is the largest pipe and tube

producer in North America. We produce over 2 million tons of tubes annually consuming almost

2.2 million tons of domestically produced steel. Our millions of miles of tubing provide the

thread that sews the security blanket  that covers our great nation.

Tubular products are critical to maintaining a strong defense and essential civilian sectors

of the U.S. economy, and is the backbone of our nation's infrastructure.  In 2008 we produced

125,000 tons of hollow steel structural tubing used for the border security fence, which protects

this country and its citizens from illegal border crossings and illicit drug trafficking. We produce

the fire suppression pipe that is routed through our buildings, schools, hospitals, power plants,

industrial plants, warehouses, and military bases. We produce the electrical conduit that provides

safe passage and routing to all of the wiring in all building we see, especially in our data centers,

mission critical military and space centers, power plants, and transportation systems. We make

the pipes that carry the water and waste throughout all of our buildings and civil infrastructure.

Our military bases, airports, transportation systems, and ports all rely on our pipes. We produce

the oil country tubular goods and line pipe that is vital to the exploration and extraction of oil and

gas that provide us with energy to run our economic and military machine. Our tube transports

fuel and gas to planes, trains and automobiles, to houses and buildings for heat, to fuel power

generating turbines and to support solar panel and wind turbines to propel clean energy use.  Our

structural tubing is used for the protective posts which you see throughout this city and many

others for vehicle barriers.  It is used for buildings and agricultural equipment to farm our fields

and feed not only the U.S. population, but the rest of the world.  Highway signage, guardrails,

bridges, electrical distribution towers, cell towers and rail cars are all made with our hollow steel

structurals. The foundation of One World Trade is set upon our pilings. Our drawn over mandrel

tubing is used for hydraulic cylinders that makes movement in all machinery possible, including

mining equipment, construction machinery, transportation, robots and automation. Ask any

military man if a hydraulic cylinder is critical to their success. There is not one piece of military

equipment that does not have a tube in it, from gun barrels to rocket launchers to helicopters and

naval ships, tanks, armored personnel carriers -- the list is infinite.  Ask the people of Flint

Michigan if water pipes are vital to their security and survival!

     In sum, to ask if pipe and tube is vital to our national security is not the right question.

The question is really how our country could possibly be secure without it.  Our economy and

our military would grind to a screeching halt without a vibrant domestic tube industry. We

employ tens of thousands of people, providing income levels far superior to the touted minimum

wage victories.  In addition, our industry consumes over 20 million tons of the flat rolled steel

produced in the United States, the largest single category.  So if we go out of business, the steel

producers are not far behind.  Imports have decimated our industry, resulting in the closure of a

host of pipe and tube mills and throwing thousands out of work.  In the first quarter of this year,

imports in all pipe and tube categories exceeded 60 percent of consumption, with some

categories reaching 70 percent and higher.  It would be the epitome of folly to allow our nation

to continue to permit imports to grow, putting U.S. producers out of business, and making our

2

country vulnerable due to its reliance on foreign producers in China, Korea, Vietnam, Turkey and elsewhere.

My company supports a strong response in the form of a combination of duties and quotas.  Trade remedy cases have not addressed the problem of unfairly traded imports and massive foreign overcapacity.  Third country dumping is rampant in our industry and a stronger response is essential to ensure the ongoing viability of our industry.  We have to break the cycle of dependency on imported pipe and tube, and the only way to do that is by limiting imports to a smaller share of the U.S. market.  If we allow our domestic industry to disappear, we will only have only ourselves to blame for placing our country in an extremely vulnerable position.  We have the best and most efficient steel producers in the world.  We should make it here, and put America first.

DMSLIBRARY01\30441959.v1

# Statement of Dennis M. Oates
# Chairman, Specialty Steel Industry of North America (SSINA)

# Chairman, President and Chief Executive Officer
# Universal Stainless & Alloy Products, Inc.

# Public Hearing on
# Section 232 National Security Investigation
# Regarding Imports of Steel

# May 24, 2017

Good morning Mr. Secretary and members of the panel.  I am Denny Oates, Chairman, Specialty Steel Industry of North America (SSINA) and Chairman, President and Chief Executive Officer, Universal Stainless & Alloy Products, Inc.

SSINA is a Washington, DC-based trade association representing virtually all continental specialty metals producers, which include high technology, high value stainless and other specialty alloy products.

SSINA membership includes virtually all North American manufacturers of stainless steel and nickel based alloys, including superalloys.  Other specialty metals such as titanium and titanium alloys, zirconium and niobium alloys are also produced by SSINA member companies.

There can be no doubt that the domestic specialty metals industry is critical to the national defense.  Attached to my testimony is a report entitled "Specialty Metals and the National Defense," which summarizes the contributions of the specialty metals industry to the national defense.  Also attached is a press release issued when the report was made public.  The report proves unequivocally that specialty metals are vitally important to virtually every U.S. military platform.  Without these specialty metals, the U.S. military and Homeland Security forces would not have the ability to fight a war, defend our borders, and protect our citizens from terrorism.  The press release quotes then-Acting Deputy Under Secretary of Defense Gary A. Powell, who said, "There is no question that specialty metals are critical to the national defense, and the U.S. specialty metals industry is a very important supplier of these materials to various defense contractors.  And myriad defense programs would be negatively impacted by specialty metals supply disruptions."  Furthermore, Department of Defense studies provide further evidence of the critical importance of specialty metals to the national defense.  A series of reports entitled, "Defense Industrial Base Capabilities Studies" clearly show that applications which contain

specialty metals are essential to meeting national defense requirements and are critical components of technologies that focus on 21st century warfare.

A key concern, however, is that the domestic specialty steel industry must be healthy and profitable in order to supply the critical defense applications.  Simply put, the survival of the industry is dependent upon the core commodity products produced by our members.  This includes basic stainless steel in the form of sheet and strip, plate, bar, rod, ingot and billet.  The specialty steel industry cannot exist simply by producing materials for defense applications.  While it is difficult for the specialty metals industry to identify the percentage of our total production which goes to specific defense applications because many of our sales go through service centers or distributors before reaching end users, a reasonable estimate is 10 percent.  If civilian applications which play essential supporting roles for defense such as aircraft, highways, power plants, etc. are considered the percentage is much larger, perhaps 50 percent.  And let me be clear -- the specialty steel industry could not abandon manufacturing in the United States and focus on technology development.  It just does not work that way.  Technology development travels with the manufacturing process.  Our steel mills are laboratories.  It would be naive to think that manufacturing of these materials could be transferred abroad to countries like China while technology development remained in the United States.

Import competition has taken a serious toll on U.S. producers.  In the 1970s there were approximately twice as many specialty metals producers in the U.S. as today.  We have battled unfairly-traded imports for decades.  We have filed and won many antidumping and countervailing duty (subsidy) cases.  The Commerce Department and the U.S. International Trade Commission reached affirmative findings in an antidumping case last year against imports of stainless steel

sheet and strip from China.  We constantly monitor developments on other products to determine whether additional trade cases should be filed.

As you are well aware, there is tremendous overcapacity worldwide to make stainless steel. China alone has <u>excess</u> production capacity equal to twice the size of the entire U.S. market.  And it remains to be seen whether China will cooperate with the rest of the world in the Global Steel Forum simply to develop a database demonstrating current production capabilities.  Global overcapacity, endemic dumping and foreign government subsidies all pose direct threats to U.S. producers and an associated threat to our ability to provide the critical materials essential to the national defense.  In conclusion, let me express our sincere appreciation for the efforts of this Administration to recognize the threat to our national security and to undertake this investigation to determine how to deal with this vital problem.  Thank you.

# Statement of Terrence L. Hartford
# Vice Chairman, Specialty Steel Industry of North America (SSINA)

# Vice President, ATI Defense
# Allegheny Technologies Incorporated

# Public Hearing on
# Section 232 National Security Investigation
# Regarding Imports of Steel

# May 24, 2017

Good afternoon, Mr. Secretary, and members of the panel.  I am Terry Hartford, Vice Chairman, Specialty Steel Industry of North America (SSINA), and Vice President - Defense for Allegheny Technologies Incorporated. ATI is a U.S.-based manufacturer of advanced specialty materials, including nickel-based alloys, superalloys, titanium alloys, stainless steels and other specialty materials, including zirconium, niobium and hafnium alloys. We've also made significant investments in downstream capabilities to produce specialty components from these materials. Many of these alloys have significant defense applications in our most advanced military systems.

ATI is one of the largest and most diverse specialty metals and components manufacturers in the world.  Our largest markets are in the aerospace and defense sectors, although we also have a strong presence in the oil and gas, electrical energy, medical, automotive and other industrial and commodity markets.  Virtually every major military aerospace system contains an ATI specialty steel or alloy.   Our materials are also utilized in the production of land-based vehicles; naval systems; missiles and rockets; armor and munitions.  The applications of these materials are wide-reaching, and in many instances, these materials are sole-sourced and not substitutable.  Let me provide a few illustrative examples, beginning with the aerospace sector.

1.     Our vacuum melted nickel alloy sheet, bar and finished forgings and our aerospace quality titanium alloys provide the strength and thermal protection that enables our military jet engines to operate at the highest temperatures with the necessary strength.    The Joint Strike Fighter F-135 engines and the F-404 engines of the F/A-18-Hornetare aerospace platforms are examples of programs that rely heavily on ATI specialty metals.

2.      Our premium quality titanium for dynamic rotor components and blades on many military helicopters, including the Apache, Blackhawk and Chinook programs provide high strength and light weight performance that is critical to the operation of these aircraft.

3.      Our Precipitation Hardening stainless steel bars and finished forgings are used for landing gears and other aircraft structural components of our military aircraft.

Moving from aerospace into the realm of ground vehicles, our vacuum melted nickel alloy sheets are used for recuperators on the M1-A2 Abrams tank engine, and our titanium alloys are used to produce armor for the M1-A2 tank.  Several years ago, ATI developed a new titanium alloy for armor systems, and this new material is nearing final qualification from the US Army and its prime contractors.

On the sea, our nickel-based alloys are utilized in hull construction to increase the system performance, durability and survivability of our naval vessels; while our special alloys for Navy submarine and aircraft carriers' nuclear propulsion systems ensure the corrosion resistance necessary in high temperature and salt water environments. Similarly, our duplex stainless steel is used for structural components on the Navy's newest Zumwalt-class destroyer, providing cost effective strength and corrosion resistance.

This is a small sampling of the numerous applications served by ATI specialty steels and specialty metals.  Many of these applications involve the use of proprietary materials that we have developed directly with the Departments of Navy, the Air Force and the Army.  These metals are high tech in nature and are in a constant state of advancement.  They are not "off-the-shelf" items. It is their superior performance, often under the most severe operating conditions, that enable our defense systems to function at high levels of performance and to do so reliably.

ATI is committed to the defense market.  We are investing heavily in the development of new materials to navigate the transition to the next generation of advanced jet engines that will power our commercial and military air fleets.  These materials will help our engines operate at higher temperatures to drive greater performance and improve fuel efficiency. Our efforts, however, are not limited to mill products.  We are a leader in the production of titanium-based and nickel based alloy powders for use in next-generation jet engine forgings, as well as in the production powder and wire for 3-D printed components.

Mr. Secretary.  We applaud the Administration's willingness to study the relationship between imports and national security in this investigation.  To understand that relationship, however, requires an understanding the operations of companies like ATI that are leaders in the development of the specialty metals that will power our military into the future.

ATI grew through investment, technology development and innovation into the diverse specialty metals and components producer that it is today.  A core business segment, however, is stainless steel production.  Like most U.S. specialty steel mills, the ability to sell stainless steels into the commercial market requires us to be cost competitive to sustain our business.  The domestic specialty steel industry – including companies like ATI – cannot exist simply by producing materials for leading edge defense applications.  The production of materials for all defense applications, represents, in our case, perhaps 10 percent of total production.  The survival of this industry, however, is dependent on the viability of all of its businesses, not just its defense-related production.  It is important to realize that the production equipment used to make materials for defense applications is the same as the equipment used to produce materials like stainless steel for large volume non-defense applications, including infrastructure projects.  Many of our engineers and metallurgists are also the same.  It is the efficiencies of these larger volume, non-

defense related businesses that sustain the development and production of leading edge specialty metals for defense applications. Thus, the economic welfare of our high volume stainless steel operations directly impacts our ability to serve the needs of our military. For this reason, and relevant to this investigation, I would like to address the current state of the stainless steel market from the perspective of the stainless flat-rolled sector, which accounts for about two-thirds of U.S. stainless production.

For more than 40 years, the stainless steel flat-rolled market has been targeted by imports. Nevertheless, the sector has persevered and invested billions in world class technologies to remain globally competitive. We have also relied on the trade laws to respond to the challenges from illegally traded imports. Most recently, ATI and the other stainless steel-flat-rolled producers were forced to confront a Chinese state-owned juggernaut that increased its production of stainless steel from 3.8 percent of global production in 2001 to 54.5 percent in 2016.

China's production capacity is nearly eight times the size of the U.S. market, and its excess capacity alone is more than double the size of the entire U.S. market. These capacity imbalances, not surprisingly, translate into an intent, through the use of aggressive pricing, to dominate and potentially take over our market. Over the period 2013-2015, imports of stainless sheet and strip products from China grew 133.1 percent from 63,114 to 147,143 tons. China's share of the entire U.S. stainless sheet and strip market doubled during that period. The recent import surge from China, in fact, created market conditions that forced ATI to close our Midland Pennsylvania facility in 2015, with the loss of hundreds of jobs. Through the use of the trade laws, we were able over the period 2016-2017 to obtain antidumping and countervailing duty orders against China that should restore temporarily some degree of fairness to the market place. The fundamental structural problem of overcapacity, however, remains, and Chinese imports have been supplanted

by imports from Taiwan and Vietnam, many of which originate from Chinese-produced upstream material.

ATI's revenues come primarily from commercial markets, complemented by significant positions in defense.   ATI recently invested $1.2 billion to build the world's most advanced hot-rolling, and processing facility in Brackenridge Pennsylvania.  We will be processing some of our most sophisticated specialty alloys at that facility, many of which will be the foundation of our future military platforms.  The new mill, however, to operate profitably and efficiently needs to be able to produce stainless steel in commercial volumes.  This is true of many of our operations, including our Forged Products business.  If our commercial markets continue to be victimized by unfair imports, we will not be able to operate our mills at a level of profitability and return on investment that will permit us to invest in the research and development of the materials so critical to our national defense.   Many of these materials cannot be produced anywhere else.   Indeed, this is why the U.S. Department of Defense asked Congress in 1973 to impose a domestic sourcing requirement on specialty metals.   That requirement is a reason why companies in the specialty steel industry, like ATI, have had the ability to develop the specialty alloys that power our military, and why the U.S. leads the world in the technology development and production of these materials.

A domestic sourcing requirement alone, however, will not preserve that US leadership position, given the structural problems of excess capacity that plague the specialty steel industry. This investigation must recognize the inextricable linkage between our national defense needs and the ability of our specialty metals manufacturers to achieve the returns on investment in their commercial markets that will support the research and development of the high technology materials that are vital to our defense industrial base.  This investigation must therefore address the fundamental issues of overcapacity and unfair trade that have plagued our commercial markets,

and it must fashion a remedy that will permanently address those issues. The remedy, however, cannot undermine the antidumping and countervailing duty orders that have been effective in restraining import surges, nor can it weaken the domestic sourcing requirement incorporated in the Specialty Metals Amendment, which has ensured that the U.S. has the ability to produce the specialty metals from which most of our military platforms are built. We look forward to working with the Administration in helping shape that remedy.

**Testimony of**

**Lourenco Goncalves - Chairman, President and Chief Executive Officer**

**Cliffs Natural Resources Inc.**

**U.S. Department of Commerce - Bureau of Industry and Security**

**Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel**

**May 24, 2017**

Good morning, Secretary Ross and members of the panel.

My name is Lourenco Goncalves and I serve as Chairman,

President and Chief Executive Officer of Cliffs Natural Resources.

Thank you for the opportunity to speak here today.

By way of background, Cliffs is the largest supplier of iron ore

to the steel mills in the United States.  We own and operate four of

the seven active iron ore mines in the country, directly employing

approximately 3,000 Americans.  In stark contrast to the Australian

iron ore miners BHP, Rio Tinto and Fortescue, which almost entirely

produce and sell iron ore sinter feed fines to China and other

countries, Cliffs' operations in the United States exclusively produce

iron ore pellets.  While iron ore fines feed sinter operations that contribute immensely to the well-known air pollution problem in China, the pellets we sell to our domestic clients make the American steel industry one of the most – if not **the most** environmentally friendly in the entire world.  Chinese non-compliance with minimal environmental standards is the most absurd, unfair and unacceptable advantage the Chinese have in exporting their excess steel.

I will speak today both in my capacity as Cliffs' Chairman and CEO and from decades of experience in the steel industry.  Prior to joining Cliffs, I served as CEO of two other American companies: Metals USA Holdings, a leading national steel service center company; and California Steel Industries, the biggest steel supplier on the West Coast of the United States.  In light of my ten years at Metals USA and my active role in the previous cases under Sections 201 and 232 back in 2001 when I was at California Steel, I would like to confront a very important part of the problem that has

2

never been properly addressed.  That problem is the role played by some domestic service centers and steel buyers **as enablers of the entire steel import crisis**, by providing a home within the United States for illegal steel imports.

Dumped steel products do not find their way to this country spontaneously, nor do these imports swim to U.S. shores.  Every steel product that enters this country is brought here because a steel trader, distributor, service center or end user will buy – or already bought - that steel. Some steel buyers, traders and service centers, **by design**, acquire dumped and illegally subsidized steel and, in many cases, intentionally circumvent duties and tariffs assigned to steel products.

These bad players know exactly what they are doing, but they do it anyway, because they feel they are beyond reach.  As evidence, emails sent from traders to steel buyers in the U.S., offering to navigate around duties applied to steel from China and

3

South Korea, have been submitted along with the written version of my remarks.

Let me be clear: any American company or individual who is complicit in such a scheme **must be held accountable**.  These steel buyers are no different than recipients of stolen goods after a robbery.  While these recipients did not directly perpetrate the initial crime, it is nonetheless an offense to, knowingly, acquire stolen goods. Their only real concern is not to be caught; they do not care that artificially cheap products negatively affect the health of the domestic iron and steel industry and, by extension, the military readiness of the United States.

While not all service centers and steel buyers act as domestic enablers of illegal trade, the ones providing dumped and circumvented steel products a destination within the United States **must be punished**.   Any real solution to our imported steel problem **must include** a commitment by the federal government to

directly confront the American companies and individuals that facilitate the trade of illegal steel imports by ensuring that these products find a home in the United States.

In closing, I would like to remind the panelists that the worst enemy is the one that pretends to be a friend.  Some of these perpetrators use a speech very similar to ours, despite their actions. If any of these individuals do have the courage to show up today, please ask them if importing illegal steel is part of their business model and, if so, why they break the law.  I am sure they will not accept accountability because their illegal short-term profits are more important to them than the military readiness of the United States.

Thank you once again for the opportunity to speak today.  I would be happy to answer any questions you may have.

5

**Testimony of John Adams, Brigadier General, U.S. Army (Retired)**
**President, Guardian Six LLC**
**Hearing Regarding Section 232 National Security Investigation of Imports of Steel**
**May 24, 2017**

Thank you for the opportunity to share my views on the effects on the national security of imports of steel.

I applaud the administration's initiation of this Section 232 national security investigation of this issue. As a thirty-year veteran of the U.S. Army, with a background in strategy and intelligence, and as a lead author of the 2013 study of the U.S. defense industrial base, *Remaking American Security*, my experience and research convince me that imports of cheap and subsidized steel from our strategic competitors put our national security at risk by eroding the U.S. steel industry's position as a fundamental building block of our national security infrastructure. I therefore advocate concerted action at all levels of government to preserve a strong domestic steel industry.

Our nation's security rests on a military equipped with the technology, weapons systems, and platforms needed to protect our nation supplemented with logistical and critical infrastructure. Despite technological advances in materials, notably composites and ceramics, steel remains irreplaceable to the U.S. military. From nuclear-powered submarines to aircraft carriers, and from main battle tanks to mine-resistant vehicles, steel shields our nation and the lives of our warriors. A healthy domestic steel sector – including the many small and specialty manufacturers that depend on steel – is critical to sustaining the quantity and quality of capabilities needed to preserve our national security.

The glut of low-priced steel in the world market, resulting in large part from China's and other potentially hostile trading partners' actions, undermines the ability of American-made steel to fairly compete in the marketplace. Left unchecked, the current steel market situation will continue to result in plant closures, mass layoffs, and the loss of key technology and manufacturing know-how. In this insecure world, the need to build more defense platforms in a hurry may very well come sooner than we would like. As China expands its global presence, a situation in which China exercises market control over global steel is all-the-more alarming.

There is more to this issue than "lowest cost is best." While low prices for steel can reduce defense acquisition costs, irreparable damage to our domestic steel industry and loss of our steelmaking capacity will increase defense industrial base dependency on China and other potentially hostile foreign governments.

It is a myth that steel will always be available for U.S. defense requirements. Domestic steelmakers' health depends on the health of their commercial sectors. Conversely, the overall health of domestic steelmakers is not contingent on defense production. If the commercial market is severely disrupted or unprofitable, the defense production sector cannot survive.

Reliance on foreign sources of steel, especially from strategic competitors, results in uncertain supply for critical national requirements, especially in a crisis. In 2004, on temporary duty in Iraq, I witnessed our warriors apply jury-rigged armor plates – often sent by their families – to their vehicles to protect against IEDs. When DoD asked foreign suppliers to "uparmor" American vehicles, they put our requirements in their months' long queue for orders. Only American steel companies – subject to "rated orders" scheduled in weeks rather than months – supplied armor plate for the uparmored vehicles that protected our warriors from IEDs.

We must take urgent action to address these risks.

- Take aggressive action to safeguard America's economic and national security by recommending remedies to the President that will yield a meaningful opportunity for U.S. producers to recapture lost market share and rebuild broken supply chains.

- Take a broad view of steel products that are necessary for our national security. While the first products that come to mind are ships and tanks, we must also consider and include steel used to construct America's logistical and critical infrastructure – everything from our electrical grid and transformers to rail networks and underground water systems. A strong and readily-available supply of iron and steel products is vital to America's economic and national security.

- Focus on the entire supply chain, including everything from iron to semi-finished steel products in your recommendations to the President. According to SteelOnTheNet.com, a semi-finished steel slab constitutes roughly 90 percent of the cost of a finished hot-rolled steel product. Thus, allowing for the importation of foreign slabs, despite a 232 safeguard remedy, could undermine the goal of stabilizing and protecting steel production that is vital to our national security. The same goes for upstream raw materials production of iron. We must ensure that the entire supply chain of iron and steelmaking in the United States benefits from actions arising from this investigation.

- We must establish verifiable and enforceable mechanisms for the elimination of global overcapacity in the steel sector, and implement rules to counter anti-competitive behavior of state-owned entities, especially in China.

- We must proactively apply our trade enforcement laws to provide relief from market distortions before plants are forced to close and capacity is irreparably lost.

- We must rigorously apply domestic sourcing policies in government procurement of steel.

Our goal is to maximize domestic capabilities combined with supplies from unquestionably reliable third parties. The one supplier in whom I have complete confidence is Canada. Not only do we currently have a steel surplus with Canada, but we share a border and have synergistic strategic, economic, and national security interests. However, treating Canada as a unique partner under any Section 232 relief measures requires that Canada also strengthen and align its trade enforcement efforts with ours. Circumvention and evasion of U.S. trade laws and actions through Canada is unacceptable.

Again, I applaud the administration's initiation of this Section 232 investigation of the effects of imports of steel from a national security perspective, and as indicated, to recommend actions to adjust steel imports so that they will not put our national security at risk. We need concerted action to address the risks to our domestic steelmaking capacity before we lose it, especially to our most dangerous long-term strategic competitors, and to ensure that the U.S. steel industry remains a strong and ready foundation of our national security.

## Section 232 National Security Investigation of Steel Imports
## Testimony of John Stupp
## May 24, 2017

Good morning.  I am John Stupp, President and Chief Executive Officer of Stupp Bros. and Chief Executive Officer of Stupp Corporation, our steel pipe manufacturing division.  I am also a representative of the American Line Pipe Producers Association or ALPPA.  I would like to thank you for this opportunity to testify today and explain how imports of large diameter line pipe threaten U.S. national security.

Stupp was founded in 1856 and has been supplying products to the U.S. military since the Civil War.  Back then, it was iron classing for the monitor class vessels that helped secure the lower Mississippi.  During World War I, Stupp provided fabricated steel sections for maritime vessels and during World War II, Stupp built Bailey bridges, a portable, pre-fabricated, truss bridge that was used extensively by the military during the war. We also began making bomb bodies for the 500, 1000 and 2000 pound bombs used by the Air Force and Navy in the early 1970s and continue to manufacture those bomb bodies today.

Stupp's involvement in pipeline manufacturing dates back to the 1940s, when it began providing financing and project management for the 898-mile Michigan-Wisconsin Pipeline.  In 1952, Stupp started manufacturing pipe in Baton Rouge, Louisiana and added an integrated coating plant to its operations in 2004.

In 2009, Stupp added a second pipe manufacturing facility to its campus. Stupp is strongly committed to producing the highest quality line pipe in the United States and has been for decades.

Stupp, together with American Steel Pipe, Berg Pipe, and Dura-Bond, make up the ALPPA, a domestic coalition of large diameter line pipe manufacturers. Together, we account for the vast majority of large diameter line pipe domestic production. ALPPA's members produce line pipe for a number of U.S. national security applications, including for oil, gas, chemical, water, sewage, and slurry pipelines, all of which are critical U.S. infrastructure. ALPPA's members also produce specific products for the U.S. military, including steel bridges and munitions. We are proud to produce steel products that protect our citizens and infrastructure. However, unprecedented global steel overcapacity and the resultant surge in steel imports into the U.S. market are threatening our ability to continue doing so. That is why I am here today.

This Section 232 investigation comes at a pivotal time. As you are likely aware, the domestic steel industry is suffering from chronic overcapacity and a growing import crisis, both of which have been largely driven by government-sponsored capacity expansions. Over the past several years, governments in China, Korea, Turkey, and elsewhere have provided their producers with massive

subsidies to expand capacity and production far in excess of demand, which has resulted in a severe supply glut.

Estimates place current global excess capacity at more than 700 million metric tons. This figure is staggering and represents a sharp increase from the roughly 500 million tons of global excess steel capacity recorded in 2014. While China accounts for the bulk of this excess capacity, there is also significant overcapacity in Korea, Turkey, Japan, and other countries.

In the United States, the effects of the global excess steel capacity crisis are being felt most acutely in the form of record steel imports. The domestic large diameter line pipe industry has experienced this firsthand. Despite Korean welded line pipe being under order and a sizeable drop in U.S. demand in 2016, Korean producers have continued to ship substantial volumes of large diameter line pipe to the United States and now capture roughly 20 percent of the U.S. market, more than any other import source. Japanese volumes almost doubled between 2014 and 2016. Turkish and Greek volumes of large diameter line pipe increased by 267 percent and 991 percent, respectively, between 2014 and 2015, and remained significant in 2016, despite weakened U.S. demand.

These elevated import levels have resulted in dramatic declines in the domestic large diameter line pipe industry's capacity, production, revenue, investment, and employment. In 2015, which was a peak demand year, the

domestic industry was operating at a capacity utilization rate of only 37 percent. Since then, conditions have worsened. The industry is now operating at a capacity utilization rate of well under 30 percent – the lowest that it has been in years. While some large diameter pipe operations have been forced to shut down in response to the import surge, including U.S. Steel Tubular Products' McKeesport pipe mill, others have been idled. Just last May, American Pipe idled one of its two mills and reduced its workforce to one shift because of the import surge. Berg Pipe has also suffered a dramatic reduction in workforce – from 660 employees in 2015 to roughly 415 today – for this same reason.

The U.S. national security implications of the domestic industry's current state are significant. The industry is gradually losing the ability to produce large diameter line pipe to equip the U.S. military, respond to disasters, and modernize increasingly aging infrastructure. ALPPA's members supply a variety of different line pipe for critical oil, gas, and other pipeline projects throughout the United States as well as steel munitions, bridges, and other products for the U.S. military. However, we cannot keep producing these products if the import crisis continues.

The industry's ability to develop new steel products to meet evolving national security needs is also in jeopardy. ALPPA's members have made significant investments in recent years to produce the highest performance pipelines for the most demanding U.S. military and critical infrastructure

applications.  Stupp added a second mill to its operations in 2009, American Pipe invested $80 million in a new facility to increase its capacity in 2012, Berg made significant upgrades to its technology in 2013, and Dura-Bond purchased the former McKeesport pipe mill in 2016.  Such investments are necessary to keep our industry strong and healthy.

Yet, as President Trump recently acknowledged, if the present situation persists, "it may place the American steel industry at risk by undermining the ability of American steel producers to continue investment and research and development, and by reducing or eliminating the jobs needed to maintain a pool of skilled workers essential for the continued development of advanced steel manufacturing."  The domestic large diameter line pipe industry could not agree with the President more.

For these reasons, the ALPPA and its workers ask that Commerce find that steel imports are threatening U.S. national security and grant much needed trade relief to domestic large diameter line pipe producers and the rest of the steel industry.  A failure to grant broad relief to the steel industry will result in further harm to U.S. producers and workers, and continue to place our national security at risk.  The ALPPA will talk more about remedy in our written submission, but strongly believes that there is a need for import tariffs covering the large diameter line pipe industry.

DRAFT – 5/22/2017

Thank you for your time and attention on this critical issue.

**Oral Presentation of Ryan Chadwick, VP and General Counsel of TMK IPSCO**
**Public Hearing on Section 232 National Security Investigation of Imports of Steel**
**May 24, 2017**

Good morning Secretary Ross and distinguished members of the panel.  Thank you for the opportunity to speak at this hearing.

My name is Ryan Chadwick and I am the Vice President and General Counsel of TMK IPSCO, one of the largest manufacturers of steel pipe for the energy industry in the United States.  Our energy related products include OCTG and line pipe up to 16".  TMK IPSCO also manufacturers standard pipe, industrial pipe, and structural steel products.  TMK IPSCO has 1.6 million tons of annual steel pipe manufacturing capacity at our facilities in Pennsylvania, Kentucky, Ohio, Arkansas, Iowa, Oklahoma, Nebraska, and Texas.  Approximately 75% of our pipe production capacity is for welded pipe; the remainder is for seamless pipe.  TMK IPSCO currently employs 1,370 employees at these facilities and at its headquarters and R&D facility in Houston, Texas.  At full capacity utilization, TMK IPSCO would employ over 2,600 individuals in the United States.

According to the US Energy Information Administration, net imports of petroleum products account for 25% of US consumption of petroleum and US natural gas production is equal to about 99% of US natural gas consumption.  Our country has made great strides on the path to energy independence.  Dependence on imports of steel pipe to support this critical energy infrastructure, however, leaves our country less able to independently provide for its energy needs and less secure.

Our pipeline infrastructure is aging, with much of it installed prior to 1970.  We must have a secure supply of steel pipe to repair and maintain this pipeline infrastructure.

Over one third of electricity generation in the United States is powered with natural gas, increasing the need to assure the security of steel pipe supplies to support the transmission of natural gas to these generation facilities.

Total steel pipe production in the United States is approximately 10% of total steel production in the United States by tonnage.  A healthy domestic steel pipe industry helps insure a healthy domestic steel industry.

After final AD and CVD duties were implemented in 2010 against Chinese steel and steel pipe, Chinese steel overcapacity was redirected to other countries, such as South Korea.  After 2010, we saw a steady increase in imported steel pipe manufactured by foreign companies able to take advantage of reduced steel prices caused by steel overproduction at unprofitable Chinese companies.  By 2013, producing welded OCTG and line pipe became unprofitable for TMK IPSCO and other domestic producers.

The gap between US and Chinese steel coil prices expanded to as much as $340/ton last year and is $266/ton as of May 11 of this year.  The Chinese steel coil prices warp the world steel market outside the US, lowering prices to well below the US coil price.  It is very difficult and often impossible to compete with foreign steel pipe producers that have such an advantage in lower input costs.  In some instances, foreign steel pipe has been priced close to the prices for domestic steel coil used in the production of US steel pipe.  If the status quo is maintained, many of the steel pipe production facilities in the United States, particularly for welded pipe, will remain or become money-losing operations.

If the Administration takes action on imported steel under Section 232 and does not take action on imported steel pipe, the resulting influx of cheap steel pipe imports is likely to drive many domestic producers out of business because there will, at the same time, be a significant increase in US steel coil prices for domestic steel pipe producers.

In 2012, TMK IPSCO spent close to $100 million on capital projects to improve its manufacturing facilities in the United States.  In 2013 and 2014, TMK IPSCO reduced its capital spending to approximately $40 million annually as it responded to difficult market conditions created by low-priced imported pipe.  In 2015 and 2016, TMK IPSCO reduced capital spending to $19 million and $6 million as it idled its welded pipe facilities in response to low-priced imported pipe and the downturn in the oil and gas industry.  In all, TMK IPSCO has invested half of a billion dollars in its US operations since 2008.  TMK IPSCO has also spent approximately $10 million annually on research and development on improved metallurgies and advanced connection technologies that make the types of oil and gas well drilling that now occur in the United States possible.  TMK IPSCO would like to return to a full workforce, return to spending on capital projects that allow it to compete in a fair marketplace, and maintain its R&D programs.

Both TMK IPSCO and a strong consensus of the US steel pipe industry at the CPTI annual meeting last week in Washington, D.C. agree that quotas, rather than tariffs, would be a better choice for relief under Section 232. These quotas should be based on 2010 and 2011 levels, a period between relief from massive Chinese imports and the onslaught of imports from many other countries.

**Position of the Ministry of Commerce of China:**
**U.S. Section 232 Investigation on Imported Steel**

**Testimony Before the U.S. Bureau of Industry and Security**
**May 24, 2017**

Gu Yu, First Secretary
Embassy of the People's Republic of China
in the United States

Good morning.    My name is Gu Yu, and I am First Secretary at the Embassy of the People's Republic of China here in Washington.    I welcome the opportunity to present the position of the Ministry of Commerce of China in this investigation on the effects, if any, of steel imports on the national security of the United States.

The Ministry of Commerce believes there is no evidence that steel imports threaten to impair U.S. national security.    United States defense requirements are plainly not dependent on imports of foreign-made steel.    Nor does imported steel fundamentally threaten the ability of domestic producers to satisfy national security requirements, or threaten the security and welfare of industries that are critical to the minimum operations of the economy and government.    Simply put, United States national defense and other critical sectors' need for steel can be, and are, readily satisfied by U.S. domestic production.

First, your agency, as well as the U.S. Department of Defense, have previously determined that U.S. national defense requirements for finished steel are very low. Recent statistics of the American Iron and Steel Institute show that just 3% of total U.S. domestic steel shipments go to national defense and homeland security.    Clearly,

current and projected U.S. national defense demand for steel can be readily satisfied by domestic production.    Moreover, the U.S. Department of Defense has long-established domestic procurement requirements that apply to all steel used in critical national security systems.    None of these systems are dependent upon foreign steel.    Annual reports of U.S. domestic steel producers show that they cover the steel supply for national defense and national security applications, and the capacity and shipments of steel of these companies far exceed U.S. national defense and security requirements.    Thus, steel produced domestically in the United States remains in abundant supply relative to U.S. national defense requirements.

Second, the United States imports its steel from a diverse array of more than 100 countries and territories.    Steel pipe and tube imports, for example, are sourced from more than 50 different countries.    The United States is not dependent on steel imports from any particular source country.    The portion of imports from each individual country is relatively low compared to total imports.    Canada, for example, the largest source of imported steel, accounts for only 17% of steel imports.    And the vast majority of U.S. steel imports -- nearly 70 percent -- are from close U.S. allies. The top five suppliers are Canada, Brazil, South Korea, Mexico and Turkey. Furthermore, U.S. reliance on imported steel is declining.    Your Commerce Department found that steel imports have declined by more than <u>25 percent</u> since 2014.

Third, the U.S. steel industry is healthy and has the capacity to produce the steel needed to satisfy the country's national security requirements.    In particular, U.S. producers have state-of-the-art technology to produce high-end, high-value steel products, and they maintain steady and competitive exports of such products in global markets.    The top domestic U.S. steel producers are actively making significant new investments, both domestically and abroad, that increase the efficiency of their domestic output and enhance their global strength and competitiveness.    These investments are reflected in relatively stable levels of U.S.-based steel workers, as well as in the overall expansion of employment by U.S. steel producers in their global operations.    Furthermore, given current capacity utilization rates around 70%, the U.S. steel industry has significant expansion potential to continue providing ample supply for national security needs.

The U.S. government already provides domestic producers with adequate trade protections.    Over the last 40 years the U.S. initiated more than 200 trade remedy investigations on imported steel products.    U.S. steel producers are currently the beneficiaries of more than 150 separate antidumping and countervailing duty orders that your Commerce Department enforces on imported steel products from over 25 countries.    These orders provide the U.S. industry with full protection from imports of steel, as well as generate revenue for the U.S. Treasury due to high rates of duties.

Fourth, the volume of imports of steel from China has significantly declined in recent periods and represent a very minimal portion of U.S. steel imports.    Steel

imports from China, which are primarily low-end products sold to distributors and processing centers, are <u>down</u> <u>67.4 percent</u> since September 2015.   Chinese steel imports plainly do not impact U.S. national security.

Finally, in light of the lack of a unified definition of "national security" within the WTO framework, such action may trigger other Members to invoke similar national security interests to protect their own allegedly critical industries from imports, which would create unnecessary and harmful barriers to trade.   At the same time, any steel import restrictions imposed as a result of this investigation will do nothing to enhance U.S. national security, but would only harm downstream U.S. manufacturers and the broader domestic economy. We hope that the United States will carefully assess the impact of this section 232 investigation and play a positive role in the global order of international trade.

The Ministry of Commerce plans to file a written submission further elaborating and documenting these points by May 31, 2017.   Thank you for the opportunity to share these views with you today.



TRADE REPRESENTATION
OF THE RUSSIAN FEDERATION
IN THE UNITED STATES OF AMERICA

ТОРГОВОЕ ПРЕДСТАВИТЕЛЬСТВО
РОССИЙСКОЙ ФЕДЕРАЦИИ
В СОЕДИНЕННЫХ ШТАТАХ АМЕРИКИ

2001, CONNECTICUT AVE., NW.,
WASHINGTON, DC 20008,
USA

www.rustradeusa.org

Tel.: +1 (202) 232-5988        E-mail: dc@rustradeusa.org        Fax: +1 (202) 232-2917

Our ref. *TrУОч-ОЧ-ОЧ/ЧІЧ*
May 22, 2017

**Submitted Electronically**

Mr. Brad Botwin                                          Section 232 National Security
Director for Industrial Studies                                    Investigation on Steel
Office of Technology Evaluation
Bureau of Industry and Security
U.S. Department of Commerce                          **PUBLIC DOCUMENT**
14th Street and Constitution Ave., N.W.
Washington, D.C. 20230

> *Re:   Section 232 National Security Investigation on Steel; Confirmation of Participation at*
> *Public Hearing and Copy of Testimony*

Dear Mr.Botwin:

　　We hereby confirm a participation of Alexander Zhmykhov, Deputy Head of Economic Section, Trade Representation of the Russian Federation in the USA at the hearing on the above-referenced investigation on May 24, 2017.
　　Please, find attached a copy of a planned testimony.

　　Respectfully submitted,

                                                        Aleksander Y. Stadnik
                                                        Trade Representative of
                                                        the Russian Federation in the USA

Encl.: 2 pages.

**Summary of Hearing Statement of**

**the Trade Representation of the Russian Federation on behalf of
the Ministry of Economic Development of the Russian Federation
before the Office of Technology Evaluation,
Bureau of Industry and Security
at a public hearing on Section 232 National Security
Investigation on Steel
on May 24, 2017**

Thank you for the opportunity to speak today on behalf of the Ministry of Economic Development of the Russian Federation.

Currently, exports of a broad range of steel products from Russia to the United States are subject to substantial limitations imposed by an Agreement Suspending the Antidumping Investigation on Cut-To-Length Carbon Steel Plate[1], and by antidumping duties against hot-rolled flat-rolled carbon-quality steel[2].

These two remedies have had the effect of disciplining imports of steel products from Russia to such an extent that Russian imports must be excluded from any remedy recommendation in the current investigation. A contrary result would unfairly subject imports of Russian steel to duplicative and severe limitations.

Regarding cut-to-length carbon steel plates, in accordance with the Plate Suspension Agreement that was put in effect in 2003, each signatory Russian producer/exporter agrees not to sell its merchandise subject to this Agreement to any unaffiliated purchaser in the US at prices that are less than the normal values of the merchandise, as determined by the Department on the basis of information submitted to the Department.

There is only one Russian producer who provides necessary information to the Department and has the possibility to sell subject goods into the USA. The quantities of shipments of the product from Russia to the USA plummeted by more than 25 times: from 252 thousand tons in 1996 to 10 thousand tons in 2016. The Department issues the normal values, which exclude the risk of unfair trade practices by Russian import.

---

[1] See Suspension of Antidumping Duty Investigation: Certain Cut-to-Length Carbon Steel Plate From the Russian Federation, 68 FR 3859 (January 27, 2003). Plate Suspension Agreement is attached hereto as Exhibit 1.

[2] See Termination of the Suspension Agreement on Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From the Russian Federation, Rescission of 2013-2014 Administrative Review, and Issuance of Antidumping Duty Order, 79 FR 77455 (December 24, 2014).

2

The U.S. market of hot-rolled coils and sheets has been closed for the Russian exporters due to the prohibited level of antidumping duties up to 184.56% since the end of 2014. Prior to that there was the suspension agreement in force. Russian producers treated that agreement with duly respect although it was designed for non-market economy country in 1999.

Also, in September, 2016 (less than 3 quarters ago) the Department finished the antidumping and countervailing investigations against certain cold-rolled steel flat products with no measures for Russian-originated products due to negligible amount of import, proving that import of these goods from Russia did not cause any injury to the US industry[3].

In light of the array of limitations that already exist and have already severely reduced the volume of imports of Russian flat-rolled carbon steel products into the United States, we urge the Department to use great caution in the course of the current investigation, in order to ensure that Russian merchandise is not subject to excessive, redundant and conflicting restrictions.

The statute directs the President to provide relief "only to the extent the cumulative impact of such action does not exceed the amount necessary to prevent or remedy the serious injury."[4] In the current case, however, the Russian imports have already been so drastically limited by the measures in force that further limitations would be excessive in terms of the "amount necessary to prevent or remedy" the injury found by the Department. It would be unfair, therefore, for the Department to recommend a remedy to the President that is not necessary to fulfill the statutory standard for the imposition of relief.

For the reasons outlined above, we respectfully reiterate that there is no need for the imposition of additional import restraints on steel products from Russia. Additional remedies under Section 232 would unfairly impose redundant and potentially conflicting remedies on imports from Russia.

We respectfully ask the Department to abstain from recommending any additional remedies on imports of steel from Russia.

---

[3] See Cold-Rolled Steel Flat Products From Brazil, India, Korea, Russia, and the United Kingdom; Determinations, 81 FR 63806 (September 16, 2016).
[4] 19 U.S.C. § 2253(e)(2).

**EUROFER**
The European Steel Association

May 22, 2017

Total No. of Pages: 5
Trade Expansion Act of 1962
§232 National Security Investigation
Bureau of Industry and Security
U.S. Department of Commerce

**PUBLIC DOCUMENT**

BY EMAIL

Brad Botwin, Director
Industrial Studies, Office of Technology Evaluation
Bureau of Industry and Security
U.S. Department of Commerce
Room 1093
1401 Constitution Avenue, NW
Washington, DC 20230

Re:   **Public Hearing on Section 232 National Security Investigation of Imports of Steel**

Dear Director Botwin,

I plan to appear on behalf of EUROFER at the May 24, 2017 public hearing on the United States' Section 232 National Security Investigation of Imports of Steel. A copy of my planned testimony is attached. Thank you for the opportunity to participate in the hearing.

Please do not hesitate to contact me if you have any questions.

Sincerely,

Karl Tachelet
EUROFER

Director, International Affairs

**Public Hearing on Section 232 National Security Investigation of Imports of Steel:**
**Written Statement of Karl Tachelet on behalf of EUROFER**

**(May 24, 2017)**

Director Botwin and members of the Panel, thank you for inviting me to participate in this hearing. My name is Karl Tachelet. I am the Director of International Affairs for EUROFER. I have worked in the European steel industry for over 20 years. EUROFER represents 100 percent of steel production in the EU. Our members are steel companies and national steel federations. We are longstanding, reliable suppliers of steel to the United States. Many of our members have steel plants in the United States.

EUROFER shares the US government's concerns regarding excess steel production, unfair trading practices, and global steel overcapacity. We have worked with EU officials to address the injurious effects of these problems through the enforcement of our trade remedy laws and their root causes through international negotiations in fora like the OECD and the G-20 (Global Forum on Steel Excess Capacity). Continued joint efforts between the EU, the US, and other like-minded governments are the only effective avenue to address these problems and secure balance in the global and US steel markets.

We do not believe that restrictive actions based on national security will allow for the lasting solution the market needs. However, if the US pursues this investigation, EUROFER believes the Bureau's analysis of national security must be narrowly tailored to focus on direct threats to national security.

**First**, the analysis should be focused on specific steel products needed for specific uses directly tied to national security, in particular defense applications. As a rule, commercial and national

interests do not rise to the level of security interests.  For example, the following products clearly do not affect national security:

- Rebar and heavy sections used in construction;

- Wire rod used to make tire cord, springs, and fasteners for autos;

- Wide flange beams and channels used in construction;

- Hot-rolled wide strip used in construction and autos;

- Cold-rolled sheet used to make household appliances and auto components;

- Metallic and organic coated sheet used in household appliances, building materials, autos, and for deep drawing and stamping; and

- Tin mill products used to make cans for food and beverages.

The Bureau must therefore focus its analysis only on steel products that have a strong, direct national security nexus.  In this regard, we note that many of the subsectors identified by the Department of Homeland Security as "critical infrastructure applications" have little or no relevance to national security and should be removed from the analysis.

**Second**, for each steel product with a strong, direct national-security nexus, the Bureau should determine whether US producers have sufficient capacity to meet the needs of the Defense Department and critical infrastructure applications.

**Third**, the Bureau should account for factors arguing against import adjustment.  In particular, the Bureau should consider whether adequate complementary imports are available from US allies like the EU.  If so, no action should be taken.  Furthermore, any remedy proposed to adjust

imports should differentiate based on the threat posed to US national security by specific foreign steel suppliers.

Not all foreign sources of steel are the same with respect to national security.  The US and EU share a long history of collaboration on national security issues.  Indeed, 22 EU Members are members of the North Atlantic Treaty Organization (NATO) and are committed to defend US security, including by providing assistance in times of crisis.  Additionally, there are dozens of bilateral agreements between the US and individual EU Members covering matters such as defense cooperation and weapons production, and many EU Members are parties to reciprocal defense procurement memoranda of understanding with the US under which each country agrees to remove barriers to purchases of supplies and services of the other country.

Furthermore, EUROFER members are longstanding, reliable suppliers of high-quality steels that are needed to maintain US national security.  Indeed, many of our members have invested in US plants to make steel products and employ American workers.  Thus, EUROFER companies have a manifest interest in a strong, prosperous, and secure United States.

If the Bureau does not have adequate information to perform this type of rigorous analysis, it should issue questionnaires to US users in defense and critical infrastructure applications, US producers of steel, and foreign producers of steel.  The lack of detailed data regarding the consumption of specific steels by these industries or US producers' capacity to make the specific steels is not a valid basis for conducting an overly broad analysis or imposing overly broad measures.  We note that the US International Trade Commission regularly solicits data of this sort in trade remedy investigations, and the Bureau should do so here.

EUROFER is available to contribute to the establishment of such an analytical framework, and to provide data, to ensure that the Bureau produces a focused analysis and recommendations that address national security concerns.

Thank you.

Section 232 National Security Investigation
Of Imports of Steel

## Summary of Oral Statement
## By the Embassy of Ukraine

- Ukraine believes that there is no ample ground to impose by the United States any measures under Section 232 against imports of steel from Ukraine.

## Close Security Cooperation Between Ukraine and the United States

- The United States and Ukraine have maintained a close diplomatic and security relationship since Ukraine regained its independence in 1991.

  o Ukraine has closely cooperated with the United States on nuclear non-proliferation issues, including giving up its nuclear weapons.

  o The U.S. Department of Defense is assisting Ukraine in its defense and security reform, including related to defense planning, policy, strategy, and financing.

  o Ukrainian military officers attend U.S. military schools to receive vital training, instruction, and professional development.

  o Ukraine has contributed a large number of troops to Iraq to support United States efforts there.  From 2003-2005, Ukraine had the fourth largest number of foreign troops in Iraq, after the United States, United Kingdom, and Poland.

- As a result of the illegal occupation of the Autonomous Republic of Crimea and the city of Sevastopol by the Russian Federation and it's further military invasion in certain areas of the Donetsk and Luhansk regions, since 2014 slightly over 7% of the territory of Ukraine temporarily remains out of control of the Government of Ukraine.

- Under the circumstances, maintaining a close cooperation in the diplomatic and security fields is clearly in the mutual interest of both of our nations.

## Ukrainian Steel Poses No Threat to U.S. National Security

- The United States is not a major export market for Ukrainian steel.  Ukraine steel producers are principally focused on regional markets in Eastern Europe, the Middle East and North Africa.  Exports of steel to the United States barely ranked 19th of all export destinations in 2016. 1/

- As a result of the illegal expropriation of Ukrainian companies' assets and property by the Russian forces in certain areas of the Donetsk and Luhansk

---

1/     *See* U.S. Department of Commerce, International Trade Administration, Global Steel Monitor, Steel Exports Report: Ukraine, March 2017, *available at* http://trade.gov/steel/countries/pdfs/2016/annual/exports-ukraine.pdf

regions of Ukraine in March 2017, a large part of Ukraine's steel industry was put in uncertain position.

- Ukraine's steel industry is under attack – both physically and economically – by foreign-backed separatists in the Eastern portion of Ukraine. In March, a large segment of Ukraine's steel industry in the Donetsk region was seized by the separatists. This has put the Ukrainian steel industry in a very uncertain position.

- The viability and success of Ukraine's steel industry is crucial to economic and political stability of Ukraine. It is also vital to the bilateral U.S.-Ukraine security relationship, which bolsters U.S. strategic interests in the region.

- The U.S. Government in 2001 completed a similar Section 232 investigation concerning imports of iron ore and semi-finished steel. 2/ The Department of Commerce concluded in that case that:

    There is neither evidence showing that the United States is dependent on imports of iron or semi-finished steel, nor evidence showing that such imports threaten the ability of domestic producers to satisfy national security requirements. 3/

- Applying the same methodologies, we are confident that the evidence obtained in this case will likewise show that the steel imports do not threaten U.S. national security.

## WTO Concerns

- Taking into account that the United States and Ukraine are Members of the WTO, we would like to emphasize that any possible measures should be in line with of the obligation under the WTO provision and GATT.

We look forward to continued cooperation with the U.S. Government in securing peace, protecting international law and stabilizing the Ukrainian economy. We do hope to continue to develop an open and mutually beneficial trade and investment relationship with the United States.

---

2/ See *The Effect of Imports of Iron Ore and Semi-Finished Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, U.S. Department of Commerce, Bureau of Export Administration (Oct. 2001).

3/ *Id.* at 1.

# TESTIMONY OF TIM JOHNS

# NIPPON STEEL & SUMIKIN COLD HEADING WIRE INDIANA INC.

## May 24, 2017

Good morning/afternoon.  I am Tim Johns, Vice President of Manufacturing for Nippon Steel & Sumikin Cold Heading Wire Indiana Inc. ("NSCI"), a newly established manufacturer of steel wire for automotive cold heading and forging located in Shelbyville, Indiana.  NSCI is scheduled to open in October 2017 and begin production of steel wire starting in January 2018.  When fully operational, NSCI's production facility will directly employ approximately 70 people in Shelbyville.

NSCI is unique in that it will not follow others by simply importing finished steel wire from Japan.  Rather, the company will import the raw material – that is, high-quality wire rods – from Japan, and produce finished steel wire in the United States.  However, in order to do so, NSCI needs access to a reliable supply of high-quality Japanese wire rod.

If NSCI is not able to import these materials, the company will be forced to shut down because the wire quality needed for the production of fasteners and other safety-critical auto parts can be achieved only with the high-quality wire rod available from Japanese manufacturers.

The quality of the wire rod produced by the Japanese manufacturers is unavailable in the United States.  In short, Japanese wire rod is superior to wire rod produced elsewhere because only the Japanese manufacturers have demonstrated the ability consistently to meet the precision and performance requirements of fastener and other safety critical auto parts manufacturers.  These downstream manufacturers require wire rod that is both extremely durable but also light weight.  The Japanese wire rod manufacturers are uniquely able to meet these contradictory requirements due to their advanced methods of controlling for surface defects, inclusions, and size tolerances.

NSCI intends to win business from its downstream U.S. customers based on the quality and reliability of our products.  Import duties on wire rod from Japan will compromise the viability of our business and lead to the elimination of many jobs in Shelbyville and the surrounding area.  Further, such duties would also cause serious damage to automobile and fastener supply chains in the United States, potentially affecting the jobs of thousands of people throughout the country.  To block imports of Japanese wire rod will simply lead to export of U.S. jobs and import of the finished products we make here.  For these reasons, I urge you to find that Japanese wire rod is integral to the U.S. economy and that such imports do not compromise the national security of the United States.

Thank you.

## BEFORE THE U.S. DEPARTMENT OF COMMERCE
## BUREAU OF INDUSTRY AND SECURITY

|  |  |
|---|---|
| | ) |
| Section 232 Investigation on the Effect of | ) |
| Imports of Steel on U.S. National Security | ) |
| | ) |

### Oral Presentation of Byeong Bae Lee, President, Hyundai Steel America

1.      Good morning.  My name is Byeong Bae Lee.  I am the President of Hyundai Steel America, located in Greenville, Alabama.

2.      Hyundai Motor Manufacturing Alabama, LLC or "HMMA" is a U.S. automobile manufacturer located in Montgomery, Alabama.  Kia Motors Manufacturing Georgia or "KMMG" is a U.S. automobile manufacturer located in West Point, Georgia.  Hyundai Steel operates a steel processing center in Greenville, Alabama that processes cold-rolled and corrosion-resistant steel for HMMA, KMMG, and other Automobile Companies, as well as for the suppliers of parts and components to those companies. All three companies are affiliated with Hyundai Steel of Korea, a Korean producer of various steel products.

3.      Hyundai has invested approximately $2.1 billion in the three establishments, with a plan of future investment of approximately $3.1 billion. The details are as follows:  HMMA was established in 2005. The total investment has been approximately $1.7 billion.  HMMA employs approximately 3,500 American workers.  In 2016, HMMA purchased approximately 170,000 tons of

1

cold-rolled and corrosion-resistant steel -- 49,000 tons were purchased from domestic steel producers, and 121,000 tons were imported from Korea and Japan.

4.     KMMG was established in 2010.  The total investment in KMMG has been approximately $1.1 billion. KMMG employs approximately 3,000 American workers.  In 2016, KMMG purchased approximately 208,000 tons of cold-rolled and corrosion-resistant steel -- 59,000 tons were purchased from domestic steel producers, and 149,000 tons were imported from Korea and Japan.

5.     Hyundai Steel America is a steel processing center for cold-rolled and corrosion-resistant steel. Hyundai Steel was established in 2003 with a total investment of approximately $82 million.  Hyundai Steel employs approximately 140 employees.  Going forward, Hyundai Steel plans to purchase approximately 40 percent of the cold-rolled and corrosion-resistant steel purchased from domestic steel producers.  The balance will be imported from Japan, Korea, and other sources.

6.     HMMA and KMMG have a plan to invest approximately $3.1 billion in upgrading and expanding their domestic U.S. manufacturing operations.  The investment in these automobile facilities was based on the assumption that HMMA and KMMG would be able to purchase high quality cold-rolled and corrosion-resistant steel from domestic and imported sources.  Roughly 10 percent of Hyundai's Steel requirements are not available from domestic steel manufacturers

2

in the qualities and tolerances required.  Hyundai's access to steel is threatened by

this action and thus jeopardizes the investments already made as well as the

planned investments.

7.      The volume of cold-rolled and corrosion-resistant steel required

directly for national defense needs is limited, and Hyundai believes that existing

domestic capacity is more than adequate to meet current and projected national

defense requirements.

8.      For auto makers like HMMA and KMMG, by far the most important

factors in purchasing cold-rolled and corrosion-resistant steel are product quality

and product uniformity.  Different auto parts require specific qualities, but flatness,

no wave, and low reject rates are always important.  HMMA and KMMG are not

following a policy of purchasing from their Korean affiliates.  To the contrary,

HMMA and KMMG prefer to purchase from U.S. suppliers where the steel is

available and meets these quality requirements.

9.      With the emphasis on light weight vehicles to maximize fuel

efficiency, there is an emphasis on high tensile strength steel.  Some U.S.

producers produce some grades and qualities required, but they do not produce

other grades and qualities.  Both HMMA and KMMG require increased quantities

of Advanced High Strength Steel ("AHSS") and Ultra High Strength Steel

("UHSS"). These high strength steels are difficult to produce and not all domestic

3

steel producers produce these qualities in the dimensions and to the tolerances demanded by KMMG and HMMA.

10.     The investment in KMMG, HMMA, and Hyundai Steel have increased employment and provided jobs and economic activity in the communities where they are located that previously did not exist.  The companies have increased domestic purchases of steel, providing customers and opportunities that did not previously exist.

11.     At the same time, these investments demand the ability to also access high quality imports of cold-rolled and corrosion-resistant steel.  As noted, some of these grades and qualities are not available from U.S. producers.  In addition, because HMMA's and KMMG's research center for development of new models is located in Korea, new models are often designed initially using Korean and Japanese steel due to the ease of logistics.

12.     Existing trade remedy laws already protect the domestic steel industry against unfair subsidization and dumping.  Further restrictions are not necessary.

13.     Thank you and I am prepared to answer any questions you may have.

**Statement of the American Institute for International Steel**

**At the**

**Public Hearing for the Section 232 Investigation on the Effects of Steel Imports on**

**U.S. National Security**

**Bureau of Industry and Security**

**U.S. Department of Commerce**

**May 24, 2017**

I am Gary Horlick appearing on behalf of AIIS.  We include 108 members, including traders, freight forwarders, stevedores, shippers, importers, exporters, railroads, port authorities, unions, and many other logistics companies.  We account for approximately 80% of imported basic steel products.

1.    The purpose of Section 232 is to ensure that the U.S. military can obtain the types of products it needs in the quantities it needs when it needs them.  It was not intended to provide overall protection for U.S. industry for other purposes – there are lots of other statutes for that purpose.

The Department of Commerce's Federal Register notice requests information concerning a very broadly undefined industry of "steel."  That industry's long-term prospects are sound, as shown by the start-up of new facilities such as Big River Steel.  The major change in the industry was the emergence of entrepreneurial companies such as Nucor.  The electric arc furnace sector grew from less than 10 percent to 57.9 million tons in CY2016 compared to 28.5 million tons for blast furnace production, and 26.5 million tons of imports.  Individual companies making individual products may change their

product mix from time to time, but there is no sign that they cannot make the products our military requires as needed.

Further, analysis under this statute requires looking at all the capacity that would be available to the U.S. military in times of need, and that would most certainly include Canada and Mexico, and probably other countries as well.

2.  The past history of this clause illustrates the extreme caution needed to avoid misuse for political reasons.  It is frequently stated that the statute has only been used for import protection twice, both involving relatively minor uses involving crude oil in the 1970s. But this forgets the largest use of this statute, under a predecessor statute.  From 1959 to 1973, the U.S., for internal domestic political reasons, imposed quantitative restrictions on the import of crude oil.  This had 3 very direct consequences:

(a)  In the name of protecting our national security, the U.S. for those 12 years pumped out our own reserves, and in the end of the period, the U.S. for most of its history a major net oil exporter, had become a net importer of crude oil.

(b)  During this period, U.S. downstream industry, as a direct result of the quotas, paid 50-100% more for its oil (used both as an input and as energy) than its foreign competitors, effectively giving a huge cost advantage to competitors in the newly reconstructed industries in Japan and Europe.  At the end of the quotas, the U.S. ran a trade deficit in goods.

(c)  The U.S. granted an exemption to the quotas to its close ally and neighbor, Canada.  In 1959, the minister of national patrimony of Venezuela, then a very close U.S. ally, flew to Washington to ask for a similar exemption.  This was

refused and Minister Alonso instead of flying back to Caracas flew directly to Riyadh and founded OPEC.

The important lesson that we can draw from this is that when contemplating using a statute like Section 232, we should treat it with extreme caution and concern for foreseeable and unforeseen consequences.  This is especially true when the rationale for employing Section 232 appears to be entangled with political considerations for broad industrial policy goals.

3.   Logically, the national security "bottleneck" if there is one is the dwindling reserves of U.S. iron ore.  According to the U.S. Geological Survey, the U.S. is not even in the top 10 for iron ore reserves, while significant military competitors such as Russia and China have more than double our reserves.  This is unsurprising, since we have been using up our iron ore at a substantial rate for more than 100 years.  In addition, U.S. iron ore has relatively low iron content compared to those countries. Consequently, stimulating production of steel in the U.S., which currently relies heavily on U.S. iron ore, only makes us more dependent on imports of iron ore.  Fortunately, Canada and Mexico have good reserves of iron ore, as do friendly countries such as Australia and Brazil.  But if the concern is to have everything sourced in the U.S., it would be not only illogical but dangerous to use up our own iron ore first – as we did with crude oil.

4.   Finally, it is impossible to ignore the certainty that other countries will retaliate against U.S. exports.  Let's start with the obvious:

- The United States is the largest exporter of military equipment in the world, selling over $20 billion annually in recent years.  But we have competitors for almost all our products—Russia is second, for example.  This affects not only the

jobs that are dependent on exports, but the entire economics of our defense base. The economics of great airplanes like the F-35 or the F-22 do not work unless they are sold to some of the same countries whose steel this proceeding might limit from entering the U.S. It is hardly hypothetical that those steel exporting countries might want to stop buying our military equipment and switch to other sources, as they might easily do.

- And there is no reason to believe retaliation would be limited to military sales. A member of the Mexican Senate and a candidate in the 2018 presidential election recently introduced a bill to force Mexico to diversify its sources of corn away from the U.S. He states that the goal is to reduce Mexico's imports of corn from the U.S. from $1.3 billion down to $500 million. While some may think that that is no problem for U.S. corn growers, as they can simply sell the corn elsewhere, that logic does not apply if many countries do the same thing. And in any event, agriculture today is not that simple. When more than 60 countries banned our beef exports in 2003 on spurious SPS grounds, we lost more than $3 billion in exports a year, and in fact we never fully recovered to this day (China, for example, the world's largest potential market for beef, remains closed to the U.S. despite announcements from last year and this year that it would reopen, while it is open to our friendly competitors in Australia). When the prior administration imposed a safeguard on tires from China, China retaliated the same day by announcing antidumping and countervailing duty cases against imports of U.S. automobiles and chicken parts. There are reports that Jeep eventually had to ship production of Jeeps—and jobs--to be sold in China from Toledo, Ohio to China because of

those cases.  Chicken was more impacted:  $500 million of the $800 million that the U.S. industry sold to China annually before the cases was composed of chicken paws and tips for which there is no other market except rendering.  We had been selling those parts at 80 cents a pound in China. When they were sold for rendering in the U.S., our chicken producers received only 4-5 cents a pound.  In general, the underlying economics of agriculture is that a relatively small loss of foreign markets leads to very large and potentially catastrophic drop in prices in the U.S. market.  Food security for Americans would seem a very immediate national security concern.

5.      None of this is necessary, of course.  For items for which there is a national security need – even according to the American Iron and Steel Institute, this amounts to approximately 3% of U.S. steel production; prior statistics set this amount originally at 0.3%, a number which is still used by reputable analysts-- the Government has full legal means to access what it needs.  In addition, less trade restrictive means such as additional subsidies could be used to stimulate production of those items.

Thank you very much.



**Can Manufacturers Institute**

CANS: INFINITELY RECYCLABLE™

May 17, 2017

Mr. Brad Botwin, Director Industrial Studies
Office of Technology Evaluation, Bureau of Industry and Security
U.S. Department of Commerce
1401 Constitution Avenue, NW – Room 1093
Washington, DC 20230

Re: *Comment on Section 232 National Security Investigation of Imports of Steel*

Dear Mr. Botwin:
Pursuant to the invitation set forth in the BIS Notice published in the Federal Register on April 26, 2017, and on behalf of the Can Manufacturers Institute, I hereby request the opportunity to participate in the public hearing on the Section 232 National Security Investigation of Imports of Steel scheduled for May 24, 2017.

Below is a summary of our oral presentation:

- Can Manufacturers Institute (CMI), the national trade association of the metal and composite can manufacturing industry and its suppliers in the United States, requests that tinmill products be excluded in the U.S. Commerce Department's Section 232 investigation into steel imports and not subject to tariffs or other import restrictions.

- CMI member facilities employ over 10,000 American workers and produce approximately 24.5 billion steel cans, all of which are made here in this country. The can manufacturing industry is responsible for $36.31 billion in total economic activity in United States and pays substantial taxes revenues $1.75 billion in federal taxes and $1.04 billion in state taxes.

- As per the findings of the U.S. Department of Commerce and the U.S. International Trade Commission, tinmill steel is a separate category of steel, requiring its own consideration and examination.

- To our knowledge tinmill is not used by the U.S. Department of Defense, used in any defense applications or have any use to protect the National Security interests of the United States.

- Access to affordable nutrition is vital for the 42.2 million Americans that live in food insecure households, including 29.1 million adults and 13.1 million children. Canned foods play a very important role as a staple of the American diet, with a significant percentage of Americans depending on canned fruits and vegetables as part of their daily diets. And, those on food assistance consume canned fruits and vegetable at an even higher rate than the average American. Those on food assistance rely on canned products to prepare convenient, nutritious, affordable meals. Canned vegetables can cost up to 50% less than frozen and 20% less than fresh with virtually no sacrifice to the nutrition profile. A tariff or any trade action on tinmill products would lead to higher prices for American consumers of canned food. Millions of Americans rely on canned foods for their basic sustenance including Americans who are part of the USDA Supplemental Nutrition Assistance Program. A tariff would drive costs for the SNAP program.

- Any trade actions would harm U.S. based companies competing internationally against foreign companies that do not have to pay such tariffs, and it would also harm the U.S. companies that make up our supply chain, including transportation companies, and warehouse providers, along with all of their respective employees and the communities in which these employees live and work across the United States.

- CMI wants to maintain our industry's competitiveness. A trade action against tinplate products would not be in our country's best interests.

As per the posted procedures for the Hearing please be advised of the following:

- CMI's testimony will be given by Robert Budway, President of CMI
- He can be reached via phone at (202) 232-4677 or email at rbudway@cancentral.org.

Please contact us at the contact information listed below with any questions or comments. Thank you for your time and consideration.

Sincerely,

Robert Budway
President
Can Manufacturers Institute

**U.S. DEPARMENT OF COMMERCE**
**PUBLIC HEARING ON SECTION 232**
**NATIONAL SECURITY INVESTIGATION OF**
**IMPROTS OF STEEL**
**May 24, 2017**

<u>**ORAL TESTIMONY OF**</u>

**Tracey J. Norberg**
**Senior Vice President & General Counsel**
**U.S. Tire Manufacturers Association**
**CONTACT: tnorberg@USTires.org or +1 202 682 4839**

On behalf of the member companies of the U.S. Tire Manufacturers Association ("USTMA"),[1] I

appreciate the opportunity to submit testimony to the Section 232 National Security Investigation of

Imports of Steel. USTMA represents ten tire manufacturers with manufacturing operations in the United

States. USTMA's membership includes: Bridgestone Americas, Inc.; Continental Tire the Americas, LLC;

Cooper Tire & Rubber Company; The Goodyear Tire & Rubber Company; Kumho Tire U.S.A., Inc.;

Michelin North America, Inc.; Pirelli Tire North America; Sumitomo Rubber Industries; Toyo Tire Holdings

of Americas Inc.; and Yokohama Tire Corporation.  In the United States, USTMA members employ nearly

100,000 workers, operate 55 tire-related manufacturing facilities in 19 states and generate over $27

billion in annual sales.

Tire manufacturing is vital to the U.S. economy. Tires manufactured by USTMA members safely

transport millions of Americans and millions of tons of goods each day throughout the United States.

USTMA members have a direct interest in the Section 232 National Security Investigation of Imports of

Steel. Virtually all of the steel wire rod used to manufacture tire cord that is consumed in U.S. tire

manufacturing plants is sourced from foreign suppliers due to the stringent performance and quality

requirements of tire manufacturing, as well as quality and supply limitations of domestic steel wire rod

---

[1] Effective May 23, 2017, the Rubber Manufacturers Association, the national trade association for tire
manufacturers that produce tires in the United States, has officially changed its name to the U.S. Tire
Manufacturers Association (USTMA).

U.S. Tire Manufacturers Association
May 24, 2017
Page **2**

suppliers. It is our understanding that electric arc furnace technology, used in domestic steel mills, is unable to produce consistently the quality of tire cord-quality wire rod necessary to make tire cord for use in tire manufacturing. Tire cord-quality wire rod is produced using basic oxygen furnace technology, which is employed by foreign wire rod suppliers, and is a product that cannot be supplied in the volume and under the quality necessary for military and civilian applications by domestic producers.

Depending on the outcome of the Section 232 National Security Investigation of Imports of Steel, potential remedies could have a significant negative impact on the U.S. tire manufacturing industry. In particular, any action that curtails the availability of the supply of tire cord or tire cord-quality wire rod would affect U.S. tire production. Any such trade constraint could potentially have a cascading negative impact on U.S. commerce, since the transportation industry and the military depend on a reliable supply of tires to ship goods throughout the country. In addition, the U.S. military depends on the tire manufacturing industry to supply tires to protect our national security.

Tires contain a number of highly engineered components, including high carbon steel. The steel wire in tires is manufactured using SAE 1080 or higher steel wire rods (often called "tire cord-quality wire rod"), which are drawn into steel wire to meet exact specifications (or "tire cord" and "bead wire"). This steel wire is used both in a tire's steel belts, providing strength, high load-carrying capacity, puncture resistance and durability, and in the bead, which holds the tire to the rim. SAE 1080 and higher tire cord-quality wire rod contains a minimum of 0.80 percent carbon content, a low manganese content, between 5.0 mm and 6.5 mm in diameter and is generally free from defects.  The high carbon content and consistent surface quality are required to assure performance to stringent tire performance requirements.  All types of modern tires designed for highway use contain steel belts and steel beads, including passenger, light truck and truck/bus tires. However, truck/bus tires contain a greater percentage of steel, due to the more demanding load and durability requirements of heavier vehicles.

U.S. Tire Manufacturers Association
May 24, 2017
Page **3**

Military and related vehicles have intrinsically demanding durability requirements, in light of the need to operate such equipment in extreme conditions around the world.

Tires sold in the United States are self-certified by tire manufacturers to meet U.S. Federal Motor Vehicle Safety Standards set by the National Highway Traffic Safety Administration.  Federal Motor Vehicle Safety Standard No. 139 applies to passenger and light truck tires made after September 1, 2009 for use on vehicles that have a gross vehicle weight rating (GVWR) of 10,000 pounds or less and that were manufactured after 1975. Generally recognized as the most stringent tire performance standard in the world, FMVSS No. 139 was promulgated in response to the Transportation Recall Enhancement, Accountability and Documentation (or TREAD) Act enacted in October 2000.  Among other requirements, FMVSS No. 139 mandates that tires sold in the United States perform to meet the specifications of the endurance low pressure test, which requires a tire to run for 34 hours at increasing loads on a test wheel, then run for two additional hours on the test wheel after being significantly deflated. Adherence with FMVSS No. 139 necessitates tire construction to be robust, puncture resistant and resistant to the effects of load and heat, demanding high quality materials, including high carbon steel. Similarly, truck and bus tires sold in the United States must meet FMVSS No. 119, which includes tests for strength and high-speed performance. Additionally, truck/bus tires must meet customer and vehicle requirements for substantial load-carrying capacity to meet the demand of a diverse array of vehicles. As well, passenger/light truck and truck/bus tires are designed to contribute to vehicle fuel economy by reducing vehicle weight and lowering the tire's rolling resistance. Tire cord made from high quality, high carbon steel is vital to maintaining tire safety and performance.

Given the unique needs of tire manufacturers to have continuous, consistent supply of tire cord made from tire cord-quality rod (Grade SAE 1080 and higher steel), USTMA respectfully requests that the U.S. Department of Commerce exclude from the Section 232 National Security Investigation of

U.S. Tire Manufacturers Association
May 24, 2017
Page **4**

Imports of Steel the specific Harmonized Tariff System (HTS) codes corresponding to the steel products necessary for the production of tires.  In particular, USTMA asks that the following HTS codes be excluded from the Section 232 National Security Investigation of Imports of Steel:

- 7213.91.3011: Tire cord-quality steel wire rod

- 7312.10.1030: Tire cord

- 7217.30.4530, 4560, 4590: Bead wire

Tariffs or quotas on these products would significantly disrupt the production of tires in the United States, have quality and supply limitations in producing SAE 1080 and higher steel wire rod to replace imported products. A disruption in tire manufacturing in the U.S. would harm the U.S. economy, since consistent tire supply is critical to the nation's shipping and commerce needs, and threaten national security, since the U.S. military relies on the tire industry to provide high performing and durable tires to aid in our national defense.



May 22, 2017

Presentation for **Section 232 National Security Investigation of Imports of Steel:**

Honorable members of the panel, my name is Suzi Agar and I'm representing ADI (Air Distribution Institute).  ADI is a non-profit association that was formed in 1947 to promote steel products and fittings for the heating, venting and air conditioning industry.  Currently, there are sixteen members who are the owners or principals of over thirty-six manufacturing facilities located throughout the US. Together, we also proudly employ over 5,000 full time and 150 part-time workers within the U.S.

A key product used by ADI members is light-gauged corrosion-resistant steel, commonly referred to as "CORE". Specifically, we utilize: Hot Dipped Galvanized Sheet in coil form, which conforms to ASTM A653; Grade CS, Type B, with a zinc coating known as G-30.

Please note that, first and foremost, the key products we import are not in any way tied to the national defense industry.  Our products are not used for armor, defense vehicles, ships, aircrafts or infrastructure.  The HVAC products we manufacture are predominantly utilized for the housing industry and for the construction of light commercial buildings.

For decades, domestic mills have vacated the residential HVAC market by choice.  Because most domestic mills are governed by a 'tons per hour' pay scale, it's simply not profitable nor advantageous for them to produce light gauge steel or aluminum.  Rightfully so, they have focused their production on fabricating heavier gauged metals.  These metals are used for the appliance, automobile, heavy construction, tube and pipe industries. They are favored not only because of the higher prices they can command, but also because they are less taxing to produce.  There is neither the demand nor the desire for them to produce light gauged metals and aluminum.

The scarce availability of domestic light gauge metals coupled with the high prices they charge, is directly reflected in the average yearly totals ADI members buy from domestic mills: approximately 77,000 tons of galvanized metal and 960 tons of aluminum, all 0.010" - 0.012".   On a yearly average, ADI members purchase approximately 200,000 tons of these same type light gauge metals from foreign sources.

ADI members also have a need for multiple widths of steel.  There are some types of steel we purchase that are currently available from only one U.S. mill. We would prefer to source our metals from domestic mills, but due to restricted availability and pricing, we are basically forced to find mills outside of the U.S. who are willing to work with us.

Because of the tariffs already added from the 2015 Antidumping lawsuit, our members and therefore our U.S. consumers are already feeling the effects of higher priced steel. Additional tariffs and restrictions from a second action will continue to drive prices up.  Domestically, prices have increased around 16% between 2015-2016.  And, on average, 2017 domestic prices are even higher, by approximately 10% YTD.

We would anticipate a serious disruption and probable scarcity of metal if forced to buy higher priced steel from either within or outside the U.S. This would escalate the probability of the housing industry to seek alternatives to ducted HVAC systems.  Additionally, we believe jobs will be lost due to a lack of demand for our affordable products.

The members of ADI believe in and support President Trump's initiative to prepare America for adequate readiness in the event of a national security event.  We do not want our types of light gauge metals to interfere with domestic mills being able to react quickly if there was a crisis.  We are sympathetic to the intent of this investigation, however, U.S. manufactures, like ourselves, are truly in a unique niche: the production of light gauge HVAC ductwork and fittings.

We need readily accessible as well as reasonably priced steel.  We respectfully ask that you exclude light gauge galvanized metals and aluminum (0.010"-0.012" thicknesses) from the **Section 232 National Security Investigation of Imports of Steel.** We respectfully appeal to the U.S. government to give our industry consideration by not imposing additional tariffs, adding restrictions or prohibiting our ability to purchase light gauge metals and aluminum from foreign markets.  Thank you.

**Testimony of John Cross (Steelscape LLC)**

Good morning (afternoon). My name is John Cross, President of Steelscape LLC, an American company that manufactures coated and painted steel for US companies.  Steelscape has facilities in Washington State and California, together employing almost 400 men and women in productive, high-paying jobs.  As I will explain below, Steelscape is structured to import the raw material that we use to produce our coated and painted steel, from Australia and Asia.  This imported substrate not only does not threaten the country's national security, but actually promotes it by permitting Steelscape, a US steelmaker, to participate productively in the US economy.  If the president were to institute broad-based restrictions on steel imports, it would jeopardize the viability of Steelscape itself, and in the process threaten the livelihood of our American employees.

Steelscape has two facilities, one located on the Columbia River in Kalama, Washington, and one located in Rancho Cucamonga, California.  Both facilities produce coated steel products, but not from liquid steel.  Our Kalama facility transforms hot rolled coils into cold rolled and galvanized coils, while our Rancho facility purchases cold-rolled steel to produce galvalume coils.  Both facilities also paint most of the coated steel they produce.  A large portion of Steelscape's output ships to ASC Profiles LLC, an affiliated company, which uses our steel to

manufacture steel profiles and building components for commercial and residential use in the western United States.

Both Steelscape facilities need imported steel substrate to make their coated products.  The Kalama site is located literally along the side of the Columbia River, a deep-water port facility which allows ocean-going vessels to discharge steel directly from the dock to Steelscape's storage yard.  Shipping costs from Australia or Asia range from $60 to $100 per ton LESS than rail rates from most US mills.

For US mills to get their steel to the West Coast, they have to ship steel by rail across the Rocky Mountains, which is an expensive proposition.  I know, because one of Steelscape's parents, BlueScope Steel, also owns a US steel mill, North Star BlueScope Steel in Delta Ohio, producing hot-rolled steel. Steelscape can purchase only a few hundred tons of steel a month from North Star due to the added cost of freight.

Sourcing steel from west coast producers is also problematic for us.  There are only two or three suppliers of hot-rolled steel in the West Coast, and they are focused on supplying their own downstream needs and customers.  Let me tell you something else about the West Coast steel market – none of the major steel producers in the West Coast melt and pour their own steel.  California Steel Industries, a joint-venture of JFE Steel of Japan and Vale of Brazil, hot-rolls and

cold-rolls semi-finished slab that it buys from elsewhere, mostly from import sources.  UPI, the other major producer, cold-rolls its steel from hot-rolled steel that it purchases from its two owners, US Steel and POSCO of Korea.  Historically, half or more of the hot-rolled steel that UPI uses to produce downstream steel products it obtains from Korea.  The dynamics of the West Coast market are such that virtually all steel producers in the market have to import a large portion of the raw material they use from abroad.  Steelscape is no different.

Steelscape is subject to another structural restriction that prevents it from purchasing raw material from US mills:  Any steel substrate that Kalama would buy from domestic suppliers would have to arrive by rail, which Kalama cannot accommodate due to space limitations.  We are not in a position to absorb the significant capital investment that would be required for additional land and heavy equipment to support delivery by rail.

Domestically produced steel does not compete with imported steel for Steelscape' substrate business.  Steelscape requires imported steel to survive as an American producer of coated steel products.  The proof of that is this: last year, when the Commerce Department imposed almost 30% dumping duties on hot-rolled steel from Australia, Steelscape did not replace its Australian hot-rolled steel with a single ton of domestically-produced hot-rolled steel.  Instead, we imported hot-rolled and cold-rolled substrate from other countries to meet its needs.  By

doing so, Steelscape was able to remain a going concern, saving 243 jobs in Kalama and 131 in California.

And it is not only Steelscape jobs that would potentially be at risk. As I mentioned, much of Steelscape's production goes to ASC Profiles, which uses the coated steel to produce metal building components. If ASC could not buy reliable, high-quality steel from Steelscape – made from imported substrate – its operations could also be at risk.

The steel substrate that Steelscape must import from Australia and other countries does not threaten the security of at least this part of the United States' steel industry; it helps the industry survive and prosper.

I would like to point out, in addition, that a large portion of the steel substrate that Steelscape imports is from BlueScope Steel Ltd. in Australia. BlueScope Steel Limited is the only exporter of flat-rolled steel from Australia. The steel substrate that Steelscape imports from Australia – or from any other source – is not for any defense or national security use. It is simple, flat-rolled steel that we coat and paint and ship for use in commercial and residential buildings throughout North America. This kind of steel has no impact on the United States' national security requirements.

Steelscape, in short, needs to import steel in order to produce steel in the U.S. We ask the Department to consider the special situation of companies such as

ours, companies that depend on imported steel to survive as American steel

producers.  And we ask you to take the special relationship between Australia and

the United States into account.

## BEFORE THE U.S. DEPARTMENT OF COMMERCE
## BUREAU OF INDUSTRY AND SECURITY

---

|  |  |
|---|---|
|  | ) |
| Section 232 Investigation on the Effect of | ) |
| Imports of Steel on U.S. National Security | ) |
|  | ) |

---

### Oral Presentation of Jim Tennant, Chief Executive Officer, Ohio Coatings Company

1.      Good morning.  My name is Jim Tennant.  I am the Chief Executive Officer of Ohio Coatings Company or "OCC", located in Yorkville, Ohio, on the Ohio/West Virginia border.

2.      OCC is a domestic U.S. producer of tin plate.   Tin plated products are used in food and beverage cans, paint cans, aerosol cans, and similar products.

3.      OCC operates a world-class, 130,000 square foot electrolytic tin plate manufacturing facility with a capacity to produce 250,000 tons per year of the highest quality tin plate available anywhere.  When OCC's plant opened in 1997, it was the first tin plating mill to have been constructed in North America in over 30 years.  OCC employs 66 American workers who live in Ohio and West Virginia. Those jobs, and the very survival of OCC as a U.S. tin plate manufacturer, are threatened if imports of tin-mill black plate, the steel substrate used to produce tin plate, are restricted as the result of this investigation.

4.      OCC is owned by TCC, a Korean producer of Tin Plate, and Esmark. The total investment in OCC to date is $80,000,000.  The investment in the mill,

1

and its continued operation, was conditioned on the ability to import some of the black plate substrate necessary to produce tin plate.

5.     Black plate is a specialty steel that was developed and designed for the production of tin plate. It has no other significant uses.  Besides OCC, there are three other domestic producers of tin plate products in the United States: ArcelorMittal, U.S. Steel, and USS-POSCO Industries ("UPI").  The volume of tin plate and black plate required directly for national defense needs is limited, and OCC believes that existing domestic capacity is adequate to meet current and projected national defense requirements.

6.     Unlike our three competitors in the tin plate market, OCC does not have its own captive supply of black plate.  Rather, OCC is dependent upon purchasing black plate in the merchant market. The only domestic producers of black plate, however, are also our competitors in the tin plate market – primarily ArcelorMittal and U.S. Steel.  As a West Coast producer, UPI is not a viable supplier of black plate for OCC.  Sourcing 100 percent of our black plate requirements from our competitors is not a viable option for OCC.  Unless we are able to continue to also purchase high-quality black plate from import sources, OCC may have to close its doors.

7.     In 2012, RG Steel, our former parent company and source of OCC's black plate, went through bankruptcy and was liquidated.  Until the 3rd quarter of

2016, OCC obtained its black plate from ArcelorMittal, POSCO, and from Japanese suppliers.  The only viable domestic supplier at this point is ArcelorMittal.

8.     OCC is no longer able to import black plate from Korea and Japan and has not done so since the 3rd quarter of 2016 as a result of the antidumping and countervailing duty actions against cold-rolled steel.  As a result, OCC continues to purchase black plate from ArcelorMittal and from some import sources, but OCC lacks sufficient raw materials to maximize its efficiency.  In 2015, OCC operated at 60 percent of capacity, declining to 50 percent in 2016 as a result of the antidumping and countervailing duty orders.  In the first quarter of 2017, OCC is operating at 40 percent of capacity because of shortages of black plate substrate.

9.     Moreover, despite U.S. Steel's assurances before the International Trade Commission that they could supply black plate, U.S. Steel has never even offered competitively priced black plate to OCC, as compared to offers from ArcelorMittal and other suppliers.  U.S. Steel's "offers" have been at prices that were higher than the current market price for finished tin plate.  Clearly, U.S. Steel is not interested in supplying OCC due to the fact that we compete with them in the tin plate market.

3

10.     OCC cannot survive with ArcelorMittal as its only supplier.  If OCC sourced all of its black plate from ArcelorMittal and that plant were to have any kind of shutdown, fire, strike, *etc.*, OCC would be shut down.

11.     Second, ArcelorMittal is OCC's direct competitor in the tin plate market.  They will always prioritize supplying their own operations first.

12.     Any further import restrictions on black plate would be devastating to OCC and would threaten its survival as a U.S. producer.

13.     To the extent that this proceeding is designing an industrial policy toward the steel industry and steel users, thought must be given to the costs of shutting out imported steel needed to supplement domestic production and to support downstream users of steel.  Restrictions on imports of black plate have weakened, not strengthened the U.S. industry.

14.     Thank you and I am prepared to answer any questions you may have.

**Testimony of**
**Leo W. Gerard**
**International President**
**United Steel, Paper and Forestry, Rubber, Manufacturing, Energy,**
**Allied Industrial and Services Workers International Union (USW)**
**regarding the**
**Section 232 National Security Investigation of Imports of Steel**
**May 24, 2017**


Mr. Chairman.

On behalf of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW), I appreciate the opportunity to testify today on behalf of our membership in the iron and steel sector. Our members are involved at every level of steelmaking, from the raw materials to finished products in almost every North American Industry Classification System (NAICS) category of steel product, which gives our union a very broad perspective of the critical nature of steel manufacturing to our national security.

The examination of this potential action occurs at a perilous time for the steel industry. There is no doubt that the U.S. steel sector is essential to our nation's national security. From the materials utilized by our military, to the materials necessary to build, maintain and repair our critical infrastructure, our national security is increasingly at risk because of the relentless economic attacks on our steel industry.

It's important to recognize that the steel sector is not monolithic. Indeed, as public policy clearly identifies, there is a continuum of products from the basic materials through iron and on to steel. When talking about Buy America, for example, the statute refers to "iron and steel". And, the industry's preeminent trade association is named the American *Iron* and Steel Institute.

As this Section 232 investigation continues, I hope that the Administration will evaluate the challenges facing the entire industry spectrum. From the basic material to iron and steel products; to elements like silicon metal, manganese and chromium used in making alloys, our national security interests are at risk. All of these products are important to our national security. My testimony will use the term steel to reflect the entire sector and all these products.

Steel is literally the backbone of this great country ensuring our military might and our ability to respond to potential attacks.   America's steel producers and workers have been called upon to support this nation in times of war and to build the capacity to deter potential adversaries from initiating conflict.   We need to revitalize the sector to meet today's growing needs and to ensure that we have the "surge" capacity, should it be needed.   That means having not only the productive capacity in our mills, but the skilled workforce necessary to man the operations.

Meeting national security needs in steel is not just about basic commodities.   It's also about having the capacity to fabricate the products we need that are necessary for the functioning of the U.S. economy. The criteria of the National Security Industrial Base Regulation (NSIBR) provide broad guidance for the vital understanding of how steel can affect national security. USW believes the Administration must focus in on the criteria developed into law which incorporates an understanding that steel is not only necessary to build a tank or a ship but to grow and build a strong nation. Criteria such as the impact of foreign competition on the economic welfare of the steel industry must rise in prominence as the 232 report is prepared.

Others will likely testify about vulnerabilities related to a smaller, less diversified domestic steel industry but I wish to highlight a few products which show the interrelatedness to defense and non-defense applications. The plate mills at USW-represented ArcelorMittal Burns Harbor produce not just steel for military applications but have supplied steel for John Deere tractors which harvest the foodstuffs for our country. Simply, an army marches on its stomach as much as it moves in USW-made Bradley fighting vehicles. This is why we urge that this investigation approach national security in steel from a holistic perspective. We as a country have to ask ourselves the question; if we don't have a domestic non-defense manufacturing base that provides steel goods, how can domestic defense steel industries survive?

The ability to fabricate and produce basic steel products like pipe and tube must also be considered in this investigation. A lack of domestic capability has the potential of undermining the country's ability to deliver basic needs to communities.

The United States uses 42 billion gallons of water a day to support daily life from cooking and bathing in homes to use in factories and offices across the country. Drinking water is delivered via one million miles of pipes across the country. Every day, nearly six billion gallons of treated drinking water are lost due to leaking pipes.   An estimated 240,000 water main breaks occur each year. That is why we as a union are dismayed when we read about infrastructure projects like the Holland Tunnel using Turkish, Eastern European, and Chinese steel for 5,700 tons of pipe. We are undermining domestic producers' ability to supply our citizens. As plants close, the decrease in revenue to government from local property and business taxes creates a vicious downward cycle in disinvestment. This in turn creates social and economic instability for millions of working Americans.

Another example is Grain Oriented Electrical Steel (GOES) which is critical to producing the transformers that help deliver power.  Products made from GOES – power transformers, switchgear, and distribution transformers – are all necessary to complete the delivery of electricity to the entire country. The Department of Energy (DOE) has highlighted that if our country's electrical grid sustained substantial damage, it could take months to obtain certain key parts. We must have the capacity not only to produce the underlying product, but this nation must retain the ability to manufacture the final products dependent on those commodities.

We live in highly uncertain times with rising threats.   Traditional nation states, like North Korea, are not the only threats we face.   As the 9/11 attacks made all-too-clear, non-state actors have the capacity to inflict enormous damage.

Europe is confronting terrorist actions on a regular basis and the threats here at home are just as real.   Cyber capabilities have the capacity not only to damage control systems, but the very operations themselves as was reported in 2014 when hackers attacked a German steel mill and inflicted "massive" physical damage.   The ability to strengthen our critical infrastructure and ensure its resiliency, should it be damaged, are vital to protecting the country, its citizens and its interests.

America's steel mills are far from the smoke-belching "rust belt" images that many still have in their minds.   Here in the United States a combination of massive investments in plant, equipment, technology and people have made our plants some of the most efficient on earth. Labor productivity has seen a five-fold increase since the early 1980s, going from an average of 10.1 man-hours per finished ton of steel to an average of 1.9 man-hours per finished ton in 2015.

Traveling through a facility you will find few workers on the plant's floor as most man computers and high tech monitoring equipment. We must recognize that the modern steel mill requires specialized skills.  Our members spend hundreds of hours training and specializing in making steel products. I fear that lack of action and continued decline of U.S. steelmaking will reduce the basic skilled human resources necessary to produce steel products in the country anymore, weakening our national security and economy.

The decision to include all steel products spanning the gamut of the industry in this investigation sends an important signal:  The United States cannot simply try to isolate one product or one technology and then rely on world markets to generously, and immediately, support America's needs in a crisis.  If you travel through the holding yards of a steel mill, you will see materials which appear common in appearance, but one that may have vastly different metallurgical properties from its twin right next to it.  From armor plate, to high carbon steel, to fan blades for jet engine turbines, to Oil Country Tubular Goods and countless other basic and finished products; steel supports our nation's security interests. And, product-after-product has been under attack by our trading

partners – all important in some way to our national security.  Other countries will first worry about their own needs.   We want to have the ability to meet our needs quickly, without having to worry about supply lines and security.

In a time of crisis it is quite possible that some countries may simply refuse to supply us, depending on what the underlying cause of the conflict or problem is and who is involved.  Remember during the Gulf War how Switzerland refused to provide the U.S. military with over-flight rights?   Others could easily refuse to supply the United State with materials in future confrontations.   At the end of the day, only the United States can guarantee the security interests of its people.   We cannot simply hope for the best, we must prepare for the worst.

Our domestic industry has been, and is, under attack from foreign unfair, illegal, predatory and protectionist policies.  Heading up this list is China which, through a network of non-market economic policies has dramatically expanded its steel production capacity, fueling global overcapacity that has swamped world markets.  China is engaged in an attack on our entire manufacturing sector but it has been targeting steel longer than any other product.

Attached to this testimony is a paper we prepared on China's "Broken Promises." Its leaders have repeatedly indicated that steel overcapacity is something the People's Republic of China intends to lower, and while the country makes promise after renewed promise of their intent to dismantle the excess capacity it has created there has been no net decrease in capacity, only increases.

China, despite all its rhetoric on cutting its overcapacity, increased its operating capacity by 36 million tons in 2016. China's overall operating capacity is estimated to have risen to 1 billion tons, from about 965 million tons the year before.

Shortly after the last steel crisis in the late 1990s which decimated U.S. production and employment, we were able to convince the Bush Administration to bring a Section 201 case on certain steel products.  Let's recognize that his Administration did not readily embrace the effort:  It was only after Senator Jay Rockefeller had cobbled together the votes on the Senate Finance Committee to initiate action that the Administration used their authority to self-initiate action.

Quickly, the Administration began to issue waivers and reduce the scope of the relief.  But, after a lot of pain and suffering through bankruptcies, restructurings, layoffs and benefit cuts, the industry stabilized.   At roughly the same time, China became a member of the World Trade Organization as a result of Congress' grant of Permanent Normal Trade Relations.   China took that as the signal to begin a massive trade attack on the U.S. and world markets.

China's actions have been virtually unchallenged by the international community. Indeed, here in the U.S., the bulk of the trade actions which have been taken were at the initiation of the private sector – a substantial portion because of the Steelworkers. The USW has participated in hundreds of antidumping and countervailing duty cases and have initiated and brought a number of them on our own. We have launched Section 301 cases on green technology and efforts on China's actions in the auto parts sector as well as a Section 421 case on tires.

All of these efforts could have been initiated by government with its existing authority. We do not view filing trade cases as a sign of success. Yes, we are proud of our fights on behalf of our members. But, to win a case, you have to lose: Winning a case requires that you prove injury, or the threat of injury. At the International Trade Commission, this generally requires employment reductions, lost profits, suppressed wages, and diminished market share. When relief is obtained, if it's authorized, we are lucky to stabilize the industry as our competitors often take their unfairly-traded products and ship them through third country markets.

We are watching this slow creep of relief in the market this year because the steel industry and the USW have been working cooperatively on several major trade cases. Three of these cases, filed in 2015 and completed in 2016, impact approximately 8 million tons of finished imports that entered the U.S. in 2015 alone. In fact between January 2016 and January 2017, duties (tariffs) against illegally dumped and subsidized steel increased close to 20 percent.

These cases are having an effect but they are muted by global overcapacity and lack of sustained policy action by the U.S. government. The steel industry adjusted year-to-date production through May 13, 2017 was 39,924,000 net tons, at a capability utilization rate of 74.3 percent. That is up 3.2 percent from the 31,912,000 net tons during the same period last year, when the capability utilization rate was 72.1 percent. To give perspective, in 2007 through the summer of 2008, domestic steel capacity utilization was at 87.6 percent.

Winning relief has become the equivalent of Trade Whack-A-Mole.

China's massive subsidies and dumping, along with domestic policies to sustain and build capacity, have flooded world markets destabilizing and undermining those producers who must abide by free market rules. The market has been stabilized at a lower level of production and capacity because of the injury that has already been inflicted is not addressed by the orders as U.S. trade law does not address past harm.

It is vital that any relief authorized as a result of this investigation leave in place, and supplement the relief provided by existing AD/CVD orders.

Over the years, we have worked to get action on China's overall policies, and address the anticompetitive actions of certain other countries – Russia and others – as well. The Steel Committee at the Organization for Economic Cooperation and Development (OECD) has worked to identify the problem.   Last year, President Obama was able to get Chinese leadership to agree to participate in a Global Forum on Steel as part of China's leadership in the eleventh meeting of the G-20.

China has refused to work to define the scope of the problem beyond pointing fingers at others. Countries including China must come to the table for negotiations that result in enforceable disciplines on steel capacity with measurable, and significant, reductions in capacity and production. We should negotiate with an eye towards ensuring our existing steel capabilities be maintained and grown to meet our basic security and infrastructure needs.  Our overall goal has never been to protect our market, but do that we must, if our national security is at risk. We simply cannot wait any longer while our steel sector and others gets downsized through repeated attacks.

This Section 232 investigation has the potential not only to protect America's national security by imposing market restraints on imports from those countries causing the problem, but also to create the impetus for serious negotiations.   A negotiated solution is the best approach – but not the only one.

Mr. Chairman, the Steelworkers are a binational union with significant membership on both sides of the US-Canadian border.   As you move forward with your assessment of the importance of steel to U.S. national security interests and what measures, if any, to implement, I hope you will focus on where the problem lies.   It is not to our north, but to our east, west and south.   Indeed, we have a trade surplus in steel with Canada. Products flow back and forth across our borders – often multiple times – because of integrated supply chains and finishing operations.

And, from a national security perspective, Canada is one of the few countries that has always been there for us with no question, in my mind or in the military or intelligence expert's views.   Indeed, our national security and intelligence relationship with Canada is truly unique.   We share an uncontested border.   We have an intelligence sharing relationship known as Five Eyes (FVEY) that is limited to only five countries.   We have the North American Aerospace Defense Command – NORAD – that has existed for more than sixty years that was the initial line of defense for North America during the Cold War. Canada has been an ally, a friend and a trusted partner.

Canada is the only country that should be exempted from any potential action in the steel sector.

But as we face increasing competitive challenges and threats to our steel sector Canada must also ensure that they enforce the trade laws so that steel products don't use their market as a way-station to enter the U.S. market and circumvent and evade our

laws and our interests.    I am confident that the leaders of Canada will embrace those efforts with the goal of sustaining and advancing our individual and joint national security interests.

This testimony is not a treatise on the domestic steel sector as the Commerce Department's experts have the experience and the data, to assist in your investigation. But, we stand ready to provide whatever assistance is appropriate as you continue this critical investigation and use the authority you have under the law to protect our nation's security.

###

## AMERICAN INSTITUTE OF STEEL CONSTRUCTION



130 E. Randolph Street, Suite 2000, Chicago, IL 60601
**www.aisc.org**

**STATEMENT OF THE AMERICAN INSTITUTE OF STEEL CONSTRUCTION
TO THE SECRETARY OF COMMERCE ON SECTION 232 INVESTIGATION
<u>OF STEEL IMPORTS AND NATIONAL SECURITY</u>**

**David Zalesne
Vice-Chair, AISC Board of Directors, Chicago, IL
President, Owen Steel Company, Columbia, SC
May 24, 2017**

---

**<u>Intro</u>**

Good morning/afternoon.  It is my privilege to speak today on behalf of the American

Institute of Steel Construction as the Vice-Chair of its Board of Directors, and to thank the

Administration and Secretary Ross for initiating this investigation into trade issues facing the

American steel industry.

**<u>Who We Are</u>**

AISC is a non-profit, non-partisan, technical institute and trade association that has

served the structural steel design community and construction industry since 1921.  AISC

develops industry standards, specifications and codes for steel construction; conducts technical

research; and operates programs for education, technical assistance and quality certification.

Together with its affiliate the National Steel Bridge Association, AISC represents more than

1,000 U.S. businesses involved in the structural steel industry, and has more than 40,000

Professional, Affiliate and Student members.  AISC estimates that the U.S. structural steel

industry directly supports about 200,000 jobs, most of which involve skilled labor.

## What We Do

Steel fabricators are the critical intermediaries in the structural steel supply chain, positioned between the mills that produce steel plate and shapes, and the cranes that lift the steel columns, beams, girders and trusses into place on construction sites. Fabricators convert steel produced at the mills into site-ready pieces, operating plants where sophisticated equipment and skilled craftspeople cut, drill, fit and weld components to meet the plans and specifications for each project. Fabricators invest in both physical assets and human assets, because while some fabrication processes can be automated, most of the labor in fabrication plants is in fitting and welding, which are difficult skills to automate on custom-designed projects. Equally important, fabricators are entrusted with the design drawings for projects that show the forces the buildings are designed to resist – both natural forces and forces that can be introduced by actions designed to damage or bring the structures down.

In short, fabricators are responsible for the steel that goes into projects -- from high-rise towers in Manhattan to dams in California; from wastewater plants in Michigan to power plants in the Gulf States; from bridges crossing the Mississippi River to ports handling cargo on the coasts. Indeed, our company, based in South Carolina, was entrusted with the structural steel for the U.S. Capitol Visitor's Center – and the security enhancements that were designed into that structure after the terrorist attacks of 9/11 to protect Members of Congress in the event of a future attack.

For most of the long history of the American steel industry, major steel projects like bridges, high-rise towers and secure government facilities were routinely fabricated in American plants.  However, following the passage of NAFTA, fabricators working the Northeast saw an immediate erosion of domestic market share in cities like Boston and New York, as Canadian fabricators rushed into those areas.  Then as the Chinese steel industry grew, Americans were shocked to see steel for the Bay Bridge in California fabricated in China.  Almost overnight, the American construction market became a rich target for foreign steel industries; while oversight was focused on imports of mill steel, foreign companies brought steel into the U.S. market as fabricated products with virtually no resistance.  Today, offshore access to American construction markets has become so soft that on at least one major project in New York City, steel plate made in China was shipped to a fabricator in Mexico, fabricated into building components there, brought freely into the U.S. under NAFTA rules, and shipped 3,000 miles to New York City.  And somehow, all of that offshore material, labor and freight was priced to the project below the cost domestic fabricators would have had.

According to Commerce Department statistics, imported fabricated structural steel has increased by 136% in the past five years -- far in excess of the growth of the U.S. construction market.  Fabricated steel is being imported not just from China, but from Canada, Mexico, Italy, the U.K., and even the U.A.E., among many other places.  As a result, foreign steel fabricators have gained far more from the American economic recovery of the past five years than American steel fabricators have.  But because fabricated steel is imported for specific projects and not as a commodity, it is exceptionally difficult and expensive for individual fabricators to

3

prove a violation of trade laws through traditional trade case procedures – especially when imports come in through NAFTA rules that were designed to encourage trade with Mexico and Canada – but are now being used routinely to allow global access to the U.S. market.

**What We Propose**

Against that backdrop, AISC believes that the U.S. structural steel industry is directly and adversely impacted by fabricated steel imports.  Tracking to the areas of investigation under section 232, AISC respectfully requests that the Department make the following findings:

- First, that the domestic production -- and fabrication -- of structural steel is necessary for national defense and security requirements.  In this context, defense and security are not limited to traditional military installations and equipment, but also include the security and integrity of our infrastructure -- buildings, bridges, power plants, water treatment facilities and other major projects built with steel that are essential to defense and security.  And if it is important to have an American structural steel industry to build these projects, then trade policy involving steel imports must address both produced steel as melted and poured product, and components from the mill to be effective.  Otherwise, the industry will be unable to support the costs of domestic fabrication, and will see the technical engineering that goes into the security of American structures become entrusted to foreign companies – often supported or even owned by governments whose interests are not necessarily aligned with ours.

- Second, that <u>there is ample capacity in the domestic structural steel industry to meet national marketplace requirements</u>.  AISC has approximately 1,000 steel fabricator members located throughout the country.  While many are small and focus on local and regional projects, there are several big fabricators that have invested heavily in both equipment and human resources, including in-house training and development programs, to handle major projects.  These fabricators not only have the capacity and ability to meet current market demands, they have the ability to grow as markets expand.  But steel fabrication is an incredibly risky -- and competitive – industry, even in good markets.  It is virtually impossible to operate successfully when markets are undercut by below-cost offshore fabrication.

- Third, that <u>the close relation between the Nation's economic welfare and national security is undermined by foreign tactics to obtain easy access to domestic steel construction markets</u>.  In many ways, steel built the great economic strength of this Country, and fabricators positioned between producers and projects created thousands of middle-class jobs for American welders, fitters, machine operators and other workers in hundreds of plants all across the country.  Today, however, the tactics of foreign steel interests to obtain access to the American structural steel marketplace are challenging the economic viability of domestic fabricators.  Whether the tactic involves using NAFTA to bring in steel made in non-NAFTA countries, or pushing subsidies and support downstream from production to fabrication, or simply dumping fabricated steel at below-cost pricing into American

5

markets without fear of any trade remedy whatsoever, the domestic steel industry is under pressure from both northern and southern borders, and from eastern and western ports.

- Fourth, that <u>the domestic structural steel industry supports high-wage, skilled-labor jobs, a strong tax base, and stable employment opportunities</u>.  Unlike offshore fabricators, American fabricators offer market-based wages and benefits to their employees, comply with detailed safety and environmental regulations in their plants, and pay significant federal and state income taxes, local sales and use taxes, and payroll taxes.  Of course, those factors add costs to domestic fabricators, which can only be recovered if they are passed on to the marketplace.  So when offshore fabricators with none of these costs have open access to the same marketplace, domestic fabricators are at an obvious disadvantage.  This is one of the reasons why attaching Buy America requirements to infrastructure investment is incredibly important, even if infrastructure is partially financed by non-government sources.

- Finally, that <u>while prior government efforts to counter illegal steel dumping and illegal subsidies under trade agreements and WTO rules have been well-meaning, they have proven largely ineffective to address imported fabricated steel</u>.  To the contrary, offshore producers have responded to tariffs on mill-produced steel by moving products downstream to the fabricated level – hurting both fabricators <u>and producers</u>.  And as noted earlier, it is exceptionally difficult and expensive for

individual fabricators to prove a violation of trade laws through traditional trade case procedures on individual projects.

As the Administration looks at trade policies to protect and strengthen our national economic, security, and defense interests, AISC submits that not only are few industries as critical as steel, but that <u>a broad focus that includes steel fabrication -- along with steel production -- is critical to the effectiveness of those policies</u>.  The historical focus of remedies on steel production alone has opened doors for foreign steel companies to expand to downstream manufactured and fabricated steel products.  And as demonstrated by a 136% increase in imports of fabricated structural steel over the past five years historical, narrow approaches to steel imports have failed.

With respect to relief, AISC has no specific recommendation on tariffs or quotas, except to suggest that any tariffs or quotas that are imposed must be extended downstream from mill-produced steel to also include fabricated steel to be effective.  An alternative or additional remedy, in the context of Section 232 relief, would be for Commerce to designate <u>classes of structures that are strategically sensitive or important</u> – high-rise towers, power plants, port facilities, major bridges, etc. – and attach domestic fabrication requirements to those classes of projects.  Third, a comprehensive review of the impact NAFTA has had on American structural steel markets is necessary, including both how non-NAFTA producers are obtaining open access to American markets, and how other NAFTA countries are undermining the original intent of the treaty by dumping the products of their excess and below-cost fabrication capacity on American markets.

On behalf of AISC, we appreciate the interest of the Administration in the domestic steel industry.  We look forward to working with the Department in any capacity where we can be of assistance on these issues critical to US national security and competitiveness.

# # #



**Philip K. Bell**
President

**Phone:** (202) 296-1515

*21st Century Steelmakers*

# Statement of Philip K. Bell

## President, Steel Manufacturers Association (SMA)

### Before the

### U.S. Department of Commerce

### Public Hearing in Conjunction with Section 232 Investigation Regarding the Effects on the National Security of Imports of Steel

### May 24, 2017

Good morning Secretary Ross and members of the panel. Thank you for the invitation to appear before you today regarding the Department's Section 232 investigation into the national security effects of imported steel.

My name is Philip Bell and I am President of the Steel Manufacturers Association ("SMA"). The SMA is the voice of the U.S. steelmakers that rely on electric arc furnace (EAF) steel manufacturing technology, which is the dominant steelmaking technology used in America. SMA is our country's largest steel industry trade association – based on the actual number of steel producing members and the amount of steelmaking capacity represented. SMA's membership contains a variety of steel producers including some of the nation's largest steelmakers and employers.

As "21st Century Steelmakers" our members utilize post-consumer recycled ferrous scrap as their principal feedstock, turning this waste into world-class steel. SMA's members account for more than 75 percent of domestic steelmaking capacity, directly employing more than 60,000 workers across North America, and indirectly supporting over 420,000 additional jobs.

It is imperative to our national security that the United States have a strong, viable domestic steel industry with sufficient productive capacity to meet both defense and commercial needs. We cannot rely on foreign steel producers to arm and protect our military forces and to rebuild and maintain the nation's critical infrastructure.

Before discussing some of these threats to our industry, I want to briefly focus on the importance of a broad definition of national security, and steel's role therein.

Steel is critical to our national defense.  But beyond direct defense applications, steel is an engine of economic activity and employment that is of critical importance to the United States.  Steel connects our energy grid and utilities, powering our homes and businesses.   Steel in pipelines delivers our abundant natural resources to consumers, empowering our competitiveness. Steel gives strength to the cars, trains and ships that carry our commerce to market over the highways, bridges, rail and waterways that are built with steel.  In short, steel is a ubiquitous and indispensable component of the nation's critical infrastructure and its economic wellbeing.

Imports of steel, quite simply, present an existential threat to the American steel industry. The volumes of imported steel today have impaired demand for U.S.-produced steel, forced reductions in domestic production and diminished returns on capital investments. U.S. steelmaking production capacity utilization has hovered under 75 percent for many years. We believe capacity utilization of 85% is necessary to allow steelmakers to:

- Ensure double digit return on capital employed;

- Operate at full employment levels;

- Make necessary capital investments;

- Invest in research and development; and

- Efficiently operate both the "hot end" (steelmaking) and "cold end" (steel finishing) of finished steel production.

Not since before the 2007 global economic downturn has SMA members' capacity utilization come close the 85 percent level.

The ability of SMA's members to meet episodic national defense requirements, and to improve and make necessary capital investments for tomorrow, depends entirely on today's demand for their U.S. produced steel.

SMA members are the safest, most productive and most sustainable steelmakers in the world. We can compete with anyone on a level playing field. The United States also has the world's most open markets, and SMA supports free and fair trade. The same openness, however, should not be extended to illegally traded, dumped and subsidized steel.

Over the last decade, global steelmaking capacity has grown at an unprecedented rate. The world's steel consumption, however, has not kept pace, contributing to a large and increasing gap between global capacity and demand. Now estimated to be more than 800 million tons, this excess capacity – much of it propped up by illegal subsidies by foreign governments – strains the profitability of even the most efficient producers.

The effect of global overcapacity has been, quite simply, to flood the U.S. market, typically unlawfully, with imported steel. Over the course of 2014 and 2015, import penetration reached historic levels, which it continues to approximate today.

Import market penetration has come at a great price to the U.S. steel industry and the U.S. economy. From January 2015 through the end of 2016, steel industry employment in the U.S. declined by 14,400 workers. Multiple U.S. facilities remain idled or operate with significantly reduced work forces. Because each steel industry job supports an additional seven jobs throughout the supply chain, the impact is far greater.

As the domestic steel industry has been weakened, tax revenues have been lost and our national security impaired. Using an estimated nationwide average annual steelworker income of $61,465, SMA estimates that the U.S. Federal Government forgoes – on average - $13,207 in federal income taxes for each steelworker lost to unfairly-traded imported foreign steel.  For each 1.5 million in tons of steel imported into the United States, the Federal Government will forego an estimated $9,000,000 in personal income tax revenue. As applied to the 14,400 workers lost since 2015, the Federal government has lost an estimated $190,000,000 in personal income tax revenues.

With hundreds of millions of dollars in lost tax revenue the effects are being felt at the local, state and national level – while foreign producers continue to dedicate vast government resources to support their steel industries and promote exports to our market.

SMA commends ongoing diplomatic efforts to rationally reduce global steel production capacity. While the United States may need to act unilaterally to ensure its steel producers and their workers and customers are not driven out of business by unfairly-traded imports, it is our hope that other like-minded countries that believe in free and fair markets and the rule of law will join us in these efforts to reduce over capacity. We also believe that the 232 process should serve as a catalyst to explore creative and meaningful remedies that deal with underselling, overcapacity and other market distortions that impact our entire supply chain.

Again, we commend the Administration for taking this important step and we stand ready to work with you to find ways to address these illegal steel imports and the threats they pose to our national security.

Thank you.



THE **COLD FINISHED**
**STEEL BAR**
**INSTITUTE**, NFP

3050 K Street, NW  Suite 400

Washington, DC 20007

www.cfsbi.com | info@cfsbi.com

**Statement of Bill Geary**

**Chairman, Cold Finished Steel Bar Institute**

**(CFSBI)**

**President, Nelsen Steel Company**

**Public Hearing on**

**Section 232 National Security Investigation**

**Regarding Imports of Steel**

**May 24, 2017**

Good morning Mr. Secretary and members of the panel.  I am Bill Geary, Chairman, Cold Finished Steel Bar Institute (CFSBI) and President, Nelsen Steel Company.

The Cold Finished Steel Bar Institute is a Washington, DC based trade association representing U.S. producers of cold finished steel bar.  Cold finished steel bar is incorporated into a wide range of consumer, industrial, aerospace, and military products.  Essentially any product that contains a motor or moving part contains one or more components made from cold finished steel bar.  The U.S. cold finished steel bar industry produces high-quality products on an efficient and cost-competitive basis, using highly trained workers under environmentally sound conditions.

### Critical Contributions to the U.S. National Defense Made by CFSBI Members

The following is a summary of national defense-related materials and applications provided by cold finished steel bar producers:

| | |
|---|---|
| A-10 Warthog and Apache attack helicopters | Projectiles |
| Shell cases | Cold extruded armament shell cases |
| Armored vehicles | door hinge pins |
| Vehicles | Shafts |
| | Gears |
| | Engines |
| | Suspension parts |
| | Drive chains |
| | Military lockers |
| | Rocket fuel rods |
| | Grab handles |
| | Steering systems |
| | Braking systems |
| | Pallets/and bomb fin adaptors |
| Guns | Virtually every gun contains cold finished steel bars |
| Smart bombs | Cold finished bar parts |
| Aircraft | Numerous applications |
| M-16 rounds | 1060 steel for penetrator |

Cold finished steel bar producers also provide materials for civilian applications which provide critical supportive functions essential to the national defense and the fight against terrorism:

| Motor vehicles | Numerous auto parts |
|---|---|
| Transportation | Airline seat parts |
| | Locomotive axles |
| | Wire ductwork for jet ramps |
| Infrastructure | Bridge parts |
| | Wire supports for concrete |
| | Sewer pipe parts |
| | Rebar tie wire |
| | Nails |
| | Wire for cement columns and barrier walls |
| Power generation | Bolts for wind turbines |
| | Wire for electrical transmission towers |
| | Oil & gas applications |
| | Mining industry applications |

## The Effects of Import Competition On U.S. Cold Finished Steel Bar Producers

Like much of the steel industry, CFSBI member companies are facing extraordinary challenges from foreign producers. We believe there is widespread dumping in the U.S. market. China and other countries have built substantial excess production capacity, frequently with government subsidies. We face competitors which never have to make a profit to survive, thanks to government handouts.

The U.S. market for cold finished steel bar has declined precipitously. We estimate that within the last 45 years, the demand for cold finished steel bar in the United States has gone from 2.5 million tons per year to about 1 million tons per year today. This reflects the loss of much of our U.S. customer base. Unless the underlying commercial production of cold finished steel bars is healthy, competitive and profitable, CFSBI companies would be unable to survive and would not be able to provide critical materials essential to the national defense. For this reason, we respectfully urge that any remedy determined in this section 232 case apply not only to the cold

finished steel bar we produce, but also to downstream component parts made by our customers and are then incorporated into subassemblies.

I will be pleased to respond to any questions you have.  Thank you.

**ORAL TESTIMONY OF CHAIRMAN EDWARD VORE**
May 24, 2017

Secretary Ross, my name is Edward Vore and I pleased to be here today in my capacity as the Chairman of the Committee on Pipe and Tube Imports, which is known as CPTI. I also serve as the CEO of ArcelorMittal Tubular Products North America, but today I am here to speak on behalf of CPTI and the entire U.S. pipe and tube industry.

CPTI is the leading trade association for the steel pipe and tube industry in the United States. It was founded in 1984 in response to the damage being done to domestic producers by imported products. Regrettably, notwithstanding our organization's efforts over three decades, the domestic pipe and tube industry has continued to decline as imports take more and more market share.

Today, the CPTI has 40 members with 123 facilities in 32 states. Our members employ more than 35,000 workers across the United States. Thousands more workers are currently laid off, awaiting better economic conditions that would allow their employers to recall them.

Although 2016 provided some respite for the domestic pipe and tube industry in the sense that imports declined from the highs of 2014 and 2015, imports still took more than half of the U.S. market. 2017 is not looking good. Imports are up 55 percent so far, which portends badly for domestic producers.

Our industry is a critical supplier to a number of important sectors of the U.S. economy, including agriculture, construction, infrastructure, and manufacturing. I am here today, however, to underscore that a healthy pipe and tube industry is vital to the nation's defense and security.

First, pipe and tube have direct military applications such as casings for munitions and are also essential components of piping systems in jets, ships, military vehicles, weapons systems, and prefabricated buildings.

Second, pipe and tube are critical to our nation's energy security. Oil wells, for example, use pipe and tube products like drill pipe and oil country tubular goods, and both oil and natural gas are transported through pipelines made of line pipe. Petroleum products like gasoline – which is essential to virtually any military action – also are refined in facilities made almost entirely of pipe and tube.

Third, pipe and tube are important to national security because they are used in the transmission of critical fluids and gases for fire protection, industrial production, heating and cooling, and water gathering systems.

Finally, pipe and tube are an integral part of the overall steel industry. Seamless pipe and tube is made from steel billets, and welded pipe and tube is made from flat-rolled steel. Domestic pipe and tube companies tend to buy these inputs from domestic sources; foreign pipe and tube producers buy their steel from foreign suppliers. We estimate that domestic pipe and tube makers account for as much as one-third of the consumption of U.S. made hot-rolled steel. If domestic pipe and tube manufacturers were to go out of business, U.S. steel producers would be hard pressed to fill the resulting void in demand.

The Reagan Administration recognized the importance of including pipe and tube in its voluntary restraint agreements, as did the second Bush Administration when crafting a safeguard remedy. The Trump Administration should do the same.

According to the publication STEELBENCHMARKER, Chinese export prices for hot rolled steel in 2016 were $453/ton, whereas U.S. prices were $671/ton. China's state-owned

enterprises don't care about profits and will continue producing at a loss in order to maintain production and employment. If the Administration were to limit only imports of steel itself, and not pipe and tube, domestic coil prices would likely increase – potentially making domestic pipe and tube less competitive. CPTI therefore favors a remedy for all flat rolled steel and billets extending to pipe and tube and associated components like couplings and nipples, as well as fabricated products such as pipe spools and pipe modules.

On behalf of the nation's makers of pipe and tube, as well as their workers, I am grateful for this opportunity to present you with testimony and would be pleased to answer any questions either now or in a written submission.

# STEEL FOUNDERS' SOCIETY OF AMERICA

780 MCARDLE DRIVE UNIT G
CRYSTAL LAKE, IL 60014-8155
PHONE: 815/455-8240
FAX: 815/455-8241
www.sfsa.org



*Testimony from the Steel Founders' Society of America*

*Section 232 Investigation: The Effect of Steel Imports on National Security*

**Submitted by:** Raymond Monroe, Executive Vice President, Steel Founders' Society of America, monroe@sfsa.org

On September 9th, 2003, Amite Foundry in Amite, Louisiana poured a seven ton casting made with steel scrap from the World Trade Center to make the bow stem for the USS New York. Amite Foundry is a part of the U.S. foundry industry that manufactures thousands of custom designed, high performance castings ranging in size from 1 pound to 50 tons for critical sectors of the U.S. economy.

On behalf of Steel Founders' Society of America (SFSA), we appreciate this opportunity to provide these comments for the U.S. Department of Commerce investigation to determine the effects of the imports of steel on national security.

Steel Founders' Society of America (SFSA) is a trade association for advancing the steel casting industry. We are over 100 years old and since World War II have worked to develop the most advanced technology in steel casting production and use.

The U.S. steel foundries have 200 plants that make over a million tons of castings each year. We are a part of the casting industry that supplies about 10 million tons of steel, iron, titanium, nickel, copper, magnesium and aluminum castings. Global competitors, primarily China, have taken at least 25 percent of the U.S. steel casting market. More serious than direct imports are the castings embedded in equipment imported from global sources.

Since 2000, 80 steel foundries have shut their doors. Over 8,000 foundry workers have lost good paying jobs and these closures have reduced our capacity by 500,000 tons to 1,400,000 tons.

Amite Foundry is one of those steel foundries that is closed. They are part of a group that includes Atchison Foundry in Atchison, Kansas that survived the manufacturing depression of the 1980s by producing the turret ring for the M1 Abrams Tank. Now Atchison is working with the Army to produce a cast steel armor capable of defeating IEDs but they are operating at less than 50% of their capacity. Their sister plant in Tacoma, Washington makes critical castings for the *Virginia*-class submarine program as the only qualified U.S. source. They are also operating at less than half their capacity. These poor business conditions put their plants at risk of closure and jeopardize their ability to supply these needed items for defense.

These examples highlight the critical yet specialized products we make for national security. Around the buildings on Capitol Hill, Sivyer Steel of Bettendorf, Iowa makes the cast steel

bollards for protection and Nova Precision of Auburn, Pennsylvania casts the artful custom tops.

Working with the Defense Logistics Agency (DLA) since 1992, the metal casting industry has identified suppliers and tools for castings needed by the U.S. Department of Defense (DOD). Over 75 steel foundries provide more than 10,000 parts for the DOD.  SFSA has worked with the Army to develop an affordable armor cast underbody to protect the warfighter from IEDs.  We have also teamed up with the Air Force to make munition castings.

As suppliers of defense parts, U.S. steel foundries need to be successful commercially in the non-defense market because defense procurement needs are volatile and sporadic.  If the specialized U.S. production capabilities are closed because of imports, they are not available when needed for critical defense castings.

**To remain capable and available for Defense needs, the steel foundry industry needs viable commercial business.**

Unfair trading practices, U.S. economic policies, the strength of the dollar, globalization, regulatory burdens and foreign competition have made maintaining our businesses as reliable suppliers for the military challenging.   We are in an extremely competitive U.S. market and are not afraid to compete but we cannot compete with global suppliers that are supported to gain dominance in the global market to eliminate our production.

**Our current system allows our global competitors to practice trade distorting behavior with no remedy for us as U.S. suppliers.**

Fluctuations in exchange rates have a dramatic effect on trade.  The U.S. dollar is the reserve currency of the world.  Our global competitors exploit the value of the dollar to displace U.S. suppliers from the market.

**Exploiting the variations of currency valuations is not included in the trade distorting behavior subject to our current set of rules.**

The U.S. metalcasting industry continues to face intense global competition. China is now the largest producer of all types of castings of any country in the world, with over 30,000 foundries. Chinese imports now make-up 25 percent of the U.S. marketplace imports.  Like the steel mill industry globally, China has the capacity to make half the steel castings--five million tons--in a world production of ten million tons.

Global sourcing strategies of our U.S. customers gain the benefit of a global supply chain at the expense of reducing the U.S. supply chain.  Before the move to globalization, the U.S. had at least 2 qualified suppliers for every critical item. Globalization has reduced that to one.  With the reduction of U.S. suppliers, our global competitors seek to eliminate our U.S. supply and establish a market dominant position that is monopolistic, especially in small specialty products. This behavior violates our antitrust laws but is beyond the reach of our current rules-based trading system. Also globalization has resulted in the acquisition of critical U.S. suppliers by

foreign entities.  This undermines our technical advantages by disseminating our technologies to the global suppliers of foreign parent companies.

**Globalization reduces cost by increasing the supply base but reduces the supply base in the U.S. and makes it more vulnerable.**

Another issue in trade is the inability to maintain and enforce the rules-based trading systems envisioned in our trade agreements. There are two significant challenges in our use of rules-based trading; the inability to prosecute smaller claims of unfair, rule violating behavior and the inability to gain meaningful enforcement of current rules.

Our trade remedies envision only large volume commodity product violations.  For advanced manufacturing and high quality niche products of limited supply and market size, the U.S. trade remedy structure is unworkable.  There are no small claims courts, no alternative complaint approaches, no relief for small market segments to access; no matter how egregious the violations.  The industry needs to use this cumbersome system that provides no direct relief for violations even if they have spent the money to prosecute a case and were successful.  Our system provides no solution to the modern market of small custom products traded in small dollar volumes in a global system.

**Trade remedies in the U.S. cost too much, take too long and provide too little benefit to allow our trading rules to work for niche or advanced manufactured products like steel castings.**

Enforcement is the other challenge.  Since our trade system deals with discrete products, the violating party can take steps to avoid it.  They can move up or down the supply chain.  The ability to embed castings into a later product is an example. This damages not only the steel casting producer but also his customer.  They can mislabel the product or transship through another country in violation of agreements.  They can ship to another country and complete enough work to evade restrictions on the country of origin.  Our enforcement is too little and too late to protect U.S. companies.  It lacks the transparency to allow U.S. manufacturers to gain confidence that their interests are being protected.  It provides no relief to the injured industry.

**Enforcement of our trade laws is ineffective to protect the interests of US manufacturers that make small volumes of valuable products and lack transparency in their application.**

Given the short time we have today and the nature of the hearing, we do not propose solutions to these challenges.  We are happy to engage and work with you to make progress to improve this situation to ensure a capable and reliable supply chain for critical steel parts required for our nation's security.

Once again, thank you for the opportunity to provide comments on the significant challenges facing the domestic steel foundry industry against the tide of imports and unfair trade practices. We appreciate the administration and Commerce Department taking the time to investigate and determine the effects of the imports of steel on national security. If you have any questions or would like additional information, please do not hestiate to contact me.

**Testimony of Mark Millett, Steel Dynamics, Inc.**
Section 232 Steel Investigation Hearing – May 24, 2017

Secretary Ross and other distinguished members of the panel. For the record, my name is Mark Millett, and I am the President and CEO of Steel Dynamics, Inc., known as SDI. I was one of the three co-founders of the company in 1994.

Our company produced 9.3 million tons of steel in 2016 with 7,400 associates. We have an annual capacity of 11 million tons. Over the last five years we have made approximately two billion dollars of capital investments, including a 1.65 billion dollar investment on a 3.5 million ton plant in Mississippi, previously owned by Severstal of Russia. We are a major scrap company. We are also now one of the largest galvanized sheet producers, the second largest structurals producer, and the leading rail producer in the U.S.

Our products are vital to our national and economic security. They go into national defense, military installations, transportation infrastructure, building construction, and autos. Our Mississippi plant is a major steel supplier to oil country tubular goods and line pipe mills in Texas.

The steel import problem stems from global overcapacity that must be addressed through a global solution. For example, we filed antidumping and countervailing duty cases in 2015 on corrosion resistant sheet and cold-rolled steel. Duties of over 100 percent eliminated direct Chinese imports of each product by over 100,000 tons per month. However, just last month in April 2017, 460,000 tons of corrosion resistant sheet and 230,000 tons of cold-rolled sheet were imported, almost 50 percent more than before we filed the cases. In addition, more than 700,000 tons of steel pipe and tube were imported in just April alone.

We are playing a game of whack a mole: hit the Chinese with duties and Chinese steel goes to 10 other countries to become cold-rolled steel, corrosion resistant sheet, or steel pipe and tube. We are also seeing our market for structurals erode as massive quantities of fabricated structurals are imported. Big international construction companies such as Bechtel and Fluor are fabricating whole plants in China. Between 2013 and 2017, imports doubled from 850,000 to 1.7 million tons, and they keep growing.

World Steel Dynamics released a study on April 13, 2017 on the international hot-rolled market. I will attach it to our written comments. The study said that Chinese export prices were about $400 a short ton, which it stated was $100 per ton below Chinese mills cost. The study said that U.S. domestic prices were at $640 a ton, $240 or 60 percent higher than the Chinese export price.

This is why SDI favors quotas at the 2010 or 2011 volume of imports. The U.S. and the rest of the world must cut off subsidized and dumped Chinese steel exports to stop this game of whack a mole and to get China to truly shutter excess capacity now, not five or 10 years from now.

To do otherwise would truly jeopardize our national and economic security.

**Section 232 National Security Investigation of Steel Imports**
**Testimony of Alexander Maass**
**May 24, 2017**

Good morning.   I am Alexander Maass, President of Maass Flange Corporation.  I am here on behalf of the Coalition of American Flange Producers, its members, and employees.  Thank you for the opportunity to appear before each of you here today.  We fully support this Section 232 investigation on steel imports, and urge the Secretary of Commerce to find that these imports are threatening to impair our country's national security, and that assertive action must be taken.

Maass Flange Corporation is a U.S. manufacturer of stainless steel and alloy flanges formed 35 years ago in 1982, and we are located in Houston, Texas.  Our products are used to strengthen and connect pipes, valves, pumps, and other equipment for piping systems.  Maass Flange is a fully integrated forging and machining manufacturer, with the most diversified offering of stainless steel and alloy products.  We offer a complete line of both small and large diameter flanges, in a full range of pressure classes and in various grades of material.  Maass Flange, together with Core Pipe Products, Inc., are the founding members of the Coalition of American Flange Producers.   We are a domestic coalition of flange manufacturers and produce steel flanges for numerous national security applications.

1

Because our products are resistant to the harshest applications, they are used in navy ships and submarines, warfare products, aviation jet refueling systems, national fuel refining, chemical manufacturing plants, nuclear power reactors, turbine power and coal gasification generation, liquid natural gas recovery, aviation, aerospace, and in the submarine building industry.  We also sell to utilities companies who use our products for the national power grid, a critical component of the infrastructure that protects the United States and its citizens.  Our flanges are also used to assemble pharmaceutical equipment vital to the production and development of medicines that prevent and respond to epidemics.  However, imports of steel, including stainless steel and alloy flanges, into the U.S. market threaten our ability to supply products for these and many other national security applications.

This is why we are here today to urge Commerce to find that imported steel is threatening to impair the national security, and that actions such as a comprehensive tariff or quota system on all steel products, are needed to significantly restrain these imports.  In our industry, imports have often entered the market in disruptive, massive waves at a time, rather than predictably throughout the year.  For example, we have seen Indian producers ship substantial, year-and-a-half supplies of stainless steel flanges to our customers over the period of a single

2

quarter.  But it is not just India; we see the same disruptive behavior from China, the Philippines, Korea, and many others.

As these imports surge into the U.S. market, our capacity to supply our customers, invest, and our production, revenue, and employment numbers, suffer greatly.  Just last month in April, Ameriforge Group Inc., another U.S. producer of stainless steel and alloy flanges, filed for Chapter 11 bankruptcy protection.  That decision, we are sure, was in no small part a result of imports coming into the United States, and displacing American production and business.

Moreover, the injury these imports cause our industry is confirmed by the existence of past antidumping duty orders on imports of stainless steel flanges from India and Taiwan, and by ongoing investigations.  Currently, the International Trade Commission is in the final phase of antidumping investigations on carbon steel flanges from India, Italy, and Spain, and a countervailing duty investigation on carbon steel flanges from India.  Moreover, the Department of Commerce recently calculated between 19 and 24.4 percent dumping margins on carbon steel flanges from Spain.  As these investigations show, unfairly traded imports of steel flanges are irrationally entering the U.S. market, and have caused and are likely to continue causing great injury to our industry.  But this is about much more than dumped flanges from one or two countries; imports of these products do indeed threaten the national security of the United States.

The threat caused by imports is unsurprising given the global steel overcapacity crisis, which has undoubtedly spurred foreign overproduction in a range of steel products including flanges.  Over the past years, it has become particularly evident that the imports coming in from these other countries are not only "second class" flange and other pipe connector products of questionable quality and workmanship, but they are also being sold at price levels that are unsustainable according to our business environment, which involves high quality U.S. workmanship, business ethics, and national responsibilities.  With each new aggressive surge of imports, our ability to adequately supply flanges for national security applications deteriorates.  The flanges we supply to the armed forces go into the assembly of military vessels, assisting to keep our warfighters and nation safe.  As I mentioned earlier, they go into equipment for wind, oil, coal, natural gas, and nuclear energy plants.  The power and energy that fuels our national security efforts are transmitted through pipes that are strengthened and held together by flanges.  But steel imports competing with us in the U.S. market take opportunities we would otherwise have, affecting our current numbers and hindering our ability to innovate and invest in stronger, better products to remain competitive and continue supplying the best to our customers.  In addition, we believe these imports do endanger, as President Trump said, "the jobs needed to maintain a pool of

4

14107667.1

skilled workers essential for the continued development of advanced steel manufacturing."

Our industry also needs the Secretary to broadly define steel imports to include stainless steel and alloy flanges, and broadly define the scope of national security requirements to include critical infrastructural applications in the energy industry, national power grid, and pharmaceutical industry, in addition to military applications.

On behalf of the Coalition of American Flange Producers, I urge Commerce to find that steel imports are threatening U.S. national security, and urge the agency to recommend aggressive, comprehensive, and concrete actions to adjust steel imports – including stainless steel and alloy flanges – and stop them from impairing the national security.

Thank you for your time, attention, and for all your efforts in this critical investigation.

**Statement of**

**Robert M. Landry, Vice President and Chief Commercial Officer**

**Port of New Orleans**

**Public Hearing on Section 232 Investigation of Steel Imports**

**Wednesday May 24, 2017**

My name is Robert Landry, and I am the Vice President and Chief Commercial Officer for the Port of New Orleans. It is my honor to appear before you today to address the impact of potential Section 232 actions on the Port of New Orleans and its entire maritime community. The Port appreciates the President's efforts to spotlight and correct improper trade practices so that the United States can compete fairly in a global environment. Today, I will share insights gained from previous U.S. trade sanctions of imported steel as an educational caution, and will suggest that other remedies to directly incentivize or otherwise assist the domestic steel industry be fully explored and implemented instead of undertaking Section 232 import adjustments or other actions.

The Port of New Orleans is annually among the top five cargo ports in the United States as well as one of the leading cruise ports in this country. More germane to this hearing is the top-tier status New Orleans maintains as one of the largest steel importing ports in the U.S. The importance of this commodity to the Port cannot be understated. In 2016, imported steel accounted for 45 percent of all imported cargo moving across the publicly-owned facilities within the Port's jurisdiction. As a result, approximately 35 percent of the Port's cargo-related revenue is generated by this single commodity.

It is with solid historical context that I can testify to the detrimental impact of trade sanctions on imported steel. In 2002, then-President Bush imposed tariffs on a variety of imported steel products from several foreign countries under Section 201 of the Trade Act of 1974. In the ensuing year, the Port of New Orleans suffered a 46 percent decline in steel imports and a direct loss of over $1.6 million in revenue. The Section 232 authority under the Trade Expansion Act of 1962 is far broader than the statutory authorities used in 2002, and could result in far steeper import restrictions on a wider variety of steel products from many more foreign countries.

Notably, a Trade Partnership Worldwide, LLC economic study that reviewed the near-term impacts of the 2002 steel import tariffs found that:

- 200,000 Americans lost their jobs during 2002 due to higher steel prices.

- More American workers lost their jobs in 2002 to higher steel prices than the total number employed by the U.S. steel industry itself.

- Every U.S. state experienced employment losses from higher steel costs.

The impact of a tariff on imported steel would have a broad economic impact.  Just recently, the Association of General Contractors cited the rise in commodity prices as one of the major reasons that home prices have increased.  Steel was one of the main commodities mentioned in the Association's study.  While one would expect sanctions on imported steel to only exacerbate the rise in steel prices, the ripple effect on other commodities would be less noticeable but just as adverse.  For example, 80 percent of the steel moving through the Port of New Orleans is further transported up the Mississippi River by tug and barge.  Those same barges are then used by American farmers to deliver agricultural products downriver to the grain elevators located on the Lower Mississippi River.  Without those barges moving upriver with cargo, the cost to transport U.S. grain increases, making U.S. agricultural products less competitive on the worldwide market with those in other producing countries like Brazil and Russia.

The Port of New Orleans, like other commercial enterprises, needs and depends upon a strong U.S. economy.  A vibrant, healthy, and competitive U.S. steel industry is essential to that goal.  However, the wide imposition and enforcement of new restrictions on imported steel would create a negative impact on the U.S. port industry, the larger maritime community, and American manufacturers and other steel-consuming industries.  Fair and open trade policies, combined with appropriate incentives and other remedies for the U.S. steel producers, would be the best means to promote all sectors of the U.S. economy.

\* \* \* \* \*

**BEFORE THE U.S. DEPARTMENT OF COMMERCE**
**BUREAU OF INDUSTRY AND SECURITY**

———————————————————
                                                    )
Section 232 Investigation on the Effect of    )
Imports of Steel on U.S. National Security   )
———————————————————)

## Oral Presentation of Joel Johnson, Chief Executive Officer, Borusan Mannesmann Pipe U.S. Inc.

1.      Good morning.  My name is Joel Johnson.  I am the Chief Executive Officer of Borusan Mannesmann Pipe U.S. Inc. or "BMP." BMP is a U.S. pipe mill located in Baytown, Texas. We manufacture welded steel pipes, primarily casing for oil and gas wells, known as Oil Country Tubular Goods, or OCTG.

2.      Our pipe mill opened in 2014.  The total invested capital by the Borusan Group in this facility is $300 million, 50 percent of which represents fixed assets.  We intend to make further investments as long as market conditions continue to be favorable and no additional import restrictions are imposed.

3.      BMP employs 180 personnel in its U.S. operations.  Our plan is to produce over 200,000 tons of OCTG in 2017.  However, our facility cannot produce every size of OCTG used in the U.S. market.  Just like most other U.S. OCTG producers, we fill out our product line by importing selective sizes of pipe that are produced by our parent in Turkey.  As with other U.S. producers, these imports allow us to be fully competitive in the U.S. market and thus enhance the

1

volume of our domestic production. **<u>If we were suddenly unable to import these</u> <u>products, jobs will be threatened</u>**.

4.     While not used in national defense production, OCTG and oil and gas line pipe are an important element of the basic manufacturing infrastructure needed for domestic energy production and distribution. Expanding domestic energy production and increasing America's energy independence have obvious national security implications. Thus, any import measures that would adversely affect these sectors will threaten national security by undermining U.S. energy production and energy independence.

5.     I would also like to bring to your attention that domestic pipe and tube manufacturers such as ours are consumers of flat-rolled steel. We add significant value added through the pipe manufacturing process. Import restrictions on these basic flat-rolled steel products pose the risk of undermining the domestic steel pipe sector by increasing costs and reducing competitiveness. Higher costs for OCTG and line pipe will discourage oil and gas drilling and the construction of new pipelines.

6.     A case in point is large-diameter line pipe. This is pipe used in large oil and gas pipelines such as the recently approved Keystone pipeline. U.S. health and safety regulations governing such pipelines require that the pipe be produced

using high-quality, heavy gauge steel with very specific and demanding chemical and mechanical properties.

7.      As the U.S. pipeline operators commented in a recent proceeding before the Commerce Department, the U.S. line pipe industry cannot produce certain large diameter line pipe that is used in major pipeline projects.  One reason is that the flat-rolled steel that meets certain required specifications cannot be sourced in the U.S.  Furthermore, imported flat-rolled steel products that do meet those specifications are subject to high antidumping and countervailing duties.

8.      We have concerns about future U.S. investments in large diameter pipe production despite our extensive technical expertise and experience with this high value-added product.  Any new trade barriers call into question the feasibility of such investments.   Moreover, if high tariffs or restrictive quotas are imposed on imports of large diameter line pipes, critical energy infrastructure projects would be threatened due to the inability to source the specific pipes required in the United States.

9.      We believe that the Borusan Group has proven its commitment to the American economy.  Before our investment in Texas, we imported pipe from our Turkish facilities. Once our investment was established, we ramped up our production in the U.S. and we now employ hundreds directly and indirectly by focusing on domestic production and strategically importing as needed.

10.     We do not believe further import restrictions are necessary; however, if the President imposes a trade restrictive measure, it should be designed to carefully protect those companies that have already invested in the U.S.  Every effort should be taken to work directly with these companies to ensure that neither their sources of raw material supply nor their supplemental imports are endangered.  The goal should be to encourage U.S. investment and protect the very companies that have demonstrated their commitment to the U.S. market.

11.     Thank you and I am prepared to answer any questions you may have.

# PUBLIC COMMENTS

On April 26, 2017, the Department of Commerce ("the Department") published a Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel in the Federal Register. The public comment period ended on May 31, 2017. The Department received 201 written public comment submissions.

The public comment submissions were the following:

1) Acenta Steel Limited
2) Air Distribution Institute
3) AK Steel
4) Algoma
5) Alliance for American Manufacturing
6) Allied Machine & Engineering Corporation
7) Altos Hornos de Mexico
8) American Association of Exporters and Importers
9) American Automotive Policy Council
10) American Iron and Steel Institute
11) American Line Pipe Producers Association
12) American Nickeloid Company
13) American Wire Producers Association
14) Aperam SA
15) Apollo Metals Limted
16) ArcelorMittal USA
17) Arundel
18) Association of Equipment Manufacturers
19) Atlas Steel Products Corporation
20) Autoliv
21) Ball Corporation
22) BlueScope Steel Ltd
23) Boker's Inc
24) Boltex Manufacturing Corporation
25) BorgWarner
26) Borusan Mannesmann
27) Brazil Steel Institute
28) Bridgestone Metalpha U S A
29) BSH Home Appliances

30) Business & Institutional Furniture Manufacturer's Association
31) Bway Corporation
32) California Steel Industries
33) Canadian Manufactureres & Exporters and Canadian Manufacturing Coalition
34) Canadian Steel Producers Association
35) Canam Group Inc
36) Carpenter Technology Corporation
37) Central Moloney Inc
38) Charter Steel
39) China Iron and Steel Association
40) Coalition of American Flange Producers
41) Coalition of Energy Equipment Manufacturers
42) Cogent Power Inc
43) Commercial Metals Company
44) Committee on Pipe and Tube Imports
45) Congressional Steel Caucus
46) Copperweld Bimetallics LLC
47) CPW America Co
48) Crown Cork & Seal
49) CSN LLC
50) Dana Incorporated
51) Daniel Pearson CATO
52) Daniel R Pearson CATO Institute
53) Dayton Rogers
54) DB&S Steel
55) Decra Roofing Systems
56) Delta Star Inc
57) Diamond Sawblades Manufacturers' Coalition
58) Downhole Pipe Equipment LP
59) Drill Rod & Tool Steels Inc
60) Drinker Biddle and Reath
61) DS Containers Inc
62) E&E Manufacturing Co
63) Eaton Corporation
64) Economic Policy Institute
65) Electrolux Home Products
66) Eurofer
67) Evraz North America
68) Finarvedi SpA
69) Finkl Steel

70) Forging Industry Association
71) Freudenberg Sealing Technologies
72) G & L Manufacturing
73) Gerdau North America
74) German Steel Foundation
75) Grant Prideco and National Oilwell Varco
76) Greater Pittsburgh Chamber of Commerce
77) Greenbrier Companies
78) H&T Waterbury Inc
79) Hartree Partners LP Metallia Division
80) Hirsh Industries
81) Hitachi Metals
82) Hytrol Conveyor Company
83) IBEW Local 2150 Additional Signatory
84) IBEW Local 2150
85) Independent Pipe
86) Industrial Fastener's Institute
87) Institute of Scrap Recycling Industries
88) International Longshore Warehouse Union Local 13
89) International Longshore Warehouse Union Local 63
90) International Union, United Automobile, Aerospace & Agricultural Implement Workers of America
91) Japan Iron and Steel Federation
92) Jarvis Cutting Tools
93) JSW Steel
94) JTEKT North America Corporation
95) Kerr Pumps
96) Key Knife Inc
97) Kiewit Corporation
98) Knife Source
99) Komatsu Mining Corporation
100) Korea Iron & Steel Association and various member companies
101) Latin American Steel Association (Alacero)
102) Law Office of Lewis Leibowitz
103) Lyman Steel Company
104) M7 Metals
105) Magellan Corporation
106) MAGNA International
107) Maritime Exchange for the Delaware River and Bay Public
108) Markem Imaje Corporation

109) Merfish Pipe & Supply
110) Metal Flow Corporation
111) Metal Partners International
112) Metals 2 Go
113) Metals Service Center Institute
114) Metglas Amorphous
115) Mexican Iron and Steel Industry
116) Ministry of Commerce of China
117) Mitsubishi Electric Power Products
118) Motor & Equipment Manufacturers Association
119) National Electrical Manufacturers Association
120) National Foreign Trade Council
121) Niagara Transformer Corporation
122) Nippon Steel & Sumikin Inc
123) Nippon Steel & Sumitomo Metal Corporation
124) Nippon Yakin Kogyo
125) NLMK USA
126) North American Die Casting Association
127) North American Tool
128) Nucor Corporation
129) Oil and Natural Gas Industry
130) Pasha Stevedoring & Terminals L P
131) Pentaflex Inc
132) Pentair
133) Port of Los Angeles
134) Port of Vancouver USA
135) Port Tampa Bay
136) Power Partners Inc
137) Precision Machined Products Association
138) Precision Marshall Steel Company
139) Precision Marshall Steel Company Belgium & France Division
140) Precision Metalforming Association and National Tooling and Machining Association
141) Rail Security Alliance
142) Russel Metals
143) Saha Thai Steel Pipe PCL
144) Samuel Son & Co Limited
145) Seilkop Industries Inc
146) Senator Al Franken
147) Senator Mitch McConnell and Senator Rand Paul

148) Senator Murray Cantwell
149) Silgan Containers
150) Simonds International
151) Spectrum Brands Inc
152) SPX Transformer Solutions, Inc
153) SRG Global
154) SSAB Americas
155) SSINA
156) Stainless Steel Tube Trade Advancement Committee
157) Star Cutter
158) Star Pipe Products
159) Steel Dynamics Inc
160) Steel Europe AG
161) Steel Founders' Society of America
162) Steel Manufacturer's Association
163) Steel Tank Institute
164) Steel Users
165) Steel Warehouse Company
166) Steelcase Inc
167) Stewart and Stewart
168) Sumitomo Corporation of Americas
169) Ta Chen International Inc Aperam
170) Ta Chen International Inc ArcelorMittal
171) Tata Steel Europe
172) Tenaris
173) Titan Metal Service
174) TMK IS
175) Tool Manufacturers of New Hampshire and Wisconsin
176) Toyota Tsusho America
177) Transformer Manufacturers
178) Trinity Meyer Utility Structures
179) Truck and Engine Manufacturer's Association
180) Tubular Synergy Group
181) Turkish Steel Exporters' Association
182) U.S. Tire Manufacturers Association
183) U.S. Wheat Associates
184) UK Steel
185) United Association Labor Management Cooperation Committee
186) United States Cutting Tool Institute
187) Universal Steel Products

188) Valbruna Slater Stainless Inc
189) Valeo North America
190) Vallourec Star
191) Vaugh Manufacturing
192) Vest Incorporated
193) Vietnam Steel Association
194) Villares Metals
195) Voestalpine AG Austria
196) Voestalpine AG Sweden
197) Volkswagen Group of America Chattanooga Operations, LLC
198) Weldbend Corporation
199) Wheeler Metals
200) Wind Tower Trade Coalition
201) ZF North America, Inc


To view any of the public comments listed, please visit:

https://www.bis.doc.gov/232steel

APPENDIX H, Page 1

**Uses of Steel for National Defense**

The U.S. Department of Defense (DoD) has a large and ongoing need for a range of steel products that are used in fabricating weapons and related systems for the nation's defense.  DoD requirements are met by steel companies which also support the requirements for critical infrastructure and commercial industries.

Navy ships require hardened steel for their exterior armor, specialized alloys for sensor and weapons housings, high-carbon forged steels for machinery components, and rolled high-tensile strength steel for hull plates and frames. Importantly, Navy ship hulls require steel produced from integrated steel mills.  In addition, Army vehicle armor plating requires hard, high-carbon steel laminate, and vacuum melted nickel alloy sheet for recuperators on the Abrams Tank engine.  Air Force (F-35 Joint Strike Fighter) and Navy F-18 aircraft require exotic steel alloys with high-strength and low weight.  The Army's Apache and other helicopters also utilize steel alloys.  Vacuum-melted nickel alloy sheet, bar and finished forgings are used for engine shafts, landing gear, jet engine parts and components such as super precision bearings and gears.

The single largest use of steel is for production of ships and submarines, with most modern submarines needing 10,000 net tons of steel. A single aircraft carrier requires 60,000 net tons of structural steel (*see* Figure H1).[1]

Although U.S. Navy and Coast Guard purchases of ships decreased in recent years, ship procurements are expected to increase in the years ahead.  According to the Office of Budget and Management, the Administration is preparing to increase the size of the military, especially the Navy (from 275 ships to an estimated 292 ships by the end of FY 2018). [2]  Some Navy officials report that the demand for ships could reach as high as 355, creating an increase in the demand for specialized steel for military purposes.[3]

---

[1]   2001 Report, note 20 ("DOD indicated that 60,000 net tons of finished steel was used in the multi-year construction of [the Navy aircraft carrier] the *USS Ronald Reagan*").

[2]   Office of Management and Budget. "2018 Budget: Investing in Our National Defense". Fact Sheet.  The White House.

[3]   U.S. Naval Institute (USNI) News, "Moran: Navy Needs as Much As $150B Extra to 'Jump-Start' Path to 355 Ships; Would Buy Mostly DDGs, SSNs, Carriers," March 22, 2017, https://news.usni.org/2017/03/22/moran-

| Figure H1.  Weapons Systems Steel Requirements* | |
|---|---|
| | Steel Usage Per Unit |
| *Navy Vessels* | |
| Aircraft Carriers (excluding propulsion and armaments) | $60,000 - 70,000$ tons |
| Amphibious Force Ships | 12,000 tons |
| Submarines | $4,000 - 10,000$ tons |
| Guided Missile Destroyers | 3,500 tons (steel plate) |
| *Ground Systems* | |
| M-1 Abrams Tank | 62 tons (approx.) |
| Light Armored Vehicles | 8 tons |
| *Examples<br>*Source: American Iron and Steel Institute* | |

Thus, U.S. military platforms are dependent in varying degrees on U.S.-produced steel and specialty metal. In many cases, the U.S. military relies on special types of steel and the U.S. steel industry's ability to support critical defense needs. It is important to note, however, that this ability to meet defense requirements in turn depends on the continued ability of the U.S. steel industry to compete fairly in the commercial marketplace and maintain a financially viable domestic manufacturing capability.  This includes the ability to have an adequately skilled workforce for manufacturing as well as to conduct research and development for future products. A continued loss of viable commercial production capabilities and related skilled workforce will jeopardize the U.S. steel industry's ability to meet the full spectrum of defense requirements.

A recent U.S. Army aerospace specialty steel (including stainless) sector report concluded that, "Maintaining a healthy domestic specialty metals industry is vital to U.S. security interests.  Domestic manufacturing of these critical interests is needed in times of war.  The ability of the United States to maintain leading edge

---

navy-needs-additional-150b-over-next-7-years-to-get-on-355-ship-trajectory-would-buy-mostly-ddgs-ssns-carriers

technology in specialty metals depends on the continued existence of a healthy domestic manufacturing capability."[4]

The U.S. Department of Defense also has had to take specific actions to assist portions of the U.S. steel industry that are important for national security needs in part due to unique DoD requirements for which there is limited commercial demand. Through the Defense Production Act Title III program, which funds projects to "create assured, affordable and commercially viable production capabilities and capacities for items essential for national defense" the Department of Defense funded two steel programs.

In 2008, the Defense Production Act Title III office funded a $59 million effort to expand domestic production capacity for low-alloy Vacuum Induction Melting/Vacuum Arc Re-melting steel. U.S. capacity for producing this type of steel (high-purity, low-alloy iron based steel) was constrained, creating unacceptable lead times for the Mine-Resistant Ambush-Protected (MRAP) vehicles. This steel is also used in bearings for jet engines, rotor shafts and heads for helicopters, flap actuators for fighter jets, gears in jet and helicopter transmissions, mounts and fasteners for jet engines and jet tail hooks.

In 2015, the Defense Production Act Title III office also funded a $23 million project to enhance domestic, economically viable merchant supplier steel product capabilities. The aim was to improve production capability for very wide, very thick Navy-grade heavy alloy steel plate that is dimensionally uniform. Current capabilities are not sufficient to meet existing and growing demands for this type of steel. Steel plate is used in submarines, aircraft carriers, destroyers, helicopter landing decks, Army combat vehicles and tanks. [5]

Providing the wide range of steel products needed for defense requires a strong steel industry. As mentioned in the 2001 Report, military programs such as armored vehicles, aircraft, and ships represent approximately 0.03 percent of U.S. steel demand (peacetime requirements). These steels are not generally used in building

---

[4]    U.S. Army Aerospace Specialty Steel Sector Analysis - U.S. Army Aviation and Missile Research, Development and Engineering Center Engineering Directorate, page 52. July 2015.

[5]    U.S. Department of Defense, "Defense Production Act: Title III," http://www.dpatitle3.com/dpa_db/, accessed May 2017.

construction or consumer goods.   However, when steel needs for critical infrastructure are included with defense needs, overall steel requirements are significantly higher.  All remaining U.S. steel companies supply commercial and specialized steel for critical infrastructure and defense end-markets.[6]

Steel used in defense-related products includes all five categories (flat, long, pipe and tube, semi-finished, stainless).   The Department in the 2001 Report previously estimated that national defense needs for steel were 325,000 net tons of steel per year.[7]  The Department in the present investigation has seen evidence of an increase in national defense needs since the 2001 Report. In 2017, DoD estimates for U.S. steel needs is now calculated to be three percent of U.S. steel production.

The ability of U.S. production to supply national defense needs is entirely dependent on the existence of commercially viable steel mills that are not dependent on national defense demand alone.  The free market system in the United States requires commercially viable steel producers to meet defense needs.  No company could afford to construct and operate a modern steel mill solely to supply defense needs because those needs are too diverse.  To be available to supply those diverse national defense needs, U.S. steel mills must attract sufficient commercial (i.e., non-defense) business to support construction, operation and maintenance of production capacity and to support the upgrades, research and development needed to continue to supply defense needs in the future.

This section summarizes briefly the depth and breadth of defense usage of steel across the full spectrum of the five product categories (and the nearly 800 subcategories of steel that make up the five categories).

1. **Flat Products: Produced by rolling semi-finished steel through varying sets of rolls.  Includes sheets, strips, and plates.**

Land-based vehicles such as the Bradley Fighting Vehicle, Abrams Tank, and the family of Light Armored Vehicles use significant tonnage of steel plate per

---

[6]   U.S. Department of Defense requirements for steel would be prioritized over U.S. civilian needs during a national emergency through existing authorities of the Defense Production Act Title I and the Defense Prioritization and Allocation System (DPAS).

[7]   2001 Report at 13 and note 14.

vehicle.[8]  In addition, steel plate is used in the bodies and propulsion systems of the naval fleet. [9]

Conventional and high-permeability domain-refined grain-oriented electrical steels (GOES) are used in cores and core assemblies for electrical transformers (including power transformers, switchgear, step-up, step-down, and distribution transformers) installed at military facilities across the United States.

In addition, small transformers employing electrical steel are used in radar, ships, and some weapons systems.  The availability of electrical steel meeting defense performance specifications is important to mission assurance and reliable operations.

## 2.  Long Products: Steel products that fall outside the flat products category. Includes bars, rails, rods, and beams.

These products have application in a range of military systems, including personnel carriers, tanks, and weapons.  They are instrumental in the creation of mechanical parts.  For example, the control cables on virtually all military aircraft, including fighter jets and military transport planes, are produced from steel wire rope.[10]

## 3.  Pipe and Tube Products: Seamless or welded pipe and tube products.

Several companies supply tubular steel products for a variety of direct defense needs.  These military-related products include bomb shells, vehicle cylinders for Humvees, axles for trailers that haul M-1 tanks, 500-pound bomb rings, and cylinders on Patriot missile launchers.[11]

---

[8] Specialty Steel Industry of North America (SSINA), www.ssina.com

[9] *Id.*

[10] *Id.*

[11] Multiple U.S. steel manufacturers

Seamless tubes are suitable for demanding applications where maximum corrosion resistance or mechanical integrity are required.  Examples of defense applications include military aircraft, submarines, ships, nuclear equipment and fuel elements, and equipment used for the manufacture of special chemicals.[12]

4. **Semi-finished Products: The initial, intermediate solid forms of molten steel, to be re-heated and further forged, rolled, shaped, or otherwise worked into finished steel products. Includes blooms, billets, slabs, ingots, and steel for castings.**

The production of steel ingot is key to the manufacture of downstream products used by the DoD.  Ingot is used as the basis for fabricating heavy forged products including ship drive shafts and pressure vessels for the defense market.  Also, interior fittings for naval vessels including ship galleys, machinery housings and bulkheads, are made from steel ingot material.[13]

5. **Stainless Products: Steel products, in flat-rolled, long, pipe and tube, and semi-finished forms, containing at minimum 10.5 percent chromium and, by weight, 1.2 percent or less of carbon, offering better corrosion resistance than other steel.**

The U.S. carbon/alloy and specialty steel industries are vital partners to American defense contractors and to the Defense Department.  Domestic and specialty metals are found in virtually every military platform, including missiles, jet aircraft, submarines, helicopters, Humvees® and munitions.  Fighter aircraft engines, gears, bearings, and the fuselage also use high performance specialty steels and super-alloys produced by U.S. specialty steel companies.[14] [15]

---

[12] The Stainless Steel Tube Trade Advancement Committee (SSTTAC), www.ssttac.com

[13] http://www.steel.org/the-new-steel/national-defense.aspx

[14] Specialty Steel Industry of North America (SSINA), www.ssina.com

[15] For example, Valbruna is an approved stainless steel supplier for Halliburton, Schlumberger, Bombardier, Johnson & Johnson, Delphi Automotive, and several other companies with significant defense contracts. As a manufacturer of stainless steel bars comprised of high-performance grades, Valbruna's steel is used in key defense applications such the structural components and landing gear on aircraft, gun and rifle barrels, and munitions casings. (Valbruna Slater Stainless, Inc.)

## Uses of Steel for Critical Infrastructure

Pursuant to Presidential Policy Directive 21 (PPD-21), there are 16 designated critical infrastructure sectors in the United States, many of which use high volumes of steel (*see* Figure I1).[1]

| Figure I1. DHS Critical Infrastructure Sectors – Use of Steel | | |
|---|---|---|
| | *Sectors* | *Steel End-Uses* |
| 1. | Chemical Production | Centrifuges, Conduit, Fire Suppression, Flange Heaters, Incubators, Piping, Stainless Steel Heaters, Storage Tanks, Safety Showers |
| 2. | Commercial Facilities | Structural Beams, Electrical Conduit, Kitchen Equipment, Elevators, Escalators, Waste Pipes, Metal Framing and Studs, Machinery, Valves, Manufacturing Plants, Chemical Processing Plants |
| 3. | Communications | Antennas, Radio/TV Antenna Masts, and Transmissions Towers, Tower Cables |
| 4. | Critical Manufacturing | Blast Furnaces, Rolling Mills, Extrusion, Casting, Forging Production Plants; Fabrication Facilities (i.e. Bend, Cut, Mold, and Stamp steel materials). Specialty Metals Production (i.e. Stainless Steel, Alloy Steel, Magnetic/Electronic, High Strength Alloy Steel, Carbon Steel), Plates, Hot Rolled Round Bar, Cold Finished Steel Bars, Steel Wire, Rebar |
| 5. | Dams | Reinforced Dams and Reservoirs (Rebar, Piping, Structural Supports, Flood Gates, Water Release Gates and Valves, Turbine Supports) |
| 6. | Defense Industrial Base | Armored Personnel Carriers, Heavy Weapons (i.e. Cannon, Machine Guns, Missiles), Humvees, Jet Aircraft, Submarines, Munitions, Aircraft Engines, Fighting Vehicles, Tanks, Ship Propulsion Systems |
| 7. | Emergency Services | Ambulances, Fire Trucks, Helicopters, Portable/Temporary Shelters |
| 8. | Energy | Petroleum Refineries (i.e. Specialty Pipe, Valves, Fittings), Oil and Gas Pipelines (i.e. Steel Plate, Heavy Gauges), Storage Tanks, Electricity Power Generating Plants, Electric Power Transmission Towers, Power Distribution Grids and Stations, Transformers, Utility Distribution Poles, Transformer Cores, Wind Turbines |

---

[1]    Department of Homeland Security, "Critical Infrastructure Sectors," https://www.dhs.gov/critical-infrastructure sectors (accessed May 2017).

| 9. | Financial Services | Steel Safes, Bank Vaults, Lockers, Armored Trucks, Building Doors and Barriers |
|---|---|---|
| 10. | Food and Agriculture | Canned Goods, Harvesters, Mechanical Planters, Balers, Tractors, Storage Silos, Partitions, Gates, Watering Systems, Fencing Systems (i.e. Gates, Barb Wire, Posts) |
| 11. | Government Facilities | Structural Steel,  Elevators/Escalators, Furniture, Piping, Vehicle,  Barriers, Vault Doors, Barracks, Storage Buildings, Shelving, Records Storage, Fences |
| 12. | Health Care/Public Health | Elevators/Escalators, Hospital Framing, Structural Supports, Roofing, Operating Tables, Furniture, Wheel Chairs, Bed Frames, Waste Pipes and Fire Suppression Pipe, Medical Devices (i.e. Drug Delivery Needles, Surgical Pins and Screws) |
| 13. | Information Technology | Data Center Cooling Systems, Data Center Structural Supports, Electronic System Racks, Electrical Conduit, System Cabinets, |
| 14. | Nuclear Reactors, Materials, and Waste Sector | Structural Steel, Pressurizers, Reactor Pressure Vessels, Safety Water Tanks, Containment Vessels, Primary Pumps and Steam Water Lines, Steam Generator Components, Cooling Towers, Overhead Cranes for Reactor Maintenance. |
| 15. | Transportation Systems | Airports, Aircraft, Bridges, Highways, Railroads, Mass Transit Systems, Seaports, Navigation Systems, Shipbuilding, Trucks, Trailers, Boats, Ships |
| 16. | Water and Waste Water Systems | Water Distribution Pipes, Storage Tanks and Towers, Valves, Storm Water Distribution (i.e. Culverts, Flood Control Gates), Waste Water and Sewage Treatment Facilities |

Note: Presidential Policy Directive (PPD-21) on Critical Infrastructure Security and Resilience, issued in February 2013, identified 16 industrial sectors.  *See:*  https://www.dhs.gov/critical-infrastructure-sectors.

Source:  Bureau of Industry and Security, multiple industrial references, http://www.ssina.com/news/releases/pdf_releases/steel_and_national_defense_0107.pdf

These 16 sectors require reliable supplies of steel for new construction as well as maintenance and repairs.[2]

---

[2]    End-use markets for U.S. steel:  According to AISI industry statistics about end use markets for U.S. steel shipments in 2015, the majority (2/3) of U.S. produced steel mill products were sold by steel companies directly to end use markets. Construction consumed approximately 42 percent of steel sales. Infrastructure and commercial construction projects increase the demand for structural steel and cut length plates. The automotive market comprises 27 percent of U.S. sales. Automotive is the largest market category for sheet products and is also increasingly the market for high strength steels. Other key markets include machinery (9 percent), containers (4 percent), and pipe and energy (7 percent) by weight for sales.

The Department found that demand for steel in critical industries has increased since the Department's last investigation in 2001. The 2001 Report determined that there were 33.68 million tons of finished steel consumed per year in critical industries in the United States based on 1997 data. The Department updated that analysis for this report using 2007 data (the latest available) and determined that 54 million metric tons of steel is being consumed in critical industries, an increase of 63 percent.[3]

Potential disruptions in adequate supplies of needed steel products could impair critical infrastructure sectors such as:

    a. Transportation: bridges (over 600,000 bridges), tunnels, national highway system, railcars and tracks, ports, airport runways and facilities (19,000 U.S. airports)

    b. Energy: petroleum and natural gas pipelines, offshore oil/gas platforms, electric power generation (over 6,000 power plants), refineries, and nuclear facilities (99 units)

    c. Water treatment: community drinking water systems (155,000 public drinking water systems)[4], wastewater treatment and management facilities (16,000 publicly owned wastewater treatment systems)[5].

There is a large and ongoing need for a range of steel products that are used in supporting critical infrastructure in the United States. These products include all five categories (flat, long, pipe and tube, semi-finished, and stainless steel) that are produced by U.S. integrated and mini-mill steel companies. Uses include:

---

[3] Bureau of Industry and Security analysis of Bureau of Economic Analysis, Annual Input-Output Accounts of the U.S. Economy, 2007 data.

[4] U.S. Department of Health and Human Services, Center for Disease Control and Prevention, Drinking Water

[5] U.S. Environmental Protection Agency, Office of Waste and Management, 1996.

1. **Flat Products: Produced by rolling semi-finished steel through varying sets of rolls. Includes sheets, strips, and plates. Used most often in the automotive, tubing, appliance, and machinery manufacturing sectors.**

Similar to defense, flat steel products have a wide range of applications in commercial and industrial systems. Plate products find application in a variety of places, such as storage tanks, ships and railcars, and large diameter pipe and machinery parts.

In the commercial sector steel plate is used for offshore drilling rigs, construction and mining equipment, bridges, tool and die production, and petro-chemical applications.

Pipelines, the mode by which petroleum and natural gas is most often delivered to refineries and then on to consumers, are made from technically demanding steel plate in wide and very heavy gauges.[6]

The electrical grid of the United States relies on the availability specially engineered conventional and high-permeability flat electrical steel. Domain-refined grain-oriented electrical steels (GOES) is the key component of cores and core assemblies in electrical transformers used to control the distribution of electricity.

GOES is used in both the large step-up transformers that power the electrical grid by enabling the transport of electricity over great distances and in smaller step-down transformers that power individual neighborhoods and businesses.[7]

Non-oriented electrical steel (NOES) is also critical for the electrical grid, because it is the used to make the large cores for electrical power generators. In addition, NOES is used in industrial applications and motors for hybrid and electric automobiles. Importantly, there is today only one remaining domestic producer of GOES and NOES in the United States: AK Steel. It is also the only producer of these products in North America.[8]

---

[6] American Iron and Steel Institute (AISI), www.steel.org

[7] AISI

[8] AISI

2. **Long Products: Steel products that fall outside the flat products category. Includes bars, rails, rods, and beams. Used in many sectors but most commonly in construction.**

Long products have application in a range of industries and are frequently used in transportation, including commercial aircraft, automobiles, trucks, and railroads. Special bar quality (SBQ) and cold-finished bars also are used to reinforce concrete in roads and bridges. Another important application is oil and gas drilling, production and transmission in the energy sector.[9]

3. **Pipe and Tube Products: Either seamless or welded pipe and tube products. Used in many sectors but most commonly in construction and energy sectors.**

The availability of high-performance steel pipe and tube is critical to oil well drillers, pipeline operators and refineries. Steel pipe and tube is used to extract, process, and transport petroleum products that are essential for the day-to-day functioning of the U.S. economy.[10] In fact, steel line pipe is required for pipeline systems that require high pressure or operate in harsh environments (e.g., sub-sea pipelines). The installation of deep water and ultra-deep water pipeline construction carries greater risk in terms of pipeline failure, installation safety, environmental impact and life cycle cost. Transmission pipelines, which are typically large diameter, use low-carbon steels or low-alloy steels because of their strength, toughness, ductility, and weldability. In construction, steel pipe is used for structural support, fire suppression, waste-water handling, railings, and other applications.

4. **Semi-finished Products: The initial, intermediate solid forms of molten steel, which are re-heated and further forged, rolled, shaped, or otherwise worked into finished steel products. Includes blooms, billets, slabs, ingots, and steel for castings.**

---

[9] AISI http://www.steel.org/the-new-steel/

[10] Committee on Pipe and Tube Imports

The supply of semi-finished steel products is essential to the operation of many U.S. industrial sectors that require unique parts and systems fabricated from steel. Steel slab is used in the fabrication of pressure vessels for the commercial nuclear and petrochemical industries. In addition, it is used in commercial ship building and construction. Likewise, fabricators also rely on a ready supply of ingots that are needed for forging and casting operations.[11]

5. **Stainless Products: Steel products, in flat-rolled, long, pipe and tube, and semi-finished forms, containing at minimum 10.5 percent chromium and, by weight, 1.2 percent or less of carbon, offering better corrosion resistance than other steel.**

The stainless steel sector of the U.S. industry provides a significant portion of the high technology, high value steel used for a variety of critical infrastructure end-uses.

Stainless steel tubing is used in a wide range of commercial settings and in defense systems. Applications include: auto exhaust systems, industrial gas lines, water systems, aircraft systems, heat exchangers, petrochemical facilities, hydraulic lifts and other systems using hydraulic fluid.

Pipe products fabricated from stainless steel are used across industry, including for: breweries, dairies, oil and gas processing, pharmaceutical plants, power plants, paper mills, synthetic fiber production, and ships. Stainless steel products also are employed in nuclear power plants, including: sleeves for fuel rods, heat transfer tubes, reactor vessel components, and other uses.

---

[11] ArcelorMittal USA

## U.S. Government Steel Measures and Actions

| U.S. Government Steel Measures and Actions | | | | | |
|---|---|---|---|---|---|
| **Year/ Admin.** | **Measure/ Initiative** | **Coverage** | **Characteristics** | **End Date** | **U.S. Steel Finished Import Penetration** |
| 1968<br><br>Johnson | Voluntary Restraint Agreements (VRAs) | Japan and the European Community (EC) | Sought by European producers facing antidumping (AD)/countervailing duty (CVD) tariffs | Renegotiated | 18% |
| 1972<br><br>Nixon | VRAs | Japan and the EC | Renegotiation of 1968 VRAs; ended with 1974 market recovery | 1974 | 19.3% |
| 1978<br><br>Carter | Trigger Price Mechanism (TPR) | Japan and the EC | Established minimum "fair" import price; imports below this price subject to "fast track" trade remedy investigation, self-initiated by the USG | Revised | 21.1% |
| 1980<br><br>Carter | TPR | Japan and the EC | Revised TPR which raised trigger price and enhanced auditing and monitoring | 1981 | 15.5% |
| 1981<br><br>Reagan | USG Self-Initiates 7 AD/CVD investigations | EU | Initiated pursuant to the existing trigger price mechanism which allowed for self-initiation if imports below fair price | Settled in 1982 with the voluntary restraint agreements | 19.9% |
| 1982<br><br>Reagan | VRAs | EC | Sought by European producers facing AD/CVD tariffs | Renegotiated and expanded to include more countries | 16.6% |
| 1984<br><br>Reagan | VRAs | 19 countries and the EC | -Tailored to each country and involved market share agreements and quotas<br><br>-AD/CVD petitions withdrawn by industry<br><br>-Tied to a steel industry commitment to modernize and provide retraining for workers | 1992 | 26.4% |
| 1989<br><br>George H.W. Bush | Pursuit of a Multilateral Steel Agreement | Global | -Efforts launched to negotiate a global agreement to abolish subsidies in exchange for an end to the VRAs | N/A; agreement not reached | 15.8% |

## U.S. Government Steel Measures and Actions

| U.S. Government Steel Measures and Actions (Continued) | | | | | |
|---|---|---|---|---|---|
| **Year/ Admin.** | **Measure/ Initiative** | **Coverage** | **Characteristics** | **End Date** | **U.S. Steel Finished Import Penetration** |
| 1999<br><br>Clinton | Steel Action Plan | Global | -Enhanced engagement with trading partners to cut steel imports<br><br>-Tax relief for steel companies and financial adjustment for out-of-work steelworkers<br><br>-Vigorous enforcement of AD/CVD<br><br>-DOC Global Steel Report<br><br>-Improved steel monitoring | N/A | 21.6% |
| 1999<br><br>Clinton | Comprehensive Steel Agreement with Russia | Russia | Terms of the agreement reduced by 64 percent overall imports of Russian steel from 1998 levels and established minimum pricing | 2004 | 21.6% (all steel imports; not specific to Russia) |
| 2000<br><br>Clinton | Global Section 201 Safeguards on Certain Wire Rod and Line Pipe | Global | -Based on a petition brought by the U.S. industry, tariffs ranged from 10 to 19%, phased out over 3 years.<br><br>-The duties affected only those imports that exceeded 1998 import levels. | 2003 | 22.3% (all steel imports; not specific to line pipe and wire rod) |
| 2002<br><br>George W. Bush | Global Section 201 Safeguards on most steel products | Global, with exclusions (e.g., FTA partners, short supply) | Tariffs on most producers and tariff rate quotas on slab (along with a process for exclusions)<br><br>-Enhanced Import Monitoring<br><br>-Multilateral efforts to address excess capacity and steel subsidies in the OECD | 2004 | 20.4% |

**Steel Antidumping and Countervailing Duty Orders in Effect as of January 11, 2018**

| Country | Product/Country | CaseNo | Order Date | Steel Product Category | Grade |
|---|---|---|---|---|---|
| Australia | Certain Hot-Rolled Steel Flat Products/Australia | A602807 | 10/3/2016 | Flat | Carbon/Alloy |
| Austria | Certain Carbon & Alloy Steel Cut-to-Length Plate/Austria | A433812 | 5/25/2017 | Flat | Carbon/Alloy |
| Belarus | Steel Concrete Reinforcing Bars/Belarus | A822804 | 9/7/2001 | Long | Carbon/Alloy |
| Belgium | Certain Carbon & Alloy Steel Cut-to-Length Plate/Belgium | A423812 | 5/25/2017 | Flat | Carbon/Alloy |
| Belgium | Stainless Steel Plate In Coils/Belgium | A423808 | 5/21/1999 | Flat | Stainless |
| Brazil | Carbon & Alloy Steel Wire Rod/Brazil | A351832 | 10/29/2002 | Long | Carbon/Alloy |
| Brazil | Carbon & Alloy Steel Wire Rod/Brazil (CVD) | C351833 | 10/22/2002 | Long | Carbon/Alloy |
| Brazil | Certain Carbon and Alloy Steel Cut-to-Length Plate/Brazil | A351847 | 2/1/2017 | Flat | Carbon/Alloy |
| Brazil | Certain Cold-Rolled Steel Flat Products/Brazil | A351843 | 9/20/2016 | Flat | Carbon/Alloy |
| Brazil | Certain Cold-Rolled Steel Flat Products/Brazil (CVD) | C351844 | 9/20/2016 | Flat | Carbon/Alloy |
| Brazil | Certain Hot-Rolled Steel Flat Products/Brazil | A351845 | 10/3/2016 | Flat | Carbon/Alloy |
| Brazil | Certain Hot-Rolled Steel Flat Products/Brazil (CVD) | C351846 | 10/3/2016 | Flat | Carbon/Alloy |
| Brazil | Circular Welded Non-Alloy Steel Pipe/Brazil | A351809 | 11/2/1992 | Pipe and Tube | Carbon/Alloy |
| Brazil | Stainless Steel Bar/Brazil | A351825 | 2/21/1995 | Long | Stainless |
| China | Carbon and Certain Alloy Steel Wire Rod/PRC | A570012 | 1/8/2015 | Long | Carbon/Alloy |
| China | Carbon and Certain Alloy Steel Wire Rod/PRC (CVD) | C570013 | 1/8/2015 | Long | Carbon/Alloy |
| China | Certain Carbon & Alloy Steel Cut-to-Length Plate/PRC | A570047 | 3/20/2017 | Flat | Carbon/Alloy |
| China | Certain Carbon & Alloy Steel Cut-to-Length Plate/PRC (CVD) | C570048 | 3/20/2017 | Flat | Carbon/Alloy |
| China | Certain Cold-Rolled Steel Flat Products/PRC | A570029 | 7/14/2016 | Flat | Carbon/Alloy |
| China | Certain Cold-Rolled Steel Flat Products/PRC (CVD) | C570030 | 7/14/2016 | Flat | Carbon/Alloy |
| China | Circular Welded Austenitic Stainless Pressure Pipe/PRC | A570930 | 3/17/2009 | Pipe and Tube | Stainless |
| China | Circular Welded Austenitic Stainless Pressure Pipe/PRC (CVD) | C570931 | 3/19/2009 | Pipe and Tube | Stainless |
| China | Circular Welded Carbon-Quality Steel Line Pipe/PRC | A570935 | 5/13/2009 | Pipe and Tube | Carbon/Alloy |
| China | Circular Welded Carbon-Quality Steel Line Pipe/PRC (CVD) | C570936 | 1/23/2009 | Pipe and Tube | Carbon/Alloy |
| China | Circular Welded Carbon-Quality Steel Pipe/PRC | A570910 | 7/22/2008 | Pipe and Tube | Carbon/Alloy |
| China | Circular Welded Carbon-Quality Steel Pipe/PRC (CVD) | C570911 | 7/22/2008 | Pipe and Tube | Carbon/Alloy |
| China | Corrosion-Resistant Steel Products/PRC | A570026 | 7/25/2016 | Flat | Carbon/Alloy |
| China | Corrosion-Resistant Steel Products/PRC (CVD) | C570027 | 7/25/2016 | Flat | Carbon/Alloy |
| China | Cut-to-Length Carbon Steel Plate/PRC | A570849 | 11/3/2003 | Flat | Carbon/Alloy |
| China | Hot-Rolled Carbon Steel Flat Products/PRC | A570865 | 11/29/2001 | Flat | Carbon/Alloy |
| China | Light-Walled Rectangular Pipe & Tube/PRC | A570914 | 8/5/2008 | Pipe and Tube | Carbon/Alloy |
| China | Light-Walled Rectangular Pipe & Tube/PRC (CVD) | C570915 | 8/5/2008 | Pipe and Tube | Carbon/Alloy |
| China | Non-Oriented Electrical Steel/PRC | A570996 | 12/3/2014 | Flat | Carbon/Alloy |
| China | Non-Oriented Electrical Steel/PRC (CVD) | C570997 | 12/3/2014 | Flat | Carbon/Alloy |
| China | Oil Country Tubular Goods/PRC | A570943 | 5/21/2010 | Pipe and Tube | Carbon/Alloy |
| China | Oil Country Tubular Goods/PRC (CVD) | C570944 | 1/20/2010 | Pipe and Tube | Carbon/Alloy |
| China | Prestressed Concrete Steel Rail Tie Wire/PRC | A570990 | 6/24/2014 | Long | Carbon/Alloy |
| China | Seamless C&A Steel Standard, Line & Pressure Pipe/PRC | A570956 | 11/10/2010 | Pipe and Tube | Carbon/Alloy |
| China | Seamless C&A Steel Standard, Line & Pressure Pipe/PRC (CVD) | C570957 | 11/10/2010 | Pipe and Tube | Carbon/Alloy |
| China | Stainless Steel Sheet and Strip/PRC | A570042 | 4/3/2017 | Flat | Stainless |
| China | Stainless Steel Sheet and Strip/PRC (CVD) | C570043 | 4/3/2017 | Flat | Stainless |
| China | Steel Concrete Reinforcing Bars/PRC | A570860 | 9/7/2001 | Long | Carbon/Alloy |
| France | Certain Carbon & Alloy Steel Cut-to-Length Plate/France | A427828 | 5/25/2017 | Flat | Carbon/Alloy |
| Germany | Certain Carbon & Alloy Steel Cut-to-Length Plate/Germany | A428844 | 5/25/2017 | Flat | Carbon/Alloy |
| Germany | Non-Oriented Electrical Steel/Germany | A428843 | 12/3/2014 | Flat | Carbon/Alloy |
| Germany | Small Diameter Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe/Germany | A428820 | 8/3/1995 | Pipe and Tube | Carbon/Alloy |
| India | Certain Cold-Rolled Steel Flat Products/India | A533865 | 9/20/2016 | Flat | Carbon/Alloy |
| India | Certain Cold-Rolled Steel Flat Products/India (CVD) | C533866 | 9/20/2016 | Flat | Carbon/Alloy |
| India | Corrosion-Resistant Steel Products/India | A533863 | 7/25/2016 | Flat | Carbon/Alloy |
| India | Corrosion-Resistant Steel Products/India (CVD) | C533864 | 7/25/2016 | Flat | Carbon/Alloy |
| India | Cut-to-Length Carbon-Quality Steel Plate/India | A533817 | 2/10/2000 | Flat | Carbon/Alloy |
| India | Cut-to-Length Carbon-Quality Steel Plate/India (CVD) | C533818 | 2/10/2000 | Flat | Carbon/Alloy |
| India | Hot-Rolled Carbon Steel Flat Products/India | A533820 | 12/3/2001 | Flat | Carbon/Alloy |
| India | Hot-Rolled Carbon Steel Flat Products/India (CVD) | C533821 | 12/3/2001 | Flat | Carbon/Alloy |
| India | Oil Country Tubular Goods/India | A533857 | 9/10/2014 | Pipe and Tube | Carbon/Alloy |
| India | Oil Country Tubular Goods/India (CVD) | C533858 | 9/10/2014 | Pipe and Tube | Carbon/Alloy |
| India | Stainless Steel Bar/India | A533810 | 2/21/1995 | Long | Stainless |
| India | Stainless Steel Wire Rod/India | A533808 | 12/1/1993 | Long | Stainless |
| India | Welded Carbon Steel Pipe & Tube/India | A533502 | 5/12/1986 | Pipe and Tube | Carbon/Alloy |
| India | Welded Stainless Pressure Pipe/India | A533867 | 11/17/2016 | Pipe and Tube | Stainless |
| India | Welded Stainless Pressure Pipe/India (CVD) | C533868 | 11/17/2016 | Pipe and Tube | Stainless |
| Indonesia | Carbon & Alloy Steel Wire Rod/Indonesia | A560815 | 10/29/2002 | Long | Carbon/Alloy |
| Indonesia | Cut-to-Length Carbon-Quality Steel Plate/Indonesia | A560805 | 2/10/2000 | Flat | Carbon/Alloy |
| Indonesia | Cut-to-Length Carbon-Quality Steel Plate/Indonesia (CVD) | C560806 | 2/10/2000 | Flat | Carbon/Alloy |
| Indonesia | Hot-Rolled Carbon Steel Flat Products/Indonesia | A560812 | 12/3/2001 | Flat | Carbon/Alloy |
| Indonesia | Hot-Rolled Carbon Steel Flat Products/Indonesia (CVD) | C560813 | 12/3/2001 | Flat | Carbon/Alloy |
| Indonesia | Steel Concrete Reinforcing Bars/Indonesia | A560811 | 9/7/2001 | Long | Carbon/Alloy |
| Italy | Certain Carbon & Alloy Steel Cut-to-Length Plate/Italy | A475834 | 5/25/2017 | Flat | Carbon/Alloy |

**Steel Antidumping and Countervailing Duty Orders in Effect as of January 11, 2018**

| Country | Product/Country | CaseNo | Order Date | Steel Product Category | Grade |
|---|---|---|---|---|---|
| Italy | Corrosion-Resistant Steel Products/Italy | A475832 | 7/25/2016 | Flat | Carbon/Alloy |
| Italy | Corrosion-Resistant Steel Products/Italy (CVD) | C475833 | 7/25/2016 | Flat | Carbon/Alloy |
| Japan | Carbon & Alloy Seamless Standard, Line & Pressure Pipe (Over 4.5 Inches)/Japan | A588850 | 6/26/2000 | Pipe and Tube | Carbon/Alloy |
| Japan | Carbon & Alloy Seamless Standard, Line & Pressure Pipe (Under 4.5 Inches)/Japan | A588851 | 6/26/2000 | Pipe and Tube | Carbon/Alloy |
| Japan | Certain Carbon & Alloy Steel Cut-to-Length Plate/Japan | A588875 | 5/25/2017 | Flat | Carbon/Alloy |
| Japan | Certain Cold-Rolled Steel Flat Products/Japan | A588873 | 7/14/2016 | Flat | Carbon/Alloy |
| Japan | Certain Hot-Rolled Steel Flat Products/Japan | A588874 | 10/3/2016 | Flat | Carbon/Alloy |
| Japan | Clad Steel Plate/Japan | A588838 | 7/2/1996 | Flat | Carbon/Alloy |
| Japan | Diffusion-Annealed, Nickel-Plated, Flat-Rolled Steel Products/Japan | A588869 | 5/29/2014 | Flat | Carbon/Alloy |
| Japan | Non-Oriented Electrical Steel/Japan | A588872 | 12/3/2014 | Flat | Carbon/Alloy |
| Japan | Stainless Steel Bar/Japan | A588833 | 2/21/1995 | Long | Stainless |
| Japan | Stainless Steel Sheet & Strip In Coils/Japan | A588845 | 7/27/1999 | Flat | Stainless |
| Japan | Stainless Steel Wire Rod/Japan | A588843 | 9/15/1998 | Long | Stainless |
| Japan | Steel Concrete Reinforcing Bar/Japan | A588876 | 7/14/2017 | Long | Carbon/Alloy |
| Japan | Tin Mill Products/Japan | A588854 | 8/28/2000 | Flat | Carbon/Alloy |
| Japan | Welded Large Diameter Line Pipe/Japan | A588857 | 12/6/2001 | Pipe and Tube | Carbon/Alloy |
| Latvia | Steel Concrete Reinforcing Bars/Latvia | A449804 | 9/7/2001 | Long | Carbon/Alloy |
| Malaysia | Welded Stainless Pressure Pipe/Malaysia | A557815 | 7/21/2014 | Pipe and Tube | Stainless |
| Mexico | Carbon & Alloy Steel Wire Rod/Mexico | A201830 | 10/29/2002 | Long | Carbon/Alloy |
| Mexico | Circular Welded Non-Alloy Steel Pipe/Mexico | A201805 | 11/2/1992 | Pipe and Tube | Carbon/Alloy |
| Mexico | Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes/Mexico | A201847 | 9/13/2016 | Pipe and Tube | Carbon/Alloy |
| Mexico | Light-Walled Rectangular Pipe & Tube/Mexico | A201836 | 8/5/2008 | Pipe and Tube | Carbon/Alloy |
| Mexico | Prestressed Concrete Steel Rail Tie Wire/Mexico | A201843 | 6/24/2014 | Long | Carbon/Alloy |
| Mexico | Steel Concrete Reinforcing Bar/Mexico | A201844 | 11/6/2014 | Long | Carbon/Alloy |
| Moldova | Carbon & Alloy Steel Wire Rod/Moldova | A841805 | 10/29/2002 | Long | Carbon/Alloy |
| Moldova | Steel Concrete Reinforcing Bars/Moldova | A841804 | 9/7/2001 | Long | Carbon/Alloy |
| Netherlands | Certain Hot-Rolled Steel Flat Products/Netherlands | A421813 | 10/3/2016 | Flat | Carbon/Alloy |
| Oman | Circular Welded Carbon-Quality Steel Pipe/Oman | A523812 | 12/19/2016 | Pipe and Tube | Carbon/Alloy |
| Pakistan | Circular Welded Carbon-Quality Steel Pipe/Pakistan | A535903 | 12/19/2016 | Pipe and Tube | Carbon/Alloy |
| Poland | Steel Concrete Reinforcing Bars/Poland | A455803 | 9/7/2001 | Long | Carbon/Alloy |
| Romania | Carbon & Alloy Seamless Standard, Line & Pressure Pipe (Under 4.5 Inches)/Romania | A485805 | 8/10/2000 | Pipe and Tube | Carbon/Alloy |
| Russia | Hot-Rolled Flat-Rolled Carbon-Quality Steel Products/Russia | A821809 | 12/24/2014 | Flat | Carbon/Alloy |
| South Africa | Certain Carbon and Alloy Steel Cut-to-Length Plate/S Africa | A791822 | 2/1/2017 | Flat | Carbon/Alloy |
| South Africa | Stainless Steel Plate In Coils/S Africa | A791805 | 5/21/1999 | Flat | Stainless |
| South Africa | Stainless Steel Plate In Coils/S Africa (CVD) | C791806 | 5/11/1999 | Flat | Stainless |
| South Korea | Certain Carbon & Alloy Steel Cut-to-Length Plate/Korea | A580887 | 5/25/2017 | Flat | Carbon/Alloy |
| South Korea | Certain Carbon & Alloy Steel Cut-to-Length Plate/Korea (CVD) | C580888 | 5/25/2017 | Flat | Carbon/Alloy |
| South Korea | Certain Cold-Rolled Steel Flat Products/Korea | A580881 | 9/20/2016 | Flat | Carbon/Alloy |
| South Korea | Certain Cold-Rolled Steel Flat Products/Korea (CVD) | C580882 | 9/20/2016 | Flat | Carbon/Alloy |
| South Korea | Certain Hot-Rolled Steel Flat Products/Korea | A580883 | 10/3/2016 | Flat | Carbon/Alloy |
| South Korea | Certain Hot-Rolled Steel Flat Products/Korea (CVD) | C580884 | 10/3/2016 | Flat | Carbon/Alloy |
| South Korea | Circular Welded Non-Alloy Steel Pipe/S Korea | A580809 | 11/2/1992 | Pipe and Tube | Carbon/Alloy |
| South Korea | Corrosion-Resistant Steel Products/Korea | A580878 | 7/25/2016 | Flat | Carbon/Alloy |
| South Korea | Corrosion-Resistant Steel Products/Korea (CVD) | C580879 | 7/25/2016 | Flat | Carbon/Alloy |
| South Korea | Cut-to-Length Carbon-Quality Steel Plate/S Korea | A580836 | 2/10/2000 | Flat | Carbon/Alloy |
| South Korea | Cut-to-Length Carbon-Quality Steel Plate/S Korea (CVD) | C580837 | 2/10/2000 | Flat | Carbon/Alloy |
| South Korea | Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes/Korea | A580880 | 9/13/2016 | Pipe and Tube | Carbon/Alloy |
| South Korea | Light-Walled Rectangular Pipe & Tube/S Korea | A580859 | 8/5/2008 | Pipe and Tube | Carbon/Alloy |
| South Korea | Non-Oriented Electrical Steel/S Korea | A580872 | 12/3/2014 | Flat | Carbon/Alloy |
| South Korea | Oil Country Tubular Goods/S Korea | A580870 | 9/10/2014 | Pipe and Tube | Carbon/Alloy |
| South Korea | Stainless Steel Sheet & Strip In Coils/S Korea | A580834 | 7/27/1999 | Flat | Stainless |
| South Korea | Stainless Steel Sheet & Strip In Coils/S Korea (CVD) | C580835 | 8/6/1999 | Flat | Stainless |
| South Korea | Stainless Steel Wire Rod/S Korea | A580829 | 9/15/1998 | Long | Stainless |
| South Korea | Welded Astm A-312 Stainless Steel Pipe/S Korea | A580810 | 12/30/1992 | Pipe and Tube | Stainless |
| South Korea | Welded Line Pipe/S Korea | A580876 | 12/1/2015 | Pipe and Tube | Carbon/Alloy |
| Spain | Stainless Steel Bar/Spain | A469805 | 3/2/1995 | Long | Stainless |
| Sweden | Non-Oriented Electrical Steel/Sweden | A401809 | 12/3/2014 | Flat | Carbon/Alloy |
| Taiwan | Certain Carbon & Alloy Steel Cut-to-Length Plate/Taiwan | A583858 | 5/25/2017 | Flat | Carbon/Alloy |
| Taiwan | Circular Welded Carbon Steel Pipes & Tubes/Taiwan | A583008 | 5/7/1984 | Pipe and Tube | Carbon/Alloy |
| Taiwan | Circular Welded Non-Alloy Steel Pipe/Taiwan | A583814 | 11/2/1992 | Pipe and Tube | Carbon/Alloy |
| Taiwan | Corrosion-Resistant Steel Products/Taiwan | A583856 | 7/25/2016 | Flat | Carbon/Alloy |
| Taiwan | Hot-Rolled Carbon Steel Flat Products/Taiwan | A583835 | 11/29/2001 | Flat | Carbon/Alloy |
| Taiwan | Light-Walled Rectangular Welded Carbon Steel Pipe & Tube/Taiwan | A583803 | 3/27/1989 | Pipe and Tube | Carbon/Alloy |
| Taiwan | Non-Oriented Electrical Steel/Taiwan | A583851 | 12/3/2014 | Flat | Carbon/Alloy |
| Taiwan | Non-Oriented Electrical Steel/Taiwan (CVD) | C583852 | 12/3/2014 | Flat | Carbon/Alloy |
| Taiwan | Stainless Steel Plate In Coils/Taiwan | A583830 | 5/21/1999 | Flat | Stainless |
| Taiwan | Stainless Steel Sheet & Strip In Coils/Taiwan | A583831 | 7/27/1999 | Flat | Stainless |
| Taiwan | Stainless Steel Wire Rod/Taiwan | A583828 | 9/15/1998 | Long | Stainless |

**Steel Antidumping and Countervailing Duty Orders in Effect as of January 11, 2018**

| Country | Product/Country | CaseNo | Order Date | Steel Product Category | Grade |
|---|---|---|---|---|---|
| Taiwan | Steel Conrete Reinforcing Bar/Taiwan | A583859 | 10/2/2017 | Long | Carbon/Alloy |
| Taiwan | Welded Astm A-312 Stainless Steel Pipe/Taiwan | A583815 | 12/30/1992 | Pipe and Tube | Stainless |
| Thailand | Hot-Rolled Carbon Steel Flat Products/Thailand | A549817 | 11/29/2001 | Flat | Carbon/Alloy |
| Thailand | Hot-Rolled Carbon Steel Flat Products/Thailand (CVD) | C549818 | 12/3/2001 | Flat | Carbon/Alloy |
| Thailand | Welded Carbon Steel Pipe & Tube/Thailand | A549502 | 3/11/1986 | Pipe and Tube | Carbon/Alloy |
| Thailand | Welded Stainless Pressure Pipe/Thailand | A549830 | 7/21/2014 | Pipe and Tube | Stainless |
| Trinidad & Tobago | Carbon & Alloy Steel Wire Rod/Trinidad & Tobago | A274804 | 10/29/2002 | Long | Carbon/Alloy |
| Turkey | Certain Carbon and Alloy Steel Cut-to-Length Plate/Turkey | A489828 | 2/1/2017 | Flat | Carbon/Alloy |
| Turkey | Certain Hot-Rolled Steel Flat Products/Turkey | A489826 | 10/3/2016 | Flat | Carbon/Alloy |
| Turkey | Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes/Turkey | A489824 | 9/13/2016 | Pipe and Tube | Carbon/Alloy |
| Turkey | Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes/Turkey (CVD) | C489825 | 9/13/2016 | Pipe and Tube | Carbon/Alloy |
| Turkey | Light-Walled Rectangular Pipe & Tube/Turkey | A489815 | 5/30/2008 | Pipe and Tube | Carbon/Alloy |
| Turkey | Oil Country Tubular Goods/Turkey | A489816 | 9/10/2014 | Pipe and Tube | Carbon/Alloy |
| Turkey | Oil Country Tubular Goods/Turkey (CVD) | C489817 | 9/10/2014 | Pipe and Tube | Carbon/Alloy |
| Turkey | Steel Concrete Reinforcing Bar/Turkey | A489829 | 7/14/2017 | Long | Carbon/Alloy |
| Turkey | Steel Concrete Reinforcing Bar/Turkey (CVD) | C489819 | 11/6/2014 | Long | Carbon/Alloy |
| Turkey | Steel Concrete Reinforcing Bar/Turkey (CVD) | C489830 | 7/14/2017 | Long | Carbon/Alloy |
| Turkey | Welded Carbon Steel Pipe & Tube/Turkey | A489501 | 5/15/1986 | Pipe and Tube | Carbon/Alloy |
| Turkey | Welded Carbon Steel Pipe & Tube/Turkey (CVD) | C489502 | 3/7/1986 | Pipe and Tube | Carbon/Alloy |
| Turkey | Welded Line Pipe/Turkey | A489822 | 12/1/2015 | Pipe and Tube | Carbon/Alloy |
| Turkey | Welded Line Pipe/Turkey (CVD) | C489823 | 12/1/2015 | Pipe and Tube | Carbon/Alloy |
| Ukraine | Hot-Rolled Carbon Steel Flat Products/Ukraine | A823811 | 11/29/2001 | Flat | Carbon/Alloy |
| Ukraine | Steel Concrete Reinforcing Bars/Ukraine | A823809 | 9/7/2001 | Long | Carbon/Alloy |
| United Arab Emirates | Circular Welded Carbon-Quality Steel Pipe/United Arab Emirates | A520807 | 12/19/2016 | Pipe and Tube | Carbon/Alloy |
| United Kingdom | Certain Cold-Rolled Steel Flat Products/United Kingdom | A412824 | 9/20/2016 | Flat | Carbon/Alloy |
| United Kingdom | Certain Hot-Rolled Steel Flat Products/United Kingdom | A412825 | 10/3/2016 | Flat | Carbon/Alloy |
| Vietnam | Oil Country Tubular Goods/Vietnam | A552817 | 9/10/2014 | Pipe and Tube | Carbon/Alloy |
| Vietnam | Welded Stainless Pressure Pipe/Vietnam | A552816 | 7/21/2014 | Pipe and Tube | Stainless |

**As of January 11, 2018, there are 164 AD/CVD orders in place on steel, with 28 against China.**

**Ongoing Steel Investigations**

| Country | Product/Country |
|---|---|
| Belarus | Carbon and Alloy Steel Wire Rod/Belarus |
| Italy | Carbon and Alloy Steel Wire Rod/Italy |
| Italy | Carbon and Alloy Steel Wire Rod/Italy (CVD) |
| South Korea | Carbon and Alloy Steel Wire Rod/South Korea |
| Russia | Carbon and Alloy Steel Wire Rod/Russia |
| South Africa | Carbon and Alloy Steel Wire Rod/South Africa |
| Spain | Carbon and Alloy Steel Wire Rod/Spain |
| Turkey | Carbon and Alloy Steel Wire Rod/Turkey |
| Turkey | Carbon and Alloy Steel Wire Rod/Turkey (CVD) |
| Ukraine | Carbon and Alloy Steel Wire Rod/Ukraine |
| United Arab Emirates | Carbon and Alloy Steel Wire Rod/UAE |
| United Kingdom | Carbon and Alloy Steel Wire Rod/United Kingdom |
| China | Cold-Drawn Mechanical Tubing/PRC |
| China | Cold-Drawn Mechanical Tubing/PRC (CVD) |
| Germany | Cold-Drawn Mechanical Tubing/Germany |
| India | Cold-Drawn Mechanical Tubing/India |
| India | Cold-Drawn Mechanical Tubing/India (CVD) |
| Italy | Cold-Drawn Mechanical Tubing/Italy |
| South Korea | Cold-Drawn Mechanical Tubing/South Korea |
| Switzerland | Cold-Drawn Mechanical Tubing/Switzerland |

**As of January 11, 2018, there are 20 ongoing AD/CVD investigations on steel products.**

**Global Excess Capacity in Steel Production**

The excess capacity situation for steel is a global problem, and steel-producing nations have committed, in principle, to work together on possible solutions. In December 2016, G20 economies and interested Organization for Economic Cooperation and Development (OECD) members formally launched the Global Forum on Steel Excess Capacity (Global Forum), a multilateral effort mandated by G20 Leaders during the September 2016 Hangzhou Summit to enhance communication and cooperation and to take effective steps to address the global excess capacity challenge so as to enhance market function and encourage adjustment. The Global Forum brings together more than 30 economies representing more than 93 percent of the world's steel production.

Consistent with the G20 Leaders' mandate for increased information sharing, one of the first tasks of the Global Forum was to develop a mechanism to exchange data on crude steel capacity, as well as subsidies and other government supports that contribute to steel excess capacity. All 33 members of the Global Forum participated to some degree in the information-sharing exercise, but much work remains, including with respect to the completeness, review and analysis of information provided.

The Hangzhou mandate was highlighted at the G20 Hamburg Summit in July 2017 where Leaders called on members to rapidly develop concrete policy solutions that reduce excess steel capacity and to produce a substantive report with such solutions by November 2017.

In response to both the Hangzhou and Hamburg mandates, the Global Forum developed a set of six principles to serve as the basis for policy action by members which include, among other measures, enhancing market function by refraining from market-distorting subsidies and government support measures, fostering a level playing field in the steel industry and ensuring market-based outcomes, as well as encouraging adjustment. With these principles as guidance, the Global Forum outlined a series of recommendations for concrete policy solutions to reduce excess capacity and enhance market function in the steel sector. These voluntary policy recommendations are contained in the report concluded at a November 30, 2017

Ministerial meeting of the Global Forum and are intended to enhance market function and encourage adjustment and include the removal of market-distorting subsidies and other types of support by governments and government-related entities, whether or not such measures are prohibited by WTO rules.

While the report provides helpful policy prescriptions, it does not highlight the lack of true market reforms in the steel sector[1].  China points to its targets to reduce 100 – 150 MMT of crude steelmaking capacity from 2016 to 2020, and that since 2016, it has reduced over 100 MMT of crude steel capacity, with 65 MMT reduced in 2016 alone and more expected in 2017.  The setting of capacity reduction targets is not a long-term response to the crisis.  Meaningful progress can only be achieved by removing subsidies and other forms of government support so that markets can function properly.  In addition, state-owned enterprises and private steelmakers should be treated equally.

The Office of the U.S. Trade Representative Statement on Report of Global Forum on Steel Excess Capacity highlighted concerns about the report. It stated, "The Report issued today contains many helpful policy prescriptions, but it fails to highlight the recurring failure of some countries to implement true market-based reforms in the steel sector.  In addition, the Report does not contain complete information regarding market-distorting measures in certain econo does not set forth a clear pathway for filling such data gaps.  The Report erroneously suggests that simply setting capacity reduction targets has been an effective response to the crisis, when in fact meaningful progress can only be achieved by removing subsidies and other forms of state support and letting markets do their work."[2]

Next steps for the Global Forum include additional information and data exchange, as well as three meetings in 2018, with Argentina (the next G20 President)

[1] Global Forum on Steel Excess Capacity (GFSEC) report to leaders is available at: http://www.bmwi.de/Redaktion/EN/Downloads/global-forum-on-steel-excess-capacity-report.pdf?__blob=publicationFile

[2] The Office of the U.S. Trade Representative. (2017). USTR Statement on Report of Global Forum on Steel Excess Capacity [Press release]. Retrieved from https://ustr.gov/about-us/policy-offices/press-office/press-releases/2017/november/ustr-statement-report-global-forum

as Chair, to further discuss, review and assess this information.  To be successful, this exercise will need to contain complete information regarding market-distorting measures from all economies and a clear path forward for implementation of true market-based reforms.

China in particular has long recognized it has a growing overcapacity problem and has announced many policy initiatives and bilateral commitments to reduce its steel capacity. The massive growth in China's steel production capacity illustrates the lack of implementation of such policies.  For example, as early as 2003, the Chinese State Council issued a Circular aimed at stopping blind investment in steel and other industries in an effort to address surplus capacity.[3]  Six years and several policies later, China's steel capacity had increased from 2003 levels of an estimated 278 million metric tons (mmt) to over 488 mmt.  By 2009, China's steel capacity had reached an estimated 717 mmt when China's State Council Notice on Suppressing Capacity sought to reduce the growth of China's raw steel output.[4]

By 2011, China's steel capacity had reached estimates exceeding 863 mmt. Then again, in 2013, China's capacity increased to an estimated 1.106 billion metric tons (bmt), which was the same year that China released the State Council Notice to Resolve Serious Overcapacity.[5]  In 2016, China's steel capacity increased again to estimates of more than 1.159 bmt when China introduced another measure: its 2016 State Council Opinion on Resolving Excess Capacity. In sum, China's steel production capacity has grown from 278 mmt in 2003 to 1.12 bmt in 2016, more than 300 percent (*see* Figure L1).

China's bilateral commitments regarding excess capacity have likewise been disappointing. For example, in the 2014 U.S. – China Strategic and Economic Dialogue, China committed to establish mechanisms that strictly prevent the

---

[3]   Circular of the General Office of the State Council on Transmitting and Issuing Several Opinions of the National Development and Reform Commission and Other Authorities on Curbing Irrational Investment in Steel, Electrolytic Aluminum and Cement Industries (Guo Ban Fa [2003] No.103).

[4]   Guo Fa [2009] No. 38

[5]   Guo Fa [2013] No. 41.

expansion of crude steelmaking capacity and that are designed to achieve major progress in addressing excess steel production over the next five years. However, three years into that timeframe, China's steel capacity increased from estimates of over 1.140 bmt to over 1.159 bmt. China exports 107 mmt into other markets creating global overcapacity that results in other countries making concessionary exports, including to the United States.



**Figure L1. Timeline: Major Chinese Government Policy Statements about Steel Expansion Concerns vs. Actual Growth in Steel Capacity**

Source: U.S. Department of Commerce, Enforcement and Compliance, using OECD steel capacity figures and estimates

Excess steelmaking in China is a dire concern globally. Until recently, China's steel production grew at double-digit rates. China produced 808 mmt of steel in 2016 (up 1.2 percent from its production of 799 mmt in 2015). China's share of world production, at 50 percent, is larger than the combined production of the United States, the European Union (EU), Russia, and Japan, which historically were the largest producers of steel. Additionally, China's exports of steel reached a record peak in 2015, at 110 million metric tons, before declining slightly (-3.1 percent to 106 mmt) in 2016. China's 2015 exports represented an increase of 20 percent over

2014 and were 35 percent more than the total annual production of the United States in 2015 (78.9 mmt).

The financial situation of Chinese steel producers exacerbates the substantial overcapacity caused by Chinese government investment. Half of China's steel producers reported losses totaling 64 billion yuan (approximately $9 billion) in 2014 with steel prices falling by 32 percent in 2015.[6]  The Chinese steel industry received most of the stimulus funding and did well until about 2012.[7]  "Growth in steel demand across China has been slowing since 2011, leading to pledges by officials to cut capacity….Officials said that efforts last year to cut capacity had exceeded targets set for the year.  But the research by Custeel suggest that many of the cuts were to plants that had already been idle.  As a result, only 23 million metric tons of capacity was actually closed, the report said."[8]

One large Chinese steel group has signed a debt-to-equity swap agreement with China's state-owned Industrial and Commercial Bank of China that covers 10 billion yuan ($1.45 billion) in total.[9]  Since China's policymakers re-launched the debt-for-equity scheme at the end of last year for its struggling firms, the country's banks have pledged to sign deals with state-owned enterprises to ease their burden.

As Chinese exports flood the global market, the global steel industry has become increasingly concerned about the resulting market distortions. As China exports its excess capacity into other markets, it creates global overcapacity that results in other countries making concessionary exports to the United States and other countries. Over the past few years, the United States has experienced the largest impact of the glut of excess capacity, including loss in domestic market share,

---

[6] "China's Economic Slowdown: China's Steel Sector Hit by Losses," Christian Shepherd and Tom Mitchell, The Financial Times, February 1, 2016, https://www.ft.com/content/338b4394-c8aa-11e5-be0b-b7ece4e953a0

[7] Ruohong, Fan.  "Slower Economy a Crucible for Nation's Steel Industry."  CAIXIN. N.p., 15 Feb. 2016.  Web.

[8] Greenpeace Links Beijing's Air Pollution Surge to Steel Factories - The New York Times; https://www.nytimes.com/2017/02/16/world/asia/beijing-air-pollution-china-steel-production.html?smprod=nytcore-iphone&smid=nytcore-iphone-share&_r=0

[9] Reuters, "China's Angang Group in debt-to-equity swap with Industrial Bank -Xinhua," April 2017, http://mobile.reuters.com/article/idUSL3N1HD26Y

lower capacity utilization, closures, and lay-offs, which numbered more than 14,100 employees in the United States between 2015 and 2016. There is also excess capacity elsewhere in Asia and in Europe, but China alone added roughly three-quarters of the global increase in capacity from 2000-2015.

Based on publicly available information about steel capacity additions collected by the OECD, Asia has seen a 5.3 percent increase in capacity since 2014. Commonwealth of Independent States (CIS) has seen a 2.8 percent increase, Latin America increased 6.8 percent, Africa increased 5.9 percent, and the Middle East has seen a 31.4 percent increase in capacity since 2014. There has been some general analysis done showing that the EU, CIS, and Asia exporting regions have among the highest levels of total excess steelmaking capacity. The definition used to measure excess capacity in this case was the difference between capacity and demand for each region.[10]

Determining the precise level of capacity in each country is difficult for a number of reasons, including industry concerns about proprietary data. One of the objectives of the Global Forum is to capture capacity levels by both plant and country to provide a basis for understanding the magnitude of this global problem. Publicly-available sources identify new capacity developments globally, with Asia leading the way by three or more orders of magnitude (*see* Figure L2).[11]

---

[10] OECD, "Capacity Developments in the World Steel Sector," 2016, http://www.oecd.org/sti/ind/Capacity-Developments-Steel-Industry.pdf

[11] http://www.oecd.org/industry/ind/82nd_OECD_Steel_Committee_Hokuto_Otsuka_Capacity.pdf p. 4



China's exports alone exceed U.S. steel production, and China's excess capacity is several times larger than the U.S. market. In China, the increase in steel capacity is occurring simultaneously with a major build up in military spending. China's steel exports have often been found to be unfairly traded, and the U.S. industry has obtained relief for many unfairly traded products via antidumping and countervailing duty investigations against China and other countries.[12]

The partial success of trade cases is demonstrated by the fact that China's ranking in every product category of U.S. imports has declined from 2006 to 2016 but has been replaced by other sources.  This means that China has had to ship more to markets other than the United States, thereby depressing them.   However, antidumping and countervailing duty orders alone cannot address the broader structural economic harm caused by global excess capacity, which is a major cause of relentless import pressure.

---

[12]  U.S. companies have 164 outstanding antidumping and countervailing duty orders on imported steel, 28 of which are against China. Chinese and other producers and exporters often find ways to evade the duties by transshipping through other countries and other techniques.

The largest share of China's steel exports are sent to its neighbors in Asia. Roughly 40 percent of those 2016 steel exports went to South Korea, Vietnam, Philippines, India, and Thailand. An unknown portion of these are further processed in those countries and eventually shipped to the United States. The peak year for Chinese steel exports to the United States was in 2006 when over 10 percent were exported to the United States. In 2015, China ranked 7th (after Canada, Brazil, Korea, Turkey, Mexico, and Japan) as a source of U.S. steel imports. In 2016, China slipped to 9th place behind Russia and Germany as a source of U.S. steel imports.

While a small percentage of Chinese steel exports were shipped to the United States, Chinese steel exports to other countries, such as Vietnam and Thailand, expanded rapidly. At the same time that exports from those countries, and to a lesser extent Malaysia and Indonesia, to the United States significantly increased.

In 2006, China exported over 50 million metric tons of steel globally. The United States received more than five million metric tons of steel from China in 2006, or 10 percent of China's global steel exports. In 2016, China exported over 106 million metric tons of steel globally. China sent 835,637 metric tons of steel to the United States in 2016, or 0.8 percent of China's global steel exports. This amounted to an 84 percent decline in U.S. imports from China from 2006 to 2016 (*see* Figures L3 and L4).

In 2006, China exported more than three million metric tons of steel to Vietnam, or 6.5 percent of China's global steel exports. In 2016, China exported more than 11 million metric tons of steel to Vietnam, or 10.9 percent of China's global steel imports. This amounted to a 250 percent increase in China's exports to Vietnam from 2006 to 2016.

In 2006, China exported more than two million metric tons of steel to Thailand, or 4.5 percent of China's global steel exports.  In 2016, China exported over six million metric tons of steel to Thailand, or 5.8 percent of China's global steel exports.  This amounted to a 171 percent increase in China's exports Thailand from 2006 to 2016.



**Source: IHS Global Trade Atlas**



**Source: IHS Global Trade Atlas**

# EXHIBIT 5

# THE EFFECT OF IMPORTS OF IRON ORE AND SEMI-FINISHED

# STEEL ON THE NATIONAL SECURITY

## An Investigation Conducted Under Section 232 of the
## Trade Expansion Act of 1962, as amended



**U.S. Department of Commerce**
**Bureau of Export Administration**
**October 2001**

## TABLE OF CONTENTS

I.      **EXECUTIVE SUMMARY**     **1**

II.     **LEGAL FRAMEWORK**     **3**

     A.     **SECTION 232 REQUIREMENTS AND PROCEDURES**     **3**

     B.     **DISCUSSION**     **4**

III.     **INVESTIGATION PROCESS**     **7**

     A.     **REQUEST FOR INVESTIGATION**     **7**

     B.     **INITIATION OF INVESTIGATION**     **8**

     C.     **REQUEST FOR PUBLIC COMMENTS**     **8**

     D.     **PUBLIC HEARINGS**     **8**

     E.     **INDUSTRY SURVEYS AND SITE VISITS**     **9**

     F.     **INTERAGENCY CONSULTATION**     **9**

IV.     **PRODUCT SCOPE OF THE INVESTIGATION**     **9**

     A.     **IRON ORE**     **9**

     B.     **SEMI-FINISHED STEEL**     **11**

V.     **FINDINGS OF THE INVESTIGATION**     **12**

     A.     **IRON ORE AND SEMI-FINISHED STEEL ARE IMPORTANT TO U.S. NATIONAL SECURITY**     **12**

          1.     **National Defense Requirements**     **13**

          2.     **Iron Ore and Semi-Finished Steel Requirements of Critical Industries**     **14**

          3.     **Effect of the Events of September 11, 2001**     **17**

          4.     **Summary**     **17**

**B.   U.S. NATIONAL SECURITY IS NOT DEPENDENT ON IMPORTS OF IRON ORE OR SEMI-FINISHED STEEL**   **18**

   **1.   U.S. Industry Produces Sufficient Iron Ore and Semi-Finished Steel to Satisfy National Security Requirements**   **18**

   **2.   There are Sufficient "Human Resources, Products, Raw Materials and Other Supplies and Services" Necessary to the Domestic Production of Iron Ore and Semi-Finished Steel**   **24**

   **3.   Growth of the Iron Ore and Steel Industries is Not Necessary to Ensure the National Security**   **26**

   **4.   Domestic Production of Finished Steel Necessary to Meet National Security Requirements is Not Dependent Upon Imports of Iron Ore or Semi-Finished Steel, and in any Event, Imports of Iron Ore and Semi-Finished Steel are from Safe and Diverse Suppliers**   **27**

**C.   IMPORTS OF IRON ORE AND SEMI-FINISHED STEEL DO NOT FUNDEMENTALLY THREATEN TO IMPAIR THE CAPABILITY OF THE U.S. IRON ORE AND SEMI-FINISHED STEEL INDUSTRIES TO SATISFY NATIONAL SECURITY REQUIREMENTS**   **28**

   **1.   Overview of Imports of Iron Ore**   **28**

   **2.   Overview of Imports of Semi-Finished Steel**   **31**

   **3.   Imports of Iron Ore and Semi-Finished Steel Do Not Fundamentally Threaten to Impair the Capability of the U.S. Iron Ore and Semi-Finished Steel Industries to Satisfy National Security Requirements**   **37**

**VI.   RECOMMENDATION**   **37**

**ANNEX 1   REQUEST TO INITIATE INVESTIGATION**   **A1-1**

**ANNEX 2   SUMMARY OF CONGRESSIONAL AND INDUSTRY SUBMISSIONS AND TESTIMONY**   **A2-1**

**ANNEX 3   APPLICABLE DEFENSE FEDERAL ACQUISITION REGULATION SUPPLEMENT**   **A3-1**

## I.   <u>EXECUTIVE SUMMARY</u>

This report summarizes the findings of an investigation conducted by the Secretary of Commerce ("Secretary") pursuant to Section 232 of the Trade Expansion Act of 1962, as amended, 19 U.S.C. §1862 ("Section 232"), into the effects of imports of iron ore and semi-finished steel on the national security of the United States.  The conclusions of this report are as follows:

(1)    Iron ore and semi-finished steel are important to U.S. national security.  Specifically, iron ore and semi-finished steel – as raw and semi-finished materials consumed by certain segments of the steel industry in the production of finished steel products – are needed to satisfy the requirements for finished steel products of (i) the U.S. Department of Defense ("DOD"), and (ii) certain industries that are critical to the minimum operations of the U.S. economy and government.

(2)    Imports of iron ore and semi-finished steel could threaten to impair U.S. national security in either of two ways: (i) through excessive domestic dependency on unreliable foreign suppliers, or (ii) if such imports fundamentally threaten to impair the capability of the U.S. iron ore and semi-finished steel industries to satisfy national security requirements.

(3)    In fact, however, there is no probative evidence that imports of iron ore or semi-finished steel threaten to impair U.S. national security.  There is neither evidence showing that the United States is dependent on imports of iron ore or semi-finished steel, nor evidence showing that such imports fundamentally threaten the ability of domestic producers to satisfy national security requirements.  Specific findings supporting this conclusion include the following:

- National defense requirements, as communicated to the Department of Commerce ("Department") by DOD, for finished steel – and thus for iron ore and semi-finished steel as inputs – are very low and likely to remain flat over the next five years. DOD's current and projected demand for iron ore and steel can be readily satisfied by domestic production.  Moreover, DOD already has established domestic preferences that apply to essentially all of the steel used in weapons systems; accordingly, no weapons system is dependent upon foreign steel.  DOD has concluded that "imports of iron ore and semi-finished steel do not currently affect the national security when assessed in terms of the ability to meet defense demands."

1

- The demand of critical industries for iron ore and semi-finished steel can be readily satisfied by domestic production, even assuming that all such demand were necessary to preserve the national security (which is not the case).

- Consideration of other relevant factors, as dictated by Section 232, does not demonstrate that imports of iron ore or semi-finished steel threaten to impair U.S. national security.  U.S. industry currently has, and anticipates continuing to have in the future, sufficient human resources, products, raw materials, and other supplies and services needed for the production of iron ore and semi-finished steel.

- Imports of iron ore and semi-finished steel are from diverse and "safe" foreign suppliers, with the largest suppliers of these products being U.S. allies in the Western Hemisphere (Canada, Mexico, and Brazil).

- Although domestic manufacturers of iron ore and semi-finished steel clearly are enduring substantial economic hardship, there is no evidence that imports of these items (which account for approximately 20 and 7 percent of U.S. iron ore and semi-finished steel consumption, respectively) fundamentally threaten to impair the capability of U.S. industry to produce the quantities of iron ore and semi-finished steel needed to satisfy national security requirements, a modest proportion of total U.S. consumption.

- These conclusions take into account the campaign against terrorism resulting from the events of September 11, 2001, and the requirements of related military operations.

Accordingly, the Department is unable to conclude that imports of iron ore and semi-finished steel threaten to impair the national security of the United States, or to recommend to the President that he take action under Section 232 to adjust the level of imports.

## II.   **LEGAL FRAMEWORK**

This report is produced pursuant to, and in satisfaction of, the obligations of the Secretary under Section 232.

### A.   **SECTION 232 REQUIREMENTS AND PROCEDURES**

Section 232 provides the Secretary[1] with the authority to conduct investigations to determine the effects on the national security of the United States of imports of any article.  It authorizes the Secretary to conduct an investigation if requested by the head of any department or agency, upon application of an interested party, or upon his own motion.  See 19 U.S.C. § 1862(b)(1)(A)(2001).

Once an investigation has been initiated, Section 232 mandates that the Secretary provide notice to the Secretary of Defense that such an investigation has been initiated.  Section 232 also requires the Secretary to do the following:

1.   "Consult with the Secretary of Defense regarding the methodological and policy questions raised in [the] investigation;"

2.   "Seek information and advice from, and consult with, appropriate officers of the United States;" and

3.   "If it is appropriate, hold public hearings or otherwise afford interested parties an opportunity to present information and advice relevant to such investigation."[2]

See 19 U.S.C. § 1862(b)(2)(A)(i)-(iii).  In conducting the investigation, Section 232 permits the Secretary to request that the Secretary of Defense provide an assessment of the defense requirements of the article that is the subject of the investigation.  See 19 U.S.C. § 1862(b)(2)(B).

Upon completion of a Section 232 investigation, the Secretary is required to submit a report to the President no later than 270 days after the date on which the investigation was initiated.  See 19 U.S.C. § 1862(b)(3)(A).  The required report must:

1.   Set forth "the findings of the investigation with respect to the effect of the importation of the article in such quantities or under such circumstances upon the national security;"

---

[1]   Until 1979, authority for conducting Section 232 investigations resided with the Secretary of the Treasury.  On December 3, 1979, this authority was transferred to the Secretary of Commerce where it remains today.  See Reorganization Plan No. 3 of 1979, 44 Fed. Reg. 69,273 (Dec. 3, 1979).  Since the transfer (and including the present investigation), the Department has initiated 13 investigations pursuant to Section 232.  Only two of these 13 investigations have resulted in the imposition of any import-adjusting measures.

[2]   Department regulations (i) set forth additional authority and specific procedures for such input from interested parties, see 15 C.F.R. §§ 705.7 and 705.8, and (ii) provide that the Secretary may vary or dispense with those procedures "in emergency situations, or when in the judgment of the Department, national security interests require it." Id., § 705.9.

2.        Set forth, "based on these findings, the recommendations of the Secretary for action or inaction under this Section;" and

3.        "If the Secretary finds that such article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, . . . so advise the President."

See 19 U.S.C. § 1862(b)(3)(A).[3]  All unclassified and non-proprietary portions of the report submitted by the Secretary to the President must be published.

Within 90 days after receiving a report in which the Secretary finds that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the President shall:

1.        "Determine whether the President concurs with the finding of the Secretary"; and

2.        "If the President concurs, determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust imports of the article and its derivatives so that such imports will not threaten to impair the national security."

See 19 U.S.C. § 1862(c)(1)(A).

## B.    <u>DISCUSSION</u>

As set forth above, Section 232 authorizes the Secretary to investigate the effects of imports of an item or items on the national security of the United States and determine whether those imports threaten to impair the national security.  Implicit in this mandate is the need to resolve three issues:  (i) what constitutes "national security"?; (ii) what "effects of imports" should be considered?; and (iii) when do those imports "threaten to impair" the national security?[4]

---

[3]  The specific duty to "advise" arises only if the Secretary makes a "positive" finding (<u>i.e.</u>, that imports of the item threaten to impair national security).  <u>See</u> 19 U.S.C. § 1862(b)(3)(A).  If the Secretary does not or cannot make that finding, the Secretary is not required by Section 232 to "so advise the President."

[4]  An additional issue on which Section 232 provides no specific direction is the meaning of the phrase "under such circumstances." (As noted above, the statute requires the Secretary to present "the findings of the investigation with respect to the effect of the importation of the article in such quantities or <u>under such circumstances</u> upon the national security" and to advise the President "[i]f the Secretary finds that the article is being imported into the United States in such quantities or <u>under such circumstances</u> as to threaten to impair the national security." (Emphases added.))  Some guidance on the issue exists in a statement in the House Report for the Trade Agreements Extension Act (a predecessor statute to the Trade Expansion Act of 1962) in 1958:

The Committee Amendment states that the circumstances under which imports are entering, <u>which include their character and use</u>, should be also studied.

Trade Agreements Extension Act of 1958, H.R. Rep. No. 85-1761 at 15 (1958) (emphasis added).  Further, the U.S. Supreme Court noted additional legislative history in its decision in <u>Federal Energy Administration v. Algonquin</u>, and cited the following statement concerning the term "under such circumstances":

1. *What constitutes "national security"?*  Neither Section 232 nor the relevant Department regulations (15 C.F.R. Pt. 705) contain a definition of the term "national security." In the absence of such a definition, it is incumbent upon the Secretary to employ a definition that is consistent with the statute and the intent of the drafters, and reasonable under the circumstances.

It is clear that, at a minimum, an assessment of the United States' "national security" requirements must include a military or "national defense" component.  This could range from the military defense of the U.S. homeland to, more expansively, the ability to project U.S. military capabilities globally.  For the purpose of this study, we have adopted a broad definition of national defense.  As set forth in Section V below, we have included DOD's total projected needs for finished steel, as communicated to the Department by DOD (and, based thereon for, iron ore and semi-finished steel as inputs).

In addition to the satisfaction of national defense requirements, the term "national security" can be interpreted more broadly to include the general security and welfare of certain industries, beyond those necessary to satisfy national defense requirements, that are critical to the minimum operations of the economy and government ("critical industries").  To be sure, a definition of national security that includes critical industries is not dictated by statute.  Previous Section 232 investigations have adopted a more limited definition of national security.  See, e.g., U.S. Department of Commerce, The Effects on the National Security of Imports of Crude Oil and Refined Petroleum Products (1999) (looking only at DOD requirements when assessing national security needs).  Moreover, as the Supreme Court has made clear, there are limits to how broadly the term "national security" can be defined.  See Fed. Energy Admin. v. Algonquin, 426 U.S. 548, 569 (1976) (stating that "national security" must be interpreted more narrowly than "the national interest").

However, a broader interpretation of "national security" – one that encompasses the needs of critical industries – is not without support.  For example, Section 232 directs the Secretary to "recognize the close relation of the economic welfare of the Nation to our national security."  See 19 U.S.C. § 1862(d).  Moreover, the legislative history of Section 232, including the legislative history of predecessor provisions, indicates that some members of Congress intended that "national security" should encompass certain domestic economic concerns, in addition to national defense concerns.  See e.g. S. Rep. No. 85-1838, at 12 (1958).

Accordingly, as described in greater detail in Section V, for purposes of this investigation, we have included in "national security" the requirements of certain critical industries for finished steel and based thereon, for iron ore and semi-finished steel as inputs.

---

["Under such circumstances"] reflects Congress' judgment that "not only the quantity of imports . . . but also the circumstances under which they are coming in:  their use, their availability, their character" could endanger the national security and hence should be a potential basis for Presidential action.

426 U.S. 548, 561 (1976), citing 104 Cong. Rec. 10,542-10,543 (1958).  By including such language in the Trade Expansion Act of 1962, Congress apparently intended to permit the Secretary to consider not only the quantity of imports of an article, but also its character, use, and availability, along with other relevant factors and any potential effects on the national security.

2. *What "effects of imports" should be considered?*  Section 232 requires the Secretary to assess the "effects of imports" and to determine whether imports "threaten to impair" the national security.  Section 232 does not articulate precisely what "effects" must be considered nor does it articulate when or how imports may "threaten to impair" the national security.  Accordingly, as with "national security," it is incumbent upon the Secretary to employ definitions that are consistent with the statute and the legislative intent, and that are reasonable under the circumstances.

Although Section 232 does not define what "effects" are relevant, it does instruct the Secretary, "in light of the requirements of national security and without excluding other relevant factors," to "give consideration" to:

- "domestic production needed for projected national defense requirements;"

- "the capacity of domestic industries to meet such requirements;"

- "existing and anticipated availabilities of the human resources, products, raw materials, and other supplies and services essential to the national defense;"

- "the requirements of growth of such industries and such supplies and services including the investment, exploration, and development necessary to assure such growth;" and

- "the importation of goods in terms of their quantities, availabilities, character, and use as those affect such industries and the capacity of the United States to meet national security requirements."

See 19 U.S.C. § 1862(d).  Section 232 also directs the Secretary to recognize the "close relation of the economic welfare of the Nation to our national security" and directs the Secretary to "take into consideration":

- "the impact of foreign competition on the economic welfare of individual domestic industries;" and

- "any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products."

See 19 U.S.C. § 1862(d).  In assessing the "effects of imports" of iron ore and semi-finished steel on national security, this investigation has considered all of the factors listed above.  Findings with respect to the factors listed above can be found in Section V.

3. *When do imports "threaten to impair" the national security?*  Given this list of statutorily mandated "considerations" and the statute's broad intent, imports can reasonably be found to "threaten to impair" the national security in either of two ways.  First, imports can threaten to impair U.S. national security if the United States is excessively dependent on imports from unreliable or unsafe sources, and thereby is vulnerable to a supply disruption.  This concept

of "threaten to impair" has been adopted in previous Section 232 cases, and has figured especially prominently in those cases assessing the effect of imports of crude oil and refined petroleum products. See, e.g., U.S. Department of Commerce, The Effect on the National Security of Imports of Crude Oil and Refined Petroleum Products (1999); U.S. Department of Commerce, The Effect of Imports of Crude Oil and Refined Petroleum Products on the National Security (1994); U.S. Department of Commerce, The Effect of Crude Oil and Refined Petroleum Product Imports on the National Security (1988).

Second, imports can threaten to impair U.S. national security if they fundamentally threaten the viability of U.S. industries and resources needed to produce domestically goods and services necessary to ensure U.S. national security. This interpretation also is consistent with previous Section 232 reports. See, e.g., U.S. Department of Commerce, The Effect of Imports of Gears and Gearing Products on the National Security (1992). Accordingly, for purposes of this analysis, we have investigated whether imports of iron ore and semi-finished steel threaten to impair U.S. national security either: (i) by fostering U.S. dependence on unreliable or unsafe imports; or (ii) by fundamentally threatening the ability of U.S. domestic industries to satisfy national security needs.

It should be noted that, on each of a series of issues related to the scope of the required analysis,[5] the Department has interpreted the requirements of Section 232 in the manner most likely to result in a positive finding. For example, we have adopted a broader definition of national security than is compelled by statute; we have based our assessment of U.S. iron ore and semi-finished steel requirements on DOD's and critical industries' total requirements (nothwithstanding the fact that a substantial portion of these needs are likely not integral to national security); and we have considered how imports might "threaten to impair" national security in a very broad sense.

## III.    INVESTIGATION PROCESS

### A.    REQUEST FOR INVESTIGATION

On January 16, 2001, Representative James Oberstar (Minnesota) and Representative Bart Stupak (Michigan) requested that the Secretary initiate an investigation pursuant to Section 232 to determine the effects on the national security of imports of iron ore and semi-finished steel. Representatives Oberstar and Stupak stated in their request that imports of iron ore and semi-finished steel threaten the U.S. iron ore mines and the integrated U.S. steel sector, industries they view as critical to national security. A copy of their request is reproduced at Annex 1.

In their request, Representatives Oberstar and Stupak stated that U.S. iron ore producers have been forced to reduce production dramatically due to record levels of semi-finished steel imports. Representatives Oberstar and Stupak estimated that each ton of imported semi-finished steel utilized in domestic steel production displaces 1.3 tons of iron ore pellet consumption. Representatives Oberstar and Stupak also noted that the January 2001 closure of the LTV Steel

---

[5]  Given the nature of the products at issue in this investigation and this report's conclusion, these interpretations are appropriate in this case. However, they may not be appropriate (and, therefore, will not necessarily be adopted) in future Section 232 investigations.

Mining Company in Hoyt Lakes, Minnesota had resulted in the elimination of 1,400 jobs and eight million tons of annual iron ore production, and that other U.S. iron ore mines had reduced production.

### B.    INITIATION OF INVESTIGATION

In response to the request of Representatives Oberstar and Stupak, on February 1, 2001, the Secretary initiated an investigation under Section 232 to determine the effects on the national security of imports of iron ore and semi-finished steel.  This investigation was undertaken in accordance with Part 705 of the National Security Industrial Base Regulations (15 C.F.R. §§ 700-709).

### C.    REQUEST FOR PUBLIC COMMENTS

On February 6, 2001, the Department invited interested parties to submit written comments, opinions, data, information, or advice relevant to the criteria listed in Section 705.4 of the National Security Industrial Base Regulations (15 C.F.R. § 705.4) as they affect the requirements of national security, including the following:  (1) quantity of the articles subject to the investigation and other circumstances related to the importation of such articles; (2) domestic production needed for projected national defense requirements; (3) the capacity of domestic industries to meet projected national defense requirements; (4) the existing and anticipated availabilities of human resources, products, raw materials, production equipment and facilities, and other supplies and services essential to the national defense; (5) the growth requirements of domestic industries to meet national defense requirements and the supplies and services including the investment, exploration, and development necessary to assure such growth; (6) the impact of foreign competition on the economic welfare of any domestic industry essential to our national security; (7) the displacement of any domestic products causing substantial unemployment, decrease in the revenues of government, loss of investment or specializes skills and productive capacity, or other serious effects; and (8) any other relevant factors that are causing or will cause a weakening of our national economy.  See 66 Fed. Reg. 9,067 (Feb. 6, 2001).

The public comment period ended on May 2, 2001.  The Department received approximately 3,000 written submissions concerning this investigation.  The overwhelming majority of these submissions were letters from residents of northeastern Minnesota or the Upper Peninsula of Michigan, which are the primary iron ore-producing regions within the United States.  A summary of all public comments received is set forth in Annex 2.

### D.    PUBLIC HEARINGS

The Department held two public hearings to elicit further information concerning this investigation – one in Virginia, Minnesota on July 5, 2001, and one in Marquette, Michigan on July 15, 2001.  The Department heard testimony from 63 witnesses at these hearings.  The Department also accepted written submissions through August 17, 2001 from any person, whether or not testifying, as part of the public record of these proceedings.  A summary of the comments received at the public hearings is included in Annex 2.

E.      **INDUSTRY SURVEYS AND SITE VISITS**

The Department sent surveys to approximately 175 U.S. iron ore and semi-finished steel producers and potential consumers.  It received 140 responses; these responses are treated confidentially.  Department staff also conducted visits to sites in California, Michigan, Minnesota, and Wisconsin associated with the production, shipment, and consumption of iron ore and semi-finished steel.

F.      **INTERAGENCY CONSULTATION**

As required by Section 232, the Department consulted with DOD regarding the methodological and policy questions raised in this investigation.  DOD provided an assessment of its projected national defense requirements for the articles under investigation.  The Department also sought information from other agencies.  The Department of Labor provided an assessment of the labor trends in the U.S. iron ore and steel industries.  The Department of Interior's U.S. Geological Survey ("USGS") provided information on trends in the U.S. iron ore industry.

In addition, the Department consulted with other U.S. Government departments and agencies, including the Departments of State, Treasury, and Transportation, the Office of the United States Trade Representative, and the United States International Trade Commission.

IV.     **PRODUCT SCOPE OF THE INVESTIGATION**

Consistent with the initiating request, this investigation was focused on imports of two articles:  (i) iron ore, and (ii) semi-finished steel.  These are, respectively, raw and semi-finished materials consumed by segments of the steel industry as inputs in the production of finished steel.  It is important to note that imports of finished steel mill products, pig iron, coke, direct reduced iron, and steel scrap were not included in the scope of this investigation.

A.      **IRON ORE**

Iron ore is a mineral substance that, when heated in the presence of a reductant, yields metallic iron (Fe).  Iron ore almost always consists of iron oxides, the primary forms of which are magnetite ($Fe_3O_4$) and hematite ($Fe_2O_3$).  Iron ore is the primary source of iron for the world's iron and steel industries.  Iron ore is produced through mining; today it is mined in approximately 50 countries.

Almost all iron ore (98 percent) mined is used in steelmaking.[6]  Specifically, iron ore is the primary source of iron units for the blast furnaces operated by integrated steel mills.  Iron ore

---

[6]  According to the USGS, the remaining 2 percent of iron ore is used in the manufacture of cement, heavy-medium materials, pigments, ballast, agricultural products, or specialty chemicals.

is mixed with coke and limestone and fired in a blast furnace to make molten iron, the first step in the integrated steelmaking process.[7]

Integrated steel mills are one of two sectors in the U.S. steel industry that produce semi-finished steel.  Integrated steel mills are those steel producers that have ironmaking and steelmaking capabilities, as well as the capability to process steel into finished products.  For the most part, integrated steel mills produce raw steel in basic oxygen furnaces ("BOFs") from steel scrap and larger quantities of molten iron, the latter produced as described above.[8]  An integrated steel producer also operates casting, rolling, and other equipment to make semi-finished and, ultimately, finished steel products.

The second sector of the U.S. steel industry that produces semi-finished steel is referred to as "mini-mills."  The key characteristic of mini-mills is their use of electric arc furnaces ("EAFs") to melt scrap steel and, more recently, scrap substitutes such as direct reduced iron, to produce raw steel.  Mini-mills also operate casting, rolling, and other equipment to make semi-finished and, ultimately, finished steel products.  Mini-mills do not utilize iron ore as their primary source of iron in the steelmaking process.

According to the Office of Management and Budget's industrial classification system,[9] the U.S. iron ore industry is comprised of establishments primarily engaged in (i) developing mine sites, mining, and/or beneficiating (i.e., preparing) iron ores and manganiferous ores valued chiefly for their iron content, and/or (ii) producing sinter iron ore (except iron ore produced in iron and steel mills) and other iron ore agglomerates.[10]

The USGS indicated that iron ore mining in the United States has changed significantly since the Second World War.  At that time, natural ores were the mainstay of the domestic mining industry.  The natural ores, which consisted primarily of hematite and goethite, were extracted from near-surface "zones of enrichment" in iron ore formations in Minnesota, Michigan, and Wisconsin.  These ores averaged 50-60 percent iron and could be shipped directly to the steelworks without prior beneficiation.  Demand for steel during the Second World War and the Korean War accelerated the depletion of these reserves, and U.S. mining companies became increasingly reliant on magnetic taconite.  Most natural ore reserves in the United States have now been depleted.

---

[7]  Molten iron is also called "hot metal" and, when cooled into a solid form, "pig iron."

[8]  The American Iron and Steel Institute defines "raw steel" as steel in the first solid state after melting, suitable for further processing or sale, which includes ingots, steel for foundry castings and strand or pressure cast blooms, billets, slabs, or other product forms.  See American Iron and Steel Institute, Annual Statistical Report 2000.  In this report, the Department uses the terms "raw steel" and "semi-finished steel" interchangeably.

[9]  The North American Industry Classification System ("NAICS"), established in 1997, is the uniform system of North American industry classifications.  It replaced the Standard Industrial Classification ("SIC") system that had been used by the United States since the 1930s to present industrial statistical information.  Under these systems, the iron ore industry is classified respectively as NAICS 212210 and SIC 1101.

[10]  "Sintering" is a process that combines iron-bearing particles, once recovered from environmental control filters in blast furnaces, into small pellets. The production of iron sinter made in steel mills is classified in NAICS 331111 and SIC 3312, Iron and Steel Mills.

Taconite, the principal iron ore mined in the United States today, is a hard flinty rock that is far poorer in iron; it contains between 20-30 percent iron.  It is mined using the open-pit method, then crushed into a fine powder.  The iron particles are separated, rolled into a marble-sized pellets containing about 65 percent iron, then heat-hardened for shipment to integrated steel mills.[11]

Iron ore is classified in the Harmonized Tariff Schedules of the United States ("HTS") under HTS 2601.11.00, HTS 2601.12.00, and HTS 2601.20.00.

## B.   SEMI-FINISHED STEEL

Semi-finished steel is an intermediate steel product formed from (i) the molten steel produced by basic oxygen furnaces operated by integrated steel mills, or (ii) the molten steel produced by electric arc furnaces operated by mini-mills.  Semi-finished steel products are then rolled or shaped into finished steel mill products.  Over 60 countries produce semi-finished steel.[12]

Steel mills worldwide convert semi-finished steel into finished steel products.  Of the semi-finished steel that is produced in the United States, most is consumed within the integrated or mini-mill producer's facility for processing into finished steel products.  As a result, very little semi-finished steel is available on the U.S. merchant market.

Under the NAICS system, the steel industry (NAICS 331111 (Iron and Steel Mills), formerly SIC 3312, and SIC 3399) comprises establishments primarily engaged in one or more of the following:  (1) direct reduction of iron ore; (2) manufacturing pig iron in molten or solid form; (3) converting pig iron into steel; (4) making steel; (5) making steel and manufacturing shapes (e.g., bar, plate, rod, sheet, strip, wire); and (6) making steel and forming tube and pipe.

The semi-finished steel products included in this investigation are ingots, slabs, blooms, and billets of all grades (carbon, stainless, and alloy).  The table below provides American Iron and Steel Institute ("AISI") and HTS codes for these products.

---

[11]   Most foreign iron ore deposits remain far richer than those in the United States.  While most U.S. (beneficiated) and imported (unbeneficated) iron ores are fungible, certain U.S. steel mills have stated that they rely on imports of iron ore with certain chemical properties that is not available from U.S. iron ore mines to support their production of certain types of semi-finished steel.  For example, **[Confidential business information - redacted]** indicated that certain of their sintering operations require iron ore with chemical properties not available in the United States.  **[Confidential business information - redacted]** also noted that certain of its blast furnaces require that portions of their feedstock be a relatively high-titanium-bearing iron ore not found in the United States.  Certain U.S. steel mills have, accordingly, indicated to the Department that restricting iron ore imports could adversely impact the ability of U.S. integrated steel mills to produce semi-finished steel.

[12]   The semi-finished steel produced by the BOF and EAF processes is largely, although not entirely, interchangeable.  For metallurgical and technical reasons, at this time, only steel produced by integrated steel mills using iron ore is suitable for a few end-use applications (including certain applications in the automotive, food can, and container fabrication sectors).

**TABLE 1 –**
**SEMI-FINISHED STEEL PRODUCTS BY**
**AISI AND HTS CODES**

|  | AISI | HTS | |
|---|---|---|---|
| Ingots | 1A | 7206.10.00<br>7224.10.00 | 7218.10.00 |
| Slabs, Blooms, and Billets | 1B | 7207.11.00<br>7207.19.00<br>7218.91.00<br>7224.90.00 | 7207.12.00<br>7207.20.00<br>7218.99.00 |

- <u>Ingot</u>. An ingot is metal that is cast into a mold. Molten steel is poured from a ladle into an ingot mold. Once the steel is solid, the mold is stripped and the 25- to 30-ton ingot is then ready for subsequent rolling or forging into a slab, bloom, or billet. Only 3.6 percent of U.S. raw steel produced in 2000 was cast in ingot form, compared with 24.1 percent in 1991. Most semi-finished steel produced in the United States is continuously cast into a slab, bloom, or billet directly from its molten form.

- <u>Slab</u>. A slab is the most common type of semi-finished steel. Traditional slabs measure 10 inches thick, 30 to 85 inches wide, and average about 20 feet long. (The output of the recently developed "thin slab" casters is approximately two inches thick.) A slab is hot-rolled down from an ingot or strand cast. Slabs are used in the manufacture of sheet, strip, plate, and other flat-rolled steel products.

- <u>Bloom</u>. A bloom is a semi-finished steel product that has been rolled or forged from an ingot or strand cast. A bloom usually has a square cross-section exceeding 36 inches. Blooms are further processed into "long products," such as structural shapes.

- <u>Billet</u>. A billet is a semi-finished steel product that has been rolled or forged from an ingot or strand cast. Billets are smaller and longer than blooms. Billets usually have a square cross section less than 36 square inches. Billets are further processed into "long products," including wire rod, bar, pipes, and wire products.

As noted, the above articles are inputs into the steelmaking process that are used to produce finished steel products. On average, iron and steel are by far the least expensive of the world's metals. Thousands of products having various chemical compositions, forms, and sizes are made from iron and steel by casting, forging, and rolling processes.

## V.   <u>FINDINGS OF THE INVESTIGATION</u>

### A.   <u>IRON ORE AND SEMI-FINISHED STEEL ARE IMPORTANT TO U.S. NATIONAL SECURITY</u>

Iron ore and semi-finished steel are important to the national security as inputs used in the production of finished steel products needed by (i) the Department of Defense, and (ii) critical industries.

1.  National Defense Requirements.  As provided in Section 232, the Department requested that DOD provide an assessment of its requirements for the articles under investigation.  DOD does not purchase iron ore or semi-finished steel directly; rather, it procures weapon systems, equipment, and material that contain finished steel components.  DOD's primary use of steel in weapons systems is for shipbuilding, followed by ammunition, aircraft parts, and aircraft engines.

DOD's need for finished steel items is based upon its national defense strategy.  DOD's current national defense strategy is described in the Quadrennial Defense Review Report ("QDR") recently completed on September 30, 2001.  The QDR identified necessary adjustments for organizations and doctrines to ensure a U.S. advantage in such areas as space, information systems, and power projection, and includes an emphasis on intelligence and homeland defense, as well as defense against weapons of mass destruction.  DOD indicated that the QDR adopts a new force-sizing construct, moving away from the two major theater war ("2-MTW") scenario that previously had served as the basis for defense planning.[13]  DOD indicated that the evolved strategy contained in the new QDR will not increase its requirement for steel.

DOD reported:

- Continued access to steel is critical to sustaining the manufacture of weapons systems.  Steel of all types is purchased for DOD by prime contractors to produce weapons systems.  DOD also has miscellaneous needs for finished steel products similar to those used for civil applications (e.g., filing cabinets, automobiles, etc.).

- DOD's steel requirements are satisfied by both integrated steel mills (consumers of iron ore) and mini-mills (consumers of scrap).

- DOD's demands for iron ore and steel for weapons systems are a small portion of the domestic industries' annual output.  DOD's annual steel requirements comprise less than 0.3 percent of the industry's output by weight (i.e., 325,000 net tons of finished steel per year).[14]

- DOD's requirement for steel for weapons systems is projected to be flat over the next five years, after declining in recent years.  DOD projected a slight increase in its need for steel associated with shipbuilding and aircraft parts over the next five years, counterbalanced by a slight decrease in the need for steel for ammunition and aircraft engines.

- Even after a 2-MTW conflict, the need to replenish the force would create a DOD demand for steel that would remain small relative to domestic output.  DOD estimated

---

[13]  DOD reported that this approach has been used to determine requirements for the National Defense Stockpile, as required by the Strategic and Critical Materials Stock Piling Act, as amended (50 U.S.C. § 98h-5).  DOD does not maintain stockpiles of iron ore or semi-finished steel.

[14]  In 2000, U.S. steel industry shipments of steel mill products totaled 109 million net tons according to AISI data.  For purposes of this investigation, we have estimated DOD annual peacetime requirements for steel as 0.3 percent of the industry's 2000 shipments, i.e., 325,000 net tons of finished steel.

that the combination of peacetime and additional replenishment demand would be no more than twice its total peacetime demand (i.e., no more than 650,000 net tons of finished steel annually).

- DOD's demands for steel for military uses are met by domestic industries already subject to procurement policies establishing preferences for domestic suppliers. DOD stated that these domestic preferences apply to essentially all of the steel used in weapons systems. DOD also indicated that the preference defines domestic steel by where it is melted, and as a result, imports of semi-finished steel are not used for DOD weapons systems.[15]

- Imports of iron ore and semi-finished steel do not currently affect the national security when assessed in terms of the ability to meet defense demands.

2. Iron Ore and Semi-Finished Steel Requirements of Critical Industries. Historically, in conducting Section 232 studies, the Department has focused principally on DOD needs for the item at issue. Although this "narrow" definition of national security is defensible under the statute, in this case, as explained in Section II above, the Department has adopted a broader concept of national security, one that also embraces the needs of those industries that the U.S. Government has determined are critical to minimum operations of the economy and government.

For purposes of this investigation, we have consulted with the Department's Critical Infrastructure Assurance Office to identify those critical industries and have attempted to assess their need for finished steel. Critical industries include, but are not limited to, telecommunications, energy, banking and finance, transportation, water systems, and emergency services – both government and private.

The finished steel requirements of these industries was assessed on the basis of the 1997 annual input-output ("I-O") accounts for the U.S. economy data published by the Department's Bureau of Economic Analysis ("BEA") in December 2000, and statistical data published by AISI.[16] These data furnished estimates of consumption of iron and steel commodities by U.S. industry. We identified the 28 industries related to supporting the U.S. national defense and critical industry requirements. As noted in Table 2 below, these 28 industries accounted for 30.9 percent of the output of the primary iron and steel manufacturing sector.

Applying this percentage to total U.S. output, we have estimated that these 28 industries would require no more than 33.68 million tons of finished steel per year. For purposes of this investigation, we have assumed that the entire consumption by these 28 industries of primary iron and steel manufacturing output is related to supporting U.S. national defense and critical industry requirements. Given that, as explained below, even this over-estimate of total consumption can easily be satisfied by domestic production, we have not attempted to discount consumption for non-national security purposes. In reality, however, a substantial portion of consumption by these industries is likely not related to national security requirements.

---

[15] An overview of the applicable DOD Defense Federal Acquisition Regulation Supplement ("DFARS") is attached as Annex 3.

[16] Bureau of Economic Analysis, Annual Input-Output Accounts of the U.S. Economy; American Iron and Steel Institute, 2000 Annual Statistical Report.

For purposes of this investigation, we have converted the requirements for finished steel of these 28 industries into requirements for semi-finished steel and iron ore.  We have estimated that the production of 36.04 million net tons of semi-finished steel is necessary to satisfy the finished steel requirement described above.[17]  Assuming that this requirement for semi-finished steel was supplied by mini-mills and integrated steel producers in proportion with current ratios,[18] U.S. integrated steel producers would require approximately 22.5 million metric tons of iron ore to satisfy this requirement.[19]

---

[17]  For purposes of this investigation, the Department has assumed that the production of each net ton of finished steel requires the production of 1.07 net tons of raw "semi-finished" steel.  According to AISI, the yield factor (ratio of shipments to production) is approximately 93 percent, and higher for some mini-mills.

[18]  As set forth in Section V(B)1(b) below, in 2000 approximately 53 percent of raw steel was produced by integrated producers, with the remaining 47 percent produced by mini-mills.

[19]  Based on information obtained during the course of this investigation, the Department has calculated that the production of 1.0 net ton of semi-finished steel by an integrated steel mill requires 1.3 net tons of iron ore.

**TABLE 2 -**
**THE USE OF PRIMARY IRON AND STEEL MANUFACTURING COMMODITIES**
**(INDUSTRY NUMBER 37) BY CRITICAL INDUSTRIES, 1997**
[Million of Dollars at Producers' Prices]

| INDUSTRY | MILLIONS OF DOLLARS | PERCENT OF PRIMARY IRON AND STEEL MANUFACTURING OUTPUT |
|---|---|---|
| Crude petroleum and natural gas (industry number 8) | 1,956 | 1.91 percent |
| New construction, including own-account construction (industry number 11) | 5,046 | 4.93 percent |
| Maintenance and repair construction, including own-account construction (industry number 12) | 2,246 | 2.19 percent |
| Ordnance and accessories (industry number 13) | 193 | 0.19 percent |
| Petroleum refining and related products (industry number 31) | 13 | 0.01 percent |
| Metal containers (industry number 39) | 2,419 | 2.36 percent |
| Engines and turbines (industry number 43) | 3,600 | 3.52 percent |
| Computer and office equipment (industry number 51) | 142 | 0.14 percent |
| Audio, video, and communication equipment (industry number 56) | 419 | 0.41 percent |
| Motor vehicles (passenger cars and trucks) (industry number 59A) | 393 | 0.38 percent |
| Truck and bus bodies, trailers, and motor vehicle parts (industry number 59B) | 11,417 | 11.15 percent |
| Aircraft and parts (industry number 60) | 829 | 0.81 percent |
| Other transportation equipment (industry number 61) | 2,249 | 2.20 percent |
| Railroads and related services, passenger ground transportation (industry number 65A) | 441 | 0.43 percent |
| Motor freight transportation and warehousing (industry number 65B) | 0 | 0.00 percent |
| Water transportation (industry number 65C) | 0 | 0.00 percent |
| Air transportation (industry number 65D) | 3 | 0.00 percent |
| Pipelines, freight forwarders, and related services (industry number 65E) | 0 | 0.00 percent |
| Communications, except radio and TV (industry number 66) | 0 | 0.00 percent |
| Radio and TV broadcasting (industry number 67) | 0 | 0.00 percent |
| Electric services (utilities) (industry number 68A) | 0 | 0.00 percent |
| Gas production and distribution (utilities) (industry number 68B) | 2 | 0.00 percent |
| Water and sanitary services (industry number 68C) | 0 | 0.00 percent |
| Finance (industry number 70A) | 3 | 0.00 percent |
| Insurance (industry number 70B) | 2 | 0.00 percent |
| Computer and data processing services (industry number 73A) | 0 | 0.00 percent |
| Health services (industry number 77A) | 3 | 0.00 percent |
| National defense: consumption expenditures (industry number 96C) | 259 | 0.25 percent |
| SUBTOTAL | 31,635 | 30.88 percent |
| TOTAL PRIMARY IRON AND STEEL MANUFACTURING OUTPUT | 102,368 | 100.00 percent |

Source:  Bureau of Export Administration analysis of Bureau of Economic Analysis, Annual Input-Output Accounts of the U.S. Economy, 1997 data.

3. <u>Effect of the Events of September 11, 2001</u>.  This investigation was, of course, well underway prior to the campaign against terrorism resulting from the events of September 11, 2001, and the related military operations.  Accordingly, we have reassessed our analysis in light of those developments.  We have affirmed that the events do not cause any material change in the foregoing estimates.

DOD indicated to the Department that it "does not anticipate any change in the DOD assessment as a result of the September 11, 2001, events and the subsequent military efforts."[20] The Department has also found no evidence that there will be a spike in demand for steel by critical industries resulting from the events of September 11, 2001.  AISI reports that the capacity utilization rate for the U.S. steel industry has remained relatively steady since September 11, 2001, ranging from 72.2 percent to 73.8 percent during the weeks ending between September 15 – October 13, 2001.  As set forth in detail in Section V(B) below, the U.S. steel industry has been experiencing a significant market downturn since the second half of 2000, and it is apparent that both the U.S. iron ore and steel industries are operating at far less than normal business capacity.

4. <u>Summary</u>.  Having reviewed the needs for finished steel by (i) the U.S. Department of Defense, and (ii) critical industries that are essential to minimum operations of the economy and government, we have determined that the national security requirements for finished steel would require the production of no more than 36.04 million net tons of semi-finished steel. Assuming that this quantity of semi-finished steel were to be supplied by the integrated sector of the U.S. steel industry in accordance with current production ratios, approximately 22.5 million metric tons of iron ore would be required.  Again, however, it is important to note that these estimates are upper limits and include consumption not directly related to national security requirements.

---

[20]  Even if entirely unforeseen events were to generate national defense-related demands for steel that were greater than DOD forecasts, such demands would still consume only a very small percentage of total U.S. steel output.  To take just one example:  DOD indicated that 60,000 net tons of finished steel was used in the multi-year construction of the U.S. Navy's newest aircraft carrier, the *USS Ronald Reagan* (CVN 76).  Sixty thousand net tons constitutes less than one-tenth of 1 percent of total U.S. annual steel output.  Accordingly, DOD could double the U.S. Navy's entire fleet of aircraft carriers, and still not substantially vary the total percentage of U.S. domestic output attributed to national security uses.

**B.**   **U.S. NATIONAL SECURITY IS NOT DEPENDENT ON IMPORTS OF IRON ORE OR SEMI-FINISHED STEEL**

1.  U.S. Industry Produces Sufficient Iron Ore and Semi-Finished Steel to Satisfy National Security Requirements.  Based on the information and data obtained during the course of this investigation, the Department has found that domestic production of iron ore and semi-finished steel far exceeds the amounts necessary to satisfy U.S. national security requirements.

As set forth above, satisfaction of U.S. national security requirements would require at most 36.04 million net tons per year of semi-finished steel and 22.5 million metric tons per year of iron ore.  In each of the past ten years, as demonstrated below, the United States has produced far in excess of these amounts.  Further, U.S. production capacity also far exceeds these amounts.[21]

a.  *Production of Iron Ore*.  In 2000, the United States produced 63.1 million metric tons of iron ore, far more than the maximum amount needed for national security requirements.  The 63.1 million metric tons produced in 2000 constituted a 9.2 percent increase over 1999 levels.[22] Altogether, iron ore production increased 11.4 percent (6.4 million metric tons) during the ten-year period between 1991 and 2000, ranging from a high of 63.1 million metric tons in 2000, to a low of 55.6 million metric tons in 1992.

Moreover, information provided in response to the Department's surveys indicated that iron ore production could be increased further if needed.  The eight operating mines indicated that, in the event of a mobilization, maximum production could be increased 10 percent within 36 months.

U.S. integrated steel producers are assured access to most of this domestic iron ore production.  In 2000, captive mines (i.e., mines producing for company-owned blast furnaces) accounted for 79 percent of the iron ore produced in the United States.  Moreover, U.S. production is not fragmented.  The USGS reported that in 2000, nine mines accounted for 99 percent of U.S. iron ore production.[23]  Seven mines in Minnesota produced 76.1 percent of the national output of usable iron ore in 2000, with two mines in Michigan accounting for 23.8 percent of the output of usable iron ore.   In 2000, the United States produced 6 percent of the world's iron ore and consumed approximately 8 percent.

To be sure, the U.S. iron ore industry is undergoing restructuring.  On January 3, 2001, LTV Steel Corporation ceased production at the LTV Steel Mining Company in Hoyt Lakes, Minnesota, which represented approximately 15 percent of U.S. iron ore production capacity,

---

[21] Indeed, the production capacity of the integrated sector of the U.S. steel industry alone could satisfy this requirement if the necessity were to arise.  Between 1991-2000, raw steel production by U.S. integrated producers ranged from a low of 52.7 million net tons in 1991 to a high of 62.5 million net tons in 1995.

[22] All iron ore statistics are published USGS data unless otherwise noted.

[23] One mine closed in January 2001 (see discussion below), leaving eight operating mines.  Most U.S. iron ore mines are owned by U.S. integrated steel mills.  Canadian steel mills have partial ownership in three U.S. mines. One U.S. merchant iron ore company manages and holds interest in two mines in Minnesota, two mines in Michigan, and one in Canada.

stating that the quality of LTV Mining's operations and ore reserves had deteriorated to noncompetitive levels.[24]

There is no evidence, however, that additional closures are expected, let alone sufficient numbers of closures to preclude satisfaction of U.S. national security requirements.  The Department surveyed the U.S. iron ore industry as part of this investigation, and received responses from the nine mines operating in 2000.  **[Confidential business information – redacted**

**].** [25]

b.  *Production of Semi-Finished Steel*.  As discussed in Section IV above, semi-finished steel is consumed by U.S. steel mills in the production of finished steel.  In 2000, the United States produced domestically 112.2 million net tons of semi-finished steel – far in excess of 36.04 million net tons, the maximum required for U.S. national security.

Like iron ore, domestic production of semi-finished steel has increased over the past decade.  Between 1991 and 2000, total U.S. semi-finished steel production increased 27.7 percent.[26]  Since 1991, U.S. raw steel production ranged from a high of 112.2 million net tons in 2000, to a low of 87.9 million net tons in 1991.  (See Chart 1).  U.S. production of raw steel even increased 4.5 percent in 2000 compared with 1999 levels, despite a significant market downturn during the second half of 2000 when capacity utilization rates fell from 91.6 percent during the first half of the year, to 79.9 percent during the second half of the year.[27]  This data clearly demonstrates that total domestic semi-finished steel production far exceeds national security requirements.

---

[24] On October 10, 2001, LTV Corporation announced that it had entered into an agreement to sell its LTV mine assets to subsidiaries of Cleveland-Cliffs, Inc., the largest iron ore supplier in North America, and Minnesota Power, subject to regulatory and bankruptcy court approvals.  Cleveland-Cliffs indicates that the mine assets will not be operated to produce iron ore pellets, but may be used to provide transportation support services to other Minnesota mining operations, or for non-ferrous metals development.  In November 2000, Wheeling-Pittsburgh Steel Corp., an integrated mill, sold its interest in a Michigan mine.  Bethlehem Steel Corp. and National Steel Corp., both integrated producers, are marketing their interests in Minnesota iron ore mines.

[25] The Department has found that, once closed, an iron ore mine cannot be reconstituted quickly due to the significant challenges associated with resuming the iron ore mining and processing operations, rebuilding the infrastructure to support the mine, and acquiring workers with the required skills.  Although relevant, the difficulties of reconstitution only pose a threat to national security to the extent that mines are expected to close.  Steel mills that have closed have been reopened on occasion.  California Steel Industries, Inc. and Duferco Farrell each produce finished steel products on the sites of former integrated steel mills.

[26] All steel statistics are published AISI data unless otherwise noted.

[27] AISI defines raw steel capability as the tonnage capability to produce raw steel for a sustained full order book.  For the purpose of this investigation, the Department has used AISI's capability utilization rate as the industry's capacity utilization rate.

**CHART 1 –**
**U.S. RAW STEEL PRODUCTION AND IRON ORE CONSUMPTION - 1991-2000**



Sources:  AISI and USGS data

Significantly, the greatest growth in the production of raw steel has occurred in the mini-mill sector – <u>i.e.</u>, the sector that does not utilize iron ore.  From 1991-2000, the amount of U.S. raw steel produced by integrated producers utilizing basic oxygen furnaces ranged from a low of 52.7 million net tons in 1991, to a high of 62.5 million net tons in 1995.  During the same period, the amount of U.S. raw steel produced by mini-mills operating electric arc furnaces (for which steel scrap, not iron ore, is the primary feedstock) steadily increased from a low of 33.8 million net tons in 1991, to 52.8 million net tons in 2000.  (<u>See</u> Chart 2).  In short, over the past decade, raw steel production by integrated producers increased 12.8 percent, while raw steel production by mini-mills increased 56.2 percent.  Altogether, approximately 53 percent of the raw steel produced in the United States in 2000 was produced by U.S. integrated mills operating blast furnaces and basic oxygen furnaces, down from sixty percent in 1991.[28]

---

[28]  In 2000, the remaining 47 percent of the raw steel produced in the United States came from mini-mills operating electric arc furnaces.

**CHART 2 –**
**U.S. RAW STEEL PRODUCTION BY TYPE OF FURNACE - 1991-2000**



Source:  AISI data

Domestic semi-finished steel production is not dependent on any one producer or small group of producers.  In 2000, the USGS reported that the U.S. steel industry consisted of about 105 companies that produced raw steel at approximately 144 locations, with a raw steel capacity of 130 million net tons.  Indiana accounted for 23 percent of total raw steel production, followed by Ohio (16 percent), and Pennsylvania (7 percent).  In 2000, 13 companies operated integrated steel mills, with an average of 35 blast furnaces in continuous operation during the year.

**CHART 3 –**
**U.S. RAW STEEL PRODUCTION  AND**
**CAPABILITY UTILIZATON RATE - 1991-2000**



Source:  AISI data

Not only has total U.S. semi-finished steel production – production far in excess of that needed to ensure U.S. national security – increased over the past decade, but production capacity also has increased.  U.S. semi-finished steel production capacity has increased over 10 percent during the past decade from 117.6 million net tons in 1991 to 130.3 million net tons in 2000. (See Chart 3).

Moreover, data reported in the Census Bureau's Survey of Plant Capacity illustrate that, during a national emergency, additional steel production capacity beyond that reported as full production capacity under normal business operations could be made available to meet national security requirements.  The Census data demonstrate that the companies classified under SIC 3312 (Blast Furnaces and Steel Mills) were operating at 78 percent capacity in 1999, but were operating at only 71 percent of the capacity that could be reached in a national emergency, based on the Census Bureau's criteria.[29]

---

[29] See Census Bureau, Survey of Plant Capacity data.  The Survey of Plant Capacity does not cover the U.S. iron ore industry.

c. *Prior Government Findings.*  The finding that U.S. domestic industry produces sufficient iron ore and semi-finished steel to satisfy national security requirements is consistent with earlier findings by the U.S. Government, specifically the decision to deactivate the "Controlled Materials Program."

During the Second World War and the Korean War, the production and distribution of certain critical metals – steel, copper, and aluminum – were managed under "Controlled Materials Plans."  From 1953 to 1988, these materials (with nickel alloys added in 1958) were subject to government allocations regulations under the Controlled Materials Program rules promulgated by the Department.[30]

By the 1980s, the importance of the controlled materials to defense production was declining as the use of more exotic specialty materials increased.[31]  In addition, improved technologies and production techniques meant that an increasingly smaller percentage of overall production capacity was needed to meet defense requirements.  A 1987 Department study of the Controlled Materials Program found that the program had little relevance to defense requirements for the controlled materials or to the ability of industry to supply the controlled materials to meet these requirements.  The 1987 study recommended that the controlled materials procedures be deactivated.[32]

An interagency committee comprised of the Department and three of the Delegate Agencies under the Defense Priorities and Allocations System ("DPAS") – the Federal Emergency Management Agency, and the Departments of Defense and Energy – concurred with this recommendation.  Action was subsequently taken by these agencies to deactivate the program, including action by the Department to discontinue the information collection burden imposed upon controlled materials producers, distributors, and users.  Subsequently, in 1998, the Department officially revised its DPAS regulations, deleting all of the "Controlled Materials Program" provisions.[33]

Although the Controlled Materials Program provisions have been deleted from the DPAS, in times of national crisis, the U.S. iron ore and steel industries could receive priority "rated orders" to meet defense and other national security customer requirements.  Upon receipt of a rated order from a customer for a specified quantity of iron ore or steel product, the iron ore or steel producer must (i) accept that order (except as otherwise provided in the DPAS rules),

---

[30]  Within several years of enactment of the Defense Production Act of 1950 (50 U.S.C. app. § 2061 et seq.), the Department promulgated regulations to implement priorities and allocations.  The purpose of these regulations was to ensure the timely availability of industrial products and materials for the national defense.  See generally 15 C.F.R. § 700 et seq.

[31]  The program functioned on the basis of requirements information supplied by DOD and production and plant capacity information collected by the Department from the major controlled materials producers.  Under the Controlled Materials Program, controlled material producers were required to reserve order book space for the production and timely delivery of material against defense orders.

[32]  Department of Commerce, Evaluation of the Controlled Materials Program – Final Report (1987).

[33]  See 62 Fed. Reg. 51,389 (Oct. 1, 1997) and 63 Fed. Reg. 31,918 (Jun. 11, 1998).

and (ii) ship the iron ore or steel product as necessary to meet the delivery requirement stated in the order.  If necessary, production and delivery preference must be given to the rated order over any commercial (non-rated) orders that have been placed with the producer to ensure timely delivery of items needed to meet approved national defense and civil emergency program requirements.

     d. *Summary*.  The U.S. iron ore and steel industries' production levels and production capacity far exceed the amounts needed to satisfy U.S. national security requirements.  In addition, the Department found that current capacity could be increased in the event of a national emergency, and in times of a national crisis, national security-related needs could receive preferential treatment through the Department's DPAS program.

     2. There are Sufficient "Human Resources, Products, Raw Materials and Other Supplies and Services" Necessary to the Domestic Production of Iron Ore and Semi-Finished Steel.  As set forth in Section II above, Section 232 requires the Department to consider – in addition to national defense requirements, domestic production, and domestic capacity – "existing and anticipated availabilities of the human resources, products, raw materials, and other supplies and services essential to the national defense."  Based on the data and relevant information obtained during the course of this investigation, the Department has found that, although the U.S. iron ore and steel industries are undergoing restructuring, there are and will continue to be ample human resources, products, raw materials, and other supplies and services essential for the domestic production of iron ore and semi-finished steel in sufficient quantities to meet U.S. national security requirements.

     a. *Human resources*.  Although the number of people employed in the U.S. iron ore and steel industries has declined over the past ten years, this development has not substantially affected these industries' production capacities, and does not threaten their ability to satisfy national security requirements.  In fact, production of iron ore and semi-finished steel has increased over the same period.

     • Iron ore.  Employment in the U.S. iron ore industry (SIC 1011) has declined as the industry undergoes restructuring.  The Department of Labor reported that employment in the U.S. iron ore industry was 7,700 in 2000, a decrease of 13.5 percent in employment compared with 1991 levels (8,900 employees).  During the same period, U.S. iron ore production increased 11.4 percent.  The Department of Labor estimates current employment in the industry at approximately 6,000 employees after the closure of the LTV mine.

     Capital investment in the iron ore industry over the past decade has enabled production to remain steady or to increase, perhaps contributing to the diminution in employment.  For example, iron ore mines have made investments to improve and modernize their operations, including facilitating the labor intensive process of the movement of the crude iron ore to grinding and processing facilities.  Thus, the iron ore mines generally believe they will have sufficient human resources to meet their needs.

     The Department's survey of iron ore producers asked the nine U.S. iron ore mines operating in 2000 to "assess the likelihood that a ready and qualified work force will remain available … for the next five years."  Five mines responded "likely," two mines **[Confidential business information - redacted]** responded "unlikely," and two mines responded "uncertain."

• Semi-Finished Steel.  The Department of Labor reported that employment in the U.S. steel industry (SIC 3312, Blast Furnaces and Steel Mills) was 151,200 in 2000, a decrease of 24 percent compared with 1991 levels (198,800).  During the same period, U.S. raw steel production increased 27.7 percent.

As the Department noted in its July 2000 report, Global Steel Trade: Structural Problems and Future Solutions, two technology trends contributed to the increase in productivity nothwithstanding the decline in employment in the U.S. steel industry.  First, raw steel production shifted away from relatively labor intensive and less efficient open-hearth furnaces.[34] Second, the percentage of total U.S. raw steel production that was continuously cast increased from 75.8 percent in 1991 to 96.4 percent in 2000.[35]  Recent developments in thin slab casting by U.S. mini-mills have increased productivity even further.

The Department's Steel Mill Survey asked U.S. steel mills that consume iron ore or consume, produce, or ship semi-finished steel to "assess the likelihood that a ready and qualified work force will remain available … for the next five years."  Fifty-three  respondents answered this question.  Sixty-two percent responded "likely," 25 percent responded "possible," 2 percent responded "unlikely," and 11 percent responded "uncertain."

We note that only a minority of the workers in the iron ore and semi-finished steel industries that have petitioned for Trade Adjustment Assistance ("TAA") have been certified as eligible.[36]  The Department of Labor indicated that certification of a TAA petition is dependent upon a determination that there are increased imports of products like or directly competitive with those produced by the petitioning workers or, in the case of North American Free Trade Agreement ("NAFTA")-TAA only, a shift of production to Canada or Mexico.

---

[34]  Department of Commerce, Global Steel Trade: Structural Problems and Future Solutions, July 2000, p. 12.  At one time, open-hearths were the most abundant steelmaking furnaces operated by integrated steel mills.  These furnaces were characterized by a broad, shallow hearth to refine pig iron and scrap into steel.  The last open-hearth furnace operated in the United States was closed in 1991.  Integrated steel mills now rely on basic oxygen furnaces.

[35]  Continuous casting is a method of pouring steel from the basic oxygen or electric arc furnace into a billet, bloom, or slab directly from its molten form.  Continuous casting avoids the need to roll ingots into slabs, thus increasing production efficiency.

[36]  The Department of Labor reported that workers in the iron ore industry (SIC 1011) have filed eight TAA petitions since the beginning of fiscal year 1991.  Three of these petitions, covering 1,456 workers, resulted in certifications of eligibility to apply for adjustment assistance, and the other five, covering an estimated 1,533 workers, resulted in denials.  Workers in SIC 1011 have filed two petitions for NAFTA-TAA since the program began in January 1994.  One of these petitions, covering 29 workers, resulted in a certification for eligibility to apply for adjustment assistance, and the other, covering an estimated 676 workers, resulted in a denial.

Similarly, U.S. steelworkers (SIC 3312) have filed 210 TAA petitions since the beginning of fiscal year 1991.  Of these, 98 petitions, covering an estimated 17,354 workers, resulted in certifications of eligibility to apply for adjustment assistance; 99 petitions, covering an estimated 11,611 workers, resulted in denials; and 13 eligibility investigations were terminated before completion.  Workers in SIC 3312 have filed 41 petitions for NAFTA-TAA.  Of these, 13 petitions, covering an estimated 3,427 workers, resulted in a certification for adjustment assistance; 26 petitions, covering an estimated 4,106 workers, resulted in a denial; and two eligibility investigations were terminated before completion.

b. *Products, raw materials, supplies, and other services*.  In addition to the human resources described above, the production of iron ore and semi-finished steel requires various other "products, raw materials, supplies and other services."  Specifically, the inputs required for the production of iron ore pellets include electricity, fuel, water, and bentonite.[37]  The inputs required for the production of semi-finished steel can include iron ore, coal and coke, electricity, natural gas, oxygen, limestone, and steel scrap.

Based on the information obtained during the course of this investigation, we found no evidence that these products, raw materials, supplies, or other services are in short supply.

Although it does not change the ultimate conclusion of this Section, we would note that there are a web of resources – transportation, utilities, and community infrastructure – relevant to the production of iron ore and semi-finished steel, whose existence often is heavily dependent upon the steel marketplace and that would not be easy to replace once lost or shuttered.  For example, the iron ore industry is supported by an infrastructure of railways and ships, utilities, and power companies.[38]  The Department of Labor noted that, although the closure of a single mine does not destroy the infrastructure, it does directly affect these support industries.

In addition, the Department of Labor noted that the closing of a mine and the permanent or temporary lay-off of workers also impacts local communities and businesses.  This impact is felt particularly strong in northeastern Minnesota and in Michigan's Upper Peninsula, where iron ore mining wages are nearly twice the average wages for other occupations.  A mine's closing results in significant loss of income and taxes for these local communities.[39]

3. <u>Growth of the Iron Ore and Steel Industries is Not Necessary to Ensure National Security</u>.  Section 232 also requires the Department to consider "the requirements of growth" of the relevant industries.  As a preliminary matter, it is important to recognize that <u>growth</u> in the iron ore and steel industries is not necessary to satisfy the national security requirements set forth above.  Indeed, domestic production of iron ore and semi-finished steel could satisfy national security requirements even if such production was at substantially lower levels than it is today.

Growth in iron ore and semi-finished steel production is principally driven by downstream demand.  Semi-finished steel production is sensitive to consumer demand for finished steel products, particularly demand for automobiles, construction, machinery, and appliances.  Similarly, iron ore production is directly related to the demand for semi-finished steel.  As set forth above, there is no evidence that there will be a spike in demand for these products that would threaten the ability of the U.S. iron ore and semi-finished steel industries to satisfy national security needs.

---

[37]  Bentonite is a form of clay.  During iron ore processing, ground taconite is mixed with small amounts of bentonite.  Bentonite serves as a binder to the taconite as the mixture is processed into iron ore pellets that are then heat-hardened for shipment to integrated steel mills.

[38]  No U.S. iron ore is consumed near where it is produced.  Nearly all U.S. iron ore leaves the mine by rail, after which much of it is transported by ship along the Great Lakes.  The Lake Carriers' Association reported that domestically-mined iron ore is the largest commodity moved by the U.S.-flagged Great Lakes fleet.

[39]  On July 3, 2001, the Department's Economic Development Administration announced a $525,000 grant to the Arrowhead Regional Development Commission and the Northspan Group, Inc. of Duluth, Minnesota to assist these organizations develop economic adjustment strategies to help limit the impact of the closure of the LTV mine.

26

In addition to downstream demand, a principal requirement for growth is access to substantial amounts of capital.  As the Department noted in its July 2000 report, construction of a large integrated steel mill costs billions of dollars.  Even for much smaller mini-mills, construction and equipment costs can reach hundreds of millions of dollars.[40]

The U.S. iron ore industry is exploring the development and commercialization of new iron-bearing products and improvement of existing products that may provide growth opportunities.[41]  To the extent that growth in the production of semi-finished steel occurs, it would likely occur among mini-mills operating electric arc furnaces.  As discussed above, a key trend in the U.S. steel industry over the past decade has been the significant increase in the amount of steel produced by U.S. mini-mills.

4.  <u>Domestic Production of Finished Steel Necessary to Meet National Security Requirements is Not Dependent Upon Imports of Iron Ore or Semi-Finished Steel, and in any Event, Imports of Iron Ore and Semi-Finished Steel are from Safe and Diverse Suppliers</u>.  Based on the information obtained during the course of this investigation, the Department found no evidence that U.S. production of finished steel necessary to meet national security requirements is dependent on imports of iron ore or semi-finished steel.  To the contrary, as set forth above, the United States is capable of producing and in fact produces sufficient iron ore and semi-finished steel to satisfy national security requirements.  This conclusion is further supported by the fact that, as set forth in greater detail in Section V(B) below, imports of iron ore and semi-finished steel account for only small percentages of total domestic consumption of these articles – approximately 20 percent and 7 percent, respectively – with the overwhelming majority of U.S. domestic demand being satisfied by domestic supply.

Further, the Department found that iron ore and semi-finished steel are imported from reliable foreign sources.  Accordingly, even if the United States were dependent on imports of iron ore and semi-finished steel, imports would not threaten to impair national security.

As set forth in detail in Section V(C) below, imports of iron ore and semi-finished steel come from diverse and reliable trading partners.  More than a dozen countries exported iron ore to the United States in 2000; many of these countries are in the Western Hemisphere.  Over the past ten years, Canada – with which the United States shares a 3,987-mile border – has been the source of more than 50 percent of U.S. iron ore imports.  Canada is a North Atlantic Treaty Organization ("NATO") ally, the United States' largest trading partner, and also a party to NAFTA.  Moreover, two U.S. companies own interests in one of the principal Canadian iron ore mines.[42]

More than 30 countries exported semi-finished steel to the United States in 2000.  Brazil and Mexico alone accounted for over 50 percent of these imports.  Both countries are safe and reliable suppliers.  Brazil is a participant in the Free Trade Area of the Americas initiative.

---

[40]  <u>Global Steel Trade:  Structural Problems and Future Solutions</u>, p. 14.

[41]  For example, in July 2001 the State of Minnesota's Iron Range Resources and Rehabilitation Board announced it was providing funding to support the Mesabi Nugget project, which is seeking to develop an iron product suitable for both integrated and mini-mill producers.

[42]  <u>See</u> discussion in Section V(C)1 <u>infra</u>.

Mexico – with which the United States shares a 1,550-mile border – is a close ally and is a party to NAFTA.

C.      **IMPORTS OF IRON ORE AND SEMI-FINISHED STEEL DO NOT FUNDAMENTALLY THREATEN TO IMPAIR THE CAPABILITY OF THE U.S. IRON ORE AND SEMI-FINISHED STEEL INDUSTRIES TO SATISFY NATIONAL SECURITY REQUIREMENTS**

1.  Overview of Imports of Iron Ore.  Although imports of iron ore have increased over the past decade, they still account for a relatively minor share (approximately 20 percent) of total domestic consumption.

**CHART 4 –
U.S. IMPORTS OF IRON ORE - 1991-2000**



Source:  U.S. Census Bureau data compiled by USGS

In 2000, imports of iron ore totaled 15.7 million metric tons, a 10 percent increase compared with 1999 levels.  Iron ore imports have increased 17.7 percent (2.4 million metric tons) between 1991 and 2000.[43]  Imports ranged from a high of 18.5 million metric tons in 1997 to a low of 12.5 million metric tons in 1992.  (See Chart 4).  During the first six months of 2001, imports of iron ore totaled 4.9 million metric tons, a 37 percent decrease compared with the same period in 2000.

---

[43]  Although not strictly relevant to this investigation, we would note that, by comparison, U.S. finished steel imports have increased far more rapidly.  Between 1991 and 2000, U.S. finished steel imports increased 116.4 percent.  U.S. finished steel imports ranged from a high of 34.7 million net tons in 1998 to a low of 13.6 million net tons in 1991.

**CHART 5 –**
**SALIENT IRON ORE STATISTICS - 1991-2000**
**(Thousand Metric Tons)**



Source:  USGS data

According to USGS data, imported iron ore accounted for 20.5 percent of U.S. consumption in 2000.  During the 1991-2000 period, imports accounted for less than one-quarter of total U.S. consumption of iron ore, ranging from a high of 23.2 percent in 1997 to a low of 16.7 percent 1992. (See Chart 5).

As noted above, two Canadian integrated steel mills own interests in three U.S. mines. U.S. exports of iron ore totaled 6.2 million metric tons in 2000, and have increased 52 percent (2.1 million metric tons) between 1991 and 2000.  U.S. exports ranged from a high of 6.3 million metric tons in 1997, to a low of 4.0 million metric tons in 1991.

U.S. net imports of iron ore accounted for only 12.5 percent of U.S. iron ore consumption in 2000.  During the 1991-2000 period, net imports have accounted for less than 16 percent of total U.S. consumption of iron ore, ranging from a high of 15.6 percent in 1994 to a low of 10.9 percent in 1999.

**CHART 6 –**
**U.S. IMPORTS OF IRON ORE BY COUNTRY - 1996-2000**



Source:  U.S. Census Bureau data compiled by USGS

More than a dozen countries exported iron ore to the United States in 2000.[44]  In 2000, as in the period 1996-2000, approximately 51 percent of U.S. iron ore imports (based on quantity) originated in Canada, and 39 percent originated in Brazil.  (See Chart 6).   The principal reasons for Canada's leading position are ownership and proximity.  Acme Metals Inc., a U.S. integrated steel mill, and Cleveland-Cliffs, Inc., a U.S. merchant iron ore company, currently own a combined 37.9 percent interest in one of the three Canadian iron ore producers.  **[Confidential business information -redacted].**[45]  The proximity of the producers and consumers of iron ore in the two countries, in particular along the Great Lakes region, also results in lower transportation costs for Canadian iron ore suppliers.

No duties are levied on the importation of iron ore, and there are no anti-dumping or countervailing duty orders in place.

---

[44]  The U.S. iron ore industry identified the Iron Ore Company of Canada (Canada), Quebec Cartier Mining Co. (Canada), and Cia. Vale do Rio Doce (CVRD) (Brazil) as leading foreign competitors.  CVRD is the world's largest iron ore producer.

[45]  Bethlehem Steel Corporation also owned an interest in one of Brazil's iron ore producers, which it sold to another Brazilian iron ore producer in September 2001.

2. <u>Overview of Imports of Semi-Finished Steel</u>. Semi-finished steel is imported by segments of the U.S. steel industry to convert into finished steel. As the Department noted in its July 2000 report, the U.S. steel industry utilizes semi-finished steel imports to supplement its own production.[46] Certain U.S. steel mills that do not produce raw steel, or whose steelmaking capacity does not meet its rolling capacity, indicated that they are dependent on imported semi-finished steel for some portion or all of their semi-finished steel needs.[47]

### CHART 7 –
### U.S. IMPORTS OF SEMI-FINISHED STEEL
### AND U.S. RAW STEEL PRODUCTION - 1991-2000



Source: AISI data

Although imports of semi-finished steel have increased significantly over the past decade, they still account for a small percentage (approximately 7 percent) of total U.S. semi-finished steel consumption. The majority of the increase in imports occurred between 1991 and 1994, when imports rose 252 percent, from 2.26 million net tons in 1991 to 7.94 million net tons in 1994. Since 1994, imports have ranged from a high of 8.58 million net tons in 1999 to a low of 5.20 million net tons in 1995. In 2000, imports of semi-finished steel totaled 8.56 million net tons, virtually the same level recorded in 1999. (See Chart 7). During the first six months of 2001, imports of semi-finished steel totaled 2.75 million net tons, a 43 percent decrease compared to the same period in 2000. More than thirty countries exported semi-finished steel to the United States in 2000.

---

[46] <u>Global Steel Trade: Structural Problems and Future Solutions</u>, p. 12.

[47] U.S. steel mills also use imported semi-finished steel to continue finished steel production when their blast furnaces or basic oxygen furnaces are down for repairs or maintenance (<u>e.g.</u>, relining). Further, some producers, including mini-mills, import high-quality semi-finished steel in order to produce high quality, specialty steels that they could not otherwise make.

**CHART 8 –**
**U.S. SEMI-FINISHED STEEL IMPORTS - 1996-2000**



Source:  U.S. International Trade Commission Dataweb

Approximately 85 percent (by quantity) of all semi-finished steel imported in 2000 was in the form of carbon slabs (7.26 million net tons).  Approximately 11 percent was in the form of carbon ingots, billets, and blooms (0.95 million net tons).  Four percent was in the form of stainless slabs, ingots, billets, and blooms (0.34 million net tons).  It is noteworthy that two U.S. steel companies without the capability to produce semi-finished steel consumed over 31 percent of total semi-finished steel imports in 2000.[48]

---

[48]  **[Confidential business information – redacted].**

**CHART 9 –**
**U.S. SEMI-FINISHED STEEL IMPORTS - 1996-2000**



Source:  U.S. International Trade Commission Dataweb

Carbon slabs ($1.6 billion) accounted for approximately 69 percent of all semi-finished steel imported in 2000 on a value basis.  Stainless slabs, ingots, billets, and blooms ($450 million) accounted for 20 percent.  Carbon ingots, billets, and blooms ($257 million) accounted for 11 percent.[49]

---

[49] The U.S. steel industry identified Companhia Siderúrgica de Tubarão S.A. (CST) (Brazil); Companhia Siderúrgica Nacional (CSN) (Brazil); Companhia Siderúrgica Paulista (COSIPA) (Brazil); Ispat Mexicana S.A. (Mexico); Severastahl (Russia); Magnitigorsk (MMK) (Russia); and Ilyich Iron and Steel Works (Ukraine) as leading foreign exporters of semi-finished steel to the United States.

**CHART 10 –**
**IMPORTS OF CARBON FLAT: SLABS BY COUNTRY - 1996-2000**



Source:  U.S. International Trade Commission Dataweb

In 2000, the United States imported carbon slabs from twenty countries.  Thirty-six percent of U.S. carbon slab imports originated in Brazil, 23 percent originated in Mexico, 10 percent originated in Russia, and 9 percent originated in Ukraine.  During the 1996-2000 period, total imports of carbon slabs increased 15 percent; shipments from Brazil increased 41 percent and shipments from Mexico increased 30 percent.

**CHART 11 –**
**IMPORTS OF CARBON LONG: INGOTS, BILLETS, AND BLOOMS**
**BY COUNTRY - 1996-2000**



Source:  U.S. International Trade Commission Dataweb

In 2000, the United States imported carbon ingots, billets, and blooms from 31 countries. Twenty-four percent of these imports originated in Brazil, 18 percent originated in Germany, 10 percent originated in Canada, and 9 percent originated in Finland.  During the 1996-2000 period, total imports of carbon ingots, billets, and blooms decreased 15 percent; shipments from Brazil increased 96 percent and shipments from Canada increased 9 percent, while shipments from Germany decreased 35 percent.

**CHART 12 –**
**IMPORTS OF STAINLESS AND TOOL STEEL:**
**SLABS, INGOTS, BILLETS, AND BLOOMS BY COUNTRY - 1996-2000**



Source:  U.S. International Trade Commission Dataweb

In 2000, the United States imported stainless slabs, ingots, billets, and blooms from 18 countries.[50]  Forty-two percent of these imports originated in Spain, 18 percent originated in the United Kingdom, 13 percent originated in Canada, and 8 percent originated in Sweden.  During the 1996-2000 period, total imports of stainless slabs, ingots, billets, and blooms increased 206 percent.

Duties levied on the importation of semi-finished steel vary by product and country of origin.  There are no anti-dumping or countervailing duty orders in place on the importation of semi-finished steel.  Only Russian semi-finished steel shipments are subject to quantitative restraints under the U.S.-Russia July 1999 <u>Agreement Concerning Trade in Certain Steel Products from the Russian Federation</u>.

---

[50]  The U.S. steel industry's raw stainless steel production totaled 2.4 million net tons in 2000, all of which was produced by steel mills operating electric arc furnaces, which rely on steel scrap, not iron ore, as their primary feedstock.

3.   Imports of Iron Ore and Semi-Finished Steel Do Not Fundamentally Threaten to Impair the Capability of the U.S. Iron Ore and Semi-Finished Steel Industries to Satisfy National Security Requirements.  As the Administration noted in its June 22, 2001 request to the U.S. International Trade Commission to initiate a broad investigation under Section 201 of the Trade Act of 1974 on the effect of steel imports on the U.S. steel industry, the U.S. steel industry is suffering financially, with marked declines in profits, returns on investment, and market share. As a result, over 20 U.S. steel companies have sought bankruptcy protection since 1998.

There can be no question that the U.S. steel industry generally – and their iron ore suppliers – have endured and continue to endure substantial economic difficulties.  However, based on the information obtained during the course of this investigation, the Department is unable to conclude that imports of iron ore and semi-finished steel fundamentally threaten the capability of U.S. iron ore and semi-finished steel producers to satisfy national security requirements.

As set forth in Section V(B) above, the evidence presented to the Department shows that U.S. industry currently produces sufficient quantities of iron ore and semi-finished steel to satisfy current and projected national security requirements.  The Department has been presented with conflicting evidence as to whether imports threaten competing U.S. producers.  There is evidence – principally in the form of testimony and comments from domestic iron ore and steel producers – that lower-priced imports have harmed, and threaten to continue to harm, domestic producers.  However, there also is evidence that it is the broader steel market downturn – not imports of iron ore and semi-finished steel (which comprise only approximately 20 and 7 percent of U.S. iron ore and semi-finished steel consumption respectively) – that is principally to blame for the economic difficulties faced by U.S. iron ore and semi-finished steel producers.

The issue whether imports have harmed or threaten to harm U.S. producers writ large is beyond the scope of the Department's inquiry, and need not be resolved here.  Under Section 232, the Department is authorized only to determine whether imports fundamentally threaten the ability of domestic producers to satisfy the United States' national security requirements.  The evidence before the Department does not support such a finding.  To the contrary, the evidence suggests that U.S. national security requirements are easily satisfied by current domestic production, and could continue to be satisfied domestically even if there were substantial further diminution of U.S. production, whether caused by imports or otherwise.  Responses to the Department's surveys confirm this conclusion, as does DOD's own analysis.   Accordingly, while the Department makes no finding as to whether U.S. producers are being harmed by imports, it finds that there is no evidence that imports threaten the viability of U.S. producers so fundamentally as to threaten to impair U.S. national security.

# VI.     RECOMMENDATION

Based on the findings set forth above, the Department does not recommend that the President take action under Section 232.

# EXHIBIT 6



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MEMORANDUM FOR SECRETARY OF COMMERCE

SUBJECT: Response to Steel and Aluminum Policy Recommendations

This memo provides a consolidated position from the DoD on the investigation of the effect of steel mill imports and the effects of imports of aluminum on national security, conducted by the Department of Commerce under Section 232 of the Trade Expansion Act of 1962 (hereinafter "Section 232 Report").

Regarding the December 15, 2017 reports on steel and aluminum, DoD believes that the systematic use of unfair trade practices to intentionally erode our innovation and manufacturing industrial base poses a risk to our national security. As such, DoD concurs with the Department of Commerce's conclusion that imports of foreign steel and aluminum based on unfair trading practices impair the national security. As noted in both Section 232 reports, however, the U.S. military requirements for steel and aluminum each only represent about three percent of U.S. production. Therefore, DoD does not believe that the findings in the reports impact the ability of DoD programs to acquire the steel or aluminum necessary to meet national defense requirements.

DoD continues to be concerned about the negative impact on our key allies regarding the recommended options within the reports. However, DoD recognizes that among these reports' alternatives, targeted tariffs are more preferable than a global quota or global tariff. In addition, we recommend an inter-agency group further refine the targeted tariffs, so as to create incentives for trade partners to work with the U.S. on addressing the underlying issue of Chinese transshipment.

If the Administration moves forward with targeted tariffs or quotas on steel, DoD recommends that the management and labor leaders of the respective industries be convened by the President, so that they may understand that these tariffs and quotas are conditional. Moreover, if the Administration takes action on steel, DoD recommends waiting before taking further steps on aluminum. The prospect of trade action on aluminum may be sufficient to coerce improved behavior of bad actors. In either case, it remains important for the President to continue to communicate the negative consequences of unfair trade practices.

This is an opportunity to set clear expectations domestically regarding competitiveness and rebuild economic strength at home while preserving a fair and reciprocal international economic system as outlined in the National Security Strategy. It is critical that we reinforce to

our key allies that these actions are focused on correcting Chinese overproduction and countering their attempts to circumvent existing antidumping tariffs – not the bilateral U.S. relationship.

cc:
Secretary of the Treasury
Secretary of State
Chief of Staff to the President
Assistant to the President for National Security Affairs
Chairman, National Economic Council
United States Trade Representative

2

# EXHIBIT 7

# Presidential Documents

Proclamation 9711 of March 22, 2018

## Adjusting Imports of Steel Into the United States

**By the President of the United States of America**

**A Proclamation**

1. On January 11, 2018, the Secretary of Commerce (Secretary) transmitted to me a report on his investigation into the effect of imports of steel mill articles on the national security of the United States under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862).

2. In Proclamation 9705 of March 8, 2018 (Adjusting Imports of Steel Into the United States), I concurred in the Secretary's finding that steel mill articles are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States, and decided to adjust the imports of steel mill articles, as defined in clause 1 of Proclamation 9705, as amended by clause 8 of this proclamation (steel articles), by imposing a 25 percent ad valorem tariff on such articles imported from all countries except Canada and Mexico.

3. In proclaiming this tariff, I recognized that our Nation has important security relationships with some countries whose exports of steel articles to the United States weaken our internal economy and thereby threaten to impair the national security. I also recognized our shared concern about global excess capacity, a circumstance that is contributing to the threatened impairment of the national security. I further determined that any country with which we have a security relationship is welcome to discuss with the United States alternative ways to address the threatened impairment of the national security caused by imports from that country, and noted that, should the United States and any such country arrive at a satisfactory alternative means to address the threat to the national security such that I determine that imports from that country no longer threaten to impair the national security, I may remove or modify the restriction on steel articles imports from that country and, if necessary, adjust the tariff as it applies to other countries as the national security interests of the United States require.

4. The United States is continuing discussions with Canada and Mexico, as well as the following countries, on satisfactory alternative means to address the threatened impairment to the national security by imports of steel articles from those countries: the Commonwealth of Australia (Australia), the Argentine Republic (Argentina), the Republic of Korea (South Korea), the Federative Republic of Brazil (Brazil), and the European Union (EU) on behalf of its member countries. Each of these countries has an important security relationship with the United States and I have determined that the necessary and appropriate means to address the threat to the national security posed by imports from steel articles from these countries is to continue these discussions and to exempt steel articles imports from these countries from the tariff, at least at this time. Any country not listed in this proclamation with which we have a security relationship remains welcome to discuss with the United States alternative ways to address the threatened impairment of the national security caused by imports of steel articles from that country.

5. The United States has an important security relationship with Australia, including our shared commitment to supporting each other in addressing national security concerns, particularly through our security, defense, and

intelligence partnership; the strong economic and strategic partnership between our countries; our shared commitment to addressing global excess capacity in steel production; and the integration of Australian persons and organizations into the national technology and industrial base of the United States.

6. The United States has an important security relationship with Argentina, including our shared commitment to supporting each other in addressing national security concerns in Latin America, particularly the threat posed by instability in Venezuela; our shared commitment to addressing global excess capacity in steel production; the reciprocal investment in our respective industrial bases; and the strong economic integration between our countries.

7. The United States has an important security relationship with South Korea, including our shared commitment to eliminating the North Korean nuclear threat; our decades-old military alliance; our shared commitment to addressing global excess capacity in steel production; and our strong economic and strategic partnership.

8. The United States has an important security relationship with Brazil, including our shared commitment to supporting each other in addressing national security concerns in Latin America; our shared commitment to addressing global excess capacity in steel production; the reciprocal investment in our respective industrial bases; and the strong economic integration between our countries.

9. The United States has an important security relationship with the EU and its constituent member countries, including our shared commitment to supporting each other in national security concerns; the strong economic and strategic partnership between the United States and the EU, and between the United States and EU member countries; and our shared commitment to addressing global excess capacity in steel production.

10. In light of the foregoing, I have determined that the necessary and appropriate means to address the threat to the national security posed by imports of steel articles from these countries is to continue ongoing discussions and to increase strategic partnerships, including those with respect to reducing global excess capacity in steel production by addressing its root causes. In my judgment, discussions regarding measures to reduce excess steel production and excess steel capacity, measures that will increase domestic capacity utilization, and other satisfactory alternative means will be most productive if the tariff proclaimed in Proclamation 9705 on steel articles imports from these countries is removed at this time.

11. However, the tariff imposed by Proclamation 9705 remains an important first step in ensuring the economic viability of our domestic steel industry and removing the threatened impairment of the national security. Without this tariff and the adoption of satisfactory alternative means addressing long-term solutions in ongoing discussions with the countries listed as excepted in clause 1 of this proclamation, the industry will continue to decline, leaving the United States at risk of becoming reliant on foreign producers of steel to meet our national security needs—a situation that is fundamentally inconsistent with the safety and security of the American people. As a result, unless I determine by further proclamation that the United States has reached a satisfactory alternative means to remove the threatened impairment to the national security by imports of steel articles from a particular country listed as excepted in clause 1 of this proclamation, the tariff set forth in clause 2 of Proclamation 9705 shall be effective May 1, 2018, for the countries listed as excepted in clause 1 of this proclamation. In the event that a satisfactory alternative means is reached such that I decide to exclude on a long-term basis a particular country from the tariff proclaimed in Proclamation 9705, I will also consider whether it is necessary and appropriate in light of our national security interests to make any corresponding adjustments to the tariff set forth in clause 2 of Proclamation 9705 as it applies to other countries. Because the current tariff exemptions

are temporary, however, I have determined that it is necessary and appropriate to maintain the current tariff level at this time.

12. In the meantime, to prevent transshipment, excess production, or other actions that would lead to increased exports of steel articles to the United States, the United States Trade Representative, in consultation with the Secretary and the Assistant to the President for Economic Policy, shall advise me on the appropriate means to ensure that imports from countries exempt from the tariff imposed in Proclamation 9705 do not undermine the national security objectives of such tariff. If necessary and appropriate, I will consider directing U.S. Customs and Border Protection (CBP) of the Department of Homeland Security to implement a quota as soon as practicable, and will take into account all steel articles imports since January 1, 2018, in setting the amount of such quota.

13. Section 232 of the Trade Expansion Act of 1962, as amended, authorizes the President to adjust the imports of an article and its derivatives that are being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security.

14. Section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), authorizes the President to embody in the Harmonized Tariff Schedule of the United States (HTSUS) the substance of statutes affecting import treatment, and actions thereunder, including the removal, modification, continuance, or imposition of any rate of duty or other import restriction.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including section 232 of the Trade Expansion Act of 1962, as amended, section 301 of title 3, United States Code, and section 604 of the Trade Act of 1974, as amended, do hereby proclaim as follows:

(1) Imports of all steel articles, as defined in clause 1 of Proclamation 9705, as amended by clause 8 of this proclamation, from the countries listed in this clause shall be exempt from the duty established in clause 2 of Proclamation 9705 until 12:01 a.m. eastern daylight time on May 1, 2018. Further, clause 2 of Proclamation 9705 is amended by striking the last two sentences and inserting the following two sentences: "Except as otherwise provided in this proclamation, or in notices published pursuant to clause 3 of this proclamation, all steel articles imports specified in the Annex shall be subject to an additional 25 percent ad valorem rate of duty with respect to goods entered, or withdrawn from warehouse for consumption, as follows: (a) on or after 12:01 a.m. eastern daylight time on March 23, 2018, from all countries except Canada, Mexico, Australia, Argentina, South Korea, Brazil, and the member countries of the European Union, and (b) on or after 12:01 a.m. eastern daylight time on May 1, 2018, from all countries. This rate of duty, which is in addition to any other duties, fees, exactions, and charges applicable to such imported steel articles, shall apply to imports of steel articles from each country as specified in the preceding sentence.".

(2) Paragraph (a) of U.S. note 16, added to subchapter III of chapter 99 of the HTSUS by the Annex to Proclamation 9705, is amended by replacing "Canada and of Mexico" with "Canada, of Mexico, of Australia, of Argentina, of South Korea, of Brazil, and of the member countries of the European Union".

(3) The "Article description" for heading 9903.80.01 of the HTSUS is amended by replacing "Canada or of Mexico" with "Canada, of Mexico, of Australia, of Argentina, of South Korea, of Brazil, or of the member countries of the European Union".

(4) The exemption afforded to steel articles from Canada, Mexico, Australia, Argentina, South Korea, Brazil, and the member countries of the EU shall apply only to steel articles of such countries entered, or withdrawn from warehouse for consumption, through the close of April 30, 2018, at which

time Canada, Mexico, Australia, Argentina, South Korea, Brazil, and the member countries of the EU shall be deleted from paragraph (a) of U.S. note 16 to subchapter III of chapter 99 of the HTSUS and from the article description of heading 9903.80.01 of the HTSUS.

(5) Any steel article that is admitted into a U.S. foreign trade zone on or after 12:01 a.m. eastern daylight time on March 23, 2018, may only be admitted as ''privileged foreign status'' as defined in 19 CFR 146.41, and will be subject upon entry for consumption to any ad valorem rates of duty related to the classification under the applicable HTSUS subheading. Any steel article that was admitted into a U.S. foreign trade zone under ''privileged foreign status'' as defined in 19 CFR 146.41, prior to 12:01 a.m. eastern daylight time on March 23, 2018, will likewise be subject upon entry for consumption to any ad valorem rates of duty related to the classification under applicable HTSUS subheadings imposed by Proclamation 9705, as amended by this proclamation.

(6) Clause 3 of Proclamation 9705 is amended by inserting a new third sentence reading as follows: ''Such relief may be provided to directly affected parties on a party-by-party basis taking into account the regional availability of particular articles, the ability to transport articles within the United States, and any other factors as the Secretary deems appropriate.''.

(7) Clause 3 of Proclamation 9705, as amended by clause 6 of this proclamation, is further amended by inserting a new fifth sentence as follows: ''For merchandise entered on or after the date the directly affected party submitted a request for exclusion, such relief shall be retroactive to the date the request for exclusion was posted for public comment.''.

(8) The reference to ''7304.10'' in clause 1 of Proclamation 9705, is amended to read ''7304.11''.

(9) The Secretary, in consultation with CBP and other relevant executive departments and agencies, shall revise the HTSUS so that it conforms to the amendments and effective dates directed in this proclamation. The Secretary shall publish any such modification to the HTSUS in the *Federal Register.*

(10) Any provision of previous proclamations and Executive Orders that is inconsistent with the actions taken in this proclamation is superseded to the extent of such inconsistency.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-second day of March, in the year of our Lord two thousand eighteen, and of the Independence of the United States of America the two hundred and forty-second.

[FR Doc. 2018–06425
Filed 3–27–18; 11:15 am]
Billing code 3295–F8–P

# EXHIBIT 8

# Presidential Documents

Proclamation 9740 of April 30, 2018

## Adjusting Imports of Steel Into the United States

**By the President of the United States of America**

**A Proclamation**

1. On January 11, 2018, the Secretary of Commerce (Secretary) transmitted to me a report on his investigation into the effect of imports of steel mill articles on the national security of the United States under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862).

2. In Proclamation 9705 of March 8, 2018 (Adjusting Imports of Steel Into the United States), I concurred in the Secretary's finding that steel mill articles are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States, and decided to adjust the imports of steel mill articles, as defined in clause 1 of Proclamation 9705, as amended by clause 8 of Proclamation 9711 of March 22, 2018 (Adjusting Imports of Steel Into the United States) (steel articles), by imposing a 25 percent ad valorem tariff on such articles imported from all countries except Canada and Mexico. I further stated that any country with which we have a security relationship is welcome to discuss with the United States alternative ways to address the threatened impairment of the national security caused by imports from that country, and noted that, should the United States and any such country arrive at a satisfactory alternative means to address the threat to the national security such that I determine that imports from that country no longer threaten to impair the national security, I may remove or modify the restriction on steel articles imports from that country and, if necessary, adjust the tariff as it applies to other countries, as the national security interests of the United States require.

3. In Proclamation 9711, I noted the continuing discussions with the Argentine Republic (Argentina), the Commonwealth of Australia (Australia), the Federative Republic of Brazil (Brazil), Canada, Mexico, the Republic of Korea (South Korea), and the European Union (EU) on behalf of its member countries, on satisfactory alternative means to address the threatened impairment to the national security by imports of steel articles from those countries. Recognizing that each of these countries and the EU has an important security relationship with the United States, I determined that the necessary and appropriate means to address the threat to national security posed by imports of steel articles from these countries was to continue the ongoing discussions and to exempt steel articles imports from these countries from the tariff proclaimed in Proclamation 9705 until May 1, 2018.

4. The United States has successfully concluded discussions with South Korea on satisfactory alternative means to address the threatened impairment to our national security posed by steel articles imports from South Korea. The United States and South Korea have agreed on a range of measures, including measures to reduce excess steel production and excess steel capacity, and measures that will contribute to increased capacity utilization in the United States, including a quota that restricts the quantity of steel articles imported into the United States from South Korea. In my judgment, these measures will provide an effective, long-term alternative means to address South Korea's contribution to the threatened impairment to our national security by restraining steel articles exports to the United States

from South Korea, limiting transshipment, and discouraging excess capacity and excess steel production. In light of this agreement, I have determined that steel articles imports from South Korea will no longer threaten to impair the national security and have decided to exclude South Korea from the tariff proclaimed in Proclamation 9705. The United States will monitor the implementation and effectiveness of the quota and other measures agreed upon with South Korea in addressing our national security needs, and I may revisit this determination, as appropriate.

5. The United States has agreed in principle with Argentina, Australia, and Brazil on satisfactory alternative means to address the threatened impairment to our national security posed by steel articles imported from these countries. I have determined that the necessary and appropriate means to address the threat to national security posed by imports of steel articles from Argentina, Australia, and Brazil is to extend the temporary exemption of these countries from the tariff proclaimed in Proclamation 9705, in order to finalize the details of these satisfactory alternative means to address the threatened impairment to our national security posed by steel articles imported from these countries. In my judgment, and for the reasons I stated in paragraph 10 of Proclamation 9711, these discussions will be most productive if steel articles from Argentina, Australia, and Brazil remain exempt from the tariff proclaimed in Proclamation 9705, until the details can be finalized and implemented by proclamation. Because the United States has agreed in principle with these countries, in my judgment, it is unnecessary to set an expiration date for the exemptions. Nevertheless, if the satisfactory alternative means are not finalized shortly, I will consider re-imposing the tariff.

6. The United States is continuing discussions with Canada, Mexico, and the EU. I have determined that the necessary and appropriate means to address the threat to the national security posed by imports of steel articles from these countries is to continue these discussions and to extend the temporary exemption of these countries from the tariff proclaimed in Proclamation 9705, at least at this time. In my judgment, and for the reasons I stated in paragraph 10 of Proclamation 9711, these discussions will be most productive if steel articles from these countries remain exempt from the tariff proclaimed in Proclamation 9705.

7. For the reasons I stated in paragraph 11 of Proclamation 9711, however, the tariff imposed by Proclamation 9705 remains an important first step in ensuring the economic stability of our domestic steel industry and removing the threatened impairment of the national security. As a result, unless I determine by further proclamation that the United States has reached a satisfactory alternative means to remove the threatened impairment to the national security by imports of steel articles from Canada, Mexico, and the member countries of the EU, the tariff set forth in clause 2 of Proclamation 9705 shall be effective June 1, 2018, for these countries.

8. In light of my determination to exclude, on a long-term basis, South Korea from the tariff proclaimed in Proclamation 9705, I have considered whether it is necessary and appropriate in light of our national security interests to make any corresponding adjustments to the tariff set forth in clause 2 of Proclamation 9705 as it applies to other countries. I have determined that, in light of the agreed-upon quota and other measures with South Korea, the measures being finalized with Argentina, Australia, and Brazil, and the ongoing discussions that may result in further long-term exclusions from the tariff proclaimed in Proclamation 9705, it is necessary and appropriate, at this time, to maintain the current tariff level as it applies to other countries.

9. Section 232 of the Trade Expansion Act of 1962, as amended, authorizes the President to adjust the imports of an article and its derivatives that are being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security.

10. Section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), authorizes the President to embody in the Harmonized Tariff Schedule of the United States (HTSUS) the substance of statutes affecting import treatment, and actions thereunder, including the removal, modification, continuance, or imposition of any rate of duty or other import restriction.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including section 232 of the Trade Expansion Act of 1962, as amended, section 301 of title 3, United States Code, and section 604 of the Trade Act of 1974, as amended, do hereby proclaim as follows:

(1) Imports of all steel articles from Argentina, Australia, Brazil, and South Korea shall be exempt from the duty established in clause 2 of Proclamation 9705, as amended by clause 1 of Proclamation 9711. Imports of all steel articles from Canada, Mexico, and the member countries of the EU shall be exempt from the duty established in clause 2 of Proclamation 9705 until 12:01 a.m. eastern daylight time on June 1, 2018. Further, clause 2 of Proclamation 9705, as amended by clause 1 of Proclamation 9711, is also amended by striking the last two sentences and inserting in lieu thereof the following two sentences: "Except as otherwise provided in this proclamation, or in notices published pursuant to clause 3 of this proclamation, all steel articles imports specified in the Annex shall be subject to an additional 25 percent ad valorem rate of duty with respect to goods entered for consumption, or withdrawn from warehouse for consumption, as follows: (a) on or after 12:01 a.m. eastern daylight time on March 23, 2018, from all countries except Argentina, Australia, Brazil, Canada, Mexico, South Korea, and the member countries of the European Union, and (b) on or after 12:01 a.m. eastern daylight time on June 1, 2018, from all countries except Argentina, Australia, Brazil, and South Korea. This rate of duty, which is in addition to any other duties, fees, exactions, and charges applicable to such imported steel articles, shall apply to imports of steel articles from each country as specified in the preceding sentence.".

(2) In order to provide the quota treatment referred to in paragraph 4 of this proclamation to steel articles imports from South Korea, U.S. Note 16 of subchapter III of chapter 99 of the HTSUS is amended as provided for in Part A of the Annex to this proclamation. U.S. Customs and Border Protection (CBP) of the Department of Homeland Security shall implement this quota as soon as practicable, taking into account all steel articles imports from South Korea since January 1, 2018.

(3) The exemption afforded to steel articles from Canada, Mexico, and the member countries of the EU shall apply only to steel articles of such countries entered for consumption, or withdrawn from warehouse for consumption, through the close of May 31, 2018, at which time such countries shall be deleted from the article description of heading 9903.80.01 of the HTSUS.

(4) Clause 5 of Proclamation 9711 is amended by inserting the phrase ", except those eligible for admission under "domestic status" as defined in 19 CFR 146.43, which is subject to the duty imposed pursuant to Proclamation 9705, as amended by Proclamation 9711," after the words "Any steel article" in the first and second sentences.

(5) Steel articles shall not be subject upon entry for consumption to the duty established in clause 2 of Proclamation 9705, as amended by clause 1 of this proclamation, merely by reason of manufacture in a U.S. foreign trade zone. However, steel articles admitted to a U.S. foreign trade zone in "privileged foreign status" pursuant to clause 5 of Proclamation 9711, as amended by clause 4 of this proclamation, shall retain that status consistent with 19 CFR 146.41(e).

(6) No drawback shall be available with respect to the duties imposed on any steel article pursuant to Proclamation 9705, as amended by clause 1 of this proclamation.

(7) The Secretary, in consultation with CBP and other relevant executive departments and agencies, shall revise the HTSUS so that it conforms to the amendments and effective dates directed in this proclamation. The Secretary shall publish any such modification to the HTSUS in the *Federal Register.*

(8) Any provision of previous proclamations and Executive Orders that is inconsistent with the actions taken in this proclamation is superseded to the extent of such inconsistency.

IN WITNESS WHEREOF, I have hereunto set my hand this thirtieth day of April, in the year of our Lord two thousand eighteen, and of the Independence of the United States of America the two hundred and forty-second.

Billing code 3295–F8–P

# ANNEX

## TO MODIFY CERTAIN PROVISIONS OF CHAPTER 99 OF
## THE HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES

A.  Subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States (HTS) is modified below, with the material in the new tariff provisions inserted in the columns labeled "Heading/Subheading", "Article Description", "Rates of Duty 1-General", "Rates of Duty 1-Special," and "Rates of Duty 2", respectively.  Except as provided in the superior text to subheadings 9903.80.05 through 9903.80.58 in item 4, the modifications made in items 1, 3 and 4 of this part shall be effective for goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on May 1, 2018; except that the modifications in item 1 to the opening paragraph of subdivision (a) and to subdivision (a)(i) of U.S. note 16, as well as the modifications made in item 2 of this part, shall be effective for goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on March 23, 2018.  Quota amounts are calculated beginning on January 1 of each calendar year, including for calendar year 2018.

1.  The text of subdivision (a) of U.S. note 16 to such subchapter is modified to read as follows:

"This note and the tariff provisions referred to herein set forth the ordinary customs duty treatment applicable to all entries of the iron or steel products of all countries other than of the United States, when such iron or steel products are classifiable in the headings or subheadings enumerated in subdivision (b) of this note.  All anti-dumping or countervailing duties, or other duties and charges applicable to such goods shall continue to be imposed, except as may be expressly provided herein.

(i)    Heading 9903.80.01 provides the ordinary customs duty treatment of iron or steel products of all countries other than products of the United States and other than of countries expressly exempt therefrom, pursuant to the article description of such heading and the terms of subdivision (e) of this note.  For any such products that are eligible for special tariff treatment under any of the free trade agreements or preference programs listed in general note 3(c)(i) to the tariff schedule, the duty provided in this heading shall be collected in addition to any special rate of duty otherwise applicable under the appropriate tariff subheading, except where prohibited by law.  Goods for which entry is claimed under a provision of chapter 98 and which are subject to the additional duties prescribed herein shall be eligible for and subject to the terms of such provision and applicable U.S. Customs and Border Protection ("CBP") regulations, except that duties under subheading 9802.00.60 shall be assessed based upon the full value of the imported article.  No claim for entry or for any duty exemption or reduction shall be allowed for the iron or steel products enumerated in subdivision (b) of this note under a provision of chapter 99 that may set forth a lower rate of duty or provide duty-free treatment, taking into account information supplied by CBP, but any additional duty prescribed in any provision of this subchapter or subchapter IV of chapter 99 shall be imposed in addition to the duty in heading 9903.80.01.

(ii)   Subheadings 9903.80.05 through 9903.80.58, inclusive, provide the ordinary customs duty and quota treatment of such goods enumerated in subdivision (b) of this note when they are the product of any country enumerated in the superior text thereto and expressly exempt from the scope of heading 9903.80.01, subject to the limitations in subdivision (e) of this note.

2. The text of subdivision (b) of such U.S. note 16 is modified by adding below clause (b)(v) the sentence "Any reference above to iron or steel products classifiable in any heading or subheading of chapter 72 or 73, as the case may be, shall mean that any good provided for in the article description of such heading or subheading and of all its subordinate provisions (both legal and statistical) is covered by the provisions of this note and related tariff provisions."  The text of subdivisions (b), (c) and (d) of such U.S. note 16 are each modified by deleting "heading 9903.80.01" and by inserting in lieu thereof "heading 9903.80.01 and subheadings 9903.80.05 through 9903.80.58, inclusive,".

3. The following new subdivision (e) is hereby inserted at the end of such U.S. note 16:

"(e) Subheadings 9903.80.05 through 9903.80.58, inclusive, set forth the ordinary customs duty treatment for the iron or steel products (as enumerated in subdivision (b) of this note) of any country enumerated in the superior text to such subheadings, subject to the annual aggregate quantitative limitations proclaimed for these subheadings and as set forth on the Internet site of CBP at the following link:  https://www.cbp.gov/trade/quota . Imports from any such country in an aggregate quantity under any such subheading during any of the periods January through March, April through June, July through September, or October through December in any year that is in excess of 30 percent of the total aggregate quantity provided for a calendar year for such country, as set forth on the Internet site of CBP, shall not be allowed."

4. The following new subheadings and superior text thereto are inserted in numerical sequence in subchapter III:

| Heading/ Subheading | Article description | Rates of Duty | | 2 |
|---|---|---|---|---|
| | | 1 | | |
| | | General | Special | |
| | Iron or steel products of South Korea enumerated in U.S. note 16(b) to this subchapter, if entered in aggregate quantities prescribed in subdivision (e) of such note for any calendar year starting on January 1, 2018 and for any portion thereof as prescribed in such subdivision (e): | | | |
| 9903.80.05 | Hot-rolled sheet, provided for in subheading 7208.10.60, 7208.26.00, 7208.27.00, 7208.38.00, 7208.39.00, 7208.40.60, 7208.53.00, 7208.54.00, 7208.90.00, 7225.30.70 or 7225.40.70......................... Free | Free | | |
| 9903.80.06 | Hot-rolled strip, provided for in subheading 7211.19.15, 7211.19.20, 7211.19.30, 7211.19.45, 7211.19.60, 7211.19.75, 7226.91.70 or 7226.91.80.......................................................... Free | Free | | |
| 9903.80.07 | Hot-rolled plate, in coils, provided for in subheading 7208.10.15, 7208.10.30, 7208.25.30, 7208.25.60, 7208.36.00, 7208.37.00, 7211.14.00 (except for statistical reporting numbers 7211.14.0030 and 7211.14.0045) or 7225.30.30............................. Free | Free | | |
| 9903.80.08 | Cold-rolled sheet and other products, provided for in subheading 7209.15.00, 7209.16.00, 7209.17.00, 7209.18.15, 7209.18.60, 7209.25.00, 7209.26.00, 7209.27.00, 7209.28.00, 7209.90.00, 7210.70.30, 7225.50.70, 7225.50.80 or 7225.99.00..................... Free | Free | | |
| 9903.80.09 | Cold-rolled strip and other products, provided for in subheading 7211.23.15, 7211.23.20, 7211.23.30, 7211.23.45, 7211.23.60, 7211.29.20, 7211.29.45, 7211.29.60, 7211.90.00, 7212.40.10, 7212.40.50, 7226.92.50, 7226.92.70, 7226.92.80 or 7226.99.01 (except for statistical reporting numbers 7226.99.0110 and 7226.99.0130)................................. Free | Free | | |
| 9903.80.10 | Cold-rolled black plate, provided for in subheading 7209.18.25.......................................................... Free | Free | | |
| 9903.80.11 | Plate in cut lengths, provided for in subheading 7208.40.30, 7208.51.00, 7208.52.00, 7210.90.10, 7211.13.00, 7211.14.00 (except for statistical reporting number 7211.14.0090), 7225.40.30, 7225.50.60 or 7226.91.50............................................... Free | Free | | |

| Heading/ Subheading | Article description | Rates of Duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| 9903.80.12 | Flat-rolled products, hot-dipped, provided for in subheading 7210.41.00, 7210.49.00, 7210.70.60 (except for statistical reporting numbers 7210.70.6030 and 7210.70.6090), 7212.30.10, 7212.30.30, 7212.30.50, 7225.92.00 or 7226.99.01 (except for statistical reporting numbers 7226.99.0110 and 7226.99.0180)................................... | Free | | |
| 9903.80.13 | Flat-rolled products, coated, provided for in subheading 7210.20.00, 7210.61.00, 7210.69.00, 7210.70.60 (except for statistical reporting numbers 7210.70.6030 and 7210.70.6060), 7210.90.60, 7210.90.90, 7212.50.00 or 7212.60.00........................... | Free | | |
| 9903.80.14 | Tin-free steel, provided for in subheading 7210.50.00............................................................... | Free | | |
| 9903.80.15 | Tin plate, provided for in subheading 7210.11.00, 7210.12.00 or 7212.10.00............................................... | Free | | |
| 9903.80.16 | Silicon electrical steel sheets and strip, provided for in subheading 7225.11.00, 7225.19.00, 7226.11.10, 7226.11.90, 7226.19.10 or 7226.19.90........................ | Free | | |
| 9903.80.17 | Sheets and strip electrolytically coated or plated with zinc, provided for in subheading 7210.30.00, 7210.70.60 (except for statistical reporting numbers 7210.70.6060 and 7210.70.6090), 7212.20.00, 7225.91.00 or 7226.99.01 (except for statistical reporting numbers 7226.99.0130 and 7226.99.0180)................................................... | Free | | |
| 9903.80.18 | Oil country pipe and tube goods, provided for in subheading 7304.23.30, 7304.23.60, 7304.29.10, 7304.29.20, 7304.29.31, 7304.29.41, 7304.29.50, 7304.29.61, 7305.20.20, 7305.20.40, 7305.20.60, 7305.20.80, 7306.29.10, 7306.29.20, 7306.29.31, 7306.29.41, 7306.29.60 or 7306.29.81........................ | Free | | |

| Heading/ Subheading | Article description | Rates of Duty | | 2 |
| --- | --- | --- | --- | --- |
| | | 1 | | |
| | | General | Special | |
| 9903.80.19 | Line pipe exceeding 406.4 mm in outside diameter, provided for in subheading 7304.19.10 (except for statistical reporting numbers 7304.19.1020, 7304.19.1030, 7304.19.1045 and 7304.19.1060), 7304.19.50 (except for statistical reporting numbers 7304.19.5020 and  7304.19.5050), 7305.11.10, 7305.11.50, 7305.12.10, 7305.12.50, 7305.19.10 or 7305.19.50.......................................................................... | Free | | |
| 9903.80.20 | Line pipe not exceeding 406.4 mm in outside diameter, provided for in subheading 7304.19.10 (except for statistical reporting number 7304.19.1080), 7304.19.50 (except for statistical reporting number 7304.19.5080), 7306.19.10 (except for statistical reporting number 7306.19.1050) or 7306.19.51 (except for statistical reporting number 7306.19.5150)....................................................... | Free | | |
| 9903.80.21 | Other line pipe, provided for in subheading 7306.19.10 (except for statistical reporting number 7306.19.1010) or 7306.19.51 (except for statistical reporting number 7306.19.5110)................................... | Free | | |
| 9903.80.22 | Standard pipe, provided for in subheading 7304.39.00 (except for statistical reporting numbers 7304.39.0002, 7304.39.0004, 7304.39.0006, 7304.39.0008, 7304.39.0028, 7304.39.0032, 7304.39.0040, 7304.39.0044, 7304.39.0052, 7304.39.0056, 7304.39.0068 and 7304.39.0072), 7304.59.80 (except for statistical reporting numbers 7304.59.8020, 7304.59.8025, 7304.59.8035, 7304.59.8040, 7304.59.8050, 7304.59.8055, 7304.59.8065 and 7304.59.8070) or 7306.30.50 (except for statistical reporting numbers 7306.30.5010, 7306.30.5015, 7306.30.5020 and 7306.30.5035).................................................... | Free | | |
| 9903.80.23 | Structural pipe and tube, provided for in subheading 7304.90.10, 7304.90.30, 7305.31.20, 7305.31.40, 7305.31.60 (except for statistical reporting number 7305.31.6010), 7306.30.30, 7306.50.30, 7306.61.10, 7306.61.30, 7306.69.10 or 7306.69.30........................... | Free | | |

| Heading/ Subheading | Article description | Rates of Duty | | 2 |
| --- | --- | --- | --- | --- |
| | | 1 | | |
| | | General | Special | |
| 9903.80.24 | Mechanical tubing and other products, provided for in subheading 7304.31.30, 7304.31.60 (except for statistical reporting number 7304.31.6010), 7304.39.00 (except for statistical reporting numbers 7304.39.0002, 7304.39.0004, 7304.39.0006, 7304.39.0008, 7304.39.0016, 7304.39.0020, 7304.39.0024, 7304.39.0036, 7304.39.0048, 7304.39.0062, 7304.39.0076 and 7304.39.0080), 7304.51.10, 7304.51.50 (except for statistical reporting numbers 7304.51.5005, 7304.51.5015 and 7304.51.5045), 7304.59.10, 7304.59.60, 7304.59.80 (except for statistical reporting numbers 7304.59.8010, 7304.59.8015, 7304.59.8030, 7304.59.8045, 7304.59.8060 and 7304.59.8080), 7304.90.50, 7304.90.70, 7306.30.10, 7306.30.50 (except for statistical reporting numbers 7306.30.5010, 7306.30.5025, 7306.30.5028, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090), 7306.50.10, 7306.50.50 (except for statistical reporting number 7306.50.5010), 7306.61.50, 7306.61.70 (except for statistical reporting number 7306.61.7030), 7306.69.50 or 7306.69.70 (except for statistical reporting number 7306.69.7030)..................................... | Free | | |
| 9903.80.25 | Pressure tubing and other products, provided for in subheading 7304.31.60 (except for statistical reporting number 7304.31.6050), 7304.39.00 (except for statistical reporting numbers 7304.39.0016, 7304.39.0020, 7304.39.0024, 7304.39.0028, 7304.39.0032, 7304.39.0036, 7304.39.0040, 7304.39.0044, 7304.39.0048, 7304.39.0052, 7304.39.0056, 7304.39.0062, 7304.39.0068, 7304.39.0072, 7304.39.0076 and 7304.39.0080), 7304.51.50 (except for statistical reporting numbers 7304.51.5005 and 7304.51.5060), 7304.59.20, 7306.30.50 (except for statistical reporting numbers 7306.30.5015, 7306.30.5020, 7306.30.5025, 7306.30.5028, 7306.30.5032, 7306.30.5035, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090) or 7306.50.50 (except for statistical reporting numbers 7306.50.5030, 7306.50.5050 and 7306.50.5070)................................................................. | Free | | |

Federal Register / Vol. 83, No. 88 / Monday, May 7, 2018 / Presidential Documents    20693

| Heading/ Subheading | Article description | Rates of Duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| 9903.80.26 | Tubes or pipes for piling and other products, provided for in subheading 7305.39.10 or 7305.39.50................................................................ | Free | | |
| 9903.80.27 | Pipes and tubes, not specially provided for, provided for in subheading 7304.51.50 (except for statistical reporting numbers 7304.51.5015, 7304.51.5045 and 7304.51.5060), 7305.90.10, 7305.90.50, 7306.90.10 or 7306.90.50................................................................ | Free | | |
| 9903.80.28 | Hot-rolled sheet of stainless steel, provided for in subheading 7219.13.00, 7219.14.00, 7319.23.00 or 7219.24.00................................................................ | Free | | |
| 9903.80.29 | Hot-rolled strip of stainless steel and other products, provided for in subheading 7220.12.10 or 7220.12.50................................................................ | Free | | |
| 9903.80.30 | Hot-rolled plate of stainless steel, in coils, and other products, provided for in subheading 7219.11.00 or 7219.12.00................................................................ | Free | | |
| 9903.80.31 | Cold-rolled sheet of stainless steel and other products, provided for in subheading 7219.32.00, 7219.33.00, 7219.34.00, 7219.35.00 or 7219.90.00.... | Free | | |
| 9903.80.32 | Cold-rolled strip of stainless steel, provided for in subheading 7220.20.10, 7220.20.60, 7220.20.70, 7220.20.80, 7220.20.90 or 7220.90.00......................... | Free | | |
| 9903.80.33 | Cold-rolled plate of stainless steel, in coils, provided for in subheading 7219.31.00 (except for statistical reporting number 7219.31.0050)................................. | Free | | |
| 9903.80.34 | Wire of stainless steel, drawn, provided for in subheading 7223.00.10, 7223.00.50 or 7223.00.90..... | Free | | |
| 9903.80.35 | Pipes and tubes of stainless steel, provided for in subheading 7304.41.30, 7304.41.60, 7304.49.00, 7305.31.60 (except for statistical reporting number 7305.31.6090), 7306.40.10, 7306.40.50, 7306.61.70 (except for statistical reporting number 7306.61.7060) or 7306.69.70 (except for statistical reporting number 7306.69.7060)................................. | Free | | |
| 9903.80.36 | Line pipe of stainless steel, provided for in subheading 7304.11.00 or 7306.11.00.......................... | Free | | |

| Heading/ Subheading | Article description | Rates of Duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| 9903.80.37 | Bars and rods of stainless steel, cold finished, provided for in subheading 7222.20.00 or 7222.30.00............................................................... | Free | | |
| 9903.80.38 | Bars and rods of stainless steel, hot-rolled, provided for in heading 7221.00.00 (except for statistical reporting numbers 7221.00.0017, 7221.00.0018 and 7221.00.0030) or subheading 7222.11.00, 7222.19.00 or 7222.40.30 (except for statistical reporting numbers 7222.40.3025 and 7222.40.3045)............................................................... | Free | | |
| 9903.80.39 | Blooms, billets and slabs of stainless steel and other products, provided for in subheading 7218.91.00 and 7218.99.00............................................................... | Free | | |
| 9903.80.40 | Oil country pipe and tube goods of stainless steel and other products, provided for in subheading 7304.22.00, 7304.24.30, 7304.24.40, 7304.24.60, 7306.21.30, 7306.21.40 or 7306.21.80........................ | Free | | |
| 9903.80.41 | Ingot and other primary forms of stainless steel, provided for in subheading 7218.10.00........................ | Free | | |
| 9903.80.42 | Flat-rolled products of stainless steel, provided for in subheading 7219.21.00, 7219.22.00, 7219.31.00 (except for statistical reporting number 7219.31.0010) or 7220.11.00.................................... | Free | | |
| 9903.80.43 | Bars and rods, hot-rolled, in irregularly wound coils, of stainless steel, provided for in heading 7221.00.00 (except for statistical reporting numbers 7221.00.0005, 7221.00.0045 and 7221.00.0075).......... | Free | | |
| 9903.80.44 | Angles, shapes and sections of stainless steel, provided for in subheading 7222.40.30 (except for statistical reporting numbers 7222.40.3065 and 7222.40.3085) or 7222.40.60.................................... | Free | | |
| 9903.80.45 | Angles, shapes and sections, provided for in subheading 7216.31.00, 7216.32.00, 7216.33.00, 7216.40.00, 7216.50.00, 7216.99.00, 7228.70.30 (except for statistical reporting numbers 7228.70.3060 and 7228.70.3081) or 7228.70.60.......... | Free | | |

| Heading/ Subheading | Article description | Rates of Duty | | 2 |
|---|---|---|---|---|
| | | 1 | | |
| | | General | Special | |
| 9903.80.46 | Bars and rods, hot-rolled, in irregularly wound coils, provided for in subheading 7213.91.30, 9213.91.45, 7213.91.60, 7213.99.00 (except for statistical reporting number 7213.99.0060), 7227.20.00 (except for statistical reporting number 7227.20.0080) or 7227.90.60 (except for statistical reporting numbers 7227.90.6005, 7227.90.6010, 7227.90.6040 and 7227.90.6090)............................................................. | Free | | |
| 9903.80.47 | Wire (other than of stainless steel), provided for in subheading 7217.10.10, 7217.10.20, 7217.10.30, 7217.10.40, 7217.10.50, 7217.10.60, 7217.10.70, 7217.10.80, 7217.10.90, 7217.20.15, 7217.20.30, 7217.20.45, 7217.20.60, 7217.20.75, 7217.30.15, 7217.30.30, 7217.30.45, 7217.30.60, 7217.30.75, 7217.90.10, 7217.90.50, 7229.20.00, 7229.90.10, 7229.90.50 or 7229.90.90............................................... | Free | | |
| 9903.80.48 | Bars, hot-rolled, not of stainless steel, provided for in subheading 7213.20.00, 7213.99.00 (except for statistical reporting numbers 7213.99.0030 and 7213.99.0090), 7214.10.00, 7214.30.00, 7214.91.00, 7214.99.00, 7215.90.10, 7227.20.00 (except for statistical reporting number 7227.20.0030), 7227.90.60 (except for statistical reporting numbers 7227.90.6020, 7227.90.6030 and 7227.90.6035), 7228.20.10, 7228.30.80 (except for statistical reporting number 7228.30.8010), 7228.40.00, 7228.60.60 or 7228.80.00............................................... | Free | | |
| 9903.80.49 | Bars, cold-finished, not of stainless steel, provided for in subheading 7215.10.00, 7215.50.00, 7215.90.30, 7215.90.50, 7228.20.50, 7228.50.50 or 7228.60.80........................................................................ | Free | | |
| 9903.80.50 | Angles, shapes and sections of a type known as "light-shaped bars" and other products, provided for in subheading 7216.10.00, 7216.21.00, 7216.22.00 or 7228.70.30 (except for statistical reporting numbers 7228.70.3010, 7228.70.3020 and 7228.70.3041).......... | Free | | |
| 9903.80.51 | Reinforcing bars, provided for in subheading 7213.10.00, 7214.20.00 or 7228.30.80 (except for | | | |

| Heading/ Subheading | Article description | Rates of Duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| . | statistical reporting numbers 7228.30.8005, 7228.30.8015, 7228.30.8041, 7228.30.8045 and 7228.30.8070)................................................. | Free | | |
| 9903.80.52 | Sheet piling, provided for in subheading 7301.10.00........................................................... | Free | | |
| 9903.80.53 | Nonumerated railroad goods, provided for in subheading 7302.40.00, 7302.90.10 and 7302.90.90......................................................... | Free | | |
| 9903.80.54 | Rails other than those known as "standard rails," provided for in subheading 7302.10.10 (except for statistical reporting numbers 7302.10.1010, 7302.10.1035, 7302.10.1065 and 7302.10.1075)......................................................... | Free | | |
| 9903.80.55 | Rails known as "standard rails," provided for in subheading 7302.10.10 (except for statistical reporting numbers 7302.10.1015, 7302.10.1025, 7302.10.1045 and 7302.10.1055) or 7302.10.50.......................................................... | Free | | |
| 9903.80.56 | Products of tool steel and other products, provided for in subheading 7224.10.00 (except for statistical reporting numbers 7224.10.0005 and 7224.10.0075), 7224.90.00 (except for statistical reporting numbers 7224.90.0005, 7224.90.0045, 7224.90.0055, 7224.90.0065 and 7224.90.0075), 7225.30.11, 7225.30.51, 7225.40.11, 7225.40.51, 7225.50.11, 7226.20.00, 7226.91.05, 7226.91.15, 7226.91.25, 7226.92.10, 7226.92.30, 7227.10.00, 7227.90.10, 7227.90.20, 7228.10.00, 7228.30.20, 7228.30.40, 7228.30.60, 7228.50.10, 7228.60.10 or 7229.90.05........................................................... | Free | | |
| 9903.80.57 | Blooms, billets and slabs, semi-finished, provided for in subheading 7207.11.00, 7207.12.00, 7207.19.00, 7207.20.00 or 7224.90.00 (except for statistical reporting numbers 7224.90.0015, 7224.90.0025, and 7224.90.0035)......................................................... | Free | | |
| 9903.80.58 | Ingots, provided for in subheading 7206.10.00, 7206.90.00 or 7224.10.00 (except for statistical reporting number 7224.10.0045).................................. | Free | | |

B.  For the purposes of administering the quantitative limitations applicable to subheadings 9903.80.05 through 9903.80.58 (as created in part A of this annex), the following annual aggregate limits shall apply for the period starting with calendar year 2018 and for subsequent years, unless modified or terminated:

### SOUTH KOREA

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
|  | Iron or steel products of South Korea enumerated in U.S. note 16(b) to this subchapter,  if entered in aggregate quantities prescribed in subdivision (e) of such note for any calendar year starting on January 1, 2018 and for any portion thereof as prescribed in such subdivision (e): |  |
| 9903.80.05 | Hot-rolled sheet, provided for in subheading 7208.10.60, 7208.26.00, 7208.27.00, 7208.38.00, 7208.39.00, 7208.40.60, 7208.53.00, 7208.54.00, 7208.90.00, 7225.30.70 or 7225.40.70.............................. | 404,694,045 kg |
| 9903.80.06 | Hot-rolled strip, provided for in subheading 7211.19.15, 7211.19.20, 7211.19.30, 7211.19.45, 7211.19.60, 7211.19.75, 7226.91.70 or 7226.91.80.................................................................... | 249,173 kg |
| 9903.80.07 | Hot-rolled plate, in coils, provided for in subheading 7208.10.15, 7208.10.30, 7208.25.30, 7208.25.60, 7208.36.00, 7208.37.00, 7211.14.00 (except for statistical reporting numbers 7211.14.0030 and 7211.14.0045) or 7225.30.30............................................. | 125,346,920 kg |
| 9903.80.08 | Cold-rolled sheet, and other products, provided for in subheading 7209.15.00, 7209.16.00, 7209.17.00, 7209.18.15, 7209.18.60, 7209.25.00, 7209.26.00, 7209.27.00, 7209.28.00, 7209.90.00, 7210.70.30, 7225.50.70, 7225.50.80 or 7225.99.00............................. | 90,336,230 kg |
| 9903.80.09 | Cold-rolled strip, and other products, provided for in subheading 7211.23.15, 7211.23.20, 7211.23.30, 7211.23.45, 7211.23.60, 7211.29.20, 7211.29.45, 7211.29.60, 7211.90.00, 7212.40.10, 7212.40.50, 7226.92.50, 7226.92.70, 7226.92.80 or 7226.99.01 (except for statistical reporting numbers 7226.99.0110 and 7226.99.0130)................................................................ | 3,207,110 kg |

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| 9903.80.10 | Cold-rolled black plate, provided for in subheading 7209.18.25.................................................................. | 34,385,821 kg |
| 9903.80.11 | Plate in cut lengths, provided for in subheading 7208.40.30, 7208.51.00, 7208.52.00, 7210.90.10, 7211.13.00, 7211.14.00 (except for statistical reporting number 7211.14.0090), 7225.40.30, 7225.50.60 or 7226.91.50........................................................... | 202,530,628 kg |
| 9903.80.12 | Flat-rolled products, hot-dipped, provided for in subheading 7210.41.00, 7210.49.00, 7210.70.60 (except for statistical reporting numbers 7210.70.6030 and 7210.70.6090), 7212.30.10, 7212.30.30, 7212.30.50, 7225.92.00 or 7226.99.01 (except for statistical reporting numbers 7226.99.0110 and 7226.99.0180)......................................................... | 166,310,597 kg |
| 9903.80.13 | Flat-rolled products, coated, provided for in subheading 7210.20.00, 7210.61.00, 7210.69.00, 7210.70.60 (except for statistical reporting numbers 7210.70.6030 and 7210.70.6060), 7210.90.60, 7210.90.90, 7212.50.00 or 7212.60.00............................... | 190,840,544 kg |
| 9903.80.14 | Tin-free steel, provided for in subheading 7210.50.00.................................................................. | 18,374,353 kg |
| 9903.80.15 | Tin plate, provided for in subheading 7210.11.00, 7210.12.00 or 7212.10.00....................................... | 54,749,093 kg |
| 9903.80.16 | Silicon electrical steel sheets and strip, provided for in subheading 7225.11.00, 7225.19.00, 7226.11.10, 7226.11.90, 7226.19.10 or 7226.19.90............................... | 7,505,976 kg |
| 9903.80.17 | Sheets and strip electrolytically coated or plated with zinc, provided for in subheading 7210.30.00, 7210.70.60 (except for statistical reporting numbers 7210.70.6060 and 7210.70.6090), 7212.20.00, 7225.91.00 or 7226.99.01 (except for statistical reporting numbers 7226.99.0130 and 7226.99.0180).... | 13,094,743 kg |

**Federal Register** / Vol. 83, No. 88 / Monday, May 7, 2018 / Presidential Documents       **20699**

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| 9903.80.18 | Oil country pipe and tube goods, provided for in subheading 7304.23.30, 7304.23.60, 7304.29.10, 7304.29.20, 7304.29.31, 7304.29.41, 7304.29.50, 7304.29.61, 7305.20.20, 7305.20.40, 7305.20.60, 7305.20.80, 7306.29.10, 7306.29.20, 7306.29.31, 7306.29.41, 7306.29.60 or 7306.29.81............................ | 460,867,818 kg |
| 9903.80.19 | Line pipe exceeding 406.4 mm in outside diameter, provided for in subheading 7304.19.10 (except for statistical reporting numbers 7304.19.1020, 7304.19.1030, 7304.19.1045 and 7304.19.1060), 7304.19.50 (except for statistical reporting numbers 7304.19.5020 and 7304.19.5050), 7305.11.10, 7305.11.50, 7305.12.10, 7305.12.50, 7305.19.10 or 7305.19.50................................................... | 125,646,499 kg |
| 9903.80.20 | Line pipe not exceeding 406.4 mm in outside diameter, provided for in subheading 7304.19.10 (except for statistical reporting number 7304.19.1080), 7304.19.50 (except for statistical reporting number 7304.19.5080), 7306.19.10 (except for statistical reporting number 7306.19.1050) or 7306.19.51 (except for statistical reporting number 7306.19.5150)................................................... | 51,383,847 kg |
| 9903.80.21 | Other line pipe, provided for in subheading 7306.19.10 (except for statistical reporting number 7306.19.1010) or 7306.19.51 (except for statistical reporting number 7306.19.5110)................................................... | 250,007,048 kg |
| 9903.80.22 | Standard pipe, provided for in subheading 7304.39.00 (except for statistical reporting numbers 7304.39.0002, 7304.39.0004, 7304.39.0006, 7304.39.0008, 7304.39.0028, 7304.39.0032, 7304.39.0040, 7304.39.0044, 7304.39.0052, 7304.39.0056, 7304.39.0068 and 7304.39.0072), 7304.59.80 (except for statistical reporting numbers 7304.59.8020, 7304.59.8025, 7304.59.8035, 7304.59.8040, 7304.59.8050, 7304.59.8055, 7304.59.8065 and 7304.59.8070) or 7306.30.50 (except for statistical reporting numbers 7306.30.5010, 7306.30.5015, 7306.30.5020 and 7306.30.5035)...................................... | 69,469,685 kg |

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| 9903.80.23 | Structural pipe and tube, provided for in subheading 7304.90.10, 7304.90.30, 7305.31.20, 7305.31.40, 7305.31.60 (except for statistical reporting number 7305.31.6010), 7306.30.30, 7306.50.30, 7306.61.10, 7306.61.30, 7306.69.10 or 7306.69.30............................... | 54,003,708 kg |
| 9903.80.24 | Mechanical tubing and other products, provided for in subheading 7304.31.30, 7304.31.60 (except for statistical reporting numbers 7304.31.6010), 7304.39.00 (except for statistical reporting numbers 7304.39.0002, 7304.39.0004, 7304.39.0006, 7304.39.0008, 7304.39.0016, 7304.39.0020, 7304.39.0024, 7304.39.0036, 7304.39.0048, 7304.39.0062, 7304.39.0076 and 7304.39.0080), 7304.51.10, 7304.51.50 (except for statistical reporting numbers 7304.51.5005, 7304.51.5015 and 7304.51.5045), 7304.59.10, 7304.59.60, 7304.59.80 (except for statistical reporting numbers 7304.59.8010, 7304.59.8015, 7304.59.8030, 7304.59.8045, 7304.59.8060 and 7304.59.8080), 7304.90.50, 7304.90.70, 7306.30.10, 7306.30.50 (except for statistical reporting numbers 7306.30.5010, 7306.30.5025, 7306.30.5028, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090), 7306.50.10, 7306.50.50 (except for statistical reporting number 7306.50.5010), 7306.61.50, 7306.61.70 (except for statistical reporting number 7306.61.7030), 7306.69.50 or 7306.69.70 (except for statistical reporting number 7306.69.7030)..................................................................... | 8,438,050 kg |

**Federal Register** / Vol. 83, No. 88 / Monday, May 7, 2018 / Presidential Documents    **20701**

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| 9903.80.25 | Pressure tubing and other products, provided for in subheading 7304.31.60 (except for statistical reporting number 7304.31.6050), 7304.39.00 (except for statistical reporting numbers 7304.39.0016, 7304.39.0020, 7304.39.0024, 7304.39.0028, 7304.39.0032, 7304.39.0036, 7304.39.0040, 7304.39.0044, 7304.39.0048, 7304.39.0052, 7304.39.0056, 7304.39.0062, 7304.39.0068, 7304.39.0072, 7304.39.0076 and 7304.39.0080), 7304.51.50 (except for statistical reporting numbers 7304.51.5005 and 7304.51.5060), 7304.59.20, 7306.30.50 (except for statistical reporting numbers 7306.30.5015, 7306.30.5020, 7306.30.5025, 7306.30.5028, 7306.30.5032, 7306.30.5035, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090) or 7306.50.50 (except for statistical reporting numbers 7306.50.5030, 7306.50.5050 and 7306.50.5070)................................................................ | 1,172,695 kg |
| 9903.80.26 | Tubes or pipes for piling and other products, provided for in subheading 7305.39.10 or 7305.39.50................... | 4,807,122 kg |
| 9903.80.27 | Pipes and tubes, not specially provided for, provided for in subheading 7304.51.50 (except for statistical reporting numbers 7304.51.5015, 7304.51.5045 and 7304.51.5060), 7305.90.10, 7305.90.50, 7306.90.10 or 7306.90.50.................................................................. | 449,740 kg |
| 9903.80.28 | Hot-rolled sheet of stainless steel, provided for in subheading 7219.13.00, 7219.14.00, 7319.23.00 or 7219.24.00.................................................................. | 1,172,992 kg |
| 9903.80.29 | Hot-rolled strip of stainless steel and other products, provided for in subheading 7220.12.10 or 7220.12.50.... | 13,346 kg |
| 9903.80.30 | Hot-rolled plate of stainless steel, in coils, and other products, provided for in subheading 7219.11.00 or 7219.12.00.................................................................. | 218,649 kg |
| 9903.80.31 | Cold-rolled sheet of stainless steel and other products, provided for in subheading 7219.32.00, 7219.33.00, 7219.34.00, 7219.35.00 or 7219.90.00.................................................................. | 13,460,008 kg |

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| 9903.80.32 | Cold-rolled strip of stainless steel, provided for in subheading 7220.20.10, 7220.20.60, 7220.20.70, 7220.20.80, 7220.20.90 or 7220.90.00............................ | 1,649,722 kg |
| 9903.80.33 | Cold-rolled plate of stainless steel, in coils, provided for in subheading 7219.31.00 (except for statistical reporting number 7219.31.0050)...................................... | 24,905 kg |
| 9903.80.34 | Wire of stainless steel, drawn, provided for in subheading 7223.00.10, 7223.00.50 or 7223.00.90........ | 5,338,007 kg |
| 9903.80.35 | Pipes and tubes of stainless steel, provided for in subheading 7304.41.30, 7304.41.60, 7304.49.00, 7305.31.60 (except for statistical reporting number 7305.31.6090), 7306.40.10, 7306.40.50, 7306.61.70 (except 7306.61.7060) or 7306.69.70 (except for statistical reporting number 7306.69.7060)...................... | 12,602,387 kg |
| 9903.80.36 | Line pipe of stainless steel, provided for in subheading 7304.11.00 or 7306.11.00................................................ | 1,254,097 kg |
| 9903.80.37 | Bars and rods of stainless steel, cold finished, provided for in subheading 7222.20.00 or 7222.30.00.................... | 224,622 kg |
| 9903.80.38 | Bars and rods of stainless steel, hot-rolled, provided for in heading 7221.00.00 (except for statistical reporting numbers 7221.00.0017, 7221.00.0018 and 7221.00.0030) or subheading 7222.11.00, 7222.19.00 or 7222.40.30 (except for statistical reporting numbers 7222.40.3025 and 7222.40.3045)........................................ | 45,391 kg |
| 9903.80.39 | Blooms, billets and slabs of stainless steel and other products, provided for in subheading 7218.91.00 and 7218.99.00........................................................................ | 110,360 kg |
| 9903.80.40 | Oil country pipe and tube goods of stainless steel and other products, provided for in subheading 7304.22.00, 7304.24.30, 7304.24.40, 7304.24.60, 7306.21.30, 7306.21.40 or 7306.21.80............................ | 3,500 kg |
| 9903.80.41 | Ingot and other primary forms of stainless steel, provided for in subheading 7218.10.00.............................. | 215,467 kg |

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| 9903.80.42 | Flat-rolled products of stainless steel, provided for in subheading 7219.21.00, 7219.22.00, 7219.31.00 (except for statistical reporting number 7219.31.0010) or 7220.11.00.......................................................................... | 2,329,416 kg |
| 9903.80.43 | Bars and rods, hot-rolled, in irregularly wound coils, of stainless steel, provided for in heading 7221.00.00 (except for statistical reporting numbers 7221.00.0005, 7221.00.0045 and 7221.00.0075)...................................... | 0 kg |
| 9903.80.44 | Angles, shapes and sections of stainless steel, provided for in subheading 7222.40.30 (except for statistical reporting numbers 7222.40.3065 and 7222.40.3085) or 7222.40.60.......................................................................... | 49 kg |
| 9903.80.45 | Angles, shapes and sections, provided for in subheading 7216.31.00, 7216.32.00, 7216.33.00, 7216.40.00, 7216.50.00, 7216.99.00, 7228.70.30 (except for statistical reporting numbers 7228.70.3060 and 7228.70.3081) or 7228.70.60...................................... | 106,760,293 kg |
| 9903.80.46 | Bars and rods, hot-rolled, in irregularly wound coils, provided for in subheading 7213.91.30, 9213.91.45, 7213.91.60, 7213.99.00 (except for statistical reporting number 7213.99.0060), 7227.20.00 (except for statistical reporting number 7227.20.0080) or 7227.90.60 (except for statistical reporting numbers 7227.90.6005, 7227.90.6010, 7227.90.6040 and 7227.90.6090)........................................................................ | 56,474,925 kg |
| 9903.80.47 | Wire (other than of stainless steel), provided for in subheading 7217.10.10, 7217.10.20, 7217.10.30, 7217.10.40, 7217.10.50, 7217.10.60, 7217.10.70, 7217.10.80, 7217.10.90, 7217.20.15, 7217.20.30, 7217.20.45, 7217.20.60, 7217.20.75, 7217.30.15, 7217.30.30, 7217.30.45, 7217.30.60, 7217.30.75, 7217.90.10, 7217.90.50, 7229.20.00, 7229.90.10, 7229.90.50 or 7229.90.90..................................................... | 40,508,288 kg |

| Heading/<br>Subheading | Article description | Quantitative Limitation |
|---|---|---|
| 9903.80.48 | Bars, hot-rolled, not of stainless steel, provided for in subheading 7213.20.00, 7213.99.00 (except for statistical reporting numbers 7213.99.0030 and 7213.99.0090), 7214.10.00, 7214.30.00, 7214.91.00, 7214.99.00, 7215.90.10, 7227.20.00 (except for statistical reporting number 7227.20.0030), 7227.90.60 (except for statistical reporting numbers 7227.90.6020, 7227.90.6030 and 7227.90.6035), 7228.20.10, 7228.30.80 (except for statistical reporting number 7228.30.8010), 7228.40.00, 7228.60.60 or 7228.80.00............................................................................ | 32,914,618 kg |
| 9903.80.49 | Bars, cold-finished, not of stainless steel, provided for in subheading 7215.10.00, 7215.50.00, 7215.90.30, 7215.90.50, 7228.20.50, 7228.50.50 or 7228.60.80............................................................................ | 9,535,366 kg |
| 9903.80.50 | Angles, shapes and sections of a type known as "light-shaped bars" and other products, provided for in subheading 7216.10.00, 7216.21.00, 7216.22.00 or 7228.70.30 (except for statistical reporting numbers 7228.70.3010, 7228.70.3020 and 7228.70.3041)............ | 1,150,356 kg |
| 9903.80.51 | Reinforcing bars, provided for in subheading 7213.10.00, 7214.20.00 or 7228.30.80 (except for statistical reporting numbers 7228.30.8005, 7228.30.8015, 7228.30.8041, 7228.30.8045 and 7228.30.8070)............................................................... | 4,400,770 kg |
| 9903.80.52 | Sheet piling, provided for in subheading 7301.10.00............................................................................ | 0 kg |
| 9903.80.53 | Nonumerated railroad goods, provided for in subheading 7302.40.00, 7302.90.10 and 7302.90.90............................................................................ | 109,715 kg |
| 9903.80.54 | Rails other than those known as "standard rails," provided for in subheading 7302.10.10 (except for statistical reporting numbers 7302.10.1010, 7302.10.1035, 7302.10.1065 and 7302.10.1075)............ | 467 kg |

**Federal Register** / Vol. 83, No. 88 / Monday, May 7, 2018 / Presidential Documents    **20705**

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| 9903.80.55 | Rails known as "standard rails," provided for in subheading 7302.10.10 (except for statistical reporting numbers 7302.10.1015, 7302.10.1025, 7302.10.1045 and 7302.10.1055) or 7302.10.50...................................... | 770 kg |
| 9903.80.56 | Products of tool steel and other products, provided for in subheading 7224.10.00 (except for statistical reporting numbers 7224.10.0005 and 7224.10.0075), 7224.90.00 (except for statistical reporting numbers 7224.90.0005, 7224.90.0045, 7224.90.0055, 7224.90.0065 and 7224.90.0075), 7225.30.11, 7225.30.51, 7225.40.11, 7225.40.51, 7225.50.11, 7226.20.00, 7226.91.05, 7226.91.15, 7226.91.25, 7226.92.10, 7226.92.30, 7227.10.00, 7227.90.10, 7227.90.20, 7228.10.00, 7228.30.20, 7228.30.40, 7228.30.60, 7228.50.10, 7228.60.10 or 7229.90.05................................................... | 849,004 kg |
| 9903.80.57 | Blooms, billets and slabs, semi-finished, provided for in subheading 7207.11.00, 7207.12.00, 7207.19.00, 7207.20.00 or 7224.90.00 (except for statistical reporting numbers 7224.90.0015, 7224.90.0025, and 7224.90.0035)........................................................ | 1,697,955 kg |
| 9903.80.58 | Ingots, provided for in subheading 7206.10.00, 7206.90.00 or 7224.10.00 (except for statistical reporting number 7224.10.0045)...................................... | 74,667 kg |

[FR Doc. 2018–09841

Filed 5–4–18; 11:15 a.m.]

Billing code 7020–02–C

# EXHIBIT 9

# Presidential Documents

Proclamation 9759 of May 31, 2018

## Adjusting Imports of Steel Into the United States

### By the President of the United States of America

### A Proclamation

1. On January 11, 2018, the Secretary of Commerce (Secretary) transmitted to me a report on his investigation into the effect of imports of steel mill articles on the national security of the United States under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862).

2. In Proclamation 9705 of March 8, 2018 (Adjusting Imports of Steel Into the United States), I concurred in the Secretary's finding that steel mill articles are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States, and decided to adjust the imports of steel mill articles, as defined in clause 1 of Proclamation 9705, as amended (steel articles), by imposing a 25 percent ad valorem tariff on such articles imported from most countries, beginning March 23, 2018. I further stated that any country with which we have a security relationship is welcome to discuss with the United States alternative ways to address the threatened impairment of the national security caused by imports from that country, and noted that, should the United States and any such country arrive at a satisfactory alternative means to address the threat to the national security such that I determine that imports from that country no longer threaten to impair the national security, I may remove or modify the restriction on steel articles imports from that country and, if necessary, adjust the tariff as it applies to other countries, as the national security interests of the United States require.

3. In Proclamation 9711 of March 22, 2018 (Adjusting Imports of Steel Into the United States), I noted the continuing discussions with the Argentine Republic (Argentina), the Commonwealth of Australia (Australia), the Federative Republic of Brazil (Brazil), Canada, Mexico, the Republic of Korea (South Korea), and the European Union (EU) on behalf of its member countries, on satisfactory alternative means to address the threatened impairment to the national security posed by imports of steel articles from those countries. Recognizing that each of these countries and the EU has an important security relationship with the United States, I determined that the necessary and appropriate means to address the threat to national security posed by imports of steel articles from these countries was to continue the ongoing discussions and to exempt steel articles imports from these countries from the tariff proclaimed in Proclamation 9705, as amended, until May 1, 2018.

4. In Proclamation 9740 of April 30, 2018 (Adjusting Imports of Steel Into the United States), I noted that the United States had agreed in principle with Argentina, Australia, and Brazil on satisfactory alternative means to address the threatened impairment to our national security posed by steel articles imports from these countries and extended the temporary exemption of these countries from the tariff proclaimed in Proclamation 9705, as amended, in order to finalize the details.

5. The United States has agreed on a range of measures with these countries, including measures to reduce excess steel production and excess steel capacity, measures that will contribute to increased capacity utilization in the United States, and measures to prevent the transshipment of steel articles

and avoid import surges. In my judgment, these measures will provide effective, long-term alternative means to address these countries' contribution to the threatened impairment to our national security by restraining steel articles exports to the United States from each of them, limiting transshipment and surges, and discouraging excess steel capacity and excess steel production. In light of these agreements, I have determined that steel articles imports from these countries will no longer threaten to impair the national security and thus have decided to exclude these countries from the tariff proclaimed in Proclamation 9705, as amended. The United States will monitor the implementation and effectiveness of the measures agreed upon with these countries to address our national security needs, and I may revisit this determination, as appropriate.

6. In light of my determination to exclude, on a long-term basis, these countries from the tariff proclaimed in Proclamation 9705, as amended, I have considered whether it is necessary and appropriate in light of our national security interests to make any corresponding adjustments to such tariff as it applies to other countries. I have determined that, in light of the agreed-upon measures with these countries, and the fact that the tariff will now apply to imports of steel articles from additional countries, it is necessary and appropriate, at this time, to maintain the current tariff level as it applies to other countries.

7. Section 232 of the Trade Expansion Act of 1962, as amended, authorizes the President to adjust the imports of an article and its derivatives that are being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security.

8. Section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), authorizes the President to embody in the Harmonized Tariff Schedule of the United States (HTSUS) the substance of statutes affecting import treatment, and actions thereunder, including the removal, modification, continuance, or imposition of any rate of duty or other import restriction.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including section 232 of the Trade Expansion Act of 1962, as amended, section 301 of title 3, United States Code, and section 604 of the Trade Act of 1974, as amended, do hereby proclaim as follows:

(1) The superior text to subheadings 9903.80.05 through 9903.80.58 of the HTSUS is amended by replacing "South Korea" with "Argentina, of Brazil, or of South Korea".

(2) For the purposes of administering the quantitative limitations applicable to subheadings 9903.80.05 through 9903.80.58 for Argentina and Brazil, the annual aggregate limits for each country set out in the Annex to this proclamation shall apply for the period starting with calendar year 2018 and for subsequent years, unless modified or terminated. The quantitative limitations applicable to subheadings 9903.80.05 through 9903.80.58 for these countries, which for calendar year 2018 shall take into account all steel articles imports from each respective country since January 1, 2018, shall be effective for steel articles entered for consumption, or withdrawn from warehouse for consumption, on or after June 1, 2018, and shall be implemented by U.S. Customs and Border Protection (CBP) of the Department of Homeland Security as soon as practicable, consistent with the superior text to subheadings 9903.80.05 through 9903.80.58. The Secretary of Commerce shall monitor the implementation of the quantitative limitations applicable to subheadings 9903.80.05 through 9903.80.58 and shall, in consultation with the Secretary of Defense, the United States Trade Representative, and such other senior Executive Branch officials as the Secretary deems appropriate, inform the President of any circumstance that in the Secretary's opinion might indicate that an adjustment of the quantitative limitations is necessary.

(3) The text of subdivision (e) of U.S. note 16 to subchapter III of chapter 99 of the HTSUS is amended by striking the last sentence and inserting in lieu thereof the following sentence: ''Beginning on July 1, 2018, imports from any such country in an aggregate quantity under any such subheading during any of the periods January through March, April through June, July through September, or October through December in any year that is in excess of 500,000 kg and 30 percent of the total aggregate quantity provided for a calendar year for such country, as set forth on the internet site of CBP, shall not be allowed.''.

(4) The Secretary of Commerce, in consultation with CBP and with other relevant executive departments and agencies, shall revise the HTSUS so that it conforms to the amendments and effective dates directed in this proclamation. The Secretary shall publish any such modification to the HTSUS in the *Federal Register*.

(5) Clause 5 of Proclamation 9711, as amended, is amended by striking the phrase ''as amended by Proclamation 9711,'' in the first and second sentences and inserting in lieu thereof the following phrase: ''as amended, or to the quantitative limitations established by proclamation,''. Clause 5 of Proclamation 9711, as amended, is further amended by inserting the phrase ''or quantitative limitations'' after the words ''ad valorem rates of duty'' in the first and second sentences.

(6) Clause 5 of Proclamation 9740 is amended by striking the phrase ''as amended by clause 1 of this proclamation,'' and inserting in lieu thereof the following phrase: ''as amended, or to the quantitative limitations established by proclamation,'' in the first sentence. Clause 5 of Proclamation 9740 is further amended by striking the words ''by clause 4 of this proclamation'' from the second sentence.

(7) Any provision of previous proclamations and Executive Orders that is inconsistent with the actions taken in this proclamation is superseded to the extent of such inconsistency.

IN WITNESS WHEREOF, I have hereunto set my hand this thirty-first day of May, in the year of our Lord two thousand eighteen, and of the Independence of the United States of America the two hundred and forty-second.

Billing code 3295–F8–P

# ANNEX

For the purposes of administering the quantitative limitations applicable to subheadings 9903.80.05 through 9903.80.58 with respect to Argentina and Brazil, the following annual aggregate limits shall apply for the period starting with calendar year 2018 and for subsequent years, unless modified or terminated:

## ARGENTINA

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| | Iron or steel products of Argentina enumerated in U.S. note 16(b) to this subchapter, if entered in aggregate quantities prescribed in subdivision (e) of such note for any calendar year starting on January 1, 2018 and for any portion thereof as prescribed in such subdivision (e): | |
| 9903.80.05 | Hot-rolled sheet, provided for in subheading 7208.10.60, 7208.26.00, 7208.27.00, 7208.38.00, 7208.39.00, 7208.40.60, 7208.53.00, 7208.54.00, 7208.90.00, 7225.30.70 or 7225.40.70............................ | 6,475,837 kg |
| 9903.80.06 | Hot-rolled strip, provided for in subheading 7211.19.15, 7211.19.20, 7211.19.30, 7211.19.45, 7211.19.60, 7211.19.75, 7226.91.70 or 7226.91.80............................................................ | 0 kg |
| 9903.80.07 | Hot-rolled plate, in coils, provided for in subheading 7208.10.15, 7208.10.30, 7208.25.30, 7208.25.60, 7208.36.00, 7208.37.00, 7211.14.00 (except for statistical reporting numbers 7211.14.0030 and 7211.14.0045) or 7225.30.30............................................ | 3,450,561 kg |
| 9903.80.08 | Cold-rolled sheet and other products, provided for in subheading 7209.15.00, 7209.16.00, 7209.17.00, 7209.18.15, 7209.18.60, 7209.25.00, 7209.26.00, 7209.27.00, 7209.28.00, 7209.90.00, 7210.70.30, 7225.50.70, 7225.50.80 or 7225.99.00............................ | 4,733,644 kg |

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| 9903.80.09 | Cold-rolled strip and other products, provided for in subheading 7211.23.15, 7211.23.20, 7211.23.30, 7211.23.45, 7211.23.60, 7211.29.20, 7211.29.45, 7211.29.60, 7211.90.00, 7212.40.10, 7212.40.50, 7226.92.50, 7226.92.70, 7226.92.80 or 7226.99.01 (except for statistical reporting numbers 7226.99.0110 and 7226.99.0130)............................................................. | 0 kg |
| 9903.80.10 | Cold-rolled black plate, provided for in subheading 7209.18.25.............................................................. | 0 kg |
| 9903.80.11 | Plate in cut lengths, provided for in subheading 7208.40.30, 7208.51.00, 7208.52.00, 7210.90.10, 7211.13.00, 7211.14.00 (except for statistical reporting number 7211.14.0090), 7225.40.30, 7225.50.60 or 7226.91.50.................................................................... | 0 kg |
| 9903.80.12 | Flat-rolled products, hot-dipped, provided for in subheading 7210.41.00, 7210.49.00, 7210.70.60 (except for statistical reporting numbers 7210.70.6030 and 7210.70.6090), 7212.30.10, 7212.30.30, 7212.30.50, 7225.92.00 or 7226.99.01 (except for statistical reporting numbers 7226.99.0110 and 7226.99.0180)............................................................ | 701 kg |
| 9903.80.13 | Flat-rolled products, coated, provided for in subheading 7210.20.00, 7210.61.00, 7210.69.00, 7210.70.60 (except for statistical reporting numbers 7210.70.6030 and 7210.70.6060), 7210.90.60, 7210.90.90, 7212.50.00 or 7212.60.00.............................. | 0 kg |
| 9903.80.14 | Tin-free steel, provided for in subheading 7210.50.00................................................................ | 0 kg |
| 9903.80.15 | Tin plate, provided for in subheading 7210.11.00, 7210.12.00 or 7212.10.00................................................. | 0 kg |
| 9903.80.16 | Silicon electrical steel sheets and strip, provided for in subheading 7225.11.00, 7225.19.00, 7226.11.10, 7226.11.90, 7226.19.10 or 7226.19.90............................ | 0 kg |

Federal Register / Vol. 83, No. 108 / Tuesday, June 5, 2018 / Presidential Documents   25863

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| 9903.80.17 | Sheets and strip electrolytically coated or plated with zinc, provided for in subheading 7210.30.00, 7210.70.60 (except for statistical reporting numbers 7210.70.6060 and 7210.70.6090), 7212.20.00, 7225.91.00 or 7226.99.01 (except for statistical reporting numbers 7226.99.0130 and 7226.99.0180)............................................................... | 0 kg |
| 9903.80.18 | Oil country pipe and tube goods, provided for in subheading 7304.23.30, 7304.23.60, 7304.29.10, 7304.29.20, 7304.29.31, 7304.29.41, 7304.29.50, 7304.29.61, 7305.20.20, 7305.20.40, 7305.20.60, 7305.20.80, 7306.29.10, 7306.29.20, 7306.29.31, 7306.29.41, 7306.29.60 or 7306.29.81.............................. | 147,963,294 kg |
| 9903.80.19 | Line pipe exceeding 406.4 mm in outside diameter, provided for in subheading 7304.19.10 (except for statistical reporting numbers 7304.19.1020, 7304.19.1030, 7304.19.1045 and 7304.19.1060), 7304.19.50 (except for statistical reporting numbers 7304.19.5020 and 7304.19.5050), 7305.11.10, 7305.11.50, 7305.12.10, 7305.12.50, 7305.19.10 or 7305.19.50.............................................................. | 0 kg |
| 9903.80.20 | Line pipe not exceeding 406.4 mm in outside diameter, provided for in subheading 7304.19.10 (except for statistical reporting number 7304.19.1080), 7304.19.50 (except for statistical reporting number 7304.19.5080), 7306.19.10 (except for statistical reporting number 7306.19.1050) or 7306.19.51 (except for statistical reporting number 7306.19.5150)............................................................ | 4,988,957 kg  . |
| 9903.80.21 | Other line pipe, provided for in subheading 7306.19.10 (except for statistical reporting number 7306.19.1010) or 7306.19.51 (except for statistical reporting number 7306.19.5110)........................................... | 0 kg |

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| 9903.80.22 | Standard pipe, provided for in subheading 7304.39.00 (except for statistical reporting numbers 7304.39.0002, 7304.39.0004, 7304.39.0006, 7304.39.0008, 7304.39.0028, 7304.39.0032, 7304.39.0040, 7304.39.0044, 7304.39.0052, 7304.39.0056, 7304.39.0068 and 7304.39.0072), 7304.59.80 (except for statistical reporting numbers 7304.59.8020, 7304.59.8025, 7304.59.8035, 7304.59.8040, 7304.59.8050, 7304.59.8055, 7304.59.8065 and 7304.59.8070) or 7306.30.50 (except for statistical reporting numbers 7306.30.5010, 7306.30.5015, 7306.30.5020 and 7306.30.5035)........................................ | 2,378,183 kg |
| 9903.80.23 | Structural pipe and tube, provided for in subheading 7304.90.10, 7304.90.30, 7305.31.20, 7305.31.40, 7305.31.60 (except for statistical reporting number 7305.31.6010), 7306.30.30, 7306.50.30, 7306.61.10, 7306.61.30, 7306.69.10 or 7306.69.30.............................. | 2,374 kg |
| 9903.80.24 | Mechanical tubing and other products, provided for in subheading 7304.31.30, 7304.31.60 (except for statistical reporting numbers 7304.31.6010), 7304.39.00 (except for statistical reporting numbers 7304.39.0002, 7304.39.0004, 7304.39.0006, 7304.39.0008, 7304.39.0016, 7304.39.0020, 7304.39.0024, 7304.39.0036, 7304.39.0048, 7304.39.0062, 7304.39.0076 and 7304.39.0080), 7304.51.10, 7304.51.50 (except for statistical reporting numbers 7304.51.5005, 7304.51.5015 and 7304.51.5045), 7304.59.10, 7304.59.60, 7304.59.80 (except for statistical reporting numbers 7304.59.8010, 7304.59.8015, 7304.59.8030, 7304.59.8045, 7304.59.8060 and 7304.59.8080), 7304.90.50, 7304.90.70, 7306.30.10, 7306.30.50 (except for statistical reporting numbers 7306.30.5010, 7306.30.5025, 7306.30.5028, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090), 7306.50.10, 7306.50.50 (except for statistical reporting number 7306.50.5010), 7306.61.50, 7306.61.70 (except for statistical reporting number 7306.61.7030), 7306.69.50 or 7306.69.70 (except for statistical reporting number 7306.69.7030)........................................................ | 8,758,712 kg |

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| 9903.80.25 | Pressure tubing and other products, provided for in subheading 7304.31.60 (except for statistical reporting number 7304.31.6050), 7304.39.00 (except for statistical reporting numbers 7304.39.0016, 7304.39.0020, 7304.39.0024, 7304.39.0028, 7304.39.0032, 7304.39.0036, 7304.39.0040, 7304.39.0044, 7304.39.0048, 7304.39.0052, 7304.39.0056, 7304.39.0062, 7304.39.0068, 7304.39.0072, 7304.39.0076 and 7304.39.0080), 7304.51.50 (except for statistical reporting numbers 7304.51.5005 and 7304.51.5060), 7304.59.20, 7306.30.50 (except for statistical reporting numbers 7306.30.5015, 7306.30.5020, 7306.30.5025, 7306.30.5028, 7306.30.5032, 7306.30.5035, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090) or 7306.50.50 (except for statistical reporting numbers 7306.50.5030, 7306.50.5050 and 7306.50.5070)................................................... | 128,482 kg |
| 9903.80.26 | Tubes or pipes for piling and other products, provided for in subheading 7305.39.10 or 7305.39.50.................... | 0 kg |
| 9903.80.27 | Pipes and tubes, not specially provided for, provided for in subheading 7304.51.50 (except for statistical reporting numbers 7304.51.5015, 7304.51.5045 and 7304.51.5060), 7305.90.10, 7305.90.50, 7306.90.10 or 7306.90.50............................................................ | 3,743 kg |
| 9903.80.28 | Hot-rolled sheet of stainless steel, provided for in subheading 7219.13.00, 7219.14.00, 7319.23.00 or 7219.24.00............................................................ | 0 kg |
| 9903.80.29 | Hot-rolled strip of stainless steel and other products, provided for in subheading 7220.12.10 or 7220.12.50... | 0 kg |
| 9903.80.30 | Hot-rolled plate of stainless steel, in coils, and other products, provided for in subheading 7219.11.00 or 7219.12.00............................................................ | 0 kg |
| 9903.80.31 | Cold-rolled sheet of stainless steel and other products, provided for in subheading 7219.32.00, 7219.33.00, 7219.34.00, 7219.35.00 or 7219.90.00............................ | 0 kg |

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| 9903.80.32 | Cold-rolled strip of stainless steel, provided for in subheading 7220.20.10, 7220.20.60, 7220.20.70, 7220.20.80, 7220.20.90 or 7220.90.00.............................. | 0 kg |
| 9903.80.33 | Cold-rolled plate of stainless steel, in coils, provided for in subheading 7219.31.00 (except for statistical reporting number 7219.31.0050)...................................... | 0 kg |
| 9903.80.34 | Wire of stainless steel, drawn, provided for in subheading 7223.00.10, 7223.00.50 or 7223.00.90......... | 0 kg |
| 9903.80.35 | Pipes and tubes of stainless steel, provided for in subheading 7304.41.30, 7304.41.60, 7304.49.00, 7305.31.60 (except for statistical reporting number 7305.31.6090), 7306.40.10, 7306.40.50, 7306.61.70 (except 7306.61.7060) or 7306.69.70 (except for statistical reporting number 7306.69.7060)...................... | 0 kg |
| 9903.80.36 | Line pipe of stainless steel, provided for in subheading 7304.11.00 or 7306.11.00.................................... | 0 kg |
| 9903.80.37 | Bars and rods of stainless steel, cold finished, provided for in subheading 7222.20.00 or 7222.30.00...................... | 0 kg |
| 9903.80.38 | Bars and rods of stainless steel, hot-rolled, provided for in heading 7221.00.00 (except for statistical reporting numbers 7221.00.0017, 7221.00.0018 and 7221.00.0030) or subheading 7222.11.00, 7222.19.00 or 7222.40.30 (except for statistical reporting numbers 7222.40.3025 and 7222.40.3045)...................................... | 0 kg |
| 9903.80.39 | Blooms, billets and slabs of stainless steel and other products, provided for in subheading 7218.91.00 and 7218.99.00........................................................... | 0 kg |
| 9903.80.40 | Oil country pipe and tube goods of stainless steel and other products, provided for in subheading 7304.22.00, 7304.24.30, 7304.24.40, 7304.24.60, 7306.21.30, 7306.21.40 or 7306.21.80............................ | 34,298 kg |
| 9903.80.41 | Ingot and other primary forms of stainless steel, provided for in subheading 7218.10.00............................ | 0 kg |

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| 9903.80.42 | Flat-rolled products of stainless steel, provided for in subheading 7219.21.00, 7219.22.00, 7219.31.00 (except for statistical reporting number 7219.31.0010) or 7220.11.00.......................................................... | 0 kg |
| 9903.80.43 | Bars and rods, hot-rolled, in irregularly wound coils, of stainless steel, provided for in heading 7221.00.00 (except for statistical reporting numbers 7221.00.0005, 7221.00.0045 and 7221.00.0075)................................... | 0 kg |
| 9903.80.44 | Angles, shapes and sections of stainless steel, provided for in subheading 7222.40.30 (except for statistical reporting numbers 7222.40.3065 and 7222.40.3085) or 7222.40.60........................................................... | 209 kg |
| 9903.80.45 | Angles, shapes and sections, provided for in subheading 7216.31.00, 7216.32.00, 7216.33.00, 7216.40.00, 7216.50.00, 7216.99.00, 7228.70.30 (except for statistical reporting numbers 7228.70.3060 and 7228.70.3081) or 7228.70.60..................................... | 0 kg |
| 9903.80.46 | Bars and rods, hot-rolled, in irregularly wound coils, provided for in subheading 7213.91.30, 9213.91.45, 7213.91.60, 7213.99.00 (except for statistical reporting number 7213.99.0060), 7227.20.00 (except for statistical reporting number 7227.20.0080) or 7227.90.60 (except for statistical reporting numbers 7227.90.6005, 7227.90.6010, 7227.90.6040 and 7227.90.6090)........................................................ | 182,555 kg |
| 9903.80.47 | Wire (other than of stainless steel), provided for in subheading 7217.10.10, 7217.10.20, 7217.10.30, 7217.10.40, 7217.10.50, 7217.10.60, 7217.10.70, 7217.10.80, 7217.10.90, 7217.20.15, 7217.20.30, 7217.20.45, 7217.20.60, 7217.20.75, 7217.30.15, 7217.30.30, 7217.30.45, 7217.30.60, 7217.30.75, 7217.90.10, 7217.90.50, 7229.20.00, 7229.90.10, 7229.90.50 or 7229.90.90.................................... | 2,076 kg |

| Heading/Subheading | Article description | Quantitative Limitation |
|---|---|---|
| 9903.80.48 | Bars, hot-rolled, not of stainless steel, provided for in subheading 7213.20.00, 7213.99.00 (except for statistical reporting numbers 7213.99.0030 and 7213.99.0090), 7214.10.00, 7214.30.00, 7214.91.00, 7214.99.00, 7215.90.10, 7227.20.00 (except for statistical reporting number 7227.20.0030), 7227.90.60 (except for statistical reporting numbers 7227.90.6020, 7227.90.6030 and 7227.90.6035), 7228.20.10, 7228.30.80 (except for statistical reporting number 7228.30.8010), 7228.40.00, 7228.60.60 or 7228.80.00.................................................................. | 896,377 kg |
| 9903.80.49 | Bars, cold-finished, not of stainless steel, provided for in subheading 7215.10.00, 7215.50.00, 7215.90.30, 7215.90.50, 7228.20.50, 7228.50.50 or 7228.60.80.................................................................. | 0 kg |
| 9903.80.50 | Angles, shapes and sections of a type known as "light-shaped bars" and other products, provided for in subheading 7216.10.00, 7216.21.00, 7216.22.00 or 7228.70.30 (except for statistical reporting numbers 7228.70.3010, 7228.70.3020 and 7228.70.3041)............ | 0 kg |
| 9903.80.51 | Reinforcing bars, provided for in subheading 7213.10.00, 7214.20.00 or 7228.30.80 (except for statistical reporting numbers 7228.30.8005, 7228.30.8015, 7228.30.8041, 7228.30.8045 and 7228.30.8070)....................................................... | 0 kg |
| 9903.80.52 | Sheet piling, provided for in subheading 7301.10.00............................................................... | 0 kg |
| 9903.80.53 | Nonumerated railroad goods, provided for in subheading 7302.40.00, 7302.90.10 and 7302.90.90.................................................................. | 0 kg |
| 9903.80.54 | Rails other than those known as "standard rails," provided for in subheading 7302.10.10 (except for statistical reporting numbers 7302.10.1010, 7302.10.1035, 7302.10.1065 and 7302.10.1075)............ | 0 kg |

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| 9903.80.55 | Rails known as "standard rails," provided for in subheading 7302.10.10 (except for statistical reporting numbers 7302.10.1015, 7302.10.1025, 7302.10.1045 and 7302.10.1055) or 7302.10.50.................................... | 0 kg |
| 9903.80.56 | Products of tool steel and other products, provided for in subheading 7224.10.00 (except for statistical reporting numbers 7224.10.0005 and 7224.10.0075), 7224.90.00 (except for statistical reporting numbers 7224.90.0005, 7224.90.0045, 7224.90.0055, 7224.90.0065 and 7224.90.0075), 7225.30.11, 7225.30.51, 7225.40.11, 7225.40.51, 7225.50.11, 7226.20.00, 7226.91.05, 7226.91.15, 7226.91.25, 7226.92.10, 7226.92.30, 7227.10.00, 7227.90.10, 7227.90.20, 7228.10.00, 7228.30.20, 7228.30.40, 7228.30.60, 7228.50.10, 7228.60.10 or 7229.90.05................................................... | 0 kg |
| 9903.80.57 | Blooms, billets and slabs, semi-finished, provided for in subheading 7207.11.00, 7207.12.00, 7207.19.00, 7207.20.00 or 7224.90.00 (except for statistical reporting numbers 7224.90.0015, 7224.90.0025, and 7224.90.0035)........................................ | 0 kg |
| 9903.80.58 | Ingots, provided for in subheading 7206.10.00, 7206.90.00 or 7224.10.00 (except for statistical reporting number 7224.10.0045)...................................... | 0 kg |

## BRAZIL

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| | Iron or steel products of Brazil enumerated in U.S. note 16(b) to this subchapter, if entered in aggregate quantities prescribed in subdivision (e) of such note for any calendar year starting on January 1, 2018 and for any portion thereof as prescribed in such subdivision (e): | |
| 9903.80.05 | Hot-rolled sheet, provided for in subheading 7208.10.60, 7208.26.00, 7208.27.00, 7208.38.00, 7208.39.00, 7208.40.60, 7208.53.00, 7208.54.00, 7208.90.00, 7225.30.70 or 7225.40.70............................ | 108,453,546 kg |
| 9903.80.06 | Hot-rolled strip, provided for in subheading 7211.19.15, 7211.19.20, 7211.19.30, 7211.19.45, 7211.19.60, 7211.19.75, 7226.91.70 or 7226.91.80................................................................ | 5,730 kg |
| 9903.80.07 | Hot-rolled plate, in coils, provided for in subheading 7208.10.15, 7208.10.30, 7208.25.30, 7208.25.60, 7208.36.00, 7208.37.00, 7211.14.00 (except for statistical reporting numbers 7211.14.0030 and 7211.14.0045) or 7225.30.30.............................. | 21,645,653 kg |
| 9903.80.08 | Cold-rolled sheet and other products, provided for in subheading 7209.15.00, 7209.16.00, 7209.17.00, 7209.18.15, 7209.18.60, 7209.25.00, 7209.26.00, 7209.27.00, 7209.28.00, 7209.90.00, 7210.70.30, 7225.50.70, 7225.50.80 or 7225.99.00............................ | 51,717,234 kg |
| 9903.80.09 | Cold-rolled strip and other products, provided for in subheading 7211.23.15, 7211.23.20, 7211.23.30, 7211.23.45, 7211.23.60, 7211.29.20, 7211.29.45, 7211.29.60, 7211.90.00, 7212.40.10, 7212.40.50, 7226.92.50, 7226.92.70, 7226.92.80 or 7226.99.01 (except for statistical reporting numbers 7226.99.0110 and 7226.99.0130)................................ | 220,366 kg |
| 9903.80.10 | Cold-rolled black plate, provided for in subheading 7209.18.25......................................................... | 0 kg |
| 9903.80.11 | Plate in cut lengths, provided for in subheading 7208.40.30, 7208.51.00, 7208.52.00, 7210.90.10, 7211.13.00, 7211.14.00 (except for statistical reporting | |

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| | number 7211.14.0090), 7225.40.30, 7225.50.60 or 7226.91.50........................................................................ | 9,116,198 kg |
| 9903.80.12 | Flat-rolled products, hot-dipped, provided for in subheading 7210.41.00, 7210.49.00, 7210.70.60 (except for statistical reporting numbers 7210.70.6030 and 7210.70.6090), 7212.30.10, 7212.30.30, 7212.30.50, 7225.92.00 or 7226.99.01 (except for statistical reporting numbers 7226.99.0110 and 7226.99.0180)............................................................... | 179,284,354 kg |
| 9903.80.13 | Flat-rolled products, coated, provided for in subheading 7210.20.00, 7210.61.00, 7210.69.00, 7210.70.60 (except for statistical reporting numbers 7210.70.6030 and 7210.70.6060), 7210.90.60, 7210.90.90, 7212.50.00 or 7212.60.00............................ | 49,974,441 kg |
| 9903.80.14 | Tin-free steel, provided for in subheading 7210.50.00........................................................................ | 2,428,916 kg |
| 9903.80.15 | Tin plate, provided for in subheading 7210.11.00, 7210.12.00 or 7212.10.00.................................................. | 11,315,455 kg |
| 9903.80.16 | Silicon electrical steel sheets and strip, provided for in subheading 7225.11.00, 7225.19.00, 7226.11.10, 7226.11.90, 7226.19.10 or 7226.19.90............................ | 2,186,384 kg |
| 9903.80.17 | Sheets and strip electrolytically coated or plated with zinc, provided for in subheading 7210.30.00, 7210.70.60 (except for statistical reporting numbers 7210.70.6060 and 7210.70.6090), 7212.20.00, 7225.91.00 or 7226.99.01 (except for statistical reporting numbers 7226.99.0130 and 7226.99.0180).... | 687,693 kg |
| 9903.80.18 | Oil country pipe and tube goods, provided for in subheading 7304.23.30, 7304.23.60, 7304.29.10, 7304.29.20, 7304.29.31, 7304.29.41, 7304.29.50, 7304.29.61, 7305.20.20, 7305.20.40, 7305.20.60, 7305.20.80, 7306.29.10, 7306.29.20, 7306.29.31, 7306.29.41, 7306.29.60 or 7306.29.81............................ | 56,857,548 kg |
| 9903.80.19 | Line pipe exceeding 406.4 mm in outside diameter, provided for in subheading 7304.19.10 (except for statistical reporting numbers 7304.19.1020, 7304.19.1030, 7304.19.1045 and 7304.19.1060), | |

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
|  | 7304.19.50 (except for statistical reporting numbers 7304.19.5020 and 7304.19.5050), 7305.11.10, 7305.11.50, 7305.12.10, 7305.12.50, 7305.19.10 or 7305.19.50........................................................................ | 40,712 kg |
| 9903.80.20 | Line pipe not exceeding 406.4 mm in outside diameter, provided for in subheading 7304.19.10 (except for statistical reporting number 7304.19.1080), 7304.19.50 (except for statistical reporting number 7304.19.5080), 7306.19.10 (except for statistical reporting number 7306.19.1050) or 7306.19.51 (except for statistical reporting number 7306.19.5150).......................................................................... | 21,382,360 kg |
| 9903.80.21 | Other line pipe, provided for in subheading 7306.19.10 (except for statistical reporting number 7306.19.1010) or 7306.19.51 (except for statistical reporting number 7306.19.5110)........................................................................... | 57,319 kg |
| 9903.80.22 | Standard pipe, provided for in subheading 7304.39.00 (except for statistical reporting numbers 7304.39.0002, 7304.39.0004, 7304.39.0006, 7304.39.0008, 7304.39.0028, 7304.39.0032, 7304.39.0040, 7304.39.0044, 7304.39.0052, 7304.39.0056, 7304.39.0068 and 7304.39.0072), 7304.59.80 (except for statistical reporting numbers 7304.59.8020, 7304.59.8025, 7304.59.8035, 7304.59.8040, 7304.59.8050, 7304.59.8055, 7304.59.8065 and 7304.59.8070) or 7306.30.50 (except for statistical reporting numbers 7306.30.5010, 7306.30.5015, 7306.30.5020 and 7306.30.5035)...................................... | 987,756 kg |
| 9903.80.23 | Structural pipe and tube, provided for in subheading 7304.90.10, 7304.90.30, 7305.31.20, 7305.31.40, 7305.31.60 (except for statistical reporting number 7305.31.6010), 7306.30.30, 7306.50.30, 7306.61.10, 7306.61.30, 7306.69.10 or 7306.69.30.............................. | 642,480 kg |
| 9903.80.24 | Mechanical tubing and other products, provided for in subheading 7304.31.30, 7304.31.60 (except for statistical reporting numbers 7304.31.6010), 7304.39.00 (except for statistical reporting numbers 7304.39.0002, 7304.39.0004, 7304.39.0006, 7304.39.0008, 7304.39.0016, 7304.39.0020, 7304.39.0024, 7304.39.0036, 7304.39.0048, |  |

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
|  | 7304.39.0062, 7304.39.0076 and 7304.39.0080), 7304.51.10, 7304.51.50 (except for statistical reporting numbers 7304.51.5005, 7304.51.5015 and 7304.51.5045), 7304.59.10, 7304.59.60, 7304.59.80 (except for statistical reporting numbers 7304.59.8010, 7304.59.8015, 7304.59.8030, 7304.59.8045, 7304.59.8060 and 7304.59.8080), 7304.90.50, 7304.90.70, 7306.30.10, 7306.30.50 (except for statistical reporting numbers 7306.30.5010, 7306.30.5025, 7306.30.5028, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090), 7306.50.10, 7306.50.50 (except for statistical reporting number 7306.50.5010), 7306.61.50, 7306.61.70 (except for statistical reporting number 7306.61.7030), 7306.69.50 or 7306.69.70 (except for statistical reporting number 7306.69.7030)........................................................ | 1,611,145 kg |
| 9903.80.25 | Pressure tubing and other products, provided for in subheading 7304.31.60 (except for statistical reporting number 7304.31.6050), 7304.39.00 (except for statistical reporting numbers 7304.39.0016, 7304.39.0020, 7304.39.0024, 7304.39.0028, 7304.39.0032, 7304.39.0036, 7304.39.0040, 7304.39.0044, 7304.39.0048, 7304.39.0052, 7304.39.0056, 7304.39.0062, 7304.39.0068, 7304.39.0072, 7304.39.0076 and 7304.39.0080), 7304.51.50 (except for statistical reporting numbers 7304.51.5005 and 7304.51.5060), 7304.59.20, 7306.30.50 (except for statistical reporting numbers 7306.30.5015, 7306.30.5020, 7306.30.5025, 7306.30.5028, 7306.30.5032, 7306.30.5035, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090) or 7306.50.50 (except for statistical reporting numbers 7306.50.5030, 7306.50.5050 and 7306.50.5070)........................................................ | 1,728,024 kg |
| 9903.80.26 | Tubes or pipes for piling and other products, provided for in subheading 7305.39.10 or 7305.39.50.................... | 27 kg |
| 9903.80.27 | Pipes and tubes, not specially provided for, provided for in subheading 7304.51.50 (except for statistical reporting numbers 7304.51.5015, 7304.51.5045 and 7304.51.5060), 7305.90.10, 7305.90.50, 7306.90.10 or 7306.90.50........................................................ | 1,231 kg |

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| 9903.80.28 | Hot-rolled sheet of stainless steel, provided for in subheading 7219.13.00, 7219.14.00, 7319.23.00 or 7219.24.00.............................................................. | 1,051,455 kg |
| 9903.80.29 | Hot-rolled strip of stainless steel and other products, provided for in subheading 7220.12.10 or 7220.12.50... | 0 kg |
| 9903.80.30 | Hot-rolled plate of stainless steel, in coils, and other products, provided for in subheading 7219.11.00 or 7219.12.00.............................................................. | 120,126 kg |
| 9903.80.31 | Cold-rolled sheet of stainless steel and other products, provided for in subheading 7219.32.00, 7219.33.00, 7219.34.00, 7219.35.00 or 7219.90.00.............................................................. | 9,982,549 kg |
| 9903.80.32 | Cold-rolled strip of stainless steel, provided for in subheading 7220.20.10, 7220.20.60, 7220.20.70, 7220.20.80, 7220.20.90 or 7220.90.00............................ | 14,629 kg |
| 9903.80.33 | Cold-rolled plate of stainless steel, in coils, provided for in subheading 7219.31.00 (except for statistical reporting number 7219.31.0050)...................................... | 0 kg |
| 9903.80.34 | Wire of stainless steel, drawn, provided for in subheading 7223.00.10, 7223.00.50 or 7223.00.90........ | 63,219 kg |
| 9903.80.35 | Pipes and tubes of stainless steel, provided for in subheading 7304.41.30, 7304.41.60, 7304.49.00, 7305.31.60 (except for statistical reporting number 7305.31.6090), 7306.40.10, 7306.40.50, 7306.61.70 (except 7306.61.7060) or 7306.69.70 (except for statistical reporting number 7306.69.7060)...................... | 352,216 kg |
| 9903.80.36 | Line pipe of stainless steel, provided for in subheading 7304.11.00 or 7306.11.00.................................................. | 0 kg |
| 9903.80.37 | Bars and rods of stainless steel, cold finished, provided for in subheading 7222.20.00 or 7222.30.00.................... | 142,452 kg |
| 9903.80.38 | Bars and rods of stainless steel, hot-rolled, provided for in heading 7221.00.00 (except for statistical reporting numbers 7221.00.0017, 7221.00.0018 and | |

**Federal Register**/Vol. 83, No. 108/Tuesday, June 5, 2018/Presidential Documents   **25875**

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| | 7221.00.0030) or subheading 7222.11.00, 7222.19.00 or 7222.40.30 (except for statistical reporting numbers 7222.40.3025 and 7222.40.3045)........................................ | 1,354,481 kg |
| 9903.80.39 | Blooms, billets and slabs of stainless steel and other products, provided for in subheading 7218.91.00 and 7218.99.00.......................................................................... | 186 kg |
| 9903.80.40 | Oil country pipe and tube goods of stainless steel and other products, provided for in subheading 7304.22.00, 7304.24.30, 7304.24.40, 7304.24.60, 7306.21.30, 7306.21.40 or 7306.21.80............................. | 11,284 kg |
| 9903.80.41 | Ingot and other primary forms of stainless steel, provided for in subheading 7218.10.00............................. | 0 kg |
| 9903.80.42 | Flat-rolled products of stainless steel, provided for in subheading 7219.21.00, 7219.22.00, 7219.31.00 (except for statistical reporting number 7219.31.0010) or 7220.11.00.......................................................................... | 522,098 kg |
| 9903.80.43 | Bars and rods, hot-rolled, in irregularly wound coils, of stainless steel, provided for in heading 7221.00.00 (except for statistical reporting numbers 7221.00.0005, 7221.00.0045 and 7221.00.0075)...................................... | 0 kg |
| 9903.80.44 | Angles, shapes and sections of stainless steel, provided for in subheading 7222.40.30 (except for statistical reporting numbers 7222.40.3065 and 7222.40.3085) or 7222.40.60.......................................................................... | 0 kg |
| 9903.80.45 | Angles, shapes and sections, provided for in subheading 7216.31.00, 7216.32.00, 7216.33.00, 7216.40.00, 7216.50.00, 7216.99.00, 7228.70.30 (except for statistical reporting numbers 7228.70.3060 and 7228.70.3081) or 7228.70.60...................................... | 785,743 kg |
| 9903.80.46 | Bars and rods, hot-rolled, in irregularly wound coils, provided for in subheading 7213.91.30, 9213.91.45, 7213.91.60, 7213.99.00 (except for statistical reporting number 7213.99.0060), 7227.20.00 (except for statistical reporting number 7227.20.0080) or 7227.90.60 (except for statistical reporting numbers 7227.90.6005, 7227.90.6010, 7227.90.6040 and | |

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| | 7227.90.6090)................................................................ | 94,548,099 kg |
| 9903.80.47 | Wire (other than of stainless steel), provided for in subheading 7217.10.10, 7217.10.20, 7217.10.30, 7217.10.40, 7217.10.50, 7217.10.60, 7217.10.70, 7217.10.80, 7217.10.90, 7217.20.15, 7217.20.30, 7217.20.45, 7217.20.60, 7217.20.75, 7217.30.15, 7217.30.30, 7217.30.45, 7217.30.60, 7217.30.75, 7217.90.10, 7217.90.50, 7229.20.00, 7229.90.10, 7229.90.50 or 7229.90.90.................................................. | 5,683,988 kg |
| 9903.80.48 | Bars, hot-rolled, not of stainless steel, provided for in subheading 7213.20.00, 7213.99.00 (except for statistical reporting numbers 7213.99.0030 and 7213.99.0090), 7214.10.00, 7214.30.00, 7214.91.00, 7214.99.00, 7215.90.10, 7227.20.00 (except for statistical reporting number 7227.20.0030), 7227.90.60 (except for statistical reporting numbers 7227.90.6020, 7227.90.6030 and 7227.90.6035), 7228.20.10, 7228.30.80 (except for statistical reporting number 7228.30.8010), 7228.40.00, 7228.60.60 or 7228.80.00.................................................................... | 19,466,296 kg |
| 9903.80.49 | Bars, cold-finished, not of stainless steel, provided for in subheading 7215.10.00, 7215.50.00, 7215.90.30, 7215.90.50, 7228.20.50, 7228.50.50 or 7228.60.80.................................................................... | 892,811 kg |
| 9903.80.50 | Angles, shapes and sections of a type known as "light-shaped bars" and other products, provided for in subheading 7216.10.00, 7216.21.00, 7216.22.00 or 7228.70.30 (except for statistical reporting numbers 7228.70.3010, 7228.70.3020 and 7228.70.3041)............ | 160,604 kg |
| 9903.80.51 | Reinforcing bars, provided for in subheading 7213.10.00, 7214.20.00 or 7228.30.80 (except for statistical reporting numbers 7228.30.8005, 7228.30.8015, 7228.30.8041, 7228.30.8045 and 7228.30.8070).................................................................... | 22,142,544 kg |
| 9903.80.52 | Sheet piling, provided for in subheading 7301.10.00.................................................................... | 0 kg |
| 9903.80.53 | Nonumerated railroad goods, provided for in subheading 7302.40.00, 7302.90.10 and | |

| Heading/ Subheading | Article description | Quantitative Limitation |
|---|---|---|
| | 7302.90.90............................................................... | 372,848 kg |
| 9903.80.54 | Rails other than those known as "standard rails," provided for in subheading 7302.10.10 (except for statistical reporting numbers 7302.10.1010, 7302.10.1035, 7302.10.1065 and 7302.10.1075)............ | 1,089 kg |
| 9903.80.55 | Rails known as "standard rails," provided for in subheading 7302.10.10 (except for statistical reporting numbers 7302.10.1015, 7302.10.1025, 7302.10.1045 and 7302.10.1055) or 7302.10.50.................................... | 939 kg |
| 9903.80.56 | Products of tool steel and other products, provided for in subheading 7224.10.00 (except for statistical reporting numbers 7224.10.0005 and 7224.10.0075), 7224.90.00 (except for statistical reporting numbers 7224.90.0005, 7224.90.0045, 7224.90.0055, 7224.90.0065 and 7224.90.0075), 7225.30.11, 7225.30.51, 7225.40.11, 7225.40.51, 7225.50.11, 7226.20.00, 7226.91.05, 7226.91.15, 7226.91.25, 7226.92.10, 7226.92.30, 7227.10.00, 7227.90.10, 7227.90.20, 7228.10.00, 7228.30.20, 7228.30.40, 7228.30.60, 7228.50.10, 7228.60.10 or 7229.90.05.................................................................. | 9,426,132 kg |
| 9903.80.57 | Blooms, billets and slabs, semi-finished, provided for in subheading 7207.11.00, 7207.12.00, 7207.19.00, 7207.20.00 or 7224.90.00 (except for statistical reporting numbers 7224.90.0015, 7224.90.0025, and 7224.90.0035)....................................................................... | 3,505,707,831 kg |
| 9903.80.58 | Ingots, provided for in subheading 7206.10.00, 7206.90.00 or 7224.10.00 (except for statistical reporting number 7224.10.0045)........................................ | 8,719 kg |

[FR Doc. 2018–12140

Filed 6–4–18; 8:45 a.m.]

Billing code 7020–02–C

# EXHIBIT 10

10/9/2018                    Donald J. Trump on Twitter: "I have just authorized a doubling of Tariffs on Steel and Aluminum with respect to ...currency, t...

Case 1:19-cv-00009-CRK-GSK-JAR   Document 15   Filed 04/01/19   Page 408 of 473





# Donald J. Trump ✔
@realDonaldTrump

**Follow**

I have just authorized a doubling of Tariffs on Steel and Aluminum with respect to Turkey as their currency, the Turkish Lira, slides rapidly downward against our very strong Dollar! Aluminum will now be 20% and Steel 50%. Our relations with Turkey are not good at this time!

5:47 AM - 10 Aug 2018

**36,778** Retweets  **120,969** Likes

     

💬 49K          ⟲ 37K          121K

# EXHIBIT 11

# Presidential Documents

**Proclamation 9777 of August 29, 2018**

### Adjusting Imports of Steel Into the United States

**By the President of the United States of America**

**A Proclamation**

1. On January 11, 2018, the Secretary of Commerce (Secretary) transmitted to me a report on his investigation into the effect of imports of steel articles on the national security of the United States under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862). The Secretary found and advised me of his opinion that steel articles are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States. In light of this conclusion, the Secretary recommended action to adjust the imports of steel articles so that such imports will not threaten to impair the national security. The Secretary also recommended that I authorize him, in response to specific requests from affected domestic parties, to exclude from any adopted import restrictions those steel articles for which the Secretary determines there is a lack of sufficient domestic production capacity of comparable products, or to exclude steel articles from such restrictions for specific national security-based considerations.

2. In Proclamation 9705 of March 8, 2018 (Adjusting Imports of Steel Into the United States), I concurred in the Secretary's finding that steel articles, as defined in clause 1 of Proclamation 9705, as amended by clause 8 of Proclamation 9711 of March 22, 2018 (Adjusting Imports of Steel Into the United States), are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States, and decided to adjust the imports of these steel articles by imposing a 25 percent ad valorem tariff on such articles imported from most countries. I further authorized the Secretary to provide relief from these additional duties for any steel article determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality and also to provide such relief based on specific national security considerations.

3. Consistent with the Secretary's recommendation that I authorize him to exclude from any adopted import restrictions those steel articles for which the Secretary determines there is a lack of sufficient domestic production of comparable products, or for specific national security-based considerations, I have determined to authorize the Secretary to provide relief from quantitative limitations on steel articles adopted pursuant to section 232 of the Trade Expansion Act of 1962, as amended, including those set forth in Proclamation 9740 of April 30, 2018 (Adjusting Imports of Steel Into the United States), and Proclamation 9759 of May 31, 2018 (Adjusting Imports of Steel Into the United States), on the same basis as the Secretary is currently authorized to provide relief from the duty established in clause 2 of Proclamation 9705.

4. In addition, I have been informed that the quantitative limitations set forth in Proclamation 9740 and Proclamation 9759 have in some cases already filled for this year, and that projects in the United States employing thousands of workers may be significantly disrupted or delayed because imports of specific steel articles, which were contracted for purchase prior to my decision to adjust imports of these articles, cannot presently be

entered into the United States because the quantitative limits have already been reached. In light of these circumstances, and after considering the impact on the economy and the national security objectives of section 232 of the Trade Expansion Act of 1962, as amended, I have determined to direct the Secretary to provide relief from the quantitative limitations set forth in Proclamation 9740 and Proclamation 9759 in limited circumstances.

5. In light of my determinations, I have considered whether it is necessary and appropriate in light of our national security interests to make any corresponding adjustments to the tariff or quotas imposed by previous proclamations. It is my judgment that it is necessary and appropriate, at this time, to maintain the current tariff and quota levels. As directed in Proclamation 9705, the Secretary shall continue to monitor imports of steel articles and inform me of any circumstances that, in his opinion, might indicate the need for further action under section 232 of the Trade Expansion Act of 1962, as amended.

6. The United States continues to hold discussions with countries on satisfactory alternative means to address the threatened impairment to our national security posed by steel articles imports. Should these discussions result in an agreement concerning such alternative means, I will take further action as appropriate.

7. Section 232 of the Trade Expansion Act of 1962, as amended, authorizes the President to adjust the imports of an article and its derivatives that are being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security.

8. Section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), authorizes the President to embody in the Harmonized Tariff Schedule of the United States (HTSUS) the substance of statutes affecting import treatment, and actions thereunder, including the removal, modification, continuance, or imposition of any rate of duty or other import restriction.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including section 232 of the Trade Expansion Act of 1962, as amended, section 301 of title 3, United States Code, and section 604 of the Trade Act of 1974, as amended, do hereby proclaim as follows:

(1) The Secretary, in consultation with the Secretary of State, the Secretary of the Treasury, the Secretary of Defense, the United States Trade Representative (USTR), the Assistant to the President for National Security Affairs, the Assistant to the President for Economic Policy, and such other senior Executive Branch officials as the Secretary deems appropriate, is hereby authorized to provide relief from the quantitative limitations applicable to steel articles described in subheadings 9903.80.05 through 9903.80.58 of subchapter III of chapter 99 of the HTSUS for any steel article determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality, and is also authorized to provide such relief based upon specific national security considerations. Such relief shall be provided for a steel article only after a request for relief is made by a directly affected party located in the United States. Such relief may be provided to directly affected parties on a party-by-party basis taking into account the regional availability of particular articles, the ability to transport articles within the United States, and any other factors as the Secretary deems appropriate. If the Secretary determines that relief should be granted to a requesting party for the importation of a particular steel article, the Secretary shall publicly post such determination and notify U.S. Customs and Border Protection (CBP) of the Department of Homeland Security concerning such article so that it will be excluded from the applicable quantitative limitation. Relief granted under this clause shall apply only to an article entered for consumption, or withdrawn from warehouse for consumption, on or after the date on which the request for relief is granted by the Secretary. Until such time as any applicable

quantitative limitation for a particular article has been reached, CBP shall count any steel article for which relief is granted under this clause toward such quantitative limitation at the time when such steel article is entered for consumption or withdrawn from warehouse for consumption. Any steel article for which relief is granted under this clause shall not be subject to the additional rate of duty set forth in Proclamation 9705, as amended. Steel articles for which relief is granted under this clause shall be subject to the duty treatment provided in subheading 9903.80.60 of subchapter III of chapter 99 of the HTSUS, as established by the Annex to this proclamation.

(2) The Secretary shall, on an expedited basis, grant relief from the quantitative limitations set forth in Proclamation 9740 and Proclamation 9759 and their accompanying annexes for any steel article where (i) the party requesting relief entered into a written contract for production and shipment of such steel article before March 8, 2018; (ii) such contract specifies the quantity of such steel article that is to be produced and shipped to the United States consistent with a schedule contained in such contract; (iii) such steel article is to be used to construct a facility in the United States and such steel article cannot be procured from a supplier in the United States to meet the delivery schedule and specifications contained in such contract; (iv) the payments made pursuant to such contract constitute 10 percent or less of the cost of the facility under construction; and (v) lack of relief from the quantitative limitations on such steel article would significantly disrupt or delay completion of the facility being constructed in the United States with the steel article specified in such contract. Until such time as any applicable quantitative limitation for a particular article has been reached, CBP shall count any steel article for which relief is granted under this clause toward such quantitative limitation at the time when such steel article is entered for consumption or withdrawn from warehouse for consumption. Any steel article for which relief is granted under this clause shall be subject to the additional rate of duty set forth in clause 2 of Proclamation 9705, as amended by this proclamation, when such steel article is entered for consumption or withdrawn from warehouse for consumption. This rate of duty is in addition to any other duties, fees, exactions, and charges applicable to such steel article. Any steel article provided relief under this clause must be entered for consumption, or withdrawn from warehouse for consumption, on or before March 31, 2019, and may not be granted further relief by the Secretary under clause 3 of Proclamation 9705, as amended. Steel articles for which relief is granted under this clause shall be subject to the duty treatment provided in subheading 9903.80.61 of subchapter III of chapter 99 of the HTSUS, as established by the Annex to this proclamation.

(3) The Secretary shall grant relief under clause 2 of this proclamation only upon receipt of a sworn statement signed by the chief executive officer and the chief legal officer of the party requesting relief. Such statement shall attest that (i) the steel article for which relief is sought and the associated contract meet all of the criteria for relief set forth in clause 2 of this proclamation; (ii) the party requesting relief will accurately report to CBP, in the manner that CBP prescribes, the quantity of steel articles entered for consumption, or withdrawn from warehouse for consumption, pursuant to any grant of relief; and (iii) the quantity of steel articles entered pursuant to a grant of relief will not exceed the quantity specified in such contract for delivery on or before March 31, 2019. Upon granting relief under clause 2 of this proclamation, the Secretary shall notify CBP and publish a notice of relief for the quantity of steel articles specified in such contract that are scheduled for delivery on or before March 31, 2019. The Secretary shall revoke any grant of relief under clause 2 of this proclamation if the Secretary determines at any time after such grant that the criteria for relief have not been met and may, if the Secretary deems it appropriate, notify the Attorney General of the facts that led to such revocation.

(4) As soon as practicable, the Secretary shall issue procedures for the requests for exclusion described in clause 1 of this proclamation. The issuance of such procedures is exempt from Executive Order 13771 of January 30, 2017 (Reducing Regulation and Controlling Regulatory Costs). CBP shall implement exclusions granted pursuant to clause 1 or relief provided under clause 2 of this proclamation as soon as practicable.

(5) Clause 3 of Proclamation 9705, as amended by Proclamation 9711, is further amended by striking the fourth and fifth sentences and inserting in lieu thereof the following two sentences: "If the Secretary determines that a particular steel article should be excluded, the Secretary shall publicly post such determination and notify U.S. Customs and Border Protection (CBP) of the Department of Homeland Security concerning such article so that it will be excluded from the duties described in clause 2 of this proclamation. For merchandise entered for consumption, or withdrawn from warehouse for consumption, on or after the date the duty established under this proclamation is effective and with respect to which liquidation is not final, such relief shall be retroactive to the date the request for relief was accepted by the Department of Commerce.".

(6) In order to establish the duty rate on imports of steel articles for which relief is granted under clause 2 of this proclamation, clause 2 of Proclamation 9705, as amended, is further amended by striking the last sentence and inserting in lieu thereof the following two sentences: "All steel articles imports covered by subheading 9903.80.61, in subchapter III of chapter 99 of the HTSUS, shall be subject to the additional 25 percent ad valorem rate of duty established herein with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on the date specified in a determination by the Secretary granting relief. These rates of duty, which are in addition to any other duties, fees, exactions, and charges applicable to such imported steel articles, shall apply to imports of steel articles from each country as specified in the preceding three sentences.".

(7) Where the government of a country identified in the superior text to subheadings 9903.80.05 through 9903.80.58 of subchapter III of chapter 99 of the HTSUS notifies the United States that it has established a mechanism for the certification of exports to the United States of products covered by the quantitative limitations applicable to these subheadings, and where such mechanism meets the operational requirements for participation in an export certification system administered by the United States, CBP, in consultation with the Secretary, USTR, and other relevant executive departments and agencies, may require that importers of these products furnish relevant export certification information in order to qualify for the treatment set forth in subheadings 9903.80.05 through 9903.80.58. Where CBP adopts such a requirement, it shall publish in the *Federal Register* notice of the requirement and procedures for the submission of relevant export certification information. No article that is subject to the export certification requirement announced in such notice may be entered for consumption, or withdrawn from warehouse for consumption, on or after the effective date specified in such notice, except upon presentation of a valid and properly executed certification, in accordance with the procedures set forth in the notice.

(8) Subdivision (c) of U.S. note 16 to subchapter III of chapter 99 of the HTSUS is amended by inserting at the end the following new sentence: "Pursuant to subheadings 9903.80.60 and 9903.80.61 and superior text thereto, the Secretary may provide that any excluded product may be granted entry into the customs territory of the United States when the applicable quantitative limitation has filled for the specified period for such good.".

(9) Subdivision (d) of U.S. note 16 to subchapter III of chapter 99 of the HTSUS is amended by inserting after "9903.80.58" the phrase "and 9903.80.60 and 9903.80.61".

(10) The rate of duty specified in the HTSUS in the general column for heading 9903.80.01 is amended by striking ''25%'' and inserting in lieu thereof: ''The duty provided in the applicable subheading + 25%''.

(11) The rate of duty specified in the HTSUS in the general column for heading 9903.80.02 is amended by striking ''50%'' and inserting in lieu thereof: ''The duty provided in the applicable subheading + 50%''.

(12) The superior text for subheadings 9903.80.05 through 9903.80.58 of the HTSUS is amended by deleting ''Iron'' and inserting in lieu thereof: ''Except as provided in subheadings 9903.80.60 and 9903.80.61, iron''.

(13) To implement clauses 1 and 2 of this proclamation, subchapter III of chapter 99 of the HTSUS is modified as provided in the Annex to this proclamation.

(14) The modifications to the HTSUS made by clauses 8 through 13 of this proclamation and the Annex to this proclamation shall be effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on August 30, 2018, and shall continue in effect, unless such actions are expressly reduced, modified, or terminated.

(15) Clause 5 of Proclamation 9705 is amended by inserting ''for consumption'' after ''goods entered'' in the first sentence. Clause 5 of Proclamation 9711, as amended, is amended by striking ''by this proclamation'' from the end of the second sentence. Clause 6 of Proclamation 9740 is amended by striking ''by clause 1 of this proclamation''.

(16) The Secretary, in consultation with CBP and other relevant executive departments and agencies, shall revise the HTSUS so that it conforms to the amendments directed by this proclamation. The Secretary shall publish any such modification to the HTSUS in the *Federal Register*.

(17) Any provision of previous proclamations and Executive Orders that is inconsistent with the actions taken in this proclamation is superseded to the extent of such inconsistency.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-ninth day of August, in the year of our Lord two thousand eighteen, and of the Independence of the United States of America the two hundred and forty-third.

# ANNEX

## TO MODIFY CERTAIN PROVISIONS OF CHAPTER 99 OF THE HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES

Effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on August 30, 2018, subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States is modified by inserting in numerical sequence the following new tariff provision, with the material in the new tariff provisions inserted in the columns labeled "Heading/Subheading", "Article Description", "Rates of Duty 1-General", "Rates of Duty 1-Special," and "Rates of Duty 2", respectively:

| Heading/ Subheading | Article description | Rates of Duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| | "Iron or steel products of Argentina, of Brazil, or of South Korea enumerated in U.S. note 16(b) to this subchapter, each covered by an exclusion granted by the Secretary of Commerce under note 16(c) to this subchapter: | | | |
| 9903.80.60 | Goods granted relief from the application of quantitative limitation otherwise imposed in relation to subheadings 9903.80.05 through 9903.80.58, for any steel article determined by the Secretary not to be produced in the United States in a sufficient and reasonably available amount, or of a satisfactory qualify, or for specific national security reasons, provided that such goods shall be counted toward any quantitative limitation proclaimed by the President until such limitation has filled......................................................................... | The duty provided in the applicable subheading | | |
| 9903.80.61 | Goods subject to a qualifying contract for which relief has been provided from the application of quantitative limitation otherwise imposed in relation to subheadings 9903.80.05 through 9903.80.58, provided that such goods shall be counted toward any quantitative limitation proclaimed by the President until such limitation has filled............................................................... | The duty provided in the applicable subheading + 25%" | | |

[FR Doc. 2018–19284

Filed 8–31–18; 11:15 am]

Billing code 7020–02–C

# EXHIBIT 12

**232 Steel: First Unit of Quantity by Customs Value
for Turkey**

U.S. Imports for Consumption in Metric Tons

**Annual + Year-To-Date Data from Jan - Jul**

| HTS | TYPE | STEEL TYPE DESCRIPTION | HTS Description | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2017 YTD | 2018 YTD | Percent Change YTD2017 - YTD2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 720711 | 4 | Carbon and Alloy Semi-finished Products (Semi-finished Products) | 720711 SEMIFINISHED PRODUCTS OF IRON OR NONALLOY STEEL, UNDER 0.25% (WT.) CARBON, RECTANGULAR OR SQUARE CROSS SECTION, WIDTH LESS THAN TWICE THE THICKNESS | 0 | 0 | 0 | 0 | 0 | 68 | 68 | 0 | -100.00% |
| 720810 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720810 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, OF A WIDTH OF 600 MM OR MORE, IN COILS, NOT FURTHER WORKED THAN HOT-ROLLED, WITH PATTERNS IN RELIEF | 1,940 | 1,499 | 5,932 | 0 | 0 | 0 | 0 | 0 | N/A |
| 720825 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720825 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, OF A WIDTH OF 600 MM OR MORE, COILS,HOT-ROLLED WORKED ONLY,PICKLED, THICKNESS 4.75 MM OR MORE, NESOI | 0 | 0 | 26 | 11,357 | 0 | 0 | 0 | 0 | N/A |
| 720826 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720826 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, OF A WIDTH OF 600 MM OR MORE, COILS,HOT-ROLLED WORKED ONLY,PICKLED,3MM BUT < 4.75MM THICK, N.E.S.O.I. | 0 | 0 | 1,406 | 6,304 | 70 | 0 | 0 | 0 | N/A |
| 720827 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720827 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, WIDTH OF 600 MM OR MORE,IN COILS,HOT-ROLLED WORKED ONLY, PICKLED, LESS THAN 3 MM THICK, N.E.S.O.I. | 0 | 373 | 1,469 | 7,891 | 403 | 0 | 0 | 0 | N/A |
| 720836 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720836 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, WIDTH OF 600 MM OR MORE IN COILS, HOT-ROLLED WORKED ONLY, OF A THICKNESS EXCEEDING 10 MM, N.E.S.O.I. | 665 | 2,816 | 32,450 | 31,317 | 11,667 | 5,202 | 3,869 | 5,921 | 53.00% |
| 720837 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720837 FLAT-ROLLED PRODUCTS OF IRN OR NONALLOY STEEL, WIDTH OF 600MM OR MORE, IN COILS, HOT-ROLLED WORKED ONLY, OF A THICKNESS 4.75MM BUT NOT OVER 10MM NESOI | 1,312 | 13,742 | 78,170 | 102,544 | 36,164 | 15,323 | 12,069 | 21,219 | 75.80% |
| 720838 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720838 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL,WIDTH 600MM OR MORE,IN COILS,HOT-ROLLED WORKED ONLY, OF A THICKNESS 3MM OR MORE BUT UNDER 4.75MM, NESOI | 1,752 | 11,695 | 102,019 | 94,169 | 33,621 | 49,313 | 46,415 | 25,412 | -45.20% |
| 720839 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720839 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL,WIDTH 600MM OR MORE,IN COILS,HOT-ROLLED WORKED ONLY, OF A THICKNESS OF LESS THAN 3MM, N.E.S.O.I. | 3,515 | 11,141 | 141,339 | 85,847 | 112,699 | 25,212 | 18,491 | 31,413 | 69.90% |
| 720840 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720840 FLAT-ROLLED IRON OR NONALLOY STEEL, 600 MM OR MORE WIDE, HOT-ROLLED, NOT CLAD, PLATED OR COILS, PATTERNS IN RELIEF | 140 | 363 | 111 | 157 | 126 | 0 | 0 | 0 | N/A |

| HTS | TYPE | STEEL TYPE DESCRIPTION | HTS Description | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2017 YTD | 2018 YTD | Percent Change YTD2017 - YTD2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 720851 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720851 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL,WIDTH 600MM OR MORE, NOT IN COILS, HOT-ROLLED WORKED ONLY, OF A THICKNESS EXCEEDING 10 MM, N.E.S.O.I. | 50,840 | 13,314 | 97,275 | 13,108 | 29,239 | 13 | 5 | 0 | -100.00% |
| 720852 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720852 FLAT-ROLLED IRON OR NONALLOY STEEL, 600 MM OR MORE WIDE, HOT-ROLLED, NOT CLAD, PLATED, COATED OR COILS, 4.75 MM TO 10 MM THICK | 5,586 | 4,689 | 8,280 | 6,648 | 2,785 | 0 | 0 | 22 | N/A |
| 720853 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720853 FLAT-ROLLED IRON OR NONALLOY STEEL, 600 MM OR MORE WIDE, HOT-ROLLED, NOT CLAD, PLATED, COATED OR COILS, 3 MM TO UNDER 4.75 MM THICK | 682 | 886 | 1,497 | 1,368 | 1,273 | 0 | 0 | 0 | N/A |
| 720854 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720854 FLAT-ROLLED IRON OR NONALLOY STEEL, 600 MM OR MORE WIDE, HOT-ROLLED, NOT CLAD, PLATED, COATED OR COILS, LESS THAN 3 MM THICK | 906 | 415 | 482 | 406 | 232 | 0 | 0 | 0 | N/A |
| 720890 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720890 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, 600 MM OR MORE WIDE, HOT-ROLLED, NOT CLAD, PLATED OR COATED, NESOI | 0 | 0 | 33 | 21 | 0 | 7 | 0 | 0 | N/A |
| 720915 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720915 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, WIDTH 600MM OR MORE, IN COILS, COLD-ROLLED WORKED ONLY, OF A THICKNESS OF 3 MM OR MORE | 0 | 0 | 0 | 0 | 404 | 0 | 0 | 0 | N/A |
| 720916 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720916 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, WIDTH 600MM OR MORE, IN COILS,COLD-ROLLED WORKED ONLY, OF A THICKNESS OVER ONE MM BUT LESS THAN 3 MM | 0 | 0 | 4,698 | 17,574 | 99,574 | 180,698 | 95,505 | 34,115 | -64.30% |
| 720917 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720917 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, WIDTH 600MM OR MORE, IN COILS, COLD-ROLLED WORKED ONLY, OF A THICKNESS 0.5MM OR MORE BUT NOT OVER 1MM | 0 | 0 | 300 | 7,389 | 41,501 | 100,251 | 76,941 | 38,201 | -50.40% |
| 720918 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720918 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, WIDTH 600MM OR MORE, IN COILS, COLD-ROLLED WORKED ONLY, OF A THICKNESS OF LESS THAN 0.5 MM | 0 | 0 | 0 | 1,298 | 13,009 | 42,630 | 31,622 | 19,341 | -38.80% |
| 720926 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720926 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL,WIDTH 600MM OR MORE, NOT IN COILS,COLD-ROLLED WORKED ONLY, OF A THICKNESS OVER 1 MM BUT LESS THAN 3 MM | 0 | 0 | 0 | 269 | 20 | 60 | 60 | 0 | -100.00% |
| 720927 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720927 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL,WIDTH 600MM OR MORE, NOT IN COILS,COLD-ROLLED WORKED ONLY, OF A THICKNESS 0.5MM OR MORE BUT N/O 1MM | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 22 | N/A |
| 720990 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720990 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, 600 MM OR MORE WIDE, COLD-ROLLED, NOT CLAD, PLATED OR COATED, NESOI | 0 | 0 | 40 | 5 | 0 | 0 | 0 | 0 | N/A |

| HTS | TYPE | STEEL TYPE DESCRIPTION | HTS Description | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2017 YTD | 2018 YTD | Percent Change YTD2017 - YTD2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 721011 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721011 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, 600 MM OR MORE WIDE, PLATED OR COATED WITH TIN, 0.5 MM OR MORE THICK | 6 | 0 | 0 | 0 | 16 | 107 | 78 | 0 | -100.00% |
| 721012 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721012 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, 600 MM OR MORE WIDE, PLATED OR COATED WITH TIN, UNDER 0.5 MM THICK | 0 | 0 | 107 | 0 | 0 | 147 | 0 | 45 | N/A |
| 721030 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721030 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, WIDTH OF 600MM OR MORE, ELECTROLYTICALLY PLATED OR COATED WITH ZINC | 0 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | N/A |
| 721041 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721041 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, CORRUGATED, 600 MM OR MORE WIDE, PLATED OR COATED WITH ZINC OTHER THAN ELECTROLYTICALLY | 0 | 0 | 0 | 0 | 0 | 75 | 75 | 0 | -100.00% |
| 721049 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721049 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, NOT CORRUGATED, 600 MM OR MORE WIDE, PLATED OR COATED WITH ZINC OTHER THAN ELECTROLYTICALLY | 0 | 0 | 538 | 30,363 | 81,857 | 279,512 | 154,344 | 79,991 | -48.20% |
| 721050 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721050 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, 600 MM OR MORE WIDE, PLATED OR COATED WITH CHROMIUM OXIDES OR WITH CHROMIUM AND CHROMIUM OXIDES | 0 | 0 | 0 | 0 | 0 | 7 | 7 | 658 | 9203.60% |
| 721061 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721061 FLAT-ROLLD IRON OR NONALLOY STEEL 600MM OR MORE, PLATED OR COATED WITH ALUMINUM-ZINC ALLOYS | 0 | 0 | 0 | 0 | 0 | 3,536 | 3,536 | 3,419 | -3.30% |
| 721069 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721069 FLAT-ROLLD IRON OR NONALLOY STEEL 600MM OR MORE, PLATED OR COATED WITH OTHER ALUMINUM | 0 | 0 | 0 | 0 | 0 | 142 | 0 | 0 | N/A |
| 721070 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721070 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, 600 MM OR MORE WIDE, PAINTED, VARNISHED OR COATED WITH PLASTICS | 0 | 0 | 0 | 0 | 813 | 10,658 | 4,373 | 9,465 | 116.50% |
| 721090 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721090 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, 600 MM OR MORE WIDE, CLAD, PLATED OR COATED, NESOI | 0 | 0 | 0 | 6 | 365 | 0 | 0 | 0 | N/A |
| 721114 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721114 FLAT-ROLLD HIGH-STRNGTH IRON OR NONALLOY STEEL UNDER 600MM WIDE HOT-ROLLD, NOT CLAD, COATED OR PLATED 4.75MM THICK OR MORE | 0 | 0 | 69 | 1,283 | 162 | 558 | 387 | 85 | -78.10% |
| 721119 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721119 FLAT-ROLLED HIGH-STRENGTH NONALLLOY STEEL PRODUCTS NESOI, UNDER 600 MM WIDE, HOT-ROLLED, NOT CLAD, PLATED OR COATED, UNDER 4.75 MM THICK | 2,754 | 653 | 1,536 | 842 | 296 | 411 | 272 | 6 | -97.90% |
| 721123 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721123 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, WIDTH LESS THAN 600 MM, NOT FURTHER WORKED THAN COLD-ROLLED, NOT CLAD, PLATED OR COATED, | 0 | 0 | 11 | 284 | 0 | 58 | 58 | 0 | -100.00% |
| 721210 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721210 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, UNDER 600 MM WIDE, PLATED OR COATED WITH TIN | 0 | 0 | 0 | 34 | 0 | 0 | 0 | 0 | N/A |

| HTS | TYPE | STEEL TYPE DESCRIPTION | HTS Description | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2017 YTD | 2018 YTD | Percent Change YTD2017 - YTD2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 721220 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721220 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, WIDTH OF LESS THAN 600 MM, ELECTROLYTICALLY PLATED OR COATED WITH ZINC | 0 | 0 | 12 | 449 | 38 | 24 | 0 | 0 | N/A |
| 721230 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721230 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, UNDER 600 MM WIDE, PLATED OR COATED WITH ZINC OTHER THAN ELECTROLYTICALLY | 0 | 0 | 0 | 257 | 918 | 3,290 | 2,832 | 4,329 | 52.90% |
| 721240 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721240 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, UNDER 600 MM WIDE, PAINTED, VARNISHED OR COATED WITH PLASTICS | 0 | 0 | 93 | 135 | 322 | 795 | 544 | 298 | -45.30% |
| 721250 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721250 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, UNDER 600 MM WIDE, PLATED OR COATED, NESOI | 0 | 0 | 0 | 3 | 2 | 2 | 2 | 0 | -100.00% |
| 721310 | 2 | Carbon and Alloy Long Products (Long Products) | 721310 BARS AND RODS OF IRON OR NONALLOY STEEL, HOT-ROLLED, IN IRREGULARLY WOUND COILS, CONCRETE REINFORCING | 64,180 | 52,959 | 37,708 | 35,087 | 57,109 | 8,888 | 6,502 | 1,964 | -69.80% |
| 721391 | 2 | Carbon and Alloy Long Products (Long Products) | 721391 BARS AND RODS,HOT-ROLLED, IN IRREGULARLY WOUND COILS, OF IRON OR NONALLOY STEEL, OF CIRCULAR CROSS-SECTION MEASURING LESS THAN 14MM IN DIAMETER, NESOI | 148,315 | 27,479 | 172,113 | 211,679 | 81,705 | 100,688 | 100,040 | 23 | -100.00% |
| 721399 | 2 | Carbon and Alloy Long Products (Long Products) | 721399 BARS AND RODS, HOT-ROLLED, IN IRREGULARLY WOUND COILS, OF IRON OR NONALLOY STEEL, N.E.S.O.I. | 2,114 | 1,584 | 0 | 7,576 | 2,439 | 2,110 | 2,110 | 0 | -100.00% |
| 721410 | 2 | Carbon and Alloy Long Products (Long Products) | 721410 BARS AND RODS OF IRON OR NONALLOY STEEL, FORGED | 0 | 0 | 0 | 41 | 0 | 1,202 | 0 | 0 | N/A |
| 721420 | 2 | Carbon and Alloy Long Products (Long Products) | 721420 BARS AND RODS OF IRON OR NONALLOY STEEL, HOT-WORKED NESOI, CONCRETE REINFORCING | 510,630 | 572,163 | 852,423 | 1,439,369 | 1,296,377 | 782,698 | 715,662 | 259,833 | -63.70% |
| 721430 | 2 | Carbon and Alloy Long Products (Long Products) | 721430 BARS AND RODS OF FREE-CUTTING NONALLOY STEEL, HOT-WORKED NESOI | 0 | 0 | 0 | 41 | 0 | 0 | 0 | 0 | N/A |
| 721491 | 2 | Carbon and Alloy Long Products (Long Products) | 721491 BARS AND RODS OF IRON OR NONALLOY STEEL, NOT FURTHER WORKED THAN HOT-ROLLED, HOT-DRAWN OR HOT-EXTRUDED BUT INCL TWISTED,RECTANULAR CROSS SECTN, NESOI | 21,503 | 13,171 | 12,645 | 12,010 | 7,905 | 9,599 | 6,619 | 2,597 | -60.80% |
| 721499 | 2 | Carbon and Alloy Long Products (Long Products) | 721499 BARS AND RODS OF IRON OR NONALLOY STEEL, NOT FURTHER WORKED THAN HOT-ROLLED, HOT-DRAWN OR HOT-EXTRUDED, BUT INCLUDING TWISTED AFTER ROLLING, N.E.S.O.I | 13,638 | 6,580 | 13,358 | 12,345 | 16,472 | 12,178 | 8,851 | 992 | -88.80% |
| 721550 | 2 | Carbon and Alloy Long Products (Long Products) | 721550 BARS AND RODS OF IRON OR NONALLOY STEEL, NOT FURTHER WORKED THAN COLD-FORMED OR COLD-FINISHED, N.E.S.O.I. | 256 | 1,726 | 1,302 | 2,290 | 2,829 | 4,048 | 2,531 | 2,503 | -1.10% |
| 721590 | 2 | Carbon and Alloy Long Products (Long Products) | 721590 BARS AND RODS OF IRON OR NONALLOY STEEL, NESOI | 10 | 0 | 18 | 22 | 177 | 95 | 0 | 0 | N/A |
| 721610 | 2 | Carbon and Alloy Long Products (Long Products) | 721610 U, I OR H SECTIONS OF IRON OR NONALLOY STEEL, HOT-WORKED, LESS THAN 80 MM HIGH | 2,383 | 1,601 | 3,157 | 4,804 | 723 | 261 | 126 | 196 | 55.80% |
| 721621 | 2 | Carbon and Alloy Long Products (Long Products) | 721621 L SECTIONS OF IRON OR NONALLOY STEEL, HOT-WORKED, LESS THAN 80 MM HIGH | 26,237 | 8,624 | 17,767 | 18,162 | 9,411 | 9,909 | 7,752 | 3,912 | -49.50% |

| HTS | TYPE | STEEL TYPE DESCRIPTION | HTS Description | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2017 YTD | 2018 YTD | Percent Change YTD2017 - YTD2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 721622 | 2 | Carbon and Alloy Long Products (Long Products) | 721622 T SECTIONS OF IRON OR NONALLOY STEEL, HOT-WORKED, LESS THAN 80 MM HIGH | 981 | 854 | 845 | 706 | 936 | 1,082 | 792 | 839 | 6.00% |
| 721631 | 2 | Carbon and Alloy Long Products (Long Products) | 721631 U SECTIONS OF IRON OR NONALLOY STEEL, HOT-WORKED, 80 MM OR MORE HIGH | 125 | 212 | 2,504 | 2,461 | 427 | 522 | 485 | 171 | -64.90% |
| 721632 | 2 | Carbon and Alloy Long Products (Long Products) | 721632 I SECTIONS OF IRON OR NONALLOY STEEL, HOT-WORKED, 80 MM OR MORE HIGH (STANDARD BEAMS) | 0 | 0 | 0 | 112 | 20 | 0 | 0 | 0 | N/A |
| 721633 | 2 | Carbon and Alloy Long Products (Long Products) | 721633 H SECTIONS OF IRON OR NONALLOY STEEL, HOT-WORKED, 80 MM OR MORE HIGH | 0 | 68 | 0 | 3 | 0 | 0 | 0 | 12 | N/A |
| 721640 | 2 | Carbon and Alloy Long Products (Long Products) | 721640 L OR T SECTIONS OF IRON OR NONALLOY STEEL, HOT-WORKED, 80 MM OR MORE HIGH | 12,845 | 5,982 | 8,744 | 5,745 | 5,036 | 820 | 788 | 926 | 17.40% |
| 721650 | 2 | Carbon and Alloy Long Products (Long Products) | 721650 ANGLES, SHAPES AND SECTIONS NESOI OF IRON OR NONALLOY STEEL, HOT-WORKED | 19,872 | 4,799 | 3,483 | 8,449 | 11,994 | 5,508 | 5,022 | 2,742 | -45.40% |
| 721699 | 2 | Carbon and Alloy Long Products (Long Products) | 721699 ANGLES, SHAPES AND SECTIONS IRON OR NONALLOY STEEL NESOI | 95 | 51 | 232 | 75 | 285 | 298 | 63 | 36 | -43.10% |
| 721710 | 2 | Carbon and Alloy Long Products (Long Products) | 721710 WIRE OF IRON OR NONALLLOY STEEL, NOT PLATED OR COATED, WHETHER OR NOT POLISHED | 368 | 1,055 | 2,174 | 348 | 388 | 44 | 44 | 0 | -100.00% |
| 721720 | 2 | Carbon and Alloy Long Products (Long Products) | 721720 WIRE OF IRON OR NONALLOY STEEL, PLATED OR COATED WITH ZINC | 4,059 | 5,074 | 3,435 | 3,882 | 2,064 | 1,435 | 892 | 549 | -38.50% |
| 721730 | 2 | Carbon and Alloy Long Products (Long Products) | 721730 WIRE OF IRON OR NONALLOY STEEL, PLATED OR COATED WITH BASE METAL OTHER THAN ZINC | 0 | 0 | 0 | 18 | 0 | 0 | 0 | 98 | N/A |
| 721790 | 2 | Carbon and Alloy Long Products (Long Products) | 721790 WIRE OF IRON OR NONALLOY STEEL LESS THAN 0.25 PERCENT CARBON, NESOI | 59 | 0 | 9 | 0 | 23 | 0 | 0 | 0 | N/A |
| 721810 | 5 | Stainless Products | 721810 STAINLESS STEEL INGOTS AND OTHER PRIMARY FORMS | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | N/A |
| 721899 | 5 | Stainless Products | 721899 OTHER SEMIFINISHED PRODUCTS OF STAINLESS STEEL | 0 | 0 | 0 | 17 | 0 | 2 | 2 | 0 | -100.00% |
| 721911 | 5 | Stainless Products | 721911 FLAT-ROLLED STAINLESS STEEL IN COILS, 600 MM OR MORE WIDE, HOT-ROLLED, OVER 10 MM THICK | 0 | 0 | 0 | 0 | 39 | 0 | 0 | 0 | N/A |
| 721913 | 5 | Stainless Products | 721913 FLAT-ROLLED STAINLESS STEEL IN COILS, 600 MM OR MORE WIDE, HOT-ROLLED, 3 MM BUT UNDER 4.75 MM THICK | 0 | 0 | 0 | 0 | 19 | 0 | 0 | 0 | N/A |
| 721924 | 5 | Stainless Products | 721924 FLAT-ROLLED STAINLESS STEEL NOT IN COILS, 600 MM OR MORE WIDE, HOT-ROLLED, UNDER 3 MM THICK | 0 | 0 | 0 | 0 | 13 | 0 | 0 | 0 | N/A |
| 721931 | 5 | Stainless Products | 721931 FLAT-ROLLED STAINLESS STEEL PRODUCTS, 600 MM OR MORE WIDE, COLD-ROLLED, 4.75 MM OR MORE THICK | 0 | 0 | 0 | 0 | 999 | 0 | 0 | 0 | N/A |
| 721932 | 5 | Stainless Products | 721932 FLAT-ROLLED STAINLESS STEEL PRODUCTS, 600 MM OR MORE WIDE, COLD-ROLLED, 3 MM BUT UNDER 4.75 MM THICK | 0 | 0 | 0 | 145 | 0 | 0 | 0 | 0 | N/A |
| 721933 | 5 | Stainless Products | 721933 FLAT-ROLLED STAINLESS STEEL PRODUCTS, 600 MM OR MORE WIDE, COLD-ROLLED, OVER 1 MM BUT UNDER 3 MM THICK | 55 | 0 | 360 | 1,383 | 861 | 603 | 492 | 34 | -93.00% |

| HTS | TYPE | STEEL TYPE DESCRIPTION | HTS Description | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2017 YTD | 2018 YTD | Percent Change YTD2017 - YTD2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 721934 | 5 | Stainless Products | 721934 FLAT-ROLLED STAINLESS STEEL PRODUCTS, 600 MM OR MORE WIDE, COLD-ROLLED, 0.5 MM BUT NOT OVER 1 MM THICK | 38 | 0 | 639 | 190 | 523 | 1,054 | 445 | 129 | -71.00% |
| 721935 | 5 | Stainless Products | 721935 FLAT-ROLLED STAINLESS STEEL PRODUCTS, 600 MM OR MORE WIDE, COLD-ROLLED, UNDER 0.5 MM THICK | 0 | 0 | 35 | 52 | 659 | 360 | 200 | 192 | -4.00% |
| 722100 | 5 | Stainless Products | 722100 BARS AND RODS OF STAINLESS STEEL, HOT-ROLLED, IN IRREGULARLY WOUND COILS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | N/A |
| 722240 | 5 | Stainless Products | 722240 ANGLES, SHAPES AND SECTIONS OF STAINLESS STEEL | 0 | 0 | 0 | 1 | 6 | 1 | 1 | 7 | 442.30% |
| 722300 | 5 | Stainless Products | 722300 WIRE OF STAINLESS STEEL | 0 | 0 | 0 | 40 | 0 | 20 | 20 | 0 | -100.00% |
| 722490 | 4 | Carbon and Alloy Semi-finished Products (Semi-finished Products) | 722490 SEMIFINISHED PRODUCTS OF ALLOY STEEL (OTHER THAN STAINLESS) NESOI | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | N/A |
| 722540 | 1 | Carbon and Alloy Flat Product (Flat Products) | 722540 FLAT-ROLLED ALLOY STEEL (OTHER THAN STAINLESS) NOT IN COILS, 600 MM OR MORE WIDE, HOT-ROLLED, NESOI | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 0 | N/A |
| 722550 | 1 | Carbon and Alloy Flat Product (Flat Products) | 722550 FLAT-ROLLED ALLOY STEEL (OTHER THAN STAINLESS) PRODUCTS, 600 MM OR MORE WIDE, COLD-ROLLED, NESOI | 0 | 0 | 3,017 | 5,773 | 10,880 | 21,798 | 14,420 | 12,588 | -12.70% |
| 722592 | 1 | Carbon and Alloy Flat Product (Flat Products) | 722592 FLAT-ROLLED ALLOY STEEL NESOI 600 MM OR MORE WIDE PLATED OR COATED WITH ZINC, NOT ELECTROLYTICALLY | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | N/A |
| 722691 | 1 | Carbon and Alloy Flat Product (Flat Products) | 722691 FLAT-ROLLED ALLOY STEEL (OTHER THAN STAINLESS) PRODUCTS, UNDER 600 MM WIDE, HOT-ROLLED, NESOI | 6 | 0 | 0 | 4 | 49 | 0 | 0 | 0 | N/A |
| 722790 | 2 | Carbon and Alloy Long Products (Long Products) | 722790 BARS AND RODS OF ALLOY STEEL (OTHER THAN STAINLESS), HOT-ROLLED, IN IRREGULARLY WOUND COILS, NESOI | 0 | 1,048 | 18,483 | 18,329 | 4,544 | 414 | 414 | 0 | -100.00% |
| 722830 | 2 | Carbon and Alloy Long Products (Long Products) | 722830 BARS AND RODS OF ALLOY STEEL (OTHER THAN STAINLESS), HOT-WORKED, NESOI | 19,836 | 29,863 | 23,155 | 10,546 | 1,348 | 81,259 | 73,074 | 13,010 | -82.20% |
| 722840 | 2 | Carbon and Alloy Long Products (Long Products) | 722840 BARS AND RODS OF ALLOY STEEL (OTHER THAN STAINLESS), FORGED, NESOI | 42 | 9 | 1,209 | 0 | 0 | 0 | 0 | 1,803 | N/A |
| 722850 | 2 | Carbon and Alloy Long Products (Long Products) | 722850 BARS AND RODS OF ALLOY STEEL (OTHER THAN STAINLESS), COLD-FORMED OR COLD-FINISHED, NESOI | 0 | 0 | 0 | 35 | 43 | 0 | 0 | 0 | N/A |
| 722860 | 2 | Carbon and Alloy Long Products (Long Products) | 722860 BARS AND RODS OF ALLOY STEEL (OTHER THAN STAINLESS), NESOI | 4,284 | 387 | 32 | 27 | 59 | 0 | 0 | 0 | N/A |
| 722870 | 2 | Carbon and Alloy Long Products (Long Products) | 722870 ANGLES, SHAPES AND SECTIONS OF ALLOY STEEL (OTHER THAN STAINLESS), NESOI | 0 | 0 | 4,064 | 2,901 | 271 | 1,265 | 1,265 | 0 | -100.00% |
| 722880 | 2 | Carbon and Alloy Long Products (Long Products) | 722880 HOLLOW DRILL BARS AND RODS OF ALLOY OR NONALLOY STEEL | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | N/A |
| 722920 | 2 | Carbon and Alloy Long Products (Long Products) | 722920 WIRE OF SILICO-MANGANESE STEEL | 212 | 113 | 131 | 161 | 140 | 549 | 409 | 353 | -13.70% |
| 722990 | 2 | Carbon and Alloy Long Products (Long Products) | 722990 WIRE OF ALLOY STEEL NESOI | 513 | 418 | 851 | 356 | 185 | 285 | 285 | 0 | -100.00% |
| 730110 | 2 | Carbon and Alloy Long Products (Long Products) | 730110 SHEET PILING OF IRON OR STEEL, WHETHER OR NOT DRILLED, PUNCHED OR MADE FROM ASSEMBLED ELEMENTS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | N/A |

| HTS | TYPE | STEEL TYPE DESCRIPTION | HTS Description | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2017 YTD | 2018 YTD | Percent Change YTD2017 - YTD2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 730210 | 2 | Carbon and Alloy Long Products (Long Products) | 730210 RAILWAY OR TRAMWAY RAILS OF IRON OR STEEL | 0 | 0 | 0 | 328 | 707 | 425 | 245 | 381 | 55.40% |
| 730290 | 2 | Carbon and Alloy Long Products (Long Products) | 730290 RAILWAY OR TRAMWAY TRACK CONSTRUCTION MATERIAL OF IRON OR STEEL NESOI | 0 | 0 | 17 | 219 | 0 | 58 | 58 | 0 | -100.00% |
| 730411 | 5 | Stainless Products | 730411 LINE PIPE FOR OIL AND GAS PIPELINES, OF STAINLESS STEEL | 0 | 170 | 1,537 | 780 | 1,156 | 500 | 492 | 8 | -98.30% |
| 730419 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730419 LINE PIPE FOR OIL AND GAS PIPELINES, OF SEAMLESS IRON (OTHER THAN CAST IRON) OR STEEL, NES | 0 | 3,750 | 7,500 | 4,007 | 3,301 | 1,135 | 1,127 | 102 | -91.00% |
| 730424 | 5 | Stainless Products | 730424 CASING & TUBING USED IN DRILLING FOR OIL OR GAS, OTHER OF STAINLESS STEEL | 787 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | N/A |
| 730429 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730429 CASING AND TUBING OF A KIND USED IN DRILLING FOR OIL OR GAS, OF IRON (EXCEPT CAST IRON) OR STEEL | 0 | 0 | 0 | 0 | 49 | 0 | 0 | 0 | N/A |
| 730431 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730431 TUBES, PIPES AND HOLLOW PROFILES, SEAMLESS NESOI, OF CIRCULAR CROSS SECTION OF IRON OR NONALLOY STEEL, COLD-DRAWN OR COLD-ROLLED | 20 | 17 | 161 | 203 | 32 | 28 | 0 | 28 | N/A |
| 730439 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730439 TUBES, PIPES AND HOLLOW PROFILES, SEAMLESS NESOI, OF CIRCULAR CROSS SECTION OF IRON OR NONALLOY STEEL, NOT COLD-DRAWN OR COLD-ROLLED | 424 | 7 | 3 | 2 | 12 | 0 | 0 | 64 | N/A |
| 730441 | 5 | Stainless Products | 730441 TUBES, PIPES AND HOLLOW PROFILES, SEAMLESS NESOI, OF CIRCULAR CROSS SECTION OF STAINLESS STEEL, COLD-DRAWN OR COLD-ROLLED | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | N/A |
| 730449 | 5 | Stainless Products | 730449 TUBES, PIPES AND HOLLOW PROFILES, SEAMLESS NESOI, OF CIRCULAR CROSS SECTION OF STAINLESS STEEL, NOT COLD-DRAWN OR COLD-ROLLED | 0 | 101 | 9 | 0 | 0 | 0 | 0 | 0 | N/A |
| 730451 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730451 TUBES, PIPES AND HOLLOW PROFILES, SEAMLESS NESOI, OF CIRCULAR CROSS SECTION OF ALLOY STEEL (OTHER THAN STAINLESS), COLD-DRAWN OR COLD-ROLLED | 0 | 0 | 2 | 0 | 0 | 31 | 0 | 17 | N/A |
| 730459 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730459 TUBES, PIPES AND HOLLOW PROFILES, SEAMLESS NESOI, OF CIRCULAR CROSS SECTION OF ALLOY STEEL (OTHER THAN STAINLESS), NOT COLD-DRAWN OR COLD-ROLLED | 0 | 4 | 5 | 1,088 | 14 | 0 | 0 | 0 | N/A |
| 730490 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730490 TUBES, PIPES AND HOLLOW PROFILES, SEAMLESS NESOI, OF IRON (OTHER THAN CAST IRON) OR STEEL | 0 | 0 | 0 | 23 | 12 | 7 | 3 | 2 | -9.50% |
| 730511 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730511 LINE PIPE FOR OIL OR GAS PIPELINES, EXTERNAL DIAMETER OVER 406.4 MM (16 IN.), OF IRON OR STEEL, LONGITUDINALLY SUBMERGED ARC WELDED | 392 | 0 | 4,808 | 2,251 | 919 | 61 | 61 | 1,004 | 1534.20% |
| 730512 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730512 LINE PIPE FOR OIL OR GAS PIPELINES, EXTERNAL DIAMETER OVER 406.4 MM (16 IN.), OF IRON OR STEEL, LONGITUDINALLY WELDED NESOI | 0 | 0 | 3,127 | 1,318 | 589 | 0 | 0 | 0 | N/A |

| HTS | TYPE | STEEL TYPE DESCRIPTION | HTS Description | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2017 YTD | 2018 YTD | Percent Change YTD2017 - YTD2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 730519 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730519 LINE PIPE FOR OIL OR GAS PIPELINES, EXTERNAL DIAMETER OVER 406.4 MM (16 IN.), OF IRON OR STEEL, RIVETED OR SIMILARLY CLOSED NESOI | 2,097 | 14,650 | 23,247 | 110,897 | 104,082 | 41,415 | 40,078 | 0 | -100.00% |
| 730520 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730520 CASING FOR OIL OR GAS DRILLING, EXTERNAL DIAMETER OVER 406.4 MM (16 IN.), OF IRON OR STEEL | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 0 | N/A |
| 730531 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730531 PIPES AND TUBES NESOI, EXTERNAL DIAMETER OVER 406.4 MM (16 IN.), OF IRON OR STEEL, LONGITUDINALLY WELDED | 0 | 2,033 | 205 | 255 | 48 | 937 | 937 | 0 | -100.00% |
| 730539 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730539 PIPES AND TUBES NESOI, EXTERNAL DIAMETER OVER 406.4 MM (16 IN.), OF IRON OR STEEL, WELDED NESOI | 29 | 0 | 0 | 908 | 2,909 | 14,276 | 5,651 | 3,729 | -34.00% |
| 730590 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730590 PIPES AND TUBES NESOI, EXTERNAL DIAMETER OVER 406.4 MM (16 IN.), OF IRON OR STEEL, RIVETED OR SIMILARLY CLOSED NESOI | 0 | 133 | 0 | 0 | 2 | 0 | 0 | 0 | N/A |
| 730611 | 5 | Stainless Products | 730611 LINE PIPE FOR OIL OR GAS PIPELINES, WELDED, OF STAINLESS STEEL, NESOI | 0 | 0 | 5,152 | 1,444 | 2,221 | 860 | 856 | 58 | -93.30% |
| 730619 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730619 LINE PIPE FOR OIL OR GAS PIPELINES, OF IRON OR STEEL, NESOI | 60,302 | 59,897 | 71,254 | 26,568 | 2,204 | 123 | 123 | 537 | 335.30% |
| 730629 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730629 CASING OR TUBING FOR OIL OR GAS DRILLING, OF IRON OR STEEL, NESOI | 137,508 | 121,357 | 87,770 | 51,033 | 25,710 | 61,517 | 43,490 | 29,933 | -31.20% |
| 730630 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730630 PIPES, TUBES AND HOLLOW PROFILES NESOI, WELDED, OF CIRCULAR CROSS SECTION, OF IRON OR NONALLOY STEEL | 61,043 | 46,914 | 56,077 | 118,595 | 45,625 | 72,227 | 59,196 | 24,854 | -58.00% |
| 730640 | 5 | Stainless Products | 730640 PIPES, TUBES AND HOLLOW PROFILES NESOI, WELDED, OF CIRCULAR CROSS SECTION, OF STAINLESS STEEL | 4 | 0 | 90 | 414 | 794 | 394 | 393 | 22 | -94.30% |
| 730650 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730650 PIPES, TUBES AND HOLLOW PROFILES NESOI, WELDED, OF CIRCULAR CROSS SECTION, OF ALLOY STEEL (OTHER THAN STAINLESS) NESOI | 19 | 13 | 0 | 0 | 9 | 133 | 133 | 14 | -89.40% |
| 730661 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730661 TUBES, PIPES AND HOLLOW PROFILES, OF IRON OR STEEL, WELDED, OF A SQUARE OR RECTANGULAR CROSS-SECTION, NESOI | 36,299 | 45,383 | 62,471 | 41,166 | 15,815 | 29,086 | 14,943 | 14,135 | -5.40% |
| 730690 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730690 PIPES, TUBES AND HOLLOW PROFILES NESOI, OF IRON OR STEEL, RIVETED OR SIMILARLY CLOSED | 0 | 0 | 23 | 0 | 0 | 0 | 0 | 0 | -100.00% |
| Total | | | | 1,221,681 | 1,091,837 | 1,985,243 | 2,588,036 | 2,190,748 | 1,990,317 | 1,568,645 | 654,339 | |

Sources: Data on this site have been compiled from tariff and trade data from the U.S. Department of Commerce and the U.S. International Trade Commission.

**232 Steel: First Unit of Quantity for Turkey by HTS Number**
U.S. Imports for Consumption in Metric Tons

Monthly data for January 2017 - July 2018

| HTS | TYPE | STEEL TYPE DESCRIPTION | HTS Number | JAN '17 | FEB '17 | MAR '17 | APR '17 | MAY '17 | JUN '17 | JUL '17 | AUG '17 | SEP '17 | OCT '17 | NOV '17 | DEC '17 | 2017 Total | JAN '18 | FEB '18 | MAR '18 | APR '18 | MAY '18 | JUN '18 | JUL '18 | 2018 JAN-JUN Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 720711 | 4 | Carbon and Alloy Semi-finished Products (Semi-finished Products) | 720711 SEMIFINISHED PRODUCTS OF IRON OR NONALLOY STEEL, UNDER 0.25% (WT.) CARBON, RECTANGULAR OR SQUARE CROSS SECTION, WIDTH LESS THAN TWICE THE THICKNESS | 0 | 0 | 0 | 0 | 0 | 0 | 68 | 0 | 0 | 0 | 0 | 0 | 68 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 720836 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720836 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, WIDTH OF 600 MM OR MORE IN COILS, HOT-ROLLED WORKED ONLY, OF A THICKNESS EXCEEDING 10 MM, N.E.S.O.I. | 0 | 0 | 61 | 2,112 | 0 | 1,696 | 0 | 0 | 0 | 0 | 0 | 1,333 | 5,202 | 969 | 0 | 1,358 | 0 | 0 | 1,547 | 2,046 | 5,921 |
| 720837 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720837 FLAT-ROLLED PRODUCTS OF IRN OR NONALLOY STEEL, WIDTH OF 600MM OR MORE, IN COILS, HOT-ROLLED WORKED ONLY, OF A THICKNESS 4.75MM BUT NOT OVER 10MM NESOI | 0 | 0 | 1,268 | 5,359 | 165 | 5,277 | 0 | 0 | 0 | 0 | 0 | 3,254 | 15,323 | 5,949 | 0 | 4,480 | 0 | 0 | 2,656 | 8,134 | 21,219 |
| 720838 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720838 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, WIDTH 600MM OR MORE, IN COILS, HOT-ROLLED WORKED ONLY, OF A THICKNESS 3MM OR MORE BUT UNDER 4.75MM, NESOI | 4,182 | 0 | 3,925 | 6,384 | 783 | 6,817 | 24,323 | 0 | 0 | 0 | 0 | 2,899 | 49,313 | 6,160 | 0 | 6,664 | 0 | 0 | 1,922 | 10,667 | 25,412 |
| 720839 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720839 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, WIDTH 600MM OR MORE, IN COILS, HOT-ROLLED WORKED ONLY, OF A THICKNESS OF LESS THAN 3MM, N.E.S.O.I. | 734 | 0 | 985 | 7,679 | 447 | 6,186 | 2,459 | 0 | 0 | 0 | 0 | 6,721 | 25,212 | 9,013 | 0 | 10,117 | 0 | 0 | 1,793 | 10,490 | 31,413 |
| 720851 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720851 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, WIDTH 600MM OR MORE, NOT IN COILS, HOT-ROLLED WORKED ONLY, OF A THICKNESS EXCEEDING 10 MM, N.E.S.O.I. | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 720852 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720852 FLAT-ROLLED IRON OR NONALLOY STEEL, 600 MM OR MORE WIDE, HOT-ROLLED, NOT CLAD, PLATED, COATED OR COILS, 4.75 MM TO 10 MM THICK | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 19 | 22 |
| 720890 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720890 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, 600 MM OR MORE WIDE, HOT-ROLLED, NOT CLAD, PLATED OR COATED, NESOI | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| HTS | TYPE | STEEL TYPE DESCRIPTION | HTS Number | JAN '17 | FEB '17 | MAR '17 | APR '17 | MAY '17 | JUN '17 | JUL '17 | AUG '17 | SEP'17 | OCT '17 | NOV '17 | DEC '17 | 2017 Total | JAN '18 | FEB '18 | MAR '18 | APR '18 | MAY '18 | JUN '18 | JUL '18 | 2018 JAN-JUN Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 720916 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720916 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, WIDTH 600MM OR MORE, IN COILS,COLD-ROLLED WORKED ONLY, OF A THICKNESS OVER ONE MM BUT LESS THAN 3 MM | 15,099 | 9,756 | 7,200 | 6,206 | 15,040 | 29,227 | 12,978 | 23,352 | 11,721 | 28,676 | 4,169 | 17,275 | 180,698 | 6,539 | 3,459 | 0 | 7,654 | 5,640 | 5,845 | 4,977 | 34,115 |
| 720917 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720917 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, WIDTH 600MM OR MORE, IN COILS, COLD-ROLLED WORKED ONLY, OF A THICKNESS 0.5MM OR MORE BUT NOT OVER 1MM | 8,667 | 20,680 | 5,647 | 3,576 | 7,780 | 7,902 | 22,690 | 6,669 | 5,997 | 6,492 | 1,353 | 2,798 | 100,251 | 4,908 | 6,263 | 0 | 7,015 | 3,195 | 14,763 | 2,057 | 38,201 |
| 720918 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720918 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, WIDTH 600MM OR MORE, IN COILS, COLD-ROLLED WORKED ONLY, OF A THICKNESS OF LESS THAN 0.5 MM | 6,575 | 5,500 | 2,828 | 2,463 | 5,156 | 7,375 | 1,725 | 2,079 | 1,080 | 679 | 7,000 | 170 | 42,630 | 4,851 | 548 | 6,889 | 1,040 | 760 | 4,939 | 314 | 19,340 |
| 720926 | 1 | Carbon and Alloy Flat Product (Flat Products) | 720926 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL,WIDTH 600MM OR MORE, NOT IN COILS,COLD-ROLLED WORKED ONLY, OF A THICKNESS OVER 1 MM BUT LESS THAN 3 MM | 0 | 0 | 0 | 0 | 0 | 60 | 0 | 0 | 0 | 0 | 0 | 0 | 60 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 721011 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721011 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, 600 MM OR MORE WIDE, PLATED OR COATED WITH TIN, 0.5 MM OR MORE THICK | 78 | 0 | 0 | 0 | 0 | 0 | 0 | 29 | 0 | 0 | 0 | 0 | 107 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 721012 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721012 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, 600 MM OR MORE WIDE, PLATED OR COATED WITH TIN, UNDER 0.5 MM THICK | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 147 | 147 | 0 | 0 | 0 | 0 | 0 | 0 | 45 | 45 |
| 721041 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721041 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, CORRUGATED, 600 MM OR MORE WIDE, PLATED OR COATED WITH ZINC OTHER THAN ELECTROLYTICALLY | 0 | 0 | 0 | 0 | 0 | 0 | 75 | 0 | 0 | 0 | 0 | 0 | 75 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 721049 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721049 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, NOT CORRUGATED, 600 MM OR MORE WIDE, PLATED OR COATED WITH ZINC OTHER THAN ELECTROLYTICALLY | 21,609 | 4,327 | 8,179 | 32,497 | 18,457 | 23,314 | 45,961 | 37,843 | 26,492 | 20,063 | 32,808 | 7,961 | 279,512 | 21,106 | 2,799 | 4,736 | 24,359 | 13,559 | 9,871 | 3,560 | 79,991 |
| 721050 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721050 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, 600 MM OR MORE WIDE, PLATED OR COATED WITH CHROMIUM OXIDES OR WITH CHROMIUM AND CHROMIUM OXIDES | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 658 | 0 | 0 | 0 | 658 |

| HTS | TYPE | STEEL TYPE DESCRIPTION | HTS Number | JAN '17 | FEB '17 | MAR '17 | APR '17 | MAY '17 | JUN '17 | JUL '17 | AUG '17 | SEP '17 | OCT '17 | NOV '17 | DEC '17 | 2017 Total | JAN '18 | FEB '18 | MAR '18 | APR '18 | MAY '18 | JUN '18 | JUL '18 | 2018 JAN-JUN Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 721061 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721061 FLAT-ROLLD IRON OR NONALLOY STEEL 600MM OR MORE, PLATED OR COATED WITH ALUMINUM-ZINC ALLOYS | 282 | 400 | 426 | 629 | 492 | 1,307 | 0 | 0 | 0 | 0 | 0 | 0 | **3,536** | 61 | 0 | 399 | 1,490 | 907 | 562 | 0 | **3,419** |
| 721069 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721069 FLAT-ROLLD IRON OR NONALLOY STEEL 600MM OR MORE, PLATED OR COATED WITH OTHER ALUMINUM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 142 | 0 | 0 | **142** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| 721070 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721070 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, 600 MM OR MORE WIDE, PAINTED, VARNISHED OR COATED WITH PLASTICS | 0 | 374 | 247 | 2,385 | 0 | 328 | 1,038 | 278 | 982 | 435 | 2,928 | 1,662 | **10,658** | 1,016 | 952 | 678 | 2,931 | 2,658 | 25 | 1,205 | **9,466** |
| 721114 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721114 FLAT-ROLLD HIGH-STRNGTH IRON OR NONALLOY STEEL UNDER 600MM WIDE HOT-ROLLD, NOT CLAD, COATED OR PLATED 4.75MM THICK OR MORE | 18 | 89 | 189 | 0 | 54 | 34 | 4 | 0 | 0 | 0 | 0 | 171 | **558** | 65 | 20 | 0 | 0 | 0 | 0 | 0 | **85** |
| 721119 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721119 FLAT-ROLLED HIGH-STRENGTH NONALLLOY STEEL PRODUCTS NESOI, UNDER 600 MM WIDE, HOT-ROLLED, NOT CLAD, PLATED OR COATED, UNDER 4.75 MM THICK | 54 | 66 | 30 | 0 | 122 | 0 | 0 | 101 | 0 | 38 | 0 | 0 | **411** | 0 | 6 | 0 | 0 | 0 | 0 | 0 | **6** |
| 721123 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721123 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, WIDTH LESS THAN 600 MM, NOT FURTHER WORKED THAN COLD-ROLLED, NOT CLAD, PLATED OR COATED, | 0 | 0 | 0 | 0 | 0 | 0 | 58 | 0 | 0 | 0 | 0 | 0 | **58** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| 721220 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721220 FLAT-ROLLED PRODUCTS OF IRON OR NONALLOY STEEL, WIDTH OF LESS THAN 600 MM, ELECTROLYTICALLY PLATED OR COATED WITH ZINC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 0 | **24** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| 721230 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721230 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, UNDER 600 MM WIDE, PLATED OR COATED WITH ZINC OTHER THAN ELECTROLYTICALLY | 0 | 426 | 910 | 188 | 172 | 496 | 639 | 234 | 50 | 173 | 0 | 0 | **3,290** | 0 | 700 | 421 | 817 | 556 | 1,357 | 478 | **4,328** |
| 721240 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721240 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, UNDER 600 MM WIDE, PAINTED, VARNISHED OR COATED WITH PLASTICS | 38 | 172 | 59 | 19 | 116 | 0 | 139 | 19 | 39 | 37 | 77 | 77 | **795** | 57 | 123 | 39 | 19 | 19 | 40 | 0 | **298** |
| 721250 | 1 | Carbon and Alloy Flat Product (Flat Products) | 721250 FLAT-ROLLED IRON OR NONALLOY STEEL PRODUCTS, UNDER 600 MM WIDE, PLATED OR COATED, NESOI | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | **2** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |

| HTS | TYPE | STEEL TYPE DESCRIPTION | HTS Number | JAN '17 | FEB '17 | MAR '17 | APR '17 | MAY '17 | JUN '17 | JUL '17 | AUG '17 | SEP'17 | OCT '17 | NOV '17 | DEC '17 | 2017 Total | JAN '18 | FEB '18 | MAR '18 | APR '18 | MAY '18 | JUN '18 | JUL '18 | 2018 JAN-JUN Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 721310 | 2 | Carbon and Alloy Long Products (Long Products) | 721310 BARS AND RODS OF IRON OR NONALLOY STEEL, HOT-ROLLED, IN IRREGULARLY WOUND COILS, CONCRETE REINFORCING | 1,010 | 2,177 | 1,856 | 1,027 | 0 | 433 | 0 | 560 | 554 | 1,272 | 0 | 0 | 8,888 | 0 | 0 | 1,120 | 844 | 0 | 0 | 0 | 1,964 |
| 721391 | 2 | Carbon and Alloy Long Products (Long Products) | 721391 BARS AND RODS,HOT-ROLLED, IN IRREGULARLY WOUND COILS, OF IRON OR NONALLOY STEEL, OF CIRCULAR CROSS-SECTION MEASURING LESS THAN 14MM IN DIAMETER, NESOI | 8,615 | 2,863 | 25,319 | 13,741 | 3,394 | 46,108 | 0 | 0 | 648 | 0 | 0 | 0 | 100,688 | 0 | 0 | 23 | 0 | 0 | 0 | 0 | 23 |
| 721399 | 2 | Carbon and Alloy Long Products (Long Products) | 721399 BARS AND RODS, HOT-ROLLED, IN IRREGULARLY WOUND COILS, OF IRON OR NONALLOY STEEL, N.E.S.O.I. | 603 | 0 | 0 | 533 | 0 | 973 | 0 | 0 | 0 | 0 | 0 | 0 | 2,110 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 721410 | 2 | Carbon and Alloy Long Products (Long Products) | 721410 BARS AND RODS OF IRON OR NONALLOY STEEL, FORGED | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,195 | 0 | 6 | 0 | 1,202 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 721420 | 2 | Carbon and Alloy Long Products (Long Products) | 721420 BARS AND RODS OF IRON OR NONALLOY STEEL, HOT-WORKED NESOI, CONCRETE REINFORCING | 178,837 | 101,223 | 184,872 | 61,813 | 59,569 | 101,268 | 28,079 | 9,405 | 25,200 | 32,431 | 0 | 0 | 782,698 | 55,410 | 18,117 | 65,890 | 60,408 | 38,080 | 13,358 | 8,570 | 259,833 |
| 721491 | 2 | Carbon and Alloy Long Products (Long Products) | 721491 BARS AND RODS OF IRON OR NONALLOY STEEL, NOT FURTHER WORKED THAN HOT-ROLLED, HOT-DRAWN OR HOT-EXTRUDED BUT INCL TWISTED,RECTANULAR CROSS SECTN, NESOI | 1,616 | 1,038 | 842 | 198 | 1,240 | 1,043 | 643 | 1,248 | 216 | 866 | 69 | 580 | 9,599 | 101 | 332 | 39 | 1,136 | 0 | 342 | 647 | 2,597 |
| 721499 | 2 | Carbon and Alloy Long Products (Long Products) | 721499 BARS AND RODS OF IRON OR NONALLOY STEEL, NOT FURTHER WORKED THAN HOT-ROLLED, HOT-DRAWN OR HOT-EXTRUDED, BUT INCLUDING TWISTED AFTER ROLLING, N.E.S.O.I | 2,153 | 399 | 3,343 | 250 | 1,107 | 1,132 | 468 | 696 | 1,216 | 394 | 8 | 1,014 | 12,178 | 208 | 166 | 19 | 368 | 5 | 10 | 216 | 992 |
| 721550 | 2 | Carbon and Alloy Long Products (Long Products) | 721550 BARS AND RODS OF IRON OR NONALLOY STEEL, NOT FURTHER WORKED THAN COLD-FORMED OR COLD-FINISHED, N.E.S.O.I. | 54 | 518 | 220 | 52 | 648 | 461 | 578 | 461 | 651 | 130 | 150 | 125 | 4,048 | 487 | 559 | 233 | 512 | 151 | 490 | 71 | 2,504 |
| 721590 | 2 | Carbon and Alloy Long Products (Long Products) | 721590 BARS AND RODS OF IRON OR NONALLOY STEEL, NESOI | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 0 | 28 | 52 | 95 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 721610 | 2 | Carbon and Alloy Long Products (Long Products) | 721610 U, I OR H SECTIONS OF IRON OR NONALLOY STEEL, HOT-WORKED, LESS THAN 80 MM HIGH | 41 | 10 | 0 | 40 | 27 | 0 | 7 | 35 | 0 | 100 | 0 | 0 | 261 | 78 | 0 | 95 | 0 | 22 | 0 | 0 | 196 |
| 721621 | 2 | Carbon and Alloy Long Products (Long Products) | 721621 L SECTIONS OF IRON OR NONALLOY STEEL, HOT-WORKED, LESS THAN 80 MM HIGH | 1,969 | 727 | 559 | 392 | 1,547 | 1,579 | 979 | 746 | 626 | 415 | 218 | 153 | 9,909 | 316 | 164 | 2,564 | 489 | 22 | 0 | 357 | 3,912 |

| HTS | TYPE | STEEL TYPE DESCRIPTION | HTS Number | JAN '17 | FEB '17 | MAR '17 | APR '17 | MAY '17 | JUN '17 | JUL '17 | AUG '17 | SEP'17 | OCT '17 | NOV '17 | DEC '17 | 2017 Total | JAN '18 | FEB '18 | MAR '18 | APR '18 | MAY '18 | JUN '18 | JUL '18 | 2018 JAN-JUN Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 721622 | 2 | Carbon and Alloy Long Products (Long Products) | 721622 T SECTIONS OF IRON OR NONALLOY STEEL, HOT-WORKED, LESS THAN 80 MM HIGH | 179 | 99 | 139 | 9 | 72 | 146 | 148 | 0 | 98 | 117 | 75 | 0 | 1,082 | 151 | 63 | 241 | 0 | 75 | 262 | 48 | 840 |
| 721631 | 2 | Carbon and Alloy Long Products (Long Products) | 721631 U SECTIONS OF IRON OR NONALLOY STEEL, HOT-WORKED, 80 MM OR MORE HIGH | 16 | 195 | 87 | 0 | 60 | 60 | 67 | 20 | 0 | 17 | 0 | 0 | 522 | 52 | 0 | 62 | 57 | 0 | 0 | 0 | 171 |
| 721633 | 2 | Carbon and Alloy Long Products (Long Products) | 721633 H SECTIONS OF IRON OR NONALLOY STEEL, HOT-WORKED, 80 MM OR MORE HIGH | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | 0 | 12 |
| 721640 | 2 | Carbon and Alloy Long Products (Long Products) | 721640 L OR T SECTIONS OF IRON OR NONALLOY STEEL, HOT-WORKED, 80 MM OR MORE HIGH | 192 | 76 | 10 | 185 | 67 | 144 | 112 | 16 | 0 | 0 | 0 | 16 | 820 | 17 | 149 | 2 | 413 | 344 | 0 | 0 | 926 |
| 721650 | 2 | Carbon and Alloy Long Products (Long Products) | 721650 ANGLES, SHAPES AND SECTIONS NESOI OF IRON OR NONALLOY STEEL, HOT-WORKED | 326 | 591 | 213 | 1,832 | 631 | 971 | 458 | 104 | 96 | 192 | 93 | 0 | 5,508 | 1,181 | 739 | 120 | 446 | 79 | 0 | 176 | 2,741 |
| 721699 | 2 | Carbon and Alloy Long Products (Long Products) | 721699 ANGLES, SHAPES AND SECTIONS IRON OR NONALLOY STEEL NESOI | 0 | 2 | 18 | 0 | 0 | 0 | 43 | 0 | 99 | 0 | 88 | 48 | 298 | 0 | 18 | 0 | 18 | 0 | 0 | 0 | 36 |
| 721710 | 2 | Carbon and Alloy Long Products (Long Products) | 721710 WIRE OF IRON OR NONALLLOY STEEL, NOT PLATED OR COATED, WHETHER OR NOT POLISHED | 0 | 22 | 0 | 0 | 0 | 22 | 0 | 0 | 0 | 0 | 0 | 0 | 44 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 721720 | 2 | Carbon and Alloy Long Products (Long Products) | 721720 WIRE OF IRON OR NONALLOY STEEL, PLATED OR COATED WITH ZINC | 269 | 84 | 102 | 37 | 99 | 179 | 121 | 327 | 58 | 158 | 0 | 0 | 1,435 | 0 | 434 | 0 | 92 | 20 | 3 | 0 | 549 |
| 721730 | 2 | Carbon and Alloy Long Products (Long Products) | 721730 WIRE OF IRON OR NONALLOY STEEL, PLATED OR COATED WITH BASE METAL OTHER THAN ZINC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 98 | 0 | 98 |
| 721899 | 5 | Stainless Steel | 721899 OTHER SEMIFINISHED PRODUCTS OF STAINLESS STEEL | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 721933 | 5 | Stainless Products | 721933 FLAT-ROLLED STAINLESS STEEL PRODUCTS, 600 MM OR MORE WIDE, COLD-ROLLED, OVER 1 MM BUT UNDER 3 MM THICK | 76 | 128 | 127 | 54 | 78 | 0 | 29 | 0 | 86 | 0 | 25 | 0 | 603 | 16 | 0 | 0 | 0 | 18 | 0 | 0 | 34 |
| 721934 | 5 | Stainless Products | 721934 FLAT-ROLLED STAINLESS STEEL PRODUCTS, 600 MM OR MORE WIDE, COLD-ROLLED, 0.5 MM BUT NOT OVER 1 MM THICK | 122 | 11 | 35 | 0 | 178 | 34 | 65 | 156 | 157 | 97 | 200 | 0 | 1,054 | 110 | 19 | 0 | 0 | 0 | 0 | 0 | 129 |
| 721935 | 5 | Stainless Products | 721935 FLAT-ROLLED STAINLESS STEEL PRODUCTS, 600 MM OR MORE WIDE, COLD-ROLLED, UNDER 0.5 MM THICK | 56 | 84 | 15 | 2 | 0 | 0 | 43 | 94 | 0 | 19 | 47 | 0 | 360 | 17 | 19 | 0 | 40 | 0 | 116 | 0 | 192 |
| 722240 | 5 | Stainless Products | 722240 ANGLES, SHAPES AND SECTIONS OF STAINLESS STEEL | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 6 | 1 | 0 | 0 | 0 | 0 | 0 | 7 |

| HTS | TYPE | STEEL TYPE DESCRIPTION | HTS Number | JAN '17 | FEB '17 | MAR '17 | APR '17 | MAY '17 | JUN '17 | JUL '17 | AUG '17 | SEP'17 | OCT '17 | NOV '17 | DEC '17 | 2017 Total | JAN '18 | FEB '18 | MAR '18 | APR '18 | MAY '18 | JUN '18 | JUL '18 | 2018 JAN-JUN Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 722300 | 5 | Stainless Products | 722300 WIRE OF STAINLESS STEEL | 0 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **20** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| 722490 | 4 | Carbon and Alloy Semi-finished Products (Semi-finished Products) | 722490 SEMIFINISHED PRODUCTS OF ALLOY STEEL (OTHER THAN STAINLESS) NESOI | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | **4** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| 722550 | 1 | Carbon and Alloy Flat Product (Flat Products) | 722550 FLAT-ROLLED ALLOY STEEL (OTHER THAN STAINLESS) PRODUCTS, 600 MM OR MORE WIDE, COLD-ROLLED, NESOI | 0 | 0 | 2,288 | 2,525 | 363 | 2,088 | 7,157 | 1,272 | 2,573 | 875 | 1,042 | 1,615 | **21,798** | 0 | 911 | 892 | 3,254 | 1,358 | 2,825 | 3,347 | **12,587** |
| 722790 | 2 | Carbon and Alloy Long Products (Long Products) | 722790 BARS AND RODS OF ALLOY STEEL (OTHER THAN STAINLESS), HOT-ROLLED, IN IRREGULARLY WOUND COILS, NESOI | 0 | 0 | 0 | 217 | 197 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **414** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| 722830 | 2 | Carbon and Alloy Long Products (Long Products) | 722830 BARS AND RODS OF ALLOY STEEL (OTHER THAN STAINLESS), HOT-WORKED, NESOI | 0 | 856 | 0 | 1,234 | 14,939 | 22,663 | 33,382 | 1,584 | 3,574 | 394 | 1,099 | 1,534 | **81,259** | 1,333 | 1,745 | 519 | 3,785 | 1,724 | 0 | 3,903 | **13,010** |
| 722840 | 2 | Carbon and Alloy Long Products (Long Products) | 722840 BARS AND RODS OF ALLOY STEEL (OTHER THAN STAINLESS), FORGED, NESOI | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0 | 0 | 0 | 1,803 | 0 | 0 | 0 | **1,803** |
| 722870 | 2 | Carbon and Alloy Long Products (Long Products) | 722870 ANGLES, SHAPES AND SECTIONS OF ALLOY STEEL (OTHER THAN STAINLESS), NESOI | 0 | 0 | 0 | 1,265 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **1,265** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| 722920 | 2 | Carbon and Alloy Long Products (Long Products) | 722920 WIRE OF SILICO-MANGANESE STEEL | 110 | 42 | 46 | 74 | 17 | 119 | 0 | 8 | 37 | 31 | 54 | 9 | **549** | 86 | 0 | 89 | 54 | 6 | 93 | 26 | **353** |
| 722990 | 2 | Carbon and Alloy Long Products (Long Products) | 722990 WIRE OF ALLOY STEEL NESOI | 2 | 6 | 111 | 76 | 46 | 35 | 9 | 0 | 0 | 0 | 0 | 0 | **285** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| 730110 | 2 | Carbon and Alloy Long Products (Long Products) | 730110 SHEET PILING OF IRON OR STEEL, WHETHER OR NOT DRILLED, PUNCHED OR MADE FROM ASSEMBLED ELEMENTS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0 | 0 | 2 | 0 | 0 | 0 | 0 | **2** |
| 730210 | 2 | Carbon and Alloy Long Products (Long Products) | 730210 RAILWAY OR TRAMWAY RAILS OF IRON OR STEEL | 0 | 0 | 0 | 19 | 115 | 55 | 57 | 0 | 36 | 18 | 35 | 91 | **425** | 19 | 72 | 91 | 73 | 37 | 55 | 34 | **381** |
| 730290 | 2 | Carbon and Alloy Long Products (Long Products) | 730290 RAILWAY OR TRAMWAY TRACK CONSTRUCTION MATERIAL OF IRON OR STEEL NESOI | 0 | 0 | 0 | 0 | 0 | 0 | 58 | 0 | 0 | 0 | 0 | 0 | **58** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| 730411 | 5 | Stainless Products | 730411 LINE PIPE FOR OIL AND GAS PIPELINES, OF STAINLESS STEEL | 145 | 49 | 99 | 17 | 88 | 94 | 0 | 0 | 0 | 0 | 8 | 0 | **500** | 0 | 0 | 0 | 0 | 0 | 4 | 5 | **9** |
| 730419 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730419 LINE PIPE FOR OIL AND GAS PIPELINES, OF SEAMLESS IRON (OTHER THAN CAST IRON) OR STEEL, NES | 228 | 226 | 237 | 94 | 224 | 110 | 9 | 0 | 0 | 0 | 8 | 0 | **1,135** | 0 | 0 | 0 | 0 | 31 | 39 | 32 | **102** |

| HTS | TYPE | STEEL TYPE DESCRIPTION | HTS Number | JAN '17 | FEB '17 | MAR '17 | APR '17 | MAY '17 | JUN '17 | JUL '17 | AUG '17 | SEP '17 | OCT '17 | NOV '17 | DEC '17 | 2017 Total | JAN '18 | FEB '18 | MAR '18 | APR '18 | MAY '18 | JUN '18 | JUL '18 | 2018 JAN-JUN Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 730431 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730431 TUBES, PIPES AND HOLLOW PROFILES, SEAMLESS NESOI, OF CIRCULAR CROSS SECTION OF IRON OR NONALLOY STEEL, COLD-DRAWN OR COLD-ROLLED | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 10 | 0 | 9 | **28** | 0 | 9 | 9 | 0 | 9 | 0 | 0 | **28** |
| 730439 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730439 TUBES, PIPES AND HOLLOW PROFILES, SEAMLESS NESOI, OF CIRCULAR CROSS SECTION OF IRON OR NONALLOY STEEL, NOT COLD-DRAWN OR COLD-ROLLED | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 | 32 | 32 | **64** |
| 730441 | 5 | Stainless Products | 730441 TUBES, PIPES AND HOLLOW PROFILES, SEAMLESS NESOI, OF CIRCULAR CROSS SECTION OF STAINLESS STEEL, COLD-DRAWN OR COLD-ROLLED | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | **5** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| 730449 | 5 | Stainless Products | 730449 TUBES, PIPES AND HOLLOW PROFILES, SEAMLESS NESOI, OF CIRCULAR CROSS SECTION OF STAINLESS STEEL, NOT COLD-DRAWN OR COLD-ROLLED | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| 730451 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730451 TUBES, PIPES AND HOLLOW PROFILES, SEAMLESS NESOI, OF CIRCULAR CROSS SECTION OF ALLOY STEEL (OTHER THAN STAINLESS), COLD-DRAWN OR COLD-ROLLED | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 18 | 13 | **31** | 0 | 0 | 0 | 0 | 0 | 17 | 0 | **17** |
| 730459 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730459 TUBES, PIPES AND HOLLOW PROFILES, SEAMLESS NESOI, OF CIRCULAR CROSS SECTION OF ALLOY STEEL (OTHER THAN STAINLESS), NOT COLD-DRAWN OR COLD-ROLLED | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| 730490 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730490 TUBES, PIPES AND HOLLOW PROFILES, SEAMLESS NESOI, OF IRON (OTHER THAN CAST IRON) OR STEEL | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 3 | **7** | 0 | 0 | 0 | 2 | 0 | 0 | 0 | **2** |
| 730511 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730511 LINE PIPE FOR OIL OR GAS PIPELINES, EXTERNAL DIAMETER OVER 406.4 MM (16 IN.), OF IRON OR STEEL, LONGITUDINALLY SUBMERGED ARC WELDED | 54 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **61** | 0 | 0 | 0 | 0 | 244 | 548 | 212 | **1,005** |
| 730519 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730519 LINE PIPE FOR OIL OR GAS PIPELINES, EXTERNAL DIAMETER OVER 406.4 MM (16 IN.), OF IRON OR STEEL, RIVETED OR SIMILARLY CLOSED NESOI | 12,917 | 0 | 4,265 | 0 | 0 | 11,062 | 11,834 | 0 | 0 | 0 | 1,337 | 0 | **41,415** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| 730531 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730531 PIPES AND TUBES NESOI, EXTERNAL DIAMETER OVER 406.4 MM (16 IN.), OF IRON OR STEEL, LONGITUDINALLY WELDED | 0 | 0 | 0 | 0 | 937 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **937** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |

| HTS | TYPE | STEEL TYPE DESCRIPTION | HTS Number | JAN '17 | FEB '17 | MAR '17 | APR '17 | MAY '17 | JUN '17 | JUL '17 | AUG '17 | SEP'17 | OCT '17 | NOV '17 | DEC '17 | 2017 Total | JAN '18 | FEB '18 | MAR '18 | APR '18 | MAY '18 | JUN '18 | JUL '18 | 2018 JAN-JUN Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 730539 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730539 PIPES AND TUBES NESOI, EXTERNAL DIAMETER OVER 406.4 MM (16 IN.), OF IRON OR STEEL, WELDED NESOI | 1,081 | 3,199 | 0 | 0 | 0 | 0 | 1,370 | 0 | 3,186 | 0 | 5,440 | 0 | 14,276 | 0 | 0 | 3,729 | 0 | 0 | 0 | 0 | 3,729 |
| 730611 | 5 | Stainless Products | 730611 LINE PIPE FOR OIL OR GAS PIPELINES, WELDED, OF STAINLESS STEEL, NESOI | 201 | 131 | 208 | 66 | 181 | 65 | 3 | 0 | 0 | 0 | 4 | 0 | 860 | 0 | 0 | 0 | 0 | 0 | 7 | 51 | 58 |
| 730619 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730619 LINE PIPE FOR OIL OR GAS PIPELINES, OF IRON OR STEEL, NESOI | 112 | 2 | 5 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 123 | 0 | 0 | 0 | 314 | 158 | 65 | | 537 |
| 730629 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730629 CASING OR TUBING FOR OIL OR GAS DRILLING, OF IRON OR STEEL, NESOI | 3,304 | 8,571 | 6,138 | 5,154 | 0 | 6,729 | 13,595 | 5,324 | 11,443 | 0 | 0 | 1,260 | 61,517 | 0 | 7,027 | 5,286 | 5,691 | 6,181 | 2,454 | 3,295 | 29,933 |
| 730630 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730630 PIPES, TUBES AND HOLLOW PROFILES NESOI, WELDED, OF CIRCULAR CROSS SECTION, OF IRON OR NONALLOY STEEL | 7,274 | 12,328 | 6,582 | 8,706 | 4,131 | 3,521 | 16,654 | 2,979 | 4,566 | 1,824 | 2,059 | 1,604 | 72,227 | 4,602 | 4,475 | 3,704 | 4,838 | 3,528 | 2,262 | 1,444 | 24,854 |
| 730640 | 5 | Stainless Products | 730640 PIPES, TUBES AND HOLLOW PROFILES NESOI, WELDED, OF CIRCULAR CROSS SECTION, OF STAINLESS STEEL | 75 | 76 | 49 | 40 | 104 | 12 | 37 | 0 | 0 | 0 | 1 | 0 | 394 | 0 | 10 | 0 | 0 | 0 | 0 | 13 | 23 |
| 730650 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730650 PIPES, TUBES AND HOLLOW PROFILES NESOI, WELDED, OF CIRCULAR CROSS SECTION, OF ALLOY STEEL (OTHER THAN STAINLESS) NESOI | 0 | 0 | 0 | 0 | 133 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 133 | 0 | 0 | 14 | 0 | 0 | 0 | 0 | 14 |
| 730661 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730661 TUBES, PIPES AND HOLLOW PROFILES, OF IRON OR STEEL, WELDED, OF A SQUARE OR RECTANGULAR CROSS-SECTION, NESOI | 348 | 676 | 313 | 1,719 | 1,158 | 7,067 | 3,662 | 777 | 6,741 | 6,602 | 0 | 23 | 29,086 | 1,680 | 1,130 | 919 | 2,073 | 3,607 | 4,307 | 418 | 14,135 |
| 730690 | 3 | Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products) | 730690 PIPES, TUBES AND HOLLOW PROFILES NESOI, OF IRON OR STEEL, RIVETED OR SIMILARLY CLOSED | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| AGGREGATE | ALL | ALL | AGGREGATE | 279,322 | 178,207 | 270,053 | 170,896 | 140,144 | 298,194 | 231,830 | 96,431 | 109,442 | 102,710 | 60,472 | 52,616 | 1,990,317 | 126,566 | 51,028 | 121,447 | 132,377 | 83,166 | 72,820 | 66,935 | 654,339 |

Sources: Data on this site have been compiled from tariff and trade data from the U.S. Department of Commerce and the U.S. International Trade Commission.

# EXHIBIT 13



INTERNATIONAL
**T R A D E**
ADMINISTRATION

# Global Steel Trade
# Monitor

# Steel Imports Report: **United States**

June 2018

## Background

The United States is the world's largest steel importer.  In year-to-date 2018 (through March), further referred to at YTD 2018, the U.S. imported 7.9 million metric tons of steel, a decrease from 8.1 million metric tons in YTD 2017.  U.S. imports in 2017 represented about 9 percent of all steel imported globally, based on available data.  The volume of U.S. steel imports in 2017 was more than 25 percent larger than that of the world's second-largest importer, Germany.  In value terms, steel represented just 1.2 percent of the total goods imported into the United States in 2017.

The United States imported steel from 85 countries and territories in 2017.  The 9 countries highlighted in the map below represent the top sources for U.S. imports of steel, with the U.S. receiving more than 1 million metric tons from each and together accounting for 75 percent of U.S. steel imports in 2017.

### U.S. Imports of Steel Mill Products - 2017



Copyright © IHS Global Ltd., 2018. All rights reserved.

## Quick Facts:

● World's largest steel importer: 7.9 million metric tons (YTD 2018)

● 176% steel import growth since Q2 2009

● YTD import volume down 3% while import value up 17%

● Import penetration down from 31.3% in YTD 2017 to 30.0% in YTD 2018

● Top three import sources: Canada, Brazil, South Korea

● Largest producers: Nucor, ArcelorMittal USA, U.S. Steel

● 167 trade remedies in effect against imports of steel mill products

# Steel Imports Report: **United States**

## Steel Trade Balance

The United States has maintained a persistent trade deficit in steel products for over a decade. Since 2009, imports have returned to average levels seen prior to the 2008 global recession while exports have remained relatively flat in comparison, and the trade deficit has widened accordingly. Since their most recent low point, imports have grown by 176 percent between Q2 2009 and Q1 2018, while exports have increased by 26 percent. In YTD 2018, the U.S. steel trade deficit amounted to −5.5 million metric tons.



Source: IHS Global Markit

## Import Volume, Value, and Product

In 2014, U.S. imports of steel products reached a near-record high of 40.3 million metric tons, only topped by the 41.3 million metric tons imported in 2006. Import levels fell from 2014 by 12 percent in 2015 and by 15 percent in 2016, before rising 15 percent in 2017 to 34.6 million metric tons. In YTD 2018, imports have decreased 3 percent compared to YTD 2017 to a total of 7.9 million metric tons. The value of imports in YTD 2018 has increased — up 17 percent to $7.4 billion from $6.3 billion in YTD 2017.

In YTD 2018, flat products accounted for the largest share of U.S. steel imports at 35 percent, or 2.8 million metric tons. Pipe and tube products accounted for 23 percent, or 1.8 million metric tons, followed by semi-finished products at 20 percent (1.6 million metric tons), long products at 17 percent (1.4 million metric tons), and stainless products at 3 percent (273 thousand metric tons).



Source: IHS Global Markit
YTD through March 2018



Source: IHS Global Markit
YTD through March 2018

# Steel Imports Report: **United States**

## Imports by Top Source

The top 10 source countries for U.S. steel imports represented 79 percent of the total steel import volume in YTD 2018 at 6.3 million metrics tons (mmt). Canada accounted for the largest share of U.S. imports by source country at 20 percent (1.6 mmt), followed by Brazil at 13 percent (1.0 mmt), South Korea at 11 percent (0.9 mmt), Mexico at 11 percent (0.9 mmt), and Russia at 7 percent (0.5 mmt).

**U.S. Steel Imports - Top 10 Sources**
YTD 2018 - Percent of Volume

Rest of World 21%
Top 10 Sources 79%
Canada 20%
Brazil 13%
South Korea 11%
Mexico 11%
Russia 7%
Japan 5%
Turkey 4%
Germany 3%
Taiwan 3%
China 2%

Source: IHS Global Markit
YTD through March 2018

While the rankings of the top 10 source countries for U.S. imports have fluctuated over time, Canada has retained the top spot.

## Trends in Imports from Top Sources

Between YTD 2017 and YTD 2018, imports increased from five of the United States' top 10 import source countries. Imports from Germany showed the largest volume increase in YTD 2018, up 29 percent, followed by Mexico (14%), Canada (7%), South Korea (6%), and China (5%). Some of the countries which the United States had decreases in imports from were Turkey (-59%), Russia ( -10%), and Taiwan (-10%).

The overall value of U.S. imports increased from nine of the top 10 sources. Imports from Germany, South Korea, and Russia showed the largest increases in value in YTD 2018, up 39 percent, 33 percent, and 28 percent, respectively. Turkey was the only top import source country that had a decrease in value, down 49 percent in YTD 2018.

**Percent Change in Imports from Top 10 Sources (YTD 2017 to YTD 2018)**

Legend: Volume, Value

Countries: Canada, Brazil, South Korea, Mexico, Russia, Japan, Turkey, Germany, Taiwan, China

Source: IHS Global Markit
YTD through March 2018

Outside the top 10 sources, other notable volume changes included U.S. imports from 11th-ranked Vietnam (-32%), 17th-ranked Romania (444%), 26th-ranked Greece (2879%), and 32nd-ranked Indonesia (304%).

3

# Steel Imports Report: **United States**

### Top Sources by Steel Product Category

The top source countries for U.S. imports by volume vary across types of steel products. The United States. imported the largest share of flat products from Canada in YTD 2018 at 34 percent (950 thousand metric tons). Canada was also the largest source for long product imports at 23 percent (313 thousand metric tons).

The United States imported 26 percent of pipe and tube products from South Korea (474 thousand metric tons). Nearly half of the United States' imports of semi-finished steel came from Brazil in YTD 2018 — a total of 796 thousand metric tons, or 49 percent.

Taiwan was the largest source of imported stainless products at 12 percent (32 thousand metric tons), followed closely by Italy at 11 percent (29 thousand metric tons).



U.S. Top 5 Import Sources by Product - YTD 2018

Source: IHS Global Markit
YTD through March 2018

**Millions of Metric Tons**

# Steel Imports Report: **United States**

## U.S. Export Market Share from Top Source Countries

In 2017, the share of steel exports sent to the United States from its top import sources decreased in the majority of the U.S. top 10 sources.   Mexico's share of exports to the U.S. showed the largest decrease between 2016 and 2017, down 7.9 percentage points. Other notable decreases included Turkey's share of exports to the U.S. (down 4.3 percentage points from 2016), followed by Brazil (down 1.2 percentage points).  The share of exports to the U.S. in Japan and South Korea both decreased by less than one percentage point.

| U.S. Steel Export Market Share | | | | |
|---|---|---|---|---|
| Top 10 Import Sources | Share of Exports to U.S - 2016 | U.S.'s Rank in 2016 | Share of Exports to U.S. - 2017 | U.S. Rank in 2017 |
| Canada | 87.7% | 1 | 89.9% | 1 |
| Brazil | 34.0% | 1 | 32.8% | 1 |
| South Korea | 12.1% | 2 | 11.2% | 3 |
| Mexico | 72.9% | 1 | 65.0% | 1 |
| Russia | 2.3% | 11 | N/A | 0 |
| Turkey | 15.0% | 1 | 10.7% | 1 |
| Japan | 4.9% | 7 | 4.7% | 8 |
| Germany | 4.0% | 9 | N/A | 0 |
| Taiwan | 9.2% | 3 | 9.6% | 3 |
| China | 0.8% | 25 | 1.1% | 26 |

Source: IHS Global Trade Atlas, based on import data per reporting country

2017 Data not available for Russia and Germany

Countries with increases in their share of steel exports to the U.S. included Canada (up 2.3 percentage points), Taiwan (up 0.4 percentage points), and China (up 0.3 percentage points).

Among the U.S. top import sources, Canada and Mexico sent more than half of their total steel exports to the United States.  In 2017, flat products accounted for the largest share of steel exports to the U.S. in both Canada at 56 percent (3.3 million metric tons) and Mexico at 28 percent (913 thousand metric tons).



**Steel Export Composition of Top Market-Share Countries - 2017**

Source: IHS Global Trade Atlas, based on import data per reporting country

# Steel Imports Report: **United States**

## Overall Production and Import Penetration



### U.S. Import Penetration

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | | YTD 2017 | YTD 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Production | 59.4 | 80.5 | 86.4 | 88.7 | 86.9 | 88.2 | 78.8 | 78.6 | 81.6 | | 20.3 | 20.7 |
| Apparent Consumption | 65.1 | 90.7 | 99.6 | 106.0 | 104.0 | 117.0 | 104.6 | 99.7 | 106.2 | | 26.0 | 26.2 |
| Imports | 14.8 | 21.8 | 26.0 | 30.5 | 29.2 | 40.3 | 35.4 | 30.0 | 34.6 | | 8.1 | 7.9 |
| Import Penetration | 22.7% | 24.0% | 26.1% | 28.7% | 28.1% | 34.4% | 33.8% | 30.1% | 32.6% | | 31.3% | 30.0% |

Sources: World Steel Association; IHS Global Markit
YTD through March 2018

U.S. crude steel production increased 4 percent between 2015 and 2017, from 78.8 million metric tons in 2015 to 81.6 million metric tons in 2017.  Production in YTD 2018 has increased 2 percent to 20.7 million metric tons from 20.3 million metric tons in YTD 2017.  Since 2009, apparent consumption (a measure of steel demand) has increasingly exceeded production.  The gap between demand and production decreased to 5.5 million metric tons in YTD 2018.  Imports have captured an increasing share of demand, as shown by the relatively high levels of import penetration in 2015, 2016, and 2017 at 33.8, 30.1, and 32.6 percent, respectively.  In YTD 2018, import penetration stood at 30.0 percent, down from 31.3 percent in YTD 2017.

## Top Producers

The top seven steel producers in the United States are a mix of foreign and domestically-owned companies and a mix of electric arc furnace mills and blast furnace mills. The top three companies alone accounted for the majority of U.S. crude steel production in 2017 at 66 percent.

| United States Top Steel Producers in 2017 | | | |
|---|---|---|---|
| Rank | Company | Production (mmt) | Main Products |
| 1 | Nucor Corporation | 24.39 | Bars, beams, sheets, plate |
| 2 | ArcelorMittal USA | 15 | Hot-rolled, cold-rolled, plate, coated products, rails |
| 3 | United States Steel Corp. | 14.43 | Hot-rolled, cold-rolled, coated sheets, tubular products |
| 4 | Gerdau North America | 12.4 (N. Amer. capacity) | Beams, pilings, billets, rebar, wire rod |
| 5 | Steel Dynamics Inc. | 8.27 | Flat-rolled, structural, bars, rails |
| 6 | AK Steel Corporation | 5.6 | Hot-rolled, cold-rolled, galvanized, stainless, electrical |
| 7 | Commercial Metals Co. | 3 (capacity) | Rebar, bars, sections, billets |

Source: World Steel Association; Metal Bulletin, *Iron and Steelworks of the World Directory 2017*; Company websites

# Steel Imports Report: **United States**

**Trade Remedies in the Steel Sector**

Antidumping duties (AD), countervailing duties (CVD), associated suspension agreements, and safeguards are often referred to collectively as trade remedies. These are internationally agreed upon mechanisms to address the market-distorting effects of unfair trade, or serious injury or threat of serious injury caused by a surge in imports. Unlike anti-dumping and countervailing measures, safeguards do not require a finding of an "unfair" practice. Before applying these duties or measures, countries investigate allegations and can remedy or provide relief for the injury caused to a domestic industry. The table below provides statistics on the current number of trade remedies the United States has against imports of steel mill products from various countries. The U.S. has no steel mill safeguards in effect.

## U.S. Trade Remedies in Effect Against Steel Mill Imports

| Country | AD | CVD | Suspension Agreements and Undertakings | Total |
|---|---|---|---|---|
| Australia | 1 | | | 1 |
| Austria | 1 | | | 1 |
| Belarus | 1 | | | 1 |
| Belgium | 2 | | | 2 |
| Brazil | 6 | 3 | | 9 |
| China | 16 | 12 | | 28 |
| France | 1 | | | 1 |
| Germany | 3 | | | 3 |
| India | 9 | 6 | | 15 |
| Indonesia | 4 | 2 | | 6 |
| Italy | 2 | 1 | | 3 |
| Japan | 14 | | | 14 |
| Latvia | 1 | | | 1 |
| Malaysia | 1 | | | 1 |
| Mexico | 6 | | | 6 |
| Moldova | 2 | | | 2 |
| Netherlands | 1 | | | 1 |
| Oman | 1 | | | 1 |
| Pakistan | 1 | | | 1 |
| Poland | 1 | | | 1 |
| Romania | 1 | | | 1 |
| Russia | 1 | | 1 | 2 |
| South Africa | 2 | 1 | | 3 |
| South Korea | 14 | 6 | | 20 |
| Spain | 1 | | | 1 |
| Sweden | 1 | | | 1 |
| Taiwan | 12 | 1 | | 13 |
| Thailand | 3 | 1 | | 4 |
| Trinidad &Tobago | 1 | | | 1 |
| Turkey | 8 | 6 | | 13 |
| Ukraine | 2 | | 2 | 4 |
| United Arab Emirates | 1 | | | 1 |
| United Kingdom | 2 | | | 2 |
| Vietnam | 2 | | | 2 |
| **TOTAL** | **125** | **39** | **3** | **167** |

**Source: World Trade Organization, through December 31, 2017**

# Steel Imports Report: Glossary

**Apparent Consumption:** Domestic crude steel production plus steel imports minus steel exports. Shipment data are not available for all countries, therefore crude steel production is used as a proxy.

**Export Market:** Destination of a country's exports.

**Flat Products:** Produced by rolling semi-finished steel through varying sets of rolls. Includes sheets, strips, and plates. Used most often in the automotive, tubing, appliance, and machinery manufacturing sectors.

**Import Penetration:** Ratio of imports to apparent consumption.

**Import Source:** Source of a country's imports.

**Long Products:** Steel products that fall outside the flat products category. Includes bars, rails, rods, and beams. Used in many sectors but most commonly in construction.

**Pipe and Tube Products:** Either seamless or welded pipe and tube products. Used in many sectors but most commonly in construction and energy sectors.

**Semi-finished Products:** The initial, intermediate solid forms of molten steel, to be re-heated and further forged, rolled, shaped, or otherwise worked into finished steel products. Includes blooms, billets, slabs, ingots, and steel for castings.

**Stainless Products:** Steel products containing at minimum 10.5% chromium (Cr) offering better corrosion resistance than regular steel.

**Steel Mill Products:** Carbon, alloy, or stainless steel produced by either a basic oxygen furnace or an electric arc furnace. Includes semi-finished steel products and finished steel products. For trade data purposes, steel mill products are defined at the Harmonized System (HS) 6-digit level as: 720610 through 721650, 721699 through 730110, 730210, 730240 through 730290, and 730410 through 730690. The following discontinued HS codes have been included for purposes of reporting historical data (prior to 2007): 722520, 722693, 722694, 722910, 730410, 730421, 730610, 730620, and 730660.

**Special Note on U.S. Import Data:** Import data for the United States used in this report are general imports, rather than imports for consumption, so as to be consistent across countries. Therefore, U.S. import data in this report may not match similar data used in our other U.S. import data products.

**Global Steel Trade Monitor:** The monitor provides global import and export trends for the top countries trading in steel products. The current reports expand upon the early release information already provided by the Steel Import Monitoring and Analysis (SIMA) system that collects and publishes data on U.S. imports of steel mill products. Complementing the SIMA data, these reports provide objective and current global steel industry information about the top countries that play an essential role in the global steel trade. Information in these reports includes global exports and import trends, production and consumption data and, where available, information regarding trade remedy actions taken on steel products. The reports will be updated quarterly.

**Steel Import Monitoring and Analysis (SIMA) System:** The Department of Commerce uses a steel import licensing program to collect and publish aggregate data on near real-time steel mill imports into the United States. SIMA incorporates information collected from steel license applications with publicly released data from the U.S. Census Bureau. By design, this information provides stakeholders with valuable information on the steel trade with the United States. For more information about SIMA, please go to http://enforcement.trade.gov/steel/license/.



**INTERNATIONAL**

**T R A D E**

**ADMINISTRATION**

*Steel Import Monitoring and Analysis*
1401 Constitution Ave., NW, Room 21006
Washington, D.C. 20230

**T** 202.482.2105
**F** 202.501.1377
**Email** ECGlobalSteelStats@trade.gov

*trade.gov/steel*

# EXHIBIT 14



Organisation for Economic Co-operation and Development

**DSTI/SC(2018)2/FINAL**

**Unclassified**

**English - Or. English**

**Recent developments in steelmaking capacity**

*This document, as well as any data and map included herein, are without prejudice to the status of or sovereignty over any territory, to the delimitation of international frontiers and boundaries and to the name of any territory, city or area.*

The OECD Steel Committee delegates discussed a draft of the report at the Steel Committee meeting on 5-6 March 2018 and have approved it for declassification following comments from delegates which are reflected in this document. The report and the underlying data on steelmaking capacity for all steel producing economies will be made available on the Steel Committee website: oe.cd/steelcapacity and on O.N.E. under the reference code: DSTI/SC(2018)2/FINAL.

This document, as well as any data and any map included herein, are without prejudice to the status of or sovereignty over any territory, to the delimitation of international frontiers and boundaries and to the name of any territory, city or area.

© OECD 2018

You can copy, download or print OECD content for your own use, and you can include excerpts from OECD publications, databases and multimedia products in your own documents, presentations, blogs, websites and teaching materials, provided that suitable acknowledgment of OECD as source and copyright owner is given. All requests for commercial use and translation rights should be submitted to rights@oecd.org.

# *Recent developments in steelmaking capacity*

Daichi Mabashi

OECD Paris

## ABSTRACT

The Secretariat of the OECD Steel Committee provides monitoring reports on crude steelmaking capacity developments on a regular basis, using a wide range of publicly available and commercial data sources. This paper presents an updated overview of regional capacity trends, including an assessment of gross capacity additions in the period until 2020. Global steelmaking capacity (in nominal crude terms) has decreased for the second consecutive year to a level of 2 251.2 million tonnes in 2017. The decline in global steelmaking capacity in 2017 follows a deceleration in capacity growth since 2013 and results from capacity reductions and slower capacity growth in OECD/EU economies and non OECD/EU economies. However the modest reduction in 2017 (-1.3%) still falls short of alleviating global excess capacity. Moreover, the updated information on announced investment projects suggests that nearly 52 million tonnes of gross capacity additions are currently underway and could come on stream during the three-year period of 2018-20. An additional 39 million tonnes of capacity additions are currently in the planning stages for possible start-up during the same time period. The Middle East region is expected to experience a considerable increase in steelmaking capacity over the next few years, while many capacity additions are also planned in Asia. The information on announced investment projects also suggests that the CIS region, Latin America and Africa are regions where steel-making capacity could increase somewhat in the coming years.

# *Table of contents*

**Recent developments in steelmaking capacity** ........................................................................... 3

**1. Summary of the latest steelmaking capacity developments** ........................................... 5

**2. Latest developments of global steelmaking capacity** ..................................................... 6

**3. A review of regional capacity developments, closures, postponement and cancellations** ........... 9

**Annex A. AVAILABLE EVIDENCE OF PLANT LEVEL INVESTMENTS** ............................. 14

**Annex B. AVAILABLE EVIDENCE OF PLANT LEVEL CLOSURES** ..................................... 20

**Annex C. STEELMAKING CAPACITY DATA BY ECONOMY** ................................................ 23

**Annex D. WORKING DEFINITION USED** ................................................................................ 27

**References** ....................................................................................................................................... 29

**Endnotes** ......................................................................................................................................... 31

## Tables

Table 1. Current nominal capacity and potential gross capacity additions by region ............................ 7

Table A1. Investment data ................................................................................................................. 14

Table A2. Closure data ...................................................................................................................... 20

Table A3. Crude steelmaking capacity developments (in mmt) ......................................................... 23

## Figures

Figure 1. Evolution of crude steelmaking capacity in OECD/EU economies and non OECD/EU economies ....................................................................................................................... 6

Figure 2. Global crude steelmaking capacity and crude steel production ............................................ 8

## 1. Summary of the latest steelmaking capacity developments[1]

The Secretariat of the OECD Steel Committee provides monitoring reports on crude steelmaking capacity development to members of the Committee on a regular basis. This paper presents an updated overview of recent steelmaking capacity developments taking place around the world and provides an assessment of gross capacity additions that could come on stream during the three-year period of 2018-20. The document also includes a brief summary, by region, identifying closures of capacity and investment projects, including any postponements and cancellations of announced projects where applicable.

The latest available data suggest that global steelmaking capacity has decreased for the second consecutive year in 2017. However this modest adjustment (-1.3%) still falls short of alleviating global excess capacity. Moreover, a number of new investment projects continue to take place around the world and global steelmaking capacity could increase by +2.3% between 2018 and 2020 in the absence of any further closures. Global excess capacity is expected to continue to be a major challenge for the global steel industry.

Conditions in steel markets are changing rapidly with several developments in steelmaking capacity, on both the investment and closure side. The Secretariat monitors capacity developments on an ongoing basis and updates capacity numbers with incoming publicly available information on capacity closures and new information on the status of investment projects. The information used to assess capacity developments has been obtained from a wide range of publicly available and commercial data sources. The figures presented in this document are based on data available until December 2017.

---

**Box 1. OECD Steelmaking Capacity database**

The OECD Steelmaking Capacity database contains data on crude steelmaking capacity by economy and provides researchers and policymakers with an important tool for analysing steel capacity developments. The database will be updated to reflect newer information provided in this paper, extending until December 2017.

The OECD Secretariat compiles steelmaking capacity data using a wide range of publicly available and commercial data sources. These data sources include government sources, commercial capacity databases, specialised media reports, and company information. The data are reviewed periodically by the OECD Steel Committee. Capacity figures are in terms of nominal crude steelmaking capacity. The data refer to maximum theoretical equipment capacity. This definition does not take into account yield losses, maintenance and other factors affecting the productivity of installed steelmaking equipment. Therefore, these steelmaking capacity figures provided should neither be regarded as effective capacity nor as production. The annual capacity figures reflect all existing steelmaking capacity at the end of a calendar year.

The OECD Steelmaking Capacity database as well as recent reports on steelmaking capacity developments are available at the OECD Steelmaking Capacity portal at: oe.cd/steelcapacity

## 2.  Latest developments of global steelmaking capacity

### 2.1. Global summary of steelmaking capacity

The latest available information (as of December 2017) suggests that global steelmaking capacity (in nominal crude terms) has decreased for the second consecutive year in 2017 (Figure 1). The OECD has revised down its 2016 and 2017 figures for world steelmaking capacity from 2 369.7 million metric tonnes (mmt) and 2 356.5 mmt to 2 280.7 mmt and 2 251.2 mmt, respectively for 2016 and 2017, to incorporate closures and investments that were not taken into account previously.[2] The decline in global steelmaking capacity in 2017 follows a deceleration in capacity growth since 2013 and results from capacity reductions and slower capacity growth in both OECD/EU economies and non OECD/EU economies (Figure 1. B).[3]

**Figure 1. Evolution of crude steelmaking capacity in OECD/EU economies and non OECD/EU economies**

A. in levels (mmt)                                    B. in changes



*Note*: Capacity data reflects all information on changes up to December 2017. The European Union (EU) is a member of the Steel Committee and accordingly this data includes all EU Member States.
*Source*: OECD

### 2.2. Regional capacity developments

#### 2.2.1. Latest developments

Table 1 provides OECD data on existing nominal crude steelmaking capacity in 2016 and 2017, taking into account new information on capacity additions and closures available up to December 2017. The largest capacity additions have been in the Middle East region, where an additional 2.8 mmt of capacity (+4.6%) was deployed in 2017. The updated capacity estimates suggest a 2.1% net reduction in Asia, and 0.5% net reduction in Europe in 2017. In 2017, steelmaking capacity increased by 2.3% in Africa, 0.9% in Latin America and 0.2% in the North American Free Trade Agreement (NAFTA) region. In the Commonwealth of Independent States (CIS) and Oceania regions, there were no new investments underway, nor were permanent closures observed during 2017 from the publicly available sources used to update the OECD's capacity monitoring databases.

**Table 1. Current nominal capacity and potential gross capacity additions by region**

| | Existing nominal capacity(mmt) | | % change expected | Potential gross capacity additions in 2018-20 (mmt) | | Capacity in 2020 (mmt) | | % change expected (2017 vs 2020) | |
|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 (A) | 2017- 2016 | Underway (B) | Planned (C) | Low (A)+(B) | High (A)+(B)+(C) | Low | High |
| Asia | 1 521.6 | 1 488.9 | -2.1% | 18.7 | 23.7 | 1 507.6 | 1 531.3 | 1.3% | 2.9% |
| CIS | 145.7 | 145.7 | 0.0% | 2.1 | 0.6 | 147.8 | 148.4 | 1.4% | 1.9% |
| Latin America | 75.3 | 75.9 | 0.9% | 1.6 | 1.4 | 77.5 | 78.9 | 2.0% | 3.9% |
| Middle East | 60.9 | 63.7 | 4.6% | 23.0 | 8.5 | 86.7 | 95.2 | 36.1% | 49.5% |
| Africa | 35.7 | 36.6 | 2.3% | 5.9 | 2.6 | 42.4 | 45.0 | 16.0% | 23.1% |
| Europe | 276.6 | 275.2 | -0.5% | 0.0 | 2.0 | 275.2 | 277.2 | 0.0% | 0.7% |
| NAFTA | 158.5 | 158.9 | 0.2% | 0.6 | 0.0 | 159.5 | 159.5 | 0.4% | 0.4% |
| Oceania | 6.4 | 6.4 | 0.0% | 0.0 | 0.0 | 6.4 | 6.4 | 0.0% | 0.0% |
| OECD/EU Economies Total | 644.7 | 642.3 | -0.4% | 0.6 | 2.0 | 642.9 | 644.9 | 0.1% | 0.4% |
| Non OECD/EU Economies Total | 1 635.9 | 1 608.9 | -1.7% | 51.3 | 36.8 | 1 660.2 | 1 697.0 | 3.2% | 5.5% |
| World Total | 2 280.7 | 2 251.2 | -1.3% | 51.87 | 38.83 | 2 303.1 | 2 341.9 | 2.3% | 4.0% |

*Note*: Capacity data reflects all information on changes up to December 2017 as well as input provided by OECD Steel Committee delegates following the discussion of a draft version of this report presented at the Steel Committee meeting on 5-6 March 2018. In the table, "Europe" includes both OECD/EU economies and non OECD/EU economies in Europe, as well as Turkey. Please see Annex C for the detailed capacity data by economy. The European Union (EU) is a member of the Steel Committee and accordingly this data includes all EU Member States.
*Source*: OECD.

## 2.2.2. Gross capacity additions for 2018-2020

Even though the global steel industry is currently facing significant excess capacity, gross capacity additions are taking place in various regions of the world. Information on announced investment projects suggests that nearly 52 mmt of gross capacity additions are currently underway and could come on stream during the three-year period of 2018-20, while an additional 39 mmt of capacity additions are currently in the planning stages for possible start-up during the same time period (Table 1).

The Middle East region is expected to experience a considerable increase in steelmaking capacity over the next few years, with around 31.5 mmt of gross capacity additions currently underway or planned for start-up during 2018-20. Many capacity additions are also planned in Asia (almost 24 mmt), with around 19 mmt currently underway for completion in the next three years. The CIS region, Latin America and Africa could also see increases in capacity, with around 2.1 mmt, 1.6 mmt, and 5.9 mmt of gross additions currently underway in each region, respectively, for the 2018-20 period. In NAFTA region, a 0.6 mmt capacity increase is underway. No capacity additions are currently underway in Europe and Oceania.

## 2.3. The global excess capacity situation

The reduction in global crude steelmaking capacity in 2017 (- 1.3 %) has contributed to narrowing the gap between global capacity and production, which is now estimated at around 561 mmt (Figure 2 A). The global steelmaking capacity utilisation rate,

measured as production divided by capacity has increased from 71.3% in 2016 to 75.1% in 2017.

**Figure 2. Global crude steelmaking capacity and crude steel production**

A. Capacity-Production gap (mmt)                    B. Capacity utilisation rate



*Source*: OECD for crude steelmaking capacity and World Steel Association for production.

## 3. A review of regional capacity developments, closures, postponement and cancellations

### 3.1. Middle East

Steelmaking capacity has increased rapidly over the last few years in the Middle East region, from around 24 mmt in 2007 to almost 63.7 mmt in 2017. Most of the newly installed steelmaking equipment in the region uses electric arc furnace (EAF) technology, reflecting natural endowments of natural gas used to produce direct reduced iron (DRI). Growth is expected to continue over the next few years and steelmaking capacity in the region could increase from 63.7 mmt in 2017 to 86.7 mmt in 2020 (+36.1%), with Iran likely to be the largest contributor to the steel industry's expansion.

The Iranian government has announced plans to increase national steelmaking capacity to 55 mmt by 2025, and there are a number of investment projects, either underway or in the planning stages, taking place in Iran's steel industry (IMIDRO, 2016[1]). If all the projects that are currently underway are completed as scheduled, Iran's nominal crude steelmaking capacity would reach 52.8 mmt by 2020, up from 28.2 mmt in 2016. Although steel demand prospects have been interesting for some foreign investors — e.g. the Chinese Metallurgical Group Corporation (MCC) has announced to finance some of the capacity projects — Iran has been experiencing difficulties in attracting the necessary investment to achieve the target of 55 mmt of steel production capacity by 2025. Elsewhere in the region, Moon Iron & Steel (MISCO) of Oman is building a 1.2 mmt EAF plant, which is expected to be operational in 2018.

### 3.2. Asia and Oceania

Steelmaking capacity in Asia has decreased from 1 521.6 mmt in 2016 to 1 488.9 mmt in 2017 (-2.1%). However, in the absence of additional closures, steelmaking capacity in the region could increase again to 1 507.6 mmt between 2018 and 2020 (+1.3 %). In Oceania, there are no new investments underway, nor were permanent closures observed during 2017 from the publicly available sources used to update the OECD's monitoring databases.

Between 2006 and 2015, Chinese steelmaking capacity more than doubled, from 488 mmt to 1 150.1 mmt. However, capacity has started to decline more recently, falling by around 60 mmt in 2016 from the previous year. Moreover, a target was set for reducing steelmaking capacity by an additional 50 mmt in 2017 as part of the 100-150 mmt closure target set for the period until 2020 by National Development and Reform Commission (NDRC)  (NDRC, 2017[2]) (MIIT, 2016[3]).[4] According to the Ministry of Industry and Information Technology (MIIT), the People's Republic of China (hereafter "China") steel capacity closures in 2017 actually exceeded 50 mmt (MIIT, 2018[4]).

China has also started closing down outdated induction furnaces (IF). MIIT reported that 140 mmt of induction furnace (IF) capacities were eliminated in 2017 (MIIT, 2018[4]) (Platts, 2017[5]).[5] It is important to note that IF is not captured in official statistics and the closure of IF is additional to the 100-150 mmt closure target for the period through to 2020.[6]

There are some new capacity investments projects in China. Shandong Iron & Steel is building an 8.5 mmt plant in Rizhao, Shandong province. In the context of Shougang Jingtang's investment project in Caofeidian port, Hebei province, the company has started a second phase that entails an additional 5 mmt of steelmaking capacity. These new mills are designed to produce high value-added products to meet demand for flat products in the automotive and home appliance industries in China.

Steelmaking capacity in India has been expanding at a fast rate in recent years and there are several new investment projects underway. Capacity is estimated to have increased to almost 122 mmt in 2016, more than double the level of 56 mmt in 2006. Further growth is expected over the short and longer term. For example, in late 2017, Jindal Steel and Power Ltd. (JSPL) completed the commissioning of a new basic oxygen furnace (BOF) at its Angul plant in the state of Odisha. The National Mineral Development Corporation (NMDC) is constructing a greenfield steelworks in the state of Chhattisgarh, while Steel Authority of India Ltd. (SAIL) is expanding steelmaking capacity at its Bhilai plant, both projects of which are expected to be operational in 2018. In addition, Shree Uttam Steel and Power Ltd. is constructing a greenfield plant in Maharashtra, which is expected to start operations in 2019. As a result of its rapid capacity expansion, India could become the world's second largest steel producer over the next few years.

On 8 May 2017, the Ministry of Steel of India published the "National Steel Policy 2017" (hereafter the NSP 2017) (Ministry of Steel of India, 2017[6]). According to the NSP 2017, India's authorities expect that 300 mmt of domestic crude steelmaking capacity would be required in the economy by 2030-31, based on its demand projections. These expectations assume that most of the projected additional demand for steel would need to be satisfied by domestic steel production. However, attaining such a level of production capacity would entail an additional 175.2 mmt from the 124.8 mmt level in 2017 (+140%) and the NSP notes that this would require an extensive mobilisation of natural resources, finances, manpower and infrastructure (including land).

Steelmaking capacity has expanded rapidly in the Association of South East Asian Nations (ASEAN) over the past decade and there are many steel projects being planned, particularly in Viet Nam. Steelmaking capacity in the ASEAN region has increased from 48.7 mmt to 55.7 mmt between 2016 and 2017 (+14.4 %).

Formosa Ha Tinh Steel has started operating a new BOF with a capacity of 7.0 mmt in Ha Tinh province, Viet Nam in 2017 (Formosa Ha Tinh Steel, 2017[7]). Other projects include the Gunung Steel Group's installation of a 0.5 mmt EAF in North Sumatra, Indonesia, and SteelAsia Manufacturing Corporation's 0.8 mmt EAF in Bulacan, Philippines, which are expected to become operational in 2018. In addition, solid steel demand growth has attracted many foreign investors to the South East Asian region and there are several new investment plans supported by Chinese companies. For example, Alliance Steel, which is funded by Chinese companies, is building a greenfield integrated steel mill with a capacity of 3.5 mmt in Kuantan Industrial Park, Malaysia, with commissioning expected for 2018. The construction of several large BOF plants are also being planned in Viet Nam, which would support capacity growth in the region in the coming few years.

Elsewhere in Asia, Bangladesh and Pakistan have enjoyed strong steel demand growth in recent years, and several projects to build new steel mills are underway. In Bangladesh, GPH Ispat Ltd. and Kabir Group of Industries are constructing new EAF

mills, with a total of 1.3 mmt of capacity expected to become operational in 2018. In Pakistan, Amreli Steels Ltd. has commissioned a 0.2 mmt IF in Dhabeji and Agha Steel Industries is installing a 0.08 mmt IF in Karachi, which are expected to become operational in 2018.

There are no capacity investments underway in Japan or Korea, but several closures have recently taken place as part of within-firm resource reallocation plans. For example, Japan's Kyoei Steel and Osaka Steel shut down two EAFs (with a capacity of 0.48 mmt each) in 2016, to reduce production costs and increase efficiency by reallocating all crude steelmaking production to other more efficient plants (Kyoei Steel, 2015[8]) (Osaka Steel, 2015[9]). In addition, Kobe Steel has shut down upstream equipment, also resulting in the permanent closure of a BOF with 1.38 mmt of capacity at Kobe Works at the end of October 2017 (Kobe Steel, 2017[10]). The upstream processes were moved to Kakogawa Works to compensate for the reduction at Kobe Works, but without any corresponding increase in crude steelmaking capacity this is likely to result in higher steelmaking capacity utilisation rates and potentially scale-driven efficiency gains at the Kakogawa Works (Kobe Steel, 2013[11]) (Platts, 2017[12]).[7]

### 3.3. CIS

In the Commonwealth of Independent States (CIS) region, several projects to build EAF and BOF facilities are currently underway. However, most of the capacity developments in this region relate to the modernisation of steel manufacturing facilities, while outdated open hearth furnaces (OHF) are shut down. For example, Russian steelmaker OMK is planning to withdraw an OHF in 2018, while Ukraine's Metinvest has plans to replace its OHF with a capacity of 4.7 mmt with new BOF capacity of 3.2 mmt in 2020. Amongst other projects, Russian steelmaker Tulachermet is installing a 1.8 mmt per year BOF in the Central Federal District, which is expected to be operational in 2018. The steelmaker NLMK has also announced a BOF capacity expansion at its Lipetsk site, of 1.5 mmt by 2020.

In addition, several Russian steel manufacturers are installing EAFs. Torex and Kirov Metallurgical Zavod are constructing new EAF furnaces with a capacity of 0.24 mmt and 0.37 mmt, respectively, which are expected to be operational in 2018. Don-Metal's new EAF with a capacity of 0.16 mmt is also underway with commissioning expected in 2019.

A total of 2.7 mmt of gross capacity additions are either underway or planned for completion in the 2018-20 period in the CIS region. Taking only underway projects into account, steelmaking capacity in the CIS region is expected to increase from 145.7 mmt to 147.8 mmt between 2018 and 2020 (+1.4%).

### 3.4. Africa

In Africa, there are investment projects planned or already underway, aimed at increasing domestically-produced steel for use in developing the region's infrastructure. Overall, a total of 8.5 mmt of gross capacity additions are either underway or planned for completion in the 2018-20 period in Africa, with new investments foreseen mainly in North African economies, and the region's steelmaking capacity is expected to grow from a level of 35 mmt in 2017.

For example, in Algeria Tosyaly is investing in a new EAF plant with the capacity to produce 2.3 mmt, with a view to starting operations by 2018. Algeria's Qatari Solb Company has started to construct a new steel plant with a capacity of 2.1 mmt, with operations expected to begin in 2018. In Egypt, the Egyptian Steel Group started operation of an EAF mill with a capacity to produce 0.83 mmt of steel in Ain Al Sokhna in 2017, while Ezz Steel's new EAF mill with a capacity of 0.85 mmt is expected to become operational in 2019.

## 3.5. Latin America

In Latin America, most of the capacity expansion projects in the recent past have occurred in Brazil, such as the 3 mmt expansion by Companhia Siderúrgica do Pecém (CSP) in 2016 and Grupo Ferroeste's 0.6 mmt expansion in 2015. However, some capacity expansion plans have been postponed recently due to weak conditions in the steel market. For instance, Arcelor Mittal Brazil's plan to install an EAF with 0.2 mmt of capacity at the Monlevade steel works, which initially was scheduled for commissioning in 2017, has been put on hold. In addition, Siderúrgica Latino Americana (Silat) has postponed its construction of a 1.2 mmt plant in Primavera, Ceará.

However, some EAF projects are underway, or have recently come on stream, in other parts of the region. For example, Gerdau S.A started operations at a 0.65 mmt EAF plant in Perez, Argentina in 2017 and Siderurgica Nacional is installing an EAF plant with 1.55 mmt of capacity in Ciudad Piar, Bolivar, Venezuela, which is expected to become operational in 2018. Overall, the level of steelmaking capacity in Latin America could increase by 2.0% to 77.5 mmt by 2020 if all the underway projects come on stream.

## 3.6. NAFTA

Crude steelmaking capacity in the NAFTA region was around 159 mmt in 2017. Changes during 2018-20 are expected to be relatively small. An addition of 0.6 mmt of EAF steelmaking capacity is expected to be deployed in Mexico's Tlaxcala region in 2018, as a result of an investment project by Industrias CH, Grupo Simec (DANIELI, 2018[13]) (Metal Expert, 2018[14]). In the United States, Commercial Metals Company (CMC) in Oklahoma, started operation of new EAF with capacities of 0.35 mmt in 2017 (CMC, 2018[15]).

A number of closures have taken place in recent years. For example, Warren Steel Holdings shut down an EAF plant in Ohio in 2016 (Platts, 2016[16]). In the absence of additional closures, steelmaking capacity in the region could increase by 0.6 mmt to reach nearly 160 mmt by 2020.

## 3.7. Europe

Steelmaking capacity in Europe decreased from 278.3 mmt to 276.9 mmt in 2017 (-0.5%) and could remain stable between 2018 and 2020, according to the publicly available sources used to update the OECD's monitoring databases.

There are no capacity investments underway in the European Union. Closures have, however, occurred, mainly in downstream and upstream facilities. In Italy, Aferpi started closing its BOF in Piombino in 2017, which had a capacity of 2.9 mmt (Aferpi, 2017[17]). On the other hand, as part of their business plan for revival of Piombino plant,

Aferpi announced that it was ordering two new EAFs with a capacity of about 1.0 mmt each, during the 2018-2019 period (Aferpi, 2016[18])[8].

In the region "Other Europe" (i.e. Norway, Switzerland and Turkey), there are no steelmaking capacity investment projects underway, except for Turkish Habas's project which started operation of an EAF with 1.5 mmt in Izmir in 2017. A previously foreseen EAF project that was underway, amounting to 0.5 mmt per year, in Turkey (Corbus Celik's plant in Hatay province), has been suspended since 2015.

## Annex A. AVAILABLE EVIDENCE OF PLANT LEVEL INVESTMENTS

Table A2 summarises the plant level database providing the developments in underway or planned steelmaking capacity investment projects up to 2020, according to publicly available information.

### Table A1. Investment data

| REGION | ECONOMIES | LOCATION | COMPANY | EQUIPMENT | NUMBER OF EQUIPMENT | CAPACITY | STATUS | START | SOURCES |
|--------|-----------|----------|---------|-----------|---------------------|----------|--------|-------|---------|
| Africa | Algeria | El Hadjar, Annaba | IMETAL | BOF | x 1 | 350 | underway | 2018 | World Steel Capacities |
| Africa | Algeria | Bethioua | Tosyali | EAF | x 1 | 2 300 | underway | 2018 | World Steel Capacities |
| Africa | Algeria | Bellara, Jijel | Algerian Qatari Solb Company | EAF | x 2 | 2 100 | underway | 2018 | World Steel Capacities |
| Africa | Algeria | El Hadjar, Annaba | Gulf National Steel | EAF | x 1 | 600 | postponement | 2018 | World Steel Capacities |
| Africa | Algeria | El Hadjar, Annaba | IMETAL | EAF | x 1 | 600 | plan | 2018 | World Steel Capacities |
| Africa | Algeria | Bellara, Jijel | Algerian Qatari Solb Company | EAF | x 1 | 2 000 | plan | 2019 | Metal Expert |
| Africa | Algeria | Annaba | Emarat Dzayer Steel Company | EAF | x 1 | n/a | plan | n/a | World Steel Capacities |
| Africa | Algeria | n/a | Lamino Group Attia | EAF | x 1 | 600 | plan | n/a | World Steel Capacities |
| Africa | Egypt | Al Ain Al Sokhna | Egyptian Steel Group | EAF | x 1 | 830 | operating | 2017 | Metal Expert |
| Africa | Egypt | Sokhna, Suez | Ezz Steel | EAF | x 1 | 850 | underway | 2019 | Metal Expert |
| Africa | Kenya | Mwavumbo | Top Steel Kenya | Steelmkg | n/a | 157 | plan | n/a | Platts |
| Africa | Kenya | Sinosteel | Sinosteel | Steelmkg | n/a | 1 000 | plan | n/a | Metal Expert |
| Africa | Mozambique | Revuboe Industrial Zone | Capitol Iron & Steel Ltd | Steelmkg | n/a | 500 | plan | n/a | Metal Expert |
| Africa | Nigeria | Lagos | Standard Metallurgical Company | EAF | x 1 | 260 | underway | 2018 | World Steel Capacities |
| Africa | South Africa | Hebei Iron & Steel (Hegang) | Hebei Iron & Steel (Hegang) | Steelmkg | n/a | 5 000 | postponement | 2020 | Metal Expert / Platts |
| Africa | Tanzania | Liganga | Tanzania China International Mineral Resources Ltd | Steelmkg | n/a | 1 000 | plan | n/a | Metal Expert |
| Asia | Bangladesh | Masjiddah, Kumira, Sitakunda, Chittagong | GPH Ispat Ltd | EAF | x 1 | 815 | underway | 2018 | World Steel Capacities |
| Asia | Bangladesh | Ghoramora, Bara Kumira, Sitakunda, Chittagong | Kabir Group of Industries | EAF | n/a | 500 | underway | 2018 | World Steel Capacities |
| Asia | China | Rizhao, Shandong | Shandong Iron & Steel Rizhao | BOF | x 4 | 8 500 | operating | 2017 | Metal Expert, Wood Machenzie |
| Asia | China | Caofeidian port, Hebei | Shougang Jingtang | BOF | x 4 | 5 000 | underway | 2018 | Platts |
| Asia | China | Fangchenggang, Guangxi | Liuzhou Iron & Steel | BOF | x 7 | 14 700 | plan | n/a | Platts |
| Asia | China | Hebei, Laoting | Hebei Iron & Steel (Hegang) | Steelmkg | n/a | 7 100 | plan | n/a | Platts |
| Asia | China | Ningde, Fujian | Angang Iron & Steel Group | Steelmkg | n/a | 10 000 | plan | n/a | Platts |
| Asia | China | Tangshan | Tangshan Bohai Iron & Steel | Steelmkg | n/a | 8 000 | plan | n/a | Platts |
| Asia | China | n/a | HBIS Tangyin (河北钢铁集团唐银钢铁有限公司) | BOF | n/a | 500 | operating | 2016 | Wood Machenzie |
| Asia | China | n/a | Jixin (内蒙古吉鑫钢铁) | BOF | n/a | 2 100 | operating | 2016 | Wood Machenzie |
| Asia | China | n/a | Qinquan (清泉钢铁有限公司) | BOF | n/a | 500 | operating | 2016 | Wood Machenzie |
| Asia | China | n/a | Sanming Fuxin (福建三明钢铁集团福建福鑫钢铁有限公司) | BOF | n/a | 500 | operating | 2016 | Wood Machenzie |
| Asia | China | n/a | Suzhou (江苏苏钢集团有限公司) | BOF | n/a | 500 | operating | 2016 | Wood Machenzie |
| Asia | China | n/a | Xinxing Kingtec (新兴铸管有限公司金特) | BOF | n/a | 1 000 | operating | 2016 | Wood Machenzie |
| Asia | China | n/a | NHIC (内蒙古北方重工) | EAF | n/a | 2 800 | operating | 2016 | Wood Machenzie |
| Asia | China | Zhanjiang, Guangdong | Guangdong Steel Group Corp | BOF | x 1 | 2 976 | operating | 2016 | Platts |
| Asia | India | Angul, Odisha | Jindal Steel and Power Limited (JSPL) | BOF | x 1 | 3 000 | operating | 2017 | Platts |
| Asia | India | Dimili, Chhattisgarh | NMDC | BOF | x 2 | 3 000 | underway | 2018 | World Steel Capacities |
| Asia | India | Bhilai, Chhattisgarh | Steel Authority of India Ltd (SAIL) | BOF | x 3 | 3 000 | underway | 2018 | World Steel Capacities |
| Asia | India | Sindhudurg, Maharashtra | Shree Uttam Steel and Power Ltd | BOF | x 1 | 1 550 | underway | 2019 | World Steel Capacities |

| REGION | ECONOMIES | LOCATION | COMPANY | EQUIPMENT | NUMBER OF EQUIPMENT | CAPACITY | STATUS | START | SOURCES |
|--------|-----------|----------|---------|-----------|---------------------|----------|--------|-------|---------|
| Asia | India | Chhattisgarh (Bastar Greenfield Project) | Tata Steel | Steelmkg | n/a | 5 000 | postponement | n/a | Metal Expert |
| Asia | India | Paradip, Odisha | Essar Steel | BOF | x 1 | 6 000 | plan | 2018 | World Steel Capacities |
| Asia | India | Kalinganagar, Odisha | Mideast Integrated Steel (Mesco Steel) | BOF | n/a | 1 200 | plan | 2019 | World Steel Capacities |
| Asia | India | Kalinganagar, Odisha | Mideast Integrated Steel (Mesco Steel) | BOF | n/a | 2 300 | plan | 2019 | World Steel Capacities |
| Asia | India | Anjar, Gujarat | Welspun Group | BOF | x 2 | 3 000 | plan | 2020 | World Steel Capacities |
| Asia | India | Dolvi, Maharashtra | JSW Ispat Steel Ltd. | BOF | x 2 | 5 000 | plan | 2020 | Platts, World Steel Capacities |
| Asia | India | Patratu, Jharkhand | Jindal Steel and Power Limited (JSPL) | BOF | x 1 | 3 200 | plan | n/a | World Steel Capacities |
| Asia | India | Ballari | Sesa Sterlite | n/a | n/a | 4 000 | plan | n/a | Metal Expert |
| Asia | India | Dilmili, Chhattisgarh | NMDC & SAIL JV | Steelmkg | n/a | 6 000 | plan | n/a | Platts |
| Asia | India | Jajpur, Odisha | Neelachal Ispat Nigam (NINL) | BOF | x 1 | 1 000 | plan | n/a | World Steel Capacities |
| Asia | India | Panjim | Shree Uttam Steel and Power Ltd | BOF | x 1 | 1 550 | plan | n/a | World Steel Capacities |
| Asia | India | Wardha, Maharashtra | Uttam Galva Steels Ltd | Steelmkg | n/a | 1 000 | plan | n/a | Metal Expert |
| Asia | India | Jamshedpur, Jharkhand | Tata Steel | EAF | n/a | 1 500 | plan | n/a | Platts |
| Asia | India | Jharkhand | Tata Steel | Steelmkg | n/a | 12 000 | plan | n/a | Metal Expert |
| Asia | India | Kalinganagar, Odisha | Mideast Integrated Steel (Mesco Steel) | EAF | n/a | 400 | plan | n/a | Metal Expert |
| Asia | India | Kalinganagar, Odisha | Tata Steel | BOF | n/a | 5 000 | plan | n/a | World Steel Capacities, Platts |
| Asia | India | Keonjhar, Odisha | NMDC & OMC JV | Steelmkg | n/a | 12 000 | plan | n/a | Metal Expert |
| Asia | India | Marakuta | MSP Metallics Ltd | IF | x 4 | 240 | plan | n/a | World Steel Capacities |
| Asia | India | Odisha | POSCO India Limited | Steelmkg | n/a | 12 000 | plan | n/a | Platts |
| Asia | India | Salboni, West Bengal | JSW Steel | BOF | x 2 | 3 000 | plan | n/a | Platts, Metal Expert |
| Asia | India | Salboni, West Bengal | JSW Steel | Steelmkg | n/a | 7 000 | plan | n/a | Platts, Metal Expert |
| Asia | India | Jharkhand | JSW Steel | Steelmkg | n/a | 10 000 | plan | n/a | Metal Expert |
| Asia | India | Odisha | JSW Steel | Steelmkg | n/a | 10 000 | plan | n/a | Metal Expert |
| Asia | India | Vijayanagar, Karnataka | JSW Steel | BOF | x 1 | 2 000 | operating | 2016 | Metal Expert |
| Asia | India | Visakhapatnam, Andhra-Pradesh | Rashtriya Ispat Nigam Ltd (RINL) | BOF | x 1 | 1 000 | operating | 2016 | Metal Expert |
| Asia | India | Jharkhand | ArcelorMittal | Steelmkg | n/a | 3 000 | cancelled | n/a | Metal Expert |
| Asia | India | Karnataka | ArcelorMittal | Steelmkg | n/a | 6 000 | cancelled | n/a | Metal Expert |
| Asia | Indonesia | North Sumatra | Gunung Gahapi Sakti (GGS) | EAF | x 1 | 500 | underway | 2018 | Metal Expert |
| Asia | Indonesia | North Sumatra | Gunung Gahapi Sakti (GGS) | EAF | x 1 | 500 | plan | n/a | Metal Expert |
| Asia | Indonesia | Central Sulawesi | Anshan Iron & Steel Group Corporation | Steelmkg | n/a | 5 000 | plan | n/a | Platts |
| Asia | Indonesia | China Minsheng Investment Co | China Minsheng Investment Co | Steelmkg | n/a | 3 000 | plan | n/a | Metal Expert |
| Asia | Indonesia | Cilegon, West Java | Krakatau POSCO | Steelmkg | n/a | 3 000 | plan | n/a | Metal Expert |
| Asia | Indonesia | East Java | Wuhan Iron & Steel (Wugang) | EAF | x 1 | 5 000 | plan | n/a | Platts |
| Asia | Malaysia | Kuantan Industrial Park | Alliance Steel | BOF | x 2 | 3 500 | underway | 2018 | Platts, World Steel Capacities |
| Asia | Malaysia | Kemaman,Terengganu | Eastern Steel Sdn Bhd | Steelmkg | n/a | 2 000 | plan | n/a | Metal Expert |
| Asia | Malaysia | Sarawak State | Hebei Xinwuan Steel Group | BOF | x 1 | 5 000 | plan | n/a | Metal Expert |
| Asia | Malaysia | Selangor Darul Ehsan | The Lion Group | BOF | x 1 | 1 600 | plan | n/a | World Steel Capacities |
| Asia | Mongolia | Sainshand | DRI plant and steelworks project | Steelmkg | n/a | 3 500 | plan | n/a | Platts |
| Asia | Pakistan | Karachi | Faizan Steel Mills | IF | x 2 | 80 | underway | 2018 | World Steel Capacities |
| Asia | Pakistan | Dhabeji | Amreli Steels / Dhabeji plant | IF | x 1 | 200 | plan | 2018 | World Steel Capacities |
| Asia | Pakistan | Port Qasim, Karachi | Agha Steel Industries | EAF | x 1 | 300 | plan | 2018 | World Steel Capacities |
| Asia | Pakistan | Faisalabad | Faisalabad Works | IF | x 2 | 600 | plan | 2019 | World Steel Capacities |
| Asia | Pakistan | n/a | Taybah Steel Group | EAF | x 1 | 500 | plan | 2020 | World Steel Capacities |
| Asia | Pakistan | n/a | Taybah Steel Group | EAF | x 1 | 500 | plan | n/a | World Steel Capacities |
| Asia | Pakistan | n/a | Indus Consortium Mining & Steel Industry | BOF | x 1 | 500 | plan | n/a | World Steel Capacities |
| Asia | Pakistan | n/a | Indus Consortium Mining & Steel Industry | BOF | x 1 | 500 | plan | n/a | World Steel Capacities |
| Asia | Pakistan | Dhabeji | Amreli Steels / Dhabeji plant | IF | x 1 | 200 | operating | 2017 | World Steel Capacities |

**16** | **RECENT DEVELOPMENTS IN STEELMAKING CAPACITY**

| REGION | ECONOMIES | LOCATION | COMPANY | EQUIPMENT | NUMBER OF EQUIPMENT | CAPACITY | STATUS | START | SOURCES |
|---|---|---|---|---|---|---|---|---|---|
| Asia | Philippines | Bulacan | SteelAsia Manufacturing Corporation | EAF | n/a | 800 | underway | 2018 | World Steel Capacities |
| Asia | Philippines | Bulacan | SteelAsia Manufacturing Corporation | EAF | n/a | 600 | plan | 2018 | World Steel Capacities |
| Asia | Philippines | Davao | SteelAsia Manufacturing Corporation | EAF | n/a | n/a | plan | n/a | World Steel Capacities |
| Asia | Viet Nam | Haiphong | Australia Steel Billet Co | EAF | n/a | 750 | postponement | n/a | Metal Expert |
| Asia | Viet Nam | Ninh Binh | Kyoei Steel Vietnam Company | EAF | x 1 | 300 | postponement | n/a | Platts |
| Asia | Viet Nam | Hai Phong | Vietnam-Japan Steel (Vija) | EAF | x 1 | 350 | plan | n/a | World Steel Capacities |
| Asia | Viet Nam | Dung Quat Industrial Park, Quang Ngai | Hoa Phat Group | BOF | x 2 | 2 000 | plan | 2018 | Metal Expert |
| Asia | Viet Nam | Dung Quat Industrial Park, Quang Ngai | Hoa Phat Group | BOF | x 2 | 2 000 | plan | 2019 | World Steel Capacities |
| Asia | Viet Nam | Lao Cai | Vietnam Steel Corporation (VSC) | BOF | x 1 | 500 | plan | n/a | Metal Expert |
| Asia | Viet Nam | Thai Nguyen | Thai Nguyen Iron & Steel Corporation (TISCO) | BOF | x 1 | 500 | plan | n/a | World Steel Capacities |
| Asia | Viet Nam | Tang Loong Industrial Zone in Bao Thang district, Lao Cai province | Viet - Trung Metallurgy Company | BOF | x 1 | 500 | plan | n/a | World Steel Capacities |
| Asia | Viet Nam | Phu My, Ba Ria Vung Tau | Hoa Sen Group | EAF | n/a | 800 | plan | n/a | World Steel Capacities |
| Asia | Viet Nam | Phu My, Ba Ria Vung Tau | Hoa Sen Group | EAF | n/a | 500 | plan | n/a | World Steel Capacities |
| Asia | Viet Nam | Vung Ang, Ha Tinh | Formosa Ha Tinh Steel Corp | BOF | x 3 | 7 000 | operating | 2017 | World Steel Capacities, Company HP |
| Asia | Viet Nam | Vung Ang, Ha Tinh | Formosa Ha Tinh Steel Corp | BOF | n/a | 3 000 | plan | n/a | World Steel Capacities |
| CIS | Azerbaijan | The Azerbaijani Government | The Azerbaijani Government | Steelmkg | n/a | n/a | plan | n/a | Platts |
| CIS | Georgia | Rustavi | Georgian Steel | EAF | x 1 | 180 | postponement | n/a | Platts |
| CIS | Georgia | Rustavi | Georgian Steel | EAF | x 1 | 180 | plan | n/a | Platts |
| CIS | Kazakhstan | Aktau | Caspian Stal | EAF | x 1 | 80 | plan | n/a | World Steel Capacities |
| CIS | Kazakhstan | Aktau | Aksuskiy Electrical Steel Works | EAF | x 1 | 600 | plan | n/a | World Steel Capacities |
| CIS | Kazakhstan | Aktobe | SBS Group | EAF | x 1 | 300 | plan | n/a | World Steel Capacities |
| CIS | Kazakhstan | Shymkent | Ferrum-Vtor | EAF | n/a | 350 | plan | n/a | World Steel Capacities |
| CIS | Kyrgyztan | Chuyskya region | Kyrgyz Metall | EAF | x 1 | 120 | plan | 2018 | World Steel Capacities |
| CIS | Russian Federation | Khabarovsk | Torex / Khabarovsk Steel Mill | EAF | x 1 | 240 | underway | 2018 | World Steel Capacities |
| CIS | Russian Federation | Kirov | Kirov Metallurgical Zavod | EAF | x 1 | 372 | underway | 2018 | World Steel Capacities |
| CIS | Russian Federation | Tula, Central Federal District | Tulachermet | BOF | x 1 | 1 800 | underway | 2018 | Metal Expert |
| CIS | Russian Federation | Rostov, Southern Federal District | Don-Metall | EAF | x 1 | 160 | underway | 2019 | Metal Expert |
| CIS | Russian Federation | Lipetsk site | NLMK | BOF | x 2 | 1 500 | underway | 2020 | Company HP, Platts |
| CIS | Russian Federation | Nizhny Tagil | Evraz NTMK | BOF | x 1 | 2 000 | postponement | 2017 | World Steel Capacities |
| CIS | Russian Federation | Nizhny Tagil | Evraz NTMK | BOF | x 1 | 1 500 | postponement | 2017 | World Steel Capacities |
| CIS | Russian Federation | Murmansk | Monchegorsk Mechanical Engineering Plant | EAF | n/a | 135 | postponement | 2017 | Metal Expert |
| CIS | Russian Federation | Kolpino, Northwestern Federal District | Mera-Stal | EAF | x 1 | 350 | postponement | 2017 | Metal Expert |
| CIS | Russian Federation | Kineshma | Kineshma Electrometallurgical Works | IF | x 1 | 240 | postponement | 2017 | World Steel Capacities |
| CIS | Russian Federation | Bratsk, Siberian Federal District | East Siberian Metallurgical Co | EAF | x 1 | 270 | postponement | 2018 | Metal Expert |
| CIS | Russian Federation | Chusovoy, Volga Federal District | United Metallurgical (OMK) | EAF | x 1 | 800 | postponement | 2018 | Ministry of Industry and Trade of the Russian Federation |
| CIS | Russian Federation | Leningradskaya region | Metal and Innovations | EAF | x 1 | 350 | postponement | 2019 | World Steel Capacities |
| CIS | Russian Federation | Rostov, Southern Federal District | DonElectroStal | EAF | x 1 | 285 | postponement | 2022 | World Steel Capacities |
| CIS | Russian Federation | Volgostemmash | Volgostemmash | EAF | n/a | 500 | postponement | n/a | Metal Expert |
| CIS | Russian Federation | Mtsensk, Orel | StalKron | Steelmkg | x 1 | 500 | postponement | n/a | Metal Expert |
| CIS | Russian Federation | Krasnoyarsk | Krasny Yar AO | EAF | n/a | 200 | postponement | n/a | World Steel Capacities |
| CIS | Russian Federation | Volgostemmash | Volgostemmash | EAF | n/a | 500 | postponement | n/a | Metal Expert |
| CIS | Russian Federation | Magnitogorsk | Magnitogorsk Iron & Steel Works | BOF | x 1 | 3 200 | plan | n/a | World Steel Capacities |
| CIS | Russian Federation | Beloretsk | Belstal | BOF | x 1 | 500 | plan | 2018 | World Steel Capacities |
| CIS | Russian Federation | Khabarovsk | | BOF | x 1 | n/a | plan | n/a | World Steel Capacities |
| CIS | Russian Federation | Chelyabinsk | Zlatoust Steel Plant | EAF | x 1 | 700 | plan | n/a | Ministry of Industry and Trade of the Russian Federation |
| CIS | Russian Federation | Novotroitsk | Metalloinvest | BOF | x 1 | 3 000 | plan | n/a | World Steel Capacities |
| CIS | Russian Federation | Irkutsk, Siberian Federal District | Basic Element and En+ Group | Steelmkg | n/a | 260 | plan | n/a | Ministry of Industry and Trade of the Russian Federation |

| REGION | ECONOMIES | LOCATION | COMPANY | EQUIPMENT | NUMBER OF EQUIPMENT | CAPACITY | STATUS | START | SOURCES |
|--------|-----------|----------|---------|-----------|---------------------|----------|--------|-------|---------|
| CIS | Russian Federation | Tula, Central Federal District | Tulachermet | BOF | x 1 | 1 870 | plan | n/a | Metal Expert |
| CIS | Russian Federation | Leninogorsk | TatStal | EAF | x 1 | 1 200 | cancelled | 2017 | World Steel Capacities |
| CIS | Russian Federation | Tatarstan | Maxi-Invest investment company | EAF | x 1 | 1 200 | cancelled | n/a | Metal Expert |
| CIS | Ukraine | Zaporizhzhya | Metinvest | BOF | x 2 | 3 200 | underway | 2020 | World Steel Capacities |
| CIS | Ukraine | Mariupol | Ilyich Iron and Steel Works | BOF | x 2 | 5 000 | postponement | 2017 | World Steel Capacities |
| CIS | Ukraine | Donetsk | Donetsk Iron & Steel Works (DMZ) | EAF | x 1 | 1 500 | postponement | n/a | Platts |
| Europe | Germany | Badische Stahlwerke GmbH | Badische Stahlwerke GmbH | EAF | x 2 | 400 | plan | n/a | World Steel Capacities |
| Europe | Italy | n/a | Aferpi | EAF | x 1 | 1 000 | plan | 2018 | World Steel Capacities |
| Europe | Italy | n/a | Aferpi | EAF | x 1 | 1 000 | plan | 2019 | World Steel Capacities |
| Latin America | Argentina | Perez | Gerdau S.A. | EAF | x 1 | 650 | operating | 2017 | World Steel Capacities |
| Latin America | Bolivia | El Mutún, Santa Cruz | Empresa Siderurgica del Mutun | EAF | x 1 | 150 | plan | 2019 | World Steel Capacities |
| Latin America | Bolivia | Buena Vista, Santa Cruz province | Las Lomas | EAF | n/a | 200 | plan | 2019 | Platts |
| Latin America | Brazil | Monlevade | ArcelorMittal Brazil | BOF | x 1 | 1 200 | postponement | 2017 | Metal Expert |
| Latin America | Brazil | Primavera, Ceará | Siderúrgica Latino Americana (Silat) | EAF | x 1 | 1 200 | postponement | n/a | Metal Expert |
| Latin America | Brazil | Juiz de Fora | ArcelorMittal Acos Longos | EAF | x 1 | 200 | plan | n/a | World Steel Capacities |
| Latin America | Brazil | Ceara | Companhia Siderúrgica do Pecém (CSP) | Steelmkg | n/a | 3 000 | plan | n/a | Metal Expert |
| Latin America | Brazil | Espírito Santo | Companhia Siderúrgica Ubu (CSU) | Steelmkg | n/a | 5 000 | plan | n/a | Metal Expert |
| Latin America | Brazil | Pará | Aços Laminados do Pará (ALPA) | Steelmkg | n/a | 2 500 | plan | n/a | Metal Expert |
| Latin America | Ecuador | Jv with Sinosteel | State-owned flat steel mill | n/a | n/a | n/a | plan | n/a | Platts |
| Latin America | Ecuador | Porsorja | EP Petroecuador | EAF | x 1 | 1 000 | plan | n/a | World Steel Capacities |
| Latin America | Peru | Pisco | Aceros Arequipa | EAF | x 1 | 650 | plan | 2018 | Platts |
| Latin America | Peru | Pisco | Aceros Arequipa | EAF | x 1 | 400 | plan | 2019 | World Steel Capacities |
| Latin America | Venezuela | Ciudad Piar, Bolivar | Siderurgica Nacional | EAF | x 1 | 1 550 | underway | 2018 | World Steel Capacities |
| Latin America | Venezuela | Ciudad Ojeda, Zulia | Gerdau Sizuca | EAF | x 1 | 60 | plan | n/a | Metal Expert |
| Middle East | Afghanistan | Hajigak | Afghan Iron & Steel Consortium (Afisco) | Steelmkg | n/a | 1 200 | plan | n/a | Platts |
| Middle East | Iran | Bandar Abbas | Kish South Kaveh Steel | EAF | x 1 | 1 200 | underway | 2018 | World Steel Capacities |
| Middle East | Iran | C. KHORASAN, Torbat Heydariyeh | National Iranian Steel Company | EAF | x 1 | 800 | underway | 2018 | World Steel Capacities |
| Middle East | Iran | Estfahan | Natanz Steel Industries | EAF | x 1 | 850 | underway | 2018 | World Steel Capacities |
| Middle East | Iran | Shiraz | Fasa Steel Complex Co (Fasco) | EAF | x 1 | 1 500 | underway | 2018 | World Steel Capacities |
| Middle East | Iran | Kermanshah | Bistoun Steel | IF | x 1 | 400 | underway | 2018 | World Steel Capacities |
| Middle East | Iran | Sadrfoulad | Sadrfoulad Complex | EAF | x 1 | 400 | underway | 2018 | World Steel Capacities |
| Middle East | Iran | Saeb Steel Complex | Saeb Steel Complex | EAF | x 1 | 550 | underway | 2018 | World Steel Capacities |
| Middle East | Iran | Bardsir | MIDHCO / Bardsir Sponge Iron and Steel Plant - Bardsir Steel Making Plant | EAF | x 1 | 1 000 | underway | 2018 | World Steel Capacities |
| Middle East | Iran | Zarand Iron & Steel Company (ZISCO) | Zarand Iron & Steel Company (ZISCO) | BOF | x 1 | 1 700 | underway | 2018 | World Steel Capacities |
| Middle East | Iran | Urmia 2nd Industrial Zone, Western Azerbaijan | Orumieh Steel Group | EAF | n/a | 1 200 | underway | 2018 | World Steel Capacities |
| Middle East | Iran | Charmahal-va-Bakhtiyari | Mobarakeh Steel / Sefid Dasht Steel Complex (Chaharmahal Bakhtiari) | EAF | x 1 | 1 000 | underway | 2018 | World Steel Capacities |
| Middle East | Iran | Fars | Eghlid Steel | EAF | x 1 | 1 500 | underway | 2018 | irsteel.com |
| Middle East | Iran | Khorasan | IMIDRO (Sabzevar Steel) | EAF | x 1 | 800 | underway | 2018 | Platts, World Steel Capacities |
| Middle East | Iran | Shadegan, Khuzestan | Khouzestan / Shadegan Steel Complex | EAF | x 1 | 1 000 | underway | 2018 | World Steel Capacities |
| Middle East | Iran | Khuzestan | Arvand Jahanara Steel Company | EAF | x 1 | 1 200 | underway | 2018 | World Steel Capacities |
| Middle East | Iran | Yazd | Iran Alloy Steel Company | EAF | x 1 | 700 | underway | 2018 | World Steel Capacities |

**18** | **RECENT DEVELOPMENTS IN STEELMAKING CAPACITY**

| REGION | ECONOMIES | LOCATION | COMPANY | EQUIPMENT | NUMBER OF EQUIPMENT | CAPACITY | STATUS | START | SOURCES |
|---|---|---|---|---|---|---|---|---|---|
| Middle East | Iran | Eshtehard, Alborz | Aria Zob Steel Complex | EAF | x 1 | 500 | underway | 2018 | World Steel Capacities |
| Middle East | Iran | Sirjan, Kerman | Golgohar Mining & Industrial Co. / Jahan Foolad Sirjan Steel Complex | EAF | x 1 | 1 300 | underway | 2018 | World Steel Capacities |
| Middle East | Iran | Chatroud, Kerman Province | Butia Steel Company | EAF | x 1 | 1 500 | underway | 2019 | Metal Expert |
| Middle East | Iran | Abarkooh, Yazd | Abar Kouh Steel & Rolling | EAF | x 1 | 600 | underway | 2019 | World Steel Capacities |
| Middle East | Iran | Abarkuh, Yazd, Sarmad Abarkuh | Sarmad Iron and Steel Company | EAF | n/a | 600 | underway | 2020 | World Steel Capacities |
| Middle East | Iran | Hormozgan, Hormozgan | Mobarakeh Steel | EAF | x 1 | 1 500 | underway | 2020 | World Steel Capacities |
| Middle East | Iran | Bonab | Bonab Steel Complex | EAF | x 1 | 1 500 | cancelled | n/a | World Steel Capacities |
| Middle East | Iran | Sadr | Shahrood Steel Co | EAF | x 1 | 400 | underway | n/a | World Steel Capacities |
| Middle East | Iran | Sadr | Azna Steel | EAF | x 1 | 700 | underway | n/a | World Steel Capacities |
| Middle East | Iran | Sirjan Iranian Steel Company (SISCO) | MIDHCO / Sirjan Iranian Steel Company (SISCO) | EAF | n/a | 1 000 | underway | n/a | Company HP |
| Middle East | Iran | Sadr | Shahrood Steel Co | EAF | x 1 | 300 | underway | n/a | World Steel Capacities |
| Middle East | Iran | Chabahar city, Sistan and Baluchestan | Pars Kohan Diar Parsian Steel (PKP) | EAF | x 1 | 1 600 | plan | 2018 | World Steel Capacities |
| Middle East | Iran | Malekan, Eastern Azerbaijan | Malekan Steel | EAF | x 1 | 400 | plan | 2018 | World Steel Capacities |
| Middle East | Iran | Azerbaijan | Eight mini steelworks (Mianeh Steel) | EAF | x 1 | 800 | plan | 2018 | Platts |
| Middle East | Iran | n/a | Bafgh Mineral Complex Iron and Steel Industry Company (B-MISCO) | EAF | x 1 | 800 | plan | 2018 | World Steel Capacities |
| Middle East | Iran | Sefid dasht Industrial Park, Chaharmahal and Bakhtiari | Saba Foulad Zagros | EAF | x 1 | 460 | plan | 2018 | World Steel Capacities |
| Middle East | Iran | Golgohar | Golgohar Mining & Industrial Co. | EAF | x 1 | 1 500 | plan | 2018 | World Steel Capacities |
| Middle East | Iran | Dezful, Khorasan province | Dezful Steel | IF | x 1 | 450 | plan | 2018 | World Steel Capacities |
| Middle East | Iran | Ahwaz | Khouzestan Steel Company (KSC) | EAF | x 6 | 1 400 | plan | 2019 | Metal Expert |
| Middle East | Iran | Qeshm Free Zone | Qeshm Steel Development Co.(QE.S.D.Co) | EAF | x 1 | 1 500 | plan | 2021 | World Steel Capacities |
| Middle East | Iran | Qeshm Free Zone | Qeshm Steel Development Co.(QE.S.D.Co) | EAF | x 1 | 1 500 | plan | 2023 | World Steel Capacities |
| Middle East | Iran | Khouzestan | Eight mini steelworks (Shadegan Steel) | EAF | x 1 | 1 000 | plan | n/a | Metal Expert |
| Middle East | Iran | Macran Steel Complex | IMIDRO | EAF | x 1 | 3 200 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Bandar Abbas, Hormozgan | Persian Gulf Saba Steel | EAF | x 1 | 1 500 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Bandar Abbas, Hormozgan | Persian Gulf Saba Steel | EAF | x 1 | 1 500 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Bandar Abbas, Hormozgan | Persian Gulf Saba Steel | EAF | x 1 | 1 500 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Torbat Heydariyeh | Mobarakeh Steel | EAF | x 1 | 1 000 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Torbat Heydariyeh | Torbat Heydariyeh Steel | EAF | x 1 | 1 450 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Torbat Heydariyeh | Torbat Heydariyeh Steel | EAF | x 1 | 1 450 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Chaharmahal Bakhtiari | Eight mini steelworks (Sefid Dasht Steel) | EAF | x 1 | 800 | plan | n/a | Metal Expert |
| Middle East | Iran | Esfahan | Esfahan Steel | BOF | x 2 | 2 280 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Esfahan | Esfahan Steel | EAF | x 1 | 1 650 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Fars | Eight mini steelworks (Neyriz Steel) | EAF | x 1 | 800 | plan | n/a | Metal Bulletin |
| Middle East | Iran | Kerman | Eight mini steelworks (Baft Steel) | EAF | x 1 | 800 | plan | n/a | Platts |
| Middle East | Iran | Shadegan Steel Complex | Khouzestan | EAF | x 1 | 1 300 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Khorramshahr Steel | Khouzestan | EAF | x 1 | 1 250 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Khorramshahr Steel | Khouzestan | EAF | x 1 | 1 250 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Khorramshahr Steel | Khouzestan | EAF | x 1 | 1 250 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Khorramshahr Steel | Khouzestan | EAF | x 1 | 1 250 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Khuzestan | Arvand Jahanara Steel Company | EAF | x 1 | 1 200 | plan | n/a | World Steel Capacities |
| Middle East | Iran | n/a | North West Steel Industries (NWSI) | EAF | x 1 | 800 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Samangan Steel Industries | Samangan Steel Industries | EAF | x 1 | 750 | plan | n/a | Metal Expert |
| Middle East | Iran | Samangan Steel Industries | Samangan Steel Industries | EAF | x 1 | 750 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Golgohar | Golgohar Mining & Industrial Co. | EAF | x 1 | 1 500 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Golgohar | Golgohar Mining & Industrial Co. | EAF | x 1 | 1 000 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Sistan and Baluchestan | IMIDRO | EAF | x 1 | 3 200 | plan | n/a | Metal Expert |
| Middle East | Iran | n/a | Foolad Kavir | EAF | x 1 | 500 | plan | n/a | World Steel Capacities |
| Middle East | Iran | Tehran | West Alborz Steel Co. | EAF | x 1 | 1 000 | plan | n/a | World Steel Capacities |

| REGION | ECONOMIES | LOCATION | COMPANY | EQUIPMENT | NUMBER OF EQUIPMENT | CAPACITY | STATUS | START | SOURCES |
|---|---|---|---|---|---|---|---|---|---|
| Middle East | Iran | Yazd | Chadormalu Mining & Industrial Co / Samen Steel | EAF | x 1 | 1 300 | operating | 2017 | World Steel Capacities |
| Middle East | Iran | Khorasan | Khorasan Steel Complex | EAF | x 1 | 650 | operating | 2017 | World Steel Capacities |
| Middle East | Iran | Shahrekord | Mobarakeh Steel / Saba Steel Complex | EAF | x 1 | 850 | operating | 2017 | World Steel Capacities |
| Middle East | Iraq | Erbil | WorldBridge Steel | EAF | x 1 | 500 | postponement | 2017 | Metal Expert |
| Middle East | Iran | Zonouz (Shams Iron & Steel Complex) | Daric Investment Group | EAF | x 1 | 1 500 | plan | n/a | World Steel Capacities |
| Middle East | Iran | South Khorasan | IMIDRO / Ghaenat Steel Complex | EAF | x 1 | 800 | plan | n/a | World Steel Capacities |
| Middle East | Iraq | Basra | Al Moussawi Trading | EAF | n/a | 500 | plan | n/a | Platts |
| Middle East | Iraq | Sulaymaniyah, Kurdistan | Mass Group Holding | EAF | x 1 | 250 | plan | n/a | Metal Expert |
| Middle East | Iraq | Taji | Al-Sumood Company for Steel Industries | EAF | x 2 | 150 | plan | n/a | Platts |
| Middle East | Jordan | Zarqa | National Steel Industry | IF | x 1 | 100 | postponement | 2018 | Metal Expert |
| Middle East | Oman | Sohar | Moon Iron & Steel (MISCO) | EAF | x 1 | 1 200 | underway | 2018 | Metal Expert |
| Middle East | Oman | Sur | Sun Metals | EAF | x 2 | 2 400 | postponement | 2018 | Metal Expert |
| Middle East | Oman | Muscat Steel | Muscat Steel | EAF | x 1 | 200 | plan | n/a | Metal Expert |
| Middle East | Saudi Arabia | Jeddah | Arkan Steel | EAF | x 1 | 600 | plan | n/a | World Steel Capacities |
| Middle East | Saudi Arabia | Rabigh | Al-Raki for Trading & Industry | EAF | x 1 | 400 | postponement | 2017 | World Steel Capacities |
| Middle East | Saudi Arabia | Yanbu, Medina | Atoun Steel Industry | EAF | x 1 | 910 | postponement | 2017 | Metal Expert |
| Middle East | Saudi Arabia | Jizan | Al-Yamamah Steel Industries | EAF | x 1 | 1 000 | postponement | n/a | Platts |
| Middle East | Saudi Arabia | Rabigh | Factory Rabigh Steel Industry | EAF | x 1 | n/a | plan | n/a | World Steel Capacities |
| Middle East | Saudi Arabia | Ras Al-Khair | Gulf Tubing Co | EAF | x 1 | 600 | plan | 2019 | Metal Expert |
| Middle East | Saudi Arabia | Al-Jubail | Saudi Iron & Steel Co (Hadeed) | Steelmkg | n/a | 3 500 | plan | 2025 | Metal Expert |
| Middle East | Saudi Arabia | Dammam | Al-Qaryan Steel Company | EAF | x 1 | 300 | plan | n/a | Metal Expert |
| Middle East | Saudi Arabia | Watani Steel II, Riyadh | Taybah Steel | EAF | x 1 | 1 500 | plan | n/a | Metal Expert |
| Middle East | Saudi Arabia | Riyadh | Rajhi Steel Industries | EAF | x 1 | 2 000 | cancelled | 2017 | World Steel Capacities |
| Middle East | United Arab Emirates | Abu Dhabi | BILDCO | Steelmkg | n/a | 1 000 | postponement | n/a | Metal Expert |
| Middle East | United Arab Emirates | Jebel Ali, Dubai | Gulf National Steel | EAF | n/a | 500 | plan | 2019 | World Steel Capacities |
| NAFTA | Mexico | Apizaco, Tlaxcala | Grupo SIMEC / Industrias CH | EAF | x 1 | 600 | operating | 2018 | World Steel Capacities, Company HP |
| NAFTA | Mexico | Pesqueria, Nuevo Leon | Ternium Mexico | EAF | x 2 | 3 000 | plan | n/a | MBR |
| NAFTA | Mexico | Nuevo León | Frisa | EAF | x 1 | 350 | operating | 2016 | Platts |
| NAFTA | United States | Durant, Oklahoma | CMC Steel Oklahoma (Durant) | EAF | x 1 | 350 | operating | 2017 | World Steel Capacities, Company HP |
| NAFTA | United States | San Patricio | Tianjin Pipe Group (TPCO) | EAF | x 1 | 500 | plan | n/a | World Steel Capacities |
| NAFTA | United States | Louisiana | Benteler Steel/Tube | EAF | x 1 | n/a | plan | 2018 | World Steel Capacities |
| NAFTA | United States | Montpelier, Iowa | SSAB North American Division | EAF | x 1 | 1 200 | plan | n/a | Metal Expert |
| NAFTA | United States | Texas | E Unitd Group | EAF | x 2 | 2 500 | plan | n/a | Metal Expert |
| NAFTA | United States | US Steel | Fairfield, Alabama | EAF | n/a | 1 600 | plan | n/a | World Steel Capacities |
| Other Europe | Turkey | n/a | Platinum Demir Celik | IF | x 2 | 100 | postponement | 2017 | Metal Expert |
| Other Europe | Turkey | Payas, Hatay | Corbus Celik | EAF | n/a | 500 | postponement | n/a | Platts |
| Other Europe | Turkey | Bartin | Mescier Steel Industry & Trade L.C. | EAF | x 1 | 1 000 | postponement | n/a | World Steel Capacities |
| Other Europe | Turkey | Osmaniye | Yolbulan Bastug | EAF | x 1 | 2 000 | plan | cancelled | Platts |
| Other Europe | Turkey | Canakkale, Biga | Icdas | BOF | x 1 | 2 000 | plan | cancelled | Metal Expert |
| Other Europe | Turkey | Filyos, Zonguldak | Kardemir | BOF | n/a | 6 000 | plan | cancelled | Platts |
| Other Europe | Turkey | Orhangazi, Bursa | Asil Celik | EAF | x 1 | 500 | plan | n/a | Metal Expert |
| Other Europe | Turkey | Aliaga, Izmir | Ege Celik | EAF | x 1 | 1 200 | plan | n/a | World Steel Capacities |
| Other Europe | Turkey | Izmir | Habas | EAF | x 1 | 1 500 | operating | 2017 | Metal Expert |

*Source*: Media sources listed in the table.

# Annex B. AVAILABLE EVIDENCE OF PLANT LEVEL CLOSURES

The closure information collected in this table is based on plant-level data originally obtained from public and commercial sources, in particular from media reports, but does not represent an exhaustive list of closures. These sources are listed in Table A3.

**Table A2. Closure data**

| REGION | ECONOMIES | LOCATION | COMPANY | EQUIPMENT | NUMBER OF EQUIPMENT | DETAIL | TYPE OF CLOSURE | CAPACITY | Year | SOURCES |
|---|---|---|---|---|---|---|---|---|---|---|
| Asia | China | n/a | Anhui Fuxin (安徽富鑫钢铁有限公司) | BOF | n/a | n/a | Permanent | 1 000 | 2016 | Wood Machenzie |
| Asia | China | n/a | Anhui Jin'an (安徽金安钢铁) | BOF | n/a | n/a | Permanent | 1 000 | 2016 | Wood Machenzie |
| Asia | China | n/a | Antai Hebei (河北安泰实业有限公司) | BOF | n/a | n/a | Permanent | 970 | 2016 | Wood Machenzie |
| Asia | China | n/a | Bajiao (德阳八角钢铁) | BOF | n/a | n/a | Permanent | 200 | 2016 | Wood Machenzie |
| Asia | China | n/a | Baode (鞍山宝得钢铁有限公司) | BOF | n/a | n/a | Permanent | 600 | 2016 | Wood Machenzie |
| Asia | China | n/a | Baogang (包钢集团有限责任公司) | BOF | n/a | n/a | Permanent | 450 | 2016 | Wood Machenzie |
| Asia | China | n/a | Baowu Kungang (宝武集团昆明钢铁集团) | BOF | n/a | n/a | Permanent | 1 170 | 2016 | Wood Machenzie |
| Asia | China | n/a | Baowu Wuhan (宝武集团武汉总公司) | BOF | n/a | n/a | Permanent | 2 120 | 2016 | Wood Machenzie |
| Asia | China | n/a | Baoxin Special (包头市宝鑫特钢有限责任公司) | BOF | n/a | n/a | Permanent | 70 | 2016 | Wood Machenzie |
| Asia | China | n/a | Changqing (山西常平集团) | BOF | n/a | n/a | Permanent | 1 200 | 2016 | Wood Machenzie |
| Asia | China | n/a | Chongqing Yuxi (重庆渝西钢铁集团) | BOF | n/a | n/a | Permanent | 100 | 2016 | Wood Machenzie |
| Asia | China | n/a | Chuanwei (四川川威集团有限公司) | BOF | n/a | n/a | Permanent | 600 | 2016 | Wood Machenzie |
| Asia | China | n/a | Dazhou (四川省达州钢铁集团有限公司) | BOF | n/a | n/a | Permanent | 200 | 2016 | Wood Machenzie |
| Asia | China | n/a | Delong Aoyu (德龙涞源奥宇钢铁) | BOF | n/a | n/a | Permanent | 600 | 2016 | Wood Machenzie |
| Asia | China | n/a | Donghai (唐山东海钢铁有限公司) | BOF | n/a | n/a | Permanent | 500 | 2016 | Wood Machenzie |
| Asia | China | n/a | Dongshan (河北新金安钢铁集团邯东山冶金工业有限公司) | BOF | n/a | n/a | Permanent | 500 | 2016 | Wood Machenzie |
| Asia | China | n/a | Fushun Fuxin (安徽钢财市富鑫钢铁公司) | BOF | n/a | n/a | Permanent | 1 200 | 2016 | Wood Machenzie |
| Asia | China | n/a | Guangyuan Metal Products (廊坊市泓远金属制品有限公司) | BOF | n/a | n/a | Permanent | 2 400 | 2016 | Wood Machenzie |
| Asia | China | n/a | Guofeng (唐山国丰钢铁有限公司) | BOF | n/a | n/a | Permanent | 1 700 | 2016 | Wood Machenzie |
| Asia | China | n/a | Hangzhou (杭州钢铁集团公司) | BOF | n/a | n/a | Permanent | 600 | 2016 | Wood Machenzie |
| Asia | China | n/a | HBIS Shijiazhuang (河北钢铁集团石家庄钢铁公司) | BOF | n/a | n/a | Permanent | 720 | 2016 | Wood Machenzie |
| Asia | China | n/a | HBIS Tangshan (河北钢铁集团唐山公司) | BOF | n/a | n/a | Permanent | 1 100 | 2016 | Wood Machenzie |
| Asia | China | n/a | Hebei Xinjin (河北新武爱钢铁集团新金钢铁有限公司) | BOF | n/a | n/a | Permanent | 450 | 2016 | Wood Machenzie |
| Asia | China | n/a | Henglong (重庆万盛恒隆钢铁公司) | BOF | n/a | n/a | Permanent | 150 | 2016 | Wood Machenzie |
| Asia | China | n/a | Huale Alloy (连云港华乐合金有限公司) | BOF | n/a | n/a | Permanent | 1 150 | 2016 | Wood Machenzie |
| Asia | China | n/a | Jiangxin (山东临沂江鑫钢铁有限公司) | BOF | n/a | n/a | Permanent | 1 050 | 2016 | Wood Machenzie |
| Asia | China | n/a | Jiaxin (唐山佳鑫钢铁有限公司) | BOF | n/a | n/a | Permanent | 500 | 2016 | Wood Machenzie |
| Asia | China | n/a | Jinxi Iron and Steel (河北唐山津西钢铁) | BOF | n/a | n/a | Permanent | 550 | 2016 | Wood Machenzie |
| Asia | China | n/a | Jiugang Hongxing (酒泉钢铁集团宏兴钢铁股份有限公司（嘉峪关）) | BOF | n/a | n/a | Permanent | 500 | 2016 | Wood Machenzie |
| Asia | China | n/a | Jiugang Yicheng (酒泉钢铁集团宜昌翼钢) | BOF | n/a | n/a | Permanent | 300 | 2016 | Wood Machenzie |
| Asia | China | n/a | Jiugang Yuzhong (酒泉钢铁集团甘肃榆中分公司) | BOF | n/a | n/a | Permanent | 1 200 | 2016 | Wood Machenzie |
| Asia | China | n/a | Jiujiang Wire (九江线材钢铁有限公司) | BOF | n/a | n/a | Permanent | 450 | 2016 | Wood Machenzie |
| Asia | China | n/a | Liangang Ruifeng (唐山瑞丰钢铁有限公司) | BOF | n/a | n/a | Permanent | 1 000 | 2016 | Wood Machenzie |

| REGION | ECONOMIES | LOCATION | COMPANY | EQUIPMENT | NUMBER OF EQUIPMENT | DETAIL | TYPE OF CLOSURE | CAPACITY | Year | SOURCES |
|---|---|---|---|---|---|---|---|---|---|---|
| Asia | China | n/a | Lueyang (陕西略阳钢铁) | BOF | n/a | n/a | Permanent | 800 | 2016 | Wood Machenzie |
| Asia | China | n/a | Ma'anshan (马钢集团马鞍山钢铁股份有限公司) | BOF | n/a | n/a | Permanent | 300 | 2016 | Wood Machenzie |
| Asia | China | n/a | Masteel Hefei (马钢集团合肥钢铁集团有限公司) | BOF | n/a | n/a | Permanent | 1 700 | 2016 | Wood Machenzie |
| Asia | China | n/a | Nanchang (江西萍乡钢铁有限责任公司) | BOF | n/a | n/a | Permanent | 1 000 | 2016 | Wood Machenzie |
| Asia | China | n/a | Nanfang (河南息马店南方钢铁有限公司) | BOF | n/a | n/a | Permanent | 750 | 2016 | Wood Machenzie |
| Asia | China | n/a | Pangang Chengdu (鞍钢集团攀钢集团成都钢铁公司) | BOF | n/a | n/a | Permanent | 1 000 | 2016 | Wood Machenzie |
| Asia | China | n/a | Pangang Panzhihua (鞍钢集团攀枝花钢铁（集团）有限责任公司) | BOF | n/a | n/a | Permanent | 1 250 | 2016 | Wood Machenzie |
| Asia | China | n/a | Pangang Xichang (鞍钢集团攀钢集团西昌钢钒有限公司) | BOF | n/a | n/a | Permanent | 500 | 2016 | Wood Machenzie |
| Asia | China | n/a | Pinggang (方大集团江西萍乡钢铁公司) | BOF | n/a | n/a | Permanent | 770 | 2016 | Wood Machenzie |
| Asia | China | n/a | Pinggang Special Steel (方大集团萍乡萍钢特钢有限公司) | BOF | n/a | n/a | Permanent | 300 | 2016 | Wood Machenzie |
| Asia | China | n/a | Puyang (河北新武安钢铁集团普阳钢铁有限公司) | BOF | n/a | n/a | Permanent | 430 | 2016 | Wood Machenzie |
| Asia | China | n/a | Qian'an Jin'an (津安钢铁有限公司) | BOF | n/a | n/a | Permanent | 500 | 2016 | Wood Machenzie |
| Asia | China | n/a | Qianjin (河北磊祁前进钢铁) | BOF | n/a | n/a | Permanent | 660 | 2016 | Wood Machenzie |
| Asia | China | n/a | Qinyou (扬州市秦邮特种金属材料有限公司) | BOF | n/a | n/a | Permanent | 500 | 2016 | Wood Machenzie |
| Asia | China | n/a | Quanfu (山西泉福钢铁厂) | BOF | n/a | n/a | Permanent | 200 | 2016 | Wood Machenzie |
| Asia | China | n/a | Ronqxin (荣信钢铁有限公司) | BOF | n/a | n/a | Permanent | 580 | 2016 | Wood Machenzie |
| Asia | China | n/a | Sande (临沂三德钢铁有限公司) | BOF | n/a | n/a | Permanent | 1 400 | 2016 | Wood Machenzie |
| Asia | China | n/a | Shagang Xixing (沙钢集团江苏锡兴钢铁有限公司) | BOF | n/a | n/a | Permanent | 800 | 2016 | Wood Machenzie |
| Asia | China | n/a | Shanghai Stainless Steel (宝武集团上海第一钢铁有限公司) | BOF | n/a | n/a | Permanent | 1 240 | 2016 | Wood Machenzie |
| Asia | China | n/a | Shanxi Huanhai (山西环海钢铁) | BOF | n/a | n/a | Permanent | 150 | 2016 | Wood Machenzie |
| Asia | China | n/a | Shengbao Pipe (河北晟宝制管有限公司) | BOF | n/a | n/a | Permanent | 600 | 2016 | Wood Machenzie |
| Asia | China | n/a | Shougang Changzhi (首钢长治钢铁有限公司) | BOF | n/a | n/a | Permanent | 500 | 2016 | Wood Machenzie |
| Asia | China | n/a | Shougang Shuicheng (首钢集团贵州水城钢铁（集团）有限责任公司) | BOF | n/a | n/a | Permanent | 750 | 2016 | Wood Machenzie |
| Asia | China | n/a | Shougang Tonghua (首钢通化钢铁集团有限责任公司) | BOF | n/a | n/a | Permanent | 400 | 2016 | Wood Machenzie |
| Asia | China | n/a | Shunxin (湖南顺鑫钢铁有限公司) | BOF | n/a | n/a | Permanent | 150 | 2016 | Wood Machenzie |
| Asia | China | n/a | Siping Modern (吉林四平现代钢铁有限公司) | BOF | n/a | n/a | Permanent | 1 000 | 2016 | Wood Machenzie |
| Asia | China | n/a | Taigang (太原钢铁集团有限公司) | BOF | n/a | n/a | Permanent | 400 | 2016 | Wood Machenzie |
| Asia | China | n/a | Taigang New Lingang (太原钢铁集团新临钢钢铁有限公司) | BOF | n/a | n/a | Permanent | 1 100 | 2016 | Wood Machenzie |
| Asia | China | n/a | Tangshan Xingye (唐山兴业工贸有限公司) | BOF | n/a | n/a | Permanent | 150 | 2016 | Wood Machenzie |
| Asia | China | n/a | Tiangang (天钢集团有限公司) | BOF | n/a | n/a | Permanent | 900 | 2016 | Wood Machenzie |
| Asia | China | n/a | Tianzhu (天柱钢铁集团有限公司) | BOF | n/a | n/a | Permanent | 1 000 | 2016 | Wood Machenzie |
| Asia | China | n/a | Wen'an (河北新武安钢铁集团文安钢铁有限公司) | BOF | n/a | n/a | Permanent | 440 | 2016 | Wood Machenzie |
| Asia | China | n/a | Wenfeng (河北文丰钢铁有限公司) | BOF | n/a | n/a | Permanent | 290 | 2016 | Wood Machenzie |
| Asia | China | n/a | Xilin (黑龙江西林钢铁集团) | BOF | n/a | n/a | Permanent | 700 | 2016 | Wood Machenzie |
| Asia | China | n/a | Xinda (德达钢铁有限公司) | BOF | n/a | n/a | Permanent | 870 | 2016 | Wood Machenzie |
| Asia | China | n/a | Xingtai (河北邢台钢铁有限公司) | BOF | n/a | n/a | Permanent | 300 | 2016 | Wood Machenzie |
| Asia | China | n/a | Xingyuan Iron and Steel (赢分县星原钢铁集团有限公司) | BOF | n/a | n/a | Permanent | 800 | 2016 | Wood Machenzie |
| Asia | China | n/a | Yaxin Zhongsheng (山西中升钢铁有限公司) | BOF | n/a | n/a | Permanent | 900 | 2016 | Wood Machenzie |
| Asia | China | n/a | Yutian Jianbang (玉田建邦实业有限公司) | BOF | n/a | n/a | Permanent | 150 | 2016 | Wood Machenzie |
| Asia | China | n/a | Zhayi Liancheng (天津轧一联成钢铁有限公司) | BOF | n/a | n/a | Permanent | 1 820 | 2016 | Wood Machenzie |
| Asia | China | n/a | Zongheng Cangzhou (河北沧州纵横钢铁集团有限公司) | BOF | n/a | n/a | Permanent | 1 100 | 2016 | Wood Machenzie |
| Asia | China | n/a | Zongheng Handan (河北邯郸纵横钢铁集团有限公司) | BOF | n/a | n/a | Permanent | 500 | 2016 | Wood Machenzie |
| Asia | China | n/a | Chengdu Metallurgy (成都冶金实验厂有限公司) | BOF | n/a | n/a | Permanent | 600 | 2016 | Wood Machenzie |
| Asia | China | n/a | Handing (内蒙古汉鼎钢铁) | BOF | n/a | n/a | Permanent | 200 | 2016 | Wood Machenzie |
| Asia | China | n/a | Jiangyin Huarun (江阴华润制钢有限公司) | BOF | n/a | n/a | Permanent | 400 | 2016 | Wood Machenzie |
| Asia | China | n/a | Shizi Metal (重庆壁山县狮子金属加工有限责任公司) | BOF | n/a | n/a | Permanent | 150 | 2016 | Wood Machenzie |
| Asia | China | n/a | Tsingshan Jinhui (青山控股闽青金.特钢) | BOF | n/a | n/a | Permanent | 150 | 2016 | Wood Machenzie |
| Asia | China | n/a | Valin Xigang (江苏华菱锡钢钢铁有限公司) | BOF | n/a | n/a | Permanent | 400 | 2016 | Wood Machenzie |
| Asia | China | n/a | Xi'an (陕西龙钢集团西安钢铁有限公司) | BOF | n/a | n/a | Permanent | 300 | 2016 | Wood Machenzie |

**22** | **RECENT DEVELOPMENTS IN STEELMAKING CAPACITY**

| REGION | ECONOMIES | LOCATION | COMPANY | EQUIPMENT | NUMBER OF EQUIPMENT | DETAIL | TYPE OF CLOSURE | CAPACITY | Year | SOURCES |
|---|---|---|---|---|---|---|---|---|---|---|
| Asia | China | n/a | Xilin (黑龙江西林钢铁集团) | BOF | n/a | n/a | Permanent | 650 | 2016 | Wood Machenzie |
| Asia | China | n/a | Xindongfang (苏州新东方特钢) | BOF | n/a | n/a | Permanent | 200 | 2016 | Wood Machenzie |
| Asia | China | n/a | Xinjiang Minxin (新疆闽新钢铁（集团）有限责任公司) | BOF | n/a | n/a | Permanent | 500 | 2016 | Wood Machenzie |
| Asia | China | n/a | Dazhan (湖北大展钢铁有限公司) | BOF | n/a | n/a | Permanent | 300 | 2016 | Wood Machenzie |
| Asia | China | n/a | Baowu Baotong (宝武集团南通宝通钢铁公司) | BOF | n/a | n/a | Permanent | 350 | 2016 | Wood Machenzie |
| Asia | China | n/a | Shengtelong (湖州盛特隆金属制品有限公司) | BOF | n/a | n/a | Permanent | 270 | 2016 | Wood Machenzie |
| Asia | China | n/a | Shougang Guiyang (首钢集团贵阳特殊钢有限公司) | BOF | n/a | n/a | Permanent | 300 | 2016 | Wood Machenzie |
| Asia | China | n/a | Shuangyou (南平市双友金属制品有限公司) | BOF | n/a | n/a | Permanent | 400 | 2016 | Wood Machenzie |
| Asia | China | n/a | Baowu Shaoguan (宝武集团广东韶关钢铁集团有限公司) | BOF | n/a | n/a | Permanent | 400 | 2016 | Wood Machenzie |
| Asia | China | n/a | Xilin Acheng (西林钢铁集团阿城钢铁有限公司) | BOF | n/a | n/a | Permanent | 550 | 2016 | Wood Machenzie |
| Asia | China | n/a | Huaxin Metallurgy (广水华鑫冶金工业有限公司) | BOF | n/a | n/a | Permanent | 300 | 2016 | Wood Machenzie |
| Asia | China | n/a | Wucheng (湖北吴城钢铁集团有限公司) | BOF | n/a | n/a | Permanent | 500 | 2016 | Wood Machenzie |
| Asia | China | n/a | Xuzhou Dongnan (江苏徐州东南钢铁有限公司) | BOF | n/a | n/a | Permanent | 200 | 2016 | Wood Machenzie |
| Asia | China | n/a | Shagang Xinrui (沙钢集团鑫瑞特钢有限公司) | BOF | n/a | n/a | Permanent | 600 | 2016 | Wood Machenzie |
| Asia | China | n/a | Shunle (武汉顺乐不锈钢有限公司) | BOF | n/a | n/a | Permanent | 600 | 2016 | Wood Machenzie |
| Asia | China | n/a | Yuebei (广东粤北钢铁有限公司) | BOF | n/a | n/a | Permanent | 700 | 2016 | Wood Machenzie |
| Asia | China | n/a | Qilu Special Steel (齐鲁特钢) | BOF | n/a | n/a | Permanent | 300 | 2016 | Wood Machenzie |
| Asia | China | n/a | Shanghai Stainless Steel (宝武集团上海第一钢铁有限公司) | BOF | n/a | n/a | Permanent | 550 | 2016 | Wood Machenzie |
| Asia | China | n/a | Fushun (东北特殊钢集团抚顺特殊钢股份有限公司) | BOF | n/a | n/a | Permanent | 300 | 2016 | Wood Machenzie |
| Asia | China | n/a | Xiwang Special (西王特钢) | BOF | n/a | n/a | Permanent | 120 | 2016 | Wood Machenzie |
| Asia | China | n/a | Southwest Stainless (四川西南不锈钢公司) | BOF | n/a | n/a | Permanent | 1 100 | 2016 | Wood Machenzie |
| Asia | China | n/a | Dingxin Nickel (福建鼎信镍业有限公司) | BOF | n/a | n/a | Permanent | 1 000 | 2016 | Wood Machenzie |
| Asia | China | n/a | Xuefeng (江苏无锡雪丰钢铁有限公司) | BOF | n/a | n/a | Permanent | 600 | 2016 | Wood Machenzie |
| Asia | China | n/a | Shanghai Special Steel (宝武集团上海特钢公司) | BOF | n/a | n/a | Permanent | 400 | 2016 | Wood Machenzie |
| Asia | China | n/a | Taigang (太原钢铁集团有限公司) | BOF | n/a | n/a | Permanent | 270 | 2016 | Wood Machenzie |
| Asia | China | n/a | Hangzhou (杭州钢铁集团公司) | BOF | n/a | n/a | Permanent | 500 | 2016 | Wood Machenzie |
| Asia | China | n/a | Lijin (湖北立金誉钢铁集团有限公司（原立吾冶金）) | BOF | n/a | n/a | Permanent | 500 | 2016 | Wood Machenzie |
| Asia | China | n/a | Shagang Xixing (沙钢集团江苏锡兴钢铁有限公司) | BOF | n/a | n/a | Permanent | 800 | 2016 | Wood Machenzie |
| Asia | China | n/a | n/a (aggregate) | Steelmkg (not including IF) | n/a | n/a | Permanent | 50 000 | 2017 | Ministry of Industry and Information Technology (MIIT) |
| Asia | China | n/a | n/a (aggregate) | IF | n/a | n/a | Permanent | 140 000 | 2017 | Ministry of Industry and Information Technology (MIIT) |
| Asia | Japan | Osaka | Kyoei Steel Ltd | EAF | x 1 | 40t | Permanent | 480 | 2016 | Company HP, World Steel Capacities |
| Asia | Japan | Okajima | Osaka Steel Co., Ltd. | EAF | x 1 | 40t | Permanent | 480 | 2016 | Company HP, World Steel Capacities |
| Asia | Japan | Kobe Works | Kobe Steel | BOF | x 2 | 90t | Permanent | 1 380 | 2017 | Company HP, World Steel Capacities |
| CIS | Russia | Vyksa | OMK | OHF | x 2 | 250 t, 251 t | Permanent | 460 | 2018 | World Steel Capacities |
| CIS | Ukraine | Zaporizhzhya | Metinvest | OHF | x 9 | n/a | Permanent | 4 700 | 2020 | World Steel Capacities |
| Europe | Italy | Piombino | Aferpi | BOF | x 3 | n/a | Permanent | 2 900 | 2017 | Company HP, Metal Expert |
| Europe | Poland | Dabrowa Gornicza | ArcelorMittal | BOF | x 1 | n/a | Others (unidentified) | n/a | 2016 | World Steel Capacities |
| Europe | Spain | Asturias (Aviles) | ArcelorMittal | BOF | x 1 | n/a | Others (unidentified) | n/a | 2016 | World Steel Capacities |
| NAFTA | United States | Ohio | Warren Steel Holdings | EAF | x 1 | n/a | Permanent | 500 | 2016 | Metal Expert |

*Note*: In column "Type of closure", the term "Others" refers to a closure that is not necessarily permanent, e.g. the idling or temporary stoppage of the steel facility. The data on nominal crude steelmaking capacity provided for China do not include the production capacity of "illegal" (*"违法 Wéifǎ"*) induction furnaces, nor does it reflect any changes in steelmaking capacity associated with those furnaces.

*Source*: Media sources listed in the table.

# Annex C. STEELMAKING CAPACITY DATA BY ECONOMY

### Table A3. Crude steelmaking capacity developments (in mmt)

| | Nominal crude steelmaking capacity | | | | | |
|---|---|---|---|---|---|---|
| | 2007 | 2013 | 2014 | 2015 | 2016 | 2017 |
| Asia | 899.0 | 1 514.3 | 1 554.9 | 1 575.4 | 1 521.6 | 1 488.9 |
| Non-OECD Asia | 712.2 | 1 297.0 | 1 337.9 | 1 359.4 | 1 306.6 | 1 275.3 |
| Non-OECD Asia (excl.China, India) | 63.7 | 86.8 | 89.9 | 94.8 | 95.3 | 102.5 |
| Japan | 129.6 | 131.2 | 131.1 | 130.5 | 129.6 | 128.2 |
| Korea | 57.2 | 86.0 | 85.9 | 85.5 | 85.5 | 85.5 |
| China (People's Republic of) | 588.5 | 1 106.2 | 1 140.0 | 1 150.1 | 1 089.4 | 1 047.9 |
| Chinese Taipei | 21.8 | 29.4 | 29.4 | 29.4 | 29.4 | 29.4 |
| India | 60.0 | 104.0 | 108.0 | 114.5 | 121.8 | 124.8 |
| Pakistan | 4.0 | 5.5 | 5.6 | 5.9 | 5.9 | 6.1 |
| Indonesia | 5.9 | 9.7 | 9.7 | 10.9 | 10.9 | 10.9 |
| Malaysia | 9.0 | 10.0 | 10.7 | 10.7 | 10.7 | 10.7 |
| Philippines | 1.8 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 |
| Thailand | 6.5 | 9.4 | 9.9 | 9.9 | 9.9 | 9.9 |
| Viet Nam | 4.7 | 10.7 | 11.2 | 13.8 | 14.3 | 21.3 |
| Others_Asia | 9.9 | 10.1 | 11.3 | 12.2 | 12.2 | 12.2 |
| Bangladesh | 2.5 | 2.5 | 3.7 | 4.6 | 4.6 | 4.6 |
| Cambodia | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Hong Kong (China) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Lao People's Democratic Republic | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Mongolia | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Myanmar | 0.1 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| Nepal | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| Democratic People's Republic of Korea | 6.0 | 6.0 | 6.0 | 6.0 | 6.0 | 6.0 |
| Singapore | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
| Sri Lanka | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Developed Asia | 208.7 | 246.6 | 246.4 | 245.4 | 244.4 | 243.0 |
| ASEAN-6 | 28.8 | 42.6 | 44.4 | 48.2 | 48.7 | 55.7 |
| | | | | | | |
| CIS | 135.0 | 143.8 | 144.7 | 144.7 | 145.7 | 145.7 |
| Kazakhstan | 6.0 | 8.2 | 8.2 | 8.2 | 8.2 | 8.2 |
| Russia | 77.0 | 86.6 | 87.0 | 87.0 | 88.0 | 88.0 |
| Ukraine | 45.5 | 42.5 | 42.5 | 42.5 | 42.5 | 42.5 |
| Others | 6.5 | 6.5 | 7.1 | 7.1 | 7.1 | 7.1 |
| Azerbaijan | 1.0 | 1.0 | 1.3 | 1.3 | 1.3 | 1.3 |
| Belarus | 2.8 | 2.8 | 3.0 | 3.0 | 3.0 | 3.0 |
| Georgia | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 |
| Moldova | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Turkmenistan | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Uzbekistan | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |

| | Nominal crude steelmaking capacity | | | | | |
|---|---|---|---|---|---|---|
| | **2007** | **2013** | **2014** | **2015** | **2016** | **2017** |
| **South America** | 56.7 | 68.1 | 68.1 | 69.0 | 72.6 | 73.2 |
| **Latin America** | 59.2 | 70.8 | 70.8 | 71.7 | 75.3 | 75.9 |
| **Non OECD Latin America** | 57.2 | 68.8 | 68.8 | 69.7 | 73.3 | 74.0 |
| **Argentina** | 6.1 | 6.7 | 6.7 | 6.7 | 6.7 | 7.3 |
| **Brazil** | 39.0 | 48.0 | 48.0 | 48.5 | 52.1 | 52.1 |
| **Chile** | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| **Colombia** | 1.4 | 2.4 | 2.4 | 2.4 | 2.4 | 2.4 |
| **Peru** | 1.6 | 1.6 | 1.6 | 2.0 | 2.0 | 2.0 |
| **Venezuela** | 6.1 | 6.2 | 6.2 | 6.2 | 6.2 | 6.2 |
| **Others** | 3.1 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 |
| **Bolivia** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Costa Rica** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Cuba** | 0.5 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 |
| **Dominican Republic** | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 |
| **Ecuador** | 0.3 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 |
| **El salvador** | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| **Guatemala** | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| **Panama** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Paraguay** | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| **Puerto rico** | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| **Trinidad and Tobago** | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| **Uruguay** | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| | | | | | | |
| **Middle East** | 24.5 | 54.3 | 59.1 | 60.9 | 60.9 | 63.7 |
| **Non OECD Middle East** | 24.0 | 53.8 | 58.6 | 60.4 | 60.4 | 63.2 |
| **Iran** | 12.0 | 27.0 | 27.0 | 28.2 | 28.2 | 31.0 |
| **Iraq** | 0.4 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 |
| **Israel** | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| **Jordan** | 0.4 | 0.9 | 1.1 | 1.1 | 1.1 | 1.1 |
| **Qatar** | 2.8 | 2.9 | 3.9 | 3.2 | 3.2 | 3.2 |
| **Saudi Arabia** | 7.4 | 12.5 | 12.5 | 13.7 | 13.7 | 13.7 |
| **Syrian Arab Republic** | 0.1 | 2.7 | 2.7 | 2.7 | 2.7 | 2.7 |
| **United Arab Emirates** | 0.2 | 3.0 | 3.7 | 3.7 | 3.7 | 3.7 |
| **Others** | 0.8 | 3.2 | 6.1 | 6.1 | 6.1 | 6.1 |
| **Afghanistan** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Bahrain** | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| **Kuwait** | 0.0 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 |
| **Lebanon** | 0.1 | 0.1 | 0.3 | 0.3 | 0.3 | 0.3 |
| **Oman** | 0.5 | 0.5 | 3.2 | 3.2 | 3.2 | 3.2 |
| **Yemen** | 0.1 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |

| | Nominal crude steelmaking capacity | | | | | |
|---|---|---|---|---|---|---|
| | 2007 | 2013 | 2014 | 2015 | 2016 | 2017 |
| **Africa** | 30.5 | 33.9 | 34.6 | 35.7 | 35.7 | 36.6 |
| **Algeria** | 2.5 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 |
| **Egypt** | 8.0 | 10.5 | 11.2 | 12.3 | 12.3 | 13.2 |
| **Libya** | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 |
| **Morocco** | 0.8 | 2.7 | 2.7 | 2.7 | 2.7 | 2.7 |
| **Nigeria** | 2.7 | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 |
| **South Africa** | 13.0 | 10.3 | 10.3 | 10.3 | 10.3 | 10.3 |
| **Zimbabwe** | 1.0 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 |
| **Others** | 0.9 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 |
| **Congo** | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| **Côte d'Ivoire** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Ethiopia** | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| **Ghana** | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| **Kenya** | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| **Mauritius** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Mozambique** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Sudan** | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| **Tanzania** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Togo** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Tunisia** | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| **Uganda** | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| **Zambia** | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| | | | | | | |
| **Europe** | 276.6 | 289.4 | 287.6 | 281.6 | 276.6 | 275.2 |
| **OECD Europe** | 258.6 | 275.1 | 273.3 | 267.3 | 262.3 | 260.9 |
| **Non-OECD Europe** | 18.0 | 14.3 | 14.3 | 14.3 | 14.3 | 14.3 |
| **Other Europe** | 39.9 | 57.8 | 58.0 | 56.0 | 56.0 | 57.5 |
| **EU-28** | 236.7 | 231.6 | 229.6 | 225.6 | 220.6 | 217.7 |
| **Turkey** | 32.0 | 49.2 | 49.4 | 47.4 | 47.4 | 48.9 |
| **Norway** | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
| **Switzerland** | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 |
| **Bosnia and Herzegovina** | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| **Bulgaria** | 3.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 |
| **Croatia** | 0.2 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| **Montenegro** | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 |
| **Romania** | 9.0 | 6.2 | 6.2 | 6.2 | 6.2 | 6.2 |
| **Serbia** | 2.2 | 2.7 | 2.7 | 2.7 | 2.7 | 2.7 |
| **Others** | 1.2 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 |
| **Albania** | 0.7 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 |
| **Cyprus** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Latvia** | 0.8 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 |
| **Former Yugoslav Republic of Macedonia** | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |

| | Nominal crude steelmaking capacity | | | | | |
|---|---|---|---|---|---|---|
| | **2007** | **2013** | **2014** | **2015** | **2016** | **2017** |
| **NAFTA** | 153.9 | 158.0 | 158.2 | 157.2 | 158.5 | 158.9 |
| **United States** | 113.4 | 113.5 | 113.5 | 111.3 | 112.3 | 112.6 |
| **Canada** | 19.0 | 20.5 | 20.7 | 20.7 | 20.7 | 20.7 |
| **Mexico** | 21.5 | 24.0 | 24.0 | 25.2 | 25.6 | 25.6 |
| | | | | | | |
| **Oceania** | 9.1 | 6.4 | 6.4 | 6.4 | 6.4 | 6.4 |
| **Australia** | 8.1 | 5.4 | 5.4 | 5.4 | 5.4 | 5.4 |
| **New Zealand** | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| | | | | | | |
| **OECD/EU economies TOTAL** | 610.9 | 659.2 | 657.4 | 649.4 | 644.7 | 642.3 |
| **Non OECD/EU economies TOTAL** | 976.9 | 1 611.6 | 1 658.8 | 1 684.2 | 1 635.9 | 1 608.9 |
| | | | | | | |
| **WORLD TOTAL** | 1 587.7 | 2 270.8 | 2 316.2 | 2 333.6 | 2 280.7 | 2 251.2 |

Note on China: The data on nominal crude steelmaking capacity provided for China does not include production capacity by "illegal" *("违法  Wéifǎ")* induction furnace, nor does it reflect any changes in steelmaking capacity associated with "illegal" *("违法 Wéifǎ")* induction furnaces.

The statistical data for Israel are supplied by and under the responsibility of the relevant Israeli authorities. The use of such data by the OECD is without prejudice to the status of the Golan Heights, East Jerusalem and Israeli settlements in the West Bank under the terms of international law.

Note by Turkey:
The information in this document with reference to "Cyprus" relates to the southern part of the Island. There is no single authority representing both Turkish and Greek Cypriot people on the Island. Turkey recognizes the Turkish Republic of Northern Cyprus (TRNC). Until a lasting and equitable solution is found within the context of United Nations, Turkey shall preserve its position concerning the "Cyprus" issue.

Note by all the European Union Member States of the OECD and the European Union:
The Republic of Cyprus is recognized by all members of the United Nations with the exception of Turkey. The information in this document relates to the area under the effective control of the Government of the Republic of Cyprus.

The European Union is a member of the Steel Committee and accordingly this data includes all EU Member States.

*Source*: OECD Secretariat

# Annex D. WORKING DEFINITION USED

**Steelmaking capacity**

The OECD Secretariat employs a definition of nominal crude steelmaking capacity based on maximum theoretical equipment capacity.[9] This definition does not take into account yield losses, maintenance and other factors affecting the productivity of installed steelmaking equipment. Therefore, steelmaking capacity figures provided by the OECD should not be regarded as effective capacity.

Capacity is defined in volume (tonnes) and annual capacity data figures reflect all existing steelmaking capacity at the end of a calendar year.

**Steelmaking equipment**

The OECD Secretariat considers as steelmaking equipment any equipment used to produce crude steel. The definition excludes iron-making equipment considered here as upstream, as well as casting, rolling or finishing equipment considered here as downstream. More specifically, the following equipment types are considered as crude steelmaking:

| Type | Code |
|---|---|
| Electric arc furnace | EAF |
| Energy Optimising Furnace | EOF |
| Induction furnace | IF |
| LD Basic Oxygen furnace | BOF |
| Open hearth furnace | OHF |
| Steelmaking - not specified | STEELMKG |

**Assessing capacity developments**

The three databases described in this paper are used to assess capacity developments. Changes in capacity are derived by taking into account new capacity additions and permanent closures in a given economy. In order to assess potential gross capacity additions in the future, investment projects are classified as "underway" or "planned". A project classified as "underway" is one which is under construction or for which contracts for equipment have been awarded and a major financial or state commitment has been made. "Planned" projects are more uncertain because they are either at the feasibility or early planning stage, yet to receive financial or state backing, or not scheduled for completion at a specified time. The classification of projects and comments on their progress do not in any way represent a judgement or imply a view on the advisability or feasibility of the projects.

Because closures cannot be forecast, the tables in this document provide only potential gross capacity additions and do not provide projections of net changes in capacity. It should be noted that planned or underway investments are sometimes altered due to changes in market conditions. Postponements refer to projects that were put on hold for a definite or indefinite period, while cancellations are previously announced projects that will no longer be implemented.

## Steelmaking capacity closures

The OECD Secretariat distinguishes between "permanent" and "temporary" steelmaking capacity closures. Permanent closures of capacity are considered to involve dismantling and scrapping of the equipment used for producing crude steel, or otherwise rendering such equipment permanently unusable for manufacturing crude steel. Temporary closures entail measures other than permanent closures as defined above, whereby production can be resumed in the future. Temporary closures include, for example, the idling of a plant's furnace. Only permanent closures are used for the purpose of calculating existing capacity. In practice, when compiling the database, it is unfortunately not always possible to understand from media sources if a closure is only temporary or permanent. This explains why the field value of "Type of closures" is sometimes set to "Others (unidentified)" in the OECD database on closures.

# References

Aferpi (2017), *STEELWORK DISMANTLING PLAN AND EQUIPMENTS ON SALE*, http://www.aferpi.it/equipment/steelwork-dismantling-plan-and-equipments-on-sale/?lang=en (accessed on 10 August 2018).                                              [17]

Aferpi (2016), *Aferpi orders new EAF and rolling mill from SMS*, http://www.aferpi.it/aferpi-orders-new-eaf-and-rolling-mill-from-sms/ (accessed on 10 August 2018).                                              [18]

CMC (2018), *CMC Reports Second Quarter 2018 Earnings From Continuing Operations Of $0.08 Per Share; And Adjusted*, http://ir.cmc.com/profiles/investor/PdfView.aspx?&m=rl&b=653&ID=87270 (accessed on 10 August 2018).                                              [15]

DANIELI (2018), *The first billet was rolled in the most modern Minimill for special steel grades in SIMEC Apizaco, Mexico*, https://www.danieli.com/en/news-media/news-events/the-first-billet-is-rolled-in-the-most-modern-minimill-for-special-steel-grades-in-simec-apizaco-mexico_37_280.htm (accessed on 10 August 2018).                                              [13]

Formosa Ha Tinh Steel (2017), *Caster Plant produced the first domestic made slab in Vietnam*, https://www.fhs.com.vn/Portal/newsroom.html (accessed on 10 August 2018).                                              [7]

IMIDRO (2016), *An Overview Of Actions Taken By IMIDRO (Iranian Mines and Mining Industries Development and Renovation Organization) 2015 - 2016 And Future Plan*, http://imidro.gov.ir/general_content/14141-An-overview-of-actions-taken-by-IMIDRO-2015-2016-and-future-plan.html (accessed on 10 August 2018).                                              [1]

Kobe Steel (2017), *GROUP PROFILE 2017*, http://www.kobelco.co.jp/english/about_kobelco/outline/group_profile/files/group_profile.pdf (accessed on 10 August 2018).                                              [10]

Kobe Steel (2013), *Fiscal 2013-2015 Midium-Term Business Plan*, http://www.kobelco.co.jp/english/releases/2013/__icsFiles/afieldfile/2013/08/09/ir_briefing_material_2013.pdf (accessed on 10 August 2018).                                              [11]

Kyoei Steel (2015), *Notice of Closure of the Hirakata Division Osaka Mill*, http://contents.xj-storage.jp/xcontents/54400/874c56ce/f56f/43a3/bdb1/6931dad31f3f/20150604212324563s.pdf (accessed on 10 August 2018).                                              [8]

Metal Expert (2018), *Mexico's Grupo SIMEC commissions new mini-mill in Tlaxcala*, https://metalexpert.com/en/news/HTMLinetnews&head=Mexicos-Grupo-SIMEC-commissions-new-mini-mill-in&unid=C3B15FD12E2D45EBC225822F00475966Q (accessed on 10 August 2018).                                              [14]

Metal Expert (2017), *World Steel Capacities Database*, Metal Expert.                                              [19]

MIIT (2018), *Steel industry in 2017 and 2018 (in Chinese)*, http://www.miit.gov.cn/n1146290/n1146402/n1146455/c6053798/content.html (accessed on 10 August 2018).                                              [4]

MIIT (2016), *Circular on Issuing the Planning for the Adjustment and Upgrading of the Iron and Steel Industry (in Chinese)*,                                              [3]

http://www.miit.gov.cn/n1146285/n1146352/n3054355/n3057569/n3057573/c5353862/content.html (accessed on 10 August 2018).

Ministry of Steel of India (2017), *National Steel Policy 2017*, http://steel.gov.in/national-steel-policy-nsp-2017 (accessed on 10 August 2018).                                                                                                     [6]

NDRC (2017), *The Opinions of Supporting the Steel and Coal Industries in Resolving Superfluous Production Capacity for Purposes of Poverty Alleviation and Development in 2017 (in Chinese)*, http://zfxxgk.ndrc.gov.cn/PublicItemView.aspx?ItemID=%7b92749e8f-3b25-4ea0-8835-4d74100b6a3e%7d (accessed on 1 December 2017).                                [2]

Osaka Steel (2015), *The Optimization of the Production System in Osaka Area (in Japanese)*, http://www.osaka-seitetu.co.jp/ir/pdf/brief_20150528.pdf (accessed on 10 August 2018).                                                        [9]

Platts (2017), *Kobe Steel stops upstream at Kobe steelworks*, https://www.steelbb.com/?PageID=157&article_id=166727 (accessed on 10 August 2018).                                                                                              [12]

Platts (2017), *Special report: China to scrap 119 mil mt/y of IF capacity*, https://www.steelbb.com/?PageID=157&article_id=162052 (accessed on 10 August 2018).                                                                          [5]

Platts (2016), *Warren Steel to permanently close Ohio mill*, https://www.steelbb.com/?PageID=157&article_id=148992 (accessed on 10 August 2018).                                                                                              [16]

# *Endnotes*

[1] This document, as well as any data and any map included herein are without prejudice to the status of or sovereignty over any territory, to the delimitation of international frontiers and boundaries and to the name of any territory, city or area.

[2] The previous figure was based on information available up until the end of June 2017. The new estimate for capacity in 2016 and 2017 is based on information made available up to December 2017 and reflects comments and modifications from OECD Steel Committee delegates after discussion on a draft of this report at the Steel Committee meeting in March 2018.

[3] The European Union (EU) is a member of the Steel Committee and accordingly this data includes all EU Member States.

[4] National Development and Reform Commission (NDRC) has announced the closure target of 2017 on 17 April 2017 at their website (NDRC, 2017[2]), however this website is not available as of 10 August 2018.

[5] According to the report by the China Iron & Steel Association (CISA), over 500 IF steel producers had been identified nationwide. Vice chairman of CISA, Mr. Chi Jingdong, said at a press conference of CISA in Beijing on April 26 2017 (Platts, 2017[5]).

[6] According to the NDRC's announcement on 17 April 2017, "Capacity of IFs shall be completely out until end of June 2017 in accordance with the law" is specified as one of "Target requirements", apart from the closure target of 50 mmt in 2017 (NDRC, 2017[2]).

[7] Kobe Steel has strengthened production capacities at Kakogawa works, by the relining of its blast furnace and adding a new continuous bloom caster (Platts, 2017[12]).

[8] According to World Steel Capacities Database (compiled by Metal Expert) on 22 December 2017, installation of two EAFs (with each 1.0 mmt) by Aferpi are described as being planned and expected to be commissioned in 2018 and 2019 (Metal Expert, 2017[19]).

[9] This definition is also commonly referred to as nominal, rated or nameplate capacity.