Slip Op. 19-142

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **TRANSPACIFIC STEEL LLC,** | |
| **Plaintiff,** | **Before: Claire R. Kelly, Gary S. Katzmann, and Jane A. Restani, Judges** |
| **v.** | |
| **UNITED STATES ET AL.,** | **Court No. 19-00009** |
| **Defendants.** | |

## <u>OPINION AND ORDER</u>

[Denying Defendants' motion to dismiss Plaintiff's amended complaint for failure to state a claim for which relief may be granted.  Judge Katzmann files a separate concurrence.]

Dated: November 15, 2019

<u>Matthew Nosher Nolan</u> and <u>Russell A. Semmel</u>, Arent Fox LLP, of Washington, DC, argued for plaintiff.  With them on the brief were <u>Nancy A. Noonan</u>, <u>Diana Dimitriuc Quaia</u>, and <u>Aman Kakar</u>.

<u>Tara K. Hogan</u>, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, and <u>Stephen C. Tosini</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendants.  With them on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Joshua E. Kurland</u>, Trial Attorney.

Kelly, Judge:  Transpacific Steel LLC ("Transpacific" or "Plaintiff") seeks a refund of the difference between the 50 percent tariff imposed on certain steel products ("steel articles") from the Republic of Turkey ("Turkey"), pursuant to Presidential Proclamation 9772, issued on August 10, 2018, and the 25 percent tariff imposed on steel articles from certain other countries.  See <u>Proclamation 9705 of March 8, 2018</u>, 83 Fed. Reg. 11,625 (Mar. 15, 2018) ("Proclamation 9705"); <u>Proclamation 9772 of August 10, 2018</u>, 83 Fed.

Reg. 40,429 (Aug. 15, 2018) ("Proclamation 9772"); Am. Compl. ¶¶ 2, 4, Prayer for Relief,

Apr. 2, 2019, ECF No. 19 ("Am. Compl.").[1]  Plaintiff contends relief is warranted because

Proclamation 9772 lacks a nexus to national security as statutorily required, fails to follow

mandated procedures within the statute, arbitrarily distinguishes importers of steel

products from Turkey and importers of steel products from all other countries in violation

of equal protection under the Fifth Amendment, and violates Fifth Amendment Due

Process guarantees.  Am. Compl. ¶¶ 3, 70; see also Pl.'s [Transpacific] Resp. Opp'n

Defs.' Mot. Dismiss, May 29, 2019, ECF No. 24 ("Pl.'s Resp. Br.").  Defendants move to

dismiss Plaintiff's Amended Complaint pursuant U.S. Court of International Trade

("USCIT") Rule 12(b)(6) for failure to state a claim for which relief may be granted.  Defs.'

Mot. Dismiss for Failure State Cl., Apr. 3, 2019, ECF No. 20 ("Defs.' Br.").  Defendants'

motion to dismiss is denied.  Based upon the facts alleged, Plaintiff's arguments that the

President failed to follow the procedure set forth in the statute and, further, that singling

out importers from Turkey violated the equal protection guarantees under the U.S.

Constitution, support its claim for a refund and defeat Defendants' motion to dismiss.  See

Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009); see also USCIT R. 12(b)(6).

---

[1] Plaintiff previously also sought declaratory and injunctive relief from the implementation of Proclamation 9772.  However, on May 21, 2019, the additional tariffs imposed by Proclamation 9772 on Turkey were lifted.  See Pl.'s Resp. Br. at 1; see also Defs.' Reply Supp. Mot. Dismiss at 2 n.1, July 10, 2019, ECF No. 27 ("Defs.' Reply Br.") (citing Proclamation 9886 of May 16, 2019, 84 Fed. Reg. 23,421, 23,421 (May 21, 2019)).  The parties agree that the case is not moot, because Plaintiff still seeks a refund.  See Pl.'s Resp. Br. at 1; Defs.' Reply Br. at 2 n.1.

