Slip Op. 20-98

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| TRANSPACIFIC STEEL LLC, <br><br> Plaintiff, <br><br> BORUSAN MANNESMANN BORU SANAYI VE TICARET A.S., ET. AL <br><br> Intervenor Plaintiffs, <br><br> v. <br><br> UNITED STATES ET AL., <br><br> Defendants. | Before: Claire R. Kelly, Gary S. Katzmann, and Jane A. Restani, Judges <br><br> Court No. 19-00009 |

### <u>OPINION</u>

[Proclamation 9772 imposing additional § 232 duties on Turkish steel violates statutorily mandated procedures and the Constitution's guarantee of equal protection under law]

Dated: July 14, 2020

<u>Matthew M. Nolan</u> and <u>Russell A. Semmel</u>, Arent Fox LLP, of Washington, DC, argued for plaintiff Transpacific Steel LLC. With them on the brief were <u>Aman Kakar</u>, <u>Andrew A. Jaxa-Debicki</u>, <u>Diana Dimitriuc-Quaia</u>, and <u>Jason R. U. Rotstein</u>.

<u>Julie C. Mendoza</u>, <u>Brady W. Mills</u>, <u>Donald B. Cameron</u>, <u>Eugene Degnan</u>, <u>Mary S. Hodgins</u>, and <u>Rudi W. Planert</u> Morris, Manning, & Martin, LLP, of Washington, DC, for intervenor plaintiff Borusan Mannesmann Boru Sanayi ve Ticaret A.S., et. al.

<u>Lewis Evart Leibowitz</u>, the Law Office of Lewis E. Leibowitz, of Washington, DC, for intervenor plaintiff the Jordan International Company.

<u>Tara K. Hogan</u>, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, <u>Stephen C. Tosini</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, and <u>Meen Geu Oh</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, argued for defendants. With them on the brief were Joseph

H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Joshua E. Kurland, Trial Attorney.

Restani, Judge: The question before us is whether President Trump issued Proclamation No. 9772 of August 10, 2018, 158 Fed. Reg. 40,429 (Aug. 15, 2018) ("Proclamation 9772") in violation of the animating statute and constitutional guarantees. We hold that he did. Proclamation 9722 is unlawful and void.

 Plaintiff Transpacific Steel LLC ("Transpacific"), a U.S. importer of steel, requests a refund[1] of the additional tariffs it paid pursuant to Proclamation 9772 on certain steel products from the Republic of Turkey ("Turkey").[2] See Proclamation No. 9705 of March 8, 2018, 83 Fed. Reg. 11,625 (Mar. 15, 2018) ("Proclamation 9705") (imposing a 25 percent tariff duty on steel products from several countries); Proclamation 9772 (imposing a 50 percent tariff duty on steel products from Turkey alone); Am. Compl., ECF No. 19, ¶¶ 2, 4 (Apr. 2, 2019) ("Am. Compl."). Plaintiffs argue that Proclamation 9772 is unlawful because it lacks a nexus to national security, was issued without following mandated

---

[1] Transpacific asserts that it paid over $2.8 million as a result of the additional tariffs. See Am. Compl. at Ex. 3.

[2] After we issued our decision denying the government's motion to dismiss, Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. ("BMB"), a steel pipe producer in Turkey and non-resident U.S. importer and Borusan Mannesmann Pipe U.S. Inc. ("BMP") (collectively "Borusan") and the Jordan International Company ("Jordan") were granted leave to intervene as Plaintiff-Intervenors. Order Granting Borusan's Mot. to Intervene, ECF No. 39 (Dec. 10, 2019); Order Granting Jordan's Mot. to Intervene, ECF No. 46 (Dec. 13, 2019). Borusan, Jordan, and Transpacific jointly submitted a motion and brief for judgment on the agency record. Pl. Transpacific & Pl.-Intervenors. Borusan, et al.'s 56.1 Mot. for J. on the Agency R., ECF No. 51 (Jan. 21, 2020) ("Pl. Br."). For ease of reference, we refer to Transpacific, Borusan, and Jordan collectively as "Plaintiffs."

statutory procedures, and singles out importers of Turkish steel products in violation of

Fifth Amendment Equal Protection and Due Process guarantees.

## BACKGROUND

During the Cold War, Congress enacted Section 232 of the Trade Expansion Act

of 1962, which authorized the President to adjust imports that pose a threat to the national

security of the United States. <u>See</u> Trade Expansion Act of 1962, Pub. L. No. 87-794, Title

II, § 232, 76 Stat. 872, 877 (1962) (codified as amended 19 U.S.C. § 1862) ("Section

232"). Since its original passage, there have been several amendments of the statute of

varying magnitude including: altering the agency responsible for advising the president,

shortening the time limit for investigation, and adding a congressional override for

presidential actions taken to adjust petroleum imports. <u>See</u> <u>generally</u>, Trade Act of 1974,

Pub. L. No. 93-618, Title I, § 127, 88 Stat. 1978, 1993–94 (1974); Crude Oil Windfall Profit

Tax Act of 1980, Pub. L. No. 96-223, Title IV, § 402, 94 Stat. 229, 301–02 (1980). The

most recent substantive change to Section 232 occurred in 1988, when the statute was

altered to add time limits on the President's ability to act pursuant to the Secretary of

Commerce's affirmative finding that investigated imports are a threat to national security.

