# United States Court of Appeals
# for the Federal Circuit

———————————

**TRANSPACIFIC STEEL LLC, BORUSAN MANNESMANN BORU SANAYI VE TICARET A.S., BORUSAN MANNESMANN PIPE U.S. INC., THE JORDAN INTERNATIONAL COMPANY,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES, JOSEPH R. BIDEN, JR., IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, TROY MILLER, IN HIS OFFICIAL CAPACITY AS SENIOR OFFICIAL PERFORMING THE DUTIES OF THE COMMISSIONER FOR UNITED STATES CUSTOMS AND BORDER PROTECTION, DEPARTMENT OF COMMERCE, GINA RAIMONDO, IN HER OFFICIAL CAPACITY AS SECRETARY OF COMMERCE,**
*Defendants-Appellants*

———————————

2020-2157

———————————

Appeal from the United States Court of International Trade in No. 1:19-cv-00009-CRK-GSK-JAR, Senior Judge Jane A. Restani, Judge Claire R. Kelly, Judge Gary S. Katzmann.

———————————

Decided: July 13, 2021

————————————

MATTHEW MOSHER NOLAN, Arent Fox, LLP, Washington, DC, argued for all plaintiffs-appellees. Plaintiff-appellee Transpacific Steel LLC also represented by DIANA DIMITRIUC QUAIA, NANCY NOONAN, LEAH N. SCARPELLI, RUSSELL ANDREW SEMMEL.

JULIE MENDOZA, Morris, Manning & Martin, LLP, Washington, DC, for plaintiffs-appellees Borusan Mannesmann Boru Sanayi ve Ticaret A.S., Borusan Mannesmann Pipe U.S. Inc. Also represented by DONALD CAMERON, JR., EUGENE DEGNAN, MARY HODGINS, BRADY MILLS, R. WILL PLANERT, EDWARD JOHN THOMAS, III.

LEWIS LEIBOWITZ, The Law Office of Lewis E. Leibowitz, Washington, DC, for plaintiff-appellee Jordan International Company.

TARA K. HOGAN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendants-appellants. Also represented by BRYAN M. BOYNTON, JEANNE DAVIDSON, ANN MOTTO, MEEN GEU OH, STEPHEN CARL TOSINI.

————————————

Before REYNA, TARANTO, and CHEN, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* TARANTO.

Dissenting opinion filed by *Circuit Judge* REYNA.

TARANTO, *Circuit Judge*.

In section 232 of the Trade Expansion Act of 1962, Pub. L. No. 87–794, 76 Stat. 872, 877, codified as amended at 19 U.S.C. § 1862, Congress provided that if the President receives, and agrees with, a finding by a specified executive officer (now the Secretary of Commerce) that imports of an

article threaten to impair national security, the President shall take action that the President deems necessary to alleviate the threat from those imports. *See Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976) (addressing then-current version of § 1862 and holding that permitted action includes requiring licenses for imports and that provision raised no substantial issue of improper delegation of legislative power); *American Inst. for Int'l Steel, Inc. v. United States*, 806 F. App'x 982 (Fed. Cir. 2020) (rejecting nondelegation challenge to the current version of the statute). In its present form, the statute includes provisions, added in 1988, that set forth process and timing standards applicable to the Secretary's making of the predicate finding of threat, § 1862(b), and set forth certain timing standards applicable to the President's follow-on decisions if the Secretary finds such a threat, § 1862(c). Of central importance here is § 1862(c)(1). It specifies one period within which the President is to concur or disagree with the Secretary's finding and to determine the necessary action if the President concurs in the finding and another period within which the President is thereafter to implement the chosen action. § 1862(c)(1). This case involves a challenge to certain presidential action as taken too late under § 1862(c)(1).

In January 2018, the Secretary, in compliance with the process and timing requirements of § 1862(b), found that imports of steel threatened to impair national security because the imports caused domestic steel-production capacity to be used less than the level of utilization needed for operation of the plants to be profitably sustained over time. In March 2018, within the periods prescribed for presidential action, the President agreed with the Secretary's finding, determined the needed plan of action, and announced the plan in a proclamation that imposed some tariffs immediately, announced negotiations with specified nations in lieu of immediate tariffs, invited negotiations more broadly, and stated that the immediate measures might be

adjusted as necessary. Proclamation 9705, 83 Fed. Reg. 11,625 (Mar. 15, 2018). Within a few months, as certain negotiations produced agreements or adequately progressed, the President determined that imports were still too high to allow domestic plant utilization to meet the Secretary's identified target, and the President raised the tariff on steel from Turkey, one of the largest producers and exporters of steel imported into the United States. Proclamation 9772, 83 Fed. Reg. 40,429 (Aug. 15, 2018). Proclamation 9772's raising of the tariff on Turkish steel imports is challenged here.

Transpacific Steel LLC, Borusan Mannesmann Boru Sanayi Ve Ticaret A.S., Borusan Mannesmann Pipe U.S. Inc., and the Jordan International Company (together, Transpacific)—importers of Turkish steel (in some cases also producers or exporters)—sued in the Court of International Trade (Trade Court), alleging that the President's issuance of Proclamation 9772 was unlawful. The Trade Court held the action unlawful on two grounds. First, the court held that Proclamation 9772 was unauthorized because, unlike the initial Proclamation 9705, it was issued outside the time periods set out in § 1862(c)(1) for presidential action after the Secretary's finding (in which the President concurred) of a national-security threat from steel imports. To take this action in August 2018, the court ruled, the President had to secure a new report with a new threat finding from the Secretary. Second, the court held that singling out steel from Turkey for the increased tariff violated the equal-protection guarantee of the Fifth Amendment to the Constitution.

We reverse. The President did not violate § 1862 in issuing Proclamation 9772. The President did not depart from the Secretary's finding of a national-security threat; indeed, the President specifically adhered to the Secretary's underlying finding of the target capacity-utilization level that was the rationale for the predicate threat finding. Moreover, the President made the determination that

further import restrictions were needed to achieve that
level in a short period after the Secretary's finding and af-
ter the initial presidential action. And that initial presi-
dential action (in March 2018) itself announced a
continuing course of action that could include adjustments
as time passed. In these circumstances, we conclude that
the increase in the tariff on steel from Turkey by Procla-
mation 9772 did not violate § 1862. We do not address
other circumstances that would present other issues about
presidential authority to adjust initially taken actions
without securing a new report with a new threat finding
from the Secretary.

Nor did the President violate Transpacific's equal-pro-
tection rights in issuing Proclamation 9772. The most de-
manding standard that could apply here is the
undemanding rational-basis standard. The President's de-
cision to take one of a number of possible steps to achieve
the goal of increasing utilization of domestic steel plants'
capacity to try to improve their sustainability for national-
security reasons meets that standard.

## I

## A

Section 1862 empowers and directs the President to act
to alleviate threats to national security from imports. It
does so by modifying and adding to other presidential au-
thority granted by Congress.

*Subsection (a).* The first subsection of § 1862 refers to
two of the preexisting, continuing statutory grants of pres-
idential authority and forbids relaxation of import re-
strictions under those grants if national security would be
threatened. Specifically, subsection (a) addresses 19
U.S.C. §§ 1821 and 1351, which grant the President certain
discretionary authority regarding tariffs on goods from for-
eign nations with which the President might enter into ex-
ecutive agreements. Section 1821(a), which dates to at

least 1962, *see* Trade Expansion Act of 1962, § 201, 76 Stat. at 872, states that the President "may," for any of the broad trade-related purposes identified in 19 U.S.C. § 1801, enter into trade agreements and, among other things, raise or lower duties (within limits) to carry out such agreements. § 1821. Section 1351, which traces back to 1934, *see* Tariff Act of 1934, ch. 474, 48 Stat. 943, confers similar authority. § 1351. Subsection (a) of § 1862 forbids the President, when acting under those provisions, "to decrease or eliminate the duty or other import restrictions on any article if the President determines that such reduction or elimination would threaten to impair the national security." § 1862(a).[1]

*Subsection (b).* The next subsection sets forth the agency-level processes required for exercise of § 1862's own grant of presidential authority to take action against imports that threaten to impair national security. In particular, subsection (b) prescribes process and timing standards for the Secretary of Commerce to make the finding that is a precondition for the President to take such action under this statute.

If the Secretary receives a request from an agency or department head or an "application of an interested party," or on the Secretary's "own motion," the Secretary must "immediately initiate an appropriate investigation to determine the effects on the national security of imports of the [relevant] article." § 1862(b)(1)(A). During the investigation, the Secretary must consult with and seek information

---

[1]    In *American Institute for International Steel*, we noted other congressional authorizations of presidential action, and the use of executive agreements, to restrict imports. 806 F. App'x at 983–84, 984 n.1; *see also American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414–15 (2003) (noting longstanding use and approval of executive agreements).

and advice from certain officers—most notably, the Secretary of Defense—and, if appropriate, "hold public hearings or otherwise afford interested parties an opportunity to present information and advice relevant to such investigation." § 1862(b)(2)(A). Within "270 days" of the investigation's start, "the Secretary shall submit to the President a report on the findings of" the investigation. § 1862(b)(3)(A). Based on those findings, the Secretary must include his "recommendations . . . for action or inaction." *Id.* "If the Secretary finds that such article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the Secretary shall so advise the President in such report." *Id.*

*Subsection (c)*. The next subsection lays out the President's authority and obligation to act under § 1862. As paragraph (1) makes clear, that authority and obligation exist only if the President receives a report "in which the Secretary finds that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security." § 1862(c)(1)(A). In that event, the President "shall," within 90 days of receiving such a report, "determine whether the President concurs with the finding of the Secretary," *i.e.*, the Secretary's finding of a threat (not the Secretary's recommendation of action or inaction). § 1862(c)(1)(A)(i). "[I]f the President concurs" in that finding, then the President "shall," within the same 90 days, "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." § 1862(c)(1)(A)(ii). Finally, "[i]f the President determines . . . to take action to adjust imports of an article and its derivatives, the President shall

TRANSPACIFIC STEEL LLC v. US

implement that action" within 15 days of the action deter-
mination. § 1862(c)(1)(B).[2]

   In paragraph (3), subsection (c) specifically addresses
the circumstance in which one of the actions that the Pres-
ident initially chooses is not a unilateral imposition on cer-
tain imports but, instead, bilateral or multilateral in
character, *i.e.*, negotiation of an agreement that "limits or
restricts the importation into, or the exportation to, the
United States of the article that threatens to impair na-
tional security." § 1862(c)(3)(A)(i).  To prevent that presi-
dential choice from turning into inaction or inadequate
action, paragraph (3) provides for unilateral action if either
no agreement is reached within 180 days, *id.*, or an agree-
ment is reached but it "is not being carried out *or* is inef-
fective in eliminating the threat to the national security
posed by imports of such article," § 1862(c)(3)(A)(ii) (em-
phasis added).  When either of those conditions is met, "the
President shall take such other actions as the President
deems necessary to adjust the imports of such article so
that such imports will not threaten to impair the national
security." § 1862(c)(3)(A).  The President must publish in

---

   [2]   Paragraph (2) requires the President to inform
Congress about the paragraph (1) determinations.
§ 1862(c)(2).  This is one of several provisions that insist on
public disclosure of the choices made under § 1862.  An-
other is the provision requiring the Secretary to submit to
Congress and publish in the Federal Register a report on
dispositions under subsection (b).  *See* § 1862(e) (though la-
beled as a second subsection (d), the U.S. Code states that
it probably should be designated (e)).  In addition, if the
President has chosen to pursue bilateral or multilateral
agreements initially, but that choice does not bear out in
the statutorily specified ways, the President must publish
notice of determinations of what if any alternative actions
to take. § 1862(c)(3)(A), (B).

the Federal Register notice of such "additional actions" or of a determination not to take "additional actions." § 1862(c)(3)(A), (B).

*Subsection (d).* Congress included what amounts to a definitional provision for § 1862. Subsection (d) states a number of "relevant factors" to which the Secretary and the President must "give consideration" in making their determinations regarding "national security." § 1862(d). Among the factors are the "domestic production needed for projected national defense requirements," the "capacity of domestic industries to meet such requirements," the "requirements of growth of such [domestic] industries," "the impact of foreign competition on the economic welfare of individual domestic industries," and whether the "weakening of our internal economy may impair the national security." *Id.* The statute enumerates other considerations as well, and the entire enumeration is set forth "without excluding other relevant factors." *Id.*[3]

### B

#### 1

On April 19, 2017, the Secretary of Commerce started "an investigation to determine the effects on the national security of imports of steel." Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel, 82 Fed. Reg. 19,205, 19,205 (Apr. 26, 2017). After following the processes, and within the time, prescribed by § 1862(a), the

---

[3]    Subsection (f) is the final subsection of § 1862. It narrowly addresses presidential action "to adjust imports of petroleum or petroleum products" and, for that subject, specifies that such action "shall cease to have force and effect upon the enactment of a disapproval resolution," defined as "a joint resolution of either House of Congress." § 1862(f).