## BACKGROUND

Section 232 of the Trade Expansion Act of 1962, as amended 19 U.S.C. § 1862 (2012),[2] ("section 232") delineates the particular circumstances of when and how the President may take action to address imports that threaten to impair the national security of the United States.  The statute also sets forth the conduct and timing of the antecedent investigation into the potential national security threat.

Specifically, section 232 authorizes the Secretary of Commerce to commence an investigation "to determine the effects on the national security of imports" of any article, and to consult with the Secretary of Defense and other officials. 19 U.S.C. § 1862(b). Within 270 days, the Secretary of Commerce must then report the investigation's findings to the President.  <u>See</u> 19 U.S.C. § 1862(b)(3)(A).[3]  In that report, the Secretary must advise the President if "such article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security[.]" <u>Id.</u>  Within 90 days after receiving the Secretary's affirmative findings, the President must determine whether he or she concurs.  19 U.S.C. § 1862(c)(1)(A)(i).  Should he or she

---

[2] Further citations to the Tariff Expansion Act of 1962, as amended, are to the relevant provisions of the United States Code, 2012 edition.

[3] The statute further provides for consultation during the investigation process. To this end, the Secretary of Commerce must "immediately provide notice to the Secretary of Defense" of the investigation's commencement and, in the course of the investigation, "consult with the Secretary of Defense regarding the methodological and policy questions raised[.]"   19 U.S.C. §§ 1862(b)(1)(B), (b)(2)(A)(i).  The Secretary of Commerce must also "(ii) seek information and advice from, and consult with, appropriate officers of the United States, and (iii) if it is appropriate and after reasonable notice, hold public hearings or otherwise afford interested parties an opportunity to present information and advice relevant to such investigation."   19 U.S.C. § 1862(b)(2)(A)(ii)–(iii).  If requested by the Secretary of Commerce, the Secretary of Defense shall also provide the Secretary of Commerce "an assessment of the defense requirements of any article that is the subject of an investigation conducted under this section."   19 U.S.C. § 1862(b)(2)(B).

concur, the statute empowers the President to act to end that threat to national security. 19 U.S.C. § 1862(c)(1)(A)(ii).  In doing so, the President must "determine the nature and duration of the action" that in his or her judgment "must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security."  Id.  If, and once, the President decides to act, he or she must implement the action within 15 days.  19 U.S.C. § 1862(c)(1)(B).

On April 19, 2017, the Secretary of Commerce initiated an investigation to determine the effect of steel imports on national security.  See Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel, 82 Fed. Reg. 19,205, 19,205 (Bureau Indus. & Sec. Apr. 26, 2017) (background). The Secretary issued his report and recommendation to the President on January 11, 2018 ("Steel Report" or "January 11 Report"), within the time frame provided under section 232.  See Am. Compl. at Ex. 4 (BUREAU OF INDUS. & SECURITY, U.S. DEP'T OF COMMERCE, THE EFFECT OF IMPORTS ON THE NATIONAL SECURITY (2018) ("STEEL REPORT")). On March 8, 2018, within 90 days of receiving the report, the President issued Proclamation 9705 imposing a 25 percent tariff on imports of steel articles from all countries, including Turkey, effective March 23, 2018.[4]  See Am. Compl. at Ex. 1.

---

[4] In addition to remedial action of adjusting imports through tariff increases, section 1862(c)(3)(A) also grants the President authority to negotiate trade agreements to reduce the number of imports.  19 U.S.C. § 1862(c)(3)(A).  Stemming from the January 11 Report, the President pursued negotiations with certain countries to reach an agreement that "limits or restricts the importation into . . . the United States" of steel articles, and successfully reached agreement with certain countries within the statutorily prescribed 180-day period. See 19 U.S.C. § 1862(c)(3)(A).

(footnote continued)

On August 10, 2018, the President issued Proclamation 9772, which imposed a 50 percent tariff on steel articles imported from Turkey as of August 13, 2018.  See Proclamation 9772, 83 Fed. Reg. at 40,429.