<u>See</u> Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100–418, Title I, §

1501, 102 Stat. 1107, 1257–60 (1988). As it currently stands, the process to adjust

imports under Section 232 is as follows.

First, the Secretary of Commerce ("Secretary"), in consultation with the Secretary

of Defense, initiates an investigation "to determine the effects on the national security of

imports of the article[s]."  19 U.S.C. § 1862(b)(1)(A). No later than "270 days after the

date on which an investigation is initiated, the Secretary shall submit to the President a

report on the findings" that will advise the President if articles being imported into the United States threaten to impair national security and recommend appropriate action. Id. § 1862(b)(3)(A). Second, after receiving the Secretary's report, the President "[w]ithin 90 days," must determine whether he or she concurs with the Secretary and, if so, "determine the nature and duration of the action" to "adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security."[3] Id. § 1862(c)(1)(A). In making this assessment, the President "shall" consider various non-exhaustive factors listed in § 1862(d). Id. §1862(d). The President "shall implement that action" no later than 15 days from his or her decision to take such action.[4] Id. § 1862(c)(1)(B). Finally, within 30 days after making any determination, the President must submit to Congress a written statement of reasons for taking that action. Id. § 1862(c)(2). Notably, the time limits described were added as part of the 1988 amendments. See Omnibus Trade and Competitiveness Act of 1988 § 1501. President Trump's recent proclamations are the first issued pursuant to Section 232 since the passage of these amendments. See CONG. RESEARCH SERV., R45249, SECTION 232 INVESTIGATIONS: OVERVIEW AND ISSUES FOR CONGRESS, App'x B (Apr. 7, 2020) ("CRS 232 Overview").

---

[3] This timeline is altered if the chosen action is to negotiate an agreement limiting importation into or exportation to the United States. 19 U.S.C. §1862(c)(3)(A); see also Transpacific Steel LLC v. United States, 415 F. Supp. 3d 1267, 1276 n.15 (CIT 2019) ("Transpacific I").

[4] While termination of proclamations is provided for in 19 U.S.C. § 1885(b), piecemeal increases to existing 232 duties would interfere with the carefully designed statutory scheme, including the right of Congress to know the reasons for and to react to the duties imposed. See 19 U.S.C. § 1862(c)(2).

On April 19, 2017, the Secretary initiated an investigation into the effect of imported steel on national security. See Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel, 82 Fed. Reg. 19,205 (Dep't Commerce Apr. 26, 2017).  On January 11, 2018, the Secretary issued his report and recommendation to the President. See The Effect of Imports of Steel on the National Security, (Dep't Commerce Jan. 11, 2018) ("Steel Report").[5] In response, on March 8, 2018, President Trump issued Proclamation 9705, which imposed a 25 percent ad valorem tariff on imports of steel products[6] effective March 23, 2018. See Proclamation 9705. On August 10, 2018, the President issued Proclamation 9772, which imposed a 50 percent ad valorem tariff on steel products imported from Turkey, effective August 13, 2018. See Proclamation 9772. The additional tariffs on Turkish steel products remained in place until the President issued Proclamation 9886, which removed the additional tariffs on Turkish steel products, effective May 21, 2019. See Proclamation No. 9886 of May 16, 2018, 84 Fed. Reg. 23,421 (May 21, 2019) ("Proclamation 9886").

## JURISDICTION AND STANDARDS OF REVIEW

The court has jurisdiction under 28 U.S.C. §§ 1581(i)(2) and (4). A President's action under Section 232 may be reviewed for a "clear misconstruction of the governing

---

[5] A summary of the Steel Report was not published in the Federal Register until July 6, 2020, even though 19 U.S.C. § 1862(b)(3)(B) requires that "any portion of the report submitted by the Secretary . . . which does not contain classified information or proprietary information shall be published in the Federal Register." 19 U.S.C. § 1862(b)(3)(B); see also Publication of a Report on the Effect of Imports of Steel on the National Security, 85 Fed. Reg. 40,202 (Dep't Commerce July 6, 2020). Plaintiffs do not raise this issue and we do not rely on it.