TRANSPACIFIC STEEL LLC v. US

Secretary, on January 11, 2018, sent his report to the President.  Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended, 85 Fed. Reg. 40,202 (July 6, 2020) (January 2018 report).

The Secretary found that "the present quantities and circumstance of steel imports are weakening our internal economy and threaten to impair the national security as defined in Section 232." *Id.* at 40,204 (internal quotation marks omitted).  Underlying that finding, the Secretary explained, were "[n]umerous U.S. steel mill closures, a substantial decline in employment, lost domestic sales and market share, and marginal annual net income for U.S.-based steel companies." *Id.*  Because the "declining steel capacity utilization rate is not economically sustainable," the Secretary reported that "the only effective means of removing the threat of impairment is to reduce imports to a level that should, in combination with good management, enable U.S. steel mills to operate at 80 percent or more of their rated production capacity." *Id.*

Based on the finding of a need for 80% average capacity utilization for the sustainable industry required to remove the national-security threat, the Secretary made several recommendations about how to adjust imports that were leaving domestic plants underutilized.  The first option was a "global quota or tariff." *Id.* at 40,205.  For the global quota, the Secretary recommended a quota limiting steel imports to 63% of 2017 import levels; for the global tariff, the Secretary recommended a 24% tariff on all steel imports. *Id.*  The second option was "tariffs on a subset of countries." *Id.*  Under that approach, the Secretary recommended a 53% tariff on all steel imports from "Brazil, South Korea, Russia, Turkey, India, Vietnam, China, Thailand, South Africa, Egypt, Malaysia and Costa Rica." *Id.*  For every option, the Secretary noted that "the President could determine that specific countries should be exempted

from the proposed" quota or tariff.  *Id.*  But if the President determined that certain countries should be exempt, the "Secretary recommend[ed] that any such determination should be made at the outset and a corresponding adjustment be made to the final quota or tariff imposed on the remaining countries." *Id.* at 40,205–06.

The Secretary further recommended "an appeal process by which affected U.S. parties could seek an exclusion from the tariff or quota imposed." *Id.* at 40,206.  Under that process, the "Secretary would grant exclusions based on a demonstrated: (1) lack of sufficient U.S. production capacity of comparable products; or (2) specific national security based considerations." *Id.*  If an exclusion was granted, the Secretary would also "consider at the time whether the quota or tariff for the remaining products needs to be adjusted to increase U.S. steel capacity utilization to a financially viable target of 80 percent." *Id.*

2

After receiving the Secretary's January 11, 2018 report, with its finding that imports of steel articles threatened to impair national security because they were preventing 80% domestic capacity utilization, the President issued several proclamations relevant here.

*Proclamation 9705.*  On March 8, 2018, well within the prescribed 90 days of receiving the report, the President issued Proclamation 9705.  83 Fed. Reg. 11,625 (Mar. 15, 2018).  The President stated that he "concur[red] in the Secretary's finding" on steel articles and had "considered [the Secretary's] recommendations." *Id.* at 11,626, ¶ 5. The President "decided to adjust the imports of steel articles by imposing a 25 percent ad valorem tariff on steel articles . . . imported from all countries except Canada and Mexico." *Id.* at 11,626, ¶ 8.  The tariffs would take effect on March 23, 2018, and "continue in effect, unless such actions are expressly reduced, modified, or terminated." *Id.* at 11,627–28, § 5(a).

On the exception, the President explained that "Canada and Mexico present a special case" because of the countries' "close relation" with and "physical proximity" to the United States and because the President sought "to continue ongoing discussions with these countries." *Id.* at 11,626, ¶ 10. The President also stated his willingness to negotiate with "[a]ny country" that has "a security relationship" with the United States in order to discuss "alternative ways to address the threatened impairment of the national security caused by imports from that country." *Id.* at 11,626, ¶ 9. The President highlighted, though, that if the negotiations led to an agreement with a country with "a satisfactory alternative means to address" the national-security threat, he "may remove or modify the restriction on steel articles imports from that country *and, if necessary, make any corresponding adjustments to the tariff as it applies to other countries as our national security interests require.*" *Id.* (emphasis added). In other words, a negotiated deal with one country, if it was generous regarding steel imports from that country, might require lowering imports from other countries by raising the initial tariff imposed on them, so that the 80% capacity-utilization level could be reached.

To facilitate the planned course of action, the President ordered the Secretary to "continue to monitor imports of steel articles," to consult "from time to time" with various officials "as the Secretary deems appropriate," and to "review the status of such imports with respect to the national security." *Id.* at 11,628, § 5(b). He also ordered the Secretary to "inform the President of any circumstances that in the Secretary's opinion might indicate the need for further action by the President" or if "the increase in duty rate provided for in this proclamation is no longer necessary." *Id.*

*Proclamations 9711, 9740, and 9759.* Thereafter, the President negotiated with many countries, made agreements with some, and adjusted tariffs on countries that did not negotiate or reach an agreement with the United

States. For example, two weeks after Proclamation 9705, the President issued Proclamation 9711. 83 Fed. Reg. 13,361 (Mar. 22, 2018). In that proclamation, the President highlighted that several countries reached out to discuss "satisfactory alternative means to address the threatened impairment to the national security" and noted that he "determined that the necessary and appropriate means to address the threat to the national security posed by imports of steel articles from these countries is to continue ongoing discussions and to increase strategic partnership." *Id.* at 13,361, ¶ 4 and 13,362, ¶ 10. The President concluded: "[D]iscussions regarding measures to reduce excess steel production and excess steel capacity, measures that will increase domestic capacity utilization, and other satisfactory alternative means will be most productive if the tariff proclaimed in Proclamation 9705 on steel articles imports from these countries is removed at this time." *Id.* at 13,362, ¶ 10. Still, the President declared, the exemption would expire on May 1, 2018, if no agreement was reached. *Id.* at 13,362, ¶ 11. And if an agreement was reached, the President said (as he did in Proclamation 9705), "corresponding adjustments to the tariff" previously set for other countries would be considered. *Id.*

About five weeks later, on April 30, 2018, the President issued Proclamation 9740 announcing agreements and further negotiations. 83 Fed. Reg. 20,683 (May 7, 2018). The President announced that negotiations with South Korea had succeeded, producing an agreement "on a range of measures, . . . including a quota that restricts the quantity of steel articles imported into the United States from South Korea." *Id.* at 20,683, ¶ 4. The President also reported that the "United States has agreed in principle with Argentina, Australia, and Brazil on satisfactory alternative means" and temporarily exempted those countries from the 25% ad valorem tariff "to finalize the details" of the agreements. *Id.* at 20,684, ¶ 5. And he noted that the United States was

"continuing discussions with Canada, Mexico and the [European Union]."  *Id.* at 20,684, ¶ 6.

Later, on May 31, 2018, the President, in Proclamation 9759, announced that the United States had reached agreements with Argentina, Australia, and Brazil.  83 Fed. Reg. 25,857, 25,857–58 (June 5, 2018).

*Proclamations 9772 and 9886.*  On August 10, 2018, just over five months after the President issued the first proclamation (Proclamation 9705), he issued the proclamation challenged here by Transpacific, *i.e.*, Proclamation 9772.  83 Fed. Reg. 40,429 (Aug. 15, 2018).  The President explained that the Secretary had monitored imports of steel articles (as directed in Proclamation 9705) and, based on that monitoring, the Secretary had "informed [the President] that while capacity utilization in the domestic steel industry has improved, it is still below the target capacity utilization level" identified in the January 2018 report and imports were "still several percentage points greater than the level of imports that would allow domestic capacity utilization to reach the target level."  *Id.* at 40,429, ¶¶ 3–4.  The President added that in the "January 2018 report, the Secretary recommended . . . applying a higher tariff to a list of specific countries" if the President "determine[d] that all countries should not be subject to the same tariff."  *Id.* at 40,429, ¶ 6.  The President also noted that the Secretary's report had Turkey on the list and that the report explained that "Turkey is among the major exporters of steel to the United States for domestic consumption."  *Id.*  Then the President declared: "To further reduce imports of steel articles and increase domestic capacity utilization, I have determined that it is necessary and appropriate to impose a 50 percent ad valorem tariff on steel articles imported from Turkey, beginning on August 13, 2018."  *Id.*  The President also highlighted that the Secretary had advised him that the adjustment on steel imports from Turkey "will be a significant step toward ensuring the viability of the domestic steel industry."  *Id.*

The 50% ad valorem tariff on Turkish steel remained in place for just under nine months—until May 21, 2019—when it returned to 25%. *See* Proclamation 9886 of May 16, 2019, 84 Fed. Reg. 23,421 (May 21, 2019). In the proclamation announcing the return to the 25% level, the President stated that the Secretary had advised him "that, since the implementation of the higher tariff under Proclamation 9772, . . . the domestic industry's capacity utilization ha[d] improved . . . to approximately the target level recommended in the Secretary's report." *Id.* at 23,421–22, ¶ 6. The President determined that "[t]his target level, if maintained for an appropriate period, will improve the financial viability of the domestic steel industry over the long term." *Id.* at 23,422, ¶ 6. "Given these improvements," the President "determined that it [wa]s necessary and appropriate to remove the higher tariff on steel imports from Turkey imposed by Proclamation 9772, and to instead impose a 25 percent ad valorem tariff on steel imports from Turkey." *Id.* at 23,422, ¶ 7. The President also determined that "[m]aintaining the existing 25 percent ad valorem tariff on most countries [wa]s necessary and appropriate at this time to address the threatened impairment of the national security that the Secretary found in the January 2018 report." *Id.*

## C

On January 17, 2019, while the 50% tariff was in effect, Transpacific sued the United States, two agencies of the United States (the Department of Commerce and U.S. Customs and Border Protection), the President, and the heads of the two agencies, invoking the Trade Court's jurisdiction under 28 U.S.C. § 1581(i)(2), (4). *See Transpacific Steel LLC v. United States*, No. 1:19-cv-00009, ECF No. 6 (Ct. Int'l Trade Jan. 17, 2019) (Complaint). Transpacific amended its complaint on April 2, 2019, naming the same defendants. J.A. 95. Like the original complaint, the amended complaint alleged that Proclamation 9772 was unlawful because the President exceeded his authority

under 19 U.S.C. § 1862 and violated the Fifth Amendment's guarantees of equal protection and of procedural due process. J.A. 95–559.

On April 3, 2019, the government moved to dismiss the suit for failure to state a claim, and on November 15, 2019, the Trade Court denied the motion. *Transpacific Steel LLC v. United States*, 415 F. Supp. 3d 1267, 1269 (Ct. Int'l Trade 2019) (*Transpacific I*). The Trade Court held that Transpacific stated a claim that the timing provisions of § 1862(c) foreclosed the President from doing what he did here, namely, announce and put into effect a plan of action within the statutory time periods (as the President did in Proclamation 9705), and then raise tariffs pursuant to the implemented plan after those deadlines passed (as the President did in Proclamation 9772) without obtaining a new report from the Secretary produced through the statutorily specified procedure. *Id.* at 1274–76. The Trade Court also determined that Transpacific stated a claim that Proclamation 9772 violated the Fifth Amendment's equal-protection guarantee because it alleged that there was "no set of facts that justify identifying importers of steel from Turkey as a class of one." *Id.* at 1272. As for the procedural-due-process claim, the Trade Court did not reach it because the court determined that the President violated the procedural constraints of § 1862. *Id.* at 1276.

Shortly thereafter, the other appellees were permitted to intervene as co-plaintiffs. *See* J.A. 64–65. On January 21, 2020, the parties jointly moved for a judgment on the agency record. J.A. 65. About six months later, on July 14, 2020, the Trade Court issued an opinion and entered judgment for Transpacific. *Transpacific Steel LLC v. United States*, 466 F. Supp. 3d 1246, 1249 (Ct. Int'l Trade 2020) (*Transpacific II*); J.A. 1–2 (Judgment). The Trade Court concluded that Proclamation 9772 was unlawful because the President violated a statutory timing constraint of § 1862 and because singling out importers of Turkish steel

products denied them the constitutionally guaranteed equal protection of the laws.