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction under 28 U.S.C. § 1581(i)(2), (4) (2012).

The court will dismiss a complaint for failure to state a claim if it fails to allege facts "plausibly suggesting (not merely consistent with)" a showing that entitles the party to relief.  Bank of Guam v. United States, 578 F.3d 1318, 1326 (Fed. Cir. 2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)).  "Factual allegations must be enough to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678 (citation omitted). In deciding a motion to dismiss, the court "must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009).

---

The President adjusted action accordingly and published timely notice in the Federal Register, issuing three Presidential Proclamations that announced agreements on alternate measures or deferred imposition of the tariffs on certain countries pending negotiation.  See Proclamation 9711 of March 22, 2018, 83 Fed. Reg. 13,361, 13,361 (Mar. 28, 2018) (reporting ongoing negotiations with Canada, Mexico, the Commonwealth of Australia ("Australia"), the Argentine Republic ("Argentina"), the Republic of Korea ("South Korea"), the Federative Republic of Brazil ("Brazil"), and the European Union member countries and deferring the tariff on steel articles from those countries); Proclamation 9740 of April 30, 2018, 83 Fed. Reg. 20,683, 20,683–84 (May 7, 2018) (limiting the temporary exemption for Canada, Mexico, and European Union member countries until June 1, 2018 and announcing an agreement with South Korea on a range of alternative measures, including a quota); Proclamation 9759 of May 31, 2018, 83 Fed. Reg. 25,857, 25,857–58 (June 5, 2018) (exempting from the steel tariffs Argentina, Australia, and Brazil, which had reached agreement with the United States on alternative measures).

## DISCUSSION

Plaintiff has stated a claim for which relief may be granted.  Plaintiff's factual allegations, which appear to be undisputed, support its claim to a refund of excess duties. Plaintiff alleges facts to demonstrate that, at the very least, the President issued Proclamation 9772 in violation of the equal protection component of the Fifth Amendment and without observing the statutorily required procedure under section 232.  Either theory defeats Defendants' motion to dismiss.

Plaintiff's arguments that Proclamation 9772 violates equal protection are sufficient to defeat Defendants' motion to dismiss. "[A] classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose."[5]  Armour v. City of Indianapolis, 566 U.S. 673, 680 (2012) (quotation marks and citation omitted). Defendants do not have a high hurdle to clear to survive a rational basis challenge—Defendants merely need to articulate any set of facts that rationally justify a distinction in classification, irrespective of whether the President himself actually justified his action at the time it was taken.  See Nordlinger v. Hahn, 505 U.S. 1, 15 (1992).  Especially in the area of economic regulation, this standard is forgiving.  See Armour v. City of Indianapolis, 566 U.S. at 680 (noting "where 'ordinary commercial transactions' are at issue, rational basis review requires deference to

---

[5] Although the Fifth Amendment does not contain a formally recognized equal protection clause, the Supreme Court has recognized an implicit protection where there exists "discrimination that is so unjustifiable as to be violative of due process." Sessions v. Morales-Santana, 137 S. Ct. 1678, 1686 n.1 (2017) (citing Weinberger v. Wiesenfeld, 420 U.S. 636, 638, n.2 (1975)).  This implicit protection is treated "precisely the same as equal protection claims under the Fourteenth Amendment."  Id. (citations and internal quotation marks omitted) (alteration in original).

reasonable underlying legislative judgments") (citations omitted); <u>Minnesota v. Clover Leaf Creamery Co.</u>, 449 U.S. 456, 469 (1981) (sustaining legislation treating plastic and non-plastic milk containers differently).   Given this standard, it is difficult to imagine Presidential action in connection with section 232 where one would be at a loss to conjure a rational justification; yet, the reality of this case proves otherwise.   Defendants submit no set of facts that justify identifying importers of steel from Turkey as a class of one.