[6] Proclamation 9705 applied to all countries except Canada and Mexico. See Proclamation 9705, ¶ 8.

statute, a significant procedural violation, or action outside delegated authority." <u>See</u>
<u>Maple Leaf Fish Co. v. United States</u>, 762 F.2d 86, 89 (Fed. Cir. 1985). In evaluating an
equal protection claim involving neither fundamental rights nor a suspect classification,
the court will apply the rational basis test, which asks "if there is a rational relationship
between the disparity of treatment and some legitimate governmental purpose." <u>Armour</u>
<u>v. City of Indianapolis</u>, 566 U.S. 673, 680 (2012) (quotations and citations omitted). In
evaluating a Due Process challenge, the court considers whether there was a
deprivation of a constitutionally protected life, liberty, or property interest and, if so,
whether the necessary procedures were followed. <u>See</u> <u>Board of Regents of State</u>
<u>Colleges v. Roth</u>, 408 U.S. 564, 570–74, 76–77 (1972).

## DISCUSSION

**I.    Whether the President Violated Section 232's Procedural Requirements**

Plaintiffs argue that the President violated statutorily mandated temporal
conditions, and investigation and report procedures in issuing Proclamation 9772. Pl. Br.
at 22–28. In their view, to avoid delegation of powers concerns, the President is bound
by these statutory restrictions. <u>Id.</u> at 22–24. Plaintiffs note that the statute requires the
President to make a decision based on the Secretary's report and recommendation within
90 days and then implement any chosen action another 15 days after that decision. <u>Id.</u> at
25 (citing 19 U.S.C. § 1862(c)(1)(A)-(B)). Insofar as the government argues that
Proclamation 9772 is a modification of the earlier, timely Proclamation 9705, Plaintiffs
assert that there is no statutory basis for a purported modification of a previous
proclamation and that allowing this interpretation would render the timelines meaningless.
<u>Id.</u> at 26. Further, Plaintiffs argue that Proclamation 9772 was issued not following a

formal report as required by the statute, but following informal information the President had later received from the Secretary. Id. at 26–28.

The government responds that Congress "inten[ded] to confer continuing authority and flexibility on the President to counter the threat identified" as confirmed by the "language, long-standing congressional understanding, and the purpose of the statute . . ." Defs.' Resp. in Opp'n to Pls.' Mot. for J., ECF No. 55 at 16 (Mar. 9, 2020) ("Gov. Br."). In its view, to require the President to strictly abide by the time restraints in the statute would frustrate its statutory purpose. Id. at 17. The government takes an expansive reading of the statutory terms "nature," "duration," and "implement" and finds that these terms indicate that the President has authority to revisit and modify previous actions taken under Section 232. Id. at 17–19 (citing congressional statements from 1955). Although the government acknowledges that the 1988 amendments intended to accelerate the 232 process, it contends that nothing in those amendments intended to prevent the President from making modifications to earlier Proclamations. Id. at 19–22. The government further contends that requiring the President to act within the temporal windows in the statute would undermine the purpose of Section 232 and would "convert the time-deadlines into impermissible sanctions," when those deadlines are in fact "directory, not mandatory." Id. at 22–27.

The language of the statute is clear, however. After receiving a report from the Secretary, "[w]ithin 90 days," and if the President concurs, he or she shall "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports." 19 U.S.C. § 1862(c)(1)(A). Then the President "shall implement that action by no later than the date that is 15 days after" the determination to take action is

made. Id. § 1862(c)(1)(B). As noted in our previous decision, Proclamation 9772 was issued far beyond this temporal window. Transpacific I, 415 F. Supp. 3d at 1273–74. The government continues to argue that the President is permitted to modify his previous proclamation, but as we have already said, "[t]he President's expansive view of his power under section 232 is mistaken, and at odds with the language of the statute, its legislative history, and its purpose." Id. at 1274–75 (citing legislative history undermining the contention that the President can take under Section 232 outside the prescribed time limits).

National security is dependent on sensitive and ever-changing dynamics; the temporal restrictions on the President's power to take action pursuant to a report and recommendation by the Secretary is not a mere directory guideline, but a restriction that requires strict adherence. To require adherence to the statutory scheme does not amount to a sanction, but simply ensures that the deadlines are given meaning and that the President is acting on up-to-date national security guidance. The President is, of course, free to return to the Secretary and obtain an updated report pursuant to the statute. As the government acknowledges, the 1988 Amendments were passed against the backdrop of President Reagan's failing to take timely action in response to the Secretary's report finding that certain machine tools threatened to impair national security and Congress's resulting frustration. Gov. Br. at 20–21 (citing Hearings Before the Committee on Ways and Means on H.R. 3 Trade and International Economic Policy Other Proposals Reform Act, 100th Congr. (1987); Hearings Before the Subcommittee on Trade of H. Comm. On Ways & Means, 99th Cong., 2d Sess. 1282 (1986)). The purpose and legislative history support that the time limits here were very much intended to require presidential action in

a timely fashion, not just encourage it.[7] See Transpacific I, 415 F. Supp. 3d at 1275 (citing legislative history from the 1988 Amendments). Finally, as we noted previously, when Congress means to allow action outside of a set temporal window, it provides for it. See id. at 1276 n.15 (citing 19 U.S.C. § 1862(c)(3)).