As to § 1862, the court maintained its view that "there is nothing in the statute to support the continuing authority to modify Proclamations outside of the stated timelines." *Transpacific II*, 466 F. Supp. 3d at 1253. Although the Trade Court recognized that § 1862 before the 1988 amendments let the President "modify previous Proclamations as a form of continuing authority," the court explained that "the statutory scheme has since been altered, and the court must give meaning to those alterations." *Id.* "The 1988 amendments prescribed time limits," the court noted, "but also deleted language that could be read to give the President the power to continually modify Proclamations." *Id.* And the court repeated that nondelegation concerns reinforced its reading. *Id.* The Trade Court therefore held that "'modifications' of existing Proclamations under the current statutory scheme, without following the procedures in the statute, are not permitted." *Id.*

As to equal protection, the Trade Court concluded that the government flunked the rational-basis standard. "Singling out steel products from Turkey," reasoned the court, "is not a rational means of addressing" the government's national-security concern. *Id.* at 1258. According to the court, the "status quo under normal trade relations is equal tariff treatment of similar products irrespective of country of origin. Although deviation from this general principle is allowable, such deviation cannot be arbitrarily and irrationally enforced in a way that treats similarly situated classes differently without permissible justification." *Id.* (citation omitted). The court, seeing no permissible justification, concluded: "Proclamation 9772 denies [Transpacific] the equal protection of the law." *Id.*

The court then addressed Transpacific's procedural-due-process argument. It stated: "[T]he process [Transpacific] request[s] is simply that the government be made to

comply with the procedures laid out in the statute. Because we hold that [Transpacific is] entitled to that process under the statute, we need not also answer whether any constitutional guarantees of Due Process were violated." *Id.* at 1259. The court added: "Whatever constitutional minimum process might be owed, it is satisfied by requiring that the President abide by the statute's procedures." *Id.*

The same day, the Trade Court entered final judgment. J.A. 1. The court ordered that Proclamation 9772 "is declared unlawful and void" and ordered that the "United States Customs and Border Protection refund [Transpacific] the difference between any tariffs collected on its imports of steel products" under Proclamation 9772 "and the 25% ad valorem tariff that would otherwise apply on these imports together with such costs and interest as provided by law." J.A. 1–2.[4]

The government timely appealed the Trade Court's judgment. We have jurisdiction under 28 U.S.C. § 1295(a)(5).[5]

---

[4]    The government moved to stay enforcement of the judgment's refund order pending appeal. The Trade Court denied the stay, *Transpacific Steel LLC v. United States*, 474 F. Supp. 3d 1332 (Ct. Int'l Trade 2020), and this court denied the government's request that we stay the order pending appeal, *Transpacific Steel LLC v. United States*, 840 F. App'x 517 (Fed. Cir. 2020).

[5]    Transpacific invoked the Trade Court's jurisdiction under a provision that gives that court jurisdiction over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for" certain tariffs or duties of the sort at issue here. 28 U.S.C. § 1581(i). The provision clearly covers this case, with one possible, limited exception: There

## II

The government challenges the Trade Court's rulings that Proclamation 9772 violated 19 U.S.C. § 1862 and the Fifth Amendment's guarantee of equal protection. In response, Transpacific defends those rulings, but it does not present here, or seek a conditional remand to press, its procedural-due-process challenge, which we therefore deem dropped. And although Transpacific briefly asserts a nondelegation challenge simply to preserve it, we have already rejected such a challenge, *American Inst. for Int'l Steel*, 806 F. App'x at 983, and Transpacific has presented no developed argument on nondelegation that warrants additional discussion. Accordingly, we limit ourselves to the § 1862 and equal-protection issues.

We review the judgment on the agency record without deference. *See Fedmet Resources Corp. v. United States*,

_____

is a question (not raised by any party) whether the claim against the President comes within the provision. *See Corus Group PLC v. Int'l Trade Comm'n*, 352 F.3d 1351, 1359 (Fed. Cir. 2003) (concluding that the President is not an "officer[]" under § 1581(i) and dismissing claim against the President); *PrimeSource Bldg. Prods., Inc. v. United States*, 497 F. Supp. 3d 1333, 1365–70 (Ct. Int'l Trade 2021) (Baker, J., concurring in part and dissenting in part) (discussing the question). We need not address that question because jurisdiction existed over the claims against the other defendants and jurisdiction exists here to review the Trade Court's judgment. *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018) (for standing, all that need be decided is that one plaintiff has standing); *Horne v. Flores*, 557 U.S. 433, 445 (2009) (same). We reverse and remand this case for entry of judgment against Transpacific; but in the remand, the Trade Court may decide whether the judgment against Transpacific should include dismissal of the claim against the President.

755 F.3d 912, 918 (Fed. Cir. 2014). This appeal involves only legal issues, which we decide de novo. *See GPX Int'l Tire Corp. v. United States*, 780 F.3d 1136, 1140 (Fed. Cir. 2015).

## A

The Trade Court concluded that § 1862 prohibited the President from raising tariffs in Proclamation 9772 because the President issued that proclamation after the 90-day period for the President to decide to concur or disagree with the Secretary's January 2018 finding of threat and to determine how to respond to the threat, and after the 15-day period for the President to implement the chosen response, without obtaining a new finding of threat from the Secretary. The Trade Court so concluded even though: Proclamation 9772 was a further implementation of Proclamation 9705; Proclamation 9705 was issued within the two specified time periods and expressly provided for future adjustments; and Proclamation 9772 adhered to the basis of the threat finding in the Secretary's January 2018 report, namely, the need for a particular domestic-plant utilization level, which the implementation measures had not yet achieved. We reverse. In these circumstances, we conclude that the Trade Court erred in determining that the President's issuance of Proclamation 9772 violated § 1862.

The key issue is whether § 1862(c)(1) permits the President to announce a continuing course of action within the statutory time period and then modify the initial implementing steps in line with the announced plan of action by adding impositions on imports to achieve the stated implementation objective. We conclude that the President does have such authority in the circumstances presented here. Specifically, we conclude that the best reading of the statutory text of § 1862, understood in context and in light of the evident purpose of the statute and the history of predecessor enactments and their implementation, is that the

authority of the President includes authority to adopt and carry out a plan of action that allows adjustments of specific measures, including by increasing import restrictions, in carrying out the plan over time. Transpacific does not argue that Proclamation 9772 is unlawful under the statute if, as we conclude, the President has the authority to adopt and pursue such a continuing course of action.

In our statutory analysis, we consider text and context, including purpose and history. Judge Reyna, in dissent, reaches different conclusions about these considerations and about the bottom-line result. Our discussion of the individual considerations provides, without further direct reference to Judge Reyna's dissent, the reasons we take a different view on the points of disagreement.

1

We start with the text of 19 U.S.C. § 1862(c)(1) and its "ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (cleaned up). Subsection (c)(1) states:

(c) Adjustment of imports; determination by President; report to Congress; additional actions; publication in Federal Register

(1)(A) Within 90 days after receiving a report submitted under subsection (b)(3)(A) in which the Secretary finds that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the President shall—

(i) determine whether the President concurs with the finding of the Secretary, and

(ii) if the President concurs, determine the nature and duration of

> the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security.
>
> (B) If the President determines under subparagraph (A) to take action to adjust imports of an article and its derivatives, the President shall implement that action by no later than the date that is 15 days after the day on which the President determines to take action under subparagraph (A).

§ 1862(c)(1).

Paragraph (1) contains several time directives. "Within 90 days after receiving a report" with a finding that importation of an article threatens to impair national security, the President "shall," first, "determine whether the President concurs with the finding of the Secretary," § 1862(c)(1)(A)(i), and, second, if the President concurs, "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security," § 1862(c)(1)(A)(ii). Then, if the President has concurred in the finding of threat and determined the action to be taken in response, the President "shall implement that action by no later than the date that is 15 days after the day on which the President determines to take action under subparagraph (A)." § 1862(c)(1)(B).

The Trade Court's interpretation of subsection (c)(1)'s time directives does not follow from the ordinary meaning of the provision's language at the time of enactment. In two ways, the Trade Court took too narrow a view of what the ordinary meaning allows.

*First*: The Trade Court indicated its view that the "necessary implication" of the timing provisions was that no burden-increasing action could be taken after the specified times. *Transpacific I*, 415 F. Supp. 3d at 1275 n.13; *Transpacific II*, 466 F. Supp. 3d at 1252 ("[T]he temporal restrictions on the President's power to take action pursuant to a report and recommendation by the Secretary is not a mere directory guideline, but a restriction that requires strict adherence. To require adherence to the statutory scheme does not amount to a sanction, but simply ensures that the deadlines are given meaning and that the President is acting on up-to-date national security guidance."). But that is not a necessary implication of the words.

As a matter of ordinary meaning, a command to "take this action by time T" is often, in substance, a compound command—one, a directive (with conferral of authority) to take the action, and, two, a directive to do so by the prescribed time. A violation of the temporal obligation imposed by the second directive does not necessarily negate the primary obligation imposed by—let alone the grant of authority implicit in—the first directive. For example: Most people would understand the directive "return the car by 11 p.m." to require the return of the car even after 11 p.m. *See, e.g., Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1722 (2017) (using a conversation between friends to show ordinary meaning). That is why a real addition of meaning, or at least a resolution of uncertainty, results when "take this action by time T" is followed by words like "or else don't take it at all."

The Supreme Court has recognized this linguistic point in the context of statutory commands to executive officers to take action within a specified time. It has made clear that such a command does not, without more, entail lack of authority, or of obligation, to take the action after that date has passed, even though the obligation to act by the specified time has been violated. The Court so ruled in 1986 in *Brock v. Pierce County*, concluding that "the mere use of the

word 'shall' in [a statute], standing alone, is not enough to remove the [official's] power to act after" the time deadline. 476 U.S. 253, 262 (1986). As the Supreme Court summarized the point some years later, *Brock* held that the particular time command was "meant 'to spur the Secretary to action, not to limit the scope of his authority,' so that untimely action was still valid." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 158 (2003) (quoting *Brock*, 476 U.S. at 265). In 2003, the Court emphasized: "Nor, since *Brock,* have we ever construed a provision that the Government 'shall' act within a specified time, without more, as a jurisdictional limit precluding action later." *Id.*; *see also*, *e.g.*, *id.* at 157 ("It misses the point simply to argue that the October 1, 1993, date was 'mandatory,' 'imperative,' or a 'deadline,' as of course it was, however unrealistic the mandate may have been."); *id.* at 160–61 (explaining that *Brock* made clear that "a statute directing official action needs more than a mandatory 'shall' before the grant of power can sensibly be read to expire when the job is supposed to be done"); *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 63 (1993) ("[I]f a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction."); *United States v. Montalvo-Murillo*, 495 U.S. 711, 718–19 (1990); *Nielsen v. Preap*, 139 S. Ct. 954, 967–68 (2019) (Alito, J., joined by Roberts, C.J., and Kavanaugh, J.).

The commonsense linguistic point, and its application in the statutory setting, formed the backdrop to Congress's amendments to § 1862 in 1988. The *Brock* decision issued two years before Congress's amendments. *See Barnhart*, 537 U.S. at 160 ("The Coal Act was adopted six years after *Brock* came down, when Congress was presumably aware that we do not readily infer congressional intent to limit an agency's power to get a mandatory job done merely from a specification to act by a certain time."); *Nielsen*, 139 S. Ct. at 967 (Alito, J., joined by Roberts, C.J., and Kavanaugh,

J.) ("This principle for interpreting time limits on statutory mandates was a fixture of the legal backdrop when Congress enacted [the statute at issue].").  We thus disagree with the Trade Court to the extent that it viewed the expiration of the time periods in § 1862(c)(1), standing alone, as automatically equating to the expiration of the President's authority to take further burden-increasing steps, as he did here.

*Second*: The Trade Court's ruling also appears to rest on a premise that the provisions of § 1862(c)(1) at issue apply their time requirements to each individual discrete imposition on imports, rather than to the adoption and initiation of a plan of action or course of action (with choices to impose particular burdens in the carrying out of the plan permissibly made later in time).  The language of the provisions, however, does not support that premise.