In their motion to dismiss, Defendants point to a general need to increase the tariffs.  <u>See</u> Defs.' Br. at 17–18; Defs.' Reply Br. at 17.   A general need to increase tariffs, however, does not explain the singular imposition of a 50 percent tariff on Turkish steel articles.   Defendants also attempt to distinguish imports from Turkey as a class by referring to "the relatively high import volumes" of steel from Turkey and the 14 anti-dumping and countervailing duty ("AD/CVD") orders against its steel exports.   Defs.' Reply Supp. Mot. Dismiss at 17, July 10, 2019, ECF No. 27 ("Defs.' Reply Br."); <u>see also</u> Defs.' Br. at 17–18, 25.   However, the Steel Report identifies five countries with higher steel import volumes than Turkey.[6]  <u>See</u> STEEL REPORT at 28.   Further, the 14 AD/CVD orders on Turkish steel products do not make Turkey remarkable but typical, compared, for example, to China's 28 AD/CVD orders, India's 15 AD/CVD orders, Japan's 14 AD/CVD orders, and Taiwan's 13 AD/CVD orders.   <u>See</u> STEEL REPORT at App. K. Defendants' contention, that it is rational to "confront the national security threat from

---

[6] The President entered into negotiations with four of those countries—Canada, South Korea, Brazil, and Mexico—and reached agreements on alternative measures, thereby exempting those countries' steel exports. <u>See</u> Proclamation 9740, 83 Fed. Reg. at 20,683–84; Proclamation 9759, 83 Fed. Reg. at 25,857–58. With respect to Russia, which exported nearly one million metric tons of steel more than Turkey to the United States in 2017, the 25 percent tariff remains in effect. <u>See</u> STEEL REPORT at 28.

imports from all countries by specifically targeting countries" with high import volumes or numerous AD/CVD orders, does not explain what differentiates Turkey from other similarly situated countries—for the President to target alone.  Defs.' Reply Br. at 17–18; see Vill. of Willowbrook v. Olech, 528 U.S. 562, 565 (2000) (holding that plaintiff homeowner could assert an equal protection claim where village demanded a 33-foot easement, while requiring 15-foot easements from similarly situated property owners).  At oral argument, when pressed on this question, counsel for Defendants offered other possible reasons but did not connect them to Turkey.  Oral Arg. at 1:01:59–1:02:38 (arguing it would be appropriate for the President to differentiate countries based on anticipated increased import volumes or currency devaluation).  Whatever the President's real motivation may be, it is not this court's concern.[7]  See FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993) ("[I]t is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the [decision maker].").[8]  But we also cannot sustain a classification for which there is no offered—or even possible—rational justification tethered to the statute.  See id. at 312–13.

---

[7] Plaintiff points to the President's comment on social media: "I have just authorized a doubling of Tariffs on Steel and Aluminum with respect to Turkey as their currency, the Turkish Lira, slides rapidly downward against our very strong Dollar! Aluminum will now be 20% and Steel 50%. Our relations with Turkey are not good at this time!"  See Pl.'s Resp. Br. at 35; Am. Compl. at Ex. 10. The President's views of the United States' relationship with Turkey do not weigh in our analysis.

[8] Although Plaintiff and Defendants agree that the rational basis test applies, see Defs.' Br. at 23 and Pl.'s Resp. Br. at 30, the parties do not agree on the content of the rationality standard. Plaintiff asserts that the standard of rationality must have "some footing in the realities of the subject addressed by the legislation." Pl.'s Resp. Br at 30 (quoting Heller v. Doe, 509 U.S. 312, 321 (1993)).  Defendant contends that a less searching standard applies, arguing that the

(footnote continued)

Plaintiff also alleges facts that demonstrate that the President issued Proclamation 9772 in violation of the procedure set forth by Congress.  The statute's clear and unambiguous steps—of investigation, consultation, report, consideration, and action— require timely action from the Secretary of Commerce and the President.  However, the President did not issue Proclamation 9772 following this procedural path.  The Secretary of Commerce submitted his report to the President on January 11, 2018, which launched a 90-day period for the President to act.  The President acted on March 8, 2018 by imposing a 25 percent tariff on steel articles through Proclamation 9705.  See 19 U.S.C. § 1862(c)(1)(B).  However, the President issued Proclamation 9772 on August 13, 2018, far beyond the 90 days permitted to decide to act and the further 15 days allowed for implementation, to impose a 50 percent tariff on steel articles from Turkey.  See id.  The Secretary's January 11 Report, which serves as the foundation for Proclamation 9705, does not serve as the foundation for Proclamation 9772.