Contrary to the government's contention, there is nothing in the statute to support the continuing authority to modify Proclamations outside of the stated timelines. The government offers no citation to the statute nor to the recent legislative history to support this theory. Instead, the government relies on legislative history prior to the 1988 amendments. See Gov. Br. at 18–19. As originally enacted, Section 232 may have allowed for the President to modify previous Proclamations as a form of continuing authority. See H.R. Rep. No. 84-745, at 8158 (1955). The court is also aware that prior to the recent amendments, several Presidents modified President Eisenhower's Proclamation No. 3279 of March 10, 1959, 24 Fed. Reg. 1781 (Mar. 12, 1959)

---

[7] The government cites several cases for the proposition that when a statute does not specify a consequence for failing to meet a deadline, the deadline is merely directory. See Barnhart v. Peabody Coal Co., 537 U.S. 149, 159 (2003); Hitachi Home Electronics (America), Inc. v. United States, 661 F.3d 1343, 1345-46 (Fed. Cir. 2011); Gilda Industries, Inc. v. United States, 622 F.3d 1358, 1365 (Fed. Cir. 2010); Canadian Fur Trappers Corp. v. United States, 884 F.2d 563, 566 (Fed. Cir. 1989). Such cases do not address delegation to the President in an area normally belonging to Congress, i.e. import duties. As discussed infra, without meaningful limits such delegation is improper. Further, the resulting consequences of finding that the deadlines in these cases were mandatory would have had greater permanence than simply requiring the President to return to the Secretary for a current report. Barnhart, 537 U.S. at 160 (deadline was directory as otherwise the consequence would be to "shift financial burdens from otherwise responsible private purses to the public fisc."); Hitachi, 661 F.3d at 1348 (deadline was directory and failing to meet that deadline did not strip Customs of its power to allow or deny a protest); Canadian Fur, 884 F.2d at 566 (deadline was directory and failure for Customs to meet a deadline did not result in liquidation); Gilda, 662 F.3d at 1365 (failure of the United States Trade Representative to timely comply with notice obligations did not mean a retaliatory action would not terminate.).

("Proclamation 3279") on Petroleum and Petroleum Products with the latest "modification" occurring under President Reagan in <u>Proclamation No. 4907 of March 10, 1982</u>, 47 Fed. Reg. 10,507 (Mar. 10, 1982). But the statutory scheme has since been altered, and the court must give meaning to those alterations. The 1988 amendments prescribed time limits, as described above, but also deleted language that could be read to give the President the power to continually modify Proclamations. <u>See</u> Omnibus Trade and Competitiveness Act of 1988 § 1501. Prior to the 1988 amendments, the relevant provision read "and the President shall take such action, and for such time, as he deems necessary to adjust the imports of such article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(b) (1982). The current relevant provisions omit the clause "and for such time." <u>See</u> 19 U.S.C. § 1862(b),(c) (2018). These changes appear to further restrict the time under which the president can act to adjust imports under 19 U.S.C. § 1862. Until the current administration, no President had issued a Proclamation after the 1988 changes, so there was no occasion to consider whether modifying an existing Proclamation remained an allowable exercise. <u>See</u> CRS 232 Overview, App'x B. Given the changes in the statute, the court holds that regardless of whether modifications were permissible before, "modifications" of existing Proclamations under the current statutory scheme, without following the procedures in the statute, are not permitted.

In <u>Federal Energy Administration v. Algonquin SNG, Inc.</u>, the Court stressed the importance of the procedural safeguards in holding that Section 232 was not an impermissible delegation of congressional authority over imports. 426 U.S. 548, 559 (1976). As we stated previously, "[i]f the President could act beyond the prescribed time

limits, the investigative and consultative provisions would become mere formalities detached from Presidential action." Transpacific I, 415 F. Supp. 3d at 1276. Section 232 grants the President great, but not unfettered, discretion. The President exceeded his authority in issuing Proclamation 9772 outside of the temporal limits required by Section 232.

## II.   Whether the President Exceeded His Authority by Issuing a Proclamation Purported to Lack a Nexus to National Security

Plaintiffs contend that the President exceeded his authority in issuing Proclamation 9772 because the Proclamation lacked a nexus to Section 232's national security objective, which would render the Proclamation ultra vires.  Pl. Br. at 14–22. Accordingly, they contend that the court may review whether the issuance of the Proclamation 9772 falls within the authority granted to the President under the statute. Id. at 14–16. Citing various D.C. Circuit Court opinions, Plaintiffs argue that this court should engage in such review to determine whether the President acted in conformity with Section 232. See id. at 14–16 (citing Independent Gasoline Marketers Council, Inc. v. Duncan, 492 F. Supp. 614 (D.D.C.1980); AFL-CIO v. Kahn, 618 F.2d 784 (D.C. Cir. 1979) (en banc); United States Chamber of Commerce v. Reich, 74 F.3d 1322 (D.C. Cir. 1996)). Turning to the facts at hand, Plaintiffs argue that Proclamation 9772 was not motivated by proper national security considerations, such as those listed in 19 U.S.C. § 1862(d), but was issued to employ "diplomatic leverage against a foreign government."[8] See id. at 18–22.