The terms "action" and "take action" are not limited in that way, but can readily be used to refer to a process or launch of a series of steps over time.  *See, e.g., Action,* Black's Law Dictionary 49 (4th ed. 1957) ("an act or series of acts"); Black's Law Dictionary 26 (5th ed. 1979) (same); Garner's Dictionary of Modern Legal Usage 19 (2d ed. 1995) ("*action* suggests a process—the many discrete events that make up a bit of behavior—whereas *act* is unitary"); Garner's Dictionary of Legal Usage 18 (3d ed. 2011) (same); Black's Law Dictionary 37 (11th ed. 2019) ("The process of doing something"); *see also, e.g., Action,* Random House Webster's Unabridged Dictionary 20 (2d ed. 2001) (similar); American Heritage Dictionary 17 (3d ed. 1992) (similar); Garner's Dictionary of Modern American Usage 14 (1998) ("*Act* is unitary, while *action* suggests a process—the many discrete events that make up a bit of behavior."); Garner's Modern American Usage 16 (3d ed. 2009) (same). The authorization for the President to determine the "nature and duration of the action," § 1862(c)(1)(A)(ii), supports, rather than excludes, coverage of a plan implemented over time, including options for contingency-

TRANSPACIFIC STEEL LLC v. US

dependent choices that are a commonplace feature of plans of action. The phrase "implement that action," § 1862(c)(1)(B), likewise conveys an understanding of "action" as covering plans of action. *See Implement*, 1 Shorter Oxford English Dictionary 1330 (5th ed. 2002) ("put (a decision or *plan*) into effect" (emphasis added)); The American Heritage Dictionary of the English Language 660 (1981) ("To provide a definite *plan* or procedure to ensure the fulfillment of" (emphasis added)); *see also, e.g.*, *Implement*, Webster's New World Dictionary of American English 677 (3rd College ed. 1988) ("to carry into effect" or "give practical effect to"); Random House College Dictionary 667 (Revised ed. 1982) ("to put into effect according to or by means of a definite plan or procedure").

In short, the ordinary meaning of "action" in context indicates that the time directive applies to the announcement and adoption of the plan of action rather than each act following the adopted plan. *Cf.* H.R. Rep. No. 100-576, at 711 (1988) (Conf. Rep.) ("The House bill requires the President to decide whether to take action within 90 days after receiving the Secretary's report, and to *proclaim* such action within 15 days." (emphasis added)).

2

What the terms of subsection (c)(1) indicate, relevant statutory context reinforces. *See Merit Mgt. Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 892–93 (2018) (considering "[t]he language of [the provision at issue], the specific context in which that language is used, and the broader statutory structure"); *Johnson v. United States*, 559 U.S. 133, 139 (2010) ("Ultimately, context determines meaning."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 24, at 167 (2012) ("[T]he whole-text canon . . . calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts.").

Paragraph (3) specifically bolsters the understanding that the President is not barred, by paragraph (1), from adopting, outside the 15-day period for implementation, specific new burden-imposing measures not decided on and adopted within the period.  Paragraph (3) so indicates for the situation when the initially proclaimed action is (bilateral or multilateral) negotiation:

(3)(A) If—

> (i) the action taken by the President under paragraph (1) is the negotiation of an agreement which limits or restricts the importation into, or the exportation to, the United States of the article that threatens to impair national security, and

> (ii) either—

>> (I) no such agreement is entered into before the date that is 180 days after the date on which the President makes the determination under paragraph (1)(A) to take such action, or

>> (II) such an agreement that has been entered into is not being carried out or is ineffective in eliminating the threat to the national security posed by imports of such article,

the President shall take such other actions as the President deems necessary to adjust the imports of such article so that such imports will not threaten to impair the national security.  The President shall publish in the Federal Register notice of any additional actions being taken under this section by reason of this subparagraph.

§ 1862(c)(3)(A).

Subparagraph (A) indicates that one of the President's options is to try to secure agreements with foreign nations. Negotiation and agreement themselves will typically occur after the 15 days specified in subsection (c)(1)(B) have passed. That is all the more true of the "other actions" the President is directed to take if negotiations fail or if resulting agreements are violated or are ineffective in eliminating the national-security threat. Those provisions run counter to the Trade Court's view that Congress forbade presidential imposition of newly specified burdens after § 1862(c)(1)'s 90-day and 15-day periods.[6]

More generally, § 1862's "evident purpose" is an aspect of the context that must be assessed to determine the fair reading of the statute. *See* Scalia & Garner, *Reading Law* § 4, at 63 (The presumption against ineffectiveness "follows inevitably from the facts that (1) interpretation always depends on context, (2) context always includes evident purpose, and (3) evident purpose always includes effectiveness."); *see also id.* § 3, at 56 ("[C]ontext includes the purpose of the text."). The manifest purpose of this statute is to enable and obligate the President (in whom Congress vested the power to make the remedial judgments) to effectively alleviate the threat to national security identified in a finding by the Secretary with which the President has concurred. Reading § 1862(c)(1) to permit

---

[6]    Although the government in this case has not specifically argued that the President, in Proclamation 9772, determined that the steel-import agreements already entered into were "ineffective in eliminating the threat to the national security," § 1862(c)(3)(A)(ii)(II), it is not clear what substantive difference there is between that formulation and the President's declaration in the proclamation that further restrictions on imports were needed to meet the capacity-utilization target.

announcement of a plan within the specified 15 days, followed by implementation decisions reflecting contingencies affecting achievement of the goal defined by the Secretary's finding, furthers that evident purpose.

This does not mean that the statutory purpose is furthered by permitting *any* presidential imposition after the 15-day period, even an imposition that makes no sense except on premises that depart from the Secretary's finding, whether because the finding is simply too stale to be a basis for the new imposition or for other reasons. The statute indisputably incorporates a congressional judgment that an affirmative finding of threat by the Secretary is the predicate for presidential action, while also incorporating a congressional judgment that how to address the problem identified in the finding is a matter for the President, whose choices about remedy are not constrained by the Secretary's recommendations. *See* § 1862(c)(1) (predicating the President's power on the Secretary's "find[ing]" and not the Secretary's "recommendations"). This case involves presidential adherence to the key finding of a need for a certain capacity-utilization level, with no indication of staleness of that finding. We have no occasion to rule on other circumstances or to decide what aspects of presidential decisions under § 1862 are judicially reviewable.

It is enough to say that the Trade Court's categorical narrow reading of § 1862(c)(1)—precluding *all* impositions adopted after the 15-day period in implementation of a plan announced within the period—obstructs the statutory purpose. This case illustrates why. The threat to national security was tied to an excess of imports overall, from numerous countries, that left domestic capacity utilized less than an identified, plant-sustaining level. As the President struck deals with some countries as contemplated by Proclamation 9705, the agreed-to imports from those countries would logically affect—most relevantly, could *reduce*—the volume of imports from other countries, lacking agreements with the United States, that could be allowed if the

TRANSPACIFIC STEEL LLC v. US

stated goal of overall-imports reduction was still to be met. Paragraph (3) of § 1862(c) and Proclamation 9705 recognize this evident relationship.  To prevent the President from increasing the impositions on non-agreement countries after the initial plan announcement would be to impede the President's ability to be effective in solving the specific problem found by the Secretary.

Transpacific has suggested that the President's authority to act outside the 15-day period without securing a new report from the Secretary is limited to relaxing impositions imposed initially within that period.  *See* Oral Arg. at 1:07:48–1:10:00; *see also Transpacific I*, 415 F. Supp. 3d at 1275 (asserting that "the statute specifically grants the President power to 'determine the . . . duration of the action[,]' a power to end any action" (alterations in original) (quoting § 1862(c)(1)(A)(ii))).  That suggestion, however, assumes a negative answer to the key question of whether the "action" authorized by paragraph (1) can be a plan under which later measures are imposed.  It does not provide support for that answer.  And that answer is not supported by the ordinary meaning of the language and conflicts with paragraph (3) of § 1862(c) and § 1862's purpose entrusting the President with the duty to adopt effective measures for the threat found by the Secretary.

3

The "legal and historical backdrop" against which Congress legislated confirms that under § 1862(c)(1) the President has authority to pursue a continuing course of action, with adjustments (including additional impositions) adopted over time.  *See Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703, 712 (2021) ("Congress drafted the expropriation exception and its predecessor, the Hickenlooper Amendment, against that legal and historical backdrop."); *id.* at 711 (interpreting the statute at issue "[b]ased on this historical and legal background").

a

Since 1955, Congress has delegated to the President broad discretion to adjust imports of an article that threaten to impair national security, if a designated executive officer has made a finding of such a threat. Subsequent amendments made changes, including changes to enhance the process leading to the predicate finding at the agency level and, at the presidential level, generally to add to the President's authority and obligation to act in response to the relevant official's threat finding. Throughout, Congress has retained the key term "action" in describing the President's response.

Section 7 of the Trade Agreements Extension Act of 1955 provided in relevant part:

> (b) In order to further the policy and purpose of this section, whenever the Director of the Office of Defense Mobilization has reason to believe that any article is being imported into the United States in such quantities as to threaten to impair the national security, he shall so advise the President, and if the President agrees that there is reason for such belief, the President shall cause an immediate investigation to be made to determine the facts. If, on the basis of such investigation, and the report to him of the findings and recommendations made in connection therewith, the President finds that the article is being imported into the United States in such quantitates as to threaten to impair the national security, he shall take such *action* as he deems necessary to adjust the imports of such article to a level that will not threaten to impair the national security.

Trade Agreements Extension Act of 1955, ch. 169, § 7, 69 Stat. 162, 166 (emphasis added). The provision gave the executive officer the responsibility to make a preliminary "reason to believe" finding, but it did not expressly declare

that the officer, after investigation, must make a positive finding of threat as a precondition to presidential action.

In the Trade Agreements Extension Act of 1958, Congress made that precondition explicit and also made other amendments, while keeping the word "action." *See Algonquin*, 426 U.S. at 568 (The 1958 amendments "added no limitations with respect to the type of action that the President was authorized to take. The 1958 re-enactment, like the 1955 provision, authorized the President under appropriate conditions to 'take such action' 'as he deems necessary to adjust the imports.'" (cleaned up)). The 1958 statute provided in relevant part:

> (b) Upon request of the head of any Department or Agency, upon application of an interested party, or upon his own motion, the Director of the Office of Defense and Civilian Mobilization (hereinafter in this section referred to as the "Director") shall immediately make an appropriate investigation, in the course of which he shall seek information and advice from other appropriate Departments and Agencies, to determine the effects on the national security of imports of the article which is the subject of such request, application, or motion. If, as a result of such investigation, the Director is of the opinion that the said *article* is being imported into the United States in such quantities *or under such circumstances* as to threaten to impair the national security, he shall promptly so advise the President, and, unless the President determines that the article is not being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security as set forth in this section, he shall *take such action, and for such time*, as he deems necessary to adjust the imports of such article *and its derivatives* so that such imports will not so threaten to impair the national security.

Pub. L. No. 85–686, § 8(b), 72 Stat. 673, 678 (emphases added).

In addition to making explicit that the designated officer must make the threat finding, the 1958 provision embodied four relevant changes from the 1955 version. First, Congress expanded the President's power by adding that the President may adjust not only the "article" but also "its derivatives," even though the executive officer's report had to investigate only the "article." Second, Congress clarified that the President's discretion for the "action" included not only the nature of the action (*i.e.*, "such action") but its duration (*i.e.*, "for such time"). Third, Congress broadened what would suffice as the predicate for the President's authority: "[W]hile under the 1955 provision the President was authorized to act only on a finding that 'quantities' of imports threatened to impair the national security, the 1958 provision also authorized Presidential action on a finding that an article is being imported 'under such circumstances' as to threaten to impair the national security." *Algonquin*, 426 U.S. at 568 n.24. Fourth, Congress removed the requirement that the relevant officer seek the President's approval before starting an investigation. These features stayed materially the same until 1988.

In 1962, Congress reenacted the 1958 provision—without material change, the Supreme Court has noted, though some wording was altered (*e.g.*, the predicate "opinion" became a predicate "finding")—as section 232 of the Trade Expansion Act of 1962, Pub. L. No. 87–796, 76 Stat. 872, 977. *See Algonquin*, 426 U.S. at 568 ("When the national security provision next came up for re-examination, it was re-enacted without material change as § 232(b) of the Trade Expansion Act of 1962."). Between 1966 and 1988, Congress made various changes to the statute that have not been featured in the arguments made to this court in this case. For example, in 1975, Congress made the Secretary of the Treasury the official with the predicate-finding responsibility and relocated the "unless" clause addressing

presidential disagreement with the predicate threat finding. *See* Trade Act of 1974, Pub. L. No. 93–618, § 127(d)(3), 88 Stat. 1978, 1993 (replacing the Director of the Office of Emergency Planning with the Secretary of the Treasury). In 1980, Congress added a legislative-veto procedure for presidential action adjusting imports of petroleum or petroleum products. *See* Crude Oil Windfall Profit Tax Act of 1980, Pub. L. No. 96–223, § 402, 94 Stat. 229, 301.