The attempt to justify Proclamation 9772 as a continuation or modification of Proclamation 9705 fails.  See Defs.' Br. at 20–23.  Defendants contend that the President retains power to modify any action taken under section 232, without conducting a new investigation or following the procedures set forth in the statute.  See id.; see also Defs.' Reply Br. at 7–12, 15.  Likewise, the President seems to have envisioned the Secretary

---

rationality standard may be satisfied by any "reasonably conceivable state of facts," and that such facts may be based on "rational speculation unsupported by evidence or empirical data." Defs.' Reply Br. at 18 (quoting Briggs v. Merit Sys. Prot. Bd., 331 F.3d 1307, 1318 (Fed. Cir. 2003) (internal citations omitted)) (citing Nordlinger v. Hahn, 505 U.S. 1, 15 (1993)).  For purposes of this motion, it is not necessary to resolve this issue. Assuming Defendants' less searching standard applies, Defendants have not proffered any facts, even those based on "rational speculation," that support the President's decision to increase tariffs on Turkish steel only.

of Commerce's January 11 Report as empowering him to take ongoing action.  The President in Proclamation 9705 states "[t]he Secretary shall continue to monitor imports of steel articles and shall, from time to time, . . . review the status of such imports with respect to the national security.  The Secretary shall inform the President of any . . . need for further action by the President."  Proclamation 9705, 83 Fed. Reg. at 11,628 ¶ (5)(b).  In Proclamation 9772, the President invokes Proclamation 9705 stating, "I also directed the Secretary to monitor imports of steel articles and inform me of any circumstances that in the Secretary's opinion might indicate the need for further action under section 232 with respect to such imports."   Proclamation 9772, 83 Fed. Reg. at 40,429 ¶ 3.[9]   The President's expansive view of his power under section 232 is mistaken, and at odds with the language of the statute, its legislative history, and its purpose.

Section 232 requires that the President not merely address a threat to national security; he must do all, that in his judgment, will eliminate it.  See 19 U.S.C. §§ 1862(c)(1)(A), (c)(3)(A) (instructing the President to take action "so that such imports will not threaten to impair the national security").[10]  Although the statute grants the President great discretion in deciding what action to take, it cabins the President's power

---

[9] The Proclamation continues: "The Secretary has informed me that while capacity utilization in the domestic steel industry has improved, it is still below the target capacity utilization level the Secretary recommended in his report. Although imports of steel articles have declined since the imposition of the tariff, I am advised that they are still several percentage points greater than the level of imports that would allow domestic capacity utilization to reach the target level." Proclamation 9772, 83 Fed. Reg. at 40,429 ¶ 4.

[10] Presidential Proclamation 9705 seems to envision an approach that "addresses" a threat rather than removing it.  "Under current circumstances, this tariff is necessary and appropriate to address the threat that imports of steel articles pose to the national security."  Proclamation 9705, 83 Fed. Reg. at 11,626 ¶ 8.

both substantively, by requiring the action to eliminate threats to national security caused by imports, and procedurally, by setting the time in which to act.[11]

In 1988, Congress added specific time limits to section 232, which preclude Defendants' arguments.  See Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100–418, Title I, §§ 1501(a), (b)(1), 102 Stat. 1107, 1257–60 (1988) (codified as amended at 19 U.S.C. § 1862).  Those amendments now impose a 90-day limit for the President to act against imports that threaten the national security.[12]  They also fix a 15-day deadline for the President to implement any action.  Id. at 1258; see also H.R. REP. NO. 100-576 at 711 (1988).[13]  The legislative history clarifies that Congress wanted the President to do all that he thought necessary as soon as possible.  See Trade Reform Legislation: Hearings Before the Subcomm. on Trade of the H. Comm. on Ways & Means, 99th Cong., 2d Sess. 1282 (1986) (statement of Hon. Barbara B. Kennelly, former