---

[8] Plaintiffs ask the court to consider President Trump's tweet regarding the detainment of Pastor Andrew Brunson in Turkey and his tweet roughly two weeks later declaring: "I have just authorized a doubling of Tariffs on Steel and Aluminum with respect to Turkey as their currency, the Turkish Lira, slides rapidly downward against our very strong Dollar!

They further contend that because imports of Turkish steel products comprise only a comparatively small percentage of steel products imported into the United States, doubling tariffs on those products would have too remote an effect to address national security concerns detailed in the Steel Report. Id. at 21.

The government responds that any analysis of whether Proclamation 9772 has a nexus to Section 232's national security purpose requires the court to engage in an improper inquiry into the President's fact-finding. Gov. Br. at 12–16. It contends that the court cannot analyze the President's action beyond inquiring whether the action taken was "of a type permitted by the statute." Id. at 13. In the government's view, any evaluation of the President's motivations is foreclosed. Id. at 13–15.

The court declines to consider proffered evidence of the President's "true motive" or question his fact-finding. Even if warranted, such an inquiry is unnecessary to the disposition of this matter. What is evident is that the President acted beyond the procedural limitations set forth in the statute in issuing Proclamation 9772, rendering his action ultra vires. In addition to acting outside of the time limitations as noted above, he acted without a proper report and recommendation by the Secretary on the national security threat posed by imports of steel products from Turkey. See Proclamation 9772.

---

Aluminum will now be 20% and Steel 50%. Our relations with Turkey are not good at this time!." See Pl. Br. at 19 (citing Donald J. Trump (@realDonaldTrump), TWITTER (Aug. 10, 2018, 8:47 AM), twitter.com/realdonaldtrump/status/1027899286586109955; Donald J. Trump (@realDonaldTrump), TWITTER (July 26, 2018, 11:22 AM), twitter.com/realdonaldtrump/status/1022502465147682817). Plaintiffs further cite tweets and statements issued after Proclamation 9772 went into effect in which the President appears to threaten to destroy the Turkish economy. See id. at 19–20. Because we do not review the President's fact-finding, we decline to consider this evidence in relation to Plaintiffs' statutory challenge. See Florsheim Shoe Co., Div. of Interco, Inc. v. United States, 744 F.2d 787, 796 (Fed. Cir. 1984).

The Steel Report assesses the impact of steel imports in the aggregate on national security and makes no finding regarding Turkey specifically. See generally, Steel Report. Other than the Steel Report, Proclamation 9772 mentions informal discussions between the President and the Secretary regarding the changes to capacity utilization in the domestic steel industry after Proclamation 9705 and how additional tariffs on steel products from Turkey would be "a significant step toward ensuring the viability of the domestic steel industry." See Proclamation 9772 ¶¶ 4, 6. The President is not authorized to act under Section 232 based on any off-handed suggestion by the Secretary; the statute requires a formal investigation and report.[9] See 19 U.S.C.A. § 1862(b), (c). To clarify, the court does not decide that there was not a national security threat meriting new duties, but instead simply holds that there was no procedurally proper finding of that

---

[9] President Ford's modification of Proclamation 3279, with Proclamation No. 4341 of January 23, 1975, 40 Fed. Reg. 3965 (January 27, 1975) ("Proclamation 4341"), the Proclamation at issue in Algonquin, was issued only after the Secretary issued a report pursuant to 19 U.S.C. § 1862(b). See Algonquin, 426 U.S. 548, 554 (1976). The Court's decision that Section 232 was not an improper delegation was based, in part, on the required precondition that the Secretary make a finding and issue a report. Id. at 559. Allowing the President to skirt this precondition would potentially pose delegation concerns. Further, it is not an insurmountable burden to require that the President return to the Secretary and obtain a new report prior to taking action under Section 232. As noted in a memorandum opinion by the then Assistant Attorney General in the Office of Legal Counsel, the report issued prior to Proclamation 4341 was "completed in only ten days." See Mem. Op. for the Deputy Att'y Gen. "The Presidents Power to Impose a Fee on Imported Oil Pursuant to the Trade Expansion Act of 1962," 6 Op. O.L.C. 74, at 80 (Jan. 14, 1982).

threat.[10] Thus, the President was not empowered under Section 232 to issue Proclamation 9772.[11]