Just before Congress enacted its amendments in 1988, 19 U.S.C. § 1862 read in relevant part:

> Upon request of the head of any department or agency, upon application of an interested party, or upon his own motion, the Secretary of the Treasury (hereinafter referred to as the "Secretary") shall immediately make an appropriate investigation, in the course of which he shall seek information and advice from, and shall consult with, the Secretary of Defense, the Secretary of Commerce, and other appropriate officers of the United States, to determine the effects on the national security of imports of the article which is the subject of such request, application, or motion.

> The Secretary shall, if it is appropriate and after reasonable notice, hold public hearings or otherwise afford interested parties an opportunity to present information and advice relevant to such investigation. The Secretary shall report the findings of his investigation under this subsection with respect to the effect of the importation of such article in such quantities or under such circumstances upon the national security and, based on such findings, his recommendation for action or inaction under this section to the President within one year after receiving an application from an interested party or otherwise beginning an investigation under this subsection.

> If the Secretary finds that such article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, he shall so advise the President and the President shall take such *action*, and for such time, as he deems necessary to adjust the imports of such article and its derivatives so that such imports will not threaten to impair the national security, unless the President determines that the article is not being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security.

§ 1862(b) (1980) (emphasis and paragraph breaks added).

In sum, from the beginning, Congress delegated broad powers to the President to combat imports that a designated executive officer found to threaten to impair national security. The word "action," which reflected the President's broad discretion in determining the nature of the act, has always been present. Congress broadened the President's already broad power in 1958 and, at the same time, reinforced the range of presidential discretion by adding the phrase "for such time."

b

Practice under § 1862 during the three decades leading up to the 1988 amendments, and the understanding expressed during that time, provide strong confirmation that the proper meaning of the language at issue here (added by those amendments) is that presidential authority extends to carrying out a course of remedial measures, including measures that further restrict imports, chosen over time to address the threat identified in the underlying finding. *Cf. Sosa v. Alvarez-Machain*, 542 U.S. 692, 714 (2004) ("We think history and practice give the edge to this latter position.").

　　　　　　　　　　　　　　　TRANSPACIFIC STEEL LLC v. US

i

From 1955 to 1988, Presidents frequently adjusted imports, including by increasing impositions so as to restrict imports, without seeking or obtaining a new formal investigation and report after the initial one. In 1959, acting under the 1958 version of § 1862, the relevant official (then, the Director of the Office of Civil and Defense Mobilization) formally investigated and submitted a report to the President stating "his opinion 'that crude oil and the principal crude oil derivatives and products are being imported in such quantities and under such circumstances as to threaten to impair the national security.'" Proclamation 3729, 24 Fed. Reg. 1,781, 1,781 (Mar. 12, 1959) (quoting the report). The President agreed and issued Proclamation 3729, which put into place a scheme, including licenses, to adjust the imports of crude oil and its derivatives. *Id.* The President also ordered the "Secretary of the Interior [to] keep under review the imports into [certain areas] of residual fuel oil to be used as fuel" and gave the Secretary the authority to "make, on a monthly basis if required, such adjustments in the maximum level of such imports as he may determine to be consonant with the objectives of this proclamation." *Id.* at 1,783, § 2(e). The President further ordered relevant officers to "maintain a constant surveillance of" the imports of the article at issue and "its primary derivatives" and to "inform the President of any circumstances which, . . . might indicate the need for further Presidential action." *Id.* at 1,784, § 6(a).

The specific imposition initially adopted in Proclamation 3729 was modified at least 26 times before a new investigation and report were completed—16 years later in 1975. *See* Restriction of Oil Imports, 43 Op. Att'y Gen. 20, 22 (1975) (1975 AG Opinion) ("Proclamation 3279 has been amended at least 26 times since its issuance in 1959." (citing 19 U.S.C. § 1862 note)). At least some of those modifications (made without a new report) "radically amended the program." *Algonquin*, 426 U.S. at 553; *see also* 1975

AG Opinion at 22 ("Some of those amendments have been minor administrative[] changes; others have involved major alteration of the means by which petroleum imports were restricted; none have been preceded by a formal § 232(b) investigation and finding.").

In 1975, the Attorney General formally opined on the proper interpretation of the statute and concluded that it permitted modifications of prior actions:

> The normal meaning of the phrase "such action," in a context such as this, is not a single act but rather a *continuing course of action*, with respect to which the initial investigation and finding would satisfy the statutory requirement. This interpretation is amply supported by the legislative history of the provision, which *clearly contemplates a continuing process of monitoring, and modifying the import restrictions, as their limitations become apparent and their effects change.*

1975 AG Opinion at 21 (emphases added).[7] The Attorney General emphasized the long practice of presidential action

---

[7]   *See also* Presidential Authority to Adjust Ferroalloy Imports Under § 232(b) of the Trade Expansion Act of 1962, 6 Op. O.L.C. 557, 562 (1982) ("Moreover, as this Department has previously indicated, the statutory language and relevant legislative history contemplate a continuing course of action, with the possibility of future modifications."); *id.* ("As noted in a Commerce Department memorandum, the constant monitoring contemplated by § 232 encompasses not only a review of factual circumstances to determine whether a particular remedy is effective, but also a review to determine whether the initial finding of a threat to the national security remains valid."); Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial

resting on that interpretation and added that Congress
was aware of this practice. *See id.* at 22 ("The interpreta-
tion here proposed, whereby import restrictions once im-
posed can be modified without an additional investigation
and finding, has been sanctioned by the Congress' failure
to object to the President's proceeding on that basis repeat-
edly during the past 15 years."). The next year, the Su-
preme Court highlighted the breadth of presidential
authority under the statute and added that Congress was
aware of presidential practice. *See Algonquin*, 426 U.S. at
570 ("Only a few months after President Nixon invoked the
provision to initiate the import license fee system chal-
lenged here, Congress once again re-enacted the Presiden-
tial authorization encompassed in § 232(b) without
material change. . . . The congressional acquiescence in
President Nixon's action manifested by the re-enactment of
§ 232(b) provides yet further corroboration that § 232(b)
was understood and intended to authorize the imposition
of monetary exactions as a means of adjusting imports.").

––––––––––––––––––––––

Reduction in Available Petroleum Products, 6 Op. O.L.C.
644, 678 (1982) ("The President's powers under § 232(b)
have received a broad interpretation.").

In 1982, the Office of Legal Counsel stated that, for at
least some changes, it would be advisable to seek a new
predicate finding, but the circumstances, involving remote-
ness or indirectness of the connection of the presidential
action to the threat, are not present here. *See* 6 Op. O.L.C.
at 561 (discussing remoteness of a program's impact on im-
portation); *see also* The President's Power to Impose a Fee
on Imported Oil Pursuant to the Trade Expansion Act of
1962, 6 Op. O.L.C. 74, 77–80 (1982) (discussing whether to
get a new report with a predicate finding to avoid chal-
lenges based on the remoteness or indirectness of the pro-
posed import restrictions). We have no occasion to explore
such situations.

Congress amended the statute in April 1980, adding what is now subsection (f), which addresses petroleum and sets out a congressional-disapproval process. Crude Oil Windfall Profit Tax Act, § 402, 94 Stat. at 301. Between the Attorney General's 1975 opinion and that amendment, which was the last one before 1988, the President continued to modify measures adopted under the statute without obtaining new formal reports. *See PrimeSource Bldg. Prods., Inc. v. United States*, 497 F. Supp. 3d 1333, 1375–76, 1387–88 (Ct. Int'l Trade 2021) (Baker, J., concurring in part and dissenting in part) (noting at least seven instances). Between the April 1980 amendment and the inauguration of the new President in January 1981, the President modified a prior proclamation at least four times without a new investigation and report. *See id.* (noting at least four instances). It is not disputed before us that the modifications during the decades of practice included impositions of additional restrictions. *See, e.g., id.* at 1386–88.

At the time of the 1988 amendments, then, practice under and executive interpretation of the statute provided a settled meaning of "action" as including a "plan" or a "continuing course of action." *See* Oral Arg. at 1:04:06–1:04:21 (Q: "The pre-1988 version, you would agree, it gave the President the authority to do subsequent actions years after the initial proclamation? Is that right?" A: "That is the way the statute reads."). This settled meaning is strongly presumed to have continued through the 1988 amendments, which kept the key term "action," even while making other changes to the provision, indeed the subsection, in which the term appeared. *See, e.g., Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 139 S. Ct. 628, 633–34 (2019) ("In light of this settled pre-AIA precedent on the meaning of 'on sale,' we presume that when Congress reenacted the same language in the AIA, it adopted the earlier judicial construction of that phrase."); *Dir. of Revenue of Missouri v. CoBank ACB*, 531 U.S. 316, 324 (2001)

(requiring a clear indication of a change in meaning to "disrupt the 50-year history of state taxation of banks for cooperatives"); *cf. NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) ("[T]he longstanding practice of the government can inform our determination of what the law is." (cleaned up)); *Trump v. Hawaii*, 138 S. Ct. 2392, 2415 (2018) (looking at "historical practice" for statutory interpretation).

ii

Overcoming the strong implication of continuity of the settled meaning would require a "clear indication from Congress of a change in policy." *United States v. O'Brien*, 560 U.S. 218, 231 (2010) (internal quotation marks omitted). There is no such indication. Congress did not change "action" in 1988. And what it did change fails to imply the narrowing of presidential authority the Trade Court found.

In the 1988 amendments, Congress elaborated on the process by which the executive official responsible for making the predicate finding of threat—by then, the Secretary of Commerce—was to make that decision. § 1862(b). And in numerous ways, Congress acted to "spur" governmental action, not "limit the scope of . . . authority" previously possessed. *Brock*, 476 U.S. at 265. Even as to the Secretary, Congress shortened the period for the determination to 270 days (from the earlier one year). § 1862(b). Congress then directed that, once the Secretary makes a finding of threat, the President is to respond to that finding within two short periods—one for the determination whether the President concurred in the finding and the determination what to do about the threat if so, the other for implementing the action the President deemed necessary. § 1862(c)(1). Congress also made express that the presidential action chosen could be a bilateral or multilateral negotiation—something the conferees themselves understood was already implicit in § 1862(c)(1), *see* Conf. Rep. at 712—but it put that option under new constraints so that the option would not be used

for what ended up as inaction or ineffective action.
§ 1862(c)(3).

None of the new language in the statute, on its own or
by comparison to what came before, implies a withdrawal
of previously existing presidential power to take a continu-
ing series of affirmative steps deemed necessary by the
President to counteract the very threat found by the Secre-
tary. To be sure, Congress did change "for such time" lan-
guage to "duration" language, but that change was a
"stylistic" one only, not suggesting a change of meaning.
*Jama v. Immigration & Customs Enforcement*, 543 U.S.
335, 343 n.3 (2005); *see also* Scalia & Garner, *Reading Law*
§ 40, at 256 ("stylistic or nonsubstantive changes" do not
imply change of prior meaning); *Universal Steel Prods.,
Inc. v. United States*, 495 F. Supp. 3d 1336, 1351–52 (Ct.
Int'l Trade 2021); *PrimeSource*, 497 F. Supp. 3d at 1378
(Baker, J., concurring in part and dissenting in part). The
same is true of the change from "take such action . . . as
[the President] deems necessary" to "determine the nature
. . . of the action that, in the judgment of the President,
must be taken."

The new provisions have the evident purpose of produc-
ing more action, not less—and of counteracting a perceived
problem of inaction, including inaction through delay. In
this context, the directive to the President to act by a spec-
ified time is not fairly understood as implicitly meaning "by
then or not at all" as to each discrete imposition that might
be needed, as judged over time.

There is no material dispute that the background to the
1988 amendments was a perceived problem of inaction, in-
cluding by delay. The conferees stated the problem: "Pre-
sent law provides no time limit after the Commerce
Secretary's report for the President's decision on the appro-
priate action to take." Conf. Rep. at 711. Indeed, in 1982,
having received a report from the Secretary finding a na-
tional-security threat from imports of ferroalloy products,

the President was advised by the Office of Legal Counsel that "[n]o time frame constrains the President" in acting on the report. Presidential Authority to Adjust Ferroalloy Imports Under § 232(b) of the Trade Expansion Act of 1962, 6 Op. O.L.C. 557, 562 (1982); *see also id.* at 558, 563. Congress plainly acted to oblige the President to act within specified periods, but as Transpacific has acknowledged, nothing in the legislative history suggests that, if that duty was breached, the President could not act later. Oral Arg. at 1:02:44–1:03:16 (Q: "Where is there any expression of legislative intent that these time limits that were installed in 1988 into section 232(b) were designed to yank away from the President any authority to take action outside of that time limit? Is the answer that there really isn't anything in the legislative history on that?" A: "I would have to agree with Your Honor, yes, there is nothing in the legislative history that says that.").