---

[11] Although, as Defendants note, courts cannot review "the President's actions to determine whether the facts support the remedy selected by the President in his exercise of the discretion afforded to him under the statute[,]" see Defs.' Reply Br. at 6, that discretion extends only to his concurrence that a threat exists and his selection of remedial action. See also Am. Inst. for Int'l Steel v. United States, 43 CIT __, __, 376 F. Supp. 3d 1335, 1344–45 (Mar. 25, 2019). ("[J]udicial review would allow neither an inquiry into the President's motives nor a review of his fact-finding."). Indeed, should the Secretary of Commerce not find a threat to impair national security, the President has no basis to disagree and no authority to take action. See 19 U.S.C. § 1862(c)(1)(A).

[12] The amendments also shortened the time limit for investigations by the Secretary of Commerce from one year to 270 days. See 102 Stat. at 1258; see also H.R. REP. NO. 100-576, at 709–10 (1988).

[13] Defendants argue that Presidents "frequently used Section 232 (and its predecessor in prior acts) to modify the means of accomplishing the necessary adjustment of imports without first receiving additional investigations and reports from the Secretary of Commerce (or predecessor advisor)."  Defs.' Br. at 20.  All instances cited by Defendants occurred before the 1988 amendments, which impose a 90-day deadline for action and a 15-day deadline for implementation of action.  Though Defendants concede that these deadlines reflect Congress's desire that the President act "without undue delay[,]" Defs.' Br. at 22, they fail to confront the necessary implication of the 90- and 15-day deadlines.  If the President has the power to continue to act, to modify his actions, beyond these deadlines, then these deadlines are meaningless.

Member, H. Comm. On Ways & Means) (discussing the need to set a deadline by which the President should act); <u>Comprehensive Trade Legislation: Hearings Before the Subcomm. on Trade of the H. Comm. on Ways & Means</u>, 100th Cong., 1st Sess. 466–67 (1987) (statement of Phillip A. O'Reilly, Chairman and CEO of Houdaille Industries, Inc., accompanied by James H. Mack, Public Affairs Director) (discussing delays in section 232 implementation); H.R. REP. NO. 99-581, pt. 1, at 135 (1986) ("The Committee believes that if the national security is being affected or threatened, this should be determined and acted upon as quickly as possible."); H.R. REP. NO. 100-40, pt. 1, at 175 (1987) ("The Committee believes that if the national security is being affected or threatened, this should be determined and acted upon as quickly as possible.").

Defendants also argue requiring the procedures of 19 U.S.C. § 1862(b)–(c) in support of Proclamation 9772 make no sense, because, by implication, these procedures would then have to be followed "any time a tariff is reduced or an exception is made for a particular product." Defs.' Br. at 23. However, the statute specifically grants the President power to "determine the . . . duration of the action[,]" a power to end any action. 19 U.S.C. § 1862(c)(1)(A)(ii). Likewise, Defendants' arguments that each exception from the steel tariffs for a particular product would require a new set of procedures are meritless, when Proclamation 9705 authorized the Secretary of Commerce to establish the overall process to exempt particular products, under certain conditions. <u>See</u> Defs.' Br. at 23; Defs.' Reply Br. at 15–16; <u>see also</u> Proclamation 9705, 83 Fed. Reg. at 11,629 ¶ (3).