### III.   Equal Protection

In addition to their statutory claims, Plaintiffs raise a Fifth Amendment Equal Protection challenge to Proclamation 9772. Pl. Br. at 28–38. Their basic contention is that the Proclamation discriminates between similarly situated importers based on the origin of their imports without rational justification. Id. at 28–34. Plaintiffs argue that the government has offered no sensible reason for targeting imports from Turkey and that no reasonable rationale is apparent. Id. at 30–34. Although Plaintiffs acknowledge that Turkey is named in the Steel Report, they argue that the Secretary's determination was based on the import of steel products in the aggregate and that nothing in the Steel Report supports additional duties on Turkish steel products alone.[12] Id. at 31–34. At base,

---

[10] The court is respectful of separation of powers and does not opine on the wisdom of the President's foreign policy. Our role here is to decide whether the statute at issue has been followed.

[11] The court does not foreclose the possibility that a future action could arise that, although procedurally sound, nonetheless is devoid of any discernable national security objective and thus subject to court review. See Am. Inst. for Int'l Steel, Inc. v. United States, 376 F. Supp. 3d 1335, 1344 (CIT 2019) ("To be sure, section 232 regulation plainly unrelated to national security would be, in theory, reviewable as action in excess of the President's section 232 authority.").

[12] Plaintiffs also cite a report from Commerce indicating that there has recently been a greater reduction of steel product imports from Turkey when compared to several other countries listed in the Steel Report. Pl. Br. at 32 (citing DEP'T OF COMMERCE, INT'L TRADE ADMIN., Global Steel Trade Monitor, Steel Imports Report: United States at 3 (June 2018) (noting that between 2017 and 2018, steel imports from Turkey decline by 59 percent by volume and 49 percent by value, whereas most top import source countries increased their exports of steel to the United States).

Plaintiffs argue that that Proclamation 9772 drew an arbitrary and irrational distinction by doubling the tariff rate on Turkish steel products and was based on an impermissible purpose.[13] Id. at 34–38.

The government responds that to succeed on their equal protection claim, Plaintiffs must first show that the government "intended to discriminate against the claimant or group," and then show that the classification lacks a connection to an "identifiable state interest." Gov. Br. at 28. Because the Plaintiffs cannot show that the President intended to discriminate against any importers of Turkish steel products, the government argues that the Plaintiffs' equal protection claim fails. Id. at 28–34. The government further argues that levying additional tariffs on Turkish steel products alone was a reasonable step towards the legitimate purpose of national security, even if it was just an incremental step towards that purpose. Id. at 34–39. Finally, it contends that Plaintiffs unjustifiably attempt to make a statutory interpretation case into a constitutional one. Id. at 38–40. In reply, Plaintiffs argue that the government has overstated their "burden to prove their equal protection claim." Pl. Reply to Def's Resp. to Pl.s' Mot. for J. on the Agency R., ECF No. 60 at 14 (Apr. 9, 2020) ("Pl. Reply"). They further point out that discrimination in this case "is clear on the face of the proclamation," and that the cases cited by the government involved facially neutral policies. Pl. Reply at 15–16.

At the outset, the government mistakes a factor sufficient to result in an Equal Protection violation for one necessary to succeed on such a claim. An intent to

---

[13] As described in supra note 8, Plaintiffs highlight statements made by the President that supposedly indicate that Proclamation 9772 was motivated by Turkey's detention of Pastor Andrew Brunson. Pl. Br. at 36–38. In their view, the President's action was guided by impermissible animus against Turkey. Id.

discriminate or "bare desire to harm a politically unpopular group" will result in a violation of the Constitution's Equal Protection clause as it "cannot constitute a legitimate government interest," Romer v. Evans, 517 U.S. 620, 634 (1996) (quoting Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973)) (quotation marks omitted), but this does not mean discriminatory motive is required to find a violation. The disparate impact cases cited by the government are inapposite as they do not focus on the central issue here–whether the challenged action was rationally related to a legitimate government purpose. See McCleskey v. Kemp, 481 U.S. 279, 293, 298–99 (1987) (Georgia death penalty statute disproportionately used against Black defendants); Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 273 (1979) (gender-neutral statute that had disproportionately adverse effects on women); Washington v. Davis, 426 U.S. 229, 237–39 (1976) (police officer examination that had disproportionately adverse effects on Black applicants).