The specific focus of Congress's concern involved presidential inaction concerning imports of machine tools. Based on a March 1983 request for investigation, the Secretary, in February 1984, sent the President a report finding that "imports in certain machine tools markets did threaten the U.S. national security." *See* General Accounting Office, *International Trade: Revitalizing the U.S. Machine Tool Industry* 9 (1990) (GAO). The President responded that the "report should incorporate new mobilization, defense, and economic planning factors then being developed by an interagency group" and "directed the Secretary of Commerce to update the machine tools investigation." Statement on the Machine Tool Industry, 1986 Pub. Papers 632, 632–33 (May 20, 1986). Nearly two years later, in March 1986, the Secretary submitted an updated report, and two months after that, the President announced that he agreed with the Secretary's finding and proclaimed his "action plan," his "course of action," *id.*—to "seek voluntary export restraint agreements to reduce machine tool imports as part of an overall Domestic Action Plan supporting

the industry's modernization efforts," GAO at 9.  About seven months later, in December 1986, the President announced that he reached a five-year voluntary restraint agreement with Japan and Taiwan.  *Id.*; *see also* Statement on the Revitalization of the Machine Tool Industry, 1986 Pub. Papers 1632, 1632–33 (Dec. 16, 1986).

It is undisputed that "Congress did not applaud the" President's delay for the machine-tools articles.  *Fed. Republic of Germany*, 141 S. Ct. at 711.  The Trade Court has recognized as much.  *See Transpacific II*, 466 F. Supp. 3d at 1252 ("[T]he 1988 Amendments were passed against the backdrop of President Reagan's failing to take timely action in response to the Secretary's report finding that certain machine tools threatened to impair national security and Congress's resulting frustration."); *Universal Steel*, 495 F. Supp. 3d at 1352 n.17 ("The history of the 1988 amendments reveals that the amendments were motivated in no small part by a desire to accelerate Presidential action pursuant to Section 232.  Congress had been frustrated by perceived undue Presidential delay in taking timely or effective action pursuant to the Secretary's report that machine tools threatened to impair the national security."); *id.* at 1353 ("Furthermore, the 1988 amendments to Section 232 were motivated by a desire to prevent Presidential inaction and inefficiency under Section 232.").[8]

---

[8]    *See also, e.g., Comprehensive Trade Legislation: Hearing on H.R. 3 Before the H. Comm. on Ways & Means*, 100th Cong. 199 (1987) (statement of Rep. Jim Wright, Speaker of the U.S. House of Representatives) ("Many of our trade problems can be directly traced to the delays, the abuses of discretion, and ill-considered policy decisions by those officially appointed to carry out American policy. One of the worst delays was the machine tools case."); *Trade Reform Legislation: Hearing Before the Subcomm. on Trade of the H. Comm. on Ways & Means*, 99th Cong. 1282

This history tends to undermine, not support, the Trade Court's ruling that the new timing provisions were meant not only to create a duty to act within specified periods but also to disable the President from acting later if those periods had ended, even if the actions were needed to effectuate the Secretary's finding of threat following a timely-announced plan of action.

4

Transpacific suggests that the Trade Court's narrow reading of § 1862(c)(1) is necessary to avoid making § 1862(c)(3) superfluous. *See* Transpacific Response Br. at 25. We disagree. Subsection (c)(3) makes clear that an initial action can indeed be a plan that leads to additional impositions well after the time periods of subsection (c)(1) have passed. For example, if an agreement with one country is "ineffective in eliminating the threat to the national security posed by imports of such article," as assessed long after the 90-day and 15-day periods have ended, the President "shall take such other actions" as necessary "to adjust

---

(1986) (statement of Rep. Barbara B. Kennelly, Member, H. Comm. on Ways & Means) (noting that without a deadline, the President could "leave these cases to languish indefinitely"); *Threat of Certain Imports to National Security: Hearing on S. 1871 Before the S. Comm. on Fin.*, 99th Cong. 18 (1986) (statement of Sen. Charles E. Grassley, Member, S. Comm. on Finance) ("[I]t was almost 2 years from that date before the President asked several major foreign sources of machine tools to cut exports to the United States. And of course, when the national security is at stake, such a delay is incomprehensible to me and to most other people."); *id.* at 24 (statement of Sen. Robert C. Byrd) ("So, there is no time limit under present law for the President to act in which he has to act. We have seen petitions by the ferroalloy industry and the machine tools industry drag on for months and months without resolution.").

the imports of such article so that such imports will not threaten to impair the national security."  § 1862(c)(3)(A). Having recognized that entry into negotiations can be part of the President's remedial choice under subsection (c)(1), Congress insisted that the negotiation/agreement option not be a route to inaction, or a substitute for effective action, by writing very specific directives that apply in that situation.  Those directives are not superfluous of subsection (c)(1)'s contemplation of a plan of action with adjustment of implementation choices over time.

Relatedly, we reject Transpacific's suggestion that the Trade Court's interpretation of subsection (c)(1) is supported by the fact that paragraph (1) uses "action" (singular) while paragraph (3) uses "actions" (plural). Transpacific Response Br. at 24.  "[U]nless the context indicates otherwise[,] words importing the singular include and apply to several persons, parties, or things; words importing the plural include the singular."  1 U.S.C. § 1.  In any event, "action," in particular, can refer to an extended-over-time process or a single event at a single moment. Here, paragraph (1)'s reference to "take action" (or "action that . . . must be taken") is addressing the initial announcement of the response as a whole, and naturally encompasses a plan that could have many components or types of components.  In contrast, paragraph (3)'s reference to "actions" is in a context where the distinction is being made between one kind of component (bilateral or multilateral efforts, which have left imports too high) and another kind, drawing the focus to the more granular level.  The broad scope of the singular formulation in paragraph (1) is not undermined by the use of the plural in paragraph (3).  *See Cherokee Nation v. State of Georgia*, 30 U.S. 1, 19 (1831) (Marshall, C.J.) ("It has been also said, that the same words have not necessarily the same meaning attached to them when found in different parts of the same instrument: their meaning is controlled by the context.  This is

undoubtedly true."); *see also Yates v. United States*, 574 U.S. 528, 537 (2015).

Transpacific also suggests that the timing provisions were meant to prevent the President from acting on stale information. Transpacific Response Br. at 29; *see also Transpacific II*, 466 F. Supp. 3d at 1252. But that observation does not support the categorical narrow interpretation adopted by the Trade Court and pressed by Transpacific, especially given the already-discussed considerations of text and context, including purpose and history, that strongly undermine the narrow interpretation. Concerns about staleness of findings are better treated in individual applications of the statute, where they can be given their due after a focused analysis of the proper role of those concerns and the particular finding of threat at issue. In so stating, we add, we are not prejudging the scope of judicial reviewability of presidential determinations relevant to that concern.[9]

Here, there is no genuine concern about staleness. Proclamation 9772, the challenged proclamation, came only months after the initial announcement, which itself provided for just such a possible change in the future, and rested on a determination by the Secretary—about needed domestic-plant capacity utilization—as to which no substantial case of staleness has been made.[10]

---

[9]   We also note the possibility that § 1862(b)(1)(A) allows an "interested party" to request that the Secretary launch an investigation to determine that imports found to threaten national security no longer do so. We do not address that possibility.

[10]   The finding of the Secretary at issue was about the needed capacity utilization. How much reduction of imports is being achieved as measures are implemented is a separate matter, necessarily a future-oriented one, that is

Finally, Transpacific argues that the constitutional-doubt canon supports its narrow reading of § 1862 because a contrary reading raises serious nondelegation-doctrine concerns. Transpacific Response Br. at 16–17, 19, 31; *see also Transpacific II*, 466 F. Supp. 3d at 1253; *Transpacific I*, 415 F. Supp. 3d at 1275–76. Under governing precedent, there is no substantial constitutional doubt. *See generally Algonquin*, 426 U.S. at 550–70; *American Inst. for Int'l Steel*, 806 F. App'x at 983–91. The Supreme Court in *Algonquin* concluded that § 1862—before Congress added the timing deadlines—"easily fulfills" the intelligible-principle standard. 426 U.S. at 559. We have not been shown why the particular interpretation of § 1862(c)(1) at issue raises a materially distinct issue under the nondelegation doctrine.

*      *      *

For the foregoing reasons, we reverse the Trade Court's determination that Proclamation 9772 violated § 1862.

### B

It is well established that the Fifth Amendment's Due Process Clause has an equal-protection guarantee that mirrors the Fourteenth Amendment's Equal Protection Clause. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975); U.S. Const. amend. XIV, § 1 ("nor deny to any person within its jurisdiction the equal protection of the

---

not the subject of § 1862(b). Proclamation 9705 put in place requirements for monitoring the import reductions so that the President had current information. *See* 83 Fed. Reg. at 11,628; *see also* Proclamation 9772, 83 Fed. Reg. at 40,429, ¶¶ 3–4 (relying on updated information); *cf.* Proclamation 3729, 24 Fed. Reg. at 1,783, § 2(e) and 1,784, § 6(a) (ordering monitoring in 1959); 1975 AG Opinion at 21 (contemplating a "continuing process of monitoring"); 6 Op. O.L.C. at 562 (same).

laws"); U.S. Const. amend. V ("nor be deprived of life, liberty, or property, without due process of law"). Here, the class allegedly being singled out for unfavorable treatment is the class of "U.S. importers of Turkish steel products." Transpacific Response Br. at 33. Transpacific's claim of unconstitutional discrimination against that class, we conclude, fails.

The most demanding standard that could apply here is the undemanding rational-basis standard. Transpacific has made no persuasive case that the class of importers of a particular product from a particular country falls into any category for which a heightened standard of review under equal-protection analysis has been recognized. The Supreme Court "has long held that a classification neither involving fundamental rights nor proceeding along suspect lines cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012) (cleaned up).

Under rational-basis review, Transpacific, as the challenger, has the burden to establish that there is no "reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 320 (1993) (internal quotation marks omitted); *see also FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."); *Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 487–88 (1955) ("But the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.").

Transpacific has failed to meet its burden. Proclamation 9772's "policy is plausibly related to the Government's stated objective to protect" national security. *Hawaii*, 138 S. Ct. at 2420. In Proclamation 9772, the President noted that the Secretary in the January 2018 report had recommended "applying a higher tariff to a list of specific countries should [the President] determine that all countries should not be subject to the same tariff"—a list that includes Turkey—and stated that "Turkey is among the major exporters of steel to the United States for domestic consumption." 83 Fed. Reg. at 40,429, ¶ 6. And the President highlighted that the Secretary "advised [him] that this adjustment will be a significant step toward ensuring the viability of the domestic steel industry." *Id.* For at least those reasons, the President determined that it was "necessary and appropriate" to increase the tariff from 25% to 50% and that the increase would "further reduce imports of steel articles and increase domestic capacity utilization." *Id.* Increasing tariffs on a major exporter is plausibly related to the achievement of the stated objective of achieving the level of domestic capacity utilization needed for plant sustainability found important to protect national security.

Transpacific complains that the President singled out Turkey, even though other countries export more. Transpacific Response Br. at 38 (noting that "Canada, Mexico, Brazil, South Korea, Russia, Japan, Germany, and China" are major exporters of steel). But it is rational for the President to try a steep increase on tariffs for only one major exporter to see if that strategy helps to achieve the legitimate objective of improving domestic capacity utilization without extending the increase more widely. That is especially true because the United States's relations with any given country often will differ, in ways relevant to § 1862, from its relations with other countries. *See Totes-Isotoner Corp. v. United States*, 594 F.3d 1346, 1357 (Fed. Cir. 2010) ("The reasons behind different duty rates vary widely based on country of origin, the type of product, the

circumstances under which the product is imported, and the state of the domestic manufacturing industry. . . . Further, differential rates may be the result of trade concessions made by the United States in return for unrelated trade advantages.").