The procedural safeguards in section 232 do not merely roadmap action; they are constraints on power. The Supreme Court has made clear that section 232 avoids

running afoul of the non-delegation doctrine because it establishes "clear preconditions to Presidential action." Fed. Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548, 559 (1976). The time limits, in particular, compel the President to do all that he can do immediately, and tie presidential action to the investigative and consultative safeguards.[14] If the President could act beyond the prescribed time limits, the investigative and consultative provisions would become mere formalities detached from Presidential action. However, Congress affirmatively linked the investigative and consultative safeguards to Presidential action, and Congress strengthened that link when it imposed time limits on the President's discretion to take action. Congress embedded these limits within its broad delegation of power to the President. As this court has recognized, "the broad guideposts of subsections (c) and (d) of section 232 bestow flexibility on the President and seem to invite the President to regulate commerce by way of means reserved for Congress, leaving very few tools beyond his reach." Am. Inst. for Int'l Steel v. United States, 43 CIT ___, ___, 376 F. Supp. 3d 1335, 1344 (2019) ("AIIS"). Further, it may be the case that judicial review will be unable to reach "a gray area where the President could invoke the statute to act in a manner constitutionally reserved for Congress but not objectively outside the President's statutory authority." Id. at 14. The broad discretion granted to the President and the limits on judicial review only reinforce the importance of the procedural safeguards Congress provided, and which the President appears to have ignored.

---

[14] In addition to the investigative and consultative steps required by the Secretary of Commerce, the statute only affords the President the power to act when the Secretary of Commerce's report finds that imports of an article threaten national security. If the President concurs, he has only the power to do what he "deems necessary to adjust the imports of such article and its derivatives so that such imports will not threaten to impair the national security." Algonquin, 426 U.S. at 559 (citation and internal quotations omitted).

Therefore, the Plaintiff has stated a claim for a refund because after the time periods set by Congress for Presidential action had passed, the President lacked power to take new action and issued Proclamation 9772 without the procedures as required by Congress.[15]  The court need not reach Plaintiff's arguments that Proclamation 9772 is ultra vires or runs afoul of due process at this time.

## CONCLUSION

In support of its motion, Defendants have failed to show that Plaintiff's complaint must be dismissed for failure to state a claim for a refund of duties on which relief can be granted.

**ORDERED** Defendants' motion to dismiss is denied, and it is further

**ORDERED**, the parties shall confer and submit a joint status report as to the issues to be briefed and a proposed scheduling order by Monday, December 9, 2019.

 /s/ Claire R. Kelly
Claire R. Kelly, Judge

 /s/ Jane A. Restani
Jane A. Restani, Judge

Dated: November 15, 2019
         New York, New York

---

[15] Where Congress envisioned ongoing action by the President it provided for it.  In subsection (c)(3), Congress provided for continuing action where the President sought to negotiate an agreement under subsection (c)(1), granting the President an additional 180 days to act. Thereafter, if such an agreement were "ineffective in eliminating the threat to the national security" the President "shall take such other actions as the President deems necessary." 19 U.S.C. § 1862(c)(3).

Katzmann, J., concurring.  I agree with my colleagues that the instant litigation can continue in the face of the Government's motion to dismiss the plaintiff's complaint, although the ultimate outcome remains for determination after further proceedings.  I write separately to note what is before the court in this case -- whether a statute has been violated -- and what is not -- whether that statute is constitutional.

The question before us at this preliminary stage is this:  Has the plaintiff, an American importer of Turkish goods containing steel articles subjected to tariffs imposed by Presidential Proclamation invoking Section 232 of the Trade Expansion Act of 1962, as amended in 18 U.S.C. § 1862 ("section 232"), countered the Government's motion  by alleging sufficient facts in its complaint that those tariffs have been imposed in violation of that statute, which provides that the President may impose tariffs on imports which "threaten to impair the national security"?