The Constitution's Equal Protection guarantees apply to actions taken by the federal government through the Fifth Amendment. See Bolling v. Sharpe, 347 U.S. 497, 499 (1954). The fundamental question is whether the government's action is justified by sufficient purpose. See Romer, 517 U.S. at 635 ("[A] law must bear a rational relationship to a legitimate governmental purpose."). The Proclamation at issue here distinguishes between imports on the basis of country of origin. See Proclamation 9772. Disparate treatment alone, however, does not violate the Equal Protection Clause, if "(1) a rational purpose underlies the disparate treatment, and (2) [the governmental decisionmaker] has not achieved that purpose in a patently arbitrary or irrational way." Belarmino v. Derwinski, 931 F.2d 1543, 1544 (Fed. Cir. 1991) (citing United States R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 177 (1980). Because the purpose need not be articulated at the time, any

legitimate purpose is sufficient.[14] See Nordlinger v. Hahn, 505 U.S. 1, 15 (1992) ("[T]his Court's review does require that a purpose may conceivably or may reasonably have been the purpose and policy of the relevant governmental decisionmaker.") (citation and quotation marks omitted); see also Trump v. Hawaii, 138 S.Ct. 2392, 2420 (2018) (considering plaintiffs' extrinsic evidence, but upholding a challenged presidential proclamation "so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds."). Thus, to survive rational basis review, Proclamation 9772 must be a rational way of achieving a legitimate government purpose.

National security is a legitimate purpose, see Trump v. Hawaii, 138 S.Ct. at 2421, so the court must assess whether additional tariffs on imported steel products from Turkey is a "rational means to serve" this "legitimate end." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 442 (1985). Unlike the determination made by the Court in Trump v. Hawaii, there is no "persuasive evidence" here to support that the President's proclamation "has a legitimate grounding in national security concerns." 138 S.Ct. at 2421.[15] In that case, the "Proclamation explain[ed], in each case the determinations were

---

[14] In prior cases, the Court has not required that the "purpose" of the law be the actual purpose because the legislature is not required to offer a rationale when enacting a statute. See F.C.C. v. Beach Comm, Inc., 508 U.S. 307, 315 (1993) ("Moreover, because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."). It is unclear whether this reasoning applies with equal force to the situation before us today, as the challenge is to a presidential proclamation, rather than a legislative act, and the President is required to state his reasons for acting pursuant to Section 232. See 19 U.S.C. §§ 1862(c)(2), (c)(3)(A), (c)(3)(B). Accordingly, whether any conceivable reasonable purpose would suffice here is an open question.

[15] The government relies heavily on Trump v. Hawaii for the proposition that an Equal Protection challenge cannot succeed without evidence of animus. See Oral Argument at

justified by the distinct conditions in each country."   Id. In contrast, here, Proclamation

9772 is purportedly based on the Steel Report, which evaluated the collective impact of

global steel imports on national security, and not the impact of imports from Turkey

individually. See Proclamation 9772 ¶ 1; see also Steel Report at 55–57 (concluding that

the global excess capacity of steel and imports into the United States "threaten[s] to

impair" national security). The national security concerns were characterized as "[t]he

displacement of domestic steel by imports," and the resulting effect on the United States

economy, and the ability to "meet national security requirements." See Steel Report at

57. Singling out steel products from Turkey is not a rational means of addressing that

concern. Section 232 does not ban the President from addressing concerns by focusing

on particular exporters, but the decision to increase the tariffs on imported steel products

from Turkey, and Turkey alone, without any justification, is arbitrary and irrational.[16]

---

57:40–58:25; see also Gov Br. at 32. Trump v. Hawaii was a case dealing with the First
Amendment's Establishment Clause in the context of border security in which a
Proclamation was issued with a "legitimate grounding in national security concerns." Id.
at 2421. That case does not stand for the proposition asserted by the government. See
Trump v. Hawaii, 138 S.Ct. at 2420 (stating that rational basis review "considers whether
the entry policy is plausibly related to the Government's stated objective"). A successful
Equal Protection claim, at least in the context of taxes and duties, does not require a
showing of animus. See Allegheny Pittsburgh Coal Co. v. County Com'n of Webster
County, 488 U.S. 336, 345 (1989).

[16] The choice is underinclusive. The Steel Report ranks Turkey as the sixth largest
exporter of steel products to the United States. See Steel Report at 28, Fig. 2. Given the
presence of larger steel exporters in the market, targeting Turkish steel products alone
would not appear to be an effective means of remedying the national security concerns
outlined in the Report. The decision may be overinclusive as well. Transpacific contends
that some of the steel slated to be imported from Turkey was destined for Puerto Rico to
aid in the "rebuilding in the aftermath of Hurricanes Irma and Maria," and that Transpacific
is "one of the largest importers of steel into Puerto Rico." See Am. Compl. ¶ 10, Ex. 3
(Declaration of Jules Levin, CEO of Transpacific). Given the broad view of national
security articulated in the Steel Report, the failure to consider the potential impact on the