Here, of the eight countries Transpacific mentions, the President was negotiating with at least four. *See, e.g.*, Proclamation 9740, 83 Fed. Reg. at 20,683–84, ¶¶ 4–6 (noting negotiations with South Korea, Brazil, Canada, and Mexico, among other countries). Of those four, the President had reached agreements with two of them (Brazil and South Korea) before issuing Proclamation 9772. *See, e.g.*, *id.* at 20,683–84, ¶¶ 4–5 (agreement with South Korea, which included "a quota that restricts the quantity of steel articles imported into the United States from South Korea"); Proclamation 9759, 83 Fed. Reg. at 25,857–58, ¶ 5 (agreement with Brazil, among other countries). And of the four countries the President might not have been negotiating with, two of them did not appear on the Secretary's list of a subset of countries to impose tariffs on. *See* January 2018 report, 85 Fed. Reg. at 40,205 (not listing Japan or Germany but listing "Brazil, South Korea, Russia, Turkey, India, Vietnam, China, Thailand, South Africa, Egypt, Malaysia and Costa Rica"). More generally, we see no authority or sound basis for treating equal-protection analysis under the rational-basis standard as requiring judicial inquiry into differences among particular countries' relations with the United States that might legitimately affect the possibility of negotiations or furnish reasons not to include particular countries in efforts to reduce overall imports of a particular article. *See Hawaii*, 138 S. Ct. at 2421 ("[W]e cannot substitute our own assessment for the Executive's predictive judgments on such [foreign-policy] matters, all of which are delicate, complex, and involve large elements of prophecy." (internal quotation marks omitted)).

The Trade Court concluded that the present "case is materially indistinguishable from *Allegheny Pittsburgh Coal Company v. County Commission of Webster County*, 488 U.S. 336 (1989)." *Transpacific II*, 466 F. Supp. 3d at 1258. We disagree. *Allegheny* must be read narrowly; the Supreme Court has made clear that it is the "exception," the "rare case." *Armour*, 566 U.S. at 686–87; *see also Nordlinger v. Hahn*, 505 U.S. 1, 16 (1992) ("*Allegheny Pittsburgh* was the rare case where the facts precluded any plausible inference that the reason for the unequal assessment practice was to achieve the benefits of an acquisition-value tax scheme."). *Allegheny* involved a circumstance in which the only apparent basis for the county's distinction between the favored and disfavored class was one the county was barred from asserting because the State's constitution disclaimed it. *See Allegheny*, 488 U.S. at 338; *id.* at 345 ("But West Virginia has not drawn such a distinction. Its Constitution and laws provide that all property of the kind held by petitioners shall be taxed at a rate uniform throughout the State according to its estimated market value."); *Armour*, 566 U.S. at 686–87 (describing *Allegheny* as resting on the fact that "in light of the state constitution and related laws requiring equal valuation, there could be no other rational basis for the [challenged] practice").

In the present case, in contrast, there is no applicable federal-law prohibition on different treatment of the imports of articles from different countries. The Trade Court cited 19 U.S.C. § 1881 when asserting that "[t]he status quo under normal trade relations is equal tariff treatment of similar products irrespective of country of origin." *Transpacific II*, 466 F. Supp. 3d at 1258 (citing § 1881). But the Trade Court did not assert that § 1881 is actually a prohibition on the distinction made in implementing § 1862 here. Nor does Transpacific so contend—or even cite § 1881 in defending the Trade Court's decision. Transpacific Response Br. at 31–55. In fact, § 1881 begins with the phrase, "Except as otherwise provided in this title,"

before stating a principle that "any duty or other import restriction or duty-free treatment proclaimed in carrying out any trade agreement under this title or section 350 of the Tariff Act of 1930 [19 U.S.C. § 1351] of this title shall apply to products of all foreign countries, whether imported directly or indirectly." The exception for "this title," the government has explained (with no response from Transpacific), refers to Title II of the Trade Expansion Act of 1962, of which section 232 of that Act, *i.e.*, 19 U.S.C. § 1862, is a part. U.S. Opening Br. at 45. The overriding legal bar on the challenged distinction that was present in *Allegheny* is not present here. *See* Oral Arg. at 1:17:15–1:17:38 (Transpacific conceding that the applicable law here differs from the one in *Allegheny*).

Transpacific also points to certain sources outside the agency record—*i.e.*, outside the record on which the Trade Court's judgment rested, by joint motion—to support its argument that the only purpose of Proclamation 9772's policy is animus toward U.S. importers of Turkish steel. *E.g.*, Transpacific Response Br. at 43. But Transpacific has not shown how animus towards importers of goods from a particular country (which is not animus towards people from particular countries) would, if shown, alter the applicability of rational-basis review. And in any event, Transpacific's evidence does not justify altering our conclusion. Nearly all of Transpacific's extrinsic evidence consists of statements by the President that are too "remote in time and made in unrelated contexts" to "qualify as 'contemporary statements' probative of the decision at issue." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1916 (2020) (plurality opinion) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977)). And the statement from the President on the same day as Proclamation 9772 does not reflect animus toward *U.S. importers of Turkish steel*, let alone negate the reasonably conceivable state of facts establishing a rational basis for the policy. *See* J.A. 499.

We must "uphold [Proclamation 9772] so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Hawaii*, 138 S. Ct. at 2420. Transpacific has failed to establish that Proclamation 9772 had no "legitimate grounding in national security concerns, quite apart from any . . . hostility" to U.S. importers of Turkish steel. *Id.* at 2421. We conclude that Proclamation 9772 did not violate the equal-protection guarantees of the Fifth Amendment's Due Process Clause.

### III

We reverse the Trade Court's decision and remand the case for entry of judgment against Transpacific. On remand, the Trade Court may determine whether that judgment should include dismissal of the claim against the President.

The parties shall bear their own costs.

**REVERSED AND REMANDED**

# United States Court of Appeals for the Federal Circuit

———————————

**TRANSPACIFIC STEEL LLC, BORUSAN MANNESMANN BORU SANAYI VE TICARET A.S., BORUSAN MANNESMANN PIPE U.S. INC., THE JORDAN INTERNATIONAL COMPANY,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES, JOSEPH R. BIDEN, JR., IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, TROY MILLER, IN HIS OFFICIAL CAPACITY AS SENIOR OFFICIAL PERFORMING THE DUTIES OF THE COMMISSIONER FOR UNITED STATES CUSTOMS AND BORDER PROTECTION, DEPARTMENT OF COMMERCE, GINA RAIMONDO, IN HER OFFICIAL CAPACITY AS SECRETARY OF COMMERCE,**
*Defendants-Appellants*

———————————

2020-2157

———————————

Appeal from the United States Court of International Trade in No. 1:19-cv-00009-CRK-GSK-JAR, Senior Judge Jane A. Restani, Judge Claire R. Kelly, Judge Gary S. Katzmann.

———————————

2                                    TRANSPACIFIC STEEL LLC v. US

REYNA, *Circuit Judge* dissenting.

John Adams warned that "Power must never be trusted without a Check."[1]  The expression of caution from our Founding Father is as much true today as it was at the founding of our nation.  It also has exact application to this appeal.  The essential question posed by this appeal is whether Congress enacted § 232 to grant the President unchecked authority over the Tariff.

The U.S. Court of International Trade, in a special three judge panel,[2] determined that President Trump exceeded his statutory authority by adjusting tariffs imposed for national security reasons outside the time limits specified in § 232.  My colleagues reverse the Court of International Trade holding that § 232 does not temporally limit the President's authority to act.  I would affirm the Court of International Trade and hold that the discretionary authority Congress granted the President under § 232 is temporally limited and that the President in this has case exceeded that authority.  I dissent.

---

[1]     Letter from John Adams to Thomas Jefferson (Feb. 2, 1816) (on file with the National Archives), https://founders.archives.gov/documents/Jefferson/03-09-02-0285.

[2]     The chief judge of the Court of International Trade is authorized to designate a three-judge panel to decide a case that "(1) raises an issue of the constitutionality of an Act of Congress, a proclamation of the President or an Executive order; or (2) has broad or significant implications in the administration or interpretation of the customs laws." 28 U.S.C. § 255(a).

INTRODUCTION

My dissent is based on three grounds.  First, the majority overlooks the context of § 232[3] as a trade statute.  In § 232, Congress has delegated to the Executive Branch certain narrow authority over trade—an area over which Congress has sole constitutional authority—for the purpose of safeguarding national security.  The majority expands Congress's narrow delegation of authority, vitiating Congress's own express limits, and thereby effectively reassigns to the Executive Branch the constitutional power vested in Congress to manage and regulate the Tariff.  *See* U.S. CONST. art. I, § 8.  The majority therefore seeks to walk in the shoes of the Founders: its present expansion of Executive Authority is more than legislating from the bench, it is amending the Constitution.  Second, § 232 is written in plain words that evoke common meaning and application.  The majority articulates no sound reason to diverge from that plain language but expounds at great length, instead, on what the statute does not say or what it purportedly means to say.  It engages in statutory leapfrog, hopping here and there but ignoring what it has skipped.  Third, § 232's legislative history shows that Congress intended, for good reason, to end the Executive Branch's historical practice of perpetually modifying earlier actions without obtaining a new report from the Secretary of Commerce and without reporting to Congress.

---

[3]   Trade Agreement Expansion Act of 1962, Pub. L. No. 87-794, § 232, 76 Stat. 872, 877 (1962) (codified as amended at 19 U.S.C. § 1862) ("§ 232" or "§ 1862").

4                                 TRANSPACIFIC STEEL LLC v. US

DISCUSSION

I

Congress's Authority Over Trade

The majority decision is based on a rationale that ignores the history of the U.S. trade law framework. It ignores that significant experience that Congress has in enacting delegation statutes, experience that stretches back to the founding of this country. In vitiating the express limits imposed on a narrow delegation of Congressional authority, the majority tears at the legal framework established by the Founders and Congress and imperils the very relief sought to be provided under § 232.

The Constitution vests in Congress sole power over the Tariff when it confers on Congress the power "To lay and collect Taxes, Duties, Imposts, and Excises" and "To regulate Commerce with foreign Nations." U.S. CONST. art. I, § 8. Only Congress, therefore, has power derived from the Constitution to establish, revise, assess, collect, and enforce tariffs (which may include duties, taxes and imposts) that are assessed and collected upon the importation of goods.

Over time, Congress has delegated to the Executive Branch authority to act on certain matters involving tariffs. For example, Congress has delegated to the Executive Branch authority to negotiate tariff reductions via multilateral trade agreements, such as the General Agreement on Tariffs and Trade ("GATT") (reciprocal and non-reciprocal tariff reduction among the contracting members); regional trade agreements, such as the North American Free Trade Agreement ("NAFTA") (eliminating tariffs on almost 100% of the trade among the parties to the agreement); and non-reciprocal programs, such as the Generalized System of Preferences ("GSP") (programs designed to assist the

economic development of lesser developed economies).[4] But in each instance, Congress has maintained oversight by, for example, reviewing negotiating objectives and holding hearings. Congress has also held the ultimate authority to approve the results of the Executive Branch's negotiations.[5] Under our constitutional scheme, any statutory limitations placed by Congress on a delegation of authority to the President bind him to act within those limits, and any action taken outside such limits exceeds such authority and is therefore illegal. That precisely is what happened in this case.

## Section 232

Section 232 is a trade relief statute, a narrow delegation of authority by Congress to the President to take trade-related action when necessary to safeguard national security. *See* 19 U.S.C. § 1862. As such, we should be wary of any undue expansion, whether by the Executive or the Judicial branch, of the President's delegated authority.

The § 232 procedures relevant to this appeal are straightforward and clear. At the outset, the Secretary of Commerce initiates an investigation on whether certain importation threatens to impair national security. 19 U.S.C. § 1862(b)(1)(A). Section 232 investigations are trade focused. The "evidence" examined is therefore trade data and economic statistics and any other circumstances

---

[4]   The GSP was authorized by Congress in the Trade Act of 1974, *see* Trade Act of 1974, Pub. L. No. 93-618, § 501, 88 Stat. 1978, 2066 (1975), and is subject to renewal by Congress.

[5]   *See, e.g.*, Uruguay Round Agreements Act, Pub. L. No. 103-465, § 101(a), 108 Stat. 4809, 4814 (1994) (approving the trade agreements and the statement of administrative action to implement the agreements submitted to Congress).