Not before us now is the fundamental constitutional question:  Does section 232, which provides power to the President in international trade without meaningful limitation, violate the Constitution's separation of powers, as it is Congress that exclusively has the "power To lay and collect Taxes, Duties, Imposts and Excises" and "to regulate Commerce with foreign Nations"?  U.S. Const. art. 1 § 8.[1]  That question was presented to this court earlier this year in American Institute for International Steel, Inc.  v.  United

---

[1] Under the Constitution, "[t]he president has no similar grant of substantive authority over economic policy, international or domestic.  Consequently, international trade policy differs substantially from other foreign affairs issues, such as war powers, where the president shares constitutional authority with Congress.  Where international trade policy is concerned, the president's authority is almost entirely statutory."  Timothy Meyer, Trade, Redistribution, and the Imperial Presidency, 44 Yale J. Int'l L. Online 16 (2018) (footnotes omitted), http://www.yjil.yale.edu/features-symposium-international-trade-in-the-trump-era/.  See Am. Inst. for Int'l Steel, Inc.  v.  United States, 43 CIT __, 376 F. Supp. 3d 1335, 1352 n.8 (2019) ("AIIS").

States, 43 CIT __, 376 F. Supp. 3d 1335 (2019) ("AIIS").   There, this court unanimously concluded that it was bound by the Supreme Court decision in Federal Energy Administration v. Algonquin SNG, Inc., 426 U.S. 548 (1976), which, in different circumstances involving licensing fees, stated that section 232's standards were "clearly sufficient" to confine presidential action consistent with the separation of powers.[2]   In a dubitante opinion in AIIS, 376 F. Supp. 3d at 1345–52, I respectfully suggested that section 232, lacking ascertainable standards, "provides virtually unbridled discretion to the President with respect to the power over trade that is reserved by the Constitution to Congress," in violation of the separation of powers.  Id. at 1352.  "[T]he fullness of time" and "real recent actions" may provide an empirical basis to revisit assumptions and inform understanding of the statute.  Id.

I submit that the case before us may well yield further evidence of the infirmity of the statute.[3]   To so note is not to diminish, in other arrangements not involving constitutional authority lodged exclusively in Congress, the dependence of Congress on executive officials to implement its programs.  See Gundy v. United States, 139 S. Ct. 2116, 2147 (2019); AIIS, 376 F. Supp. 3d at 1352.  Nor is it to diminish the flexibility

---

[2] The Court cautioned "that the imposition of a license fee is authorized by § 232(b) in no way compels the further conclusion that any action the President might take, as long as it has even a remote impact on imports, is also so authorized."  Algonquin, 426 U.S. at 571 (emphasis in original).

[3] The AIIS plaintiffs filed an appeal in the United States Court of Appeals for the Federal Circuit, appeal docketed, No. 19-1727 (Fed. Cir. Mar. 25, 2019) and also sought direct review by the Supreme Court.  379 F. Supp. 3d 1335, cert. denied, 139 S. Ct. 2748 (2019).  The Supreme Court denied the petition for direct review (without addressing the appeal filed before the United States Court of Appeals for the Federal Circuit or potential appeals therefrom).  Id.  The AIIS appeal is now before the Federal Circuit.  379 F. Supp. 3d 1335, appeal docketed, No. 19-1727 (Fed. Cir. Mar. 25, 2019).

allowed the President in the conduct of foreign affairs, see United States v. Curtiss-Wright Export Corp., 299 U.S. 304 (1936), or, for example, the authority of the executive to impose sanctions on foreign entities which endanger American interests.  See, e.g., U.S. Dep't of Treasury, Financial Sanctions: United States Statutes, https://www.treasury.gov/resource-center/sanctions/Pages/statutes-links.aspx (last visited Nov. 12, 2019) (listing a selection of sanctions statutes as identified by the U.S. Department of Treasury, Office of Foreign Asset Control).

In the end, as the case before us is framed, we proceed assuming the constitutionality of the statute.  The statute's investigative and consultative steps, within prescribed time limits, are not advisory and, as my colleagues have set forth, cannot be ignored without consequence.  Based on the facts alleged in the complaint, the violation of procedure and the absence of a rationale to justify differential treatment, warrant the conclusion at this preliminary stage that the Government has failed to show that plaintiff's complaint must be dismissed for failure to state a claim for a refund of duties on which relief can be granted.

  /s/ Gary S. Katzmann
  Gary S. Katzmann, Judge