This case is materially indistinguishable from Allegheny Pittsburgh Coal Co. v. Cnty Com'n of Webster Cnty, 488 U.S. 336 (1989). In that case, the Court declared irrational a county tax assessor's use of differing methods to assess property value that had been recently sold from property that had not. Id. at 338. The result was that generally "comparable properties" were assessed at vastly different rates depending on the last date of sale. Id. at 341. The Court found that the tax assessor's practice was arbitrary and that the "relative undervaluation of comparable property" denied the petitioners in that case equal protection. Id. at 346. The Court noted that the West Virginia Constitution establishes a general principle of uniform taxation, and held that the tax assessor's practice did not accord with the West Virginia Constitution and violated the United States Constitution's Equal Protection Clause. Id. at 345 ("The equal protection clause. . . protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class.") (quoting Hillsborough v. Cromwell, 326 U.S. 620, 623 (1946)). The situation before the court here is no different. There is no apparent reason to treat importers of Turkish steel products differently from importers of steel products from any other country listed in the Steel Report. The status quo under normal trade relations is equal tariff treatment of similar products irrespective of country of origin. See 19 U.S.C. § 1881. Although deviation from this general principle is allowable, such deviation cannot be arbitrarily and irrationally

_____

Puerto Rican recovery in issuing Proclamation 9772, and to exempt those shipments, may make the action overinclusive. Mot. to Dismiss. Hearing Tr., at 14, ECF No. 41 (Dec. 12, 2019). Under rational basis review, even significant over or underinclusiveness can be tolerable in some instances, see Vance v. Bradley, 440 U.S. 93, 108 (1979), but here this mismatch, particularly based on underinclusion, between Proclamation 9772's purported national security purpose and the chosen action to address that purpose is simply too great.

enforced in a way that treats similarly situated classes differently without permissible justification. Proclamation 9772 denies Plaintiffs the equal protection of the law.

## IV.    Constitutional Due Process

The Constitution's Due Process Clause provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. For Plaintiffs to succeed on their procedural due process claim, the court must first determine that a protected property interest exists. See Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005) ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire") (citing Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972)). The court looks to "existing rules or understandings that stem from an independent source such as state law," in ascertaining whether a protected property interest exists. Id. (citing Paul v. Davis, 424 U.S. 693, 709) (1976)). If an interest exists, the court must then ascertain what process is required under the circumstances. See Matthews v. Eldridge, 424 U.S. 319, 335 (1976).

Plaintiffs contend that Proclamation 9772 violates the Constitution's guarantee of Due Process. Pl. Br. at 38–43. They identify the property interest as "simply that the plaintiff-imports paid large amounts of duties to the U.S. Government and incurred numerous other expenses associated with the dislocation attendant to the imposition of 50% tariffs on Turkey."[17] Id. at 38. They further identify the process owed as "at least a basic level of protection under these circumstances." Id. at 39. The government responds

---

[17] Later in their brief, Plaintiffs instead characterize the property interest as "a freedom from the interference with existing contracts and business relationships, an expectation of a benefit, a level playing field, and the freedom from malignant stigma." Pl. Br. at 41.

that Plaintiffs have failed to identify a constitutionally protected property interest. Gov. Br. at 40–43. Because Plaintiffs do not point to an independent source that gives rise to a property interest, the government contends that the only process owed to Plaintiffs is "whatever the statute or regulation provides." Id. at 43. Because, in the government's view, that process was afforded here, there is no violation. Id. at 43–44.

Plaintiffs have failed to fully articulate a property interest beyond various nebulous notions and do so without reference to any independent source establishing that a concrete, protected property interest exists. Further, the process Plaintiffs request is simply that the government be made to comply with the procedures laid out in the statute. Because we hold that Plaintiffs are entitled to that process under the statute, we need not also answer whether any constitutional guarantees of Due Process were violated. See Ashwander v. Tennessee Valley Authority, 297 U.S. 288 (1936) (Brandeis, J., concurring) (noting that a court "will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of"). The court does not foreclose the possibility that a constitutionally-protected property interest may exist,[18] but declines to identify one here. Whatever constitutional minimum process might be owed, it is satisfied by requiring that the President abide by the statute's procedures.

---

[18] At oral argument, the court questioned whether "the statutory provision for Normal Trade Relations at 19 U.S.C. § 1881 and the Harmonized Tariff Schedule of the United States, which is a statute, see 19 U.S.C. §§ 1202, 3004(c), combine together to create a legitimate expectation to a certain rate that would be sufficient to trigger procedural due process protections[.]" Issues for Oral Argument, ECF No. 63 (May 26, 2020).

## CONCLUSION

For the foregoing reasons, the court grants Plaintiffs' motion for judgment upon the agency record. Proclamation 9772 is in violation of mandated statutory procedures and in violation of the Fifth Amendment's Equal Protection guarantees. Judgment will enter accordingly.

       /s/ Jane A. Restani

Jane A. Restani, Judge

       /s/ Claire R. Kelly

Claire R. Kelly, Judge

       /s/ Gary S. Katzmann

Gary S. Katzmann, Judge

Dated: July 14, 2020
       New York, New York