TRANSPACIFIC STEEL LLC v. US

involving the production, commercialization, and importa-
tion of the good subject to investigation. Factors examined
often include U.S. shortages; U.S. and foreign production;
excess and underutilized capacity; U.S. shipments and do-
mestic consumption; plant closures; prices; and worker and
manufacturing dislocations caused by bilateral or multilat-
eral trade arrangements.[6]

No more than 270 days after the investigation is initi-
ated, the Secretary of Commerce must submit a report to
the President on the effects of the importation at issue,
whether a threat to national security exists, and the rec-
ommended course of action, if any. *Id.* § 1862(b)(3). The
President then has 90 days to determine whether he agrees
with the Secretary's findings and, if so, determine "the na-
ture and duration of the action that, in the judgment of the
President, must be taken to adjust the imports" at issue to
address the threat. *Id.* § 1862(c)(1)(A). The President's
"adjustment of imports" may involve increasing or decreas-
ing tariffs on imports of a good or the establishment or
elimination of some other trade-related restriction. To the
extent the President acts to "adjust imports" under § 232,
such adjustments invariably seek to improve the competi-
tiveness of the U.S. industry that produces the same or
similar good as that subject to the investigation (in this
case, steel).[7]

_____

[6]    *See, e.g.*, 31 C.F.R. § 9.4.
[7]    *See, e.g.*, Proclamation No. 9705, 83 Fed. Reg.
11,625, 11,626 (Mar. 8, 2018) ("This relief will help our do-
mestic steel industry to revive idled facilities, open closed
mills, preserve necessary skills by hiring new steel work-
ers, and maintain or increase production, which will reduce
our Nation's need to rely on foreign producers for steel and
ensure that domestic producers can continue to supply all
the steel necessary for critical industries and national de-
fense.").

The President is then required to "implement that action *by no later than the date that is 15 days after the day on which the President determines to take action.*" *Id.* § 1862(c)(1)(B) (emphasis added). The President "shall" also, within 30 days after the President's determination on whether to take action, submit to Congress a written statement of the reasons for the chosen action or inaction.[8] *Id.* § 1862(c)(2).

Because the procedures set forth in § 232 are trade focused, and the relief provided is trade specific, the subject matter of § 232 flows directly Congress's constitutional power over the Tariff. The majority decision, however, is untethered from the U.S. trade law context. As such, it answers the wrong question. *See King v. Burwell*, 576 U.S. 473, 492 (2015) (reciting the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme" (citation and quotation omitted)). The real question is whether Congress has delegated to the President authority to act to adjust imports outside § 232's time limits. For the reasons below, and as rightly concluded by the Court of International Trade, the answer

---

[8] Section 232 also contemplates that the President may decide to take action by way of negotiations with another country to limit or restrict imports into the U.S. *Id.* § 1862(c)(3). If the President decides to negotiate, subsection (c)(3) requires a different timeline. If no agreement is entered into before the date that is 180 days after the date on which the President made his § 1862(c)(1)(A) determination to take action, or if the negotiated agreement is not carried out or effective in eliminating the threat, the President "shall take such other actions as the President deems necessary to adjust the imports[.]" *Id.* § 1862(c)(3)(A). This appeal does not directly involve the negotiations alternative.

is no.  Congress has placed time limits upon the President that are plain, clear, and unmistakable, and has mandated that, if the President decides to act, he must do so "by no later than" those time limits.

## II

The plain language and legislative history of § 232 demonstrate that the President must act within the specified time limits or else forfeits the right to do so until the Secretary of Commerce provides a new report.

### The Plain Language

Statutory interpretation begins with the language of the statute.  *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).  If the language is plain, then the inquiry ends, and "the sole function of the courts is to enforce it according to its terms."  *Id.* (citation and quotation omitted).   Here, § 232 plainly requires that the President "shall," within 90 days of receiving the Secretary's report, determine whether she agrees with the report and determine the nature and duration of the action, if any, to take to avoid impairment to national security.   19 U.S.C. § 1862(c)(1)(A).  If the President decides to act, she "shall" do so within 15 days of determining that the action is warranted.  *Id.* § 1862(c)(1)(B).

The majority decides that "shall" means "may."  Maj. Op. at 23–24.  I discern no sound reason for that interpretation permitting the President to modify the action indefinitely outside the statutory time limits.  The word "shall" in a statute "normally creates an obligation impervious to judicial discretion."  *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998); *see also Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); *United States v. Rodgers*, 461 U.S. 677, 706 (1983).  Applying the normal legal meaning of "shall," § 232 requires the

President to follow the deadlines set forth in the statute. The result is not draconian: If the President does not act in time, he must obtain a new report from the Secretary of Commerce—which may be the same as or similar to the previous report—in order to be authorized again to take action to avoid impairment of national security. But nothing in § 232 gives the President discretion to ignore the time limits or modify the initial action indefinitely. "[W]ithout 'any indication' that [§ 232] allows the government to lessen its obligation, we must 'give effect to [§ 232's] plain command.'" *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1321 (2020) (quoting *Lexecon*, 523 U.S. at 35).

The majority also interprets the word "action" to encompass a "plan of action" that may be modified and completed long after the statutory time limits expire. Maj. Op. at 25–26. This reading is unavailing. Section 232 repeatedly refers to *taking* an action, and plans cannot be taken. Section 232's use of the word "implement" does not change this conclusion: a tariff can be implemented, but that does not make that tariff a plan of action or series of actions. Further, Congress chose the singular form of "action" even though, there is no question, it was capable of selecting the plural. *See* 19 U.S.C. § 1862(c)(3) (referring to "actions").

The majority's reading should also be rejected because it clashes with several other aspects of § 232, rendering them superfluous, nonsensical, and useless.[9] The Supreme Court has warned against statutory interpretations that "render[] superfluous another portion of that same law."

---

[9]    Section 232 is but a small part of the overall U.S. trade framework, a framework replete with limitations on presidential authority over trade matters. The majority fails to explain why its interpretation in this case does, or does not, extend to the limitations articulated in other aspects of U.S. trade law.

*Maine*, 140 S. Ct. at 1323 (citations and quotations omitted).  First, § 232 requires the President to determine the "duration" of "*the action*" chosen.  19 U.S.C. § 1862(c)(1)(A)(ii).  This requirement has no teeth if an "action" may include an open-ended series of actions that may be endlessly modified.  Further, § 232 requires the President to provide Congress with a statement of the reasons for the chosen action (or inaction) within 30 days of his determination on whether to take action.  *Id.* § 1862(c)(2).  Such a requirement is useless to Congress if the statute permits the President to adopt a continuing plan of action that may be changed later.

Section 232 also permits the President to take "such other actions as the President deems necessary" if the President initially selected the action of negotiation and the ensuing negotiations are unfruitful.  19 U.S.C. § 1862(c)(3)(A).  The majority argues that this provision's reference to "other actions" suggests that the President may undertake a plan of action that is modifiable after the time limits expire.  Maj. Op. at 26–28.  But the opposite is true.  The President would have no need for "other actions" if an "action" may include multiple actions modifiable over long periods.  Moreover, subsection (c)(3) in no way suggests that the President has carte blanche to modify past actions in a continuing fashion without a new report from the Secretary of Commerce and without reporting to Congress.  It is irrational to read the subsection on negotiations as expanding the President's authority under different subsections pertaining to all other actions *excluding* negotiations.

The majority also reduces the statutory deadlines themselves to mere optional suggestions.  The majority reasons that § 232 is analogous to a requirement that a person must "return a car by 11 p.m.": Even if the 11 p.m. deadline passes, the obligation to return the car still remains.  Maj. Op. at 23.  For support, the majority cites *Brock v. Pierce County*, 476 U.S. 253, 265 (1986).  But that

case is inapposite.  The statute in *Brock* authorized the agency to act "separate and apart" from the provision that contained time limitations.  *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 177 (2003) (Scalia, J., dissenting).  No such separate authorization exists here.  Nor does *Brock* involve the delegation to the President of a constitutional power belonging to Congress.  Because § 232 is such a delegation, extra care should be taken to avoid unduly expanding that delegation—as the majority does now—lest we reweigh the careful balances drawn by both the Founders and Congress.

Lastly, even assuming that an "action" may encompass a "plan of action," it does not follow that § 232's deadlines are mere optional suggestions.  To the extent "action" can include a "plan of action," § 232 requires the President to implement *the plan*, not a part of the plan, "by no later than" a specific deadline.  19 U.S.C. § 1862(c)(1)(B) (requiring the President to "implement *that action* by no later than the date that is 15 days after the day on which the President determines to take action" (emphasis added)).  The majority provides no persuasive reason why a "plan of action" is inherently free of time limits, requiring infinite time for completion of the plan.

Because § 232 is plain, the inquiry ends here.  *Ron Pair*, 489 U.S. at 241.

## Legislative History

The legislative history of § 232 also shows that Congress has not authorized the President to carry out open-ended plans of action, modifiable outside the statutory deadlines, without a new report from the Secretary of Commerce and without reporting to Congress.  Before Congress amended § 232 in 1988, the provision stated that the President "shall take such action, and for such time, as he deems necessary."  Trade Agreement Expansion Act of 1962, Pub. L. No. 87-794, § 232, 76 Stat. 872, 877 (1962).  Under that regime, the President had broad authority to

　　　　　　　　　　　　　　TRANSPACIFIC STEEL LLC v. US

take action and modify that action indefinitely even without obtaining a new report from the Secretary of Commerce. For example, President Eisenhower enacted Proclamation 3729, which was modified *26 times over 16 years* with no new report or investigation initiated. *See* Restriction of Oil Imports, 43 Op. Att'y Gen. 20, 22 (1975) ("Proclamation 3279 has been amended at least 26 times since its issuance in 1959." (citation omitted)). In 1987, President Reagan adopted yet another modification to President Eisenhower's proclamation. *Transpacific Steel LLC v. United Sates*, 466 F. Supp. 3d 1246, 1253 (Ct. Int'l Trade 2020). This state of affairs served as the backdrop for Congress's 1988 amendments to § 232.

In 1988, "frustrated" with the status quo, *id.*, Congress enacted requirements that the President must set a duration for his action, carry out that action, and report to Congress, all within specific deadlines. Specifically, Congress amended § 232's language to state that the President "shall *determine the nature and duration* of the action that, in the judgment of the President, must be taken." Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1501(a), 102 Stat. 1107, 1258 (1988) (emphasis added). Congress also added time limits using the key language, "no later than," which appears repeatedly throughout § 232. For example, Congress required the President to implement an action by "no later than the date that is 15 days after" the determination to take the action. 19 U.S.C. § 1862(c)(1)(A). Congress also added that, "[b]y no later than" 30 days after the determination on whether to act, the President must inform Congress of the reasons for the action or inaction. 19 U.S.C. § 1862(c)(2). By its plain terms, the language "no later than" bars action that occurs "later than" the statutory deadline. I see no legitimate reason to ignore the word "no" as the majority does.

The 1988 amendments were a "clear indication from Congress of a change in policy" that overcomes the implication of continuity, *United States v. O'Brien*, 560 U.S. 218,

231 (2010) (citation and quotation omitted), and the majority offers no support for its contention that the changes were only stylistic in nature, Maj. Op. at 41. Congress's removal of the language, "for such time[] as he deems necessary," indicates that the President may no longer act for such time as he deems necessary following the 1988 amendments. Indeed, "[f]ew principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded." *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 168 n.16 (1993) (citations and quotations omitted). "To supply omissions transcends the judicial function." *Id.* (citation and quotation omitted). Congress's addition of specific deadlines for acting and reporting to Congress compels the conclusion that the President may no longer adopt continuing, open-ended plans of action under § 232.

Congress's approach in 1988 wisely ensured that the President acted with a current report and thus warded off continuing modifications based on stale information or based on a changed purpose, such as a purpose or reasons not relating to the subject importation's effect on national security. I agree with the majority that the purpose of the 1988 amendments was to produce more action, not less. Maj. Op. at 41. But that does not negate that Congress has clearly required the President to act within the specified time limits. *See also* H.R. REP. NO. 99-581, pt. 1, at 135 (1986) ("The Committee believes that if the national security is being affected or threatened, this should be determined and acted upon as quickly as possible."). Although the majority contends that staleness concerns are not present here given that President Trump acted only a few months after the time limits under § 232 expired, Maj. Op. at 46, what is at stake here is not only this case but future readings of this provision. The majority's malleable interpretation of § 232 opens the door to modifications of prior presidential actions absent the Secretary of Commerce's

14                                    TRANSPACIFIC STEEL LLC v. US

provision of current information.  Instead we should give
life to § 232's language as plainly written, which gives the
President a narrow window for taking an action after re-
ceiving a report from the Secretary of Commerce.

### CONCLUSION

The Constitution vests Congress with sole power over
the Tariff.  U.S. CONST. art. I, § 8.  When Congress enacted
§ 232, it delegated to the President limited authority to act
to ameliorate harm caused to the national security by sud-
den increases of imports of certain goods.  Congress, how-
ever, in clear and plain words expressly limited its
delegation of authority.  Yet, the majority interprets § 232
in a manner that renders Congress's express limitations
meaningless.  I fear that the majority effectively accom-
plishes what not even Congress can legitimately do, reas-
sign to the President its Constitutionally vested power over
the Tariff.  I dissent.